UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

EMILEE CARPENTER, LLC, *et al.*,

                              Plaintiffs,                    Case # 21-CV-6303-FPG

v.
                                                             DECISION & ORDER

LETITIA JAMES, *et al.*,

                              Defendants.

## INTRODUCTION

Our nation was founded on a principle of "inherent equality"—that it is not merely true, but "self-evident," that "all men are created equal" and "endowed by their Creator with certain unalienable Rights," including "Life, Liberty, and the pursuit of Happiness." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 240 (1995) (Thomas, J., concurring in part and concurring in judgment). Historically, it is an aspiration that has been subject to a variety of caveats, restrictions, and provisos when applied to certain groups, persons, and classes. But it is also an aspiration that "could not forever tolerate" such limitations. *City of Mobile v. Bolden*, 446 U.S. 55, 104 (1980) (Marshall, J, dissenting). Throughout our history, Americans have struggled and suffered in order to extend that principle of equality to the excluded, armed with the belief that our society should fully reflect our most cherished values. The Supreme Court's landmark decisions memorialize the necessary, but oftentimes painful, process of reconciling our values and our practices. *See Brown v Bd. of Educ. of Topeka, Shawnee Cnty., Kan.*, 347 U.S. 483 (1954); *Loving v. Virginia*, 388 U.S. 1 (1967); *J.E.B. v. Alabama*, 511 U.S. 127 (1994); *Lawrence v. Texas*, 539 US 558 (2003); *Obergefell v. Hodges*, 576 U.S. 644 (2015). It is a necessary process, one which is contemplated by our Constitution. *Obergefell*, 576 U.S. at 664 ("The generations that

1

wrote and ratified the Bill of Rights and the Fourteenth Amendment did not presume to know the extent of freedom in all of its dimensions, and so they entrusted to future generations a charter protecting the right of all persons to enjoy liberty as we learn its meaning.").

As it has elsewhere, this process has unfolded in the arena of the public marketplace. Since the end of the Civil War, states and localities have enacted and expanded legislation to ensure that historically underserved, disfavored, or disadvantaged classes of persons have the same access to the American marketplace's great bounty as that afforded to the public at large. Without such access, private discrimination in the marketplace could "perpetuate a caste system in the United States," *Bell v. Maryland*, 378 U.S. 226, 288 (1964) (Goldberg, J., concurring), preventing certain groups from "achieving prosperity, health, development or happiness." *Gibbs v. Arras Bros.*, 222 N.Y. 332, 336 (1918). The Supreme Court has repeatedly and unequivocally found that such legislative efforts serve valid, and indeed compelling, interests, including in the context of sexual orientation discrimination. At bottom, these laws simply seek to guarantee that businesses purporting to serve the public truly do serve the public. "[G]ay persons and gay couples" are a part of that public. *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rts. Comm'n*, 138 S. Ct. 1719, 1727 (2018). Therefore they, like all other members of the public in the marketplace, are entitled to be treated in a manner consistent with their inherent equality, "dignity[,] and worth." *Id.* With all this in mind, the Court turns to the present dispute.

2

Plaintiffs are Emilee Carpenter and the entity through which she operates her for-profit wedding-photography business, "Emilee Carpenter, LLC."[1]  Plaintiff brings this civil rights action pursuant to 42 U.S.C. § 1983, arguing that, as applied to her business, New York's public-accommodations laws compel her to "violate her conscience by professing the state's [favorable] view about [same-sex] marriage."  ECF No. 1 at 3.  She seeks declaratory and injunctive relief against Defendants Letitia James (in her official capacity as the Attorney General of New York), Jonathan J. Smith (in his official capacity as Interim Commissioner of the N.Y.S. Division of Human Rights ("DHR")),[2] and Weedon Wetmore (in his official capacity as District Attorney of Chemung County, New York).  Currently before the Court are three motions: (1) Plaintiff's motion for a preliminary injunction (ECF No. 3), (2) Wetmore's motion to dismiss under Rule 12(b)(1) (ECF No. 24), and (3) the State's motion to dismiss under Rules 12(b)(1) and 12(b)(6) (ECF No. 27).  The motions have been fully briefed, and the Court has also received *amicus* briefs from dozens of entities and organizations.[3]  The Court thanks all involved for their thorough

---

[1] Except where context dictates otherwise, the Court refers to Emilee Carpenter and Emilee Carpenter LLC as "Plaintiff."

[2] The Court refers to James and Smith collectively as "the State."

[3] These entities include: the States of Nebraska, Alabama, Arkansas, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Oklahoma, South Carolina, Texas, Utah, and West Virginia (ECF No. 22); the New Yorker's Family Research Foundation and New Yorkers for Constitutional Freedoms (ECF No. 23); the Coalition of African American Pastors, Conservative Clergy of Color, Frederick Douglass Foundation, and the Restoration Project (ECF No. 50); New York Civil Liberties Union and American Civil Liberties Union (ECF No. 51); Americans United for Separation of Church and State, Anti-Defamation League, Bend the Arc: A Jewish Partnership for Justice, Central Conference of American Rabbis, Global Justice Institute – Metropolitan Community Churches, Hindu American Foundation, Men of Reform Judaism, Methodist Federation for Social Action, National Council of Jewish Women, New York Conference – United Church of Christ, Reconstructionist Rabbinical Association, Union for Reform Judaism, and Women of Reform Judaism (ECF No. 52); and the States of Massachusetts, California, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, and Washington, and the District of Columbia (ECF No. 55).

3

submissions. The magnitude of these briefs, coupled with the passion with which their positions are articulated, demonstrate the importance of the issues under discussion.

For the reasons that follow, Wetmore's motion is DENIED; the State's motion is GRANTED insofar as all claims are dismissed with prejudice for failure to state a claim upon which relief may be granted; the Court *sua sponte* dismisses with prejudice the claims against Wetmore for failure to state a claim upon which relief may be granted; and Plaintiff's motion for a preliminary injunction is DENIED AS MOOT.

## BACKGROUND

The following facts are taken from the complaint, unless otherwise noted. Plaintiff describes herself as a "photographer, natural people person, [] storyteller," and "Christian." ECF No. 1 at 3. Based in Chemung County, Plaintiff has been a for-profit wedding photographer since 2012, and has operated her business through "Emilee Carpenter, LLC" since 2019. *Id.* ¶¶ 25, 27. In addition to wedding photography,[4] Plaintiff provides "branding-photography" services, which "depict and promote businesses and their services" for marketing purposes. *Id.* ¶¶ 36, 37.

Living by the biblical admonition that one should "do it all for the glory of God," Plaintiff's religious beliefs "shape every aspect of her life," including her photography. *Id.* ¶¶ 20, 21. In order to "honor God's glory in His creation and display God's beauty, artistry, and truth," she only accepts projects in which she can "portray the subject(s) or content of the photograph in a positive, appealing, and uplifting manner." *Id.* ¶¶ 41, 42. Similarly, to convey her beliefs that "marriage is a gift from God that should be treasured and celebrated," Plaintiff "seeks to create photographs

---

[4] Plaintiff also provides engagement photography. ECF No. 1 ¶ 32. When the Court refers to Plaintiff's "wedding photography services," it means both engagement and wedding photography.

4

that evoke joyful emotions and . . . positively portray the couple, their wedding (or engagement), and God's design for marriage." *Id.* ¶¶ 48, 55.

Plaintiff also uses her photography services to celebrate and promote her view of marriage. On her business's website, Plaintiff maintains a blog. Plaintiff provides a "complimentary blog post for the client[s]" of each wedding she photographs, in which she posts pictures of the wedding, "encourage[s] the couple, and communicate[s] her views on marriage to the couple and to the general public." ECF No. 1 ¶¶ 35, 89. Plaintiff believes her blog is "an integral part of her business" that allows her to "publicly associate herself" with her photography and promote "her business, artistic style, and approach to photography." *Id.* ¶¶ 91, 92.

In providing her wedding photography services, Plaintiff demands "full artistic license and total editorial discretion" from her clients and uses that discretion to "create her desired image[s] consistent with her artistic style and religious beliefs." *Id.* ¶¶ 53, 77. To that end, Plaintiff would not accept any projects that required her to portray "the couple, their marriage, or their wedding in a negative way," *id.* ¶ 103, use certain aesthetic styles inconsistent with her "artistic judgment," *id.* ¶ 111, or take photographs celebrating "anything immoral" or "dishonorable to God." *Id.* ¶ 113. As is relevant here, Plaintiff will decline projects that promote or celebrate same-sex marriage, whether that be a request from a same-sex couple looking for a wedding photographer, or a "staged wedding shoot" for an advertisement that depicts a same-sex wedding. ECF No. 1 ¶¶ 117, 138. She believes that accepting such assignments would, in effect, "promote activities contrary to her beliefs [and] express messages contradicting her beliefs." *Id.* ¶ 118. Plaintiff maintains that the issue is not the people involved in the project, but the topic of same-sex marriage itself. She claims that she has no qualms with photographing "LGBT individuals" or working with

5

them as clients in other contexts; her concern is that she does not wish to "participate in a ceremony or express a message [through her photography] that violates her religious beliefs." *Id.* ¶¶ 130, 136.

Plaintiff initiated the present suit after learning about New York's public accommodation laws. She believes that those laws "threaten[] her ability to operate her business according to her faith" and "restrict[] what she could post on her studio's website and social media sites and what she could say to prospective clients." *Id.* ¶ 144. There are four provisions in dispute; three contained in the New York Human Rights Law and one contained in the New York Civil Rights Law.

The first provision is what Plaintiff refers to as the "Accommodation clause." New York's Human Rights Law provides: "It shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation, resort or amusement, because of the race, creed, color, national origin, sexual orientation, gender identity or expression, military status, sex, disability or marital status of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof." N.Y. Exec. Law § 296(2)(a). Plaintiff does not dispute that her business is a "public accommodation" subject to the law. ECF No. 1 ¶ 153.

