# 22-75

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

EMILEE CARPENTER, LLC d/b/a/ Emilee Carpenter Photography and EMILEE CARPENTER,

*Plaintiffs-Appellants*,

v.

LETITIA JAMES, in her official capacity as Attorney General of New York; MARIA L. IMPERIAL, in her official capacity as Acting Commissioner of the New York State Division of Human Rights; and WEEDEN WETMORE, in his official capacity as District Attorney of Chemung County,

*Defendants-Appellees.*

On Appeal from the United States District Court for the Western District of New York, Case No. 6:21-cv-06303

## OPENING BRIEF OF APPELLANTS

JONATHAN A. SCRUGGS
BRYAN D. NEIHART
JACOB P. WARNER
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@ADFlegal.org
bneihart@ADFlegal.org
jwarner@ADFlegal.org

JOHN J. BURSCH
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Ste. 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

RAYMOND J. DAGUE
DAGUE & MARTIN, P.C.
4874 Onondaga Road
Syracuse, NY 13215
(315) 422-2052
rjdague@daguelaw.com

*Counsel for Appellants*

**Appellants Request Oral Argument**

## CORPORATE DISCLOSURE STATEMENT

Plaintiffs-Appellants Emilee Carpenter, LLC d/b/a/ Emilee Carpenter Photography and Emilee Carpenter state that Emilee Carpenter, LLC is a limited liability company organized under New York law, and that it neither issues stock nor has a parent company.

# TABLE OF CONTENTS

Corporate Disclosure Statement...............................................i

Table of Authorities...........................................................v

Introduction...................................................................1

Statement of Jurisdiction......................................................3

Statement of the Issues........................................................4

Statement of the Case..........................................................6

    A.    Emilee tells uplifting stories through photographs and blogs.............................................................6

    B.    Emilee learns about how New York's laws threaten her editorial and religious freedom................................9

    C.    New York applies a "same-service-rule" to businesses with Emilee's beliefs. ......................................12

    D.    Emilee learns about threats to other creative professionals posed by New York's laws.............................14

    E.    Emilee self-censors to avoid violating New York's laws. .....16

    F.    Emilee files her lawsuit and the district court dismisses it despite finding that the laws compel Emilee's speech based on content. ......................18

Summary of the Argument .....................................................20

Standard of Review ..........................................................22

Argument....................................................................23

I.    Emilee plausibly alleged that New York's laws violate her First Amendment rights to free speech, expressive association, and religious liberty...................................23

A.   The Accommodations and Discrimination Clauses compel Emilee to speak and infringe her editorial freedom by forcing her to create photographs and blogs that violate her faith. ............................................. 23

　　1.   Emilee's photographs and blogs are pure speech protected by the First Amendment ............................. 24

　　2.   The Clauses compel Emilee to speak ........................... 25

　　3.   The Clauses compel Emilee to speak messages to which she objects .......................................... 27

B.   The Accommodations and Discrimination Clauses compel Emilee to speak based on content and viewpoint. ................................................. 31

C.   The Accommodations, Discrimination, and Publication Clauses restrict Emilee's speech based on content and viewpoint. ................................................. 33

D.   The Accommodations and Discrimination Clauses interfere with Emilee's expressive association .................... 36

E.   New York's laws are not generally applicable as applied to Emilee ................................................ 38

F.   The Accommodations and Discrimination Clauses force Emilee to participate in religious ceremonies contrary to her faith. .......................................... 41

II.   New York's laws fail strict scrutiny as applied to Emilee's expression and religious exercise ................................... 44

A.   New York has no compelling interest in applying its laws to Emilee. ......................................... 44

B.   New York's laws are not narrowly tailored as applied to Emilee ................................................ 47

C.    The district court erred by holding that New York's laws satisfied strict scrutiny by re-writing New York's interests and requiring no evidence or argument. ............... 49

D.    The district court's novel tailoring analysis threatens all original speakers. ............................................................ 54

III.   Emilee plausibly alleged the Unwelcome Clause facially violates the First and Fourteenth Amendments because it is vague, overbroad, and grants unbridled discretion. ...................... 59

IV.   The district court erred by denying as moot Emilee's preliminary-injunction motion, and this Court should instruct the district court to enter one on remand. ....................... 62

A.    Emilee is entitled to a preliminary injunction based on undisputed facts. ................................................................ 63

B.    This Court should exercise its authority to order Emilee's requested injunctive relief on remand. .................. 65

Conclusion ......................................................................................... 69

Certificate of Service ....................................................................... 71

Certificate of Compliance ................................................................ 72

# TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis*,
  6 F.4th 1160 (10th Cir. 2021)................................................. passim

*A.H. v. French*,
  985 F.3d 165 (2d Cir. 2021)............................................. 63

*Act Now to Stop War & End Racism Coalition & Muslim*
  *American Society Freedom Foundation v. District of*
  *Columbia*,
  846 F.3d 391 (D.C. Cir. 2017)........................................... 61

*Agudath Israel of America v. Cuomo*,
  983 F.3d 620 (2d Cir. 2020)............................................. 53

*Anderson v. Blake*,
  469 F.3d 910 (10th Cir. 2006) ......................................... 51

*Ashcroft v. ACLU*,
  542 U.S. 656 (2004) ............................................... 47, 52

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................... 20, 60

*Askins v. United States Department of Homeland Security*,
  899 F.3d 1035 (9th Cir. 2018) ......................................... 54

*Associates & Aldrich Company v. Times Mirror Company*,
  440 F.2d 133 (9th Cir. 1971) ........................................... 56

*Athenaeum v. National Lawyers Guild, Inc.*,
  No. 653668/16, 2018 WL 1172597
  (N.Y. Sup. Ct. Mar. 06, 2018)..................................... 15, 58

*Barr v. American Association of Political Consultants, Inc.*,
  140 S. Ct. 2335 (2020) .................................................. 34

*Beal v. Stern,*
    184 F.3d 117 (2d Cir. 1999) ........................................................... 61

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) ...................................................................... 43

*Bery v. City of New York,*
    97 F.3d 689 (2d Cir. 1996) .................................................... passim

*Bigelow v. Virginia,*
    421 U.S. 809 (1975) ...................................................................... 35

*Blackhawk v. Pennsylvania,*
    381 F.3d 202 (3d Cir. 2004) ......................................................... 41

*Boy Scouts of America v. Dale,*
    530 U.S. 640 (2000) ............................................................... passim

*Brown v. Entertainment Merchants Association,*
    564 U.S. 786 (2011) ...................................................................... 51

*Brush & Nib Studio, LC v. City of Phoenix,*
    418 P.3d 426 (Ariz. Ct. App. 2018) .............................................. 60

*Brush & Nib Studio, LC v. City of Phoenix,*
    448 P.3d 890 (Ariz. 2019) ........................................... 27, 28, 30, 36

*Burns v. Martuscello,*
    890 F.3d 77 (2d Cir. 2018) ........................................................... 25

*Byrne v. Rutledge,*
    623 F.3d 46 (2d Cir. 2010) ..................................................... 34, 35

*Central Rabbinical Congress of United States & Canada v. New*
    *York City Department of Health & Mental Hygiene,*
    763 F.3d 183 (2d Cir. 2014) .................................................... 39, 40

*Chelsey Nelson Photography LLC v. Louisville/Jefferson County*
    *Metro Government,*
    479 F. Supp. 3d 543 (W.D. Ky. 2020) ........................... 27, 35, 58, 69

*Chevron Corp. v. Naranjo,*
    667 F.3d 232 (2d Cir. 2012) ........................................................ 62

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993) ............................................................ passim

*City of Boerne v. Flores,*
    521 U.S. 507 (1997) ................................................................. 53

*City of Los Angeles v. Preferred Communications, Inc.,*
    476 U.S. 488 (1986) ................................................................. 53

*City of Richmond v. J.A. Croson Company,*
    488 U.S. 469 (1989) ................................................................. 52

*Cohen v. California,*
    403 U.S. 15 (1971) ................................................................... 45

*Consolidated Edison Company of New York, Inc. v. Public Service*
    *Commission of New York,*
    447 U.S. 530 (1980) ................................................................. 55

*Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.,*
    6 F.4th 1247 (11th Cir. 2021) ............................................... 27, 46

*Domen v. Vimeo, Inc.,*
    No. 20-616-cv, 2021 WL 4352312 (2d Cir. Sept. 24, 2021) ............ 15

*E.E.O.C. v. KarenKim, Inc.,*
    698 F.3d 92 (2d Cir. 2012) ........................................................ 22

*Elane Photography, LLC v. Willock,*
    309 P.3d 53 (N.M. 2013) ........................................................... 67

*Elrod v. Burns,*
    427 U.S. 347 (1976) ................................................................. 67

*Emilee Carpenter, LLC v. James,*
    No. 21-CV-6303-FPG, 2021 WL 5879090
    (W.D.N.Y. Dec. 13, 2021) ........................................................... 6

*Employment Division, Department of Human Resources of Oregon v. Smith*,
  494 U.S. 872 (1990) ........................................................................ 43

*English v. Town of Huntington*,
  448 F.2d 319 (2d Cir. 1971) ........................................................... 65

*F.C.C. v. League of Women Voters of California*,
  468 U.S. 364 (1984) ........................................................................ 35

*Forsyth County v. Nationalist Movement*,
  505 U.S. 123 (1992) ........................................................................ 61

*Fulton v. City of Philadelphia*,
  141 S. Ct. 1868 (2021) ........................................................... passim

*Giaccio v. Pennsylvania*,
  382 U.S. 399 (1966) ........................................................................ 62

*Gibson v. Texas Department of Insurance--Division of Workers' Compensation*,
  700 F.3d 227 (5th Cir. 2012) .......................................................... 54

*Gifford v. McCarthy*,
  23 N.Y.S.3d 422 (App. Div. 2016) ............................................ 13, 14

*Gonzales v. O Centro Espirita Beneficente Uniao de Vegetal*,
  546 U.S. 418 (2006) .................................................................. 44, 51

*Hobby Lobby Stores, Inc. v. Sebelius*,
  723 F.3d 1114 (10th Cir. 2013) ................................................ 67, 68

*Holt v. Hobbs*,
  574 U.S. 352 (2015) ........................................................................ 52

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*,
  515 U.S. 557 (1995) ............................................................... passim

*Irish-American Gay, Lesbian & Bisexual Group of Boston v. City of Boston*,
  636 N.E.2d 1293 (Mass. 1994) ....................................................... 46

*Janny v. Gamez*,
  8 F.4th 883 (10th Cir. 2021)..................................................... 41, 42

*Janus v. American Federation of State, County, & Municipal Employees, Council 31*,
  138 S. Ct. 2448 (2018) ....................................................... 27, 29, 45

*Jian Zhang v. Baidu.com Inc.*,
  10 F. Supp. 3d 433 (S.D.N.Y. 2014) ...................................... passim

*Johanns v. Livestock Marketing Association*,
  544 U.S. 550 (2005) ........................................................................ 37

*Kaplan v. California*,
  413 U.S. 115 (1973) ........................................................................ 24

*Klein v. Oregon Bureau of Labor & Industries*,
  410 P.3d 1051 (Or. Ct. App. 2017) ................................................ 15

*Kolender v. Lawson*,
  461 U.S. 352 (1983) ........................................................................ 61

*Kos Pharmaceuticals, Inc. v. Andrx Corp.*,
  369 F.3d 700 (3d Cir. 2004)............................................................ 66

*Lee v. Weisman*,
  505 U.S. 577 (1992) ........................................................................ 41

*Lexington-Fayette Urban County Human Rights Commission v. Hands On Originals*,
  592 S.W.3d 291 (Ky. 2019) ............................................................ 15

*Mannarino v. Cut the Cake Bakery*,
  No. 16–3465, 2017 WL 601408
  (Fl. Div. of Admin. Hr'gs Feb. 9, 2017) .................................... 16, 57

*Marrero-Méndez v. Calixto-Rodríguez*,
  830 F.3d 38 (1st Cir. 2016) ............................................................. 42

*Maryland Casualty Company v. Realty Advisory Board on Labor
  Relations*,
  107 F.3d 979 (2d Cir. 1997) ........................................................... 66

*Masterpiece Cakeshop Inc. v. Elenis*,
  445 F. Supp. 3d 1226 (D. Colo. 2019) .......................................... 15

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*,
  138 S. Ct. 1719 (2018) ................................................ 14, 31, 39, 41

*Mastrovincenzo v. City of New York*,
  435 F.3d 78 (2d Cir. 2006) ............................................................. 63

*McCullen v. Coakley*,
  573 U.S. 464 (2014) ........................................................................ 52

*McLemore v. Gumucio*,
  No. 3:19-cv-00530, 2020 WL 7129023
  (M.D. Tenn. Dec. 4, 2020) .............................................................. 54