The second provision is the "Denial clause," which makes it unlawful to "publish, circulate, issue, display, post or mail any written or printed communication, notice or advertisement, to the effect that any of the accommodations, advantages, facilities and privileges of any such place [of public accommodation] shall be refused, withheld from or denied to any person on account of race,

creed, color, national origin, sexual orientation, gender identity or expression, military status, sex, disability or marital status." N.Y. Exec. Law § 296(2)(a).

The third provision is the "Unwelcome clause," which prohibits a public accommodation from publishing, circulating, issuing, displaying, posting, or mailing any written or printed communication to the effect that "the patronage or custom [] of any person of or purporting to be of any particular race, creed, color, national origin, sexual orientation, gender identity or expression, military status, sex or marital status, or having a disability is unwelcome, objectionable or not acceptable, desired or solicited." *Id.*

The fourth provision is found in New York Civil Rights Law § 40-c. That statute reads: "No person shall, because of race, creed, color, national origin, sex, marital status, sexual orientation, gender identity or expression, or disability, as such term is defined in section two hundred ninety-two of the executive law, be subjected to any discrimination in his or her civil rights, . . . by any other person or by any firm, corporation or institution, or by the state or any agency or subdivision of the state." N.Y. Civ. Rights Law § 40-c(2); *see also id.* § 40 (stating that "[a]ll persons within . . . this state shall be entitled to the full and equal accommodations, advantages, facilities and privileges of any places of public accommodations"). Plaintiff agrees that this law is co-extensive with the Human Rights Law and does not require separate analysis. *See* ECF No. 3-1 at 11 n.1; *see also Ganzy v. Allen Christian Sch.*, 995 F. Supp. 340, 350 (E.D.N.Y. 1998) (collecting cases).

By her own admission, Plaintiff is currently refusing requests to photograph same-sex weddings, while acknowledging that New York's public-accommodation laws prohibit her from doing so. In the last year, Plaintiff has received seven requests for same-sex weddings, and she

7

has effectively declined those requests by not responding to them.  *See* ECF No. 1 ¶¶ 266-67. Furthermore, based on her understanding of these laws, Plaintiff has yet to take some actions related to her business that she would have taken absent these laws.  *See id.* ¶¶ 123-25.  For example, Plaintiff would like to amend her LLC's operating agreement to prohibit it from providing wedding photography services to same-sex couples.  She would like to do overtly what she is currently doing surreptitiously: screen prospective clients to ensure that she does not agree to photograph a same-sex wedding.  And she would like to explicitly advertise her business's limitations on her website, through social media, and with prospective clients directly.

Both for the actions she has already taken and for those she intends to take, Plaintiff fears prosecution by the three named defendants—James, Smith, and Wetmore.  Both James and Smith can file administrative complaints with DHR for violations of Section 296.  *See* N.Y. Exec. Law §§ 295(6)(b), 297(1).  Those complaints trigger an investigation by DHR, which, if jurisdiction and probable cause exist, leads to administrative proceedings.  *Id.* §§ 295(7), 297(1), 297(4)(a). If, after a hearing, a public accommodation is found to have violated the Human Rights Law, Smith is empowered to, *inter alia*, issue cease-and-desist orders, award compensatory damages, and assess civil fines up to $50,000 or (if the violation is willful, wanton, or malicious) up to $100,000. *Id.* § 297(4)(c).  Once an order is entered against a public accommodation, it is subject to criminal penalties if it willfully violates the order, *id.* § 299, which a district attorney may prosecute.  *See* N.Y. County Law 700(1); *see also* N.Y. Exec. Law § 299 (stating that violation of a DHR order is a misdemeanor "punishable by imprisonment . . . for not more than one year, or by a fine of not more than five hundred dollars").  Under certain circumstances, James may initiate civil actions to enforce DHR orders and criminally prosecute violators.  N.Y. Exec. Law §§ 63(9), (10).  In

8

addition, a violation of Civil Rights Law § 40-c constitutes a class A misdemeanor, N.Y. Civ. Rights Law § 40-d, which may be prosecuted by a district attorney or, if not, by James. N.Y. County Law 700(1); N.Y. Exec. Law § 63(10).

On April 6, 2021, Plaintiff brought this pre-enforcement challenge to New York's public accommodation laws. She alleges that the laws violate (1) her free-speech and free-association rights; (2) her right to freely exercise her religion; (3) the Establishment Clause of the First Amendment; and (4) her right to due process. ECF No. 1 at 47-53. On June 16, 2021, Wetmore filed a motion to dismiss under Rule 12(b)(1), arguing that any action against him is not ripe for adjudication and that Plaintiff lacks standing to bring a pre-enforcement challenge. ECF No. 24. On June 17, 2021, the State moved to dismiss under Rule 12(b)(1) and Rule 12(b)(6). ECF No. 27. It argues that Plaintiff lacks standing, that her claims are not ripe for adjudication, and that the Court lacks jurisdiction over James. The State also argues that Plaintiff has failed to plead any sufficient constitutional claim.

## DISCUSSION

The Court concludes that Plaintiff has standing to bring her pre-enforcement challenge, and it denies Defendants' motions to that extent. On the merits, however, the Court concludes that Plaintiff fails to state a claim for relief, dismisses her claims with prejudice, and will not grant leave to amend. Because the claims are dismissed, Plaintiff's motion for a preliminary injunction is denied as moot.

### I.  Standard of Review

A complaint will survive a motion to dismiss under Rule 12(b)(6) when it states a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). A claim for relief is plausible when

9

the plaintiff pleads sufficient facts that allow the Court to draw the reasonable inference that the defendant is liable for the alleged misconduct.  *Id.* at 678.  In considering the plausibility of a claim, the Court must accept factual allegations as true and draw all reasonable inferences in the plaintiff's favor.  *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).  At the same time, the Court is not required to accord "[l]egal conclusions, deductions, or opinions couched as factual allegations . . . a presumption of truthfulness."  *In re NYSE Specialists Secs. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007).  Where a defendant makes a "facial" Rule 12(b)(1) motion challenging the plaintiff's standing to sue, the plaintiff has no "evidentiary burden," and "[t]he task of the district court is to determine whether the [complaint] alleges facts that affirmatively and plausibly suggest that the plaintiff has standing to sue."  *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (internal quotation marks and brackets omitted); *Gelmart Indus., Inc. v. Eveready Battery Co.*, 120 F. Supp. 3d 327, 330 (S.D.N.Y. 2014) (same for ripeness challenge under Rule 12(b)(1)).

## II.    Standing

Defendants argue that Plaintiff does not have standing to maintain this action.[5]  The State contends that Plaintiff has only alleged a "speculative fear of enforcement," in light of the absence of "any past enforcement actions against her company" or the possibility "that an investigation will be started any time soon."  ECF No. 27-1 at 13.  Furthermore, Plaintiff's claims "rest on speculation" about whether and how an enforcement action might occur.  *Id.* at 14.  The State also suggests that Plaintiff's putative injury is not traceable to James, insofar as anyone can "initiate a

---

[5] Defendants frame their arguments both in terms of standing and in terms of ripeness.  *See* ECF No. 24-2 at 2, 10-13; ECF No. 26 at 12; ECF No. 59 at 2-3.  Because the Court addresses and resolves the question of standing, it need not separately address ripeness.  *See Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 689 n.6 (2d Cir. 2013).

claim under the Human Rights Law." *Id.* at 15.

For his part, Wetmore contends that Plaintiff has not alleged a credible threat of enforcement *by him* pursuant to either the Human Rights Law or Civil Rights Law.  He notes that he may criminally prosecute an individual under the Human Rights Law only if the individual interferes with DHR in the performance of its duties or violates a DHR order—neither of which Plaintiff has done or intends to do.  *See* N.Y. Exec. Law § 299.  In addition, Wetmore reads Civil Rights Law § 40-d to permit a district attorney to criminally prosecute a public accommodation for violation of Civil Rights Law § 40-c only if the violation occurs "alongside a traditional Penal Law violation."  ECF No. 24-2 at 8.  He has gone so far as to file an affidavit averring that his office "would not prosecute an action under the State Civil Rights Law[] absent contemporaneous violation of the Penal Law" or other criminal violation.  ECF No. 59 at 8.

The Court concludes that Plaintiff has plausibly alleged standing to bring this pre-enforcement challenge against all three defendants.

"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (citing U.S. Const. art. III, § 2).  "The doctrine of standing gives meaning to these constitutional limits by identifying those disputes which are appropriately resolved through the judicial process."  *Id.* (internal quotation marks and brackets omitted).  "To establish Article III standing, a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision."  *Id.* (internal quotation marks and brackets omitted).  Defendants contend that Plaintiff cannot satisfy the injury requirement, insofar as she has not sufficiently alleged a credible threat of prosecution

11

by them under the relevant laws.  *See* ECF No. 27-1 at 13-14; ECF No. 59 at 2-3.  Standing is a

jurisdictional question that is adjudicated under Rule 12(b)(1), not Rule 12(b)(6).  *See All. for Env't*

*Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 n.6 (2d Cir. 2006).

     "For an alleged injury to support constitutional standing, it must be 'concrete and

particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Knife Rts., Inc. v. Vance*,

802 F.3d 377, 383 (2d Cir. 2015) (internal quotation marks omitted).  Where the plaintiff alleges

"injury based on the threat of prosecution, the plaintiff need not expose himself to liability before

bringing suit to challenge the basis for the threat—for example, the constitutionality of a law

threatened to be enforced."  *Adam v. Barr*, 792 F. App'x 20, 21 (2d Cir. 2019) (summary order)

(internal quotation marks omitted); *see also Babbitt v. United Farm Workers Nat'l Union*, 442

U.S. 289, 298 (1979) ("[I]t is not necessary that [the individual] first expose himself to actual arrest

or prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his

constitutional rights.").  "Rather, in the context of pre-enforcement challenges . . . imminent injury

can be established by plausible allegations that a plaintiff intends to engage in a course of conduct

arguably affected with a constitutional interest, but proscribed by statute, and there exists a credible

threat of prosecution thereunder."  *Knife Rts.*, 802 F.3d at 384 (internal quotation marks, brackets,

and ellipsis omitted).  The same analysis applies whether the plaintiff faces the threat of criminal

prosecution, a civil action, or the institution of administrative proceedings.  *See Driehaus*, 573

U.S. at 165 ("[A]dministrative action, like arrest or prosecution, may give rise to harm sufficient

to justify pre-enforcement review."); *Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 382

(2d Cir. 2000) ("The fear of civil penalties can be as inhibiting of speech as can trepidation in the

face of threatened criminal prosecution."); *see also Kearns v. Cuomo*, 981 F.3d 200, 210 (2d Cir.