*Miami Herald Publishing Company v. Tornillo*,
  418 U.S. 241 (1974) ...................................................... 23, 32, 55, 56

*National Institute of Family & Life Advocates v. Becerra*,
  138 S. Ct. 2361 (2018) ..................................................................... 53

*NetChoice, LLC v. Moody*,
  546 F. Supp. 3d 1082 (N.D. Fla. 2021) .......................................... 56

*New Hope Family Services, Inc. v. Poole*,
  966 F.3d 145 (2d Cir. 2020) ....................................................... 24, 37

*New York Roadrunners Club v. State Division of Human Rights*,
  432 N.E.2d 780 (N.Y. 1982) ........................................................... 38

*New York Progress & Protection PAC v. Walsh*,
  733 F.3d 483 (2d Cir. 2013) ....................................... 63, 65, 66, 67

*Nicosia v. Amazon.com, Inc.*,
    834 F.3d 220 (2d Cir. 2016) ........................................................53

*Obergefell v. Hodges*,
    576 U.S. 644 (2015) ....................................................................30

*Pacific Gas & Electric Company v. Public Utilities Commission of
    California*,
    475 U.S. 1 (1986) ................................................................. passim

*Palin v. New York Times Company*,
    940 F.3d 804 (2d Cir. 2019) ........................................................22

*Pittsburgh Press Company v. Pittsburgh Commission on Human
    Relations*,
    413 U.S. 376 (1973) ....................................................................35

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) .................................................. 31, 33, 34, 46

*Register.com, Inc. v. Verio, Inc.*,
    356 F.3d 393 (2d Cir. 2004) ........................................................65

*Reno v. ACLU*,
    521 U.S. 844 (1997) ..............................................................24, 50

*Riley v. National Federation of the Blind of North Carolina, Inc.*,
    487 U.S. 781 (1988) ..........................................................30, 32, 55

*Rosenberger v. Rector and Visitors of University of Virginia*,
    515 U.S. 819 (1995) ..............................................................32, 33

*Santa Fe Independent School District v. Doe*,
    530 U.S. 290 (2000) ....................................................................43

*Saxe v. State College Area School District*,
    240 F.3d 200 (3d Cir. 2001) ........................................................60

*Scardina v. Masterpiece Cakeshop Inc.*,
    No. 19CV32214 (Colo. Dist. Ct. June 15, 2021) ...........................15

*Snyder v. Phelps*,
    562 U.S. 443 (2011) ........................................................................ 45

*State Division of Human Rights on Complaint of Gladwin v.*
    *McHarris Gift Center*,
    419 N.Y.S.2d 405 (App. Div. 1979) ............................................... 60

*Tandon v. Newsom*,
    141 S. Ct. 1294 (2021) ............................................................. 39, 40

*Telescope Media Group v. Lucero*,
    936 F.3d 740 (8th Cir. 2019) ..................................... 27, 30, 32, 36

*Thornhill v. State of Alabama*,
    310 U.S. 88 (1940) ........................................................................ 60

*Tunick v. Safir*,
    209 F.3d 67 (2d Cir. 2000) ........................................................... 64

*Turner Broadcasting System, Inc. v. F.C.C.*,
    512 U.S. 622 (1994) ................................................................ 32, 56

*United States v. Alvarez*,
    567 U.S. 709 (2012) ...................................................................... 51

*United States v. Playboy Entertainment Group, Inc.*,
    529 U.S. 803 (2000) ................................................................ 51, 52

*United States v. Stevens*,
    559 U.S. 460 (2010) ...................................................................... 59

*Warner v. Orange County Department of Probation*,
    115 F.3d 1068 (2d Cir. 1996) ....................................................... 42

*Washington Post v. McManus*,
    944 F.3d 506 (4th Cir. 2019) ........................................................ 46

*Washington v. Arlene's Flowers, Inc.*,
    441 P.3d 1203 (Wash. 2019) ........................................................ 15

*West Virginia State Board of Education v. Barnette,*
　319 U.S. 624 (1943) ........................................................ 27, 55, 58

*Williams v. Annucci,*
　895 F.3d 180 (2d Cir. 2018) ............................................ 53

*Wilmoth v. Secretary of New Jersey,*
　731 F. App'x 97 (3d Cir. 2018) ....................................... 54

*Wisconsin v. Yoder,*
　406 U.S. 205 (1972) ....................................................... 51

*Wooley v. Maynard,*
　430 U.S. 705 (1977) ....................................................... 23

*Yang v. Kosinski,*
　960 F.3d 119 (2d Cir. 2020) ........................................... 22

<u>Statutes</u>

28 U.S.C. § 1291 ................................................................ 3

28 U.S.C. § 1292 ................................................................ 3

28 U.S.C. § 1331 ................................................................ 3

28 U.S.C. § 1343 ................................................................ 3

42 U.S.C. § 2000a(b) ......................................................... 48

Fla. Stat. § 760.02(11) ....................................................... 48

Miss. Code § 11-62-5(5)(a) ................................................ 49

N.Y. Civ. Rts. Law § 40-c ........................................... passim

N.Y. Civ. Rts. Law § 40-d ........................................... 11, 12

N.Y. County Law § 700 ..................................................... 12

N.Y. Dom. Rel. Law § 10-b ............................................... 49

N.Y. Exec. App. § 465.17(c) ...................................................................... 12

N.Y. Exec. App. § 465.3(a) ........................................................................ 11

N.Y. Exec. Law § 290 ................................................................................ 47

N.Y. Exec. Law § 291(2) ........................................................................... 49

N.Y. Exec. Law § 292 ........................................................................... 48, 50

N.Y. Exec. Law § 295(6) ........................................................................... 11

N.Y. Exec. Law § 296 .......................................................................... passim

N.Y. Exec. Law § 297 .......................................................................... 11, 12

N.Y. Exec. Law § 299 ................................................................................ 12

N.Y. Exec. Law § 63 .......................................................................... 10, 12

## Other Authorities

1971 New York Opinion Attorney General No. 32 (Nov. 30, 1971),
    1971 WL 216933 .............................................................................. 40

Michael W. McConnell, *The Origins and Historical Understanding
    of Free Exercise of Religion*, 103 Harv. L. Rev. 1409 (1990) .......... 43

New York State Division of Human Rights, *Annual Report* (2021),
    https://on.ny.gov/3Kz65PA ............................................................. 11

Philip Messing, *Hearing for Orthodox Jewish Shops' 'Modesty'
    Rules*, N.Y. Post (Sept. 30, 2013, 12:46 AM),
    https://perma.cc/G9XP-WRF3 ....................................................... 59

Richard Wolf, *Same-sex marriage foes stick together despite long
    odds*, USA Today (Nov. 15, 2017), https://bit.ly/3m2czwk ........... 15

*Services*, The Poetry Society of New York, https://bit.ly/34dulpR ......... 58

Sue Selasky, *Lesbian baker in Detroit got homophobic cake order: Why she made it anyway*, Detroit Free Press (Aug. 13, 2020), https://perma.cc/JS53-APD3 ........................................................... 16

## Rules

Fed. R. App. P. Rule 4(a)(1)(A) .................................................................. 3

## Regulations

9 N.Y. C.R.R. § 466.13(d) ........................................................................ 40

## INTRODUCTION

Emilee Carpenter is a New York photographer and blogger who serves all people no matter their background. Like countless other artists, Emilee just cannot promote ideas contrary to her values. Because of her religious beliefs, Emilee can't create photographs or blog posts that devalue God's creation, condone racism, or promote violence. She also cannot celebrate weddings with irreverent themes or those that contradict her belief that marriage is the lifelong union of one man and one woman.

But New York's public-accommodation laws require Emilee to speak contrary to her convictions, forcing her to promote same-sex weddings in her photographs and blogs and provide special access to that content even though she treats all her clients the same. This "violates the fundamental rule" of First Amendment protection: "a speaker has the autonomy to choose the content of [her] own message." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995).

The district court largely agreed. It said these laws demand what Emilee fears, assumed they compel her speech, and applied strict scrutiny. But with no evidence in the record and at the motion-to-dismiss stage, the court upheld these laws anyway, insisting they advanced New York's compelling interest in ensuring equal access to unique expression—Emilee's.

1

This ruling is wrong on process and substance. Free-speech protection means little if the government can overcome its strict-scrutiny burden, compel speech, and violate constitutional rights based on mere say-so. On the district court's logic, the government could compel countless speech and innumerable speakers—from forcing a Jewish print shop to promote anti-Israel propaganda, a secular streaming service to post videos extolling the resurrection, or a Republican communicator to promote Democratic rallies.

The First Amendment promises and demands much more. It protects all speakers regardless of views—whether trendy or majoritarian, ancient or contrarian. In fact, the strength of the First Amendment is that it safeguards speakers *because they are different* from the mainstream. Protecting unique and dissenting views helps our pluralistic and diverse society, not harms it. The lower court's unique-means-less fallacy gets these foundational principles exactly backwards.

This Court should therefore reverse, reinstate Emilee's claims, and enjoin New York from enforcing its laws against Emilee and from violating her rights while her case proceeds.

2

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this case under 28 U.S.C. §§ 1331 and 1343 and had jurisdiction to grant the requested injunctive relief under 28 U.S.C. § 1343 because Emilee raises First and Fourteenth Amendment claims. JA.65–73. This Court has jurisdiction under 28 U.S.C. §§ 1291 and 1292 because the district court first issued an opinion dismissing Emilee's complaint and denying Emilee's preliminary-injunction motion as moot on December 13, 2021, and then entered a final judgment on December 14, 2021. JA.1115–61. Emilee timely filed her notice of appeal on January 12, 2022. JA.1162–63; Fed. R. App. P. Rule 4(a)(1)(A).

## STATEMENT OF THE ISSUES

Emilee is a storyteller. She creates photographs and blog content consistent with her religious beliefs and desires to explain this choice. Emilee challenged New York's public-accommodation laws because they (1) force her to photograph, blog about, and participate in same-sex weddings; (2) forbid her from adopting her desired editorial policy; (3) ban her from explaining her faith-based reasons for this policy online; and (4) prohibit her from asking prospective clients whether they seek services that violate her faith. The lower court assumed that these laws compel Emilee to speak against her faith but upheld their application anyway and without evidence from New York. The court then dismissed Emilee's claims and denied her injunctive relief as moot. The issues are:

1.  Whether Emilee plausibly alleged that New York's public-accommodation laws violate her First Amendment rights to free speech, expressive association, and free exercise and fail strict scrutiny when they compel her to speak the government's message, silence her from explaining her beliefs, lack general applicability, and demand that she participates in religious ceremonies.

2.  Whether Emilee plausibly alleged that a clause of New York's public-accommodation law is facially overbroad, vague or allows unbridled discretion when it bans communications indicating someone is "unwelcome, objectionable, unacceptable, or undesirable" at public accommodations because of certain protected traits.

3.  Whether the district court erred in denying Emilee's preliminary-injunction motion as moot and whether this

4

Court should instruct the district court to enter Emilee's requested injunction on remand.

## STATEMENT OF THE CASE[1]

Emilee challenges New York's public-accommodation laws—the Human Rights Law (N.Y. Exec. Law § 296(2)) and the Civil Rights Law (N.Y. Civ. Rts. Law § 40-c)—as applied to her artistic choices because they violate her First and Fourteenth Amendment rights. She also seeks a preliminary injunction to prevent New York from enforcing these laws against her. Emilee appeals the district court's opinion and final judgment granting a motion to dismiss filed by Attorney General Letitia James and Commissioner Maria Imperial ("State"), *sua sponte* granting the Chemung County District Attorney Weeden Wetmore's ("County") motion to dismiss, and denying as moot Emilee's preliminary-injunction motion.[2] *Emilee Carpenter, LLC v. James*, No. 21-CV-6303-FPG, 2021 WL 5879090 (W.D.N.Y. Dec. 13, 2021).

### A.    Emilee tells uplifting stories through photographs and blogs.

Emilee creates photographs and blog content because she loves telling stories. JA.90–91. She started photographing weddings when she was in college and continued doing so while she worked full-time for a large company. JA.91–92. Several years later, Emilee left big corporate

---

[1] This Statement cites Emilee's complaint and evidence supporting her preliminary-injunction motion because she appeals both the dismissals of her claims and the denial of that motion. JA.1162.

[2] Unless context suggests otherwise, "New York" includes the State and the County.

life to start Emilee Carpenter, LLC where she could "prioritize creating photography that told stories that matter to" her. JA.92.

Emilee offers branding, engagement, and wedding photography to the public. JA.25–26. By deciding what shots to take and then how to edit them, Emilee "retain[s] ultimate editorial … control over" what her photographs express. JA.111. *See also* JA.28, 33, 103–111, 210–19. They reflect her unique artistic judgment, as shown by the engagement and wedding photographs below. JA.33, 102–111, 251, 267–68, 277–78, 291–92.