2020) (no credible threat of prosecution where plaintiff failed to allege that challenged laws imposed "criminal or civil penalties").

"The identification of a credible threat sufficient to satisfy the imminence requirement of injury in fact necessarily depends on the particular circumstances at issue." *Knife Rts.*, 802 F.3d at 384. A credible threat of prosecution cannot rest "on fears that are imaginary or speculative," *id.* (internal quotation marks omitted), and it "will not be found where plaintiffs do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible." *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016) (internal quotation marks omitted). Nevertheless, courts generally presume "that the government will enforce the law as long as the relevant statute is recent and not moribund." *Hedges v. Obama*, 724 F.3d 170, 197 (2d Cir. 2013). The Second Circuit has observed that the relevant standard "sets a low threshold and is quite forgiving to plaintiffs seeking [such] preenforcement review," *Cayuga Nation*, 824 F.3d at 331, especially when First Amendment rights are in play. *See Walsh*, 714 F.3d at 689.

In this case, the actions in which Plaintiff has engaged and intends to engage are "arguably affected with a constitutional interest[] but proscribed by statute." *Knife Rts.*, 802 F.3d at 384. As alleged in the complaint, Plaintiff operates her business in part to act out her religious beliefs, and in doing so she creates photographs and blog posts that seek to celebrate God and her views on marriage. *See* ECF No. 1 ¶¶ 23, 40, 48. Plaintiff's First Amendment rights are arguably implicated in that conduct. *See Chelsey Nelson Photography LLC v. Louisville/Jefferson Cnty. Metro. Gov't*, 479 F. Supp. 3d 543, 550 (W.D. Ky. 2020). Plaintiff alleges that she is presently refusing to provide photography services for same-sex weddings, and she intends to continue that policy, ECF

13

No. 1 ¶¶ 123, 242, 266, 267, actions which arguably constitute sexual-orientation discrimination and thus violate the Human Rights Law and Civil Rights Law.[6]  Plaintiff has also alleged that she intends to engage in other conduct: in connection with her business, Plaintiff would like to advertise her views on same-sex marriage and notify potential clients that she will not provide services therefor.  ECF No. 1 ¶¶ 246, 247; ECF No. 1-2 at 2.  Arguably, that course of conduct implicates Plaintiff's First Amendment rights, *N.Y.S. Rest. Ass'n v. N.Y.C. Bd. of Health*, 556 F.3d 114, 131 (2d Cir. 2009), and violates the plain language of the Denial and Unwelcome clauses— and by extension, Civil Rights Law 40-c.[7]  *See* N.Y. Exec. Law § 296(2)(a) (prohibiting a public accommodation from advertising that "any of [its] accommodations" will be denied "to any person on account of . . . sexual orientation" or from communicating that "the patronage . . . of any person . . . of any particular . . . sexual orientation . . . is unwelcome"); *see also Elenis*, 6 F.4th at 1183-83; *Chelsey Nelson*, 479 F. Supp. 3d at 550-51.

Finally, Plaintiff has sufficiently alleged a "credible threat of prosecution" under these provisions.  *Knife Rts.*, 802 F.3d at 384.  As discussed above, all three defendants possess varying

---

[6] True, Plaintiff alleges that her refusal to undertake such projects results from her religious objection to same-sex marriage specifically, rather than any sort of discriminatory animus to LGBT individuals more generally.  *See* ECF No. 1 ¶¶ 128-40.  But given the obvious, intrinsic link between same-sex couples and same-sex marriage, courts have not found that distinction material.  *See, e.g.*, *303 Creative LLC v. Elenis*, 6 F.4th 1160, 1173 (10th Cir. 2021) ("[A]lthough [the business's] 'ultimate goal' might be to only discriminate against same-sex marriage, to do so [the business] might also discriminate against same-sex couples.  As a result, [the business's] refusal may be 'because of' the customers' sexual orientation."); *Elane Photography, LLC v. Willock*, 309 P.3d 53, 62 (N.M. 2013) ("[W]hen a law prohibits discrimination on the basis of sexual orientation, that law similarly protects conduct that is inextricably tied to sexual orientation.").

[7] The Court has repeatedly used the modifier "arguably" in this section to make clear that the inquiry into standing does not involve a definitive assessment of the merits of Plaintiff's allegations.  *See Davis v. United States*, 564 U.S. 229, 249 n.10 (2011) (cautioning that "weakness on the merits [should not be confused] with absence of Article III standing"); *Driehaus*, 573 U.S. at 161-62 (sufficient injury where intended conduct was "arguably affected with a constitutional interest" and "arguably proscribed" by statute).

authority to investigate, prosecute, and file complaints against public accommodations that discriminate against protected classes. *See* N.Y. Exec. Law §§ 295(6)(b), 297(1); N.Y. Exec. Law § 63(9), (10); N.Y. County Law § 700(1). Sanctions for violations range from civil fines to criminal penalties. N.Y. Exec. Law § 297(4)(c); N.Y. Civ. Rights Law § 40-d. The provisions Plaintiff challenges are not moribund, and, by their plain language, they are reasonably read to prohibit the kinds of conduct in which Plaintiff has engaged and intends to engage. Under the circumstances, it is fair to presume "an intent by [Defendants] to enforce the law against [her]." *Hedges*, 724 F.3d at 197; *see also Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 71 (2d Cir. 2019) ("Where a statute specifically proscribes conduct, the law of standing does not place the burden on the plaintiff to show an intent by the government to enforce the law against it." (internal quotation marks omitted)). Other facts bolster this conclusion: in other litigation, James and DHR have publicly taken the position that conduct like Plaintiff's violates public-accommodation laws and is not protected under the First Amendment, *see* ECF No. 1 ¶¶ 287, 288 (citing cases), and at least one business with similar objections to Plaintiff's has been administratively prosecuted and penalized under the Human Rights Law. *See Matter of Gifford v. McCarthy*, 23 N.Y.S.3d 422, 433 (3d Dep't 2016) (upholding DHR order, which found wedding venue guilty of sexual-orientation discrimination, and affirming awards of $1,500 in compensatory damages and $10,000 in civil fines).

Defendants' arguments to the contrary are not persuasive. The State cites *Jones v. Schneiderman*, 101 F. Supp. 3d 283 (S.D.N.Y. 2015), for the proposition that "[a] government official's statement that a statute prohibits a type of conduct in the abstract—even where the official also states her intent to enforce the statutory prohibition against the public generally—is

usually insufficient, without more, to establish that prosecution is imminent against a particular plaintiff." ECF No. 27-1 at 13. In the context of pre-enforcement constitutional challenges, the Second Circuit has explicitly rejected the rule stated in *Jones*. *See Cayuga Nation*, 824 F.3d at 332 n.9 (stating that "an individual plaintiff [can] establish standing even where there [is] no express threat of prosecution specifically directed at the plaintiff"). No specific threat of enforcement is necessary to confer standing. *See Tong*, 930 F.3d at 70-71 (rejecting the claim that "standing [was] not available . . . because [the State] has made no overt threat to enforce the [s]tatute").

The State next contends that James is an improper defendant because, although she can file administrative complaints for violations of the Human Rights Law, so can "almost anybody." ECF No. 27-1 at 15. But to show that her injury will be "redressed by a favorable decision," *Driehaus*, 573 U.S. at 157, Plaintiff need not prove that "a favorable decision will relieve [her] *every* injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982). The fact that Plaintiff could obtain partial relief through an injunction against James is sufficient.[8] *See Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 903 (10th Cir. 2012) ("[A] favorable decision would relieve [the plaintiffs'] problem 'to some extent,' which is all the law requires."); *281 Care Comm. v. Arneson*, 638 F.3d 621, 631 (8th Cir. 2011) (fact that anyone could institute complaint did not undercut redressability as to county attorneys and attorney general, since granting injunctive relief "would redress a discrete injury to plaintiffs").

As for Wetmore, he has filed an affidavit stating that he would not prosecute a person under

---

[8] Because James is a proper defendant on this basis, the Court need not address whether James may be sued based on her authority under Executive Law § 63. *See* ECF No. 27-1 at 16.

Civil Rights Law § 40-d "absent a contemporaneous violation of the Penal Law" or other allegations "indicating another explicit criminal violation." ECF No. 59 at 8. These caveats are derived from Wetmore's belief that, historically, district attorneys have only prosecuted violations of the Civil Rights Law when those violations have been "accompanied by other [legal] violations." ECF No. 24-2 at 6.