For her wedding clients, Emilee also always publishes a celebratory blog post as part of her service. JA.26, 211. *See also* JA.249, 254 (examples). Emilee chooses this content too. JA.31–32.

Emilee safeguards this discretion so that she only creates artwork consistent with her religious beliefs. JA.24–25, 34–38, 103. Emilee's faith shapes how she lives and runs her studio. JA.24–27. Emilee seeks to "honor" God, to "share biblical truths about marriage with others," and to "be honest and transparent" with clients and the public. JA.26, 32, 36, 42. Her faith also affects which projects she accepts. JA.34. While Emilee serves everyone, she cannot express every message through her art. JA.37–38.

Emilee evaluates each request based on the message the requested artwork promotes. JA.37–38. Because of her religious beliefs, Emilee does not provide photography services that conflict with her artistic vision, demean others, promote violence, or praise vulgarity.

JA.35. For example, Emilee declined a request to create wedding photographs with a light, bright, and airy style because that style conflicts with her artistic choice to create photographs with "warm, earthy, and moody tones." JA.34, 116–18. Emilee also views weddings as "inherently religious and solemn events," so she cannot photograph or celebrate "irreverent themed" weddings—like those with Halloween, Vampire, or super-hero themes. JA.35, 120–22. Likewise, because Emilee sees marriage as the "exclusive union between one man and one woman," she cannot create photographs or blogs celebrating polygamy or same-sex marriage—no matter who requests them. JA.35.

Emilee's decisions always turn on *what* she is asked to express, not on *who* does the asking. JA.37–38. To illustrate, Emilee happily provides photography services to LGBT persons—e.g., she will create branding photographs for persons who identify as LGBT, photograph an opposite-sex engagement and wedding if asked by an LGBT wedding planner or parent, and photograph LGBT models in a staged, opposite-sex wedding photoshoot. JA.36–38. There are just certain messages she cannot promote for anyone, no matter who asks. JA.122–25.

## B. Emilee learns about how New York's laws threaten her editorial and religious freedom.

When Emilee started to incorporate her studio, she learned about New York's public-accommodation laws and realized they threaten her if she follows her faith. JA.39–44.

9

Take New York's human rights law first, which forbids "unlawful discriminatory practice … because of" sexual orientation in "place[s] of public accommodation." N.Y. Exec. Law § 296(2)(a). It does this through two clauses: the "Accommodations Clause" and the "Publication Clause."

The Accommodations Clause makes it unlawful "for any person … to refuse, withhold from or deny" anyone "any of the … advantages, … or privileges" of a place of public accommodation "because of" sexual orientation. *Id*. The Publication Clause forbids a public accommodation from communicating "to the effect that any of" its "advantages … and privileges … shall be refused, withheld from or denied to any person on account of" sexual orientation ("Denial Clause") or that the "patronage" of any person "is unwelcome, objectionable, or not acceptable, desired or solicited" because of sexual orientation ("Unwelcome Clause"). *Id*.

New York's civil rights law, in turn, forbids "discrimination" "because of … sexual orientation" by any "person … or corporation" ("Discrimination Clause"). N.Y. Civ. Rts. Law § 40-c(2). Because this law and New York's human rights law are "co-extensive," they do "not require separate analysis." JA.1121.

These Clauses apply to Emilee and her studio. JA.26, 39–41, 43. And they can be enforced in multiple ways. For example, Attorney General James can civilly prosecute public accommodations for violating the human rights or civil rights laws. N.Y. Exec. Law § 63(12).

10

The Attorney General's office regularly does so. JA.44. Attorney General James can also file complaints against public accommodations for violating the human rights law with the New York State Division of Human Rights ("Division"). N.Y. Exec. Law § 297(1); N.Y. Exec. App. § 465.3(a)(2).

Next, the Division may file a complaint alleging a human rights law violation. N.Y. Exec. Law §§ 295(6)(b), 297(1); N.Y. Exec. App. § 465.3(a)(3). The Division can (and does) launch complaints on its own initiative through its Division-Initiated Action Unit and by deploying "testers" (persons posing as customers to bait public accommodations into an unlawful act). JA.46–47.

Any person "claiming to be aggrieved" by an alleged human rights law violation may also file a complaint with the Division. N.Y. Exec. App. § 465.3(a)(1); N.Y. Exec. Law § 297(1). An "aggrieved" person is defined broadly. JA.45. Any "aggrieved" person may bypass the Division and file a human rights law or civil rights law complaint directly in civil court. N.Y. Exec. Law. § 297(9); N.Y. Civ. Rts. Law § 40-d.

The Division actively receives and investigates complaints against public accommodations. Just in the last two years, the Division investigated more than 600 such complaints. N.Y.S. Division of Human Rights, *Annual Report* 17–19 (2021), https://on.ny.gov/3Kz65PA.

The Division then determines whether there is "probable cause" to believe a violation occurred. N.Y. Exec. Law §§ 297(1), 297(2)(a). If the

11

Division finds probable cause and cannot settle the complaint, the complaint proceeds to an adjudicatory hearing. JA.48.

After the hearing, the Division Commissioner determines whether the public accommodation violated the law. N.Y. Exec. App. § 465.17(c). If so, the Commissioner can issue a "cease and desist" order, award damages, and impose a fine up to $100,000. N.Y. Exec. Law § 297(4)(c), (e). Owners can be personally liable. JA.49.

These same remedies are available to complainants who file human-rights-law complaints directly in civil courts. N.Y. Exec. Law. § 297(9). Complainants who sue under the civil rights law can also seek fines. N.Y. Civ. Rts. Law § 40-d.

Public accommodations that violate Division orders commit a "misdemeanor" and face fines and jail up to one year. N.Y. Exec. Law § 299. Likewise, those who violate the civil rights law commit a "misdemeanor." N.Y. Civ. Rts. Law § 40-d. Attorney General James and District Attorney Wetmore prosecute criminal violations of New York's laws. N.Y. Exec. Law § 63(10); N.Y. County Law § 700.

## C. New York applies a "same-service-rule" to businesses with Emilee's beliefs.

New York applies its laws to require public accommodations to "offer the same goods and services" promoting same-sex weddings as "they offer to" promote opposite-sex weddings. *Gifford v. McCarthy*, 23

N.Y.S.3d 422, 432 (App. Div. 2016). New York applies this same-service-rule to speakers who share Emilee's religious views on marriage.

Attorney General James has argued that photographers violate public-accommodation laws if they do not offer "wedding photography for LGBTQ" weddings "to the extent that" they do for opposite-sex weddings. Br. of Mass. et al. as Amici Curiae in Supp. of Defs. at *14, *Updegrove v. Herring*, No. 21-1506 (4th Cir. Aug. 27, 2021), 2021 WL 3857972 (joined by Attorney General James).

The State has also adopted this rule for cake artists and custom website designers. JA.59–60; Br. of Mass. et al. as Amici Curiae in Supp. of Defs. at 12, *303 Creative LLC v. Elenis*, No. 19-1413 (10th Cir. Apr. 29, 2020) (joined by Attorney General James) (custom website designer); Br. of Mass., et al. as Amici Curiae in Supp. of Resp'ts (N.Y. *Masterpiece* Br.) at *14, *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719 (2018) (No. 16-111), 2017 WL 5127307 (cake artist). And New York applies this rule even when public accommodations cannot express a message because it conflicts with a sincere religious belief. JA59–60.

*Amici* below agreed that New York applies this same-service-rule. JA.549 (explaining New York "construes" its laws to force Emilee "to create images that express messages about marriage contrary to her faith"); JA.1081 (finding "no real dispute" that Emilee's intended expression "would violate New York's anti-discrimination law");

13

JA.1083 (New York's law "requires that businesses offering their services to the public make wedding photography" for same-sex weddings … to the extent that" they do so for opposite-sex weddings); JA.1029 (New York's laws require "that businesses open to the public offer the same goods and services" to opposite-sex and same-sex weddings).

So did the district court. It explained that New York's same-service-rule "compels [Emilee] to create speech"—photographs and blogs—"celebrating" same-sex weddings "to the same extent she creates such speech" to celebrate opposite-sex weddings. JA.1136–37.

### D. Emilee learns about threats to other creative professionals posed by New York's laws.

Even before Emilee learned about New York's laws, she read reports about public-accommodation laws punishing businesses and artists because of their religious beliefs about marriage. JA.39.

For example, New York prosecuted and fined a wedding venue and its owners for declining to host a same-sex wedding "based solely" on the owners' "religious beliefs regarding same-sex marriage." *Gifford*, 23 N.Y.S.3d at 428; JA.39.

In Colorado, Jack Phillips has defended himself against three lawsuits for declining to design custom cakes that violate his religious beliefs on marriage and sexuality. *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n* (*Masterpiece*), 138 S. Ct. 1719, 1724–26 (2018);

14

*Masterpiece Cakeshop Inc. v. Elenis*, 445 F. Supp. 3d 1226, 1236–37 (D. Colo. 2019); *Scardina v. Masterpiece Cakeshop Inc.*, No. 19CV32214 (Colo. Dist. Ct. June 15, 2021), https://bit.ly/3KqDxru.

And in other states, officials prosecuted a florist, a print shop, a cake artist, and a photographer under similar laws for declining to express messages celebrating same-sex weddings. *E.g. Washington v. Arlene's Flowers, Inc.*, 441 P.3d 1203, 1210–12 (Wash. 2019); *Lexington-Fayette Urban Cnty. Hum. Rts. Comm'n v. Hands On Originals*, 592 S.W.3d 291, 295 (Ky. 2019); *Klein v. Or. Bureau of Lab. & Indus.*, 410 P.3d 1051, 1057 (Or. Ct. App. 2017); *Elane Photography, LLC v. Willock*, 309 P.3d 53, 59–60 (N.M. 2013).

These prosecutions have had devastating consequences—including heavy business losses, fines of over $100,000, and even "death threats." Richard Wolf, *Same-sex marriage foes stick together despite long odds*, USA Today (Nov. 15, 2017), https://bit.ly/3m2czwk.

New York's laws also threaten secular speakers in New York. A religious nonprofit sued an "online video hosting platform" over its policy "barring the promotion of sexual orientation change efforts" after the platform deleted the nonprofit's account. *Domen v. Vimeo, Inc.*, No. 20-616-cv, 2021 WL 4352312, at *1 (2d Cir. Sept. 24, 2021). An Israeli organization sued "a progressive bar association" for refusing to publish the Israeli group's ad. *See Athenaeum v. Nat'l Lawyers Guild, Inc.*, No. 653668/16, 2018 WL 1172597, at *1–3 (N.Y. Sup. Ct. Mar. 06, 2018).

And activists sued a "search engine" for blocking results about democracy in China. *Jian Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433, 434–36 (S.D.N.Y. 2014).

Artists who *support* same-sex marriage have also been targeted. For example, a lesbian-owned cakeshop in Detroit and another cakeshop in Florida received and declined requests to design cakes criticizing same-sex marriage. Sue Selasky, *Lesbian baker in Detroit got homophobic cake order: Why she made it anyway*, Detroit Free Press (Aug. 13, 2020), https://perma.cc/JS53-APD3; *Mannarino v. Cut the Cake Bakery*, No. 16–3465, 2017 WL 601408, at *2 (Fl. Div. of Admin. Hr'gs Feb. 9, 2017).

These requests and prosecutions put speakers in a bind. They could violate the laws and risk severe penalties, ignore their faith or secular convictions to comply with the laws, or end their business.

### E.    Emilee self-censors to avoid violating New York's laws.

As Emilee learned of New York's laws, she also received requests to create photographs and blogs for same-sex weddings, including seven requests before she filed this lawsuit. JA.56. Emilee then realized that she needed to be more transparent with the public about what artwork she will create. JA.57. She also believed she needed to formalize her policies and practices to better explain and protect her artistic and religious freedom. JA.57.

So Emilee wants to amend her studio's operating agreement to include a "Beliefs and Practices" statement to specify her editorial policy about the messages her studio can promote, to ensure the policy is consistently applied, and to bind her company and any future members to that policy. JA.51, 77. Emilee also wants to ask prospective clients questions about the type of photography services they seek to ensure she doesn't violate her religious beliefs. JA.52. And Emilee wants to publish a statement on her website explaining her beliefs about marriage and her reasons for only promoting opposite-sex wedding ceremonies so that "the public will come to appreciate her point of view even if they disagree with it." JA.52, 79–80.

But Emilee is refraining from these activities. She knows that if she continues to run her studio consistent with her faith or takes any of these steps, she risks being investigated and prosecuted under New York's laws. JA.54–56. But for these laws, Emilee would adopt her policy immediately, ask prospective clients whether they seek services celebrating same-sex weddings, and publish her statements. JA.55. By not doing so, Emilee faces daily business risk and self-censorship harm. JA53–54, 64.