The Court is not convinced. Even if Wetmore's view finds support in the prosecution history of the statute, it remains the case that Civil Rights Law § 40-d makes it a criminal offense to "violate any of the provisions of [Civil Rights Law § 40-c]." N.Y. Civ. Rights Law § 40-d. There is no explicit exception or caveat of the kind Wetmore seeks to include. Plaintiff reads Civil Rights Law § 40-d to render her criminally liable if she is found "to have discriminated against any other person because of sexual orientation," ECF No. 1 ¶ 224, and that straightforward interpretation is "reasonable enough" for her to "legitimately fear . . . enforcement of the statute." *Pac. Capital Bank, N.A. v. Connecticut*, 542 F.3d 341, 350 (2d Cir. 2008). And while Wetmore purports to disavow any intent to prosecute Plaintiff based on his interpretation of the law, "there is nothing that prevents [him] from changing [his] mind." *Sorrell*, 221 F.3d at 383. He is "not forever bound, by estoppel or otherwise, to the view of the law that [he] asserts in this litigation."[9] *Id.*

In sum, Plaintiff has standing because she has plausibly alleged that she engaged and intends to engage "in a course of conduct arguably affected with a constitutional interest, but

---

[9] Because Plaintiff's theory as to the threat of prosecution is fairly discernible from her complaint, the Court denies Wetmore's request for "a more definite statement [clarifying] . . . how [he] could be in controversy with the plaintiff." ECF No. 24-2 at 14 (citing Fed. R. Civ. P. 12(e)).

proscribed by statute, and there exists a credible threat of prosecution thereunder." *Knife Rts.*, 802 F.3d at 384 (internal ellipsis omitted). This conclusion is consistent with the recent decisions of two federal circuit courts. *See Elenis*, 6 F.4th at 1171-75 (website designers who refused to create websites "that celebrate same-sex marriages" had standing to challenge Colorado public accommodation law); *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 749-50 (8th Cir. 2019) (same for wedding videographers in Minnesota). With the standing issues resolved, the Court turns to the merits.

## III. Free Speech/Free Association Claim

Plaintiff's first claim proceeds as follows. Through her photography, Plaintiff seeks to express the "love, intimacy, and sacrifice of God's design for marriage," which, in her view, can only exist in marriages "between one man and one woman." ECF No. 1 ¶¶ 47, 48, 57, 117. She claims that, because she offers her wedding-photography services to opposite-sex couples, the Accommodation clause applies to her business and compels her to offer those same expressive services to same-sex couples. In practical effect, this means that the Accommodation clause compels her to create artistic expression that celebrates same-sex marriages and to associate herself with same-sex marriages, contrary to her desire and beliefs. Plaintiff argues that this statutory mandate is subject to strict scrutiny and violates her speech and associational rights under the First Amendment. In a similar vein, Plaintiff asserts that the Denial and Unwelcome clauses unconstitutionally prohibit her from advertising her religious views and her business's policies on same-sex marriage.

The State responds that the purpose of the Accommodation clause is not to compel speech as such, but rather to prohibit businesses from discriminating against certain protected classes of

potential customers. Any effect that prohibition may have on the kinds of expression that Plaintiff ultimately produces is merely incidental to the antidiscriminatory purpose of the law. The State therefore argues that the Accommodation clause is subject to "a deferential standard of review," and that it satisfies that standard in light of the State's "compelling governmental interest" in eradicating discrimination. ECF No. 26 at 23.

### a. Accommodation Clause

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits laws that abridge the freedom of speech." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018). "Some of [the Supreme] Court's leading First Amendment precedents have established the principle that freedom of speech prohibits the government from telling people what they must say." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 61 (2006); *see, e.g.*, *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (state law requiring schoolchildren to recite Pledge of Allegiance and salute the flag held unconstitutional). This freedom to decide "what not to say" is an "important manifestation of the principle of free speech," *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995), and has been held to limit "the government's ability to force [a] speaker to host or accommodate another speaker's message." *Rumsfeld*, 547 U.S. at 63. Because compelled speech alters the content of one's speech, it is considered a "content-based regulation" subject to strict scrutiny. *Becerra*, 138 S. Ct. at 2371; *see also Riley v. Nat'l Fed'n of the Blind of North Carolina, Inc.*, 487 U.S. 781, 795 (1988); *Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233, 244 (2d Cir. 2014). Content-based regulations of speech "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling

19

state interests." *Becerra*, 138 S. Ct. at 2371.

The Supreme Court has imposed a lesser degree of scrutiny on regulations that only "incidentally burden[] speech." *United States v. Albertini*, 472 U.S. 675, 688 (1985); *see, e.g.*, *United States v. O'Brien*, 391 U.S. 367 (1968) (upholding conviction for destruction of draft card, notwithstanding that defendant burned draft card as symbolic protest). "The appropriate standard by which to evaluate the constitutionality of a content-neutral regulation that imposes only an incidental burden on speech is the intermediate level of scrutiny." *Vincenty v. Bloomberg*, 476 F.3d 74, 84 (2d Cir. 2007). "Such a restriction will be sustained under this standard if it (1) advances important governmental interests unrelated to the suppression of free speech and (2) does not burden substantially more speech than necessary to further those interests." *Time Warner Cable Inc. v. F.C.C.*, 729 F.3d 137, 160 (2d Cir. 2013) (internal quotation marks omitted).

The Supreme Court has also held that the Constitution protects one's "freedom of expressive association"—that is, "[the] right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984). "Freedom of association . . . presupposes a freedom not to associate," *id.* at 623, and "[t]he forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." *Boy Scouts of America v. Dale*, 530 U.S. 640, 648 (2000). But the freedom of expressive association can be overridden "by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Id.*; *see also Tabbaa v. Chertoff*, 509 F.3d 89, 102 (2d

20

Cir. 2007).

For purposes this order, the Court will assume that strict scrutiny applies on the theory that the Accommodation clause compels speech and expressive association. It is true that the Accommodation clause does not *facially* regulate a public accommodation's speech or other expressive activity; it simply prohibits public accommodations from withholding their goods or services for discriminatory reasons. *See* N.Y. Exec. Law § 296(2)(a); *see also Hurley*, 515 U.S. at 572. For the vast majority of businesses, the obligation to serve a customer pursuant to antidiscrimination legislation does not implicate a cognizable First Amendment interest. *See Masterpiece Cakeshop*, 138 S. Ct. at 1727; *Hurley*, 515 U.S. at 572. Relying on this logic, the State and some *amici* conceptualize Plaintiff's challenge simply as an attack on her obligation to serve customers without discrimination. *See, e.g.*, ECF No. 26 at 19-20; ECF No. 51 at 12-14; ECF No. 55 at 17.

Plaintiff's theory is a bit more nuanced than that. The complaint alleges—and the Court must accept—that Plaintiff does not intend to wholly discriminate against LGBT individuals as such, and she is willing to provide a variety of photography services to LGBT individuals. *See* ECF No. 1 ¶¶ 128-32. What Plaintiff is challenging is the Accommodation clause's prohibition on "limited menus." It is well-settled that the Accommodation clause not only prohibits a public accommodation from wholly denying a person its services on the basis of a protected characteristic, but also from withholding "*any* of the . . . advantages . . . or privileges" it offers to the public. N.Y. Exec. Law § 296(2)(a) (emphasis added). As a result, "[t]he statute does not permit businesses to offer a limited menu of goods and services to customers on the basis of a status that fits within one of the protected categories." *Gifford*, 23 N.Y.S.3d at 429 (internal

21

quotation marks omitted); *see, e.g.*, *Batavia Lodge No. 196, Loyal Ord. of Moose v. N.Y.S. Div. of Hum. Rts.*, 35 N.Y.2d 143, 145 (1974) (lodge violated statute when it permitted black customers to attend fashion show but refused to serve them at the bar); *Joyner v. Moore-Wiggins Co., Ltd.*, 136 N.Y.S. 578, 579 (4th Dep't 1912) (theater violated Civil Rights Law § 40 when it refused to seat an African-American customer in the orchestra section but permitted her to sit in the balcony).

Plaintiff argues that, as applied to her, the prohibition on "limited menus" compels her to create photographs for same-sex couples that celebrate their marriages if she creates photographs for opposite-sex couples that celebrate their marriages. *See* ECF No. 1 ¶ 160. The Court does not consider this a strained interpretation of the Accommodation clause or an unlikely target of the State's enforcement efforts. Just a few years ago, the Appellate Division, Third Department, interpreted the Accommodation clause to prohibit "limited menus" and upheld a DHR determination that a wedding venue violated that prohibition when it refused to host a same-sex wedding ceremony, even if it "would 'happily' host wedding receptions, parties or other events for couples in same-sex relationships." *Gifford*, 23 N.Y.S.3d at 429.

Plaintiff thus makes a plausible case that the "limited menu" prohibition compels her to create speech—*i.e.*, photographs celebrating the marriage of same-sex clients[10]—to the same

---

[10] In addition to the photography itself, Plaintiff claims that she engages in a variety of other activities in connection with each wedding she photographs. For example, she writes a blog post about the wedding, she acts "personally excited" at the wedding, she "verbally encourag[es]" the wedding party, and she "personally and joyfully interact[s]" with the bride and groom. ECF No. 1 ¶¶ 65, 68. Taken to an extreme, the "limited menu" prohibition might be interpreted to compel these activities in addition to the photography service itself. *See* ECF No. 3-1 at 28. But the Court is skeptical of the proposition that, merely because Plaintiff does these things in conjunction with the opposite-sex weddings she photographs, the Accommodation clause compels her to do the same at same-sex weddings. The Accommodation clause only mandates equal access to the "accommodations, advantages, facilities or privileges" of the public accommodation, *i.e.*, the goods or services the accommodation provides to the public. N.Y. Exec. Law. § 296(2)(a). The service that Plaintiff provides to the public is wedding photography. She is not hired to "joyfully

extent she creates such speech for opposite-sex clients. In analogous circumstances, two federal circuit courts have agreed that, as applied, public accommodation laws can operate to compel speech in this manner. *See Elenis*, 6 F.4th at 1177 (in case of website designer who did not wish to promote same-sex marriage, concluding that public accommodation law compelled the business "to serve customers [it] would otherwise refuse," and thereby force the business "to create websites—and thus, speech—that [it] would otherwise refuse"); *Lucero*, 936 F.3d at 753-54 ("[Minnesota's public accommodation law] compels [wedding videographers] to speak favorably about same-sex marriage if they choose to speak favorably about opposite-sex marriage.").

Regardless, the Court need not make any definitive determination on the matter. The Court will simply assume that, as applied, the Accommodation clause operates to compel Plaintiff to speak in the manner she claims, and it will therefore apply strict scrutiny to assess the constitutionality of that statutory command. *See Becerra*, 138 S. Ct. at 2371. It will likewise assume that the Accommodation clause interferes with her right to expressive association. *See Dale*, 530 U.S. at 648.