Emilee cannot abandon her religious conviction to use her studio to promote opposite-sex marriage "in an appealing way" to "persuade" others "that this type of marriage should be pursued and valued." JA.33–34. But she similarly cannot live under the credible threat posed

by New York's laws. This untenable position forced Emilee to file this lawsuit to protect her constitutional rights.

### F. Emilee files her lawsuit and the district court dismisses it despite finding that the laws compel Emilee's speech based on content.

Emilee's complaint seeks declaratory and injunctive relief to prevent New York from violating her constitutional rights. JA.65–73. Emilee also moved for a preliminary injunction. JA.81–84.

The State moved to dismiss Emilee's complaint for lack of standing and failure to state viable claims and also opposed Emilee's preliminary-injunction motion. JA.958–90. The County meanwhile moved to dismiss and opposed the preliminary injunction only on standing grounds. JA.564–80.

The district court denied the motions to dismiss attacking Emilee's standing because Emilee faced a credible threat of prosecution under New York laws. JA.1127–32.

The court then considered the State's 12(b)(6) motion and found sufficient allegations that New York's laws "compel[] [Emilee] to create speech"—i.e., photographs and blogs celebrating same-sex weddings. JA.1136. So the court assumed that the Accommodation and Discrimination Clauses operate to compel Emilee to create photographs and blogs promoting same-sex marriage and "interferes with her right to expressive association." JA.1137.

18

The court then analyzed Emilee's speech and expressive-association claims under strict scrutiny—and held that the laws satisfied that stringent test. The State claimed an interest in "the eradication of discrimination" generally. JA.1137. But the court "delineated" the State's interest "with more precision" by cabining the interest only to ensuring equal access to goods and services "without regard to sexual orientation." JA.1138. With this revision, the court held that the State had a compelling interest in "compel[ling]" Emilee's "speech." JA.1145. The court also concluded that New York's laws were narrowly tailored to Emilee because her photographs and blogs are "not fungible" and are the "product of her unique artistic style and vision." JA.1148. Put differently, protecting Emilee's "unique, nonfungible services" would undermine the State's (revised) interest by limiting the "market" for photographs promoting same-sex weddings. JA.1148.

The court then dismissed these claims against the State and the rest of Emilee's claims too. The court also *sua sponte* dismissed Emilee's claims against the County "on the merits," JA.1158—even though the County never requested this relief and took no position on the laws at issue, JA.578. After dismissing Emilee's claims, the court denied her requested preliminary injunction as moot. JA.1160.

## SUMMARY OF THE ARGUMENT

New York's laws violate the First Amendment because they force Emilee to celebrate same-sex weddings through her photography, blog, and personal participation, and ban her from explaining her religious reasons for only creating certain content.

But the district court dismissed Emilee's complaint for failure to state a claim—even though it found that New York's laws compel Emilee to speak. At this point, New York had the burden to satisfy strict scrutiny and Emilee should have received the benefit of the doubt. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Yet the district court re-wrote New York's stated interests, ignored New York's evidentiary burden under strict-scrutiny, and created a novel narrow-tailoring test that New York never proposed and that contradicts Supreme Court precedent. Then, the court dismissed Emilee's remaining claims by elevating her pleading standard from plausibility to certainty. The district court erred at each step.

The Supreme Court has never upheld a law compelling speech under strict scrutiny, much less with no evidence from the government. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995); *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 653 (2000). And for good reason. The First Amendment protects Emilee's editorial discretion to choose the content she promotes, just as it ensures

filmmakers, poets, publishers, and other artists may choose their messages.

New York's laws violate Emilee's First Amendment rights by compelling and restricting her speech based on its content and viewpoint (§ I.A–C), infringing on her expressive association (§ I.D), treating her religious activities worse than other secular business activities (§ I.E), and forcing her to participate in religious ceremonies, (§ I.F). For these reasons, New York's laws trigger, but fail, strict scrutiny. § II. The Unwelcome Clause also fails facially because it chills speech with vague and overbroad language that gives officials unfettered prosecutorial discretion. § III.

The undisputed preliminary-injunction record proves that Emilee's claims are likely to succeed. That clean record allows this Court to resolve Emilee's injunctive relief now. § IV.

Accordingly, Emilee asks this Court to reinstate her claims and to preliminarily enjoin New York from enforcing its laws against her.

## STANDARD OF REVIEW

This Court reviews dismissals on a motion to dismiss *de novo* and construes the complaint liberally—accepting all factual allegations as true and drawing all reasonable inferences in the plaintiff's favor. *Palin v. New York Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019).

This Court reviews the denial of a preliminary injunction for abuse of discretion. *Yang v. Kosinski*, 960 F.3d 119, 127 (2d Cir. 2020). A district court abuses its discretion when its decision turns on a legal error, applies "the wrong legal standard," or falls outside "the range of permissible decisions." *E.E.O.C. v. KarenKim, Inc.*, 698 F.3d 92, 99–100 (2d Cir. 2012) (per curiam). And this Court independently reviews facts concerning constitutional claims. *Hurley*, 515 U.S. at 567.

## ARGUMENT

I.  **Emilee plausibly alleged that New York's laws violate her First Amendment rights to free speech, expressive association, and religious liberty.**

Emilee plausibly alleged that New York's laws violate her First Amendment rights by (A) compelling her to speak; (B)–(C) compelling and restricting her speech based on its content and viewpoint; (D) interfering with her expressive association; (E) treating her religious exercise worse than comparable secular activities; and (F) forcing her to participate in religious ceremonies to which she objects.

### A.  The Accommodations and Discrimination Clauses compel Emilee to speak and infringe her editorial freedom by forcing her to create photographs and blogs that violate her faith.

The First Amendment protects "the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). Speakers thus have "the autonomy to choose the content of" their own speech. *Hurley*, 515 U.S. at 573. Even businesses retain this freedom to exercise "editorial control and judgment" over their speech. *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974). New York violates these principles by forcing Emilee to create photographs and blog content celebrating messages against her faith. *See* JA.1137 (assuming this violation).

A compelled-speech claim has three elements: (1) speech, (2) that the government compels, and (3) the speaker objects to. *See Hurley*, 515

23

U.S. at 572–73 (applying these elements); *New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 171 (2d Cir. 2020) (same). Because Emilee satisfies each element, strict scrutiny applies. *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.* (*PG&E*), 475 U.S. 1, 19 (1986) (plurality). Emilee alleged New York's laws compel her to speak. That claim should proceed.

### 1. Emilee's photographs and blogs are pure speech protected by the First Amendment.

Emilee's photographs, blogs, and her process for creating them are pure speech, protected by the First Amendment. *Kaplan v. California*, 413 U.S. 115, 119–20 (1973) (photographs); *Reno v. ACLU*, 521 U.S. 844, 870 (1997) (blogs); JA.1136–37. They "communicate some idea or concept to those who view [them]." *Bery v. City of New York*, 97 F.3d 689, 696 (2d Cir. 1996). Through this expression, Emilee shares her beliefs about God's design for marriage between one man and one woman to convince others that these unions "should be pursued and valued." JA.32–34, 63. Emilee's photographs positively portray the couple, their wedding (or engagement), and God's design for marriage as the below photographs highlight.[3] JA.28, 278, 286, 293.

---

[3] These examples illustrate the Complaint's description of Emilee's wedding photographs. JA.28–34.



### 2. The Clauses compel Emilee to speak.

Compelled speech poses severe dangers. It intrudes "on the liberty and intellectual privacy of the individual" and is an "affront to personal dignity." *Burns v. Martuscello*, 890 F.3d 77, 84–85 (2d Cir. 2018).

The Accommodations and Discrimination Clauses hijack Emilee's "autonomy" over the messages she expresses. *Hurley*, 515 U.S. at 573. As the lower court held, they force Emilee "to create speech"—photographs and blogs—celebrating same-sex weddings "to the same

extent [that] she creates such speech for opposite-sex" weddings. JA. 1136–137. *See also* JA.41–42. Practically, this means these Clauses also forbid Emilee from amending her studio's operating agreement to include a policy explaining her religious and artistic reasons for declining to celebrate same-sex weddings. JA.41–42, 77.

In this way, New York's laws demand more than equal access regardless of status. They require *equal promotion regardless of content*—i.e., speakers must express the same celebratory message about same-sex weddings as about opposite-sex weddings. *Supra* § C; JA.42. New York has repeatedly affirmed this same-service-rule—if Emilee "offers wedding photography services to" opposite-sex weddings, she "must offer the same services to" same-sex weddings. *See* JA.983. And because Emilee "positively portray[s]" weddings between one man and one woman through photographs and blogs, New York's rule requires her to positively portray same-sex weddings. JA.33, 1136.

In response, New York says these Clauses only "regulate conduct, not speech." JA.980. Not so. The Supreme Court has already explained that public-accommodation laws *typically* regulate conduct but can still be *applied* to compel speech—i.e., when these laws treat speech itself as "the public accommodation." *Hurley*, 515 U.S. at 572–73 (stopping application against parade).

So too New York's laws compel speech when applied to Emilee's speech—her photographs and blogs. Many courts agree that public-

accommodation laws compel speech when applied to similar expression. *See 303 Creative LLC v. Elenis*, 6 F.4th 1160, 1177 (10th Cir. 2021) (wedding websites); *Telescope Media Grp. v. Lucero* (*TMG*), 936 F.3d 740, 753 (8th Cir. 2019) (wedding films); *Brush & Nib Studio, LC v. City of Phoenix* (*B&N*), 448 P.3d 890, 913–14 (Ariz. 2019) (wedding invitations); *Chelsey Nelson Photography LLC v. Louisville/Jefferson Cnty. Metro Gov't (CNP)*, 479 F. Supp. 3d 543, 557–58 (W.D. Ky. 2020) (wedding photographs). *Cf. Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247, 1255 (11th Cir. 2021) (donation program); *Baidu.com Inc.*, 10 F. Supp. 3d at 441 (search-engine websites).

### 3. The Clauses compel Emilee to speak messages to which she objects.

Worse still, the Clauses compel Emilee to express messages about marriage to which she objects—i.e., "to utter what is not in [her] mind." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 634 (1943). Such compulsion is "demeaning" and almost "universally condemned." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463–64 (2018). It should be condemned here too.

Emilee believes that God designed marriage to be between a man and a woman. JA.27. Emilee also believes that everything she does should be "for the glory of God." JA.25. These beliefs motivate and animate Emilee's photography and blogging. She seeks to capture

27

"joyful emotions and tell a compelling story" about each couple's union so that she can "positively portray … God's design for marriage." JA.28. In fact, she's "religiously motivated" to share her views about marriage to "persuade her clients and the public that this design for marriage should be celebrated." JA.63. And Emilee objects to promoting messages about marriage that contradict her beliefs. JA.35.

But photographs and blogs positively portraying same-sex weddings necessarily communicate a different message than those celebrating ceremonies between one man and one woman. A blog post promoting the union of "Mr. and Mr." sends a different message than a post celebrating the marriage of "Mr. and Mrs." *B&N*, 448 P.3d at 909 ("writing the names of two men or two women" alters expressive content). And a shot of two men embracing at the altar promotes something different than one depicting a man and a woman doing the same. Compare, for example, Emilee's photographs celebrating opposite-sex weddings (left, JA.276, 285, 290) with other photographers' work promoting same-sex weddings (right, JA.426, 435, 462).[4]

---

[4] These examples illustrate the Complaint's description of Emilee's photographs (JA.28–32) and those of photographers who take photographs celebrating same-sex weddings (JA.62).



That the Clauses compel Emilee to speak on a "controversial subject[]" like marriage makes the compulsion even more "demeaning." *Janus*, 138 S. Ct. at 2464, 2476. But the district court minimized this harm because Emilee has "*chosen*" to make a living off her speech. JA.1145. That's no comfort. A "speaker is no less a speaker because … she is paid to speak." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487

U.S. 781, 801 (1988). *See also Bery*, 97 F.3d at 696 (same). Indeed, Emilee entered the marketplace partly to "counteract th[e] cultural narrative" of marriage that is "inconsistent with lifelong unions between one man and one woman." JA.34. By dictating otherwise, the Clauses violate the First Amendment, which protects the expression of both "those who oppose" same-sex marriage *and* those who don't. *Obergefell v. Hodges*, 576 U.S. 644, 680 (2015).

Laws like New York's cannot slant public debate. They're unconstitutional when they do as multiple courts have recently held. *E.g., TMG*, 936 F.3d at 753 (law unconstitutionally compelled "same 'positive' message" for same-sex and opposite-sex marriage); *B&N*, 448 P.3d at 909 (similar).

Although Emilee objects to celebrating same-sex weddings, she does not object to working with LGBT clients. She serves everyone; she just cannot promote messages that contradict her beliefs for anyone. JA.37–38 (making this point and providing examples). The Supreme Court in *Hurley* approved this distinction. The parade organizers there could object to permitting an LGBT group to "carry[] its own banner" that "alter[ed] the expressive content of their parade" when the organizers did not "exclude homosexuals as such." 515 U.S. at 572–73.