As noted, content-based regulations of speech "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Becerra*, 138 S. Ct. at 2371. The State asserts that it has a "compelling governmental interest" in "[t]he eradication of discrimination." ECF No. 27-1 at 31. The Court

---

interact" with the couple or to "encourage" wedding guests, so the Accommodation clause does not compel equal access to those activities. The blogposts are a closer call, as Plaintiff sometimes claims that blogging is a "service" she provides to couples, though elsewhere she suggests that its purpose is to advocate for her own religious beliefs and market her business. ECF No. 1 ¶¶ 35, 91, 92, 93, 156; *see also* ECF No. 3-5 ¶¶ 116-41. While the Court frames its analysis in terms of compelled photography, this equally applies to Plaintiff's blogging, assuming it could be deemed an accommodation, advantage, facility or privilege of her business.

agrees, though that interest must be delineated with more precision than the State's formulation. Specifically, the Court agrees that New York has a compelling interest in ensuring that individuals, without regard to sexual orientation, have "equal access to publicly available goods and services." *Roberts*, 468 U.S. at 624; *Elenis*, 6 F.4th at 1179.

This economic interest is consistent with one of the earliest justifications for public accommodation laws. At common law, "a person engaged in a public calling, such as innkeeper or common carrier, was held to be under a duty to the general public and was obliged to serve, without discrimination, all who sought service." *Madden v. Queens Cnty. Jockey Club, Inc.*, 296 N.Y. 249, 253 (1947); *see also Hurley*, 515 U.S. at 571. This duty set such businesses apart from other "proprietors of private enterprise," who were "under no such obligation" and "enjoy[ed] an absolute power to serve whom they pleased." *Madden*, 296 N.Y. at 253; *see also Aaron v. Ward*, 203 N.Y. 351, 355-56 (1911). In the nineteenth century, legislative enactments modified those common-law categories to address the societal ills associated with race discrimination. *See Hurley*, 515 U.S. at 571.

In New York, these changes were upheld as consistent with the State's police power. For example, in *People v. King*, 110 N.Y. 418 (1888), the New York Court of Appeals upheld a penal law that prohibited innkeepers, common carriers, places of amusements, schools, and cemetery associations from excluding individuals "by reason of race, color, or previous condition of servitude." *King*, 110 N.Y. at 420-21. The proprietor of a skating rink was indicted under the law and challenged it as an "unconstitutional interference with private rights." *Id.* at 422. The court noted that the law promoted the public good: "Both justice and the public interest concur in a policy which shall elevate [African Americans] as individuals, and relieve them from oppressive

24

or degrading discrimination, and which shall encourage and cultivate a spirit which will make them self-respecting, contented, and loyal citizens, and give them a fair chance in the struggle of life." *Id.* at 426. Exclusion "from places of public resort on account of [patrons'] race" tended to "fix their position as a servile and dependent people." *Id.* at 426-27; *see also Gibbs*, 222 N.Y. at 336 (noting that a public accommodation is a facility "created and operated for the common advantage, aid and benefit of the people, the denial of which to any person would be a discriminatory obstruction or deprivation in achieving prosperity, health, development or happiness"). The *King* court found any interference in the proprietor's property rights permissible because, by "devot[ing] his property" to a "*quasi* public use," the proprietor furnished the State with a "right to interfere" to further the public interest. *King*, 110 N.Y. at 428; *see also Munn v. Illinois*, 94 U.S. 113, 113 (1876) ("When the owner of property devotes it to a use in which the public has an interest, he in effect grants to the public an interest in such use, and must to the extent of that interest, submit to be controlled by the public, for the common good, as long as he maintains the use."); Lisa G. Lerman & Annette K. Sanderson, *Discrimination in Access to Public Places: A Survey of State and Federal Public Accommodations Laws*, 7 N.Y.U. Rev. L. & Soc. Change 215, 218 (1978) ("Proscription of discrimination in public accommodations is premised on the notion that many privately-owned establishments are to some extent public. Citizens' rights of access to public places must, therefore, be balanced against the right of the owner to control his or her property.").

In other words, one of the objects of public accommodation law is "to ensure by statute for [individuals in historically disadvantaged or disfavored classes] desiring to make use of public accommodations what the old common law promised to any member of the public wanting a meal

25

at the inn"—namely, "that accepting the usual terms of service, they will not be turned away merely on the proprietor's exercise of personal preference."  *Hurley*, 515 U.S. at 578.  This justification animates New York's public accommodation laws in the context of sexual orientation discrimination.  When, in 2003, the New York legislature amended the Human Rights Law and Civil Rights Law to add sexual orientation as a protected category, it declared "that many residents of this state have encountered prejudice on account of their sexual orientation, and that this prejudice has severely limited or actually prevented access to employment, housing and other basic necessities of life, leading to deprivation and suffering."  *See* 2002 N.Y. Sess. Laws ch. 2, § 1.  The purpose of the legislation was to dismantle the economic barriers that hindered LGBT individuals' opportunities to enjoy a "full and productive life," rather than to "promote any particular attitude, course of conduct or way of life."  *Id.*

The Supreme Court has long found this interest compelling.  A state's interest in "eliminating discrimination" so as to ensure that "its citizens [have] equal access to publicly available goods and services" is one of the "highest order."  *Roberts*, 468 U.S. at 624.  In her concurrence in *Roberts*, Justice Sandra Day O'Connor wrote of the "profoundly important goal of ensuring nondiscriminatory access to commercial opportunities in our society."  *Roberts*, 468 U.S. at 632 (concurring in part and concurring in judgment).  This compelling interest applies not only to race discrimination, *see Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 252-53 (1964), but also to sex discrimination, *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987), and sexual orientation discrimination, *Masterpiece*, 138 S. Ct. at 1727-28. In *Masterpiece*, the Supreme Court unequivocally recognized that society had historically treated "gay persons and gay couples . . . as social outcasts" who were "inferior in dignity and worth."  *Id.*

26

at 1727.  In light of that history, the court found it "unexceptional" that states were empowered to "protect gay persons, just as it can protect other classes of individuals, in acquiring whatever products and services they choose on the same terms and conditions as are offered to other members of the public."  *Id.* at 1728.  Indeed, it would be "inconsistent with the history and dynamics of civil rights laws," which "ensure equal access to goods, services, and public accommodations," to exempt from those laws all public accommodations that object to same-sex marriage.  *Id.*

Nevertheless, some courts appear to have concluded that, while parity of access to publicly available goods and services is a compelling interest as a general matter, it is not compelling enough to justify a public accommodation law that compels speech or forces inclusion in a manner that impairs the accommodation's expressive activity.  *See Lucero*, 936 F.3d at 755-56 (arguing that the First Amendment "prevent[s] the government from requiring [a business's] speech to serve as a public accommodation for others"); *Chelsey Nelson*, 479 F. Supp. 3d at 558-59; *Brush & Nib Studio, LC v. City of Phoenix*, 448 P.3d 890, 915 (Ariz. 2019) ("[T]he Supreme Court [has] rejected any suggestion that a public accommodations law could justify compelling speech.").  But the cases on which these courts primarily rely—*Boy Scouts of America v. Dale*, 530 U.S. 640 (2000), and *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 616 U.S. 557 (1995)— do not stand for so broad or bright-line a proposition.

In *Dale*, the Supreme Court held that New Jersey's public accommodation law was applied in an unconstitutional manner when it required the Boy Scouts—a "private, not-for-profit organization engaged in instilling its system of values in young people"—to accept James Dale, an "avowed homosexual and gay rights activist," as a member.  *Dale*, 530 U.S. at 644.

27

"[H]omosexual conduct" was "inconsistent with the values" that Boy Scouts taught and worked to instill. *Id.* at 650. The Supreme Court recognized the compelling interest "in eliminating discrimination" in public accommodations, but it observed that "[a]s the definition of 'public accommodation' has expanded from clearly commercial entities, such as restaurants, bars, and hotels, to membership organizations such as the Boy Scouts, the potential for conflict between state public accommodations laws and the First Amendment rights of organizations has increased." *Id.* at 657. By forcing the Boy Scouts to include Dale, New Jersey had "significantly affect[ed]" the organization's expression, *id.* at 656, and "such a severe intrusion on the Boy Scouts' rights to freedom of expressive association" could not be justified by the state's antidiscrimination interests. *Id.* at 659.

In *Hurley*, the Supreme Court drew a similar line with respect to compelled speech. In that case, the Massachusetts Supreme Judicial Court had interpreted the state's public accommodation law to require "private citizens who organize a parade to include among the marchers a group imparting a message the organizer do not wish to convey." *Hurley*, 515 U.S. at 559. Specifically, a group of gay, lesbian, and bisexual activists sought to march in a St. Patrick's Day parade with their own banner so as to, among other things, "express pride in their Irish heritage as openly gay, lesbian, and bisexual individuals [and] to demonstrate that there are such men and women among those so descended." *Id.* at 561. The organizers appealed to the Supreme Court, arguing that the forced inclusion of the group compelled their speech in violation of the First Amendment. *See id.* at 566.

The Supreme Court agreed. The parade was a form of expression protected by the First Amendment, *see id.* at 569-70, and the Court was of the opinion that Massachusetts's public

28

accommodation law "ha[d] been applied in a peculiar way," insofar as it did not merely compel "openly gay, lesbian, or bisexual individuals" to be admitted into the parade, but required "the admission of [the group] as its own parade unit carrying its own banner." *Id.* at 572. In the Court's view, this had the effect of "essentially requiring [the organizers] to alter the expressive content of their parade" and of "declaring the [organizers'] speech itself to be the public accommodation." *Id.* at 572-73. This expansive application of public accommodation law "violate[d] the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message." *Hurley*, 515 U.S. at 573.