Even New York approves of this distinction. Sometimes. Just not for Emilee. While New York bakers may not refuse to create cakes because of "the [people] requesting it," N.Y. *Masterpiece* Br., 2017 WL

5127307, at *29 n.15, they *may* refuse to create "anti-LGBTQ cakes" or cakes with "racist messages" if they would "refuse[] to make" cakes with "similar" messages "for anyone," *id.* at *28–29, 29 n.15.

Emilee is no different. She serves everyone, no matter their background; she only declines to speak certain messages. By drawing this line, Emilee does not offer a "limited menu." *Contra* JA.1136. She offers the same services to everyone—photographs and blogs that celebrate opposite-sex weddings. And she declines requests outside this scope—like photographs for "irreverent themed" opposite-sex weddings—no matter who asks. JA.35. That's equal treatment. *Masterpiece*, 138 S. Ct. at 1736 (Gorsuch, J., concurring) (cake designer properly objected to "the kind of cake, not the kind of customer"). The First Amendment protects Emilee's content-specific editorial choices.

### B. The Accommodations and Discrimination Clauses compel Emilee to speak based on content and viewpoint.

The Accommodations and Discrimination Clauses independently trigger strict scrutiny by compelling Emilee's speech in a content and viewpoint-based way. *Reed v. Town of Gilbert*, 576 U.S. 155, 164–65 (2015).

A content-based law regulates speech because of its subject matter. *Id.* at 163. A viewpoint-based law regulates speech because of the "particular views taken by speakers on a subject." *Rosenberger v.*

31

*Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). The Clauses do both in four ways.

*First*, the Clauses compel Emilee to celebrate same-sex weddings, which "necessarily alters the content of the speech" Emilee desires to proclaim—photographs and blogs celebrating opposite-sex weddings. *Riley*, 487 U.S. at 795. *Supra* § I.A.3.

*Second*, the Clauses treat Emilee's "choice to talk about one topic—opposite[-]sex marriage—as a trigger for compelling" her to celebrate same-sex marriage. *TMG*, 936 F.3d at 753. *Accord 303 Creative*, 6 F.4th at 1178 (same); *Tornillo*, 418 U.S. at 256 (invalidating statute that triggered obligation for newspaper to print candidate's op-eds based on printing criticism of candidate). For example, the Clauses do not compel Emilee to create same-sex wedding content if she photographs *only* landscapes. The compulsion only kicks in when Emilee photographs certain content. Creating speech about one subject triggers her obligation to create speech about another.

*Third*, the Clauses award access to Emilee's photographs and blogs "only to those who disagree[] with [Emilee's] views" on marriage. *PG&E*, 475 U.S. at 13 (law unconstitutionally forced electric company to give hostile group space in company's newsletter). *See Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 654 (1994) (*PG&E* law viewpoint-based because it awarded "benefits to speakers based on viewpoint, giving access only to [those] opposing the utility's practices"). Once

Emilee photographs opposite-sex weddings, she does not have to photograph *every* request sent her way. No, she must only fulfill requests from those seeking to promote views she opposes—celebrating same-sex weddings. The access compelled goes *only* to those expressing particular views.

*Fourth*, the Clauses aim to suppress the "particular views" on marriage that New York disfavors. *Rosenberger*, 515 U.S. at 829. *See also 303 Creative*, 6 F.4th at 1178 (noting same purpose of Colorado's antidiscrimination law). Emilee, for example, can photograph same-sex *and* opposite-sex weddings. JA.59–64. Or Emilee can decline requests for "anti-LGBTQ" messages. N.Y. *Masterpiece* Br., 2017 WL 5127307, at *28. Emilee just cannot create content *only* celebrating opposite-sex weddings. New York simply treats declines to speak one view different than declines to speak other views. That's viewpoint discrimination.

For these reasons, Emilee alleged New York's laws violate the First Amendment by compelling her to speak based on content and viewpoint.

## C. The Accommodations, Discrimination, and Publication Clauses restrict Emilee's speech based on content and viewpoint.

New York's laws also trigger strict scrutiny because they restrict Emilee's speech based on content and viewpoint. *Reed*, 576 U.S. at 164–65.

A facially content-based law "draws distinctions based on the message a speaker conveys." *Id.* at 163. A law is content- or viewpoint-based as applied if it "cannot be justified without reference to the content of the regulated speech," or if the government adopted the law because it disagrees with the speaker's message. *Id.* at 164 (cleaned up). *See Byrne v. Rutledge*, 623 F.3d 46, 60 (2d Cir. 2010) (law viewpoint-based when state accepted secular but not religious justifications for same vanity plate). New York's laws fail these tests.

The Denial and Unwelcome Clauses facially prohibit statements "to the effect that" public accommodations will decline service based on sexual orientation. N.Y. Exec. Law § 296(2)(a). Photography studios can say, "I will photograph same-sex weddings" but not "I cannot photograph same-sex weddings." "That is about as content-based as it gets." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020).

The Accommodations, Discrimination, and Publication Clauses also restrict Emilee's desired speech based on content as applied. Emilee wants to amend her operating agreement, post her editorial policy online, verbally explain the policy to prospective clients, and ask prospective clients whether they want her to photograph same-sex weddings. JA.52–53, 77, 79. But these Clauses prohibit her from doing that by finding this speech unlawful. N.Y. Exec. Law § 296(2)(a); N.Y. Civ. Rts. Law § 40-c(2) (banning "any discrimination"). This application

34

is content-based because it regulates the topic Emilee seeks to discuss—
marriage. *CNP*, 479 F. Supp. 3d at 560–61; *F.C.C. v. League of Women
Voters of Cal.*, 468 U.S. 364, 381–83 (1984) (content-based regulation of
"editorial opinion[s]" but not "daily announcements").

These Clauses also restrict Emilee's speech based on her
viewpoint. Speakers can say they celebrate same-sex weddings or that
they celebrate same-sex and opposite-sex weddings. JA.62–63. But
Emilee cannot say she only celebrates opposite-sex weddings. That is
viewpoint regulation because the Clauses "distinguish" between "views
*on the same subjects*." *Byrne*, 623 F.3d at 56–57.

The district court countered that these restrictions were
permissible because Emilee's statements intended to engage in
"unlawful" activities. JA.1150. Not so. To be sure, laws can ban speech
about *illegal* and *constitutionally unprotected* activities—like
discriminatory employment advertisements. *Pittsburgh Press Co. v.
Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 389 (1973) (banning
employment listing proposing "illegal" commercial activity). But laws
cannot ban speech about *legal* and *constitutionally protected* activities.
*Cf. id.* at 391 (reaffirming "the protection afforded to editorial
judgment"); *Bigelow v. Virginia*, 421 U.S. 809, 822 (1975) (striking
advertisement restriction that "pertained to constitutional interests").

Emilee's desired statements fall into the latter category. Because
Emilee has the constitutional right to choose her photography and blog

content, New York cannot ban Emilee from explaining this constitutionally protected choice to others, any more than it could stop the parade organizers from *Hurley* from posting a statement explaining which parade floats they will accept. *See TMG*, 936 F.3d at 757 n.5 (state could not "compel" videographers "to speak, so it cannot force them to remain silent either"); *B&N*, 448 P.3d at 899, 926 (similar). In sum, Emilee plausibly alleged that New York's laws unconstitutionally restrict her speech based on its content and viewpoint.

### D. The Accommodations and Discrimination Clauses interfere with Emilee's expressive association.

The district court also "assume[d]" that the Accommodations and Discrimination Clauses "interfere[] with" Emilee's "right to expressive association." JA.1137. And for good reason. Courts defer to expressive groups' descriptions of their expression and the burdens on it. *Dale*, 530 U.S. at 653. New York's laws thwart Emilee's expressive association rights under *Dale*'s three-part test. *Id.* at 648, 650, 656–57.

Emilee meets *Dale*'s first and third factors because (1) she "engage[s] in some form of expression" about marriage, *id.* at 648, through her photographs and blogs, *supra* §§ A, I.A and (2) New York's laws fail strict scrutiny as applied here, *infra* § II.

Emilee meets *Dale*'s second factor because the Clauses significantly impede her "ability to advocate public or private viewpoints." *Dale*, 530 U.S. at 648. They do so in two ways.

*First*, the Clauses require Emilee to publicly associate with messages about marriage contrary to messages she promotes elsewhere. JA.32, 42; *Dale*, 530 U.S. at 656 ("forced inclusion" of leader with contrary views about sexuality "significantly affect[ed]" the Boy Scout's expression"). *Cf. Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 564–66 (2005); *id.* at 568, (Thomas, J., concurring) (explaining coerced-attribution problem when law enables the public to "attribut[e] an unwanted message to" the speaker). Indeed, Emilee celebrates and associates with certain content about marriage by creating that content and then posting it on her blog and social media sites. JA.32 (describing this process and alleging public attribution). Forcing her to photograph and post content with a different view on her website undermines her advocacy and opens her to charges of hypocrisy.

*Second*, they force Emilee to work with others to create content celebrating same-sex weddings. JA.32, 42; *PG&E*, 475 U.S. at 15 (compelled access rule "impermissibly require[d] appellant to associate with speech with which appellant may disagree" by associating with opposing company); *New Hope*, 966 F.3d at 178 (plausible expressive association claim when adoption agency alleged including "unmarried or same-sex couples in" its services would "change" its "message").

These effects bulldoze Emilee's ability to "persuade" the public to "pursue[] and value[]" opposite-sex marriage. JA.34. Emilee's expressive association claim should proceed.

37

### E. New York's laws are not generally applicable as applied to Emilee.

New York's laws violate Emilee's free-exercise rights because they are not generally applicable as applied to her. The lack of general applicability calls for strict scrutiny. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993).

New York's laws are not generally applicable because they allow "individualized exemptions" for activities that affect but do not discriminate against protected classes through a "formal mechanism" of granting exemptions. *Fulton v. City of Phila.*, 141 S. Ct. 1868, 1877, 1879 (2021).

For example, New York allows cake artists to refuse to create cakes with "anti-LGBTQ" or "racist" messages. N.Y. *Masterpiece* Br., 2017 WL 5127307, at *28, 29 n.15. New York exempts public accommodations that "articulate a non-religious legitimate and nondiscriminatory reason for declining a request." JA.60. New York also authorizes medical providers to refer patients to other offices "based on sound medical judgment." JA.64. And New York allows public accommodations to deny services that would change the business's service. JA.64; *N.Y. Roadrunners Club v. State Div. of Hum. Rts.*, 432 N.E.2d 780, 781 (N.Y. 1982) (per curiam) (no discrimination when "a marathon footrace" excluded participants on "wheelchairs, skateboards, bicycles or other extraneous aids"). New York cannot "refuse to extend

that exemption system" to Emilee. *Fulton*, 141 S. Ct. at 1878 (cleaned up).

In response, the district court faulted Emilee for not providing "a single example" of New York allowing a secular-based objection to same-sex marriage. JA.1154. But Emilee need not identify an identical parallel. *Cf. Masterpiece*, 138 S. Ct. at 1730 (law not generally applicable when secular bakers could decline cakes criticizing same-sex marriage, but religious cake artist could not decline cake promoting same-sex marriage). And New York's "formal mechanism" for granting exceptions makes the laws "not generally applicable"—"regardless whether any exceptions have been given." *Fulton*, 141 S. Ct. at 1879.

New York's laws are also not generally applicable because they treat "comparable secular activity more favorably than" Emilee's religious exercise. *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam). Comparability is measured "against the asserted government interest that justifies the regulation." *Id.* New York's laws miss that standard because they "regulate[] [Emilee's] religious conduct while failing to regulate secular conduct that is" equally harmful to its asserted interests. *Cent. Rabbinical Cong. of U.S. & Canada v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 197 (2d Cir. 2014). *See also Lukumi*, 508 U.S. at 543 (invalidating ordinance that "fail[ed] to prohibit nonreligious conduct" that similarly "endanger[ed]" city's interests).

New York's asserted interest is "[t]he eradication of discrimination." JA.988. That interest uniformly applies to sexual orientation, sex, disability, and other discrimination. N.Y. Exec. Law § 291(2); N.Y. Civ. Rts. Law § 40-c. But the exemptions to New York's laws are "substantially underinclusive" as to this interest. *Cent. Rabbinical Cong.*, 763 F.3d at 197.

New York allows case-by-case exemptions for sex discrimination "based on bona fide considerations of public policy." N.Y. Exec. Law § 296(2)(b). *See also* 1971 N.Y. Op. Att'y Gen. No. 32, *1 (Nov. 30, 1971), 1971 WL 216933 (noting Division "may grant an exemption" to hairdressers and cosmetologists under this provision). And because "sex" includes "gender identity," the public policy exception applies to gender-identity discrimination too. 9 N.Y.C.R.R. § 466.13(d)(1).