Both *Dale* and *Hurley* involved, in the Supreme Court's view, expansive applications of public accommodation laws that reached beyond their core, economic justification. As originally envisioned, public accommodation laws sought to extend the "old common law" rule—which promised "to any member of the public wanting a meal at the inn [that] . . . they will not be turned away merely on the proprietor's exercise of personal preference"—to a wider swath of publicly available goods and services. *Id.* at 578. But the laws originally did no more than compel an economic relationship between proprietor and customer, a relationship that is not clothed with a significant level of constitutional protection. *See Roberts*, 468 U.S. at 634 (O'Connor, J., concurring in part and concurring in judgment) ("The Constitution does not guarantee a right to choose employees, customers, suppliers, or those with whom one engages in simple commercial transactions, without restraint from the State. A shopkeeper has no constitutional right to deal only with persons of one sex."). Over time, however, public accommodation laws were extended to compel not only access to goods and services available in the public marketplace, but also to membership in organizations. *See id.* at 616, 625-26. Standing alone, this was not irrational or

unjustified, as membership in a private organization can confer various privileges and benefits. *See id.* at 626. But the Supreme Court believed that, "[a]s the definition of 'public accommodation' [] expanded [beyond] clearly commercial entities," the potential "for conflict between state public accommodations laws and the First Amendment rights of organizations [] increased." *Dale*, 530 U.S. at 657. Individuals have a First Amendment right to "combine with others to advance [their] views," and compelling a group to accept others as members or participants can conceivably interfere with the group's ability "to advocate its desired viewpoints." *New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 13 (1988).

So it came to pass in *Dale*. Compelling the Boy Scouts to accept Dale as a member would "derogate from the organization's expressive message" and was thus unconstitutional. *Dale*, 530 U.S. at 661. The constitutional infirmity was even more pronounced in *Hurley*. The private parade was deemed a public accommodation in which participation could be compelled, notwithstanding that, unlike other private organizations, the parade appeared to offer no public "benefit" beyond its expression itself. *See Hurley*, 515 U.S. at 572, 578, 580-81. In short, *Hurley* and *Dale* both considered the First Amendment constraints on a state's ability to compel membership or participation in an entity's private expressive activities via public accommodation law. Neither case considered the First Amendment constraints on a state's ability to compel a commercial transaction between proprietor and customer via public accommodation law. To the Court, there are good reasons for a distinction, even if the commercial transaction involves "expressive" goods or services. *See Evergreen Ass'n*, 740 F.3d at 249 ("When evaluating compelled speech, [courts] consider the context in which the speech is made.").

A mandate that a business operating in the public marketplace provide equal,

30

nondiscriminatory access to its goods and services is a faithful application of, not a departure from, the "old common law" duties applicable to quasi-public entities like inns. *Hurley*, 515 U.S. at 571-72, 578; *see also Donnell v. State*, 48 Miss. 661, 680 (1873) ("Among those customs which we call the common law, that have come down to us from the remote past, are rules which have a special application to those [businesses] who sustain a quasi public relation to the community."). If the good or service in question involves protected expression, it may be that such a mandate compels speech. But it lacks the "demeaning" character usually associated with compelled speech, *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2464 (2018), as it only applies to those businesses that have *chosen* to invite the public at large to make use of their expressive capacities through a commercial transaction. *See Cahill v. Rosa*, 89 N.Y.2d 14, 21 (1996) (stating that a public accommodation is a business that "provide[s] services to the public" and is "generally open to all comers")[11]; *see also Elenis*, 6 F.4th at 1180 ("[Colorado's public accommodation law] only applies here because [the business] intend[s] to sell [its] unique services *to the public*." (emphasis added)); *cf. Dale*, 530 U.S. at 657 (distinguishing those accommodations "where the public is invited" from those that "may not carry with them open invitations to the public"). To paraphrase *Hurley*: to the extent a public accommodation law has the effect of declaring the "speech" of a business dealing in expressive goods or services to be the "accommodation," it is only because the business has already invited the public at large to treat it as such. *Hurley*, 515 U.S. at 573. In that context, public accommodation laws do no more than

---

[11] The antecedent question—whether a business has sufficiently opened its doors to the public such that it is a public accommodation—is not at issue in this case. Plaintiff concedes that her business is a public accommodation. ECF No. 1 ¶¶ 150, 153.

police the markets and ordinary commercial transactions in which publicly accessible businesses, including those dealing in custom-made goods and services, have decided to engage. *Accord Elenis*, 6 F.4th at 1179 ("When regulating commercial entities . . . public accommodations laws help ensure a free and open economy."). That economic interest, unrelated to the suppression of ideas or the codification of orthodoxy, is one which neither *Hurley* nor *Dale* had occasion to consider (given the nature of the accommodations at issue in those cases), and is one which the Supreme Court has repeatedly and unequivocally deemed compelling. *See, e.g.*, *Masterpiece*, 138 S. Ct. at 1727-28, 1732; *Roberts*, 468 U.S. at 624-26. So it is here.[12]

Thus, New York has a compelling interest in ensuring that individuals, without regard to sexual orientation, have "equal access to publicly available goods and services." *Roberts*, 468 U.S. at 624. The only remaining question is whether the Accommodation clause is "narrowly tailored," as applied to Plaintiff, to serve that interest. *Becerra*, 138 S. Ct. at 2371. The Court finds that it is.

---

[12] Plaintiff argues that the claimed importance of New York's interest is undermined by the fact that it provides exemptions from its antidiscrimination laws in certain instances of sex and disability discrimination. *See* ECF No. 3-1 at 30-31. Even if that were true, the Court is not persuaded that any underinclusiveness with respect to other forms of discrimination renders the laws underinclusive with respect to sexual orientation discrimination.

In addition, Plaintiff and some *amici* point out that New York exempts religious entities and benevolent orders from its public accommodation laws. *See* ECF No. 1 ¶ 316; ECF No. 22 at 25 (citing N.Y. Dom. Rel. Law § 10-b(1)). However, no argument has been made that these ostensibly private entities engage in public commercial activities to such a degree that an exemption limits LGBT individuals' access to publicly available goods and services. *Cf. New York State Club Ass'n v. City of New York*, 487 U.S. 1, 16 (1988) (discussing same exemption under city ordinance and finding exemption rational in light of city council's belief that such entities "have not been identified . . . as places where business activity is prevalent"). New York's decision not to regulate certain entities at the fringes of the public marketplace, especially given the countervailing considerations attaching to private religious or associational endeavors, does not fatally undermine its interest in affording equal market access without regard to sexual orientation. *See Williams-Yulee v. Florida Bar*, 575 U.S. 433, 449 (2015) ("Although a law's underinclusivity raises a red flag, the First Amendment imposes no freestanding 'underinclusiveness limitation.' A State need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns." (internal citation omitted)).

New York's public accommodation laws apply only to those businesses that choose to "provide services to the public" and are "open to all comers." *Cahill*, 89 N.Y.2d at 21 (defining "public accommodation"). As applied to the present case, there is a tight fit between the kinds of businesses regulated—those that, like Plaintiff's, provide their goods or services to the public— and New York's interest—ensuring that businesses that provide goods or services to the public do not discriminate on the basis of sexual orientation. The laws are not intended to regulate issues of conscience or belief. *See Aaron*, 203 N.Y. at 357 ("[A] man's prejudices may be part of his most cherished possessions, which cannot be invaded except when displayed in the conduct of public affairs or quasi public enterprises."); *King*, 110 N.Y. at 428; *see also* 2002 N.Y. Sess. Laws ch. 2, § 1 ("[T]he legislature makes clear its action is not intended to promote any particular attitude, course of conduct or way of life."). To sharpen the distinction between public-facing businesses and other endeavors, the laws expressly exclude all "distinctly private" accommodations from regulation.[13] N.Y. Exec. Law § 292(9); N.Y. Civ. Rights Law § 40; *see also U.S. Power Squadrons v. State Hum. Rts. Appeal Bd.*, 59 N.Y.2d 401, 412 (1983).

Nevertheless, Plaintiff asserts that the Accommodation clause is not the least restrictive means of achieving the State's interest. *See* ECF No. 3-1 at 31-32; *see also United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000) ("If a less restrictive alternative would serve the

---

[13] Because Plaintiff concedes that she serves the public at large and is a public accommodation, ECF No. 1 ¶¶ 151, 153, the Court need not delineate the precise scope of the "distinctly private" exemption. Still, it is worth noting that this exemption seems particularly well-suited to artists who must be selective in their clientele in order to express their desired message. *See Cahill*, 89 N.Y.2d at 22 ("The hallmark of a 'private' place within the meaning of the Human Rights Law is its selectivity or exclusivity."). Given the existence of that exemption, the Court is not convinced by Plaintiff's assertion that the Accommodation clause "condition[s] [her] ability to participate in the wedding industry and to create wedding photography promoting [opposite-sex marriage] . . . on the requirement that [she] also create wedding photography promoting [same-sex marriage]." ECF No. 1 ¶ 330.

33

Government's purpose, the legislature must use that alternative.").  Plaintiff notes that there are several ways in which New York could exempt her business from public accommodation law, and she asserts that such an exemption would not harm same-sex couples, as there are thousands of wedding photographers in New York that will photograph same-sex weddings.  *See* ECF No. 1 ¶ 303; ECF No. 3-1 at 30, 32.

The Court is not persuaded.  As Plaintiff concedes, an "expressive" service like hers is not fungible.  *See* ECF No. 57 at 28.  Her photographs are a product of her personal "artistic discretion," "technical proficiency," and "moral standards," and it is her "faith and eye for beauty" that "shape her photography—from first click to final edit." ECF No. 1 at 3; *id.* ¶¶ 54, 77, 80. While other photographers may operate in the same market, Plaintiff does not allege that they would deliver the *same* photographs she does. *Cf. Elenis*, 6 F.4th at 1180 ("LGBT consumers may be able to obtain wedding-website design services from other businesses; yet, LGBT consumers will never be able to obtain wedding-related services of the same quality and nature as those that Appellants offer.").  To the contrary, the crux of Plaintiff's claims is that her photography is the product of her unique artistic style and vision.  Thus, an exemption for Plaintiff's unique, nonfungible services would necessarily undermine, not serve, the State's purpose, as it would "relegate [same-sex couples] to an inferior market" than that enjoyed by the public at large.  *Id.* The Court concurs with the Tenth Circuit's observation: "It is not difficult to imagine the problems created where a wide range of custom-made services are available to a favored group of people, and a disfavored group is relegated to a narrower selection of generic services. Thus, unique goods and services are where public accommodation laws are most necessary to ensuring equal access." *Id.* at 1181.