New York never claims that it has a stronger interest in ending sexual-orientation discrimination than sex or gender-identity discrimination. Nor does New York say these types of discrimination "pose a lesser risk" to New York's interests. *Tandon*, 141 S. Ct. at 1297. So the exemptions undermine New York's stated interests. *See Lukumi*, 508 U.S. at 542–46. What's more, these exemptions "endanger[]" New York's interests to a "greater degree than" Emilee's religious activity. *Id.* at 543. They allow discrimination, but Emilee does not discriminate. *Supra* § I.A.3.

40

The district court wrongly brushed these exemptions aside. The court first shrunk New York's interest to *only* ending sexual-orientation discrimination. JA.1154–55. With that singular focus, the court argued no exemption undermined that interest. JA.1154–55. But courts cannot retrofit the state's interest. They must take those interests as presented. *See, e.g.*, *Fulton*, 141 S. Ct. at 1877 (analyzing only "the government's asserted interests"); *Lukumi*, 508 U.S. at 543 (evaluating the "two interests" advanced by the city); *Blackhawk v. Pennsylvania*, 381 F.3d 202, 211 (3d Cir. 2004) (Alito, J.) (same). And New York's asserted interest is ending discrimination generally. The many exemptions undermine that interest and trigger strict scrutiny, as Emilee alleged.

## F. The Accommodations and Discrimination Clauses force Emilee to participate in religious ceremonies contrary to her faith.

The Accommodations and Discrimination Clauses also violate the First Amendment by forcing Emilee to attend and participate in religious ceremonies to which she objects.

The Establishment and Free Exercise Clauses forbid government from coercing anyone to attend or participate in religious practices, ceremonies, or events. *Lee v. Weisman*, 505 U.S. 577, 577 (1992) (Establishment Clause); *Masterpiece*, 138 S. Ct. at 1727 (Free Exercise Clause); *Janny v. Gamez*, 8 F.4th 883, 903–13 (10th Cir. 2021) (both

clauses). For example, officials may not force (i) parolees to attend "prayer or worship services," *id.* at 911; (ii) officers to attend events with prayer, *Marrero-Méndez v. Calixto-Rodríguez*, 830 F.3d 38, 45 (1st Cir. 2016); or (iii) probationers to attend "intensely religious" Alcoholics Anonymous meetings, *Warner v. Orange Cnty. Dep't of Prob.*, 115 F.3d 1068, 1075 (2d Cir. 1996).

The Clauses violate these principles. Like many, Emilee believes all weddings "are inherently religious … events." JA.35. When Emilee photographs opposite-sex weddings, she always attends and photographs the entire wedding ceremony, follows the officiant's instructions, and "acts as a witness" of the union "before God." JA.29–30. The same-service-rule forces Emilee to do these same exercises at same-sex weddings contrary to her religious beliefs. *Supra* § D. That is coerced participation.

The district court dismissed this claim by discounting allegations and drawing reasonable inferences *against* Emilee. For example, the court held that New York's laws would not coerce Emilee to participate in "religious activities occurring at a" same-sex wedding because the activities "are not directed at the … photographer." JA.1157. But Emilee alleged that "[t]he officiant's instructions and pronouncement of marriage" are directed at "the audience, including Emilee." JA.30. And Emilee alleged she "would feel coerced … to express her approval of the wedding." JA.35–36. That "immense social pressure" to attend and

42

participate is unconstitutional. *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 311 (2000).

Next, the court admitted that the Clauses "might be interpreted to compel" Emilee's participation at same-sex weddings. JA.1136. But the court then disregarded that plausible application, said the laws "would not compel" Emilee "to participate in any religious exercises at same-sex weddings," and dismissed the claim. JA.1157. That's error—a claim need only be "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). And this claim is more than plausible. When the State compelled wedding venue owners to host a same-sex wedding, the State conceded this might require the owners to "even 'assist them' at their weddings." Br. for N.Y. as Amici Curiae in Supp. of Resp't at 33, *Gifford v. McCarthy*, 23 N.Y.S.3d 422 (App. Div. 2016) (No. 520410), 2015 WL 13813477, at *33.

The Clauses coerce Emilee's participation in and approval of a religious ceremony in ways inconsistent with our nation's history and tradition. Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1467–68 (1990) (explaining historical protections for religious objections to compelled oaths). That also warrants strict scrutiny. *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 881–82 (1990) (citing historical examples). If this Court interprets *Smith* differently, *Smith* should be overruled. While this Court cannot do that, Emilee preserves

43

this issue for appeal. *See, e.g.*, *Fulton*, 141 S. Ct. at 1883–1926 (Alito, J., concurring) (detailing reasons to overrule *Smith*).

## II. New York's laws fail strict scrutiny as applied to Emilee's expression and religious exercise.

New York must prove that its laws pass strict scrutiny—i.e., are narrowly tailored to serve a compelling interest—because they violate Emilee's constitutional rights. *Supra* § I. As applied to Emilee, New York's laws (A) serve no compelling interest and (B) lack narrow tailoring. The district court erred (C) in holding otherwise, and, in so doing, (D) created a new and dangerous narrow-tailoring test.

### A. New York has no compelling interest in applying its laws to Emilee.

New York has no compelling interest in applying its laws to Emilee's photographs and blogs.

The State has claimed an interest in the "eradication of discrimination." JA.988. But strict scrutiny "look[s] beyond broadly formulated interests." *Gonzales v. O Centro Espirita Beneficente Uniao de Vegetal*, 546 U.S. 418, 431 (2006). "[T]he First Amendment demands a more precise analysis," and New York must prove its compelling interest "in denying an exception to" Emilee. *Fulton*, 141 S. Ct. at 1881.

New York can't do so. Thousands of New York photographers photograph same-sex weddings. JA.62. In that context, New York need

44

not compel Emilee to ensure access to same-sex wedding photography. Everyone already has access to photographs.

Nor can New York justify regulating Emilee to protect people's dignity who disagree with Emilee's editorial choices. *Contra* JA.988. Dignity interests do not justify compelling or suppressing speech. *Hurley*, 515 U.S. at 574, 578–79 (protecting speech that others may consider "misguided, or even hurtful"); *Snyder v. Phelps*, 562 U.S. 443, 456 (2011) (protecting picketing signs at a funeral that were "particularly hurtful to many"). And Emilee has dignity too. Her dignity is worth protecting from the "demeaning" attempt to force her to speak and forsake her conscience. *Janus*, 138 S. Ct. at 2464. *See also Cohen v. California*, 403 U.S. 15, 24 (1971) (free speech partly "premise[d]" on "individual dignity" of speaker).

Further, compelling, silencing, and coercing Emilee does not stop discrimination. Emilee serves everyone, but just cannot convey messages and participate in religious events with which she disagrees. *Supra* § I.A.3. Public-accommodation laws serve no "legitimate end" when they compel speakers like that. *Hurley*, 515 U.S. at 578. *Accord Dale*, 530 U.S. at 659 (same conclusion about law that worked "a severe intrusion" on expressive association).

To be sure, the district court distinguished *Hurley* and *Dale* by limiting their analysis to non-profits. JA.1141–44. But *Hurley*'s parade *involved commercial transactions*—participants could "pay to enter the

parade" or "contribut[e] to the council." *Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos. v. City of Bos.*, 636 N.E.2d 1293, 1298 & 1298 n.13 (Mass. 1994). And *Hurley* rejected the district court's distinction—its rule applies to "business corporations generally." *Hurley*, 515 U.S. at 574. For that reason, courts regularly apply *Hurley*'s logic to protect for-profit entities from compelled speech. *See, e.g.*, JA.1141 (collecting cases protecting filmmakers, artists, and a photographer); *Coral Ridge*, 6 F.4th at 1255 (Amazon); *Wash. Post v. McManus*, 944 F.3d 506, 518 (4th Cir. 2019) (newspaper); *Baidu.com*, 10 F. Supp. 3d at 441–42 (internet company).

And the district court's for-profit distinction creates a massive underinclusivity problem that would undermine New York's asserted interests. *See Reed*, 576 U.S. at 172 (law underinclusive "when it leaves appreciable damage to that supposedly vital interest unprohibited") (cleaned up); *Lukumi*, 508 U.S. at 547 (same for law with exemptions undermining "the interests that [the city] ha[d] asserted"). Under this approach, a photographer, print shop, or other artist could avoid New York's laws altogether by incorporating as nonprofits. Not even New York agrees with this outcome. The State has claimed a "more compelling" interest in regulating "private nonprofit organizations" than "commercial organizations." Br. of N.Y., et al. as Amici Curiae in Supp. of Resp't (N.Y. *Dale* Br.) at *20, *Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000) (No. 99–699), 2000 WL 339875.

Speaking of underinclusivity, New York's laws are chock full of exemptions that undermine New York's interests. For public accommodations, the laws contain written and unwritten exemptions. *See* § I.E; *Lukumi*, 508 U.S. at 547 (exemptions showing ordinances lacked general application proved they were "underinclusive" and failed strict scrutiny).

New York offers more exemptions for employers and housing providers even though its antidiscrimination interests are the same for employers, landlords, and public accommodations. N.Y. Exec. Law § 290(3) (noting equal interests). Employers can discriminate based on "undue hardship" or bona fide occupational qualifications. *Id.* §§ 296(1)(d), (3)(b), (10)(a). And some landlords can discriminate for any reason. *Id.* § 296(5)(a)(4)(i). It is irrelevant that these exemptions occur in other statutes. *Lukumi*, 508 U.S. at 544–45, 547. What matters is effect, not location. New York's many exemptions for clear status discrimination "undermines [its] contention that its non-discrimination policies can brook no departures" for Emilee. *Fulton*, 141 S. Ct. at 1882.

## B. New York's laws are not narrowly tailored as applied to Emilee.

Nor are New York's laws narrowly tailored as applied to Emilee because compelling and silencing her is not "the least restrictive means among available, effective alternatives." *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004).

47

For one alternative, New York could apply its law to stop status discrimination, not message-based objections. *Supra* § I.A.3. Many states and several courts around the country (including one in New York) do this without problem. JA.556–58; § I.A.2–3 (collecting cases); *Baidu.com Inc.*, 10 F. Supp. 3d at 441 (no "discriminatory conduct" when alleged censorship reflected "editorial discretion"). New York already interprets its laws to allow this (sometimes) by exempting bakers from creating cakes with "anti-LGBTQ" messages. N.Y. *Masterpiece* Br., 2017 WL 5127307, at *28.

Second, New York could define "public accommodations" more narrowly to exclude expressive businesses. *See, e.g.*, 42 U.S.C. § 2000a(b); Fla. Stat. § 760.02(11). New York already exempts "distinctly private" businesses and could extend this exemption to artists like Emilee. N.Y. Exec. Law § 292(9). The district court suggested "this exemption seems particularly well-suited to artists who must be selective in their clientele in order to express their desired message." JA.1147.

Lastly, New York could extend any of its other exemptions to protect the artistic judgment of expressive businesses. New York could exempt public accommodations from providing services that would "fundamentally alter the nature of" their services, like it does in cases of disability discrimination. N.Y. Exec. Law § 296(2)(c)(i). Or New York could exempt individuals and small businesses that celebrate weddings,

48

like it does for religious entities. N.Y. Dom. Rel. Law § 10-b. *See also* Miss. Code § 11-62-5(5)(a) (exempting photographers that decline to provide wedding services based on sincere belief in marriage between a man and a woman). Or New York could extend its "bona fide … public policy" sex-and-gender-identity-based objection to objections based on editorial discretion. N.Y. Exec. Law § 296(2)(b).

New York's laws show that many narrowly tailored alternatives exist. These alternatives prove the laws fail strict scrutiny.

### C. The district court erred by holding that New York's laws satisfied strict scrutiny by re-writing New York's interests and requiring no evidence or argument.

The district court upheld New York's laws under strict scrutiny by re-writing New York's asserted interests, eliminating its evidentiary burden, and relieving New York of making arguments.

Start with the re-write. New York claimed a compelling interest in "[t]he eradication of discrimination." JA.988. New York has the same interest in stopping sexual-orientation, sex, gender-identity, and other forms of discrimination. N.Y. Exec. Law § 291(2); N.Y. Civ. Rts. Law § 40-c. But the district court "delineated" those interests "with more precision than" New York did. JA.1138. It narrowed New York's interests to "ensuring that individuals, without regard to sexual

orientation, have equal access" to public accommodations. JA.1138 (cleaned up).[5]

By re-writing the law, the court created a higher interest in ending sexual-orientation discrimination against persons who identify as homosexual or bisexual and lessened New York's interest in stopping other forms of discrimination. The court admitted as much—minimizing New York's interest in compelling speech "for the benefit of *any* [other] group that is deemed to be a protected class under" the laws with an eye towards "the historical inequities and economic discrimination faced by those groups." JA.1149. But courts may not "rewrite a law to conform it to constitutional requirements." *Reno*, 521 U.S. at 884–85 (cleaned up). The district court did just that. By fine-tuning New York's interest, the court discounted the "underinclusiveness" of New York's laws "with respect to other forms of discrimination." JA.1146. And only by doing this, could the court say the laws furthered a compelling interest.