34

Accordingly, the Court concludes that New York has a compelling interest in ensuring that individuals, without regard to sexual orientation,[14] have equal access to publicly available goods and services, and that the Accommodation clause is narrowly tailored, as applied to Plaintiff, to serve that interest. As a result, even if the Accommodation clause compels speech or expressive association in a manner that implicates Plaintiff's free-speech and free-association interests, the provision survives strict scrutiny.

**b.      Denial/Unwelcome Clauses**

Plaintiff's free-speech challenge to the Denial and Unwelcome clauses does not require significant analysis. It is well-established that a state "may prohibit speech that promotes unlawful activity, including unlawful discrimination." *Elenis*, 6 F.4th at 1182; *see also Jews for Jesus, Inc. v. Jewish Cmty. Rels. Council of N.Y., Inc.*, 968 F.2d 286, 296 (2d Cir. 1992) (collecting cases for proposition that "the First Amendment provides no defense to persons who have used otherwise protected speech or expressive conduct to force or aid others to act in violation of a valid conduct-regulating statute"). In *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376 (1973), the Supreme Court held that "[a]ny First Amendment interest which might be served by

---

[14] The analysis may well be different with respect to other protected classes. Over the years, "[p]ublic accommodations laws have [] broadened in scope to cover more groups" beyond "those groups that have been given heightened equal protection scrutiny under [Supreme Court precedent]." *Dale*, 530 U.S. at 656 n.2 (citing as examples characteristics "such as prior criminal record, prior psychiatric treatment, military status, personal appearance, source of income, place of residence, and political ideology"). Whether equal access to the public marketplace is a compelling interest as to those groups is a distinct question that will depend in part on the historical inequities and economic discrimination faced by those groups. The Court's opinion should not be understood to mean that public accommodation laws may compel a public accommodation's speech for the benefit of *any* group that is deemed to be a protected class under such laws. For this reason, the Court does not find salient the Eighth Circuit's fear of a slippery slope. *See Lucero*, 936 F.3d at 756 (expressing concern that, if "political affiliation or ideology" is deemed to be a protected characteristic, "a Democratic speechwriter [could be forced] to provide the same services to a Republican, or . . . a professional entertainer [could be required] to perform at rallies for both the Republican and Democratic candidates for the same office").

advertising an ordinary commercial proposal and which might arguably outweigh the governmental interest supporting the regulation is altogether absent when the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity." *Pittsburgh Press*, 413 U.S. at 389.

In this case, Plaintiff seeks to post a statement advertising the fact that she will not photograph same-sex weddings, and she wishes to make similar statements directly to prospective clients. *See* ECF No. 1 ¶¶ 246, 251. But it is unlawful for Plaintiff to discriminate on that basis, so New York may permissibly prohibit Plaintiff from advertising that "unlawful activity." *Elenis*, 6 F.4th at 1182; *see also Lucero*, 936 F.3d at 757 n.5. Plaintiff does not dispute this logic. *See* ECF No. 57 at 19-20, 30 (discussing the "intertwinement" of her claims and agreeing that "Emilee's right to post depends on her right to control her photography"). Accordingly, the Denial and Unwelcome clauses are not unconstitutional to the extent they would prohibit Plaintiff from making the identified statements.

In light of the foregoing, Plaintiff has failed to state a viable free speech/free association claim on any of the theories she raises.[15]

---

[15] In addition, Plaintiff attacks the Unwelcome clause as facially overbroad. *See* ECF No. 1 ¶ 333; ECF No. 57 at 33. In her view, that provision "could cover any critical statement related to protected classes on a public accommodation's website—statements like 'Israel commits murder' or 'Catholicism is wrong.'" ECF No. 57 at 33. The Court dismisses this claim. In her briefing, Plaintiff fails to undertake any meaningful statutory analysis of the clause to support her claimed interpretation. *See Adams v. Zenas Zelotes, Esq.*, 606 F.3d 34, 38 (2d Cir. 2010) ("[I]t is impossible to determine whether a statute reaches too far without first knowing what the statute covers."). It is not incumbent upon the Court to do so on her behalf. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."). But the Court notes that, by its plain language, the clause does not target offensive speech *per se*, but only communications "to the effect that" the "patronage" of certain protected groups is unwelcome. N.Y. Exec. Law § 296(2)(a); *see also State Div. of Hum. Rts. on Complaint of Gladwin v. McHarris Gift Ctr.*, 419 N.Y.S.2d 405, 406 (4th Dep't 1979) (sale of novelty items that "demeaned persons of Polish extraction," although "offensive and in poor taste," were not communications to the effect that those of Polish origin were

## IV.  Free Exercise

Plaintiff next asserts that New York's public accommodation laws violate her First Amendment right to free exercise of religion.  Plaintiff maintains that she exercises her religion when she operates her business, takes photographs of weddings, and participates in wedding ceremonies.  ECF No. 1 ¶ 342.  She claims that, as applied to her, the laws "substantially burden [her] sincerely held religious beliefs by requiring [her] to either operate [her] expressive business in a way that violate[s] [her] religious beliefs or to close [her] business."  *Id.* ¶ 343.  The Court concludes, however, that the laws are neutral and generally applicable and survive rational basis review.

"[L]aws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable."  *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876 (2021); *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) ("[A] law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice.").   "Neutrality and general applicability are interrelated and . . . failure to satisfy one requirement is likely an indication that the other has not been satisfied."  *Lukumi*, 508 U.S. at 531.

In terms of neutrality, the Supreme Court has been clear that the "[g]overnment fails to act

---

"unwelcome" under the Human Rights Law), *aff'd*, 52 N.Y.2d 813 (1980).  Furthermore, Plaintiff does not dispute that the clause is plainly legitimate as applied to advertisements or communications intended to deter persons in protected classes from patronizing the accommodation.  *See Pittsburgh Press Co.*, 413 U.S. at 389.  Plaintiff's conclusory claim that the Unwelcome clause may "deter protected speech to some unknown extent" is insufficient to "justify invalidating [the provision] on its face and so prohibiting [the] State from enforcing [it] against conduct that is admittedly within [the State's] power to proscribe."  *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973); *accord Elenis*, 6 F.4th at 1189.

neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices *because of their religious nature*." *Fulton*, 141 S. Ct. at 1877 (emphasis added). In other words, "if the object of a law is to infringe upon or restrict practices *because of their religious motivation*, the law is not neutral." *Lukumi*, 508 U.S. at 533 (emphasis added). "Factors relevant to the assessment of governmental neutrality include 'the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body.'" *Masterpiece*, 138 S. Ct. at 1731 (quoting *Lukumi*, 508 U.S. at 540).

New York's public accommodation laws are neutral. By only bringing an as-applied challenge, Plaintiff virtually concedes that the laws are facially neutral. *See* ECF No. 1 ¶ 343. She raises no non-conclusory factual allegations that the laws were enacted with any kind of religious (or anti-religious) motivation. And while Plaintiff attempts to assert that the State "punishes" and "manifests hostility towards" religiously motivated objectors, *id.* ¶¶ 292, 293, she does not marshal sufficient factual allegations to make that assertion plausible. The indicia cited—*e.g.*, administrative decisions in which DHR found that public accommodations had not denied service for discriminatory reasons, *id.* ¶ 291; the State's position that religious motivations do not exempt public accommodations from public accommodation laws, *id.* ¶¶ 288, 289, 295; and a tweet by James in which she expresses disagreement with the *Masterpiece* decision, *id.* ¶ 296—do not support Plaintiff's assertion and are unlike the sort of hostile conduct that might support a claim. *See, e.g.*, *Masterpiece*, 138 S. Ct. at 1729-30 (commission's treatment of public accommodation evinced "clear and impermissible hostility toward [] sincere religious beliefs," where one commissioner implied that "religious beliefs and persons are less than fully welcome in Colorado's

38

business community," another commissioner compared the accommodation's views on same-sex marriage to slavery and the holocaust, and the commission departed from its earlier rationales concerning "conscience-based objections").

The mere fact that a state enforces its public accommodation laws notwithstanding the religious motivations of the accommodation does not evince impermissible hostility. *See id.* at 1727 ("[Religious and philosophical objections] do not allow business owners and other actors in the economy and in society to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations law."); *Newdow v. Peterson*, 753 F.3d 105, 109 (2d Cir. 2014) ("[T]he Free Exercise Clause does not normally inhibit enforcement of otherwise valid laws of general application that incidentally burden religious conduct." (internal quotation marks omitted)).

Plaintiff focuses her attention more on the argument that New York's public accommodation laws are not generally applicable. "The principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause." *Lukumi*, 508 U.S. at 543. Accordingly, a law is not generally applicable "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 141 S. Ct. at 1877. "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam). As is relevant here, a law is also not generally applicable "if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individual exemptions."

39

*Fulton*, 141 S. Ct. at 1877 (internal quotation marks and brackets omitted). "[W]here the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason." *Id.*

For example, in *Lukumi*, the City of Hialeah enacted several ordinances that prohibited religious sacrifice of animals but exempted secular slaughterhouses, kosher slaughterhouses, hunting, fishing, extermination of pests, and euthanasia of animals. *Lukumi*, 508 U.S. at 526-28, 536, 543-44. The Supreme Court concluded that this scheme was not neutral because "few if any killings of animals [were] prohibited other than Santeria sacrifice," and that it was not generally applicable because it burdened "only . . . conduct motivated by religious belief." *Id.* at 545. Applying strict scrutiny, the court concluded that the laws were unconstitutional.