---

[5] The court went further and narrowed New York's interests to preventing sexual-orientation discrimination against "historically disadvantaged or disfavored classes." JA.1139. New York defines "sexual orientation" as "heterosexuality, homosexuality, bisexuality or asexuality." N.Y. Exec. Law § 292(27). But the court dropped "heterosexuality" and "asexuality" from the law. To the court, "[t]he purpose of" New York's law "was to dismantle the economic barriers that hindered *LGBT individuals'* opportunities to enjoy a 'full and productive life.'" JA.1140 (emphasis added).

Next, the district court upheld New York's laws under strict scrutiny with no evidence. That improperly shifted the burden on Emilee—at the motion-to-dismiss stage—to prove that New York's laws *did not* pass strict scrutiny.[6] *Cf. O Centro*, 546 U.S. at 429 (rejecting argument that the plaintiff had burden "of disproving the asserted compelling interests"). But New York "bears the burden" here, not Emilee. *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000).

For compelling interest, New York must prove an "actual problem" exists, *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011) (cleaned up), with "specific evidence," *Wisconsin v. Yoder*, 406 U.S. 205, 224 (1972). "Anecdote and supposition" do not suffice. *Playboy Ent. Grp.*, 529 U.S. at 822.

New York offered no evidence of an actual problem. Nor could it at the motion-to-dismiss stage. That should have been decisive—New York cannot establish a compelling interest when they have "no evidence to support its claim." *United States v. Alvarez*, 567 U.S. 709, 726 (2012)

---

[6] The district court offloaded the compelling interest burden on Emilee in another way. The court required Emilee to show that the "religious entities and benevolent orders" exemption "limits LGBT individuals' access to publicly available goods." JA.1146. That inverts Emilee's burden. New York must show that any exemptions *do not* undermine its interests, not the other way around. *Cf. Anderson v. Blake*, 469 F.3d 910, 918 (10th Cir. 2006) (not requiring plaintiff—at motion-to-dismiss stage—"to disprove every possible compelling interest").

(plurality). In fact, the record here proves the non-existence of a problem: thousands of New York studios photograph same-sex weddings. JA.62. Any "generalized assertion[s]" New York made in its briefs about "past discrimination" do not establish a problem in the face of this evidence. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 498–501 (1989).

Likewise, for narrow tailoring, New York must "prove" that "a plausible, less restrictive alternative … will be ineffective to achieve its goals." *Playboy Ent. Grp.,* 529 U.S. at 816. This standard "is exceptionally demanding." *Holt v. Hobbs*, 574 U.S. 352, 364 (2015). It requires New York to "introduce specific evidence proving" any proposed alternatives "are less effective." *Ashcroft*, 542 U.S. at 668. And New York must show that it considered and rejected as ineffective "different methods that other jurisdictions have found effective." *McCullen v. Coakley*, 573 U.S. 464, 494 (2014). *See also Holt*, 574 U.S. at 368 (department "failed to show" it could not follow inmate beard policy of other jurisdictions).

Once again, New York did not and could not provide that evidence. That's fatal, especially when many other jurisdictions apply their antidiscrimination laws generally but "refrain from applying [them] to force [their] citizens to create custom speech expressing messages that they deem objectionable." JA.556.

Equally fatal, the State never argued that it weighed alternatives. JA.988. And the County never analyzed "the underlying validity of the statutes." JA.578. New York's laws cannot pass strict scrutiny—"the most demanding test known to constitutional law," *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997)—without a single argument or record citation. *Williams v. Annucci*, 895 F.3d 180, 193 (2d Cir. 2018) (policy failed narrow tailoring when government "did not discuss, much less demonstrate" that proposed alternatives were not viable).

Rather than demand evidence or argument, the district court "imagine[d] the problems created" if Emilee were exempted. JA.1148 (cleaned up). But narrow tailoring requires more than "hypothesized or invented *post hoc*" justifications. *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 633 (2d Cir. 2020) (cleaned up). *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2377 (2018) (rejecting "purely hypothetical" justifications for compelled-disclosure rule).

All of this shows why courts should rarely (if ever) dismiss complaints for failing to satisfy strict scrutiny. Strict scrutiny requires evidence, but courts cannot consider "factual materials extrinsic to the complaint" at the motion-to-dismiss stage. *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 234 (2d Cir. 2016). And strict-scrutiny arguments are "essentially factual arguments" that courts decide on a "more thoroughly developed record of proceedings." *City of Los Angeles v. Preferred Commc'ns, Inc.*, 476 U.S. 488, 494–95 (1986) (declining to

53

dismiss "colorable First Amendment" claim to allow "a fuller development of the disputed issues"). For these reasons, courts typically deny 12(b)(6) motions to dismiss well-pled constitutional claims.[7] *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1044–45 (9th Cir. 2018) (remanding dismissal on strict scrutiny when court "assumed … restrictions were content based" because government's justifications were "too thin"). This Court should follow this approach here.

### D. The district court's novel tailoring analysis threatens all original speakers.

The district court held that New York's laws were narrowly tailored to Emilee because she creates "unique, nonfungible" photographs and blogs. JA.1148. To the court, New York's laws are "most necessary to ensuring equal access" when they regulate "unique goods" or expressive services (like Emilee's photography and blogs) to prevent "inferior market[s]" for those custom services. JA.1148 (cleaned up). Translation: the more unique the art, the more the government

---

[7] *See also Wilmoth v. Sec'y of New Jersey*, 731 F. App'x 97, 105 (3d Cir. 2018) (remanding strict scrutiny dismissal because that test "necessarily requires recourse to an evidentiary record"); *Gibson v. Tex. Dep't of Ins.--Div. of Workers' Comp.*, 700 F.3d 227, 238 (5th Cir. 2012) (remanding intermediate scrutiny dismissal because that test needed "additional factual findings"); *McLemore v. Gumucio*, No. 3:19-cv-00530, 2020 WL 7129023, at *21 (M.D. Tenn. Dec. 4, 2020) (denying motion to dismiss based on intermediate scrutiny because that required "a factual inquiry that the[] Court may not conduct at the motion to dismiss stage").

may regulate access to it. "This is … unprecedented." *303 Creative*, 6 F.4th at 1204 (Tymkovich, C.J., dissenting). The Supreme Court has never held that one-of-a-kind speech gets *less* First Amendment protection. Unique expression and viewpoints deserve more protection, not less.

"We can have intellectual individualism and the rich cultural diversities that we owe to exceptional minds only at the price of occasional eccentricity and abnormal attitudes." *Barnette*, 319 U.S. at 641–42. Indeed, most compelled speech cases involve the government trying to compel unique expression. *See Tornillo*, 418 U.S. at 255–57 (unique op-ed); *Riley*, 487 U.S. at 795–96 (unique fundraiser); *PG&E*, 475 U.S. at 5–8 (unique newsletter).

Nor has that Court said that market power justifies compelled speech.[8] *See Consol. Edison Co. of N.Y., Inc. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 534 n.1 (1980) ("regulated monopoly" status did not "preclude … First Amendment rights"); *PG&E*, 475 U.S. at 17 n.14 (same).

---

[8] The district court's "inferior market" analysis even contradicts monopoly law. So long as "there are market alternatives," a "monopoly does not exist merely because" the producer's product "differs from others." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 394 (1956). Alternatives need not be "identical products." *Id.* And the court's "market definition does not reflect any relevant market evidenced in the record." *Belfiore v. N.Y. Times Co.*, 826 F.2d 177, 180 (2d Cir. 1987) (New York Times not a monopoly).

In fact, the Court has rejected that rationale, at least when alternatives exist or when the law operates in a content-based way—as is true here. *Turner Broad. Sys.,* 512 U.S. at 656 (newspaper's "local monopoly" and "exclusive control over its own news copy" did not "obstruct readers' access to other competing publications"); *Tornillo*, 418 U.S. at 254–58 (same). *See also Assocs. & Aldrich Co. v. Times Mirror Co.*, 440 F.2d 133, 134–5 (9th Cir. 1971) (newspaper held "freedom to exercise subjective editorial discretion" despite "substantial monopoly"); *NetChoice, LLC v. Moody*, 546 F. Supp. 3d 1082, 1090–91 (N.D. Fla. 2021) (rejecting monopolist argument as applied to social media platforms).

*Hurley* also rejected the district court's argument. There, the unique "size and success" of the parade made it "an enviable vehicle for the dissemination" of opposing views. 515 U.S. at 577. Even so, the parade could exclude a contingent that "affect[ed] the message conveyed by the" parade. *Id.* at 572. *Hurley* parlayed that rule to one-off "private club[s]"—they can exclude "applicant[s] whose manifest views" are "at odds with" the club's members. *Id.* at 581.

That makes sense. A speaker's "autonomy to choose the content of [her] own message" goes hand-in-hand with the speaker's originality. *Id.* at 573. That principle explains why the "painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll" merit protection. *Id.* at 569. But the district court flipped this idea

56

upside-down, holding that the very allegations that elevate Emilee's free-speech claim to strict scrutiny review—i.e., that her artwork is custom and unique—doom her claim under that test. JA.1148.

The district court's analysis would also be devastating for free speech. As the court admitted, under its logic, a business "invite[s] the public at large to treat" its "'speech'" as the "'accommodation'" by opening its doors. JA.1145–46. In turn, New York can "police" public accommodations' "custom-made goods" and expressive services. *Id.* This creates problems because New York defines "public accommodation[s]" "liberally." JA.39. As a result, New York could force an online Etsy artist specializing in Native American portraiture to create a painting of Wounded Knee. JA.39 (websites are public accommodations). Or compel a search engine to publish anti-Chinese (or pro-Chinese) material. *Baidu.com*, 10 F. Supp. 3d at 434–36. Or require an LGBT cake artist to create a cake saying, "Homosexuality is an abomination unto the Lord." *Mannarino*, 2017 WL 601408, at *2. The possibilities are endless.

And these possibilities extend to nonprofit organizations. The State has argued that it has a greater interest in applying its laws to "private nonprofit organizations" than to "commercial organizations" because nonprofit services "tend to be far less fungible, and the general absence of a profit motive renders the need for legal protection all the more compelling." N.Y. *Dale* Br., 2000 WL 339875, at *20. So New York

could force a progressive bar association to publish advertisements promoting Israel in their magazine. *Athenaeum*, 2018 WL 1172597, at *3–5. Or the Poetry Society of New York to write a poem expressing anti-LGBT messages. *Services*, The Poetry Society of New York, https://bit.ly/34dulpR (offering poetry services for a fee). The district court's theory is simply limitless in scope and dangerous in effect.

Emilee offers a better way. She seeks protection to provide the same services to everyone—photographs and blogs that celebrate opposite-sex weddings. She provides these services no matter who asks—an LGBT parent of the groom, an LGBT wedding planner, or the engaged opposite-sex couple. JA.37. And she also refuses to promote certain messages for all too. JA.34–35. In both situations, she treats everyone equally regardless of who they are, while she treats content differently based on what it conveys. But the district court's decision inverts this, forcing Emilee to provide special treatment to certain messages New York prefers.

But that type of favoritism—the "coercive elimination of dissent"—never ends well. *Barnette*, 319 U.S. at 641. The First Amendment "was designed to avoid these ends by avoiding these beginnings." *Id.* In that way, protecting Emilee's speech protects everyone's speech—even those who "would spend a lifetime opposing" her beliefs. *CNP*, 479 F. Supp. 3d at 548. That's the hallmark of the

First Amendment—ensuring equal protection for speakers, no matter their views. Emilee's included.

## III. Emilee plausibly alleged the Unwelcome Clause facially violates the First and Fourteenth Amendments because it is vague, overbroad, and grants unbridled discretion.

The Unwelcome Clause bans speech that indicates someone's "patronage … is unwelcome, objectionable or not acceptable, desired or solicited" because of protected characteristics. N.Y. Exec. Law § 296(2)(a). This language is overbroad and vague and grants unbridled discretion to New York officials, as Emilee plausibly alleged.

**Overbreadth.** A statute is overbroad when a "substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (cleaned up). The Unwelcome Clause is overbroad because terms like unwelcome, objectionable, not accepted, or not desired are elastic and ban too much speech. These terms could prevent a Muslim shop owner from hanging a "There is no God but Allah" sign if it made a Christian customer feel unwelcome. *303 Creative*, 6 F.4th at 1213–14 (Tymkovich, C.J., dissenting) (making this point with other examples). Or an Ultra-Orthodox Jewish retail store from posting a "No Sleeveless" dress code notice to encourage modesty. Philip Messing, *Hearing for Orthodox Jewish Shops' 'Modesty' Rules*, N.Y. Post (Sept. 30, 2013, 12:46 AM), https://perma.cc/G9XP-WRF3.