That is not, however, the case here. New York's public accommodation laws prohibit sexual orientation discrimination and equally burden *both* discriminatory conduct motivated by religious belief *and* discriminatory conduct motivated by secular considerations. In other words, New York does not permit discrimination against same-sex couples for secular purposes but prohibit discrimination against same-sex couples for religious purposes. Indeed, Plaintiff has not pled a single example of New York "*ever* permitting sexual orientation discrimination [for] *any* reason—secular or religious." ECF No. 27-1 at 21.

Plaintiff identifies several exemptions from the Human Rights Law and argues that these exemptions make the laws not generally applicable. *See* ECF No. 1 ¶¶ 314-16. Most of these exemptions are not relevant, as they apply to discrimination in employment and housing. But, as Defendants correctly observe, "Plaintiff is not asking for an exemption in providing employment or housing, only in offering wedding photography." ECF No. 27-1 at 21. For the same reason,

40

Section 296(2)(b), which excuses only *sex* discrimination by public accommodations based on "bona fide considerations of public policy," is not relevant.[16]

The only relevant exemption Plaintiff identifies is New York Domestic Relations Law § 10-b, which exempts religious entities and benevolent orders from being required to provide services for "the solemnization or celebration of a marriage."  ECF No. 1 ¶ 316.  Plaintiff fails to plausibly allege that this exemption undermines the State's interest in providing equal access to the public marketplace.  *See* note 11 *supra*; *see also Fulton*, 141 S. Ct. at 187.  In any case, the Supreme Court has long given special solicitude to exemptions like Section 10-b, and they do not render antidiscrimination laws not generally applicable.  *See, e.g.*, *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 132 S. Ct. 694, 705-06 (2012) (holding that the First Amendment precludes the application of employment discrimination laws to disputes between religious organizations and their ministers); *Hobbie v. Unemp't Appeals Comm'n of Fla.*, 480 U.S. 136, 144-45 (1987) (observing that the United States Supreme Court "has long recognized that the government may (and sometimes must) accommodate religious practices" and listing examples); *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos,* 483 U.S. 327, 329-30 (1987) (upholding religious exemption to Title VII of the Civil Rights Act of 1964 against an Establishment Clause challenge).  As the Supreme Court recently explained in *Masterpiece*, such exemptions must be limited to religious organizations lest, as is relevant here,

---

[16] In *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731 (2020), the Supreme Court held that sexual orientation discrimination is a form of sex discrimination under Title VII of the Civil Rights Act of 1964.  *See Bostock*, 140 S. Ct. at 1743 ("For an employer to discriminate against employees for being homosexual . . . the employer must intentionally discriminate against individual men and women in part because of sex.").  That may be true as a general matter, but because the Human Rights Law treats sex and sexual orientation discrimination as distinct categories, the Court does not read Section 296(2)(b) to excuse sexual orientation discrimination based on "bona fide considerations of public policy."  N.Y. Exec. Law § 296(2)(b).

"a long list of persons who provide goods and services for marriages and weddings might refuse to do so for gay persons, thus resulting in a community-wide stigma inconsistent with the history and dynamics of civil rights laws." *Masterpiece*, 138 S. Ct. at 1727.

Accordingly, Plaintiff has failed to plausibly allege that New York's public accommodation laws are either not neutral or not generally applicable. As a result, rational basis, not strict scrutiny, applies. *See Cent. Rabbinical Congress of U.S. & Canada v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 193 (2d Cir. 2014). The laws easily pass muster under that standard.[17] *See Masterpiece*, 138 S. Ct. at 1727. Furthermore, as explained above, the laws would survive even strict scrutiny and therefore do not offend the Free Exercise Clause of the First Amendment.

## V.    Establishment Clause

Plaintiff asserts that New York's public accommodation laws force her to "participate in religious exercises contrary to [her] sincere religious beliefs." ECF No. 1 ¶ 356; ECF No. 56 at 7-8 (arguing that "New York's laws also force [Plaintiff] to participate in and attend sacred ceremonies she objects to"). In her view, equal access under public accommodation law requires her to "celebrate the wedding," "follow[] the officiant's instructions," "sing," and pray at same-sex weddings to the same extent she does so at opposite-sex weddings. ECF No. 3-1 at 28. "It is an elemental First Amendment principle that government may not coerce its citizens to support or

---

[17] Plaintiff cannot succeed under a "hybrid rights" theory, ECF No. 1 ¶ 348, because the Second Circuit does not recognize such claims. *See Leebaert v. Harrington*, 332 F.3d 134, 144 (2d Cir. 2003) ("We too can think of no good reason for the standard of review to vary simply with the number of constitutional rights that the plaintiff asserts have been violated. [T]herefore, at least until the Supreme Court holds that legal standards under the Free Exercise Clause vary depending on whether other constitutional rights are implicated, we will not use a stricter legal standard to evaluate hybrid claims." (internal quotation marks omitted)).

participate in any religion or its exercise." *Town of Greece, N.Y. v. Galloway*, 572 U.S. 565, 586 (2014) (internal quotation marks omitted). That principle has no application here. Insofar as those activities are not services that Plaintiff is hired to provide, the laws would not compel Plaintiff to participate in any religious exercises at same-sex weddings just because she *chooses* to actively and religiously participate in them when she photographs opposite-sex weddings. *See* note 9, *supra*. The religious activities occurring at a wedding, whether for a same-sex couple or an opposite-sex couple, are directed at the couple, the friends, the family, and any other invitees in attendance. They are not directed at the caterer, the florist, or the photographer. *See Galloway*, 572 U.S. at 587 (legislative prayer did not coerce religious participation, where, *inter alia*, the "principal audience for [the] invocations" was not "the public" but "lawmakers themselves"). The Court respects Plaintiff's sincere religious objections to even her presence at a same-sex wedding, but that is not enough to make out a claim. *Cf. id.* at 589 ("Offense . . . does not equate to coercion. Adults often encounter speech they find disagreeable; and an Establishment Clause violation is not made out any time a person experiences a sense of affront from the expression of contrary religious views . . . .").

Therefore, this claim must be dismissed.

## VI. Vagueness/Due Process

Plaintiff has also raised a claim alleging violation of the Due Process Clause of the Fourteenth Amendment. ECF No. 1 ¶ 360. She alleges that the Unwelcome clause is facially vague and grants officials "unbridled discretion." ECF No. 57 at 33. Her theory is that because the Unwelcome clause fails to define words like "unwelcome" or "objectionable," Defendants can employ its language "in a way that discriminates against content, viewpoints, and actions

Defendants disfavor."  ECF No. 1 ¶ 364; ECF No. 57 at 33-34.

"[A] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others."  *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18-19 (2010).  Thus, "[w]e consider whether a statute is vague as applied to the particular facts at issue."  *Id.*  As discussed above, the Unwelcome clause is constitutional as applied to Plaintiff's proposed statements/advertisements: it is unlawful for Plaintiff to discriminate on the basis of sexual orientation, so New York may permissibly prohibit Plaintiff from advertising that "unlawful activity."  *Elenis*, 6 F.4th at 1182; *see also Lucero*, 936 F.3d at 757 n.5.  Since her as-applied challenge fails, she cannot raise a facial vagueness challenge.  *See Holder*, 561 U.S. at 18-19; *Expressions Hair Design v. Schneiderman*, 137 S. Ct. 1144, 1151-52 (2017); *accord Elenis*, 6 F.4th at 1190.  And even if that alone were not enough to bar her claim, Plaintiff engages in no meaningful statutory analysis to show that this clause could be interpreted or wielded by enforcement officials in the manner she claims.  *Compare* ECF No. 57 at 33, *with* note 14, *supra*, *and McHarris Gift Ctr.*, 419 N.Y.S.2d at 406.  This claim is dismissed.

## VII.  *Sua Sponte* Dismissal of Claims against Wetmore

Although Wetmore has not moved to dismiss Plaintiff's claims on the merits, the reasons justifying dismissal of the claims against the State apply equally to him.  The Court "has the power to dismiss a complaint sua sponte for failure to state a claim on which relief can be granted," so long as it gives "the plaintiff an opportunity to be heard."  *Thomas v. Scully*, 943 F.2d 259, 260 (2d Cir. 1991).  Plaintiff has had an opportunity to be heard on the legal viability of her claims in conjunction with the State's motion to dismiss.  *See Ali v. Ramos*, No. 16-CV-1994, 2018 WL 1353210, at *1 n.1 (S.D.N.Y. Mar. 14, 2018).  Accordingly, the Court *sua sponte* dismisses all

claims against Wetmore for the reasons discussed above.

## VIII.     Leave to Amend

Finally, the Court dismisses all claims with prejudice and will not give Plaintiff leave to amend.  The defects in Plaintiff's claims are primarily ones of law, not of fact.  In that circumstance, a court may deny leave to amend.  *See Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) ("Where it appears that granting leave to amend is unlikely to be productive . . . it is not an abuse of discretion to deny leave to amend.").  And as to any claims that suffer from a pleading deficiency, Plaintiff does not seek leave to amend, and so the Court need not provide it.  *See Ritchie Cap. Mgmt., L.L.C. v. Gen. Elec. Cap. Corp.*, 821 F.3d 349, 351-52 (2d Cir. 2016).  Therefore, the Court dismisses all claims with prejudice and enters judgment in Defendants' favor.

**CONCLUSION**

For the foregoing reasons, Defendant Wetmore's motion to dismiss under Rule 12(b)(1) (ECF No. 24) is DENIED. The State's motion to dismiss (ECF No. 27) is GRANTED insofar as all claims against Defendants Letitia James and Johnathan J. Smith are dismissed, with prejudice, for failure to state a claim upon which relief may be granted. In addition, all claims against Defendant Weedon Wetmore are *sua sponte* dismissed, with prejudice, for failure to state a claim upon which relief may be granted. Plaintiff's motion for a preliminary injunction (ECF No. 3) is DENIED AS MOOT. The Clerk of Court is directed to enter judgment and close this case.

IT IS SO ORDERED.

Dated: December 13, 2021
Rochester, New York

HON. FRANK P. GERACI, JR.
United States District Judge
Western District of New York

46