That bans too much—courts have invalidated similarly overbroad language. *See Brush & Nib Studio, LC v. City of Phoenix*, 418 P.3d 426, 442–43 (Ariz. Ct. App. 2018) (striking nearly identical language as overbroad); *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 215 (3d Cir. 2001) (invalidating harassment policy banning "any unwelcome verbal … conduct which offends … because of" protected characteristics).

The district court erred by evaluating whether Emilee had stated an overbreadth claim "[i]n her briefing" (JA.1150), rather than drawing reasonable inferences from the complaint, *Iqbal*, 556 U.S. at 678. New York never even asked the court to dismiss Emilee's overbreadth claim. JA.578, 989. Likewise, the court thought "the clause is plainly legitimate as applied" to some advertising. JA.1151. But a law with some legitimate applications may still be overbroad. *Thornhill v. State of Alabama*, 310 U.S. 88, 105 (1940) (overbroad law whose asserted "purpose" was ending "violence"). Lastly, the court relied on a case (JA.1150) dismissing a complaint because the "novelty items … were not communications." *State Div. of Hum. Rts. on Complaint of Gladwin v. McHarris Gift Ctr.*, 419 N.Y.S.2d 405, 406 (App. Div. 1979). That case did not limit the Unwelcome Clause's expansive reach.

**Vagueness and unbridled discretion.** The Fourteenth Amendment requires laws to give adequate notice of what is prohibited and at least minimal guidelines for enforcement. *Kolender v. Lawson*, 461 U.S. 352,

60

357 (1983). The First Amendment also forbids laws that "delegate overly broad … discretion" to government officials or "allow[] arbitrary application," because "such discretion" can lead to "suppressing a particular point of view." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992) (cleaned up). The Unwelcome Clause is vague because it fails to define its terms and gives officials arbitrary power to enforce.

The Unwelcome Clause does not define "unwelcome, objectionable, or not accepted, desired or solicited." Nor is it obvious what these terms ban. As the examples above highlight, officials could take *any* critical statement related to protected classes on a public accommodation's website or made directly to prospective clients as signifying clients are unwelcome or objectionable. New York officials are thus free to apply the law selectively to restrict views they dislike.

The district court countered that Emilee cannot facially challenge the Unwelcome Clause because it clearly banned her statement. JA.1158. That is incorrect. This rule does not bar challenges to vague laws that grant too much enforcement authority. *Act Now to Stop War & End Racism Coal. & Muslim Am. Soc'y Freedom Found. v. District of Columbia*, 846 F.3d 391, 409–10 (D.C. Cir. 2017). *See also Beal v. Stern*, 184 F.3d 117, 125 (2d Cir. 1999) (allowing facial challenge to permitting scheme when appellants "had been denied a permit").

61

The Supreme Court invalidated a facially vague law that clearly applied to the defendant because the law did not "prescrib[e] definite standards to govern the jury's determination" over the amount of costs the defendant owed. *Giaccio v. Pennsylvania*, 382 U.S. 399, 401, 403 (1966).

And, though the Denial Clause may prohibit some of Emilee's statement, it's unclear whether the Unwelcome Clause bans all or part of the statement. This vagueness allows anyone to complain about *any portion* of Emilee's statement. So Emilee stated a plausible facial challenge.

## IV. The district court erred by denying as moot Emilee's preliminary-injunction motion, and this Court should instruct the district court to enter one on remand.

The district court denied Emilee's preliminary-injunction motion as moot because she failed to state First Amendment claims. JA.1160. The court abused its discretion in doing so because the court's dismissal turned on mistakes of law. *Supra* §§ I–II. *See, e.g.*, *Bery*, 97 F.3d at 697 (court abused discretion when it "fail[ed] to properly analyze the question[] of narrow tailoring" which "led to an incorrect result"); *Chevron Corp. v. Naranjo*, 667 F.3d 232, 239 (2d Cir. 2012) (legal error constitutes abuse of discretion).

This Court should instruct the district court to enter Emilee's requested injunctive relief on remand because (A) Emilee showed that

she is entitled to that relief and (B) the undisputed record allows this Court to make that determination in the first instance.

## A.    Emilee is entitled to a preliminary injunction based on undisputed facts.

Emilee deserves a preliminary injunction because (1) her claims are likely to succeed and (2) she suffers irreparable harm absent an injunction. *Mastrovincenzo v. City of New York*, 435 F.3d 78, 89 (2d Cir. 2006); *Bery*, 97 F.3d at 697. The (3) public interest and (4) equities favor her too. *See A.H. v. French*, 985 F.3d 165, 176 (2d Cir. 2021). The likelihood of success on the merits is the dominant, if not the dispositive, factor" here. *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013).

Emilee is likely to win on the merits as explained above. §§ I–II. The undisputed preliminary-injunction record confirms this. For example, this record provides more details about Emilee's photographs and blogs, her artistic process, and how New York's laws alter the content of her speech. *See, e.g.*, JA.111–18, 122–24, 131–40 (explaining this and providing more examples). These details reiterate that the Accommodations and Discrimination Clauses violate Emilee's First Amendment rights by compelling her to speak messages she disagrees with based on the content and viewpoint of her speech. § I.A–B.

Likewise, this record bolsters Emilee's argument that the Accommodations, Discrimination, and Publication Clauses restrict her

speech based on content and viewpoint. Other photographers can promote their opinions on same-sex marriage, but Emilee cannot explain her views on marriage. § I.C. *Compare* JA.125–30 (permissible statements) *with* JA.77 (Emilee's statement). And Emilee provides more details about how New York's laws coerce her participation in a religious ceremony—same-sex weddings. § I.F; JA.111–14. Throughout, Emilee explains that she objects to promoting messages, not to serving people. JA.122–25.

The preliminary-injunction record only confirms New York cannot satisfy strict scrutiny—there are no facts showing its laws are narrowly tailored to a compelling interest. For example, New York's legislative history does not have a single example of anyone lacking access to photographs celebrating same-sex weddings. And nowhere in that history did New York consider any of the alternatives Emilee proposed above (or any others). Those shortcomings are fatal. *See* § II.A–C.

Because Emilee can prove First Amendment violations, the remaining preliminary-injunction factors are also satisfied. With these constitutional violations, irreparable harm is "presumed." *Tunick v. Safir*, 209 F.3d 67, 70 (2d Cir. 2000). *See, e.g.*, *Bery*, 97 F.3d at 697 (same). The laws cause more irreparable harm by forcing Emilee to forgo prospective clients, making her less competitive, limiting her ability to create photography, and damaging her reputation as she tries to limit her exposure to the laws. JA.52–53, 63–64; *Register.com, Inc. v.*

*Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (irreparable harm for "loss of reputation, good will, and business opportunities").

The public interest also favors Emilee. "[S]ecuring First Amendment rights is in the public interest." *Walsh*, 733 F.3d at 488. *See also PG&E*, 475 U.S. at 8 (recognizing "societal interests" in "free speech"). Likewise, the equities support Emilee. She faces irreparable harm and risks penalties—damages, licensure revocation, and jailtime—without an injunction whereas New York has no interest in enforcing unconstitutional laws. *Walsh*, 733 F.3d at 488. And New York can still enforce its laws against other public accommodations—just not against Emilee's message-based objections to promoting same-sex weddings, which isn't discrimination anyway. *Supra* § I.A.3. Emilee clears the preliminary-injunction hurdles and deserves an injunction.

## B.   This Court should exercise its authority to order Emilee's requested injunctive relief on remand.

This Court may issue preliminary injunctions when there are "enough solid facts from the record to enable [it] to render a decision." *English v. Town of Huntington*, 448 F.2d 319, 321 (2d Cir. 1971). The current record provides those facts. This Court should exercise its authority to issue Emilee's requested injunction. *See, e.g., Walsh*, 733 F.3d at 489 (exercising that authority in First Amendment case).

Emilee filed a verified complaint and the parties filed sworn statements and hundreds of pages of exhibits. Emilee argued that her

65

preliminary-injunction motion could "be decided based on the submitted evidence." JA.86. New York could have but did not request an evidentiary hearing or ask to provide more evidence. And the district court agreed that Emilee's "claims are primarily ones of law, not of fact." JA.1159. In sum, the parties "do not dispute essential facts," bypassing the need to gather any more facts below. *Md. Cas. Co. v. Realty Advisory Bd. on Lab. Rels.*, 107 F.3d 979, 984 (2d Cir. 1997).

These undisputed facts prove that Emilee will likely succeed on her First Amendment claims. *Supra* §§ I–II, IV.A. Because this prong trumps the others, *Walsh*, 733 F.3d at 488, "a remand for reweighing would waste judicial resources and unnecessarily delay the proceedings further," *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 725 (3d Cir. 2004). Especially here, for four reasons.

*First*, on any subsequent appeal from a preliminary-injunction order, this Court would "make an independent examination of the record as a whole without deference to the factual findings" below. *Bery*, 97 F.3d at 693. That record is already complete, which allows this Court to conduct that review now. Remanding for further analysis below would yield no new insights either—that court already explained its legal analysis "[o]n the merits." JA.1123. What's more, this Court need not write on a blank legal slate—many courts have already considered cases like Emilee's and the possible outcomes are known. *Compare, e.g.*, *Hurley*, 515 U.S. at 572–81; *Dale*, 530 U.S. at 648–61; § I.A.2–3

66

(collecting cases) *with 303 Creative*, 6 F.4th at 1176–82 *with Elane Photography, LLC v. Willock*, 309 P.3d 53, 64–66 (N.M. 2013).

*Second*, Emilee's preliminary-injunction arguments substantially overlap with whether she plausibly alleged constitutional claims. *Compare* §§ I–II *with* IV.A. This Court can address both issues at once.

*Third*, Emilee's First Amendment injury "was both threatened and occurring at the time" she filed her complaint. *Elrod v. Burns*, 427 U.S. 347, 374 (1976) (plurality). Delaying injunctive relief would continue to harm Emilee's constitutional interests. And Emilee would continue to face credible threats of fines and jailtime. JA.1124–32 (finding these threats credible).

*Fourth*, this Court's decision would benefit the public. Claimants in New York have used its laws to threaten streaming services, search engines, and bar journals. *Supra* § D. And the State roams the country targeting other photographers, cake artists, and web designers. *Supra* § C. In this environment, securing Emilee's constitutional rights provides clear guidance to New York and the public. *See, e.g.*, *Walsh*, 733 F.3d at 488. This guidance is needed—and it can be given on this undisputed record.

Appellate courts regularly issue preliminary injunctions in the first instance when constitutional freedoms are at stake and no party disputes facts. *See, e.g.*, *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1146 (10th Cir. 2013) (en banc) (resolving preliminary injunction

factors in free exercise claim where "the government nowhere contested the *factual* adequacy or accuracy" of allegations"); *id.* at 1145 n.21 (collecting cases). Emilee requests that this Court do the same.

## CONCLUSION

New York's laws compel Emilee to promote messages that violate her faith and restrict her from sharing her beliefs with others. Meanwhile, New York freely allows other businesses to decline even non-expressive services to operate consistently with their beliefs. The First Amendment does not tolerate this winners-and-losers approach.

Instead, the First Amendment lets all speakers win by choosing the messages they speak, just not the clients they serve. That ensures all views have a voice—from the "storytelling behind … *Will & Grace*" to Emilee's "stor[ies] about the beauty and joy of marriage." *CNP*, 479 F. Supp. 3d at 557, 564–65. New York's laws violate this principle.

Emilee therefore asks this Court to reverse the lower court and direct that a preliminary injunction issue in her favor.

Respectfully submitted,

*/s/ John J. Bursch*

JONATHAN A. SCRUGGS
BRYAN D. NEIHART
JACOB P. WARNER
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@ADFlegal.org
bneihart@ADFlegal.org
jwarner@ADFlegal.org

JOHN J. BURSCH
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Ste. 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

RAYMOND J. DAGUE
DAGUE & MARTIN, P.C.
4874 Onondaga Road
Syracuse, NY 13215
(315) 422-2052
rjdague@daguelaw.com

*Counsel for Appellants*

March 4, 2022

## CERTIFICATE OF SERVICE

I hereby certify that on March 4, 2022, this brief was filed electronically with the Clerk of the Court for the United States Court of Appeals for the Second Circuit through the Court's CM/ECF system. I certify that all participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.


*/s/ John J. Bursch*
John J. Bursch

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Local Rule 32.1(a)(4)(A) because, excluding the portions exempted by Fed. R. App. R. 32(f), this brief contains 13,999 words.

This brief also complies with the typeface requirements of Fed. R. App. P. 32 (a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ John J. Bursch*
John J. Bursch
*Counsel for Appellants*

Dated: March 4, 2022