# 22-75

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

---

EMILEE CARPENTER, LLC d/b/a/ Emilee Carpenter Photography and
EMILEE CARPENTER,

*Plaintiffs-Appellants*,

v.

LETITIA JAMES, in her official capacity as Attorney General of New
York; MARIA L. IMPERIAL, in her official capacity as Acting
Commissioner of the New York State Division of Human Rights; and
WEEDEN WETMORE, in his official capacity as District Attorney of
Chemung County,

*Defendants-Appellees*.

---

On Appeal from the United States District Court for the Western
District of New York, Case No. 6:21-cv-06303

---

**JOINT APPENDIX
VOLUME 3 (JA561-JA768)**

---

JONATHAN A. SCRUGGS
BRYAN D. NEIHART
JACOB P. WARNER
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@ADFlegal.org
bneihart@ADFlegal.org

JOHN J. BURSCH
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Ste. 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

jwarner@ADFlegal.org
Raymond J. Dague
Dague & Martin, P.C.
4874 Onondaga Road
Syracuse, NY 13215
(315) 422-2052
rjdague@daguelaw.com

*Counsel for Appellants*

Mohammad Hyder Hussain
Chemung County Attorney's Office
167 Lake Street
Elmira, NY 14902
(607) 737-2982
hhussain@chemungcountyny.gov

*Counsel for Appellee Weedon Wetmore*

Alexandria Twinem
New York State Office of the Attorney General
The Capitol
Albany, NY 12224
(518) 776-2015
Alexandria.Twinem@ag.ny.gov

*Counsel for Appellees Letitia James and Maria Imperial*

# TABLE OF CONTENTS

| ECF No. | Document Description | Page |
|---|---|---|
| | **VOLUME 1** | |
| | Docket Report | JA1 |
| 1 | Verified Complaint | JA19 |
| 1-1 | Exhibit 1 to Verified Complaint | JA76 |
| 1-2 | Exhibit 2 to Verified Complaint | JA78 |
| 3 | Plaintiffs' Preliminary Injunction Motion | JA81 |
| 3-4 | Plaintiffs' List of Witnesses and Exhibits to be Presented at Hearing on the Preliminary Injunction Motion | JA86 |
| 3-5 | Declaration of Emilee Carpenter in Support of Plaintiffs' Preliminary Injunction Motion | JA89 |
| 3-6 | Table of Contents: Appendix to Plaintiffs' Brief in Support of Plaintiffs' Preliminary Injunction Motion | JA142 |
| 3-7 | Part 1 of Appendix to Plaintiffs' Brief in Support of Plaintiffs' Preliminary Injunction Motion | JA145 |
| | **VOLUME 2** | |
| 3-7 | Part 2 of Appendix to Plaintiffs' Brief in Support of Plaintiffs' Preliminary Injunction Motion | JA291 |
| 22 | Amici Curiae Brief of States in Support of Plaintiffs' Motion for Preliminary Injunction | JA534 |

| | **VOLUME 3** | |
|---|---|---|
| 24-1 | Affidavit of Jeffrey Walker in Support of a Dismissal, or in the Alternative, Opposing Preliminary Injunction as to Chemung County District Attorney | JA561 |
| 24-2 | Memorandum of Law in Support of a Dismissal, or in the Alternative, Opposing Preliminary Injunction | JA564 |
| 26-1 | Declaration of Johnathan Smith in Support of Defendants' Opposition to Plaintiffs' Preliminary Injunction Motion with Exhibits A-L | JA581 |
| | **VOLUME 4** | |
| 26-2 | Declaration of Heather McKay in Support of Defendants' Opposition to Plaintiffs' Preliminary Injunction Motion with Exhibits M-O | JA769 |
| 26-3 | Declaration of Jessica Clarke in Support of Defendants' Opposition to Plaintiffs' Preliminary Injunction Motion with Exhibits Q-S | JA923 |
| 27-1 | Memorandum of Law in Support of State Defendant's Motion to Dismiss | JA958 |
| 50 | Amicus Curiae Brief of Frederick Douglass Foundation et al. | JA991 |
| | **VOLUME 5** | |
| 51 | Amici Curiae Brief of New York Civil Liberties Union and American Civil Liberties Union in Support of Defendants' Motion to Dismiss | JA1012 |

| 52 | Amici Curiae Brief of Religious and Civil-Rights Organizations in Support of Defendants' Motion to Dismiss | JA1039 |
|----|------|------|
| 55 | Amici Curiae Brief of States in Support of Defendants | JA1067 |
| 59 | County Defendant's Reply Memorandum in Support of a Dismissal, or in the Alternative, Opposing Preliminary Injunction as to Chemung County District Attorney with Affidavit of Weeden A. Wetmore | JA1106 |
| 68 | Decision and Order | JA1115 |
| 69 | Judgment | JA1161 |
| 70 | Notice of Appeal | JA1162 |

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

Emilee Carpenter, LLC, d/b/a Emilee Carpenter
Photography and Emilee Carpenter,

               Plaintiffs,

    -against-

Letitia James, in her official capacity as Attorney
General of New York; Johnathan J. Smith, in his
official capacity as Interim Commissioner of the
New York State Division of Human Rights; and,
Weeden Wetmore, in his official capacity as
District Attorney of Chemung County,

               Defendants.

**AFFIRMATION**

Case NO. 6:21-cv-06303

---

**JEFFREY WALKER**, an attorney duly admitted to practice before the Courts of this State, affirm the following under penalty of perjury:

1.    I am an Assistant County Attorney for Chemung County. Our office represents Defendant, Weeden Wetmore, who is being sued in his official capacity as District Attorney of Chemung County. I make this affirmation, which has the same force and effect as an affidavit pursuant to CPLR § 2106.

2.    This Affirmation is made based on my review of all the filings made on behalf of the Plaintiffs in this matter, and my review of the applicable law as summarized in the accompanying Memorandum of Law, which is incorporated by reference.

3.    After a review of the hundreds of pages of documents submitted on behalf of the Plaintiffs in this matter, which allege that Plaintiffs' First Amendment rights could potentially be infringed upon by possible future prosecutions using either sections of the New York Executive Law or the New York Civil Rights Law, it is

JA0561

my belief that the hypothetical claims which Plaintiffs suggest when reviewed against existing case law do not demonstrate any actual cause of action between the Plaintiffs and Defendant, Weeden Wetmore.

4.     Any possible controversy between the Plaintiffs and Defendant, Weeden Wetmore, would not occur under the scenarios as described in the Complaint.

5.     Accordingly, for the reasons outlined in the accompanying Memorandum of Law, we seek a dismissal of the Complaint as to Defendant, Weeden Wetmore.

6.     We further request the Court strike all references in the pleadings with respect to Weeden Wetmore if the dismissal motions are granted.

7.     If the motions to dismiss are not granted, in the alternative, we request a more definite statement or pleading because we do not believe the complaint as drafted demonstrates any actual controversy between Plaintiffs and Defendant, Weeden Wetmore. We would also request an extension of our time to answer the complaint, either within 14 days after the more definite statement is served or as otherwise ordered.

8.     Lastly, we seek a Denial of the request for a preliminary injunction as to Weeden Wetmore, because the allegations in the Complaint only suggest a mere possibility of harm, which  is insufficient to justify granting a preliminary injunction.

9.     In addition, plaintiffs make only conclusory allegations as to possible harm from Defendant, Weeden Wetmore, and fails to point to any imminent and non-speculative harm that would befall them in the absence of a preliminary injunction.

JA0562

10.     In addition to the above, Plaintiffs have not sufficiently explained why they

        waited until 2021 to seek this preliminary injunction, when they have been

        performing wedding photography for several years.


**WHEREFORE**, the Defendant, Weeden Wetmore, respectfully requests that the Complaint

be dismissed for the failure to state a claim, and /or for lack of subject matter jurisdiction as to

this defendant; requests the Court strike all references in the pleadings with respect to Weeden

Wetmore, if the dismissal motions are granted; in the alternative, defendant requests a more

definite statement or pleading and the extension of time to answer; and, requests a denial of the

request for a preliminary injunction as to Weeden Wetmore.


Dated: June 16, 2021


                                        Respectfully submitted,


                                        Jeffrey Walker, Esq.
                                        Assistant Chemung County Attorney


JA0563

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

Case No. 6:21-cv-06303-FPG

**Emilee Carpenter, LLC, d/b/a**
**Emilee Carpenter Photography**
and **Emilee Carpenter**

Plaintiffs,

vs.

**Letitia James**, in her official capacity
As Attorney General of New York;
**Johnathan J. Smith**, in his official
capacity as Interim Commissioner of
the New York State Division of Human
Rights; and, **Weeden Wetmore**, in his
official capacity as District Attorney of
Chemung County,

Defendants.

**MEMORANDUM OF LAW**
**In support of a Dismissal, or in the alternative, Opposing Preliminary Injunction**
**as to Chemung County District Attorney**

<div align="right">

County of Chemung Department of Law
Attorneys for Respondent, Weeden Wetmore,
District Attorney of Chemung County
167 Lake Street
Elmira, New York 14902
By: Jeffrey Walker, Esq.

</div>

**Preliminary Statement**

The hundreds of pages submitted on behalf of the Plaintiffs in this matter, respectfully, can be summarized as follows: Plaintiffs believe their First Amendment rights under the United States Constitution could potentially be infringed upon in a possible future prosecution made under sections of the New York Executive Law or the New York Civil Rights Law, and therefore, plaintiffs seek both a temporary as well as a permanent injunction against the several defendants from *possibly* in the future enforcing those provisions of law against them.

For purposes of this motion filed on behalf of District Attorney Weeden Wetmore, who is being sued in his Official capacity as District Attorney of Chemung County, and upon a thorough review of the hypothetical claims which plaintiffs suggest in their Complaint as against existing case law, we seek a dismissal of the Complaint as to this defendant because none of the scenarios described in or contemplated by the Complaint would be prosecuted by a local district attorney.

Accordingly, this Memorandum of Law is made in support of a motion to dismiss the Complaint entirely as against to District Attorney Wetmore, for failure to state a claim upon which relief can be granted against the moving defendant [See: FRCP 12(b)(6), 12(h)(2)(B)] and /or, for lack of subject matter jurisdiction as to this defendant, because any dispute involving this moving defendant is not ripe for adjudication [See: FRCP 12(b)(1)].

If this relief is not granted, then Defendant Wetmore asks that no preliminary injunction be granted in this matter and that he be given time to file an answer in this case.

**Allegations Against Defendant Wetmore**

The allegations in the Verified Complaint concerning Defendant Wetmore are that:

- "District Attorney Wetmore has authority to administer, enforce, and prosecute New York's laws' criminal provisions, including the civil rights law. *See* N.Y. County Law § 700; N.Y. Exec. Law § 299; N.Y. Civ. Rts. Law § 40-d;"[1]

- "District Attorney Wetmore also has authority to criminally prosecute public accommodations who violate a Division order. See N.Y. County Law § 700;"[2]

- "District Attorney Wetmore also has authority to criminally prosecute any person who violates the civil rights law. *See* N.Y. County Law § 700;"[3] and,

- "District Attorney Wetmore may commence a criminal action against a person under the civil rights law without notifying Attorney General James."[4]

However, as indicated below, it appears that District Attorney Wetmore cannot file a discrimination action against the plaintiffs using these laws under any of the scenarios contemplated by the Verified Complaint.

**County Law § 700**

The first law cited by plaintiffs with respect to Defendant Wetmore, is N.Y. County Law § 700, which provides (in part) that: "… it shall be the duty of every district attorney to conduct all prosecutions for crimes and offenses cognizable by the courts of the county for which he or she shall have been elected or appointed."

Respectfully, for the reasons set forth in the two sections below, regarding the provisions of Executive Law and /or Civil Rights laws as cited by the plaintiffs, none of the possible

---

[1] See "Verified Complaint" at para. 17
[2] See "Verified Complaint" at para. 217
[3] See "Verified Complaint" at para. 226
[4] See "Verified Complaint" at para. 227

JA0566

scenarios as presented in the Complaint are "… crimes and offenses cognizable by the courts of the county…" [see, N.Y. County Law § 700] that would be prosecuted by the District Attorney of Chemung County.

### New York State's Human Rights Laws

The plaintiffs confirm that the complaint as to Humans Rights Laws "… refers to New York State's Human Rights Law (N.Y. Exec. Law §§ 290-301) …"[5] A review of those provisions confirms that initial complaints alleging discrimination pursuant to New York Executive Law §§ 290 through 301[6] can only be filed with: the Commissioner of Labor, the Attorney General, the Chairman of the Commission on Quality of Care for the Mentally Disabled, or the Division of Human Rights. See New York Executive Law §297, sub 1. A local district attorney is not contemplated as a party who has jurisdiction to entertain an action under this provision of law.

Plaintiffs explicitly cite with respect to Defendant Wetmore, "N.Y. Exec. Law§ 299" as being applicable.[7] However, that provision entitled "Penal Provision", could only give jurisdiction to a local district attorney under limited circumstances, as provided:

> Any person, employer, labor organization or employment agency, who or which shall willfully resist, prevent, impede or interfere with the division or any of its employees or representatives in the performance of duty under this article, or shall willfully violate an order of the division or commissioner, shall be guilty of a misdemeanor and be punishable by imprisonment in a penitentiary, or county jail, for not more than one year, or by a fine of not more than five hundred dollars, or by both; but procedure for the review of the order shall not be deemed to be such willful conduct. [N.Y. Exec. Law§ 299].

This provision could theoretically allow Defendant Wetmore to initiate a prosecution if plaintiffs were accused of resisting, preventing, impeding or interfering with employees from the

---

[5] See "Verified Complaint" at footnote one on page 3
[6] See "Verified Complaint" at footnote one on page 3
[7] See "Verified Complaint" at para. 17

Human Rights Division, and /or if the plaintiffs were in noncompliance with an existing enforcement order from the State Human Rights Board (N.Y. Exec. Law§ 299; See also, People v. Hvizd 70 Misc.2d 654, 656 (County Court, Westchester County, 1972). This provision does not, however, provide any avenue for a district attorney to prosecute related provisions of the Executive Law generally with respect to alleged Civil Rights violations.

There is no existing "order" from the Division of Human Rights, or the Labor Commissioner, etc., alleged to be in existence (or otherwise known to this defendant) which could trigger any action by the district attorney against the plaintiffs in this case as provided for under N.Y. Exec. Law§ 299. Moreover, going through the list of possible scenarios suggested by plaintiffs in the Complaint, there is no suggestion that plaintiffs intend to "… willfully resist, prevent, impede or interfere with the division or any of its employees or representatives in the performance of duty…" such as to trigger any action by the district attorney in this case under N.Y. Exec. Law§ 299.

Accordingly, the limited circumstances in which the district attorney could prosecute under N.Y. Exec. Law§ 299 are not alleged in the Verified Complaint, and otherwise, New York Executive Law §§ 290 through 301 are not statutes that are cognizable by the courts of the County of Chemung, because they are by statute initiated in other forums.

Where the potential claims made by plaintiffs could not cause any action by the district attorney under the Executive Law in the local county court, the Verified Complaint fails to state a cause of action against Defendant Wetmore, in this regard.

### New York State's Civil Rights Laws

The plaintiffs confirm that the Complaint in this regard refers to "…New York State's Civil Rights Law (N.Y. Civ. Rts. Law §§ 40-c-40-d)…"[8] However, like the above argument, plaintiffs' suggestion of possible prosecution by the District Attorney for violation of Civil Rights Laws §§ 40-c through 40-d[9] are similarly misplaced, where nothing in those sections of law authorizes prosecution by a district attorney for the sort of conduct described in the Complaint absent other circumstances. In addition, existing case law demonstrates that local district attorneys in New York only prosecute Civil Rights Law violations if they are accompanied by other violations of the Penal Law.

When the provisions of Civil Rights Law §§ 40–c & 40–d were adopted by the legislature in 1960, "…it did not contemplate the creation of a new class of *criminal* offenses based upon bias related incidents." See, People v. Fuller, 155 Misc.2d 812, 815 (Crim. Ct., Kings Cnty., 1992) [emphasis in original text]. There are no reported examples of a local district attorney prosecuting a charge solely under the Civil Rights Law. A thorough review of all the reported cases in New York State prosecuted by a local district attorney which includes the cited provisions of Civil Rights law raised by the Plaintiffs, were all prosecutions involving traditional crimes enumerated under the Penal Law, such as: Assault in Third Degree, Aggravated Harassment in Second Degree, and Menacing (People v. Valenti, 139 Misc.2d 254 (Criminal Court, City of New York, Kings County, April 26, 1988); Assault, Harassment, and Disruption or Disturbance of a Religious Service or Funeral (People v. Morrisey, 161 Misc.2d 295 (Criminal Court, City of NY, NY County, Part AP 9, March 15, 1994); Attempted Aggravated Disorderly Conduct (People v. McDaniel, 172 Misc.2d 854 (Sup.Ct., Appellate Term, New

---

[8] See "Verified Complaint" at footnote one on page 3
[9] See "Verified Complaint" at footnote one on page 3

York, First Department, March 26, 1997); Aggravated Harassment in the Second Degree
(People v. Dieppa, 158 Misc.2d 584 (Sp. Ct., Criminal Term, New York, Kings County, Part 16,
June 25, 1993; People v. Fuller, *supra*; and, People v. Livio, 187 Misc.2d 302 (District Court,
Nassau County, New York., First District, December 22, 2000); Aggravated Harassment
(People v. Miccio, 155 Misc.2d 697 (Criminal Court, City of New York, Kings County, Part
BTP 1, October 20, 1992; and, People v. Mulqueen, 155 Misc.2d 632 (District Court, Nassau
County, New York, First District, Criminal Part, September 10, 1992); and, Riot in the Second
Degree (People v. Bollander, 147 Misc.2d 897 (Sup.Ct., Queens County, New York, Criminal
Term, Part K 2, June 6, 1990). There are also cases where the listed civil rights laws were raised
based on other alleged defects in a prosecution (such as, alleged discriminatory equal protection
arguments involving police procedures and Spanish speaking defendants, as in People v. Garcia-
Cepero, 22 Misc.3d 490 (Sup. Ct., Bronx Cnty., 2008); and People v. Molina, 25 Misc.3d 362
(Sup. Ct., Bronx Cnty., 2009).

However, there are no prosecutions by a local district attorney solely for an alleged
violation of Civil Rights Law §§ 40–c or 40–d. This is because the codification of those laws did
not contemplate the creation of a new class of criminal offenses based upon bias related
incidents. People v. Fuller, *supra*. As noted above, the Fuller case included a claim of
Aggravated Harassment in the Second Degree, a traditional Penal Law violation.

None of the scenarios in plaintiffs' Complaint suggest that she intends to commit an
assault (People v. Valenti, *supra*), or disrupt a religious service or funeral (People v. Morrisey,
*supra*); or engage in aggravated disorderly conduct or harassment (People v. McDaniel, *supra*;
People v. Dieppa, *supra*; People v. Miccio, *supra*); or engage in a riot (People v. Bollander,
*supra*). Respectfully, if any of plaintiffs' future actions included one of these other crimes,

several of these cases suggest that the District Attorney would be free to prosecute and achieve a conviction against the plaintiffs, regardless of their alleged First Amendment Rights. See, e.g., People v. McDaniel, *supra* at 301, "… the Court has held that an individual may not exercise claimed First Amendment rights at any place or at any time." [citations omitted]. Accordingly, given the reality that a local district attorney only prosecutes Civil Rights Law cases when they occur alongside a traditional Penal Law violation, the Court should not take any steps that would prevent the district attorney from taking action against the plaintiffs in the event that her protests of the various New York Laws evolve into other transgressions of the law, such as Disorderly Conduct or Harassment, or the aforementioned resisting, preventing, impeding or interfering with any lawful performance of duty by the Division of Human Rights or any of its employees or representatives [N.Y. Exec. Law§ 299].

As alleged in the Complaint, there is no foreseen controversy that would bring the plaintiffs to the attention of the District Attorney.

It can be seen that cases alleging violations of the Civil Rights Laws of New York that *do not* include other penal law charges, are not prosecuted by a local District Attorney, but are prosecuted by the Attorney General's office. See, e.g., People of State of New York ex rel. Spitzer v. Kraeger, 160 F.Supp.2d 360 (United States District Court, N.D. New York, August 24, 2001) [prohibiting defendants from obstructing access to reproductive health care facilities and threatening patients and staff]; People by Vacco v. Mid Hudson Medical Group, P.C., 877 F.Supp. 143 (United States District Court, S.D. New York, February 6, 1995) [discrimination against people with hearing impairments in failure to provide sign language interpreters at medical examinations]; People by Abrams v. Terry, 45 F.3d 17 (United States Court of Appeals, Second Circuit, January 5, 1995) [defendant conspiracy motivated by a class-based animus to

JA0571

deprive women of rights secured by both the Constitution and New York state law]; or People by Abrams v. Hamilton, 125 A.D.2d 1000 (Sup.Ct., Appellate Division, Fourth Department, New York, December 19, 1986) [sex discrimination regarding administering polygraph test].

As can be seen by the law, it is not a local district attorney's job to enforce Civil Rights Law generally; rather, "It is the attorney general's responsibility to enforce a wide range of civil rights in addition to those that affect individuals." People v. Fuller, *supra* at 816. It is the attorney general who has the authority to bring a proceeding pursuant to Executive Law, and the power to seek penalties to be paid the aggrieved parties pursuant to Civil Rights Law § 40-d. People by Abrams v. Hamilton, *supra* at 1001-1002.

Accordingly, Plaintiffs' suggestion of possible prosecution by the District Attorney for violation of Civil Rights Laws are misguided and fail to state a cause of action.

### "District Attorney Wetmore may commence a criminal action against a person under the civil rights law without notifying Attorney General James."[10]

It would appear by reading a limited part of the above referenced Fuller case, that a district attorney could commence a prosecution for a Civil Rights Violation without notifying the attorney general. See, Fuller, *supra* at 818. However, as previously mentioned, the Fuller case does not solely regard a Civil Rights claim, but also includes a claim of Aggravated Harassment in the Second Degree. Like Fuller, and as outlined above, there are no reported cases of any district attorney's actions solely regarding a violation of the Civil Rights Law. Moreover, the Fuller case undertakes a review of the legislative history of the State's Civil Rights Laws, confirming that "When this provision was adopted by the legislature in 1960, it did not contemplate the creation of a new class of *criminal* offenses based upon bias related incidents." *Id.* at 815.

---

[10] See "Verified Complaint" at para. 227

Respectfully, the cited provisions of the Civil Right Laws[11] are not "… crimes and offenses cognizable by the courts of the county…" [see, N.Y. County Law § 700], absent another violation of the penal law as shown above. Therefore, the plaintiffs' suggestion of possible prosecution by the District Attorney of any Civil Rights Violation as suggested in the complaint are hyperbole.

### Dismissal of Complaint as against the Chemung County District Attorney for Failure to State a Cause of Action

The above arguments are adopted and re-incorporated herein. If it appears from the face of the complaint that a federal claim is without merit, the court should dismiss for failure to state a claim. See, Sarmiento v. Texas Bd. of Veterinary Medical Examiners By and Through Avery, 939 F.2d 1242, 1245 (United States Court of Appeals, Fifth Circuit, August 28, 1991), citing Bell v. Hood, 372 U.S. 678 (1946).

"To survive a motion to dismiss, a complaint must contain factual allegations sufficient to provide the defendant with 'notice of what the ... claim is and the grounds upon which it rests.'" Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007), quoting Conley v. Gibson, 355 U.S. 41, 47 (1957). Rule 8(a)(2) requires the complaint to allege facts showing that the plaintiff's claim is plausible, and these "[f]actual allegations must be enough to raise a right to relief above the speculative level." Vanterpool v. Cuccinelli, 998 F.Supp.2d 451, 457 (United States District Court, E.D. Virginia, Richmond Division, February 7, 2014), citing Twombly, *supra* at 555. Conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss. Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d 328, 337 (United States Court of Appeals, Second Circuit, September 25, 2006) (citations omitted).

The plaintiffs have concluded that the Chemung County District Attorney has the authority to prosecute them by virtue of, *inter alia*, N.Y. County Law § 700, N.Y. Exec. Law §

---

[11] See "Verified Complaint" at footnote one on page 3

JA0573

299, or N.Y. Civ. Rts. Law § 40-d;"[12]  However, under the possible scenarios presented within the complaint as compared to the existing laws and cases, the District Attorney would not be the party bringing an action against the plaintiffs, absent either: (1) some further criminal wrongdoing beyond that which is described in the complaint; (2) allegations of plaintiffs resisting, preventing, impeding or interfering with employees from the Human Rights Division; and /or, (3) allegations of the plaintiffs being in noncompliance with an existing enforcement order from the State Human Rights Board.

None of these facts are suggested in the scenarios suggested in the Complaint.  The alleged possibility of a prosecution by the Chemung County District Attorney based on the Complaint are speculative, implausible, and rife with conclusory allegations or legal conclusions masquerading as factual conclusions inasmuch as they seek to state a claim as against the Chemung County District Attorney. Accordingly, the action as drafted fails to state a plausible claim against the Chemung County District Attorney.   Therefore, the action should be dismissed against Defendant Wetmore.

## Dismissal of Complaint as against the Chemung County District Attorney for lack of Subject Matter Jurisdiction

The above arguments are adopted and re-incorporated herein as if fully pled.  In the alternative to the argument that the Complaint fails to state a cause of action as to Defendant Wetmore, it is also stated that there is a lack of subject matter jurisdiction as to this defendant, because any dispute involving this moving defendant is not ripe for adjudication [See: FRCP 12(b)(1)].

It is noteworthy that no action against plaintiffs has been filed by the Chemung County District Attorney's Office, and no such allegation exists anywhere in the Complaint.  Moreover,

---

[12] See "Verified Complaint" at para. 17

upon information and belief as per a review with our client, there are no active or pending investigations, claims, nor any other legal action with respect to the plaintiffs.

In the unnumbered "introduction" to the complaint, plaintiffs complain of the *possibility* of paying: "limitless damages and a $100,000 fine"; the *possibility* of having to "create artwork against her beliefs via court order"; the *possibility* of having their business license revoked; and /or the *possibility* of going to jail for up to a year, if these laws were in the future to *possibly* be prosecuted against plaintiffs. However, as stated above, the laws cited by the plaintiffs would not be prosecuted by the District Attorney, absent some further criminal wrongdoing beyond that which is described in the complaint, or allegations of Plaintiffs resisting, preventing, impeding or interfering with employees from the Human Rights Division, and /or, allegations of the plaintiffs being in noncompliance with an existing enforcement order from the State Human Rights Board. As such, there is no actual controversy between plaintiffs and the Chemung County District Attorney's office.

Federal courts may adjudicate only those "real and substantial controvers [ies] admitting of specific relief ... as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." Lewis v. Continental Bank Corp., 494 U.S. 472, 477 (1990) quoting North Carolina v. Rice, 404 U.S. 244, 246 (1971); See also, Auerbach v. Board of Educ. of the Harborfields Cent. School Dist. of Greenlawn, 136 F.3d 104, 108 (United States Court of Appeals, Second Circuit, January 12, 1998). "When the events alleged in a plaintiff's cause of action have not yet occurred, a federal court is precluded from exercising subject matter jurisdiction because a real case or controversy does not exist…" Auerbach v. Board of Educ. of the Harborfields Cent. School Dist. of Greenlawn, *supra* at 108-109, citing Cargill, Inc. v.

Charles Kowsky Resources, Inc., 949 F.2d 51, 56 (United States Court of Appeals, Second Circuit, November 13, 1991).

Ripeness is jurisdictional in nature and therefore properly considered on a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules. King's Gym Complex, Inc. v. Philadelphia Indem. Ins. Co., 433 F.Supp.2d 256, 260 (United States District Court, N.D. New York, June 16, 2006), citing Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 261 F. Supp.2d 293, 294 (S.D.N.Y. 2003).

Accordingly, in the alternative to the argument that the Complaint as drafted fails to state a plausible claim against the Chemung County District Attorney, it is also submitted that the *possible* events alleged in the complaint, being some *possible* action by the Chemung County District Attorney, are not a real case or controversy, and/or do not exist, and *would not occur in the future*, absent other factors – such as: (1) some further criminal wrongdoing by plaintiffs beyond that which is described in the complaint; (2) allegations of plaintiffs resisting, preventing, impeding or interfering with employees from the Human Rights Division; and /or, (3) allegations of the plaintiffs being in noncompliance with an existing enforcement order from the State Human Rights Board.

Since these are hypothetical facts, the action should be dismissed against Defendant Wetmore for lack of subject matter jurisdiction pursuant to Rule 12(b)(1).

### If Dismissal is granted, Request to Strike Portions of Pleadings referring to the Chemung County District Attorney

If the motion to dismiss as requested herein is granted, Defendant Wetmore further requests that the court strike all references in the pleadings with respect to Weeden Wetmore, in his Official capacity as District Attorney of Chemung County. [See: FRCP 12(b)(f)].

JA0576

**If Dismissal is not granted, a demand for a more definitive pleading is requested as well as a request for Defendant's Time to Respond be extended accordingly**

The above arguments are adopted and re-incorporated herein as if fully pled. In short, it is submitted that the possible scenarios presented within the complaint do not make out a cognizable action by plaintiffs with respect to the Chemung County District Attorney. The facts as suggested do not present "… crimes and offenses cognizable by the courts of the county…" [see, N.Y. County Law § 700].

Therefore, if for any reason this matter is not dismissed as to Defendant Wetmore, then in the alternative, said defendant makes a motion demanding a more definite statement or pleading, demonstrating how the Chemung County District Attorney could be in controversy with the plaintiff. This request is made based on the defects and vague and or ambiguous references to possible actions by the Chemung County District Attorney as alleged within the pleadings, as are explained herein. The District Attorney, respectfully, would not bring an action against the plaintiffs under the circumstances as described, absent either some further criminal wrongdoing by plaintiffs beyond that which is described in the complaint; allegations of Plaintiffs resisting, preventing, impeding or interfering with employees from the Human Rights Division; and /or, allegations of the plaintiffs being in noncompliance with an existing enforcement order from the State Human Rights Board. It is submitted that under the possible circumstances as drafted in the Complaint, respectfully, the Chemung County District Attorney would be unable to reasonably prepare a response without a more definite statement or pleading. [See: FRCP 12(b)(e)].

Assuming this request is granted, Defendant Wetmore requests extending his time to answer the complaint to 14 days after the more definite statement is served, or if this request is denied, that the court allow Defendant Wetmore's responsive pleading to be served 14 days after the denial of this motion, if appropriate [See: FRCP 12(a)(4)].

JA0577

**Arguments Regarding the Constitutionality of the Underlying Laws are Reserved**

In making this motion, Defendant Wetmore is at this time making no statement regarding the underlying validity of the statutes in question. It is noted that a strong presumption exists for the constitutional validity of a statute. See, People v. Hvizd, *supra* at 657, citing People v. Finkelstein, 9 N.Y.2d 342 (1961). The Defendant moving hereby reserves his rights to make further arguments in support of the statutes questioned by this lawsuit if the instant motion to dismiss is not granted in full.

**Opposing Preliminary Injunction**

The above arguments are adopted and re-incorporated herein as if fully pled. If this matter is not dismissed as to the Chemung County District Attorney, then the District Attorney opposes the plaintiffs' preliminary injunction request.

The plaintiffs' preliminary injunction motion seeks to prevent the defendants, including Wetmore, from allegedly "violating the First Amendment of the United States Constitution" by enjoining the defendants from enforcing: New York Executive Law § 269.2(a) and New York Civil Rights Law § 40-c(2), for various reasons cited.

While the preliminary injunction motion and its Memorandum in Support set forth allegations as to why they believe these laws infringe on their First Amendments rights, the same lack plausible arguments as to how Defendant Wetmore is, or potentially could be, a participant in any such infringement under the law.

In instances where a plaintiff alleges injury from a rule or regulation that may only potentially affect speech, the plaintiff must establish a causal link between the injunction sought and the alleged injury, that is, the plaintiff must demonstrate that the injunction will prevent the feared deprivation of free speech rights. To meet this standard, a party must articulate a specific

present objective harm or a threat of specific future harm; a "conjectural chill," such as when a person theoretically might not speak due to a regulation, is not sufficient to establish real and imminent irreparable harm. CompassCare v. Cuomo, 465 F.Supp.3d 122, 143 (United States District Court, N.D. New York, June 5, 2020) [internal citations omitted].

For the reasons stated herein, the possible prosecution by the Chemung County District Attorney is not real or imminent under the facts recited in the Complaint.

"A preliminary injunction is considered an `extraordinary remedy that should not be granted as a routine matter." Distribution Sys. Of Am., Inc. v. Vill. Of Old Westbury, 785 F.Supp.347, 352 (E.D.N.Y. 1992), quoting JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75, 79 (2nd Cir. 1990). The mere possibility of harm is insufficient to justify granting a preliminary injunction. See, e.g., Borey v. Nat'l Union Fire Co., 934 F.2d 30, 34 (2d Cir. 1991); Distribution Sys. Of Am., Inc., supra at 352; Costello v. McEnery, 767 F.Supp 72, 76 (S.D.N.Y. 1991). A motion for a preliminary injunction is properly denied where "the plaintiff made only conclusory allegations and failed to point to any imminent and non-speculative harm that would befall it in the absence of a preliminary injunction." Family-Friendly Media, Inc. v. Recorder Tel. Network, 74 A.D.3d 738, 739-40 (2nd Dept., 2010).

In addition to the above, Plaintiffs' Declaration in Support of Preliminary Injunction states that she started wedding photography services as far back as 2012, and started her current company in 2019.[13] She does not sufficiently explain why she waited until 2021 to seek this preliminary injunction. "[T]he failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury[.] ... [If not] explainable, delay alone may justify denial of a preliminary

---

[13] Declaration of Emilee Carpenter in Support of Plaintiffs' Preliminary Injunction Motion at paras. 28, 37, et.al.

injunction." See, <u>Tough Traveler, Ltd. v. Outbound Prods.</u>, 60 F.3d 964, 968 (2d Cir. 1995); see

also <u>Monowise Limited Corp. v. Ozy Media, Inc.</u>, No. 17-CV-8028, 2018 WL 2089342, at 1

(S.D. N.Y. May 3, 2018). Accordingly, if for no other reason, this Court may deny the

preliminary injunction request based on delay alone.

<div align="center"><u>Conclusion</u></div>

For the reasons stated herein, Defendant Weeden Wetmore, who is being sued in his

official capacity as Chemung County District Attorney, requests an Order granting:

- A Dismissal of the complaint for failure to state a claim upon which relief can be granted [See: FRCP 12(b)(6), 12(h)(2)(B)] and /or;
- A Dismissal for lack of subject matter jurisdiction as to this defendant, because any dispute involving Weeden Wetmore is not ripe for adjudication [See: FRCP 12(b)(1)];
- Requesting the Court to strike all references in the pleadings with respect to Weeden Wetmore if the dismissal motion is granted [See: FRCP 12(b)(f)];
- If the motions to dismiss are not granted, in the alternative, a request for a more definite statement or pleading, [See: FRCP 12(b)(e)];
- Extending the time to answer, either within 14 days after the more definite statement is served or as otherwise ordered [See: FRCP 12(a)(4)]; and
- Seeking a Denial of the request for a preliminary injunction as to Weeden Wetmore.

Dated: Elmira, New York

June 16, 2021

**CHEMUNG COUNTY LAW DEPARTMENT**

M. Hyder Hussain, Esq.
By: Jeffrey Walker
Attorneys for Petitioners-Plaintiffs
203 Lake Street
Elmira, NY 14902
(607) 737-2982
jwalker@chemungcountyny.gov

# DECLARATION OF JOHNATHAN J. SMITH

JOHNATHAN J. SMITH, pursuant to 28 U.S.C. § 1746, declares the following:

1. Since May 2021, I have served as the Interim Commissioner of the New York State Division of Human Rights.

2. I respectfully submit this Declaration in support of Defendants' Opposition to the Motion for Preliminary Injunction. I am familiar with the matters set forth herein, either from personal knowledge or on the basis of documents that have been created by, provided to and/or reviewed by me.

3. In 1945, New York enacted the predecessor statute to the Human Rights Law ("HRL"), which affords every citizen "an equal opportunity to enjoy a full and productive life." This law prohibits discrimination in employment, housing, credit, places of public accommodations, and non-sectarian educational institutions, based on age, race, creed, national origin, sex, sexual orientation, gender identity or expression, marital status, disability, military status, and other specified classes.

4. The New York State Division of Human Rights was created to enforce this important law and vindicate the public interest by eliminating and preventing unlawful discrimination. *See* N.Y. Exec. Law § 290(3).

5. The mission of the Division is to ensure that "every individual . . . has an equal opportunity to participate fully in the economic, cultural and intellectual life of the State." N.Y. Exec. Law § 290(3).

6. In accordance with its mission, the Division receives complaints from the public about violations of the HRL. *See* N.Y. Exec. Law § 297(1). Additionally, in 2008, a Division-Initiated Action Unit ("DIAU") was created to address allegations of systemic issues of discrimination that could be potentially high impact, such as employment cases involving a large number of employees, housing cases involving a large number of buildings or units, and public accommodations involving services sought by hundreds or thousands members of the public.

7. The vast majority of the Division's investigations are prompted by public complaints, rather than Division-initiated. On average, per year, the Division handles approximately 5,700 publicly filed complaints, as opposed to only approximately five DIAU complaints.

8. The Division employs approximately 150 staff members, including 56 investigators of individual complaints filed by members of the public (specifically, 48 Human Rights Specialists and eight Regional Directors). The DIAU, meanwhile, employs only two investigators.

1

9.  Once a complaint is received, there are multiple steps in the process before the Division would issue an order, none of which have occurred here.

10. First, an intake specialist would elicit and record the relevant information and collect documentation from the complainant.

11. After intake, the complaint would be assigned to an investigator, who would compile an administrative record and investigate the complaint under the supervision of regional office management. This process may entail conducting in-person visits to the respondent's business, requesting additional documentation, and conducting interviews.

12. Following the investigation, the investigator would make a recommendation, which must then be reviewed for factual accuracy and legal sufficiency by a Division Regional Director. *See* 9 N.Y.C.R.R. § 465.8.

13. One additional determination that must be made is whether the Division has jurisdiction over the complaint. *See* 9 N.Y.C.R.R. § 465.5(d)(1) ("Agency regulations further establish that, "If the division finds, . . . with respect to any respondent or charge, that it lacks jurisdiction . . . , the complaint shall be dismissed as to such respondent, or charge . . . ."). Executive Law § 297(2)(a) provides that "[w]ithin one hundred eighty days after a complaint is filed, the [D]ivision shall determine whether it has jurisdiction and, if so, whether there is probable cause to believe that the person named in the complaint, hereinafter referred to as the respondent, has engaged or is engaging in an unlawful discriminatory practice. If it finds with respect to any respondent that it lacks jurisdiction or that probable cause does not exist, the commissioner shall issue and cause to be served on the complainant an order dismissing such allegations of the said complaint as to such respondent."

14. If, after investigation and review by a Division Regional Director, no probable cause is found, the complainant may appeal to New York State Supreme Court. *See* NY Exec. Law § 298. Additionally, on his or her own initiative, the Commissioner may review and reopen a probable cause determination made by the regional office, in the interest of justice. Even after the time for an appeal has expired, the complainant may seek further DHR review, on limited grounds, of a regional office dismissal. On the other hand, if DHR makes a finding of probable cause, the respondent may likewise ask the Commissioner to review that that determination. 9 N.Y.C.R.R. §465.20.

15. Following a finding of probable cause, the parties attend one or more pre-hearing settlement conferences. If the parties cannot reach an agreement to resolve the dispute, a formal public hearing is scheduled before an administrative law judge ("ALJ").

16. During the hearing, evidence is taken under oath, witnesses are subject to cross examination, and a certified transcript is created. At the conclusion of the hearing,

2

the ALJ makes a recommendation. The parties then can submit objections to the ALJ's recommendation.

17. Thereafter, the Commissioner makes a determination as to whether unlawful discrimination has occurred. In doing so, the Commissioner reviews the hearing transcript and evidence, the ALJ's recommendation, and any objections from the parties to the recommendation.

18. Once the Commissioner issues his or her final order, either party may appeal to New York State Supreme Court, which, in most instances, will transfer the matter to the Appellate Division for disposition N.Y. Exec. Law §298.

19. In order to enforce an order after hearing and obtain the relief awarded, the Division must petition the Supreme Court for an order confirming the final determination. In most instances, the Supreme Court will transfer the matter to the Appellate Division for disposition. N.Y. Exec. Law §298. As it does with a petition brought by a respondent aggrieved by a final order after hearing, the court will review the administrative record to determine whether that final determination is based upon substantial evidence. *See Matter of State Division of Human Rights v. Bystricky,* 30 N.Y.2d 322, 326, 284 N.E.2d 560, 333 N.Y.S.2d 398 (N.Y. 1972).

20. Upon reviewing Plaintiff's complaint in this case, I caused a search of the Division's records for any complaints against the plaintiffs, Emilee Carpenter, LLC d/b/a Emilee Carpenter Photography, and Emilee Carpenter (collectively, "Plaintiff").

21. That search revealed that Plaintiff is not and has not been the subject of any complaint of discrimination filed with the Division by a member of the public.

22. In addition, Plaintiff is not and has not been the subject of any complaint regarding systemic discrimination filed by the DIAU.

23. Plaintiff is not and has not been the subject of any investigation by the Division.

24. Plaintiff is not and has not been the subject of any enforcement action by the Division.

25. As the text of the Human Rights Law itself makes clear, the challenged law serves to protect the rights of religious individuals and prevent against discrimination not just on the basis of sexual orientation, but also creed.

26. Attached as **Exhibit A** are true and accurate excerpts of the Division's Resource Guide, which is distributed to investigators as part of their training and made available to all Division staff in order to assist them in their work. As the Resource Guide reiterates, "Discrimination on the basis of creed is prohibited in all areas of jurisdiction under the Human Rights Law."

3

27. Thus, consistent with the Division's mission, its enabling statute, and internal guidance, the Division enforces the Human Rights Law to protect employees from discrimination and harassment on the basis of creed. *See* N.Y. Exec. Law §296(1).

28. For example, in *Méndez v. C.Y.L. Bais Oifeh*, SDHR Case No. 10141617, 6/23/2014, the Division found that termination of the complainant's employment for drinking coffee in an area of the bakery where only Jewish individuals were permitted to eat was unlawful, and awarded $4,240 back pay and $2,500 mental suffering, and ordering display of Division poster. A true and accurate copy of the Division's final order is attached as **Exhibit B**.

29. As Exhibit A further reiterates, the Human Rights Law's requirement that employers make reasonable accommodations to allow employees to practice their religion. *See* N.Y. Exec. Law §296(10).

30. Additionally, consistent with the law and its internal guidance, the Division enforces the Human Rights Law's prohibition on religious discrimination by requiring employers to provide reasonable accommodations for religious practice.

31. For example, in *Presworsky v. New York Methodist Hospital*, SDHR Case No. 10111665, 2/18/2009, the Division found that the respondent's denial of a job as a nurse based on the applicant's observance of the Sabbath was a violation the Human Rights Law because the respondent failed to engage in a "bona fide effort" to reasonably accommodate the complainant's sincerely held religious observance, and awarding $10,000 mental pain and suffering, and requiring respondent to establish a policy of non-discrimination based on religion. A true and accurate copy of the Division's final order is attached hereto as **Exhibit C**.

32. The Human Rights Law further prohibits discrimination, including discriminatory harassment, in housing based on religion, and the Division enforces this prohibition. *See* N.Y. Exec. Law §296(5).

33. For example, in *Murphy v. Hilpl*, SDHR Case No. 10140314, 12/1/2011, the Division found that the landlord's abusive language towards tenant about his race and religion was unlawful, and awarded damages. A true and accurate copy of the Division's final order is attached hereto as **Exhibit D**.

34. The Human Rights Law further prohibits discrimination based on religion in public accommodations, and the Division enforces this prohibition. *See* N.Y. Exec. Law §296(2).

35. For example, in *Pezza v. The Mill River Club, Inc.*, SDHR Case No. 3507000, 12/26/2006, the Division found that exclusion of members and favoring others based on religion, for the purposes of maintaining a balance between Christian and Jewish members, is unlawful discrimination on the basis of creed, and ordered respondent to cease and desist, and to promulgate new policies. A true and accurate copy of the

4

Division's final order is attached as **Exhibit E**. This decision was affirmed in *Mill River Club, Inc. v. N.Y. State Div. of Human Rights*, 59 A.D.3d 549 (2d Dept. 2009).

36. Similarly, in *Sun v. Lucky Joy Restaurant, Inc.*, SDHR Case No. 10126349, 10/2/2009, the Division found that the restaurant's policy of not serving food to Falun Gong members violated the law and awarded damages. A true and accurate copy of the Division's final order is attached as **Exhibit F**. This order was confirmed in *State Div. of Human Rights (Sun) v. Lucky Joy Restaurant*, 131 A.D.3d 536 (2d Dept. 2015).

37. Additionally, in *Steinberg v. Nations Café,* SDHR Case No. 2302311, 5/27/2005, the Division found that a café owner's ridiculing of the complainant and refusal to provide coffee in a disposable cup to comply with his kosher dietary laws was unlawful and awarded compensatory damages. A true and accurate copy of the final order is attached as **Exhibit G**.

38. The Human Rights Law only permits an employer to lawfully deny a job to an individual based on a protected category when it is also a bona fide occupational qualification ("BFOQ"), and the Division enforces the law accordingly.

39. For example, in *Zaic v. N.Y. State Unified Court System,* SDHR Case No. 10174105, 11/15/2017, the Division held that the Respondent's blanket policy of disqualifying candidates, such as complainant, who had hearing loss, from the position of court officer-trainee, regardless of whether such candidates could meet the standards with the use of hearing aids violated the Human Rights Law as the ability to meet the hearing standard without the use of hearing aids was not a BFOQ for the job, and the respondent failed to demonstrate that the use of hearing aids were a direct threat to public safety, and awarded damaes to the complainant and imposed a fine. A true and accurate copy of the final order is attached as **Exhibit H**. This order was affirmed in *New York State Unified Court System v. NYSDHR*, 180 A.D.3d 555 (1st Dept. 2020); *lv. denied* 35 N.Y3d. 916 (2020).

40. Similarly, in *Triebel v. Whitesboro Central School District,* SDHR Case No. 5750383, 10/3/2002, the Division found that it was lawful to deny Complainant a position of monitor with Respondent, based on her sex, as being male was a BFOQ for the position because of the deplorable condition of the boys' bathroom, the need for unannounced inspections, and the resultant embarrassment if this monitoring were performed by a female. A true and accurate copy of the final order is attached as **Exhibit I**.

41. The BFOQ defense protects all employers from the absurd result of being forced to hire an employee who, by definition, cannot perform the duties of the role. For example, it would prevent Plaintiff from being required to hire a blind photographer.

JA0585

42. There is no BFOQ for public accommodations, whether secular or religious, as there can never be a bona fide *occupational* qualification for a customer—by its nature, the exemption is for an employee based on the nature of the job sought.

43. There is a ministerial exception under the Human Rights Law for religious employers to make lawful hiring decisions on the basis of religion, as described in the Resource Guide, and the Division enforces this exception. However, the exception does not apply to secular businesses or non-ministerial roles.

44. For example, in *Lysek v. Christian Central Academy*, SDHR Case No. 10180743, 5/15/2018, the Division found that the respondent was not a religious organization, nor was the complainant employed in a ministerial role, such that it was unlawful discrimination on the basis of familial status to require teachers with children under the age of 18 to enroll their children in the respondent's school as a condition of employment, and imposed a fine. A true and accurate copy of the final order is attached as **Exhibit J**. This decision was affirmed on appeal by *Christian Central Academy v. N.Y. State Div. of Human Rights*, 172 A.D.3d 1911 (4th Dept. 2019).

45. A true and accurate copy of the final order in *Morgan v. Zaharo Cab Corp.*, SDHR Case No. 1011788 (July 2, 2014) is attached as **Exhibit K**.

46. A true and accurate copy of the final order in *Battaglia v. Buffalo Niagara Intro., Inc.*, SDHR Case No. 10138581 (Jan. 28, 2012) is attached as **Exhibit L**.

47. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed: Bronx, New York

      June 16, 2021

-----------------------------------------------
JOHNATHAN J. SMITH

6

JA0586

# EXHIBIT A

JA0587

**State of New York**
**DIVISION OF HUMAN RIGHTS**
**One Fordham Plaza; 4th Floor**
**Bronx, New York 10458-5871**

# A RESOURCE GUIDE TO THE NEW YORK STATE HUMAN RIGHTS LAW

**Prepared by:**
**Albert J. Kostelny, Jr.**
**Associate Attorney**
**2nd ed. 2003**

**Updated and revised by:**
**Elaine A. Smith**
**Associate Attorney**
**5th ed. 2016**
*(with updates through 2019)*

**Link for**
*Printable Version*

**Links to Legal Resources:**

 **Legal Resources Notebook**
*opens the Legal Resources notebook in CMS*

 **Legal Resources Topics Index**
*Lists topics and subtopics for searching the Legal Resources notebook*

# TABLE OF CONTENTS

**HOW TO USE THE RESOUCE GUIDE**

**INTRODUCTION**

LIBERAL CONSTRUCTION

ORIGINS AND DEVELOPMENT OF THE HUMAN RIGHTS LAW

Scope and Coverage of the Human Rights Law: Sections 296 and 296-A of the Executive Law Outlined in a Table Format

000001

personality traits were considered inappropriate in a woman.  Courts have interpreted the Human Rights Law to extend the prohibition on discrimination on the basis of sex stereotyping to transgender persons.  See *Martin v. J.C. Penney Corp., Inc.*, 28 F.Supp.3d 153 (E.D.N.Y. 2014) (two females who alleged they were singled out and suspected of shoplifting because they were dressed as males stated valid sex discrimination claim under the Human Rights Law); *Hispanic Aids Forum v. Bruno*, 16 Misc.3d 960, 839 N.Y.S.2d 691 (Sup.Ct. N.Y. Co. 2007) (landlord's attempts to exclude plaintiff's transgender clients from the building constituted discrimination because of sex); *Buffong v. Castle on the Hudson*, 2005 N.Y. Slip Op. 52314U, 12 Misc.3d 1193(A), 2005 WL 4658320 (Sup.Ct. Westch. Co. 2005) (unpublished decision) (transgender person states a claim pursuant to the Human Rights Law on the ground that the word "sex" in the statute covers transgender persons, reviewing existing case law).

In addition, under the Human Rights Law, a person meeting the criteria for a medical diagnosis of gender dysphoria is entitled to the disability protections of the Human Rights Law.  This includes being entitled to reasonable accommodations that may be requested based on treatments intended to ameliorate gender dysphoria.  This may include living as, and being treated as, a person with a gender opposite one's birth gender.  In *Wilson v. Phoenix House*, 42 Misc.3d 677, 978 N.Y.S.2d 748 (Sup.Ct. Kings Co. 2013), the provider of a drug rehabilitation program was found to have discriminated against the plaintiff, a biologically male transgender woman, where she was required to share facilities with men and attend all-male counselling sessions, and was told she could not wear her wig or high heeled shoes.  The court found this was discrimination based upon her disability (at that time referred to as gender identity disorder) and the program failed to make reasonable accommodations for her disability.

In *Doe v. City of New York*, 42 Misc.3d 502, 976 N.Y.S.2d 360 (Sup.Ct. N.Y. Co. 2013), the plaintiff, who was diagnosed with gender identity disorder and completed reassignment surgery, requested that HIV/AIDS Services Administration update her records and benefit card to reflect her legal name change and that she was now female, though formerly male. She submitted her court order and documentation from her doctor.  HASA's refusal to make the change because plaintiff had been unable to obtain an amended birth certificate was discriminatory.

The above information, and additional information regarding the regulations, is also available in Memorandum: Division regulations regarding gender identity.

# SEXUAL ORIENTATION

Discrimination on the basis of sexual orientation is prohibited in all areas of jurisdiction under the Human Rights Law, except with regard to the domestic worker provisions of **N.Y. Exec. L.** § 296-b.

000056

"The term 'sexual orientation' means heterosexuality, homosexuality, bisexuality or asexuality, whether actual or perceived.  However, nothing contained herein shall be construed to protect conduct otherwise proscribed by law."  **N.Y. EXEC. L.** § 292.27.

It should be noted that discrimination against individuals on the basis of sexual orientation can, in certain circumstances, also make out a cause of action for discrimination against other protected classes set out in the Human Rights Law.  For example, discrimination against an individual perceived to be homosexual (and therefore at risk for AIDS) in the provision of dental services has been held to make out a claim for disability discrimination under the Human Rights Law.  *Martell v. North Shore University Hospital*, SDHR Case No. 107810 (August 17, 1990), *rev'd on other grounds sub nom, North Shore University Hospital v. Rosa*, 194 A.D.2d 727, 600 N.Y.S.2d 90 (2d Dept. 1993), *aff'd* 86 N.Y.2d 413, 633 N.Y.S.2d 462 (1995).

The definition of "sexual orientation" set forth in the Human Rights Law does not include gender identity, the status of being transgender, or other status related to gender identity.  However, see the Gender Identity section above.

## Marriage of Same-Sex Couples

It is sexual orientation discrimination to refuse to recognize (e.g. for purposes of providing spousal benefits) a marriage of same-sex persons performed in a jurisdiction where such marriages are valid.  *Martinez v. County of Monroe*, 50 A.D.3d 189, 850 N.Y.S.2d 740 (4th Dept. 2008); General Counsel's Legal Opinion No. 2007-14.  Note, however, that in many circumstances involving spousal benefits provided by private employers, Division jurisdiction will be preempted by the Employee Retirement Income Security Act (ERISA).  Consult with the General Counsel's office before making determinations on the basis of ERISA.

As of July 24, 2011, persons of the same sex are permitted to marry in New York State.  This legislative amendment to the Domestic Relations Law did not amend the Human Rights Law.  However, the change opens the possibility of claims of discrimination in connection with a marriage ceremony or celebration for same-sex couples.  **You must consult with the General Counsel with regard to *any* such claims.**

Any questions with respect to the provision of domestic partner benefits to couples of the same sex (or opposite sex) should be referred to the General Counsel for analysis.

## Transvestism

Transvestites, i.e., cross-dressers, are not *per se* protected from discrimination under the New York State Human Rights Law.  However, see the Sex Stereotyping and Gender Identity sections above.

000057

# PREGNANCY-RELATED CONDITION

By amendment to the Human Rights Law, effective January 19, 2016, a "pregnancy-related condition" is defined at § 292.21-f, placing it on a definitional par with "disability", as defined by § 292.21.  A pregnancy-related condition is a *medical condition* related to pregnancy or childbirth.  Pregnancy-related conditions are to be treated the same as any *temporary disability*, for all purposes in the Human Rights Law.

The amendment makes reasonable accommodation an explicit requirement by adding "pregnancy-related conditions" to § 296.3(a).  Pregnancy-related conditions are to be accommodated in accordance with the Division's regulations on reasonable accommodation of temporary disabilities, found at 9 NYCRR § 466.11(i).

The amendment also added an explicit provision that the employee must cooperate in the interactive process by providing medical or other information necessary for the employer to consider the reasonable accommodation. **N.Y. EXEC. L.** § 296.3(c).  (This provision applies to the reasonable accommodation of all disabilities as well as pregnancy-related conditions.)

It should be remembered that the mere fact of being pregnant does not trigger the requirement of accommodation.  Only those "medical conditions" that are experienced by the woman trigger the requirement.

Lactation, miscarriage and abortion are pregnancy-related medical conditions.

See further, the Memorandum: Recent amendments the HRL regarding pregnancy-related conditions and Memorandum: Amendment to the Human Rights Law to clarify that lactation is a pregnancy-related condition; *see also* the section above, Disability: Reasonable Accommodation: Employment.


# CREED

Discrimination on the basis of creed is prohibited in all areas of jurisdiction under the Human Rights Law.

Creed is deemed by the Division to constitute an individual's system of beliefs concerning that individual's relationship with the universe and humanity.  Belief in a supreme being or membership in an organized religion or congregation is unnecessary.  Atheism and agnosticism are "creeds" within this definition.  A person is also protected from discrimination because of having no religion or creed.  The Division accepts an individual's self-identification with a particular creed or religious tradition as determinative.

JA0591

000074

## Accommodation of Religious Observance or Practice

"It shall be an unlawful discriminatory practice for any employer, or an employee or agent thereof, to impose upon a person as a condition of obtaining or retaining employment, including opportunities for promotion, advancement or transfers, any terms or conditions that would require such person to violate or forego a sincerely held practice of his or her religion, including but not limited to the observance of any particular day or days or any portion thereof as a sabbath or other holy day in accordance with the requirements of his or her religion or the wearing of any attire, clothing, or facial hair in accordance with the requirements of his or her religion, unless, after engaging in a bona fide effort, the employer demonstrates that it is unable to reasonably accommodate the employee's or prospective employee's sincerely held religious observance or practice without undue hardship on the conduct of the employer's business. …" **N.Y. EXEC. L.** § 296.10(a).

This section requires accommodation of more than just sabbath observance. As stated in the memorandum to the 2002 amendments to § 296.10, the intent was to broaden the protections of the law so that "Employees and prospective employees whose dress, hairstyle, beards, prayer requirements and sabbath and holy day observances are required by their religious beliefs, are all too often faced with the prospect of compromising either their faith or their ability to support themselves and their families." 2002 Sess. Law News of N.Y. Legis. Memo Ch. 539. The 2019 amendment added the phrase "or the wearing of any attire, clothing, or facial hair in accordance with the requirements of his or her religion" to further clarify the scope of accommodation required. See further Memorandum: Amendment clarifying discrimination against religious attire.

The employer is always obligated to first make a bona fide effort to accommodate an employee's or prospective employee's religious observance or practice, before denying an employment opportunity, or refusing to accommodate. *Schweizer Aircraft Corp. v. State Division of Human Rights*, 48 N.Y.2d 294, 422 N.Y.S.2d 656 (1979). In making a bona fide effort, an employer is not obliged to initiate adversarial proceedings against a union when the seniority provisions of a collective bargaining agreement limit its ability to accommodate any employee's religious observance or practice, but may satisfy its duty under this section by seeking volunteers willing to waive their seniority rights in order to accommodate their colleague's religious observance or practice. *New York City Transit Authority v. State Division of Human Rights*, 89 N.Y.2d 79, 651 N.Y.S.2d 375 (1996). Moreover, a failure on the part of complainant to inform the employer of complainant's religious needs and to assist in the accommodation process may constitute a waiver of complainant's rights under this provision. *State Division of Human Rights v. Rochester Products*, 112 A.D.2d 785, 492 N.Y. S.2d 282 (4th Dept. 1985).

### Time off for Sabbath and Other Religious Observance

Time off for religious observance of a particular day or days as a sabbath or holy day shall include granting the employee "a reasonable time prior and subsequent thereto for travel between his or her place of employment and his or her home". **N.Y. EXEC. L.** § 296.10(b). However, "any such absence from work shall, wherever practicable in the reasonable judgment of the employer, be made up by an equivalent amount of time and work at some

000075

other mutually convenient time, or shall be charged against any leave with pay ordinarily granted, other than sick leave, provided further, however, that any such absence not so made up or charged, may be treated by the employer of such person as leave taken without pay." *Id.* The employer may not refuse to allow the use of any available leave with pay because the leave will be used for religious observance. **N.Y. EXEC. L.** § 296.10(c).

In exchange for rearrangement of the work schedule to accommodate religious observance, the employee may be required to forego certain benefits that otherwise would accrue from the work time scheduled, as follows. "Notwithstanding any other provision of law to the contrary, an employee shall not be entitled to premium wages or premium benefits for work performed during hours to which such premium wages or benefits would ordinarily be applicable, if the employee is working during such hours only as an accommodation to his or her sincerely held religious requirements." **N.Y. EXEC. L.** § 296.10(a). "Premium wages" include "overtime pay and compensatory time off, and additional remuneration for night, weekend or holiday work, or for standby or irregular duty." **N.Y. EXEC. L.** § 296.10(d)(2). "Premium benefit" means "an employment benefit, such as seniority, group life insurance, health insurance, disability insurance, sick leave, annual leave, or an educational or pension benefit that is greater than the employment benefit due to the employee for an equivalent period of work performed during the regular work schedule of the employee." **N.Y. EXEC. L.** § 296.10(d)(3). However, "[n]othing in this paragraph or paragraph (b) of this subdivision shall alter or abridge the rights granted to an employee concerning the payment of wages or privileges of seniority accruing to that employee." **N.Y. EXEC. L.** § 296.10(a).

## Undue Hardship

In order to justify denying an accommodation for an employee's or prospective employee's religious observance or practice, the employer must demonstrate that such accommodation would result in undue hardship to the employer. The undue hardship standard applies to all accommodations, not only those for time off for religious observance. "Undue hardship" means an accommodation requiring significant expense or difficulty, including a significant interference with the safe or efficient operation of the workplace, or a violation of a bona fide seniority system. **N.Y. EXEC. L.** § 296.10(d)(1).

Undue hardship is an affirmative defense, which must be proved by the employer. See above Theories of Discrimination: Affirmative Defenses: Undue Hardship and Undue Burden.

In determining whether an accommodation would pose an undue economic hardship, the law sets out the factors to be considered:

(i) the identifiable cost of the accommodation, including the loss of productivity and of retaining or hiring employees or transferring employees from one facility to another, in relation to the size and operating cost of the employer;
(ii) the number of individuals who will need the particular accommodation to a sincerely held religious observance or practice; and

000076

(iii) for an employer with multiple facilities, the degree to which the geographic separateness or administrative or fiscal relationship of the facilities will make the accommodation more difficult or expensive.

**N.Y. Exec. L.** § 296.10(d)(1).

In addition to these economic factors, a requested accommodation will be considered an undue hardship, and therefore not reasonable, "if it will result in the inability of an employee to perform the essential functions of the position in which he or she is employed." **N.Y. Exec. L.** § 296.10(d)(1).

## MILITARY STATUS

Discrimination on the basis of military status is prohibited in all areas of jurisdiction under the Human Rights Law, except with regard to the domestic worker provisions of **N.Y. Exec. L.** § 296-b. Military status is defined as:

a person's participation in the military service of the United States or the military service of the state, including but not limited to, the armed forces of the United States, the army national guard, the air national guard, the New York naval militia, the New York guard, and such additional forces as may be created by the federal or state government as authorized by law.

**N.Y. Exec. L.** § 292.28. This provision protects person who are active members of any branch of the federal or state armed services. "Reservist" are active members. This provision has also been interpreted to provide protection for veterans.

The statutory provisions are directed at bias against any branch of military or military status generally. The primary impact is with members of the New York State National Guard and the various Reserves. Reservist may serve in the Army, Air Force, Marines or Navy. The issues that arise for members of the Guard and Reservists include bias or differential treatment because of monthly weekend duty, annual two week duty, unit activation from reservist to actual duty, and activation for disaster or civil unrest duty. The Commissioner has found in favor of a complainant who was terminated because of office coverage problems caused by her being ordered to report for military duty. *Jeanite v. Kaplan*, SDHR Case No. 10115251 (February 28, 2011).

Full time or career members of any branch of the military are also protected, for example with regard to housing discrimination against those stationed in New York, or whose family is living in New York.

Special situations occur with service-related disabilities and disability insurance. These cases may involve ERISA preemption, and they may also involve lawful exclusion from

000077

## Religious or Denominational Institutions

"Nothing contained in this section shall be construed to bar any religious or denominational institution or organization, or any organization operated for charitable or educational purposes, which is operated, supervised or controlled by or in connection with a religious organization, from limiting employment ... or giving preference to persons of the same religion or denomination or from taking such action as is calculated by such organization to promote the religious principles for which it is established or maintained." **N.Y. EXEC. L.** § 296.11.

This provision of the Human Rights Law has been interpreted since 2012 to be consistent with the federal "ministerial exception" as set forth in *Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.*, 132 S.Ct. 694 (2012). The ministerial exception is an affirmative defense. The burden is on the religious employer to demonstrate with credible evidence that the employee is a ministerial employee. If such demonstration is made, the case should be dismissed for no probable cause (rather than lack of jurisdiction). The assertion of the religious organization as to the label to be applied to the position, while it is an important aspect of the inquiry, is not dispositive. Emphasis should be placed on determining whether or not the employee is acting in the "ministerial" roles of leading the organization, conducting worship or rituals, or teaching the principles of the religion and passing the message of the religion on, especially to the next generation of adherents. *See further*, General Counsel's Legal Opinion No. 2012-02.

Cases involving the ministerial exemption should be referred to the General Counsel for review before issuing a determination.

Where the complaining employee is *not* in a ministerial role, the ministerial exception has no bearing on the case. In that context, the Human Rights Law does provide some additional exemption for religious organizations, in that they can give a preference in hiring to persons of the same religion or denomination. However, outside the ministerial exception context, § 296.11 does not permit discrimination on any other protected basis except creed, or in limited circumstances where an otherwise discriminatory employment decision is made "in furtherance of their religious mission." Furthermore, once a religious employer hires a person, this exemption does not permit the employer to "harass their employees and treat the employees in an odiously discriminatory manner during their employment". *Logan v. Salvation Army*, 10 Misc.3d 756, 809 N.Y.S.2d 846 (Sup.Ct. N.Y.Co. 2005), *citing Scheiber v. St. John's University*, 84 N.Y.2d 120, 615 N.Y.S.2d 3322 (1994).

By the specific terms of the statute, any *charitable or educational* venture operated by a *religious institution* also comes under the exemption of § 296.11. In New York, the status of an organization is determined by its certificate of incorporation and by statutory law, and not by its functions or purposes. *In re White's Estate*, 118 A.D. 869, 103 N.Y.S. 688 (1st Dept. 1909). A school organized to teach Christian values, but which was not operated by a religious or denominational institution or organization, was not entitled to the exemption of § 296.11. *Lysek v. Christian Central Academy*, SDHR Cae No. 10180743 (May 16, 2018),

000103

confirmed by *Christian Central Academy v. N.Y. State Div. of Human Rights (Lysek)*, 172 A.D.3d 1911, 97 N.Y.S.3d 913 (4th Dept. 2019).

A for-profit business, even if operated by devout individuals, may not claim a religious exemption pursuant to § 296.11.

## Affirmative Action Plans

It "shall not be an unlawful discriminatory practice for an employer, employment agency, labor organization or joint labor-management committee to carry out a plan, approved by the division, to increase the employment of members of a minority group … which has a statewide unemployment rate that is disproportionately high in comparison with the state wide unemployment rate of the general population. Any plan approved under this subdivision shall be in writing and the division's approval thereof shall be for a limited period and may be rescinded at any time by the Division." **N.Y. EXEC. L.** § 296.12. The Division's approval of an affirmative action plan is a defense to claims of discrimination under the Human Rights Law arising from its operation. *State Division of Human Rights v. Sears, Roebuck & Co.*, 74 A.D.2d 591, 424 N.Y.S.2d 528 (2d Dept. 1980).

Regulations regarding the submission to the Division of a "plan to increase employment of members of minority group" can be found at 9 **N.Y.C.R.R.** § 466.5.

Affirmative action plans mandated by federal regulations, or by federal or state court order, also provide those persons required to operate such plans with a defense to claims that actions taken pursuant to those plans violate the Human Rights Law. *See* General Counsel's Legal Opinion No. 2005-18 (a court ordered plan which may have outlived its usefulness must be rescinded, modified or enforced by the court that issued it, not by the Division).

The absence of Division approval constitutes a rebuttable presumption that the provisions of any challenged affirmative action plan constitute an unlawful discriminatory practice. However, employers, employment agencies, labor organizations, and joint labor-management committees may rebut this presumption by submitting evidence that the challenged affirmative action plan is necessary to erase the present consequences of their own past discriminatory actions and that its' provisions have been narrowly tailored to that remedial goal. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989), General Counsel's Legal Opinion No. 1989-06. This is an affirmative defense which must be pleaded and proved by respondents.

## Amtrak

The Division does not have employment jurisdiction over the National Rail Passenger Corporation (Amtrak). General Counsel's Legal Opinion No. 2002-22. *See further* below, Air Carriers, Amtrak, and Public Transportation Facilities.

### Single-Sex Room Rental Exemption

"The provisions of this paragraph … shall not apply … to the restriction of the rental of all rooms in a housing accommodation to individuals of the same sex … ." **N.Y. Exec. L.** § 296.5(a)(3)(2).

### Owner-Occupied Room Rental Exemption

"The provisions of this paragraph … shall not apply … to the rental of a room or rooms in a housing accommodation, if such rental is by the occupant of the housing accommodation or by the owner of the housing accommodation and the owner resides in such housing accommodation." **N.Y. Exec. L.** § 296.5(a)(3)(3). This section should be construed as referring to a situation where the renter has separate sleeping quarters, but shares communal cooking, bathing or toilet facilities with the owner and other occupants.

### Senior Housing Exemption

"The provisions of this paragraph … shall not apply … solely with respect to age and familial status to the restriction of the sale, rental or lease of housing accommodations exclusively to persons sixty-two years of age or older and the spouse of any such person, or for housing intended and operated for occupancy by at least one person fifty-five years of age or older per unit. In determining whether housing is intended and operated for occupancy by persons fifty-five years of age or older, Sec. 807(b)(2)(c) (42 U.S.C. 3607 (b)(2)(c)) of the federal Fair Housing Act of 1988, as amended, shall apply." **N.Y. Exec. L.** § 296.5(a)(3)(4).

### Senior Discount Exemption

"Nothing in this section shall prohibit the offer and acceptance of a partial discount to a person sixty-five years of age or older for housing accommodations". **N.Y. Exec. L.** § 296.17.

### Discount for Persons with Disabilities Exemption

"Nothing in this section shall prohibit the offer and acceptance of a discount for housing accommodations to a person with a disability, as defined in subdivision twenty-one of section two hundred ninety-two of this article." **N.Y. Exec. L.** § 296.21.

### Religious or Denominational Institution Exemption

Where a religious institution or organization provides housing accommodations, it is given a narrowly tailored exemption from the Human Rights Law, as follows. "Nothing contained in this section shall be construed to bar any religious or denominational institution or organization, or any organization operated for charitable or educational purposes, which is operated, supervised or controlled by or in connection with a religious organization, from limiting …sales or rental of housing accommodations … or giving preferences to persons of the same religion or denomination or from taking such action as is calculated by such organization to promote the religious principles for which it is established or maintained." **N.Y. Exec. L.** § 296.11.

000107

This section has been construed by an appellate court as giving religious organizations discretion to discriminate in furtherance of their religious mission, stating, "It is not for this court nor any other secular institution to regulate the manner in which respondent exercises its ecclesiastical judgment [citation omitted]." *Cowen v. Lily Dale Assembly*, 44 A.D.2d 772, 354 N.Y.S.2d 269 (4th Dept. 1974). It should be noted however, that nothing permits a religious institution to discriminate against a protected class, other than creed, for reasons unrelated to its "religious principles". It is not the religious entity itself that is protected from coverage of the Human Rights Law, only its ecclesiastical decisions. For a detailed discussion of this issue, see General Counsel's Legal Opinions Nos. 2009-18 and 2008-06. Cases involving the exemption for ecclesiastical decisions should be referred to the General Counsel for review prior to issuing a probable cause determination.

In New York, the status of an organization is determined by its certificate of incorporation and by statutory law, and not by its functions or purposes. *In re White's Estate*, 118 A.D. 869, 103 N.Y.S. 688 (1st Dept. 1909). A housing accommodation, even if owned or operated by devout individuals, may not claim a religious exemption pursuant to § 296.11.

## Publicly-Assisted Housing Accommodations

The Human Rights Law prohibits discriminatory practices with respect to publicly-assisted housing accommodations, similar to the provisions for privately-owned housing. **N.Y. EXEC. L.** § 296.2-a. "Publicly-assisted housing accommodations", as defined in the Human Rights Law, include not only publicly-owned and operated housing, but all housing accommodations whose construction or operation is funded or subsidized, directly or indirectly by the federal government, the state government or its political subdivisions, or any of their agencies. **N.Y. EXEC. L.** § 292.11.

The definition of "publicly-assisted housing accommodations" is the long and technical . It must be reviewed carefully because the exemptions for private housing contained in the final paragraph of § 296.5(a) (listed above in Regulated Areas: Housing: Exemptions) do not apply to publicly-assisted housing. Instead, the following exceptions apply.

### Age-Restricted Housing

"Nothing in this sub-division shall restrict the consideration of age in the rental of publicly-assisted housing accommodations if the division grants an exemption based on bona fide considerations of public policy for the purpose of providing for the special needs of a particular age group without the intent of prejudicing other age groups." **N.Y. EXEC. L.** § 296.2-a(e). The Division's approval of such a plan is a defense to claims of age discrimination under the Human Rights Law arising from its operation.

The absence or unavailability of Division approval constitutes a rebuttable presumption that the provisions of any challenged publicly-assisted senior housing plan constitutes an unlawful discriminatory practice. However, owners and operators of publicly-assisted housing accommodations may rebut this presumption by submitting evidence that the

000108

The Division **does** have public accommodation jurisdiction, including reasonable accommodation of disability, over privately-owned transportation facilities and services such as taxis, Uber, private commuter buses, etc.

## Educational Institutions

A place of public accommodation under the Human Rights Law does not include "… kindergartens, primary and secondary schools, high schools, academies, colleges and universities, extension courses, and all educational institutions under the supervision of the regents of the state of New York; [as well as] any such kindergarten, primary and secondary school, academy, college, university, professional school, extension course or other education facility, supported in whole or in part by public funds or by contributions solicited from the general public … ." **N.Y. EXEC. L. § 292.9.**

However, the Human Rights Law separately prohibits discrimination by educational institutions that are "nonsectarian and exempt from taxation". **N.Y. EXEC. L. § 296.4** (see further below Regulated Areas: Education). There are many profit-making (and therefore not "exempt from taxation") schools that are under the "supervision of the regents of the state of New York" (e.g. many cosmetology schools), and are therefore not covered as either a public accommodation or by § 296.4.

Therefore, the only "schools" covered *as public accommodations* would be privately-owned schools not offering regents-approved courses, such as, for example, dance schools, cooking schools, and other establishments offering instruction in leisure or personal interest activities. Please consult with General Counsel's Office with respect whether an institution is under the supervision of the Board of Regents.

## Religious or Denominational Institutions

Where a religious institution or organization provides a public accommodation (e.g. bingo night, theatrical production, flea market, etc.), it is given a narrowly tailored exemption from the Human Rights Law, as follows. "Nothing contained in this section shall be construed to bar any religious or denominational institution or organization or any organization operated for charitable or educational purposes, which is operated, supervised or controlled by or in connection with a religious organization, from limiting … admission to or giving preference to persons of the same religion or denomination or from taking such action as is calculated by such organization to promote the religious principles for which it is established or maintained." **N.Y. EXEC. L. § 296.11.**

This section has been construed by an appellate court as giving religious organizations discretion to discriminate in furtherance of their religious mission, stating, "It is not for this court nor any other secular institution to regulate the manner in which respondent exercises its ecclesiastical judgment [citation omitted]." ***Cowen v. Lily Dale Assembly***, 44 A.D.2d 772, 354 N.Y.S.2d 269 (4th Dept. 1974). It should be noted however, that nothing permits a religious institution to discriminate against a protected class, other than creed, for reasons unrelated to it "religious principles". It is not the religious entity itself that is protected from coverage of the Human Rights Law, only its ecclesiastical decisions.

000115

Thus, a non-religious public event held by a religious organization, such as a bingo night or other fundraiser or event to which the public is invited, is a public accommodation, and fully subject to the non-discrimination provisions of the Human Rights Law, unless the organization states an ecclesiactical reason for its discriminatory action. General Counsel's Legal Opinions Nos. 2009-07, 1999-10. If an ecclesiactical reason is given for the discrimination, the matter should be referred to the General Counsel for review.

The Human Rights Law does provide an exemption for any ***religious event*** held by a religious organization, even if the public is invited. Places of worship may frequently open their doors to welcome in nonmembers to events that are religious in nature – such as worship services, prayer meetings, celebrations of a scriptural or religious nature, religious lectures, etc. In all aspects of conducting such events fall within the exemption of § 296.11. When an investigation reveals that a case falls within the exemption, it should be dismissed for no probable cause. However, cases presenting a disputed question of fact as to whether or not the event is religious in nature may be fully investigated and sent to hearing with a finding of probable cause. *See further,* General Counsel's Legal Opinion No. 2012-03.

In New York, the status of an organization is determined by its certificate of incorporation and by statutory law, and not by its functions or purposes. ***In re White's Estate***, 118 A.D. 869, 103 N.Y.S. 688 (1st Dept. 1909).

A public accommodation, even if owned or operated by devout individuals, may not claim a religious exemption pursuant to § 296.11. A farm that operated a wedding facilities on its premises constituted a public accommodation, and use of the facilities could not lawfully be denied to a same-sex couple based on the owners' religious beliefs regarding same-sex marriage. The Free Exercise Clause does not relieve an individual of the obligation to follow a valid and neutral law of general applicability. ***Gifford v. McCarthy***, 137 A.D.3d 30, 23 N.Y.S.3d 422 (3d Dept. 2016).

## Distinctly Private Institutions

A place of public accommodation under the Human Rights Law does not include "or any institution, club or place of accommodation which proves that it is in its nature distinctly private." **N.Y. EXEC. L.** § 292.9 (middle of section). Whether a club is "distinctly private" is a question of fact, and must be proved as an affirmative defense by the club seeking exemption from the law. ***U.S. Power Squadrons v. State Human Rights App. Bd.***, 59 N.Y.2d 401, 412, 465 N.Y.S.2d 871, 876 (1983). The Court of Appeals has explained that,

> In determining the issue, the fact finder may consider whether the club (1) has permanent machinery established to carefully screen applicants on any basis or no basis at all, i.e., membership is determined by subjective, not objective factors; (2) limits the use of the facilities and the services of the organization to members and bona fide guests of members; (3) is controlled by the membership; (4) is nonprofit and operated solely for the benefit and pleasure of the members; and (5) directs its publicity exclusively and only to members for their information and guidance.

000116

*Id.* (citation omitted).

In 1994, the Law was amended to substantially limit the scope of what clubs or institutions could claim the complete exemption from the Law as being "distinctly private", even if the above criteria arguably could be met. The following sentences were added. "In no event shall an institution, club or place of accommodation be considered in its nature distinctly private if it has more than one hundred members, provides regular meal service and regularly receives payment for dues, fees, use of space, facilities, services, meals or beverages directly or indirectly from or on behalf of a nonmember for the furtherance of trade or business. An institution, club, or place of accommodation which is not deemed distinctly private pursuant to this subdivision may nevertheless apply such selective criteria as it chooses in the use of its facilities, in evaluating applicants for membership and in the conduct of its activities, so long as such selective criteria do not constitute discriminatory practices under this article or any other provision of law." **N.Y. EXEC. L.** § 292.9. Note that the criteria are conjunctive; the institution may be distinctly private *unless* it has more than 100 members, provides regular meal service **and** hosts events for non-members.

Many country clubs and urban social clubs have more than 100 members, and regularly serve meals, so the criteria that will make them a "public accommodation" is whether or not they host events for non-members. The Appellate Division upheld a Commissioner's order finding a club was not distinctly private where the club permitted members to sponsor events (weddings, fundraisers, etc.) for non-members. *Mill River Club, Inc. v. N.Y. State Div. of Human Rights (Pezza)*, 59 A.D.3d 549, 873 N.Y.S.2d 167 (2d Dept. 2009), lv. denied 13 N.Y.3d 705, 887 N.Y.S.2d 2 (2009).

With respect to amateur athletic contests or exhibitions, a description of said contest or exhibition as a New York State championship contest, or the use of the words "New York State" in its advertisements or publicity, is conclusive evidence that said contest or exhibition is not "distinctly private" **N.Y. EXEC. L.** § 292.9 (last sentence).

"For purposes of this section, a corporation incorporated under the benevolent orders law or described in the benevolent orders law but formed under any other law of this state or a religious corporation incorporated under the education law or the religious corporations law shall be deemed to be in its nature distinctly private." **N.Y. EXEC. L.** § 292.9 (next to last sentence). The substantial limitation on "distinctly private" status added to the Law in 1994 (see immediately above), does not apply to benevolent orders. *Gifford v. Guilderland Lodge*, 272 A.D.2d 721, 707 N.Y.S.2d 722 (3d Dept. 2000). This exemption, however, applies only to internal affairs and membership, not to public functions it may sponsor or permit on its premises (e.g. bar or restaurant open to the public). *Gifford v. Guilderland Lodge*, 178 Misc.2d 707, 712, 681 N.Y.S.2d 194, 198 (S.Ct.Alb.Co. 1998), aff'd 272 A.D.2d 721, 707 N.Y.S.2d 722 (3d Dept. 2000) (dicta); *see Batavia Lodge v. N.Y. State Div. of Human Rights*, 35 N.Y.2d 143, 359 N.Y.S.2d 25 (1974). Furthermore, benevolent orders are fully subject to the employment provisions of the Law. *See Dodd v. Middletown Lodge*, 264 A.D.2d 706, 695 N.Y.S.2d 115 (2d Dept. 1999) and 277 A.D.2d 276, 715 N.Y.S.2d 343 (2d Dept. 2000).

000117

# EXHIBIT B

JA0602



**ANDREW M. CUOMO**
GOVERNOR

**NEW YORK STATE**
**DIVISION OF HUMAN RIGHTS**

---

**NEW YORK STATE DIVISION**
**OF HUMAN RIGHTS**
    on the Complaint of

**JOSÉ LUIS DEL RIO MÉNDEZ,**

                                 Complainant,

                 v.

**C.Y.L. BAIS OIFEH,**

                              Respondent.

**NOTICE AND**
**FINAL ORDER**

Case No. 10141617

Federal Charge No. 16GB003557

      **PLEASE TAKE NOTICE** that the attached is a true copy of the Alternative Proposed

Order, dated March 29, 2014, and issued on May 29, 2014, by Peter G. Buchenholz,

Adjudication Counsel, after a hearing held before Robert J. Tuosto, an Administrative Law Judge

of the New York State Division of Human Rights ("Division").  An opportunity was given to all

parties to object to the Alternative Proposed Order, and all Objections received have been

reviewed.

      <u>**PLEASE BE ADVISED THAT, UPON REVIEW, THE ALTERNATIVE**</u>

<u>**PROPOSED ORDER IS HEREBY ADOPTED AND ISSUED BY THE HONORABLE**</u>

<u>**HELEN DIANE FOSTER, COMMISSIONER, AS THE FINAL ORDER OF THE NEW**</u>

<u>**YORK STATE DIVISION OF HUMAN RIGHTS ("ORDER") WITH THE FOLLOWNG**</u>

<u>**AMENDMENTS**</u>:

- In objections to the Alternative Proposed Order, Respondent argues that "the

evidence suggests" that non-Jewish employees were provided a reasonable accommodation of "an alternative area for themselves" for lunch/breaks. *See* Respondent's June 18, 2014, letter, p. 4. However, there is no evidence in this record to support that contention. Further, in this record, Respondent presents no legal justification of its disparate treatment of certain employees based on creed. Perhaps there is good reason for Respondent's behavior, however, it has not been explained. It is not clear, for instance, why Respondent did not simply prohibit all employees, regardless of creed, from bringing forbidden food into the matzo preparation area. Respondent submitted no evidence demonstrating that either its policies or the termination of Complainant's employment were lawful or permissible pursuant to an exception to the Human Rights Law. Accordingly, the Alternative Proposed Order is adopted.

- Complainant conceded his employment was to end after Passover in 2010. (Tr. 112) Official notice is taken that in 2010, Passover ended on April 6th. Accordingly, Respondent is liable to Complainant for lost wages for the four-week period following Respondent's unlawful termination of his employment on March 12th through April 6th, 2010. Calculated at the rate of $265 per week, Respondent is liable to Complainant for $1,060, plus interest at a rate of nine percent per annum from March 22, 2010, a reasonable intermediate date, until payment is made.

- The remainder of the Alternative Proposed Order is adopted as the Final Order of the Division.

In accordance with the Division's Rules of Practice, a copy of this Order has been filed in

JA0604

the offices maintained by the Division at One Fordham Plaza, 4th Floor, Bronx, New York 10458. The Order may be inspected by any member of the public during the regular office hours of the Division.

      **PLEASE TAKE FURTHER NOTICE** that any party to this proceeding may appeal this Order to the Supreme Court in the County wherein the unlawful discriminatory practice that is the subject of the Order occurred, or wherein any person required in the Order to cease and desist from an unlawful discriminatory practice, or to take other affirmative action, resides or transacts business, by filing with such Supreme Court of the State a Petition and Notice of Petition, <u>within sixty (60) days after service of this Order</u>. A copy of the Petition and Notice of Petition must also be served on all parties, including the General Counsel, New York State Division of Human Rights, One Fordham Plaza, 4th Floor, Bronx, New York 10458. <u>Please do not file the original Notice or Petition with the Division</u>.

      **ADOPTED, ISSUED, AND ORDERED**.

DATED:
     Bronx, New York

                         _____
                         HELEN DIANE FOSTER
                         COMMISSIONER

JA0605

TO:
<u>Complainant</u>
José Luis Del Rio Méndez
188-18 Jamaica Avenue, Apt. #2
Hollis, NY 11423

<u>Respondent</u>
C.Y.L. Bais Oifeh
Attn: David Rosenberg, General Manager
543 Bedford Avenue
Brooklyn, NY 11211

<u>Respondent Attorney</u>
Barry R. Feerst & Associates
Attn: Alham Usman
194 S. 8th Street
Brooklyn, NY 11211

Hon. Eric T. Schneiderman, Attorney General
Attn: Civil Rights Bureau
120 Broadway
New York, New York 10271

<u>State Division of Human Rights</u>
Robert Goldstein, Director of Prosecutions
Robert Alan Meisels, Senior Attorney
Lilliana Estrella-Castillo, Chief Administrative Law Judge
Robert J. Tuosto, Administrative Law Judge
Michael Swirsky, Litigation and Appeals
Caroline J. Downey, General Counsel
Melissa Franco, Deputy Commissioner for Enforcement
Peter G. Buchenholz, Adjudication Counsel
Matthew Menes, Adjudication Counsel

JA0606



**ANDREW M. CUOMO**
GOVERNOR

**NEW YORK STATE**
**DIVISION OF HUMAN RIGHTS**

---

**NEW YORK STATE DIVISION OF HUMAN RIGHTS**
    on the Complaint of

**JOSÉ LUIS DEL RIO MÉNDEZ,**

                Complainant,

            v.

**C.Y.L. BAIS OIFEH,**

                Respondent.

---

**ALTERNATIVE**
**PROPOSED ORDER**

Case No. **10141617**

---

<u>SUMMARY</u>

Respondent discriminated against Complainant when it terminated his employment because he drank coffee in a work area where only Jewish individuals were permitted to eat. Accordingly, Complainant is entitled to $5,600 in lost wages and $2,500 for the mental anguish he suffered, plus interest.

<u>PROCEEDINGS IN THE CASE</u>

On May 17, 2010, Complainant filed a verified complaint with the New York State Division of Human Rights ("Division"), charging Respondent with unlawful discriminatory practices relating to employment in violation of N.Y. Exec. Law, art. 15 ("Human Rights Law").

After investigation, the Division found that it had jurisdiction over the complaint and that probable cause existed to believe that Respondent had engaged in unlawful discriminatory practices. The Division thereupon referred the case to public hearing.

After due notice, the case came on for hearing before Robert J. Tuosto, an Administrative Law Judge ("ALJ") of the Division. A public hearing was held on November 4, 2013. Complainant and Respondent appeared at the hearing. The Division was represented by Robert Alan Meisels, Esq., Senior Attorney. Respondent was represented by Barry R. Feerst & Associates, Brooklyn, New York, by Barry R. Feerst, Esq.

On January 8, 2014, ALJ Tuosto issued a Recommended Findings of Fact, Opinion and Decision, and Order ("Recommended Order"). Thereafter, Complainant, *pro se*, filed objections to the Recommended Order with the Commissioner's Order Peperation Unit.

<u>FINDINGS OF FACT</u>

1.    Upon hearing the testimony and after consideration of all of the evidence, the ALJ determined that Respondent prohibited only non-Jewish employees from eating in an area in its bakery where matzo was prepared. David Rosenberg, Respondent's manager, terminated Complainant's employment for drinking coffee in that area. (Tr. 18-21) There is nothing in the record to refute these findings. Respondent had an opportunity to contest Complainant's evidence and present its own defense.

2.    Though Respondent's representative, Hershey Rosenberg, was at the hearing, Respondent presented only one witness who provided no testimony relevant to the termination of Complainant's employment or Respondent's policies. Respondent provided no evidence or argument contradicting Complainant's testimony. The record supports the ALJ's findings and they are adopted herein.

3.    Complainant earned approximately $265 per week while he was employed by Respondent. (Complainant's exhibit 1; Tr. 14, 20, 122) After his employment was terminated on March 12, 2010, Complainant looked for work as a handyman and was eventually hired to work

JA0608

in a summer camp during July and August where he earned $400 per week. In September of

2010, he was employed by a demolition company earning $500 per week. (Tr. 61-64, 120-22)

<u>DECISION AND OPINION</u>

It is an unlawful discriminatory practice for an employer to discriminate against an

employee because of his creed. *See* Human Rights Law § 296.1(a)

Respondent discriminated against Complainant in violation of the Human Rights Law

when it discharged Complainant's employment for drinking coffee in an area of the bakery

where only Jewish individuals were permitted to eat. Accordingly, Complainant is entitled to an

award of compensatory damages. *See* Human Rights Law § 297.4(c). A complainant has a duty

to exercise diligence to mitigate his damages by making reasonable efforts to obtain comparable

employment. *See Rio Mar Rest. v. New York State Div. of Human Rights*, 270 A.D.2d 47, 704

N.Y.S.2d 230 (1st Dept. 2000) (citing *State Div. of Human Rights v. North Queensview Homes*,

75 A.D.2d 819, 427 N.Y.S.2d 483 (2d Dept. 1980)). The burden is on Respondent to prove

Complainant's lack of diligent efforts to mitigate damages. *See Walter Motor Truck Co. v. New*

*York State Human Rights Appeal Bd.*, 72 A.D.2d 635, 421 N.Y.S.2d 131 (3rd Dept. 1979).

Complainant earned approximately $265 per week while employed by Respondent. After his

employment was terminated on March 12, 2010, Complainant looked for work and, in July of

2010, found employment and fully mitigated his damages. *See 121-129 Broadway Realty, Inc. v.*

*New York State Div. of Human Rights*, 48 A.D.2d 975, 369 N.Y.S.2d 837 (3rd Dept. 1975).

Complainant is, therefore, entitled to $4,240 in lost wages calculated at a rate of $265 per week

for the sixteen-week period from March 12 through July 1, 2010.

It is well-settled that an award of compensatory damages to a person aggrieved by an illegal

discriminatory practice may include compensation for mental anguish, which may be based solely

JA0609

on the complainant's testimony. *See Cosmos Forms, Ltd. v. State Div. of Human Rights*, 150 A.D.2d 442, 541 N.Y.S.2d 50 (2d Dept. 1989). Respondent's discriminatory conduct saddened Complainant and caused him to feel humiliated. He felt isolated during the months he was looking for work. He suffered from insomnia, lost his appetite and felt depressed. (Tr. 59-60, 65, 121) Considering this together with the short duration of his employment, $2,500 is appropriate to compensate him for the mental anguish he suffered as a result of the discrimination. *See State Div. of Human Rights v. Crown Gourmet Deli Corp.*, 278 A.D.2d 112 (1st Dept. 2000).

Complainant's remaining allegations are hereby dismissed for the reasons set forth in the ALJ's Recommended Order.

## ORDER

On the basis of the foregoing Findings of Fact, Opinion and Decision, and pursuant to the provisions of the Human Rights Law and the Division's Rules of Practice, it is hereby

ORDERED, that the complaint of discrimination based on race, color and national origin is dismissed; and it is further

ORDERED, that the complaint of discrimination based on creed is sustained; and it is further

ORDERED**,** that Respondent, its agents, representatives, employees, successors and assigns shall cease and desist from discriminating in employment in violation of the Human Rights Law; and it is further

ORDERED**,** that Respondent, its agents, representatives, employees, successors and assigns shall take the following affirmative actions to effectuate the purposes of the Human Rights Law:

- 4 -

JA0610

1.      Within sixty days of the date of the Final Order, Respondent shall pay to Complainant $2,500, without any withholdings or deductions, as compensatory damages for the anguish he suffered as a result of Respondent's discriminatory actions.  Interest on the award shall accrue at a rate of nine percent per annum from the date of the Final Order until the date payment is made.

2.      Within sixty days of the date of the Final Order, Respondent shall pay to Complainant the sum of $4,240 for lost wages, without any withholdings or deductions.  Interest shall accrue on this amount at a rate of nine percent per annum from May 9, 2010, a reasonable intermediate date, until the date payment is made by Respondent.

3.      The payments shall be made in the form of a certified check made payable to the order of Complainant and delivered to him at his home address by certified mail, return receipt requested.

4.      Within sixty days of the date of the Commissioner's Final Order, Respondent shall prominently post a full-sized copy of the Division's poster (available at the Division website a www.dhr.ny.gov/sites/default/files/doc/poster.pdf) in places on Respondent's premises where employees are likely to view it.

5.      Respondent shall simultaneously furnish written proof of its compliance with the directives contained in the Final Order to the New York State Division of Human Rights, Attn: Barbara Buoncristiano, One Fordham Plaza, 4th Floor, Bronx, New York 10458.

6.      Respondent shall cooperate with the Division during any investigation into compliance with the directives contained in the Final Order.


DATED:        May 29, 2014
              Bronx, New York

                                    _____
                                    Peter G. Buchenholz
                                    Adjudication Counsel

JA0611

# EXHIBIT C

JA0612

NEW YORK STATE
DIVISION OF HUMAN RIGHTS

NEW YORK STATE DIVISION
OF HUMAN RIGHTS
   on the Complaint of

SARA D. PRESWORSKY,

                     Complainant,

           v.

NEW YORK METHODIST HOSPITAL,

                Respondent.

NOTICE AND
FINAL ORDER

Case No. 10111665

**PLEASE TAKE NOTICE** that the attached is a true copy of the Recommended Findings of Fact, Opinion and Decision, and Order ("Recommended Order"), issued on December 18, 2008, by Lilliana Estrella-Castillo, an Administrative Law Judge of the New York State Division of Human Rights ("Division"). An opportunity was given to all parties to object to the Recommended Order, and all Objections received have been reviewed.

<u>**PLEASE BE ADVISED THAT, UPON REVIEW, THE RECOMMENDED ORDER IS HEREBY ADOPTED AND ISSUED BY THE HONORABLE GALEN D. KIRKLAND, COMMISSIONER, AS THE FINAL ORDER OF THE NEW YORK STATE DIVISION OF HUMAN RIGHTS ("ORDER") WITH THE FOLLOWING AMENDMENTS**</u>:

- Due to typographical error, the interest accrual date is incorrect. The Respondent shall pay interest to Complainant on the $10,000 award, at a rate of nine percent per annum, from the date of the Commissioner's Order until the date payment is made.

JA0613

○ Because Respondent discriminated against Complainant based on her religion, the decree in the Recommended Order that Respondent transmit a memorandum to its employees regarding retaliation is not adopted in this Final Order. The remainder of the Recommended Order is adopted and issued as the Final Order herein.

In accordance with the Division's Rules of Practice, a copy of this Order has been filed in the offices maintained by the Division at One Fordham Plaza, 4th Floor, Bronx, New York 10458. The Order may be inspected by any member of the public during the regular office hours of the Division.

**PLEASE TAKE FURTHER NOTICE** that any party to this proceeding may appeal this Order to the Supreme Court in the County wherein the unlawful discriminatory practice that is the subject of the Order occurred, or wherein any person required in the Order to cease and desist from an unlawful discriminatory practice, or to take other affirmative action, resides or transacts business, by filing with such Supreme Court of the State a Petition and Notice of Petition, within sixty (60) days after service of this Order. A copy of the Petition and Notice of Petition must also be served on all parties, including the General Counsel, New York State Division of Human Rights, One Fordham Plaza, 4th Floor, Bronx, New York 10458. Please do not file the original Notice or Petition with the Division.

**ADOPTED, ISSUED, AND ORDERED.**

DATED: FEB 1 8 2009
Bronx, New York

GALEN D. KIRKLAND
COMMISSIONER

- 2 -

JA0614

NEW YORK STATE
DIVISION OF HUMAN RIGHTS

---

NEW YORK STATE DIVISION OF
HUMAN RIGHTS
    on the Complaint of

SARA D. PRESWORSKY,

                    Complainant,

           v.

NEW YORK METHODIST HOSPITAL,

                    Respondent.

**RECOMMENDED FINDINGS OF
FACT, OPINION AND DECISION,
AND ORDER**

Case No. **10111665**

---

## SUMMARY

Respondent violated the Human Rights Law when it failed to take any reasonable steps to accommodate Complainant's religious observances.

## PROCEEDINGS IN THE CASE

On May 10, 2006, Complainant filed a verified complaint with the New York State Division of Human Rights ("Division"), charging Respondent with unlawful discriminatory practices relating to employment in violation of N.Y. Exec. Law, art. 15 ("Human Rights Law").

After investigation, the Division found that it had jurisdiction over the complaint and that probable cause existed to believe that Respondent had engaged in unlawful discriminatory practices. The Division thereupon referred the case to public hearing.

After due notice, the case came on for hearing before Rosalie Wholstatter, an Administrative Law Judge ("ALJ") of the Division. A public hearing session was held on August 27, 2008.

Complainant and Respondent appeared at the hearing. The Division was represented by Aaron Woskoff, Senior Attorney, of Counsel. Respondent was represented by Dennis S. Buchanan.

On October 8, 2008, the case was reassigned to ALJ Lilliana Estrella-Castillo, after ALJ Wholstatter left state service.

On October 24, 2008, ALJ Estrella-Castillo issued a recommended order, but unbeknownst to her on September 19, 2008, the Chief Administrative Law Judge had granted the parties an extension to October 28, 2008, to file their post-hearing submissions. Thereafter, ALJ Estrella-Castillo recalled the recommended order and granted the parties an opportunity to make their post-hearing submissions.

The parties' submissions, proposed findings of fact and conclusions of law, were received, considered and where appropriate, adopted.

## FINDINGS OF FACT

1.  Complainant is Jewish and a Sabbath observer. (Tr. 45-46; ALJ Exhibit 1)

2.  The Jewish Sabbath begins one hour before sundown each Friday and continues until one hour after sunset each Saturday. (Tr. 46)

3.  On March 24, 2003, Complainant became employed by Respondent as a nurse in its Mother/Baby Unit. (Tr. 44)

4.  Respondent accommodated Complainant's religious observance of the Sabbath and other holy days. (Tr. 54, 63)

5.  In June 2005, Complainant applied for a position in the Labor/Delivery Unit. (Tr. 71, 129; Complainant's Exhibit 5)

JA0616

6.      Complainant was interviewed for the nursing position in the Labor/Delivery Unit, and was told that she met all the qualifications for the position, but would not be granted the position because of her religious observance of the Sabbath. (Tr. 73-74)

7.      Complainant was very interested in working in the Labor and Delivery Unit because she wanted to become a nurse-midwife and she considered this transfer to be critical to her career development. (Tr. 45)

8.      In an effort to convince Respondent to grant her the position in the Labor and Delivery Unit, Complainant offered to work Sundays and Holidays, in exchange for Fridays and Saturdays off. (Tr. 75)   Complainant also informed Respondent that she was willing to switch shifts, work some nights and some days, or work per diem. (Tr. 75, 77-78)

9.      Respondent rejected all of Complainant's suggestions. (Tr. 75, 77-78)

10.      Respondent admitted unlawful employment discrimination. (Tr. 5, 91-98; Respondent's Exhibit 1)

11.      Respondent admitted that it discriminated against Complainant when it refused to grant Complainant the nurse position in the Labor and Delivery Unit in 2006 because she is a Sabbath observer. (Tr. 5, 91- 98)

12.      Respondent failed to take any reasonable steps to accommodate Complainant's religious observances, and when Complainant tried to engage Respondent in exploring alternatives, Respondent rejected all suggestions, without considering any of them. (Tr. 76-77),

13.      As a result of the unlawful discrimination Complainant felt devastated and as if "everything was taken away from [her]" because Respondent rejected her for the nurse position in the Labor and Delivery Unit because of her religious observances. (Tr. 75, 77)

JA0617

14.     Complainant could not sleep, was sad, upset and irritable, all of which caused tension in her marriage.  (Tr. 77-78, 144)

15.     As a result of the stress, Complainant gained about one hundred pounds. Complainant's weight increased to 280 pounds, because she would overeat to make herself feel better.  (Tr. 81, 101-02, 105, 142; Complainant's Exhibit 8)

16.     Complainant was also diagnosed with temporomandibular joint disorder ("TMJ") because, as a result of the stress, she would grind her teeth.  (Tr. 81, 107-09, 142)

17.     On August 7, 2006, after Complainant filed a complaint with the Division, Respondent granted Complainant a transfer to the Labor and Delivery Unit, with a religious accommodation.  (Tr. 7-8)  Thereafter, after having worked in the Labor and Delivery Unit, Complainant changed her plans and is no longer interested in becoming a mid-wife.  (Tr. 114)

18.     Complainant testified that some co-workers, whom she did not identify, made comments regarding her work schedule which allowed her to have Fridays and Saturdays off, while the co-workers had to work those days.  Complainant agreed that the alleged comments were made because of what her co-workers felt was a more favorable work schedule and not because of any religious animosity directed towards Complainant because she is Jewish.  (Tr. 118, 125, 127)

## OPINION AND DECISION

It is an unlawful discriminatory practice for any employer "to impose upon a person as a condition of obtaining or retaining employment, including opportunities for promotion, advancement or transfers, any terms or conditions that would require such person to violate or forego a sincerely held practice of his or her religion, including but not limited to the observance of any particular day or days or any portion thereof as a Sabbath..., unless, after engaging in a

JA0618

bona fide effort, the employer demonstrates that it is unable to reasonably accommodate the employee's or prospective employee's sincerely held religious observance or practice without undue hardship on the conduct of the employer's business. . . ." Human Rights Law § 296.10

Complainant is Jewish and a Sabbath observer. Complainant applied for a nurse position in Respondent's Labor and Delivery Unit. Respondent found that Complainant was qualified for the position, but refused to grant her the position because of Complainant's religious observance of the Sabbath. Respondent violated the Human Rights Law because it failed to engage in a "bona fide effort" to reasonably accommodate Complainant's sincerely held religious observance.

Complainant suffered humiliation and mental anguish as a result of Respondent's unlawful discrimination. Complainant suffered many sleepless nights, was sad, upset and irritable, which also caused tension in her marriage. Complainant felt devastated because her dream of becoming a nurse-midwife was taken away from her because of her religious requirements. (However, after having worked in the Labor and Delivery Unit, Complainant is no longer interested in becoming a mid-wife). The stress also caused Complainant to have physical manifestations, such as weight gain, and a diagnosis of TMJ.

An award of $10,000.00 for emotional distress, pain and suffering, humiliation and mental anguish, will effectuate the purposes of the Human Rights Law. *Bayport-Blue Point School District v. State Division of Human Rights,* 131 A.D.2d 849, 517 N.Y.S.2d 209 (1987), (Where the court held that Complainant's testimony was sufficient to support an award of $5,000 for mental anguish). In the instant complaint, Complainant's testimony regarding her mental anguish was corroborated by two witnesses.

JA0619

Finally, all of Complainant's other arguments were considered and found to be without merit.

## ORDER

On the basis of the foregoing Findings of Fact, Opinion and Decision, and pursuant to the provisions of the Human Rights Law and the Division's Rules of Practice, it is hereby

ORDERED, that Respondent, its agents, representatives, employees, successors and assigns shall cease and desist from discriminating in employment in violation of the Human Rights Law; and it is further

ORDERED, that Respondent, its agents, representatives, employees, successors and assigns shall not unlawfully retaliate against Complainant for having exercised her right to file a complaint with the Division of Human Rights; it is further

ORDERED, that Respondent, its agents, representatives, employees, successors and assigns shall take the following affirmative actions to effectuate the purposes of the Human Rights Law:

1. Within 60 days of receipt of the Final Order of the Commissioner, Respondent shall pay to Complainant the sum of $10,000.00 without any withholdings or deductions, as compensatory damages for the mental anguish and humiliation suffered by Complainant as a result of Respondent's unlawful discrimination.

2. Interest shall start to accrue within 60 days of receipt of the Final Order of the Commissioner, until such payment is made.

3. The aforesaid payments shall be made by Respondent in the form of a check made payable to the order of Complainant and delivered by certified mail, Return Receipt Requested, to Complainant, with copies to General Counsel, New York

JA0620

State Division of Human Rights, One Fordham Plaza, 4th Floor, Bronx, New York
10458.

4.    Respondent shall transmit a memorandum to its employees, agents and officers,
notifying them that it has a policy of non-discrimination based on religion.

5.    Respondent shall also transmit a memorandum to its employees, agents and
officers, notifying them that retaliation for filing a complaint, testifying or
assisting in any proceeding under the Human Rights Law is forbidden.

6.    Respondent shall furnish written proof of its compliance with the directives herein
contained, and shall cooperate with representatives of the General Counsel and
the Division during any investigation into the compliance with the directives of
this Order.

DATED:  December 18, 2008
          Bronx, New York

Lilliana Estrella-Castillo
Administrative Law Judge

- 7 -

JA0621

State Division of Human Rights, One Fordham Plaza, 4th Floor, Bronx, New York 10458.

4.  Respondent shall transmit a memorandum to its employees, agents and officers, notifying them that it has a policy of non-discrimination based on religion.

5.  Respondent shall also transmit a memorandum to its employees, agents and officers, notifying them that retaliation for filing a complaint, testifying or assisting in any proceeding under the Human Rights Law is forbidden.

6.  Respondent shall furnish written proof of its compliance with the directives herein contained, and shall cooperate with representatives of the General Counsel and the Division during any investigation into the compliance with the directives of this Order.

DATED:  December 18, 2008
        Bronx, New York




                            Lilliana Estrella-Castillo
                            Administrative Law Judge

JA0622

# EXHIBIT D



**ANDREW M. CUOMO**
GOVERNOR

**NEW YORK STATE**
**DIVISION OF HUMAN RIGHTS**

---

| | |
|---|---|
| **NEW YORK STATE DIVISION**<br>**OF HUMAN RIGHTS**<br>on the Complaint of<br><br>**GILBERT A. MURPHY,**<br><div align="right">Complainant,</div><br>v.<br><br>**JOHN C. HILPL,**<br><div align="right">Respondent.</div> | **NOTICE AND**<br>**FINAL ORDER**<br><br>Case Nos. 10140314 and<br>10141668 |

**PLEASE TAKE NOTICE** that the attached is a true copy of the Recommended Findings of Fact, Opinion and Decision, and Order ("Recommended Order"), issued on July 14, 2011, by Michael T. Groben, an Administrative Law Judge of the New York State Division of Human Rights ("Division"). An opportunity was given to all parties to object to the Recommended Order, and all Objections received have been reviewed.

<u>**PLEASE BE ADVISED THAT, UPON REVIEW, THE RECOMMENDED ORDER IS HEREBY ADOPTED AND ISSUED BY THE HONORABLE GALEN D. KIRKLAND, COMMISSIONER, AS THE FINAL ORDER OF THE NEW YORK STATE DIVISION OF HUMAN RIGHTS ("ORDER"), WITH THE FOLLOWING AMENDMENT**</u>:

- That portion of the Recommended Order which states, "[d]ue to the age difference of over 30 years between Respondent and Complainant, Complainant

<div align="right">JA0624</div>

could not have reasonably have [*sic*] felt himself to be in physical danger on that occasion," is not adopted herein.

In accordance with the Division's Rules of Practice, a copy of this Order has been filed in the offices maintained by the Division at One Fordham Plaza, 4th Floor, Bronx, New York 10458. The Order may be inspected by any member of the public during the regular office hours of the Division.

**PLEASE TAKE FURTHER NOTICE** that any party to this proceeding may appeal this Order to the Supreme Court in the County wherein the unlawful discriminatory practice that is the subject of the Order occurred, or wherein any person required in the Order to cease and desist from an unlawful discriminatory practice, or to take other affirmative action, resides or transacts business, by filing with such Supreme Court of the State a Petition and Notice of Petition, within sixty (60) days after service of this Order. A copy of the Petition and Notice of Petition must also be served on all parties, including the General Counsel, New York State Division of Human Rights, One Fordham Plaza, 4th Floor, Bronx, New York 10458. Please do not file the original Notice or Petition with the Division.

**ADOPTED, ISSUED, AND ORDERED**.

DATED:
Bronx, New York

_____
GALEN D. KIRKLAND
COMMISSIONER

JA0625

TO:

<u>Complainant</u>
Gilbert A. Murphy
P.O. Box 151
Cape Vincent, NY 13618

<u>Respondent</u>
John C. Hilpl
17752 West Maynard Ave. PO BX 653
Dexter, NY 13634

<u>Respondent Attorney</u>
Stephen W. Gebo, Esq.
Conboy, McKay, Bachman & Kendall, LLP
407 Sherman Street
Watertown, NY 13601

Hon. Eric T. Schneiderman, Attorney General
Attn: Civil Rights Bureau
120 Broadway
New York, New York 10271

<u>State Division of Human Rights</u>
Sharon J. Field, Director of Prosecutions
Lawrence J. Zyra, Senior Attorney
Christine Marbach Kellett, Chief Administrative Law Judge
Michael T. Groben, Administrative Law Judge
Sara Toll East, Chief, Litigation and Appeals
Caroline J. Downey, General Counsel
Melissa Franco, Deputy Commissioner for Enforcement
Peter G. Buchenholz, Adjudication Counsel
Matthew Menes, Adjudication Counsel

JA0626



**ANDREW M. CUOMO**
GOVERNOR

**NEW YORK STATE
DIVISION OF HUMAN RIGHTS**

| | |
|---|---|
| **NEW YORK STATE DIVISION OF HUMAN RIGHTS**<br>    on the Complaint of<br><br>**GILBERT A. MURPHY,**<br>    Complainant,<br>    v.<br><br>**JOHN C. HILPL,**<br>    Respondent. | **RECOMMENDED FINDINGS OF FACT, OPINION AND DECISION, AND ORDER**<br><br>Case Nos. **10140314** and **10141668** |

## SUMMARY

Complainant alleges that he was subjected to discriminatory practices in housing due to his race/color and creed.  Respondent denies the allegations.  Complainant has sustained his burden of proof, and damages are awarded.

## PROCEEDINGS IN THE CASE

On April 26, 2010, and June 16, 2010, Complainant filed verified complaints with the New York State Division of Human Rights ("Division"), charging Respondent with unlawful discriminatory practices relating to housing in violation of N.Y. Exec. Law, art. 15 ("Human Rights Law").

JA0627

After investigation, the Division found that it had jurisdiction over both complaints and that probable cause existed to believe that Respondent had engaged in unlawful discriminatory practices. The Division thereupon referred both cases to public hearing.

After due notice, the cases came on for hearing before Michael T. Groben, an Administrative Law Judge ("ALJ") of the Division. The public hearing session was held on March 14, 2011.

Complainant and Respondent appeared at the hearing. The Division was represented by Lawrence J. Zyra, Esq. Respondent was represented by Stephen W. Gebo, Esq.

Permission to file post-hearing briefs was granted, and the Division and Respondent filed proposed findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Complainant is an African-American of the Muslim faith. (Tr. 37)

2. Respondent owns a cottage (the "Premises") in Dexter, New York along with other properties. (Tr. 187-188) I observed Respondent to be Caucasian.

3. Tina DeLeo ("DeLeo") is Complainant's wife. She is Caucasian. (Tr. 5, 40-41,111-12)

4. Michael Tullai ("Tullai") is DeLeo's son. (Tr. 40-41, 173)

5. Jason Sorbello ("Sorbello") is Caucasian. He is of the Muslim faith, and is a friend of Complainant. (Tr. 139, 148-49)

6. Rodney Conklin ("Conklin") is a friend of Respondent. (Tr. 306, 315-16)

7. In the fall of 2009, Conklin advised Respondent that he had met Complainant and that Complainant was looking for a place to live. Respondent met with Complainant and DeLeo and

JA0628

agreed to lease the Premises to them. (Tr. 37-39, 107-08, 110-11, 113-14, 192-4, 307-12, 318, 333)

8. Complainant, DeLeo and Tullai began moving into the Premises on or about mid-October of 2009, and were fully moved in by October 23, 2009, when Complainant, DeLeo, Tullai, and Respondent executed a lease (the "Lease") for the Premises. (Complainant's Exhibit 2; Tr. 42-43, 173, 196, 219-25)

9. Pursuant to the Lease, the rent would be $800 per month, with an $800 security deposit to be paid by Complainant. A portion of the stated monthly rent would be paid by the county pursuant to the Section 8 Housing Assistance Program. (Complainant's Exhibit 2; Tr. 40-41) However, pursuant to a private arrangement between Complainant and Respondent, the security deposit was waived, and Complainant's actual share of the monthly rent would be reduced in return for his performing odd jobs at the Premises. (Complainant's Exhibit 2; Tr. 39-42, 68, 129-30, 199)

10. Respondent assisted Complainant in moving into the Premises and did other favors for him. (Tr. 43, 112-13, 196-97) After Complainant moved in, Respondent often visited the Premises, and initially, he and Complainant had a good relationship. (Tr. 44-45, 114-15, 149-51, 199, 215, 276, 321)

11. Within a few days after Complainant moved into the Premises, Respondent referred to him, in the presence of Complainant and a neighbor, Andy Cronk, as a "good nigger" and a "smart nigger." (Tr. 45-47)

12. On other occasions, Respondent complained to Complainant about President Obama, referring to him as a "nigger" and a "monkey." (Tr. 47-50)

JA0629

13.  Within a few weeks after Complainant moved into the Premises, he called Conklin and complained that he was unable to get along with Respondent, referring to Respondent as either a "lunatic" or a "crazy man." (Tr. 319-22)

14.  I take official notice of the fact that on or about November 5, 2009 a shooting occurred at the Army base in Fort Hood, Texas, with a Muslim officer identified as the shooter.[1] Within a day or so of that incident, Respondent complained to Complainant that Muslims would "tear the country down," and that Muslims were joining the American military in order to spy for Osama bin Ladin. (Tr. 48-50, 181-82)

15.  Shortly thereafter, Complainant and Respondent were watching a movie about Muhammad Ali on television at the Premises, when Respondent, referring to Ali's avoidance of the military draft during the Vietnam War, stated "niggers are always trying to dodge something," and referred to Ali as a "fucking Muslim." (Tr. 51-53)

16.  On or about November 13, 2009, Complainant attempted to discuss the Muslim religion with Respondent.  Complainant believed that this would give Respondent a better understanding of his religion.  Respondent then asked a question, which Complainant paraphrased in his testimony as, "What are you, an F-ing Muslim?" When Complainant told Respondent to leave the Premises, Respondent stated that it was "my house" and initially refused to leave.  He eventually left the Premises. (Tr. 53-56, 176-77)

17.  Complainant planned a birthday party for DeLeo for November 15, 2009.  Complainant requested that Sorbello show up early, hoping that Respondent would be more receptive to discussing the Muslim religion with Sorbello, a Caucasian. (Tr. 57-58)

---

[1] New York Times, November 6, 2009, [p. A1].

JA0630

18.  On the morning of November 15, 2009, Sorbello, Complainant and Respondent had a conversation during which Respondent told a joke referring to a black person working as a latrine attendant as a "black lavatory retriever."  Respondent then referred to Complainant as a "nigger," and made further disparaging remarks regarding Muslims. (Tr.  58-59, 60-61, 140-42, 151-52, 157)

19.  When Sorbello attempted to discuss the Muslim religion with Respondent, Respondent asked him if he was Muslim also.  Sorbello admitted that he was, and Respondent grabbed Sorbello's shirt, and shouted at him. (Tr. 61-63, 116, 142-45, 152-54, 155)

20.  Respondent then threatened to get soldiers from nearby Fort Drum to attack Complainant and his family.  (Tr. 62-63, 117-120, 124-25, 175-76) There was no proof presented that Respondent had the capability to carry out this threat, or that he had ever taken any steps to do so.

21.  Complainant had invited a number of party guests, including Loralyn Garner ("Garner"). (Tr. 161-63, 166) When the party guests arrived, Respondent continued to make disparaging remarks regarding Muslims in front of them, and he and Complainant argued.  (Tr. 63-65, 145-46, 163-65) Respondent refused to leave the Premises.  (Tr. 66)

22.  Most of the party guests then left, with Complainant, DeLeo, Tullai, Garner, and Respondent remaining at the Premises.  Respondent was aware of DeLeo's Italian ancestry. Respondent stated to Tullai that he should stay away from Italian women because they were prone to carry disease. When Complainant protested, Respondent grabbed him by the collar and told him to shut up.  (Tr. 65, 116, 146, 154-56, 163-65, 167-69, 174-75, 281-82)

JA0631

23.  Respondent then stated to Complainant that if he had known "…what you people were, I would not have rented to you.  Now that I know what you are, I want you out." (Tr. 66-67, 68, 174)

24.  DeLeo then began recording the conversation with her cell phone. (Tr. 66, 90-91) That recording was played at the public hearing from the cell phone. However, the sound reproduction quality of the cell phone was not adequate to enable the listener to clearly hear what was being said. Pursuant to agreement of counsel, a CD (compact disk) reproduction of the contents of the cell phone recording was submitted after the hearing, and received in evidence as an exhibit. (Complainant's Exhibit 5; Tr. 94-105) Although certain portions of the CD are not decipherable due to several persons talking at once, I found it to be sufficiently clear to identify the voices of Tullai, Complainant and Respondent, and to follow most of their conversation.

25.  Tullai asked Respondent how he would force Complainant and his family to leave if he did not evict them.  Respondent replied that he would report Complainant to the county for fraud, due to the difference between the amount set forth in the Lease as Complainant's share of the rent, and the amount that Complainant was actually required to pay. The three then argued further, and Respondent left. (Complainant's Exhibit 5; Tr. 67-69, 177-78)

26.  At the public hearing Respondent alleged that that he had signed a blank Lease, and that Complainant had later inserted the terms, including the inaccurate monthly rent figure. Respondent also alleged that at the time he signed the Lease he had been unable to read it, because he did not have his glasses on at the time. (Tr. 194-96, 218-19, 222-23, 237-40, 241-42, 243-44, 246-47) Respondent further alleged that within one or two days after he signed the October 23, 2009 Lease, he recognized that the $800 rent set forth therein was incorrect, and that at that time he remonstrated with Complainant, and that the cell phone recording had been made

- 6 -

JA0632

at that time, rather than at the November 15, 2009 party at the Premises. (Tr. 219-24, 240, 245-50) Respondent's testimony on this issue was not credible.

27. On or about November 16, 2009, Complainant encountered Respondent's son, Chris Hilpl, and advised him that he would take Respondent to court unless Respondent stopped bothering him. (Tr. 69-71)

28. On or about November 17, 2009, Complainant and Tullai encountered Respondent while driving. Respondent stepped in front of their vehicle to stop it, and shouted that Complainant was trying to take his property away from him. (Tr. 71-72, 178-80)

29. Complainant and DeLeo filed a police report on November 19, 2009, charging Respondent with harassment regarding Respondent's various offensive statements and actions, including the November 17, 2009 encounter. (Complainant's Exhibit 1; Tr. 72-74, 125) Respondent was charged with harassment, for which he received an ACD (adjournment in contemplation of dismissal) from the local court. (Tr. 294-95)

30. On several occasions beginning in or about mid-November, 2009, Complainant observed hunters gathering near the Premises. Complainant believed that these persons were a threat to him. He presented no credible evidence that these persons had threatened him, or that they were connected to Respondent in any way. (Tr. 75, 120-23, 301-02)

31. Respondent denied that he had made disparaging references to African-Americans, Muslims, the president, or persons of Italian descent. Respondent further testified that he had never used the word "nigger" in his life. (Tr. 200-02, 204-05, 209-16, 278-80, 284-88, 292-93, 296-97) Respondent's testimony was not credible.

32. In late November 2009, Complainant notified Respondent of his wish to leave the Premises. On December 2, 2009 they executed a county Housing Assistance Program agreement

JA0633

to that effect, which required Complainant to move out by December 15, 2009. Complainant did not have all of his possessions moved from the Premises until January 5, 2010. (Complainant's Exhibit 3; Tr. 74-79, 126-30, 131, 225, 252, 293-94)

33. Complainant never paid any rent to Respondent for the Premises. (Tr. 127-29, 218, 251-54)

34. Before Complainant moved into the Premises, he asked Respondent for assistance in obtaining Dish Network television service, because Complainant did not have good credit. Apparently in the belief that he was only supplying the $50 deposit required for the service, Respondent spoke to the Dish Network representative, and gave her his Social Security number and credit card number. (Tr. 81-83, 113, 198-99, 226-29, 232, 256-62)

35. On or about March 10, 2010, Respondent received a bill for over $300 for Dish Network television services for the Premises. That bill indicated that service was in Respondent's name. (Respondent's Exhibit 2; Tr. 229-31, 262-68)

36. Complainant filed his verified complaint number 10140314 with the Division on April 26, 2010, and on or about that date, the Division sent a letter to Respondent enclosing a copy of the verified complaint. (ALJ's Exhibit 1; Complainant's Exhibit 6; Tr. 80) Respondent received the verified complaint in early May, 2010. (Tr. 268)

37. On May 10, 2010, Respondent made a complaint against Complainant to the county sheriff regarding the Dish Network bill. That complaint states that Complainant had "used (Respondent's) name" to obtain Dish Network service, and that the offense charged was "identity theft." Respondent testified that he had not intended to charge Complainant with identity theft, but that he had simply signed the statement that the deputy sheriff typed. (Complainant's Exhibit

JA0634

4; Tr. 83-85, 232-36) Complainant was called and questioned by a deputy sheriff regarding Respondent's complaint, and he gave a statement. (Complainant's Exhibit 4; Tr. 89)

38.    Respondent denied that he had filed the May 10, 2010 complaint with the sheriff's office to retaliate against Complainant, and claimed that he contacted the sheriff's office on May 10 because he "may have" still been getting bills from Dish Network as of that date. Respondent acknowledged that he was angry when he received the verified complaint in early May. (ALJ's Exhibit 1; Tr. 268-74) No Dish Network bills from after March, 2010 were produced at the public hearing. Respondent's testimony on this issue was not credible.

39.    Respondent's testimony at times evidenced confusion regarding past events, and Respondent was occasionally evasive. (Tr. 205-06, 219-25, 229, 232, 234-35, 247-48, 272-73, 282, 285-86, 291) Based on my observation of Respondent's demeanor and behavior, and on the contents of his testimony, I find that he was not a credible witness.

40.    Complainant incurred expenses of $200 to rent a moving truck to move from the Premises, and $90 for a tow truck to tow away one of his vehicles. (Tr. 85-86) Complainant and his family moved to another location. Complainant paid $875 for the first month's rent. (Tr. 85-86)

41.    Respondent's treatment of Complainant made him angry, and fearful for his family's safety and his own. Since then, Complainant, DeLeo and Tullai have argued, which Complainant attributes to the stress caused by Respondent's statements and actions. Complainant does not wear his Islamic attire anymore, for fear of being singled out. (Tr. 86-89)

42.    At the time of the public hearing, Respondent was 75 years old, and Complainant was about 42 years old. (Complainant's Exhibit 1; Tr. 186)

JA0635

43.  Complainant was angry and humiliated when he received Respondent's identity theft complaint.  (Complainant's Exhibit 4; Tr. 89-90)

## OPINION AND DECISION

### *Hostile Housing Environment*

Pursuant to the New York State Executive Law, art. 15 (Human Rights Law), it is an unlawful discriminatory practice "for the owner… or other person having the right to… rent or lease a housing accommodation… (t)o discriminate against any person because of… race, creed, color… in the terms, conditions or privileges of the sale, rental or lease of any such housing accommodation or in the furnishing of facilities or services in connection therewith." Human Rights Law § 296.5(a) (2).

One form of unlawful discrimination occurs when a landlord subjects a tenant to a hostile housing environment.  To prevail on a hostile housing environment theory, a complainant must show that he was a member of a protected class, he was subjected to harassment based upon his membership in the protected class, and the harassment affected a term, condition or privilege of housing.  *State Div. of Human Rights v. Stoute*, 36 A.D.3d 257, 264, 826 N.Y.S.2d 122, 127 (2d Dept. 2006).

In the instant case, Complainant is an African-American, an adherent of the Muslim faith, and is married to a woman of Italian descent. During his short tenancy at the Premises, Complainant was frequently subjected to abusive language directed at African-Americans, Muslims, and Complainant himself personally as a Muslim and a black man. On one occasion, Respondent directed his disparaging remarks to Complainant's wife because of her Italian ancestry.  Respondent also grabbed Complainant on at least one occasion, and threatened his

JA0636

safety. Respondent's acts and statements altered the terms, conditions privileges of Complainant's rental of the Premises. Complainant presented a prima facie case for a hostile housing environment due to race/color and creed. Respondent was not a credible witness, and he failed to present credible proof in his defense. This complaint is sustained.

### _Retaliation_

In order to establish a prima facie case of retaliation, a complainant must show that (1) he engaged in activity protected by Human Rights Law § 296; (2) the respondent was aware that he participated in the protected activity; (3) he suffered an adverse action; and, (4) there is a causal connection between the protected activity and the adverse action. _Pace v. Ogden Svcs. Corp._, 257 A.D.2d 101, 103, 692 N.Y.S.2d 220, 223 (3d Dept. 1999)

In the instant case, Complainant engaged in activity protected by Human Rights Law § 296 when he filed his verified complaint in late April, 2010. Respondent became aware of that no later than early May, and his criminal complaint against Complainant followed almost immediately thereafter. Although the criminal complaint did not ultimately result in criminal prosecution of Complainant, he was subjected to questioning by the sheriff regarding the complaint, and was angry and humiliated. Respondent's attempts to explain why his complaint to the sheriff followed so closely on the heels of the service of Complainant's Division complaint were not convincing. Respondent failed to prove a legitimate, nondiscriminatory reason for his actions. This complaint is sustained.

### _Damages_

A complainant is entitled to recover compensatory damages for mental anguish caused by a respondent's unlawful conduct. In considering an award of compensatory damages for mental anguish, the Division must be especially careful to ensure that the award is reasonably related to

JA0637

the wrongdoing, supported in the record, and comparable to awards for similar injuries. *State Div. of Human Rights v. Muia*, 176 A.D.2d 1142, 1144, 575 N.Y.S.2d 957, 960 (3d Dept. 1991).

Because of the "strong antidiscrimination policy" of the Human Rights Law, a complainant seeking an award for pain and suffering "need not produce the quantum and quality of evidence to prove compensatory damages he would have had to produce under an analogous provision." *Batavia Lodge v. New York State Div. of Human Rights*, 35 N.Y.2d 143, 147, 359 N.Y.S.2d 25, 28 (1974). Indeed, "(m)ental injury may be proved by the complainant's own testimony, corroborated by reference to the circumstances of the alleged misconduct." *New York City Transit Authority v. State Div. of Human Rights (Nash)*, 78 N.Y.2d 207, 216, 573 N.Y.S.2d 49, 54 (1991). The severity, frequency, and duration of the conduct may be considered in fashioning an appropriate award. *New York State Department of Correctional Services v. New York State Div. of Human Rights*, 225 A.D.2d 856, 859, 638 N.Y.S.2d 827, 830 (3d Dept. 1996).

In *New York State Div. of Human Rights v. Stoute*, 36 A.D.3d 257 (2d Dept. 2006), a landlord's harassment of his tenant resulted in an award of $10,000 for mental anguish. In the instant case, Respondent subjected Complainant to insults to his race and religion, and that of his family, over a period of approximately one month, and forcibly grabbed Complainant on one occasion. Due to the age difference of over 30 years between Respondent and Complainant, Complainant could not have reasonably have felt himself to be in physical danger on that occasion. However, this unauthorized physical contact by Respondent, particularly in the presence of Complainant's family, was yet another affront to his dignity. Under these circumstances, an award of $10,000 regarding the hostile housing environment is appropriate.

Although Complainant presented proof of the first month's rent at the home he moved to after leaving Respondent's Premises, he did not present proof of what he actually paid, or for

JA0638

how long.  In addition, due to the private, informal arrangement between Complainant and Respondent regarding the rental amount for the Premises, I am unable to determine that Complainant sustained damages for increased rent, and I make no award of damages regarding rent.

Complainant did present sufficient proof that he had sustained moving expenses in the amount of $290, and an award is made in that amount.

With respect to Respondent's retaliatory conduct, the record demonstrates that although Complainant was not actually prosecuted for the alleged identity theft, he was angered and humiliated by being subject to investigation.  Under the circumstances, an award of $2,500 is appropriate.

Human Rights Law § 297.4 (c) (iv) permits the award of punitive damages to a person aggrieved by a housing discriminatory practice.  Punitive damages may be awarded "where the wrong complained of is morally culpable, or is actuated by… reprehensible motives, not only to punish the (respondent) but to deter him, as well as others who might otherwise be so prompted, from indulging in similar conduct in the future." *Micari v. Mann*, 126 Misc. 2d 422, 481 N.Y.S.2d 967 (N.Y. Sup. Ct. 1984)  Respondent's behavior towards Complainant was deliberate, and demeaning to Complainant. An award of $1,000 will serve to deter Respondent from future actions of this kind.

Pursuant to § 297 of the Human Rights Law, the Division may assess civil fines and penalties.  With reference to the instant case, I find that the damages awards as noted above will be sufficient to deter Respondent from future discriminatory behavior. Respondent's discriminatory words and actions were deliberate, and resulted in humiliation to Complainant. However, there was no evidence at the hearing that Respondent had engaged in this kind of

JA0639

behavior before, or that he possessed financial resources beyond the two houses which he rented out and, presumably, his own residence. For those reasons, it is not appropriate to assess a civil fine.

## **ORDER**

On the basis of the foregoing Findings of Fact, Opinion and Decision, and pursuant to the provisions of the Human Rights Law and the Division's Rules of Practice, it is hereby

ORDERED, that Respondent, and his agents, representatives, employees, successors, and assigns, shall cease and desist from discriminatory practices; and

IT IS FURTHER ORDERED, that Respondent shall take the following action to effectuate the purposes of the Human Rights Law, and the findings and conclusions of this order:

1.     Within 60 days of the date of the Commissioner's Order, Respondent shall pay to Complainant the sum of $12,790 without any with holdings or deductions, as compensatory damages for the mental anguish and humiliation suffered by Complainant as a result of Respondent's unlawful discrimination, and as compensation for the moving expenses incurred by Complainant. Interest shall accrue on the award at the rate of 9 per cent per annum from the date of the Commissioner's Order until payment is actually made by Respondent.

JA0640

2.  Within 60 days of the date of the Commissioner's Order, Respondent shall pay to Complainant the sum of $1,000 without any with holdings or deductions, as punitive damages for his willful and malicious conduct. Interest shall accrue on the award at the rate of 9 per cent per annum from the date of the Commissioner's Order until payment is actually made by Respondent.

3.  The aforesaid payments shall be made by Respondent in the form of a certified check made payable to the order of Complainant, and delivered by certified mail, return receipt requested, to the New York State Division of Human Rights, Albany Regional Office, Att'n Lawrence Zyra, Esq.,  Corning Tower, 28th floor, Empire State Plaza, P.O. Box 2049, Albany, NY 12220.  Respondent shall furnish written proof  to the New York State Division of Human Rights, Compliance Unit, Att'n Barbara Buoncristiano, One Fordham Plaza, 4th floor, Bronx, NY 10458, of its compliance with the directives contained in this Order.

4.  Respondent shall cooperate with the representatives of the Division during any investigation into compliance with the directives contained within this order.

DATED:  July 11, 2011
        Bronx, New York



Michael T. Groben
Administrative Law Judge

JA0641

# EXHIBIT E

JA0642

**STATE OF NEW YORK: EXECUTIVE DEPARTMENT**
**STATE DIVISION OF HUMAN RIGHTS**

| |
|---|
| **STATE DIVISION OF HUMAN RIGHTS** |

**STATE DIVISION OF HUMAN RIGHTS**
    On the complaint of

**JOSEPH P. PEZZA,**

                             Complainant,

          -against-

**THE MILL RIVER CLUB, INC.,**

                                 Respondent.

**NOTICE OF ORDER**
**AFTER HEARING**

CASE No: **3507000**

    **PLEASE TAKE NOTICE** that the within is a true copy of an Order issued herein by the Hon. Michelle Cheney Donaldson, Commissioner of the State Division of Human Rights, after a hearing held before Administrative Law Judge Thomas S. Protano. In accordance with the Division's Rules of Practice, a copy of this Order has been filed in the offices maintained by the Division at One Fordham Plaza, Bronx, New York 10458. The Order may be inspected by any member of the public during the regular office hours of the Division.

    **PLEASE ALSO TAKE NOTICE** that any party to this proceeding may appeal this Order to the Supreme Court in the County wherein the unlawful discriminatory practice which is the subject of the Order occurred, or wherein any person required in the Order to cease and desist from an unlawful discriminatory practice, or take other affirmative action resides or transacts business by filing with such Supreme Court of the State a Petition and Notice of Petition within sixty days after service of this Order. The Petition and Notice of Petition must also be served on all parties, including the Division of Human Rights.

JA0643

Notice of Order After Hearing
SDHR Case No. 3507000
Joseph P. Pezza v. The Mill River Club, Inc.

**PLEASE TAKE FURTHER NOTICE** that a complainant who seeks state judicial review,

and who receives an adverse decision therein, may lose his or her right to proceed subsequently

under federal law, by virtue of *Kremer v. Chemical Construction Corp.*, 465 U.S. 461 (1982).

DATED:
      BRONX, NEW YORK      STATE DIVISION OF HUMAN RIGHTS


_____
MICHELLE CHENEY DONALDSON
 Commissioner

JA0644

Notice of Order After Hearing
SDHR Case No. 3507000
Joseph P. Pezza v. The Mill River Club, Inc.


To:

Joseph P. Pezza
13 Winding Lane
Glen Head, New York 11545

Joseph P. Pezza
P.O. Box 8020
Garden City, New York 11530

The Mill River Club, Inc.
Mill River Road
Upper Brookville, New York 11771
Attention Jay M. Herman, President

Lazer, Aptheker, Rosella & Yedid, P.C.
Melville Law Center
225 Old Country Road
Melville, New York 11747-2712
Attention Russell L. Penzer, Esq.

Jackson Lewis, LLP
58 South Service Road
Suite 410
Melville, New York 11747
Attention Jeffrey W. Brecher, Esq.

Caroline J. Downey
Acting General Counsel
State Division of Human Rights
One Fordham Plaza
Bronx, New York 10458

Hon. Eliot Spitzer
Attorney General
120 Broadway
New York, New York 10271
Attention Civil Rights Bureau

JA0645

**STATE OF NEW YORK: EXECUTIVE DEPARTMENT**
**STATE DIVISION OF HUMAN RIGHTS**

| |
|---|
| **STATE DIVISION OF HUMAN RIGHTS** |

**STATE DIVISION OF HUMAN RIGHTS**

    On the complaint of

**JOSEPH P. PEZZA,**

                          Complainant,

        -against-                            CASE No: **3507000**

**THE MILL RIVER CLUB, INC.,**

                         Respondent.

## PROCEEDINGS IN THE CASE

On October 1, 2002, Complainant filed a verified complaint with the State Division of Human Rights (Division), charging Respondent with unlawful discriminatory practices relating to public accommodation in violation of the Human Rights Law of the State of New York.

After investigation, the Division found that it had jurisdiction over the complaint and that probable cause existed to believe that Respondent had engaged in an unlawful discriminatory practice. The Division thereupon referred the case to Public Hearing.

After due notice, the case came on for hearing before Thomas S. Protano, an Administrative Law Judge (A.L.J.) of the Division. Public Hearing sessions were held on July 12, 13,14 and 15, 2005.

Complainant and Respondent appeared at the hearing. Complainant was represented by the law firm of Lazer, Aptheker, Rosella & Yedid, P.C., by Russell L. Penzer, Esq, of Counsel. Respondent was represented by Jackson Lewis, LLP, by Jeffrey W. Brecher, Esq, of Counsel.

Permission to file post-hearing briefs was granted. Counsel for both parties filed post-hearing briefs.

JA0646

On August 7, 2006, A.L.J. Protano issued a recommended Findings of Fact, Opinion, Decision and Order (Recommended Order).  Objections were filed by both parties.

An Alternative Proposed Order was issued by the Commissioner on October 24, 2006. Objections were filed by both parties.


## FINDINGS OF FACT

1.  Respondent is a country club located in Oyster Bay, New York.  Complainant has been a member of Respondent club for 18 years.  He remains a member of Respondent club to this day. (A.L.J.'s Exhibit III; Tr. 32)

2.  The Respondent club has a kitchen and provides meal service.  It holds restaurant and bar licenses issued by governmental agencies. (Joint Exhibit 2)  It maintains tennis courts, a pool and a golf course. (Complainant's Exhibit 16; Tr. 706)

3.  In order to become a member of Respondent's club, one must find a sponsoring member, apply for admission, go through a background check, have dinner with admissions committee members and then go through an interview with the full Admissions Committee.  After that, if the applicant is found to be suitable, he or she is invited to join. (Respondent's Exhibits J & K; Tr. 146, 187-90)  The club does not advertise for new members. (Tr. 499)

4.  Non-members of Respondent club are not permitted to use the club facilities except as a guest of a member.  However, non-members can make purchases from the pro shop and they can take golf or tennis lessons from the golf or tennis pro, respectively. (Tr. 502, 705-708)  In addition, under certain circumstances, non-members can hold parties, golf outings and other functions, provided a member sponsors the event. (Tr. 352, 358, 371, 404, 591)  When such functions are held at the Respondent club, Respondent collects an agreed upon fee, usually

JA0647

Order After Hearing
SDHR Case No. 3507000
Joseph P. Pezza v. The Mill River Club, Inc.

directly from the non-member who is hosting the function. (Tr. 348, 354, 360, 373, 400, 405, 416) There were 21 such events held at Respondent club in 2002, 21 in 2003 and 17 in 2004. (Tr. 456-58)

5.  Many of the non-member events are held by individuals. Some are held by local non-profit organizations trying to raise money by conducting golf outings. Of the 59 events held from 2002 through 2004, at least 20 were golf or tennis outings held by organizations. (Joint Exhibit 1)

6.  Although all of those functions are nominally sponsored by a member, a non-member who wants to hold a function at the club can do so, even if he does not have a sponsoring member readily available. When necessary, sponsors can be "made available" by the club's general manager, who will find members to sponsor the events. Gary Jorgensen, Respondent's general manager from 1999 to 2004, stated that on occasions, when circumstances required it, he would find a sponsor for an event if "the relationship to the club was light." (Tr. 703-04) Jay Herman, a member of Respondent club, similarly stated that a general manager had asked him to sponsor an event when a sponsor was needed. (Tr. 580)

7.  Complainant alleges that Respondent maintains discriminatory membership policies. Although Respondent concedes that Complainant's description of its policy is accurate, it asserts that the policy is not unlawfully discriminatory in violation of New York State's Human Rights Law. (A.L.J.'s Exhibits III & IV; Joint Exhibits 1 & 2) Complainant further alleges that when he suggested Respondent needed to re-evaluate this policy, he was retaliated against and told not to bring the topic up again. (Joint Exhibit 2) Complainant has not sought monetary damages, and specifically states that he seeks only to end Respondent's allegedly discriminatory membership practices. (Tr. 40)

JA0648

Order After Hearing
SDHR Case No. 3507000
Joseph P. Pezza v. The Mill River Club, Inc.

8.   Specifically, Respondent's policy requires that it maintain a balanced membership with half of its members classified as Jewish and the other half of its members classified as Christian. In order to achieve this balance, every member is categorized as "J" for Jewish, "C" for Christian, "M" for mixed or "O" for other. (Tr. 32-33)  If, for example, there are openings on the Jewish side only, a Christian applicant would have to wait until there were Christian openings in order to be accepted as a member.  Similarly, a Jewish applicant would have to wait if openings were only on the Christian side. (Tr. 36)  In order to maintain the balance, Respondent has resorted to lowering its initiation fee for one side or the other to attract members of that faith. (Tr. 37)

9.   Whenever Respondent seeks new members, it must maintain that balance.  Respondent's full regular membership is set at 252 members and there are other lesser categories of membership such as weekday, house, pool and tennis, which entitle members to less than full use of the club.  In total, including all categories of membership, there are 300 to 400 members. (Complainant's Exhibit 16; Tr. 493)

10.  According to Stanley Chase, a founding member of the club, the Respondent's goals are to be "free of prejudice" and to "provide a place in which no one would feel out of place by virtue of being in a minority ethnic situation, which is what was happening and still happens to clubs." (Tr. 112)  Mr. Chase said that in 1964, when Respondent club was founded, "you were either in a Christian club or a Jewish club." (Tr. 113)  George Brownridge, a 40-year member and former club president, expressed a belief that if the balanced membership policy were abandoned, the club would become either mainly Jewish or mainly Christian. (Tr. 161)  Mr. Chase expressed a similar belief, citing other clubs that tried but failed to maintain a balance as examples. (Tr. 119)

JA0649

Order After Hearing
SDHR Case No. 3507000
Joseph P. Pezza v. The Mill River Club, Inc.

11.  It is this balanced policy that, in part, attracts new members.  Numerous current members testified that they were attracted to the Respondent club because of its policies of diversity and the balanced membership.  Many expressed pride that they belonged to a club that fostered such an atmosphere. (Tr. 164, 180, 343, 357, 364, 377, 395, 408, 457, 469, 477, 589, 592, 605)

12.  In addition to religious diversity, Respondent seeks to maintain ethnic and racial diversity. (Tr. 578, 603, 655)  It achieves racial and ethnic diversity without codifying or enforcing any policies similar to the membership policies it uses to maintain religious diversity. (Respondent's Exhibits A & B; Tr. 577-78)

13.  Complainant asserts that the policy affects his membership, because he is denied the companionship of prospective members who might be kept on waiting lists pursuant to the balanced membership policy.  He cited Andrew Bene as an example. (Tr. 98)  Mr. Bene stated however that he was not a close acquaintance of Complainant.  He stated that he believed he had met Complainant only once at Respondent club. (Tr. 147-48)  Mr. Bene applied for membership in Respondent club in April of 2002.  He was placed on a waiting list and, in May of 2003, he asked Respondent to withdraw his application because his daughter had become very ill.  Mr. Bene is Catholic. (Tr. 145, 150)  Complainant also said that the policy affects all members monetarily and forces everyone to accept "unnecessary labels", which he described as embarrassing. (Tr. 81-82)

14.  In 2002, while serving as a member of Respondent's governing board, Complainant stated that he felt the practice of labeling all applicants based upon religious affiliation should be ended.  He asserts that after making this argument, he was removed from the board in retaliation for having complained about the allegedly discriminatory practice. (Joint Exhibit 2; Tr. 88)

JA0650

Order After Hearing
SDHR Case No. 3507000
Joseph P. Pezza v. The Mill River Club, Inc.

Respondent argues that he was removed for reasons unrelated to his complaints about the membership policy.

15. In July of 2002, Complainant's term of service on the board was set to expire. In order to run for the board, a candidate must either be selected by the Nominating Committee or, failing that, he or she must submit a petition signed by 25 members. Thereafter, the membership votes on the candidates. (Tr. 426-27)

16. In 2002, when Complainant was seeking to run for another term, the nominating committee chose not to nominate him. Prior to making its decisions, the committee interviews the candidates. When the committee contacted Complainant to set up an interview, he did not respond until after the deadline the committee had set. Despite this, Complainant was given an interview even though some members of the committee objected. (Tr. 441-44) At the interview, Complainant was asked about a Beach Boys concert he had booked for the club that was poorly attended and cost the club money. He was evaluated on his fitness to continue as a board member. (Tr. 446)

17. When the members of the committee met to discuss Complainant's candidacy, several stated that he had done a bad job with the Beach Boys concert. Others felt he was brusque and not a team player. (Tr. 450, 384) Eileen Heuwetter, a committee member, felt Complainant was arrogant and overbearing. (Tr. 479) Another member of the committee, Diane Banks, had worked with Complainant previously when she was in charge of providing entertainment for the club. She stated that on one occasion, when Complainant disagreed with her choice of a promoter for Respondent's entertainment events, he became very abusive towards her and cursed at her. She related this story to the committee when they met. (Tr. 387, 642) Of approximately 15 or 16 members seeking nomination, the committee chose eight. Complainant was not among

JA0651

Order After Hearing
SDHR Case No. 3507000
Joseph P. Pezza v. The Mill River Club, Inc.

them. (Respondent's Exhibit R; Tr. 451)  Complainant's opposition to Respondent's membership

policy was not a factor in the decision.  Most of the committee members who testified said they

did not recall hearing him complain about the diversity policy. (Tr. 447, 481)  One member

remembered hearing the Complainant advocating for the abolition of the membership plan, but

he did not consider it to be a complaint of discrimination.  Instead, he felt Complainant was

arguing that the policy hurt the club financially. (Tr. 386)

## DECISION AND OPINION

**Public accommodation jurisdiction**

According to N.Y. Exec. Law, Art. 15 (Human Rights Law) §296.2(a):

it shall be an unlawful discriminatory practice for any person, being the owner,
lessee, proprietor, manager, superintendent, agent or employee of any place of
public accommodation … because of … creed … of any person, directly or
indirectly, to refuse, withhold from or deny to such person any of the
accommodations, advantages, facilities or privileges thereof … or to publish,
circulate, issue, display, post or mail any written or printed communication, notice
or advertisement, to the effect that any of the accommodations, advantages,
facilities and privileges of any such place shall be refused, withheld from or
denied to any person on account of … creed … .

A "place of public accommodation" is defined to include, among other things, golf

courses, restaurants, eating houses or any place where food is sold for consumption on premises.

It does not include any institution or club that is "distinctly private."  However,

In no event shall an institution, club or place of public accommodation be
considered in its nature distinctly private if it has more than one hundred
members, provides regular meal service and regularly receives payment for dues,
fees, use of space, facilities, services, meals or beverages directly or indirectly
from or on behalf of a non-member for the furtherance of trade or business.

Human Rights Law §292.9 (as amended by L.1994, ch. 262).

JA0652

Order After Hearing
SDHR Case No. 3507000
Joseph P. Pezza v. The Mill River Club, Inc.

Respondent has the burden of establishing that their place of accommodation is "distinctly" private. *Cahill v. Rosa*, 89 N.Y.2d 14, 22, 651 N.Y.S.2d 344, 347 (1996). Respondent argues that it is a distinctly private organization, but fails to prove that it falls outside of the provisions of §292.9. When Respondent's operations are compared to a plain reading of the statute, it is clear that they have more than one hundred members, provide regular meal service and receive payment for use of space and facilities from non-members. Therefore, Respondent is a place of public accommodation as defined by the Human Rights Law.

Respondent focuses on the portion of the statute which states that a place of public accommodation will not be considered distinctly private if it "regularly receives payment for dues, fees, use of space, facilities, services, meals or beverages directly or indirectly from or on behalf of a non-member for the furtherance of trade or business." Human Rights Law §292.9. Respondent maintains that it does not "regularly" receive payments from non-members. The terms "regularly" and "for furtherance of trade or business" are not defined by the State Human Rights Law or the Division's Rules of Practice. Because the provisions of New York City Human Rights Law are similar to State Human Rights Law, Respondent cited the definitions of "regularly" found in the Rules of Practice of the City of New York Human Rights Commission at Title 47, Chapter 2, §2-01, Rules of the City of New York, and argued that under those definitions Respondent does not "regularly receive payment … from or on behalf of a non-member for the furtherance of trade or business." While Respondent may look at definitions used by the New York City Human Rights Commission, those definitions are not controlling on the State Division of Human Rights.

Regardless of whether Respondent regularly receives payment for dues, fees, use of space, facilities, services, meals or beverages directly or indirectly from or on behalf of a non-

JA0653

member for the furtherance of trade or business, it is not a distinctly private organization.

Anyone who is interested in holding a golf outing or other event can walk into the Respondent's

premises and make arrangements for the event. If he or she does not have a member to sponsor

the event, one will be found, according to Mr. Herman and Mr. Jorgensen, a member and a

former manager, respectively. Consequently, since the club facility is open to anyone, there is

nothing private about it. Respondent club is not distinctly private.

**Complainant's standing**

Pursuant to Human Rights Law §297.1, any "person claiming to be aggrieved by an

unlawful discriminatory practice" may file a complaint with the Division. A potential

complainant must establish legal standing to file a complaint, by establishing that he or she is a

person aggrieved by the actions alleged to be unlawful under the Human Rights Law.

Complainant argues that as a member of the club, he has standing to maintain his claim

against Respondent charging discrimination on the basis of creed. With this proposition the

Commissioner agrees. As a member and officer of the Respondent, Complainant sought to

convince the club to change the discriminatory rule, to no avail. As a member, Complainant is

aggrieved by the discriminatory policy and practice of the club, and has a legitimate interest that

the rules of the club not be in violation of the Human Rights Law. Complainant and all other

members have been "labeled" as to their religion, and Complainant finds this offensive and

embarrassing. Suffering some greater personal harm, such as himself being placed on a waiting

list because of his religion, is not necessary to establish that he is a person aggrieved.

The U.S. Supreme Court, considering standing to sue under parallel provisions of federal

law, has found that a white resident of an apartment complex had standing to sue over the

racially discriminatory practices of the complex, even though the harm to that plaintiff was not

JA0654

direct discrimination, but deprivation of the right to live in a racially integrated community.

*Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205 (1972). The reasoning of

*Trafficante* was extended from renters in an apartment complex to residents of a "neighborhood"

affected by racial steering, in G*ladstone, Realtors v. Bellwood*, 441 U.S. 91 (1979). *See also*,

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)("testers" posing as prospective tenants

had standing); *EEOC v. Mississippi College*, 626 F.2d 477, 483 (1980), *cert. den.* 453 U.S. 912

(1981)(Plaintiff, who was white and alleged discrimination against blacks by her employer, had

standing to "charge a violation of her own personal right to work in an environment unaffected

by racial discrimination".)

      Complainant therefore has standing due to his interests in the situation as a member of

the club, similar to the way in which tenants had an interest in the discriminatory practices of the

apartment complex, or the residents had an interest in the effects of discrimination on their

neighborhood. Complainant would not be so affected, in his interests as a member, either by an

isolated incident of discriminatory conduct attributable to the club, which was directed at a guest

or another member, or by a facially neutral policy alleged to have discriminatory impact on

"others". *See*, *Yolles v. Golf Club of Avon, Inc.*, 2004 Conn. Super. LEXIS 107 (Superior Court

Hartford, unreported decision) at page 57. By contrast, pursuant to Respondent's facially

discriminatory policy, Complainant has been "labeled" on the basis of creed, and is subject to a

club environment where all members have been so labeled. On that basis, Complainant can

challenge the discriminatory policy.

**Retaliation**

      With respect to a retaliation claim, Complainant must first establish a prima facie case by

showing that: (1) he engaged in activity protected by the Human Rights Law, (2) Respondent

was aware that he participated in the protected activity, (3) he suffered from a disadvantageous

action based upon his activity, and (4) there is a causal connection between the protected activity

and the adverse action taken by Respondent. *Pace v. Ogden Services Corp.*, 257 A.D.2d 101;

692 N.Y.S.2d 220 (3d Dept. 1999), *citing*, *Dortz v. City of New York*, 904 F.Supp. 127, 156

(1995); *see also*, *Matter of North Shore University Hospital v. Rosa*, 86 N.Y.2d 413, 633

N.Y.S.2d 462 (1995) (wherein the Court of Appeals applied a proof scheme used for

employment discrimination cases to a public accommodation case).

Complainant asserts that he questioned the Respondent's policy and, thereafter, was

removed from the Respondent's Board of Governors in retaliation for having opposed

Respondent's membership policy. He has established a prima facie case of retaliation in that he

was removed from the Board of Governors after advocating a change in Respondent's

membership policies. Respondent's witnesses make it clear, however, that his beliefs about

Respondent's membership policy were not the reason for his removal. Rather, the committee

members felt he handled his interview badly and did not recommend him for another term on the

Board of Governors.

**Respondent's Liability**

Respondent maintains a practice that excludes some potential members (though

temporarily), favors other members, and offers discounted fees based solely upon the creed of

the applicant. Though their goal is to be inclusive rather than exclusive and they seek to create a

place that is free of prejudice, the policy is, nonetheless, discriminatory. It is in violation of the

New York State's Human Rights Law.

Respondent argues that the policy is necessary because abandoning it would make the

club either all Jewish or all Christian. Nevertheless, classification on the basis of creed is

JA0656

presumptively discriminatory. *See*, *United States v. Starrett City Assoc.*, 840 F.2d 1096, 1101 (2d Cir. 1988) ("any racial classification is presumptively discriminatory"). Although some "affirmative action plans" may pass muster under the Human Rights Law or parallel federal statutes, the use of quotas has been almost universally condemned. *See*, *e.g.*, *Starrett City*, *supra* at 1101-02.

Respondent may take other steps, tailored to retain the integrated nature of the club, that do not include either quotas, or different fees based on religion. Various types of outreach or encouragement aimed at the target group may be used, so long as these techniques would not be interpreted by a reasonable person as indicating that persons from outside the targeted group are unwelcome.

**Conclusion**

Respondent, a place of public accommodation, is in violation of New York State's Human Rights Law. Its admissions policy distinguishes between applicants on the basis of creed. There is no question applicants are regularly required to wait for membership, or to pay a different rate, solely because of their religion. Therefore, the Division can and should act to effectuate the purposes of the Human Rights Law under the authority granted to it by the Legislature under Human Rights Law §297.4(c) and order Respondent to cease and desist from its unlawful practices relative to creed.

Complainant has not established any harm to himself in the form of economic loss.

**<u>ORDER</u>**

On the basis of the foregoing Findings of Fact, Opinion and Decision and pursuant to the provisions of the Human Rights Law, it is hereby

JA0657

Order After Hearing
SDHR Case No. 3507000
Joseph P. Pezza v. The Mill River Club, Inc.

ORDERED that that Respondent, its agents, representatives, employees, successors and assigns shall cease and desist from discriminating against anyone in the terms and conditions of a public accommodation; and it is further

ORDERED that Respondent, its agents, representatives, employees, successors and assigns shall extend full and equal accommodations, advantages, facilities or privileges of membership to all persons without regard for creed, and will evaluate applicants for membership in its place of public accommodation without discrimination based on race, creed, color, national origin, sexual orientation, military status, sex, disability or marital status; and it is further

ORDERED that within 45 days of the date of this Order Respondent will promulgate new membership policies consistent with this Order and will provide evidence of those new policies to the Division at:  New York State Division of Human Rights, Office of the Acting General Counsel, One Fordham Plaza, 4th Floor, Bronx, New York, 10458; and it is further

ORDERED that Respondent will cooperate with the Division's compliance unit and furnish any and all necessary documents to insure compliance with this Order; and it is further

ORDERED that Respondent will not retaliate against Complainant for his filing of the complaint herein, or for otherwise opposing discriminatory practices.


DATED:
        BRONX, NEW YORK        STATE DIVISION OF HUMAN RIGHTS



_____
MICHELLE CHENEY DONALDSON
Commissioner

JA0658

# EXHIBIT F

NEW YORK STATE
DIVISION OF HUMAN RIGHTS

---

NEW YORK STATE DIVISION
OF HUMAN RIGHTS
    on the Complaint of

ZHENYU SUN and WEI HUANG INDIVIDUALLY,
AND ON BEHALF OF HER MINOR CHILD
XINYE FENG,

                       Complainant,

           v.

LUCKY JOY RESTAURANT, INC.,

                      Respondent.

NOTICE AND
FINAL ORDER

Case Nos. 10126349
             10126474

---

    **PLEASE TAKE NOTICE** that the attached is a true copy of the Recommended

Findings of Fact, Opinion and Decision, and Order ("Recommended Order"), issued on July 16,

2009, by Robert J. Tuosto, an Administrative Law Judge of the New York State Division of

Human Rights ("Division"). An opportunity was given to all parties to object to the

Recommended Order, and all Objections received have been reviewed.

    <u>**PLEASE BE ADVISED THAT, UPON REVIEW, THE RECOMMENDED**</u>

<u>**ORDER IS HEREBY ADOPTED AND ISSUED BY THE HONORABLE GALEN D.**</u>

<u>**KIRKLAND, COMMISSIONER, AS THE FINAL ORDER OF THE NEW YORK STATE**</u>

<u>**DIVISION OF HUMAN RIGHTS ("ORDER")**</u>. In accordance with the Division's Rules of

Practice, a copy of this Order has been filed in the offices maintained by the Division at One

Fordham Plaza, 4th Floor, Bronx, New York 10458. The Order may be inspected by any

member of the public during the regular office hours of the Division.

**PLEASE TAKE FURTHER NOTICE** that any party to this proceeding may appeal this Order to the Supreme Court in the County wherein the unlawful discriminatory practice that is the subject of the Order occurred, or wherein any person required in the Order to cease and desist from an unlawful discriminatory practice, or to take other affirmative action, resides or transacts business, by filing with such Supreme Court of the State a Petition and Notice of Petition, <u>within sixty (60) days after service of this Order</u>. A copy of the Petition and Notice of Petition must also be served on all parties, including the General Counsel, New York State Division of Human Rights, One Fordham Plaza, 4th Floor, Bronx, New York 10458. <u>Please do not file the original Notice or Petition with the Division</u>.

**ADOPTED, ISSUED, AND ORDERED**.

DATED: **OCT 0 2 2009**
Bronx, New York

GALEN D. KIRKLAND
COMMISSIONER

JA0661

NEW YORK STATE
DIVISION OF HUMAN RIGHTS

---

NEW YORK STATE DIVISION OF
HUMAN RIGHTS
on the Complaint of

ZHENYU SUN and WEI HUANG,
INDIVIDUALLY, AND ON BEHALF OF HER
MINOR CHILD XINYE FENG,

Complainants,

v.

LUCKY JOY RESTAURANT, INC.,

Respondent.

**RECOMMENDED FINDINGS OF
FACT, OPINION AND DECISION,
AND ORDER**

Case Nos. **10126349, 10126474**

---

## SUMMARY

Complainants alleged that they were denied service at Respondent's restaurant because they are Falun Gong practitioners. Respondent defaulted. Complainants have proven their cases and are hereby awarded damages.

## PROCEEDINGS IN THE CASE

On June 16, 2008 and June 24, 2008, Complainants filed verified complaints with the New York State Division of Human Rights ("Division"), charging Respondent with unlawful discriminatory practices relating to public accommodation in violation of N.Y. Exec. Law, art. 15 ("Human Rights Law").

After investigation, the Division found that it had jurisdiction over the complaints and that probable cause existed to believe that Respondent had engaged in unlawful discriminatory practices. The Division thereupon referred the case to public hearing.

On May 21, 2009, the complaint under case number 10126474 was amended to name both Complainant Huang and her minor child. (ALJ Exh. 5)

On June 2, 2009, Respondent's attorney, Jin Huang, transmitted to the undersigned a 'Consent to Change Attorney' signed by both Mr. Huang and one Xiao Rong Wu, acting "on behalf of" Respondent; said document did not name an incoming attorney as his replacement. (ALJ Exh. 6)

After due notice, the case came on for hearing before Robert J. Tuosto, an Administrative Law Judge ("ALJ") of the Division. A public hearing session was held on June 3, 2009.

Complainant appeared at the public hearing. The Division was represented by Bellew S. McManus, Esq. Respondent did not appear at the public hearing despite being served with a Notice of Hearing dated May 28, 2009. (ALJ Exh. 5) The Notice of Hearing was not returned to the Division by the U.S. Postal Service and is , therefore, presumed received. In accordance with 9 N.Y.C.R.R. § 465.11 (e) of the Division's Rules of Practice, the Respondent;s default was noted and the public hearing hearing proceeded on the complaint.

Permission to file a post-hearing brief was granted. The Division did not file a post hearing brief.


## **FINDINGS OF FACT**

1. Complainants alleged that they were denied service at Respondent's restaurant because they are Falun Gong practitioners. (ALJ Exhs. 1, 2)

2. Respondent denied unlawful discrimination in its verified Answer. (ALJ Exh. 7)

JA0663

*Background*

3. Falun Gong is a spiritual discipline or practice containing several components: meditation practice, slow motion exercise, and a system of beliefs laid out in a primary text known as 'Zhuan Falun'. Zhuan Falun centers on the principles of truthfulness, compassion and tolerance. (Tr. 27-28)

4. Complainant Sun has been a Falun Gong practitioner since 1977. Complainant Huang has been a Falun Gong practitioner since 1997. (Tr. 43, 53-54, 63)

*An Unrelated Falun Gong Practitioner Suffers Unlawful Discrimination by Respondent*

5. I credit the testimony of another Falun Gong practitioner, Amy Xue. On May 31, 2008 Xue and her party attended a Falun Gong rally which was located one or two blocks from Respondent's restaurant. Subsequently, Xue, and her party were refused service and ushered out of Respondent's restaurant after an employee inquired if they were Falun Gong practitioners. Xue, a Falun Gong practitioner for over 11 years, did not know Complainants. (Tr. 69-79)

*The Events of June 1, 2008*

6. On June 1, 2008 there had been a Falun Gong rally near a public library in Flushing, New York. (Tr. 43-44, 57)

7. At midday on June 1, 2008, Complainants entered Respondent's restaurant in Flushing to have lunch. Respondent's restaurant is across the street from the public library. Complainant Sun was wearing a t-shirt which bore the following in both English and Chinese characters: "FALUN DAFA IS GOOD"; underneath this phrase were the words "Truthfulness Compassion Tolerance" (Complainant's Exh. 1; Tr. 34-36, 52, 57, 64)

8. Complainants were met by two employees of Respondent who told Complainants, "We

- 3 -

JA0664

are not going to serve food to you" because they did not serve food to Falun Gong members. Both employees identified themselves as being Chinese, and said that the decision not to serve Complainants was made by the owner. When Complainants asked to speak to the owner they were told he was not present. Both employees ushered Complainants out of Respondent's restaurant. (Tr. 37-40, 48-50, 52-55, 58-62)

9. The minor child Xinye Feng was scared and crying when Complainants were ushered out of Respondent's restaurant. (Tr. 40, 62)

10. Complainants attempted to engage both employees in a discussion in front of the restaurant after they were ushered out but were told "Don't stay any longer. We want to do business." (Tr. 61)

11. Complainant Sun credibly testified that it was a "very unpleasant" and "humiliating" experience to be ushered out of Respondent's restaurant. Complainant Huang was "angry" as a result of this treatment, and was hurt because her daughter was crying. (Tr. 51, 54, 62)

## OPINION AND DECISION

*Respondent's Default*

After due notice, Respondent failed to appear before the Division to defend against the complaint. Pursuant to 9 NYCRR § 465.12 (b)(3), the public hearing proceeded on the evidence in support of the complaint. It is also noted that Respondent defaulted because it failed to answer the complaint in accordance with the Division's Rules of Practice. 9 NYCRR § 465.11 (e).

*Unlawful Discrimination*

The Human Rights Law, in pertinent part, makes it an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee

JA0665

of any place of public accommodation, directly or indirectly, to withhold from or deny to any person the accommodations, advantages, facilities or privileges thereof on account of his or her creed. Human Rights Law § 296.2 (a).

Respondent's restaurant qualifies as a place of public accommodation under the Human Rights Law. Human Rights Law § 292.9.

Here, the credible and unrebutted proof showed that Respondent withheld or denied from Complainants the accommodations, advantages, facilities or privileges of its restaurant solely on account of their evident Falun Gong creed. Therefore, Respondent has violated the Human Rights Law.

*Damages*

A complainant is entitled to recover compensatory damages for mental anguish caused by a respondent's unlawful conduct. In considering an award of compensatory damages for mental anguish, the Division must be especially careful to ensure that the award is reasonably related to the wrongdoing, supported in the record and comparable to awards for similar injuries. *State Div. of Human Rights v. Muia,*, 176 A.D.2d 1142, 1144, 575 N.Y.S.2d 957, 960 (3d Dept. 1991).

Because of the "strong antidiscrimination policy" of the Human Rights Law, a complainant seeking an award for pain and suffering "need not produce the quantum and quality of evidence to prove compensatory damages he would have had to produce under an analogous provision." *Batavia Lodge v. New York State Div. of Human Rights,* 35 N.Y.2d 143, 147, 359 N.Y.S.2d 25, 28 (1974). Indeed, "[m]ental injury may be proved by the complainant's own testimony, corroborated by reference to the circumstances of the alleged misconduct." *New York City Transit Auth. V. State Div. of Human Rights (Nash)*, 78 N.Y.2d 207, 216, 573 N.Y.S.2d 49, 54 (1991). The severity, frequency and duration of the conduct may be considered in fashioning

JA0666

an appropriate award. *New York State Dep't of Corr. Services v. New York State Div. of Human Rights*, 225 A.D.2d 856, 859, 638 N.Y.S.2d 827, 830 (3d Dept. 1996).

Complainant Sun credibly testified that being thrown out of Respondent's restaurant was a "very unpleasant" and "humiliating" experience. Likewise, Complainant Huang was "angry" as a result of this treatment, and hurt that her daughter was crying. *Ante* at ¶¶ 8, 10. As a result, each Complainant is awarded $7,000 for emotional pain and suffering. Such an award will effectuate the goals and objectives of the Human Rights Law, and is consistent with prior awards of the Commissioner in public accommodation cases. *See Keimel v. Manchester Newspaper d/b/a Free Press,* DHR Case No. 10102907 (May 1, 2007); *Swails v. Classic Fashion Resources, Inc., d/b/a Pittsford Pendleton Shop,* DHR case No. 10115313 (February 6, 2008).

## ORDER

On the basis of the foregoing Findings of Fact, Opinion and Decision, and pursuant to the provisions of the Human Rights Law and the Division's Rules of Practice, it is hereby

ORDERED, that Respondent, and its agents, representatives, employees, successors, and assigns, shall cease and desist from discriminatory practices in public accommodation; and

IT IS FURTHER ORDERED that Respondent shall take the following action to effectuate the purposes of the Human Rights Law, and the findings and conclusions of this Order:

1. Within sixty (60) days of the date of the Commissioner's Order, Respondent shall pay Complainant, Zhenyu Sun, an award of compensatory damages in the amount of $7,000. Respondents shall pay prejudgment interest on said award at the rate of nine per cent per annum from the date of the Commissioner's Order;

2. Within sixty (60) days of the date of the Commissioner's Order, Respondent shall pay

JA0667

Complainant, Wei Huang, an award of compensatory damages in the amount of $7,000. Respondents shall pay prejudgment interest on said award at the rate of nine per cent per annum from the date of the Commissioner's Order;

    3.  Within sixty (60) days of the date of the Commissioner's Order, Respondent shall pay Complainant, Xinye Feng, an award of compensatory damages in the amount of $7,000. Respondents shall pay prejudgment interest on said award at the rate of nine per cent per annum from the date of the Commissioner's Order;

    4.  Respondent shall pay post-judgment interest;

    5.  The aforesaid payments shall be made by Respondent in the form of certified checks made payable to the order of Complainants Zhenyu Sun, Wei Huang and Xinye Feng, and delivered by certified mail, return receipt requested, to the New York State Division of Human Rights, Office of Genral Counsel, One Fordham Plaza, 4th Floor, Bronx, New York 10458. Respondent shall furnish written proof to the N.Y.S. Division of Human Rights, Office of General Counsel, One Fordham Plaza, 4th Fl., Bronx, New York 10458, of its compliance with the directives contained in this Order;

    6.  Within sixty days of the date of the Final Order of the Commissioner, Respondent shall prominently post a copy of the Division's poster (available at the Division's website at www.dhr.state.ny.us under the homepage heading, "NYS Division of Human Rights Is…") in its restaurant where both patrons and employees are likely to view it. Respondent shall also establish in its workplace both anti-discrimination training and procedures. Respondent shall provide proof of the aforementioned to the Division upon written demand.

JA0668

7. Respondent shall cooperate with the representatives of the Division during any investigation into compliance with the directives contained within this Order.

DATED:  July 16, 2009

        Bronx, New York

                                          Robert J. Tuosto

                                          Administrative Law Judge

JA0669

key words).  This denial frustrates the purpose and intent of the Human Rights Law to eliminate discrimination.  See Cahill v. Rosa, 89 N.Y.2d at 20; Koerner v. State, 62 N.Y.2d 442, 478 N.Y.S.2d 584 (1984) ("Clearly, the elimination of discrimination in the provision of basic opportunities is the predominant purpose of this legislation"); Rochester Hosp. Svc. Corp. v. Div. of Human Rights, 92 Misc.2d 705, 401 N.Y.S.2d 413 (1977) ("The abolition of discrimination based on race, creed, color, national origin, sex, disability or marital status is a fundamental public policy of New York, and the division exists to eliminate and prevent discrimination, inter alia, in places of public accommodation.").

Accordingly, the complaint in this matter is sustained.

Complainant is entitled to compensatory damages.  Complainant credibly testified that as a result of Respondent's discriminatory actions, he felt "ridiculed," "embarrassed" and "very down."  In consideration of the severity and degree of his suffering and the nature of Respondent's offense, an award of $500 will compensate him for the mental anguish he suffered.  See Imperial Diner Inc. v. State Human Rights Appeal Bd., 52 N.Y.2d 72, 436 N.Y.S.2d 231 (1980) ($500 appropriate to compensate complainant whose creed was "reviled" by respondent); Batavia Lodge No. 196, Loyal Order of Moose v. New York State Div. of Human Rights, 35 N.Y.2d 143, 359 N.Y.S.2d 25 (1974) ($250 appropriate where respondent refused complainants service because of their race); State Div. of Human Rights v. Clarence Precision Machine and Tool, Div. of Willick Indus.,60 A.D.2d 977, 401 N.Y.S.2d 638 (4th Dept. 1978) ($500 appropriate where respondent denied service to complainant based on her sex); Hobson v. York Studios, Inc., 208 Misc. at 894 ($100 appropriate where respondent refused service to complainants because of their race).

<u>ORDER</u>

On the basis of the foregoing Findings of Fact, Decision and Opinion and pursuant to the

JA0670

provisions of the Human Rights Law, it is

ORDERED that Respondent, its agents, representatives, employees, successors and assigns shall cease and desist from discriminating on the basis of creed; it is also

ORDERED that with regard to Complainant's claim of discrimination, Respondent, its agents, representatives, employees, successors and assigns shall take the following affirmative action to effectuate the purposes of the Human Rights Law:

1.      Within thirty days of the date of this Order, Respondent shall pay to Complainant the sum of $500, without any withholdings or deductions as compensation for the mental anguish he suffered as a result of Respondent's unlawful discrimination. Interest shall also accrue on the award at a rate of nine percent per annum, from the date of this Order until payment is actually made by Respondent.

2.      The aforesaid payments by Respondent shall be in the form of a certified check payable to the order of Complainant Israel Steinberg and delivered to his attorney, addressed to the attention of Robert J. Miller, Esq., Reed Smith, LLP, 599 Lexington Avenue, New York, New York 10022-7650 by registered mail, return receipt requested. Respondent shall simultaneously furnish written proof of the aforesaid payments to the General Counsel of the Division, Gina M. Lopez Summa, Esq., at her office address of One Fordham Plaza, 4th Floor, Bronx, New York 10458.

3.      Respondent shall cooperate with the Division during any investigation into compliance with the directives contained in this Order.

DATED:

BRONX, NEW YORK                                    STATE DIVISION OF HUMAN RIGHTS

JA0671

_____
MICHELLE CHENEY DONALDSON
Commissioner

# EXHIBIT G

**STATE OF NEW YORK: EXECUTIVE DEPARTMENT**
**STATE DIVISION OF HUMAN RIGHTS**

---

**STATE DIVISION OF HUMAN RIGHTS**
on the complaint of

**ISRAEL STEINBERG,**

Complainant,

-against-

**UN PLAZA DINER CORP. d/b/a**
**NATIONS CAFÉ,**

Respondent.

**NOTICE OF ORDER AFTER HEARING**

Case No.
**1B-P-C-92-2302311**

---

PLEASE TAKE NOTICE that the within is a true copy of an Order issued herein by the Hon. Michelle Cheney Donaldson, Commissioner of the State Division of Human Rights, after a hearing held before Administrative Law Judge Margaret A. Jackson. In accordance with the Division's Rules of Practice, a copy of this Order has been filed in the offices maintained by the Division at One Fordham Plaza, Bronx, New York 10458 and at 163 West 125 Street, New York, New York 10027. The Order may be inspected by any member of the public during the regular office hours of the Division.

PLEASE ALSO TAKE NOTICE that any party to this proceeding may appeal this Order to the Supreme Court in the County wherein the unlawful discriminatory practice which is the subject of the Order occurred, or wherein any person required in the Order to cease and desist from an unlawful discriminatory practice, or take other affirmative action resides or transacts business by filing with such Supreme Court of the State a Petition and Notice of Petition within sixty days after service of this Order. The Petition and Notice of Petition must also be served on all parties, including the Division of Human Rights.

PLEASE TAKE FURTHER NOTICE that a complainant who seeks state judicial review, and

JA0674

who receives an adverse decision therein, may lose his or her right to proceed subsequently in Federal

Court under Title VII, by virtue of <u>Kremer v. Chemical Construction Corp.</u>, 456 U.S. 461, 102 S. Ct.

1883, 72 L.Ed.2d 262 (1982).

DATED:

      BRONX, NEW YORK             STATE DIVISION OF HUMAN RIGHTS

_____

MICHELLE CHENEY DONALDSON
Commissioner

To:

Israel Steinberg
1823 53rd Street
Brooklyn, New York 11204

Reed Smith, LLP
599 Lexington Avenue
New York, New York  10022-7650
Attn:   Robert J. Miller, Esq.

Nations Café, Inc.
875 First Avenue
New York, New York 10017

Nations Café, Inc.
875 First Avenue
New York, New York 10017
Attn:   Nicholas Kalas, Manager

UN Plaza Diner, Corp. d/b/a Nations Café
875 First Avenue
New York, New York 10017

UN Plaza Diner, Corp. d/b/a Nations Café
875 First Avenue
New York, New York 10017
Attn:   Nicholas Kalas, Manager

UN Plaza Diner, Corp. d/b/a Nations Café
875 First Avenue
New York. New York 10017
Attn:   Jerry Kalas
        Chairman or Chief Executive Officer

UN Plaza Diner, Corp. d/b/a Nations Café
875 First Avenue
New York. New York 10017
Attn:   Nick Kalas
        Principal Executive Office

Gina M. Lopez Summa, Esq.,
General Counsel
State Division of Human Rights
One Fordham Plaza – 4th Floor
Bronx, New York 10458

Migdalia T. Parés, Esq.
Chief Administrative Law Judge
State Division of Human Rights
One Fordham Plaza
Bronx, New York 10458

Hon. Eliot Spitzer
Attorney General
120 Broadway
New York, New York 10271
Attention Civil Rights Bureau

**STATE OF NEW YORK: EXECUTIVE DEPARTMENT**
**STATE DIVISION OF HUMAN RIGHTS**

| |
|---|
| **STATE DIVISION OF HUMAN RIGHTS**<br> on the complaint of<br><br>**ISRAEL STEINBERG,**<br><br> <div align="right">Complainant,</div><br> <div align="center">-against-</div><br><br>**UN PLAZA DINER CORP. d/b/a**<br>**NATIONS CAFÉ,**<br><div align="right">Respondent.</div> |

Case No.
**1B-P-C-92-2302311**

<u>PROCEEDINGS IN THE CASE</u>

On November 30, 1992, Complainant filed a verified complaint, thereafter amended, with the State Division of Human Rights ("Division") charging Respondent Nations Café with an unlawful discriminatory practice relating to public accommodation on the basis of his religion in violation of the Human Rights Law of the State of New York.

After investigation, the Division found that it had jurisdiction over the complaint and that probable cause existed to believe Respondent had engaged in an unlawful discriminatory practice. The Division then referred the case to a public hearing.

During a November 30, 1993, pre-hearing conference, Respondent appeared, pro <u>se</u>, by Nicholas Kalas, Manager. Kalas stated for the record that he was a primary stock-holding partner, Secretary and Manager of Nations Café located at 875 First Avenue, New York, New York 10017. He further stated that Nations Café was incorporated under the name UN Plaza Diner, Corp. doing business as Nations Café. The parties stipulated on the record to amend the complaint to include Respondent's proper corporate name. Pursuant to the parties' stipulation, the complaint has been amended and the caption is accordingly amended to read: "Isreal Steinberg v. UN Plaza Diner, Corp.

d/b/a Nations Café."  (ALJ's Exhibit I, November 30, 1993, Tr. 3-6).

On May 23, 2003, a notice of hearing was served on Respondent at: Nations Café, c/o Nicholas Kalas, Manager, 875 First Avenue, New York, New York 10017, indicating that a hearing was scheduled to take place on June 17, 2003.  The notice was not returned to the Division as undeliverable by the United States Postal Service ("USPS").

After due notice, Respondent failed to appear at the scheduled preliminary conference.

Complainant appeared by Parker Duryee Rosoff & Haft, PC, by Robert J. Miller, Esq.

On June 30, 2003, a notice of hearing was mailed to all parties informing them that a public hearing was scheduled to take place at the Division on July 15, 2003.  The notice was not returned to the Division as undeliverable by the USPS.

On June 19, 2003, Miller mailed a letter to Respondent via certified mail return receipt requested, advising it of the date, time, place and purpose of the public hearing.  The return receipt was signed on delivery.  The return receipt was returned to Miller by the USPS date-stamped June 30, 2003.

After due notice, the case came on for public hearing on July 15, 2003, before Margaret A. Jackson, an Administrative Law Judge ("ALJ") of the Division.  Respondent failed to appear.

On August 4, 2003, a post-hearing brief was submitted by Complainant's counsel.

On December 19, 2003, ALJ Jackson issued a recommended Findings of Fact, Opinion, Decision and Order ("Recommended Order") dismissing the complaint.

Objections to the Recommended Order were filed with the Division's Order Preparation Unit by Complainant's counsel dated January 5, 2004, and by Division Counsel dated March 30, 2004.

Reed Smith was substituted as Complainant's counsel on April 16, 2004.  Complainant

2

continued to be represented by Robert J. Miller, Esq.

ALJ's Exhibit I is hereby amended to include the May 24, 1993, amendment to the complaint, the November 30, 1993, hearing transcript, the May 23, 2003, and June 30, 2003, notices of hearing and the June 19, 2003, letter and return receipt from Miller.

On April 28, 2005, Adjudication Counsel Peter G. Buchenholz issued an Alternative Proposed Order pursuant to 9 NYCRR § 465.17(c)(2) of the Divisions Rules of Practice sustaining the complaint.

The Alternative Proposed Order was served on all parties including Respondent by regular mail. The Alternative Proposed Order was not returned to the Division as undeliverable by the USPS. The Alternative Proposed Order was also served on Respondent by certified mail, return receipt requested at the following addresses:

> UN Plaza Diner, Corp. d/b/a Nations Café
> 875 First Avenue
> New York, New York 10017
> Attn:  Nicholas Kalas, Manager
>
> UN Plaza Diner, Corp. d/b/a Nations Café
> 875 First Avenue
> New York. New York 10017
> Attn:  Jerry Kalas
>           Chairman or Chief Executive Officer
>
> UN Plaza Diner, Corp. d/b/a Nations Café
> 875 First Avenue
> New York. New York 10017
> Attn:  Nick Kalas
>           Principal Executive Office

The return receipts were each signed for on April 30, 2005, and returned to the Division by the USPS. The certifications and return receipts are hereby entered into the record as Commissioner's Exhibit 1.

3

No Objections to the Alternative Proposed Order were received by the Division's Order Preparation Unit.

<u>FINDINGS OF FACT</u>

1. Complainant alleged that Respondent discriminated against him in a place of public accommodation when he was denied service and ridiculed because of his creed. (ALJ's Exhibit I).

2. Despite being duly noticed, Respondent did not appear at the hearing to defend against the complaint.

3. Complainant is Jewish Orthodox. Because he observes Jewish dietary laws, his religious beliefs prohibit him from using non-kosher dishware. (ALJ's Exhibit I; Tr. 9).

4. During the relevant period, Respondent operated a café restaurant located at 875 First Avenue, New York, New York.

5. On November 17, 1992, Complainant entered Respondent's café, sat down at its counter and requested a cup of coffee. It is noted that he was wearing a yarmulke at the time. (Tr. 9-10).

6. As the coffee was being poured into a porcelain cup, Complainant requested that it be poured into a disposable cup. (Tr. 10).

7. Complainant explained that he was Jewish, that he observed Jewish dietary laws and that the porcelain cup was not kosher. (ALJ's Exhibit I; Tr. 11-13).

8. It is noted that Respondent maintained disposable cups behind the counter. (Tr. 11).

9. Initially Complainant was told, "[i]f you want me to serve you, you have to drink it outside." Ultimately, Respondent refused to serve Complainant and directed him to "get out." (Tr. 12-14).

10. Complainant was laughed at as he explained his religious beliefs and as he was directed out. (ALJ's Exhibit I; Tr. 13-14).

4

11. Complainant subsequently left.  As a result of Respondent's treatment, Complainant felt "ridiculed," "embarrassed" and "very down."  (ALJ's Exhibit I; Tr. 14).

<div align="center">DECISION AND OPINION</div>

Complainant alleged that Respondent discriminated against him in a place of public accommodation when he was denied service and ridiculed because of his creed.  The Division finds that Respondent did discriminate against Complainant.

<u>Respondent's Default</u>

After due notice, Respondent failed to appear before the Division to defend against the complaint.  Pursuant to 9 NYCRR § 465.12(b)(3), the hearing proceeded on the evidence in support of the complaint.  It is also noted that Respondent defaulted pursuant to 9 NYCRR § 465.11(e).

<u>Discrimination</u>

The Human Rights Law makes it an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation, directly or indirectly, to withhold from or deny to any person the accommodations, advantages, facilities or privileges thereof because of his creed.  Human Rights Law § 296.2(a).

Respondent café qualifies as a place of public accommodation under the Human Rights Law. Human Rights Law § 292.9.

Provisions of the Human Rights Law must be construed liberally to accomplish the purposes of the statute.  Human Rights Law § 300.  "Those purposes, the Legislature has stated, are to ensure that every person in this State has 'an equal opportunity to enjoy a full and productive life.'"  <u>Cahill v. Rosa</u>, 89 N.Y.2d 14, 20, 651 N.Y.S.2d 344 (1996) (<u>citing</u> Human Rights Law § 290.3).

In the instant case, the credible and unrebutted evidence demonstrates that Respondent denied

<div align="center">5</div>

<div align="right">JA0682</div>

and withheld from Complainant the accommodations, advantages, facilities and privileges of its establishment because of his religious beliefs. Respondent, therefore, has violated the Human Rights Law.

The record shows that Complainant entered Respondent café wearing a yarmulke. Complainant explained that he was Jewish and that his religious beliefs required him to observe kosher dietary laws. Thereafter, he was ridiculed. Respondent refused to serve him and he was directed to leave the premises. The fact that Complainant was ridiculed in the context of explaining his religious beliefs and while being directed to leave makes evident that service was denied on the basis of his creed. "It is not always necessary to find specific evidence of spoken references to [a complainant's protected class membership] for acts of discrimination may occur without such references." Hudson Transit Lines, Inc. v. State Human Rights Appeal Bd., 47 N.Y.2d 971, 973, 419 N.Y.S.2d 960 (1979) (American Indians, who were clearly recognizable as such, were discriminated against by a bus company when the driver told them to go back to the end of the line in a nasty voice after a ticket-related misunderstanding). The record in the instant case demonstrates, therefore, that Respondent denied and withheld service to Complainant and made him unwelcome in its establishment because of his religious beliefs in violation of the Human Rights Law.

It is noted that Respondent maintained disposable cups behind the counter where Complainant was refused service. There is no evidence that it would have been burdensome in any manner to have provided a cup for Complainant's use. Complainant explained his religious restrictions and Respondent had the ready ability to address those restrictions. It is apparent that by refusing to do so, Respondent effectively denied service to Complainant because of his religious beliefs. See Hobson v. York Studios, Inc., 208 Misc. 888, 145 N.Y.S.2d 162 (NY Mun. Ct. 1955) ("directly or indirectly" are

6

key words).  This denial frustrates the purpose and intent of the Human Rights Law to eliminate discrimination.  See Cahill v. Rosa, 89 N.Y.2d at 20; Koerner v. State, 62 N.Y.2d 442, 478 N.Y.S.2d 584 (1984) ("Clearly, the elimination of discrimination in the provision of basic opportunities is the predominant purpose of this legislation"); Rochester Hosp. Svc. Corp. v. Div. of Human Rights, 92 Misc.2d 705, 401 N.Y.S.2d 413 (1977) ("The abolition of discrimination based on race, creed, color, national origin, sex, disability or marital status is a fundamental public policy of New York, and the division exists to eliminate and prevent discrimination, inter alia, in places of public accommodation.").

Accordingly, the complaint in this matter is sustained.

Complainant is entitled to compensatory damages.  Complainant credibly testified that as a result of Respondent's discriminatory actions, he felt "ridiculed," "embarrassed" and "very down."  In consideration of the severity and degree of his suffering and the nature of Respondent's offense, an award of $500 will compensate him for the mental anguish he suffered.  See Imperial Diner Inc. v. State Human Rights Appeal Bd., 52 N.Y.2d 72, 436 N.Y.S.2d 231 (1980) ($500 appropriate to compensate complainant whose creed was "reviled" by respondent); Batavia Lodge No. 196, Loyal Order of Moose v. New York State Div. of Human Rights, 35 N.Y.2d 143, 359 N.Y.S.2d 25 (1974) ($250 appropriate where respondent refused complainants service because of their race); State Div. of Human Rights v. Clarence Precision Machine and Tool, Div. of Willick Indus.,60 A.D.2d 977, 401 N.Y.S.2d 638 (4th Dept. 1978) ($500 appropriate where respondent denied service to complainant based on her sex); Hobson v. York Studios, Inc., 208 Misc. at 894 ($100 appropriate where respondent refused service to complainants because of their race).

ORDER

On the basis of the foregoing Findings of Fact, Decision and Opinion and pursuant to the

JA0684

provisions of the Human Rights Law, it is

ORDERED that Respondent, its agents, representatives, employees, successors and assigns shall cease and desist from discriminating on the basis of creed; it is also

ORDERED that with regard to Complainant's claim of discrimination, Respondent, its agents, representatives, employees, successors and assigns shall take the following affirmative action to effectuate the purposes of the Human Rights Law:

1.      Within thirty days of the date of this Order, Respondent shall pay to Complainant the sum of $500, without any withholdings or deductions as compensation for the mental anguish he suffered as a result of Respondent's unlawful discrimination.  Interest shall also accrue on the award at a rate of nine percent per annum, from the date of this Order until payment is actually made by Respondent.

2.      The aforesaid payments by Respondent shall be in the form of a certified check payable to the order of Complainant Israel Steinberg and delivered to his attorney, addressed to the attention of Robert J. Miller, Esq., Reed Smith, LLP, 599 Lexington Avenue, New York, New York   10022-7650 by registered mail, return receipt requested. Respondent shall simultaneously furnish written proof of the aforesaid payments to the General Counsel of the Division, Gina M. Lopez Summa, Esq., at her office address of One Fordham Plaza, 4th Floor, Bronx, New York 10458.

3.      Respondent shall cooperate with the Division during any investigation into compliance with the directives contained in this Order.

DATED:

BRONX, NEW YORK                              STATE DIVISION OF HUMAN RIGHTS

JA0685

_____
MICHELLE CHENEY DONALDSON
Commissioner

JA0686

the court officer-trainee position with the accommodation of a hearing aid. Complainant satisfied the other two prongs of the prima facie test because he suffered an adverse employment action when Respondent automatically disqualified him from the court officer-trainee position because of his hearing loss.

Respondent argued that it disqualified Complainant from the court officer-trainee position because of his inability to meet Respondent's medical requirements for the job, not because of a disability. *See* Resp't Br. 9-10. Respondent alternatively argued that its standard for hearing acuity is a bona fide occupational qualification exempted under Human Rights Law § 296.1 (d). *See* Resp't Br. 10-12. Lastly, Respondent argued that it is not required to make a reasonable accommodation for Complainant because doing so would pose an undue burden on Respondent and pose a direct threat to the safety of the public or other employees. *See id.* at 13-15 (citing 9 N.Y.C.R.R. § 466.11(g)(2)(i); 9 N.Y.C.R.R. § 466.11 (b)(2)).

Because Respondent has a blanket policy which disqualifies all applicants with hearing loss above Respondent's hearing standards from being considered for employment as a court officer-trainee, and because Respondent does not individually assess the ability of those applicants with hearing loss to perform the essential functions of the job, Respondent's policy violates the Human Rights Law. *See Matter of State Div. of Human Rights [Granelle]*, 70 N.Y.2d 100, 106, 517 N.Y.S.2d 715, 718 (1987).

Respondent also failed to show that uncorrected hearing at its prescribed hearing standard is a bona fide occupational qualification. Certainly, there is the possibility that applicants with severe hearing loss could not perform this job, but Respondent has not adequately shown that this is true of all or nearly all applicants in the protected class of hearing impaired people, as is required. *See New York State Div. of Human Rights v. New York-Pennsylvania Prof'l Baseball*

JA0687

*League*, 36 A.D.2d 364, 367, 320 N.Y.S.2d 788, 791 (1971), *aff'd* 29 N.Y.2d 921, 279 N.E.2d 856 (1972) (citing *Weeks v. S. Bell Tel. & Tel. Co.*, 408 F.2d 228, 235 (5th Cir. 1969)). Further, by establishing a standard requiring "uncorrected hearing," Respondent is categorically denying applicants a potentially effective reasonable accommodation.

The Human Rights Law defines reasonable accommodations as "actions taken which permit an employee, prospective employee or member with a disability... to perform in a reasonable manner the activities involved in the job..." *See* Human Rights Law § 292.21 (e).

Whether or not a given accommodation is considered "reasonable" depends on balancing several factors, including the efficacy of the accommodation, convenience and hardship caused by the accommodation, even to other coworkers. *See* 9 N.Y.C.R.R. § 466.11 (b)(1)(i-iii). Additionally, accommodations otherwise deemed "reasonable" that pose an undue hardship to the employer will not be required by law. *See* 9 N.Y.C.R.R. § 466.11 (b)(2). Examples of relevant factors in determining whether an undue hardship exists are: overall size of businesses, including budget, employees and facilities; the type of business the employer is involved in; the nature and cost of the accommodation being requested, including the other resources available to the employer to help pay for the cost of such an accommodation. *See id.* at i-iii.

Respondent argues that making a reasonable accommodation, in this case, allowing Complainant to use a hearing aid, would pose an undue burden on Respondent. *See* Resp't Br. 10-12. However, Respondent did not offer any financial information or any other relevant facts to demonstrate that allowing Complainant to wear a hearing aid would pose an undue burden on Respondent logistically or would otherwise not be feasible. Rather, the crux of Respondent's argument against making a reasonable accommodation revolves around the direct threat exception.

JA0688

The Human Rights Law does not require an employer to reasonably accommodate an employee's disability where the disability or the accommodation itself poses a direct threat. *See* 9 N.Y.C.R.R. § 466.11(g)(2). "Direct threat means a significant risk of substantial harm to the health or safety of the employee or others that cannot be eliminated or reduced by reasonable accommodation." 9 N.Y.C.R.R. § 466.11(g)(2)(i). "In determining whether a direct threat exists, the employer must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective information, to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable accommodations, such as modification of policies, practices, or procedures, will mitigate the risk." 9 N.Y.C.R.R. § 466.11(g)(2)(ii). Additionally, "Heightened consideration of direct threat is to be encouraged in bona fide safety sensitive jobs." *See id.* at (iii). The record supports the conclusion that the court officer-trainee position is a safety sensitive position.

As discussed previously, Respondent's ban on hearing aids is largely rationalized based on the fact that the job requires the ability to hear and the speculation that hearing aids might become dislodged, malfunction or be used improperly. There is no evidence that this happened in the past or that Complainant has personally ever had an issue with wearing or using a hearing aid as directed or with medical compliance generally.

The only factual evidence that Respondent offered to substantiate the proposition that allowing the use of hearing aids is dangerous is a chart titled "Unusual Occurrence Card breakdown." The chart shows the number of "unusual occurrence cards" filled out by court officers during a 15 year time period gathered from the entire state of New York under various categories. The vast majority, 30,234 of the total 54,710 occurrences are categorized under the designation

- 13 -

"other." There is no testimony or other information in the record indicating the methodology used in categorizing these events or whether categorization is potentially duplicative in some cases. What the chart does indicate is that an average of 3,647 unusual occurrence cards were filled out per year between 2000 and 2015, throughout the various courts within the state of New York under Respondent's umbrella. The chart does not indicate how many, if any, of these occurrences involved a physical scuffle of the type in which Respondent fears a hearing aid could hypothetically become dislodged.

At first glance, the total number of "unusual occurrences" listed in Respondent's chart seems to demonstrate the high possibility of dangerous scenarios occurring in the presence of court officers. However, upon closer inspection it becomes clear that once spread over time and across the number of court houses falling under Respondent's responsibility, the numbers are less dire. Most importantly, nothing about these incidents or the quantity thereof adequately shows that allowing court officers to use hearing aids would pose a direct threat to the health or safety of Complainant or others.

In addition to the "unusual occurrence" chart, Respondent cites to the decision of the United States Court of Appeals in *Fraterrigo v. Akal Sec., Inc.* 2010 WL1660407 to support the proposition that allowing Complainant to use a hearing aid would pose a substantial safety risk. The Court held that Akal Security, who contracts court marshals for New York's federal courts, could categorically disqualify individuals who could not pass defendant's hearing test unassisted by a hearing aid. Fraterrigo claimed that the policy was discriminatory and violated the Americans with Disabilities Act ("ADA'), 41 U.S.C. section 12113(a) in addition to the Human Rights Law § 290. The Second Circuit affirmed the grant of summary judgment for the defendant based only on its analysis of the ADA, not the Human Rights Law. Similarly, Respondent cites *Godfrey v. New York City Transit*

JA0690

*Auth.*, No. 02CV2101LU, 2009 WL 3075207, at *1 (E.D.N.Y. Sept. 23, 2009) where plaintiff's application for employment to be a revenue collecting agent was put on hold for his failure to meet a hearing acuity standard. Godfrey also brought both ADA claims and Human Rights Law claims. Again, the Court declined to adjudicate the Human Rights Law claims, stating "Without federal claims, the court declines to exercise supplemental jurisdiction over plaintiffs claim under the New York Human Rights Law." *See id.* at *1.

Lastly, Respondent cites to *Allmond v. Akal Sec., Inc.,* 558 F.3d 1312 (11th Cir. 2009), where a court officer was fired after failing a hearing test and not permitted to use a hearing aid. In that case, defendant argued that the hearing aid ban was a business necessity for many of the same reasons Respondent puts forth here, such as the speculation that a hearing aid could become dislodged or malfunction. *See id.* at 1316. In order to show this the Court indicated that defendant would have to show that the ban was a "pertinent qualification standard…job related and consistent with business necessity." *See id.* at 1316. The Court further qualified defendant's burden of proof stating that "Although the burden of proof is quite high, it is significantly lowered when, like here… 'Economic and human risk involved in hiring an unqualified applicant are great.'" *See id.* (quoting *Hamer v. City of Atlanta*, 872 F.2d 1521, 1535 (11th Cir.1989)). While the 11th Circuit's interpretation of "business necessity" is very broad, like the previous cases cited by Respondent, it does not adjudicate the Human Rights Law claims. Those claims were not even raised, as New York is not within the jurisdiction of the 11th Circuit. To the extent that these cases may be persuasive by analogizing the ADA to the Human Rights Law, such guidance is superfluous when New York State Courts adjudicating the Human Rights Law offer controlling precedent and relevant analysis.

JA0691

The New York Court of Appeals determined that a police officer applicant automatically disqualified for having spondylolisthesis pursuant to regulations promulgated by the New York City Department of Personnel was discriminated against under the Human Rights Law. *See Matter of State Div. of Human Rights on Complaint of Granelle*, 70 N.Y.2d 100, 510 N.E.2d 799 (1987). The Court noted that Granelle was already employed doing physically intensive manual labor without incident. Similarly, Complainant's current vocation as a court interpreter is completely contingent on his ability to hear and understand speech in a court setting, the same task for which he is being disqualified for the court officer-trainee position. Though Granelle's condition was asymptomatic, respondent's expert testified to the "great likelihood of low back disability developing in the future [for Plaintiff]." *Id.* at 104. The Division determined that respondent failed to establish a relationship between Granelle's medical condition and his ability to perform the duties of his prospective job. The Court of Appeals affirmed the Division's final order and explained the need for an individualized assessment, "the employer must demonstrate that the disability is such as would 'prevent the complainant from performing in a reasonable manner the activities involved in the job or occupation sought', failing which, the disability may not be the basis for rejecting the applicant." *Id.* (citing *Matter of Westinghouse Elec. Corp. v State Div. of Human Rights*, 49 N.Y.2d 234, 238). Summarily, pursuant to enacted regulations and state case law, an individualized assessment is required. *See* 9 N.Y.C.R.R. §466.11(g)(2)(ii); *see also Bayport-Blue Point School Dist. v. State Div. of Human Rights*, 131 A.D.2d 849, 517 N.Y.S.2d 209 (2d Dept. 1987); *Sitler v. State Div. of Human Rights*, 133 A.D.2d 938, 520 N.Y.S.2d 653 (3d Dept. 1987); *Giannavola v. Leroy Cent. Sch. Dist.*, 107 A.D.2d 153, 485 N.Y.S.2d 907 (4th Dept. 1985).

Respondent has not shown that an individualized assessment determined that Complainant's hearing loss, accommodated or otherwise, poses a direct threat or undue burden to Respondent.

- 16 -

Respondent has failed to show that allowing a hearing aid in Complainant's particular case would pose a direct threat. Lastly, in *Fraterrigo,* which Respondent cites to support the proposition that such a direct threat exists, the fact that the employer subsequently changed its hearing aid ban for court officers before the case made it to the Second Circuit, demonstrates the feasibility, rather than the burden, of making this reasonable accommodation.

The Division may order a respondent to reinstate a complainant from a specific existing list from which they were discriminatorily removed, and consider that complainant as a candidate for the position, if the list still exists. Here, at the time of the public hearing, the eligibility list for the court officer-trainee position on which Complainant's name appeared had expired. The Division cannot order Respondent to reinstate Complainant to an expired list or to create a "special list" to grant him an opportunity to be considered. *See City of New York v. New York State Div. of Human Rights,* 93 N.Y.2d 768, 698 N.Y.S.2d 594 (1999).

Complainant is also entitled to an award for mental anguish and humiliation. A complainant is entitled to recover compensatory damages for mental anguish caused by a respondent's unlawful conduct. In considering an award for compensatory damages for mental anguish, the Division must be especially careful to ensure that the award is reasonably related to the wrongdoing, supported in the record, and comparable to awards for similar injuries. *State Div. of Human Rights v. Muia*, 176 A.D.2d 1142, 1144, 575 N.Y.S.2d 957, 960 (3rd Dept. 1991).

Because of the "strong antidiscrimination policy" of the Human Rights Law, a complainant seeking an award for pain and suffering "need not produce the quantum and quality of evidence to prove compensatory damages she would have had to produce under an analogous provision." *Batavia Lodge v. New York State Div. of Human Rights*, 35 N.Y.2d 143, 147, 359 N.Y.S.2d 25, 28 (1974). Indeed, "[m]ental injury may be proved by the complainant's own

- 17 -

JA0693

testimony, corroborated by reference to the circumstances of the alleged misconduct." *New York City Transit Authority v. State Div. of Human Rights (Nash)*, 78 N.Y.2d 207, 216, 573 N.Y.S.2d 49, 54 (1991). The severity, frequency and duration of the conduct may be considered in fashioning an appropriate award. *New York State Department of Correctional Services v. State Div. of Human Rights*, 225 A.D.2d 856, 859, 638 N.Y.S.2d 827, 830 (3rd Dept. 1996).

As a result of Respondent's unlawful discrimination, Complainant testified that he experienced surprise, anger, disappointment, frustration and stress. Complainant credibly testified that those feelings continue unabated, and because of the stress he continues to experience, he also suffers from stomach problems.

An award of $5,000 for emotional distress is appropriate and would effectuate the purposes of the Human Rights Law. *Palmblad v. Gibson*, 63 A.D.3d 844, 881 N.Y.S.2d 139 (2nd Dept. 2009).

In addition to awards for mental anguish, the Division is authorized to assess and issue fines and penalties not exceeding fifty thousand dollars to be paid by respondents to the State of New York when the Division has found that respondents have engaged in unlawful discrimination. Human Rights Law §297.4 (c)(vi). When determining the amount of fines and penalties to be assessed against respondents, the Division has factored into its analysis the goal of deterrence, respondents' culpability and financial resources.

In this case, Respondent has had a blanket policy of excluding hearing impaired individuals from the court officer-trainee position since at least 1990. Respondent also failed to show that its hearing aid ban was justified by anything beyond speculation about potential risks. This policy is discriminatory on its face.

JA0694

In the interest of deterring Respondent from further engaging in discriminatory practices, and taking into consideration Respondent's financial resources and culpability, a $30,000 civil fine and penalty is appropriate. *See Noe v. Kirkland*, 101 A.D.3d 1756, 957 N.Y.S. 2d 797 (4th Dept. 2012) ($20,000 civil fine and penalty confirmed); *Div. of Human Rights v. Stennett*, 98 A.D.3d 512, 949 N.Y.S. 2d 459 (2d Dept. 2012) ($25,000 civil fine and penalty confirmed).

## **ORDER**

On the basis of the foregoing Findings of Fact, Opinion and Decision, and pursuant to the provisions of the Human Rights Law and the Division's Rules of Practice, it is hereby

ORDERED, that Respondent, its agents, representatives, employees, successors, and assigns, shall cease and desist from discriminating against any individual in the terms and conditions of employment, including but not limited to, subjecting them to discriminatory policies and blanket exclusions from the court officer-trainee job title based on hearing loss or the use of hearing aids; and it is further

ORDERED, that Respondent, its agents, representatives, employees, successors and assigns shall take the following action to effectuate the purposes of the Human Rights Law:

1. Within sixty days of the date of the Final Order, Respondent shall pay to the State of New York the sum of $30,000 as a civil fine and penalty. The payment shall be made in the form of a certified check, made payable to the order of the State of New York and delivered by certified mail, return receipt requested, to Caroline Downey, Esq., General Counsel of the Division, at One Fordham Plaza, 4th Floor, Bronx, New York 10458. Interest shall accrue on this award at the rate of nine percent per annum, from the date of the Final Order until payment

JA0695

is actually made by Respondent. *See New York City Transit Auth. v. State Div. of Human Rights*, 160 A.D.2d 874, 875 (2d Dept. 1990), appeal denied, 560 N.Y.S.2d 880 (2d Dept. 1990).

2. Within sixty days of the date of the Final Order, Respondent shall pay to Complainant, Jakub Zaic, the sum of $5,000 without any withholdings or deductions, as compensatory damages for mental anguish suffered by Complainant as a result of Respondent's unlawful discrimination against him. Interest shall accrue on the award at the rate of nine percent per annum from the date of the Commissioner's Order until the date payment is actually made by Respondent.

3. The aforesaid payment shall be made by Respondent in the form of a certified check made payable to the order of Complainant, Jakub Zaic, and delivered by certified mail, return receipt requested, to Bellew McManus, Esq., Senior Attorney at New York State Division of Human Rights, One Fordham Plaza, 4th Floor, Bronx, NY 10458.

4. Respondent shall cooperate with the representatives of the Division during any investigation into compliance with the directives contained in this Order.

DATED: September 22, 2017
Bronx, New York

Lilliana Estrella-Castillo
Chief Administrative Law Judge

JA0696

# EXHIBIT H



**Division of
Human Rights**

**NEW YORK STATE
DIVISION OF HUMAN RIGHTS**

| | |
|---|---|
| **NEW YORK STATE DIVISION OF HUMAN RIGHTS** on the Complaint of **JAKUB R. ZAIC,** Complainant, v. **NEW YORK STATE, UNIFIED COURT SYSTEM, OFFICE OF COURT ADMINISTRATION,** Respondent. | **NOTICE AND FINAL ORDER** Case No. 10174105 |

Federal Charge No. 16GB501952

 

      **PLEASE TAKE NOTICE** that the attached is a true copy of the Recommended

Findings of Fact, Opinion and Decision, and Order ("Recommended Order"), issued on

September 22, 2017, by Lilliana Estrella-Castillo, an Administrative Law Judge of the New York

State Division of Human Rights ("Division"). An opportunity was given to all parties to object

to the Recommended Order, and all Objections received have been reviewed.

      **PLEASE BE ADVISED THAT, UPON REVIEW, THE RECOMMENDED**

**ORDER IS HEREBY ADOPTED AND ISSUED BY THE HONORABLE HELEN DIANE**

**FOSTER, COMMISSIONER, AS THE FINAL ORDER OF THE NEW YORK STATE**

**DIVISION OF HUMAN RIGHTS ("ORDER")**. In accordance with the Division's Rules of

Practice, a copy of this Order has been filed in the offices maintained by the Division at One

Fordham Plaza, 4th Floor, Bronx, New York 10458.  The Order may be inspected by any

member of the public during the regular office hours of the Division.

     **PLEASE TAKE FURTHER NOTICE** that any party to this proceeding may appeal this

Order to the Supreme Court in the County wherein the unlawful discriminatory practice that is

the subject of the Order occurred, or wherein any person required in the Order to cease and desist

from an unlawful discriminatory practice, or to take other affirmative action, resides or transacts

business, by filing with such Supreme Court of the State a Petition and Notice of Petition, <u>within

sixty (60) days after service of this Order</u>.  A copy of the Petition and Notice of Petition must

also be served on all parties, including the General Counsel, New York State Division of Human

Rights, One Fordham Plaza, 4th Floor, Bronx, New York 10458.  <u>Please do not file the original

Notice or Petition with the Division</u>.

     **ADOPTED, ISSUED, AND ORDERED**.

DATED:  **NOV 1 5 2017**
       Bronx, New York

 

HELEN DIANE FOSTER
COMMISSIONER

JA0699



## Division of Human Rights

**NEW YORK STATE
DIVISION OF HUMAN RIGHTS**

---

**NEW YORK STATE DIVISION OF
HUMAN RIGHTS**
on the Complaint of

**JAKUB R. ZAIC,**

Complainant,

v.

**NEW YORK STATE, UNIFIED COURT
SYSTEM, OFFICE OF COURT
ADMINISTRATION,**

Respondent.

---

**RECOMMENDED FINDINGS OF
FACT, OPINION AND DECISION,
AND ORDER**

Case No. **10174105**

---

### SUMMARY

Respondent's blanket policy of disqualifying candidates, such as Complainant, diagnosed with hearing loss above Respondent's hearing standards from the position of court officer-trainee and Respondent's ban on hearing aids as a reasonable accommodation for court officer-trainees, are unlawfully discriminatory. Accordingly, Complainant is awarded $5,000 for mental anguish, and Respondent is assessed a civil fine and penalty in the amount of $30,000.

### PROCEEDINGS IN THE CASE

On March 11, 2015, Complainant filed a verified complaint with the New York State Division of Human Rights ("Division"), charging Respondent with unlawful discriminatory practices relating to employment in violation of N.Y. Exec. Law, art. 15 ("Human Rights Law").

After investigation, the Division found that it had jurisdiction over the complaint and that probable cause existed to believe that Respondent had engaged in unlawful discriminatory practices. The Division thereupon referred the case to public hearing.

After investigation, the Division found that it had jurisdiction over the complaint and that probable cause existed to believe that Respondent had engaged in unlawful discriminatory practices. The Division thereupon referred the case to public hearing.

After due notice, the case came on for hearing before Robert J. Tuosto, an Administrative Law Judge ("ALJ") of the Division. A public hearing session was held on Feburary 29, 2016.

Complainant and Respondent appeared at the hearing. The Division was represented by Bellew S. McManus, Esq., Senior Attorney. Respondent was represented by Pedro Morales, Esq., Assistant Deputy Counsel, New York State Office of Court Administration.

At the public hearing, Complaininat withdrew his claims dealing with national origin and age discrimination. (Tr. 35-36)

ALJ Tuosto was on leave from the Division. Pursuant to the Division's Rules of Practice (9 NYCRR §465.12 (d) (2)), the complaint was reassigned to Lilliana Estrella-Castillo, another ALJ of the Division, to draft the Recommended Findings of Fact, Opinion and Decision, and Order.

During the hearing, ALJ Tuosto identified and marked a document as ALJ Exhibit 2 in evidence, as "the PC determination." (Tr. 13) Similarly, ALJ Tuosto identified and marked as ALJ Exhibit 4 in evidence, the "Notice of Hearing." (Tr. 14) The record is hereby supplemented with the correct copies of the following documents: (1) a copy of the Determination after Investigation, dated September 1, 2015, signed by William LaMot, Regional Director, as ALJ

JA0701

Exhibit 5 in evidence and; (2) a copy of the Notice of Hearing with a copy of the complaint, as well as the executed affidavit of service, as ALJ Exhibit 6 in evidence.

On August 12, 2016, ALJ Estrella-Castillo served the parties with a Recommended Findings of Fact, Opinion and Decision, and Order. (ALJ Exhibit 7) On November 7, 2016, the Commissioner, by Matthew Menes, Adjudication Counsel, on her own motion, reopened the hearing record and returned the case to the ALJ for the limited purpose of allowing the parties an opportunity to complete the record regarding Complainant's emotional distress, if any. (ALJ Exhibit 8)

On March 3, 2017, Complainant and Respondent appeared at the hearing. The Division was represented by Bellew S. McManus, Esq., Senior Attorney. Respondent was represented by Pedro Morales, Esq., Assistant Deputy Counsel, New York State Office of Court Administration.

At the conclusion of the hearing, Respondent's counsel submitted a timely letter brief in support of Respondent's position.

## FINDINGS OF FACT

1. Complainant has been a certified court interpreter since 1996. Complainant performs both simultaneous and consecutive interpretation from English to Polish and from Polish to English. (Tr. 14-15)

2. Complainant's vocation requires him to interpret while more than one conversation is going on and on occasion interpret overlapping conversations in the context of court proceedings. (Tr. 14-15)

JA0702

3.     Respondent is the state agency that oversees the state courts within New York State, and its Office of Court Administration is its administrative arm which handles support for the courts, including, the screening and selection of court officers.  (Tr. 62-63, 141)

4.     Complainant works on a per diem basis within Respondent's facilities and other courts in New York State.  (Tr. 14-15)

5.     Before Respondent added Complainant to its registry of per diem interpreters, Respondent tested Complainant in both English and Polish proficiency.  A segment of Respondent's test required Complainant to use headphones to measure his ability to identify words. This test was not administered to measure Complainant's hearing capabilities.  (Tr. 42-43)

6.     Respondent found Complainant's performance on the test satisfactory and placed him on its per diem registry of certified court interpreters.  (Tr. 42-43)

7.     Complainant has never received any complaints about his auditory acuity from Respondent or others for whom Complainant has worked.  (Tr. 34-35)

8.     On October 24, 2009, Complainant took the written portion of the court officer-trainee examination.  (Joint Exh. 1)

9.     The duties and responsibilities of court officers include maintaining order and providing security in courtrooms, court buildings and grounds.  Court officers are peace officers who are required to wear uniforms and may be authorized to carry firearms, execute warrants, make arrests, and perform other related duties.  (Respondent's Exhs 1, 2; Tr. 63)

10.    Complainant obtained a satisfactory score on the October 24, 2009, written court officer examination, and was added to the list of job candidates eligible for appointment to the court officer-trainee position on July 29, 2010.  (Joint Exh. 1)

- 4 -

JA0703

11.  On March 7, 2014, Respondent offered Complainant a conditional appointment to the court officer-trainee position in New York City, subject to successful completion of a medical examination, physical ability examination, psychological examination and background investigation.  (Joint Exh. 1)

12.  On May 21, 2014, Dr. Scott Kerstetter, a practitioner at Affiliated Physicians medically disqualified Complainant for the court officer-trainee position due to hearing loss in his right ear.  (Complainant's Exhs. 1, 2; Tr. 16-17, 21, 36-37, 92, 128, 142)

13.  Affiliated Physicians has a contract with Respondent to conduct medical examinations for Respondent.  (Tr. 76)

14.  Dr. Kerstetter is not an audiologist.  He is a doctor of osteopathy.  (Tr. 128)

15.  Dr. Kerstetter did not perform Complainant's hearing test; it was performed by a medical assistant.  (Tr. 23, 128)

16.  Respondent's court officer-trainee examination announcement contains a summary of medical standards for the position of court officer-trainee.  That standard states, in pertinent part, "[e]ach candidate must be able to pass an audiometric test of hearing acuity without the use of a hearing aid. Bilateral testing is conducted in the frequency ranges of 500, 1000, 2000, 3000, 4000, and 6000 Hz.  A candidate is qualified if the uncorrected bilateral hearing loss is less than or equal to 25 dB for the average of the following frequencies: 500, 1000, 2000, 3000 Hz; and, no greater than a 45dB loss at 4000 and 6000 Hz in either ear."  (Respondent's Exh. 2 at 21)

17.  Respondent's medical standard was last updated in 1990.  (Respondent's Exhs. 7, 8; Tr. 144-47, 149, 152, 161)

18.  Complainant's hearing loss in his right ear is greater than the allowable average under Respondent's medical standard.  As a result, Respondent automatically medically disqualified

JA0704

Complainant from the position of court officer-trainee. (Tr. 71-74, 102, 106-07, 114-17, 129, 141-43, 148, 152-56)

19. Respondent allows disqualified candidates to seek recourse testing, at the applicant's own expense, if they disagree with Respondent's medical disqualification. (Tr. 74)

20. At the public hearing, Respondent did not offer an explanation for why disqualified candidates are given an opportunity to seek recourse testing. (Tr. 162-63)

21. Respondent does not allow court officer-trainees or court officers to use hearing aids. (Respondent's Exh. 2 at 21; Tr. 95)

22. Respondent justified its ban on hearing aids on the grounds that hearing aids could fall out of the ear during a physical scuffle with an inmate or spectator, that the court officers might not wear them, and that hearing aids would have to have functioning batteries at all times. (Tr. 95, 131, 143)

23. In support of its justification to deny hearing impaired court officer-trainees a reasonable accommodation in the form of allowing hearing aids, Respondent submitted a chart which showed that between 2000 and 2015, Respondent recorded the filing of 54,710 "unusual occurrence cards" throughout the state of New York. (Respondent's Exh. 12)

24. Respondent offered no testimony as to the methods used to categorize these incidents and whether or not any of them are duplicative designations, such as "report of a crime" and "theft." The majority of these incidents were categorized as "other" and account for 30,234 of the 54,710 unusual occurrences. (Respondent's Exh. 12; Tr. 176-177)

25. The medical disqualification notice Complainant received from Affiliated Physicians informed Complainant that he could have recourse testing performed at one of the locations

JA0705

listed on the notice or a New York State licensed audiologist of his choosing. (Complainant's Exh. 1)

26. In relevant part, the medical disqualification notice also explained the protocol to be used in recourse testing and the hearing standard. (Complainant's Exh. 1)

27. This protocol, which is provided to the medically disqualified candidates, is not the same protocol used by Respondent to determine whether or not applicants for the court officer-trainee position meet Respondent's medical standard. (Respondent's Exh. 2 at 21; Tr. 71-74, 102-03, 106-07, 114-17, 129, 141-43, 148, 152-56, 164-65, 172)

28. On June 4, 2014, Complainant took his medical disqualification notice to a New York State licensed audiologist, Audiological Diagnostics PC. He provided the practice with the medical disqualification notice he received from Affiliated Physicians indicating what protocol was to be used for testing and what standards were acceptable. Complainant instructed Audiological Diagnostics to follow the protocol described in the medical disqualification notice he received from Affiliated Physicians. (Complainant's Exh. 1, Tr. 39-40)

29. Complainant was then examined by a New York State licensed audiologist, Dr. Dassan Ali. (Complainant's Exh. 3; Tr. 128)

30. Dr. Ali provided Complainant with a form indicating the results from the recourse testing he performed pursuant to the protocol outlined in the medical disqualification notice. (Complainant's Exh. 3; Tr. 27)

31. Dr. Ali concluded that Complainant's hearing loss was above the minimum standards required by Respondent. Dr. Ali recommended that Complainant follow up with his primary care physician for asymmetrical hearing loss, undergo further testing to rule out retrocochlear,

JA0706

and that Complainant be evaluated for a hearing aid after he receives medical clearance. (Complainant's Exh. 3)

32. Complainant provided Respondent with the results of his recourse testing. (ALJ's Exh.1; Tr. 54, 86)

33. Dr. Avram Nemetz is an internal medicine clinician and medical director associated with Affiliated Physicians. (Tr. 112-19)

34. Dr. Nemetz, who is not an audiologist and who did not examine Complainant, reviewed the results of Complainant's initial hearing test performed by Affiliated Physicians, along with the recourse testing done by Dr. Ali. (Tr. 112-119, 124)

35. Dr. Nemetz concluded that based on both results, Complainant did not meet Respondent's hearing medical standard. (Tr. 113-119)

36. Dr. Nemetz agreed with the recommendations made by Dr. Ali, but automatically disqualified Complainant because Respondent's medical standard does not allow hearing aids. (Tr. 122-25)

37. On July 1, 2014, based on the medical review done by Dr. Nemetz, Respondent once again medically disqualified Complainant from the court officer-trainee position. (ALJ's Exh. 1; Tr. 91)

38. On July 23, 2014, Complainant appealed the medical disqualification by writing to Respondent's Deputy Director for Court Officer Staffing and Security Services, Gregory Salerno. (ALJ's Exh. 1)

39. On December 2, 2014, Salerno sent Complainant a letter indicating that Respondent had reviewed Complainant's initial test results from Affiliated Physicians and the recourse testing results from Audiological Diagnostics and confirmed that Complainant did not qualify for the

JA0707

# EXHIBIT I

JA0708

STATE OF NEW YORK: EXECUTIVE DEPARTMENT
STATE DIVISION OF HUMAN RIGHTS

---

STATE DIVISION OF HUMAN RIGHTS
on the complaint of

ELAINE S. TRIEBEL,

Complainant,

-against-

WHITESBORO CENTRAL SCHOOL
DISTRICT; BOARD OF EDUCATION,

Respondent.

---

**NOTICE OF ORDER AFTER
HEARING**

CASE No.
4-E-S-95-5750383E

PLEASE TAKE NOTICE that the within is a true copy of an Order issued herein by the Hon. Evonne W. Jennings Tolbert, Commissioner of the State Division of Human Rights, after a hearing held before Administrative Law Judge Walter E. Farnholtz. In accordance with the Division's Rules of Practice, a copy of this Order has been filed in the offices maintained by the Division at One Fordham Plaza, Bronx, New York 10458 and at Empire State Plaza, Agency Building 2, Albany, New York 12220. The Order may be inspected by any member of the public during the regular office hours of the Division.

PLEASE TAKE FURTHER NOTICE that any party to this proceeding may appeal this Order to the Supreme Court in the County wherein the unlawful discriminatory practice which is the subject of the Order occurred, or wherein any person required in the Order to cease and desist from an unlawful discriminatory practice, or take other affirmative action resides or transacts business by filing with such Supreme Court of the State a Petition and Notice of Petition within sixty days after service of this Order.

JA0709

The Petition and Notice of Petition must also be served on all parties, including the Division of Human Rights.

PLEASE TAKE FURTHER NOTICE that a complainant who seeks state judicial review, and who receives an adverse decision therein, may lose his or her right to proceed subsequently in Federal Court under Title VII, by virtue of <u>Kremer v. Chemical Construction Corp.</u>, 456 U.S. 461, 102 S. Ct. 1883, 72 L.Ed.2d 262 (1982).

DATED: **OCT 0 3 2002**

BRONX, NEW YORK                    STATE DIVISION OF HUMAN RIGHTS


EVONNE W. JENNINGS TOLBERT
Commissioner

JA0710

To:

Ms. Elaine S. Triebel
2 Dunham Place
Whitesboro, New York 13492

Whitesboro Central School District
  Board of Education
67 Whitesboro Street
P.O. Box 304
Yorkville, New York 13494

Mark Wolber, Esq.
239 Genesee Street
Utica, New York 13051

Frank W. Miller, Esq.
6296 Fly Road
East Syracuse, New York 13057

Gina M. Lopez, Esq.
General Counsel
State Division of Human Rights
One Fordham Plaza
Bronx, New York  10458

Hon. Eliot Spitzer
Attorney General
120 Broadway
New York, New York 10271
Attention Civil Rights Bureau

STATE OF NEW YORK: EXECUTIVE DEPARTMENT
STATE DIVISION OF HUMAN RIGHTS

---

STATE DIVISION OF HUMAN RIGHTS
   on the complaint of

ELAINE S. TRIEBEL,

                Complainant,

     -against-               CASE No.
                                   4-E-S-95-5750383E

WHITESBORO CENTRAL SCHOOL
DISTRICT; BOARD OF EDUCATION,

                Respondent.

---

## PROCEEDINGS IN THE CASE

On January 25, 1995, Complainant, filed a complaint with the State Division of Human Rights ("Division") charging Respondent with an unlawful discriminatory practice relating to employment in violation of the Human Rights Law of the State of New York.

After investigation, the Division found that it had jurisdiction over the complaint and that probable cause existed to believe that Respondent had engaged in an unlawful discriminatory practice. The Division thereupon referred the case to public hearing.

Respondent moved for dismissal of the complaint based on a failure to file a timely Notice of Claim against Respondent; based on res judicata and collateral estoppel because of an Arbiter's award against Complainant, following a grievance comprised of the same facts and circumstances; based on statute of limitations; based on a claim that the Division's delay in bringing the matter to a public hearing substantially

JA0712

prejudiced Respondent and, therefore, the complaint should be dismissed for failure to timely prosecute.

After due notice, the case came on for hearing May 7, 2001, before Walter E. Farnholtz, an Administrative Law Judge of the Division. Complainant was represented by Mark A. Wolber, Esq. Respondent was represented by Frank W. Miller, Esq.

At the conclusion of the hearing, permission to file post-hearing briefs was granted. Both parties filed briefs. In Respondent's brief the Motions to Dismiss were renewed. Decision on the motions was reserved.

Complainant's counsel filed Objections to the Administrative Law Judge's Recommended Order on March 14, 2002, with the Order Preparation Unit. The Division filed Objections on March 27, 2002. Respondent's counsel filed a Rebuttal, dated March 29, 2002.

## FINDING OF FACT

1. On September 29, 1993, Respondent posted an employment notice for High School Monitor for that school year. The notice was not gender specific but under "Description of Duties" only refers to boys' room checks. (Complainant's Exhibit 4).

2. On August 8, 1994, an employment notice for the position for that school year was posted, however, it specified "Candidates for this vacancy must be male." (Respondent's Exhibit 2).

3. Undisputed are these facts: Complainant was qualified for the posted positions other than being a female. She had in years past, before a downsizing, been one of three monitors (all female) at the high school. Complainant timely applied for the 1993

2

JA0713

and 1994 positions. She had seniority over the male, Dominick Toffolo, who was hired for both postings. After Toffolo's hiring there were two female and one male monitor at the high school. Toffolo's only prior experience was as a substitute monitor. Female monitors must announce their intention to enter a boys' bathroom and wait one-half to two minutes before entering. Female monitors need not announce their intentions to enter a girls' bathroom  and male monitors need not announce their intention to enter a boys' bathroom.  Male monitors do not enter the girls' bathroom.  There was an approximately two hour period each school day before Toffolo started his four hour shift where no male monitor was on duty at the High School. When Toffolo was absent from work there were times when his substitute was a female or that there was no substitute.

4. Michelen Warzala one of the female monitors, had twenty years experience at the high school. (Tr. 32).

5. Warzala states that she would wait a couple of minutes, after announcing, before entering a boys' bathroom. (Tr. 35).

6. Barbara Thomas, started a monitor for Respondent prior to 1980. She, along with Warzala and Toffolo, made up the three Respondent's monitors after the 1993 and 1994 employment postings. (Tr. 135).

7. Thomas testifies that she would wait one-half to one minute before entering the boys' bathroom, after knocking and announcing. (Tr. 138-140).

8. Before Toffolo was hired, there was vandalism in the boys' bathrooms, including a blown up toilet, toilets stuffed with toilet paper rolls, stall doors broken, graffiti, drug

3

JA0714

flushing, fights and smoking. (Tr. 84-86, 160-161, 335-336).

9. Boys were not caught committing these offenses due to the announcement requirement for female monitors. The element of surprise was eliminated. (Tr. 86-89, 168-169, 349).

10. Before Toffolo was hired the Administration had determined that the condition in the boys' bathrooms was serious. One had to be shut down due to lack of supervision. (Tr. 320, 331, 335).

11. The two female monitors testify that when they had to go into a boys' bathroom they were embarrassed with sexual comments. They did not like being treated with lack of respect and being verbally abused. (Tr. 84, 89, 167).

12. For these reasons the two female monitors went to administration and asked that a male monitor be hired, they also complained to their union representative. (Tr. 82-83, 168, 185).

13. Complainant's testimony that when she worked for Respondent as a monitor, she was not harassed when entering the boys' bathrooms lacks credibility when compared to the testimony of her witnesses, Warzala and Thomas. (Tr. 240).

14. Dr. Zackery, Respondent's School Superintendent started his position on January 1, 1994, and was made aware of the school monitor situation. He stated it was a serious problem. He was aware of the female monitors' complaints. Zackery testifies that he felt if the situation was unresolved Respondent could be faced with harassment complaints. (Tr. 319, 320, 350-351).

15. He was aware of the 1993 posting and stated it was an error not specifying

4

"male" in the requirements. The 1994 posting specified "male" as a clarification. (Tr. 374).

16. The situation in the boys' bathrooms improved after Toffolo was hired. (Tr. 92, 145).

17. The assistant principal (male) and acting principal (male) would help out prior to 10:15 a.m. or during situations when Toffolo was not available. Having male teachers check the boys' bathrooms for the female monitors was deemed not practicable. (Tr. 151-153, 334, 345-346, 350-351, 353).

## DECISION AND OPINION

The Division finds that Respondent did not discriminate against Complainant on the basis of her gender in violation of the Human Rights Law.

To prevail, Complainant must make out a prima facie case by establishing that she belongs to a protected class and that others, who are not in that class, were treated more favorably. Pace College v. Commission on Human Rights of the City of New York, 38 N.Y.2d 28, 39-40, 377 N.Y.S.2d 471 (1975), citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817 (1973); Burlington Industries, Inc. v. New York City Human Rights Comm'n., 82 A.D.2d 415, 441 N.Y.S.2d 821 (1st Dept. 1981). If Complainant succeeds in establishing a prima facie case, the burden shifts to Respondent to articulate a legitimate, non-discriminatory reason for its actions. Thereafter, Complainant must demonstrate that the reasons offered by Respondent are merely a pretext for unlawful discrimination. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 113 S.Ct. 2742 (1993); Reeves v. Sanderson Plumbing Prod., Inc.,

5

JA0716

530 U.S. 133, 120 S.Ct. 2097 (2000).

Complainant has made out a prima facie case on her gender discrimination claim. Despite her seniority, and good employment record, a male with less experience and seniority was hired.

Respondent, however, was able to meet its burden of articulating a legitimate, non-discriminatory reason for the postings and resultant hiring of a male. Complainant was unable to demonstrate that Respondent's reasons were merely a pretext for unlawful discrimination. See State Div. of Human Rights on Complaint of Johnson v. Oneida County Sheriff's Dept., 70 N.Y.2d 974, 526 N.Y.S.2d 426 (1988).

An employer may not cause issuance of a Notice for Employment that directly or indirectly specifies sex as a qualification for employment unless that discriminatory specification is a "bona fide occupational qualification" (BFOQ). See Executive Law §296(1)(d). There must be a legitimate business reason for the postings. However, to be a legitimate reason, the gender specification cannot be a bare conclusion that a female cannot do the work. New York State Div. of Human Rights v. New York-Pennsylvania Professional Baseball League, 36 A.D.2d 364, 320 N.Y.S.2d 788 (4th Dept. 1971), affirmed by, 29 N.Y.2d 921 (1972). The justification must be individualized. There is no discrimination where close contact with members of the opposite sex can create a potentially embarrassing situation, State Div. of Human Rights on Complaint of Johnson v. Oneida County Sheriff's Dept., 119 A.D.2d 1006, 500 N.Y.S.2d 995 (4th Dept. 1986), affirmed by, 70 N.Y.2d 974 (1988), nor where a female janitor is involuntarily transferred from a department store area where

6

JA0717

it was necessary to enter male bathrooms. <u>Brooks v. ACF Industries, Inc.</u>, 537 F. Supp 1122 (S.D.W. Va. 1982).

In the instant case the deplorable conditions in the boys' bathrooms, the need for unannounced inspections, the embarrassment and harassment of female monitors, the embarrassment to male students in the boys' bathroom, and the positive results of hiring a male monitor establish a BFOQ which Complainant was unable to show was a pretext. Respondent did not give a mere conclusionary reason for its male gender specification in the posting for employment. Therefore, Complainant's complaint must fail.

The Division has reviewed counsel for Respondent's other legal arguments, as set forth in his Motion to Dismiss, and finds said arguments to be moot in light of the finding that Respondent did not discriminate against Complainant on the basis of her gender in violation of the Human Rights Law.

<div align="center">

<u>ORDER</u>

</div>

On the basis of the foregoing Findings of Fact, Decision and Opinion, and pursuant to the provision of the Human Rights Law, it is

ORDERED that the case be, and the same hereby is, dismissed.

DATED: OCT 03 2002
BRONX, NEW YORK

STATE DIVISION OF HUMAN RIGHTS

EVONNE W. JENNINGS TOLBERT
Commissioner

<div align="center">

7

</div>

JA0718

**OPINION AND DECISION**

Ministerial Exception Defense

Respondent raised the affirmative defense of "ministerial exception" in employment discrimination matters and argued that it is not subject to N.Y. Exec. Law, art. 15 ("Human Rights Law"). *Hosanna-Taber Evangelical Lutheran Church and School v. E.E.O.C.*, 132 S.Ct. 694 (2012). The ministerial exception is based on the Free Exercise Clause of the First Amendment to the United States Constitution that restricts the government's ability to intrude into ecclesiastical matters or to interfere with a church's governance of its own affairs. *Equal Employment Opportunity Commission v. Mississippi College*, 626 F.2d 477 (5th Cir. 1980), *cert. denied*, 453 U.S. 912, 101 S.Ct. 3143 (1981). In *Hosanna-Taber* the United States Supreme Court held that for the "ministerial exception" to bar an employment discrimination claim, two factors must be present: (1) the employer must be a religious institution, and (2) the employee must be a ministerial employee. *Hosanna-Tabor at 709*. There has been much litigation on the issue of what constitutes a religious institution and a ministerial employee. Courts have wrestled with each of those questions based on the unique, particular circumstances of each case.

With respect to the first element in *Hosanna-Tabor,* there was no question that the Hosanna-Tabor Evangelical Lutheran Church and School was a "church." The Court held that the ministerial exception prohibits courts from interfering with religious decisions regarding whom to employ within the "church." *Id. at 705*. The Court explained that, "the exception ensures that the authority to select and control who will minister to the faithful – a matter 'strictly ecclesiastical' – is the church's alone." *Id. at 709*. With respect to the second element in *Hosanna-Tabor*, the Court considered several factors to determine if Cheryl Perich, who

- 8 -

worked for Hosanna-Tabor as a teacher, was also a minister. Perich was classified as a "called" teacher, meaning that she was "regarded as having been called to [her] vocation by God through a congregation." Perich worked at the church's school that had as its mission to offer a "Christ-centered education." Hosanna-Tabor held Perich out as a minister and Perich held herself out as a minister at Hosanna-Tabor. Perich had also completed certain academic requirements. Hosanna-Tabor issued Perich a "diploma of vocation" that gave her the title "Minister of Religion, Commissioned." Perich completed eight ministerial-related college-level courses, obtained endorsement of her local Synod district, passed an oral examination, and claimed a special housing allowance on her taxes that was only available to individuals earning compensation for ministry. *Id. at 669-700, 707-08*.

Respondent claims that it is a religious institution with a school. However, there is no credible evidence in this record to support that position. Although Respondent points to the status and history of its predecessor institutions that were founded by a church, Respondent itself is not a church, a church with a school, or a religious institution with a school. Respondent's own proof established that its current legal status is that of a 501(c)(3) tax-exempt school, answerable only to its own board of trustees. Respondent established that, as a school, it has chosen to immerse Christian values and principles into its curriculum. However, Respondent made it very clear that it is not operated, supervised, controlled by, or connected with any religious organization, church, congregation or denomination. During the public hearing, Respondent did not provide any other evidence or clarity regarding its legal status although encouraged by the presiding ALJ to do so. Ultimately, the nature or character of a corporation is properly to be determined by the laws under which it was created, and by its certificate of incorporation or charter, and not by what activity it has chosen to engage in.

JA0720

*Estate*, 232 N.Y. 365, 134 N.E. 183 (1921); *In re De Peyster's Estate*, 210 N.Y. 216, 104 N.E. 714 (1914); *In re McCormick's Estate*, 206 N.Y. 100, 99 N.E. 177 (1912); *In re Kennedy's Estate*, 240 A.D. 20, 269 N.Y.S. 136 (1st Dep't 1934), aff'd, 264 N.Y. 691, 191 N.E. 629 (1934); *In re Loeb*, 167 A.D. 588, 152 N.Y.S. 879 (1st Dep't 1915). *In re White's Estate*, 118 A.D. 869, 103 N.Y.S. 688 (1st Dep't 1907).

Respondent also did not establish that Complainant was a minister. Respondent references a U.S. Fourth Circuit Court of Appeals case (case name and citations were not provided) for the general proposition that "if the employee's primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision of participation in a religious ritual and worship, he or she should be considered clergy." Respondent references several cases where courts found that employees were ministers, in support of its argument that Complainant was also a minister: "*Starkman v. Evans*, 198 F. 3d 173 (5th Cir. 1999) (lay choir director); *Catholic Univ.*, 317 U.S. App. D.C. 343, 83 F. 3d 455 (member of university canon law faculty); *Rayburn*, 772 F. 2d 1164 (non-ordained associate in pastoral care); *EEOC v. Southwestern Baptist Theological Seminary*, 651 F. 2d 277 (5th Cir. 1981) (faculty of seminary)." However, the court in *Hosanna-Tabor* made it clear that it declined to adopt a "rigid formula" for deciding when an employee is a minister within the meaning of the ministerial exception. *Hosanna-Tabor at 706.* As the voluminous decisions on the issue demonstrate, courts have wrestled with the fact sensitive nature of each case. This matter is distinguishable from the cases cited by Respondent. The essential facts in this matter are more closely related to the cases of *Emily Herx v. Diocese of Fort-Wayne-South Bend, Inc. and St. Vincent De Paul School*, 48 F. Supp. 3d 1168 (N.D. Ind. 2014) and *Richardson v. Northwest Christian University* 242 F. Supp. 3d 1132 (2017).

JA0721

Herx, who is a female, was a language arts teacher at a Catholic junior high school.

Herx's contract with the diocese specifically stated that:

> "Acknowledging and accepting the religious and moral nature of the Church's teaching mission, the undersigned agrees to conduct herself or himself at all times, professionally and personally, in accordance with the episcopal teaching authority, law and governance of the Church." *Id. at 1171-1172.*

The diocese's education policy stated that:

> "Since the distinctive and unique purpose of the Catholic school is to create a Christian education community, enlivened by a shared faith among the administrator(s), teachers, students and parents, the highest priority is to hire Catholics in good standing in the Catholic Church who demonstrate a commitment to Christian living, are endowed with and espouse a Catholic philosophy of life, and believe in the Catholic Church and her teachings. Both Catholic and non-Catholic teachers who are employed in a Catholic school must as a condition of employment, have a knowledge of and respect for the Catholic faith, abide by the tenets of the Catholic Church as they apply to that person, exhibit a commitment to the ideals of Christian living, and be supportive of the Catholic faith." *Id. at 1172.*

The Catholic diocese in *Herx* argued that, based on the tenets of the church, it did not renew Herx's teaching contract because she underwent *in vitro* fertilization treatments. The Catholic diocese argued that although Herx was not employed as a religion teacher, she qualified as a "minister" because the "Church, the School, and the parents of students at the school expected and relied on her to perform the function of a minister every day while teaching her students." The Catholic diocese also argued that "even Mrs. Herx agreed that she was to provide students with an example how to live their faith to share her devotion to God whenever she could." *Id. at 1176.*

The court in *Herx* determined that Herx was not a "minister" for purposes of the ministerial exception to Title VII's non-discrimination mandate. The *Herx* court followed the same logic applied by the U.S. Supreme Court in *Hosanna-Tabor*. The *Herx* court determined that Herx, unlike Perich in *Hosanna-Tabor*, never had, nor was not required to have, any

JA0722

religious instruction or training in order to be a teacher at the school, did not hold title with the Catholic church, and never held herself as a priest or minister. The court found that deeming Herx a minister "would expand the scope of the ministerial exception too far and, in fact would moot the religious exemptions of Title VII and the ADA." The court allowed Herx to proceed with her Title VII sex discrimination claim and ADA claim based on disability.

As in *Herx*, Complainant was not hired as a religion teacher, did not receive any specialized training or have any religious instruction, was required to model Christian behavior, was required to help create a Christian community with students and staff, but was not a "called teacher" by a congregation as in *Hosanna-Tabor*. Also, as in *Herx*, Complainant was required to comport her behavior to Respondent's "Statement of Faith" and "Philosophy of Christian Education." However, Respondent's own hiring literature restricted Complainant's role as a teacher in the area of faith by cautioning Complainant to "respect the distinctive doctrinal views of the various churches represented in the school community."

The plaintiff in *Richardson*, was a "professor of exercise science." Coty Richardson, an unmarried female, was fired when she became pregnant after refusing Respondent's options of either no longer living with the father of the child or marrying him. The court held that the ministerial exception did not apply to Richardson's discrimination claims of pregnancy and sex because she held a secular title and did not undergo any specialized religious training before assuming her position. The Court in *Richardson* found that, although Richardson held herself out as a Christian, there was no evidence she held herself out as a minister. The Court found that Richardson performed some important religious functions in her capacity as a professor as she was expected to integrate her Christianity into her teaching and demonstrate a maturing Christian faith but nonetheless found that her religious role was secondary to her secular role. *Richardson*

JA0723

*at 1145.* The Court in *Richardson* held that if it found Richardson "was a minister, it is hard to see how any teacher at a religious school would fall outside the exception. Courts have properly rejected a broad reading of *Hosanna-Tabor,* which would permit the ministerial exception to swallow the rule that religious employers must follow federal and state employment laws," citing to *Dias v. Archdiocese of Cincinnati*, 2013 WL 360355, *4 (S.D. Ohio Jan. 30, 2013). *Id. at 1145-1146.*

Ultimately, Respondent failed to meet its evidentiary burden to establish an affirmative defense on both elements that are necessary to establish a ministerial exception. Respondent is a school rather than a church. Complainant was not a minister. See *Winbery v. Louisiana College*, 124 So. 3d 1212 (3rd Cir. 2013) and *Mississippi College at 485.* (among other factors, in both matters, the courts found that Respondents were not a church, that the faculty and staff did not function as ministers, that the faculty members were not intermediaries between a church and its congregation. Although faculty members were expected to serve as exemplars of practicing Christians, that fact did not serve to make the terms and conditions of their employment, matters of church administration, or of "ecclesiastical concern."); see also *Puri v. Khalsa*, 844 F.3d 1152 (9th Cir. 2017) (in a dispute over two nonprofit entities within the Sikh Dharma religious community, the court found that the district court erred in dismissing this matter. The ministerial exception did not apply because the defendants were not churches and the duties of the board members in question were not religious or ecclesiastical in nature comparable to those found in *Hosanna-Tabor.*)

Human Rights Law § 296.11 Exemptions

Respondent also argues that its actions are exempted under the Human Rights Law § 296.11, which states: "Nothing contained in this section shall be construed to bar any religious

JA0724

or denominational institution or organization, or any organization operated for charitable or educational purposes, which is operated, supervised or controlled by or in connection with a religious organization, from limiting employment or sales or rental of housing accommodations or admission to or giving preference to persons of the same religion or denomination or from taking such action as is calculated by such organization to promote the religious principles for which it is established or maintained." Human Rights Law § 296.11 is consistent with the provisions of *Hosanna-Tabor*, but, outside the ministerial exception, this provision also permits preferences to persons of the same religion or denomination. Complainant's creed is not an issue in this matter, therefore this statutory provision is inapplicable. Human Rights Law § 296.11 also permits the specified institutions from "taking such action as is calculated by such organization to promote the religious principles for which it is established or maintained." Respondent's actions are not exempted under the Human Rights Law § 296.11 because it is not a covered institution. As stated above, contrary to Respondent's arguments, the only credible evidence it provided regarding its legal status was that of a tax-exempt school. Respondent's own proof established that is not operated, supervised, controlled by, connected with any religious organization, or that is was a denominational institution or organization.

<u>Familial Status Analysis</u>

Human Rights Law § 296.1(a) states that it shall be "…an unlawful practice… [f]or an employer … because of an individual's … familial status…to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

Human Rights Law § 292.26 defines familial status as (a) any person who is pregnant or has a child or is in the process of securing legal custody of any individual who has not attained

JA0725

the age of eighteen years, or (b) one or more individuals (who have not attained the age of

eighteen years) being domiciled with: (1) a parent or another person having legal custody of such

individual or individuals, or (2) the designee of such parent.

Complainant may establish a prima facie case of discrimination by demonstrating that she

is a member of a protected class, she was qualified for her job, and she was terminated or

suffered an adverse employment action under circumstances giving rise to an inference of

discrimination. *Rainer N. Mittl, Ophthalmologist, P.C. v. New York State Div. of Human Rights*,

100 N.Y.2d 326, 330, 763 N.Y.S.2d 518, 520 (2003). If Complainant establishes a prima facie

case, the burden shifts to Respondent to articulate a legitimate non-discriminatory reason for its

actions. Thereafter, Complainant must demonstrate that the reasons offered by Respondent are

merely a pretext for unlawful discrimination. *Ferrante v. American Lung Ass'n.,* 90 N.Y.2d 623,

665 N.Y.S.2d 25 (1997).

Complainant has established a prima facie case of familial status discrimination.

Complainant had a minor child. Complainant was qualified for the position of first-grade

teacher. Respondent offered Complainant the position based on her academic credentials and

performance during her interviews. Complainant suffered an adverse employment action under

circumstances that gave rise to an inference of unlawful discrimination. Respondent's policy

required it to offer Complainant a position as a first-grade teacher with terms and conditions that

were different than employment offers made to teachers with no children or with children over

the age of eighteen. Specifically, Respondent required Complainant to remove her minor child

from a public high school, to enroll her child in Respondent's school, and to pay Respondent

$4,500 a year in tuition. Teachers with no children or with children over the age of eighteen

were not required to pay any cost towards tuition or make any financial contribution to the

JA0726

school.

Respondent presented legitimate and nondiscriminatory reasons why it did not violate the Human Rights Law.

First, Respondent argued the Human Rights Law "is intended to prevent parents from being punished" for having young children and "intended to redress beliefs that they are less productive, less reliable, or irresponsible for opting not to forego a career and stay home with their children." Respondent viewed Complainant's experience as a mother as a "bonus," not a liability. Complainant was offered a job. Respondent finds that teachers who happen to be parents have a unique opportunity to demonstrate their commitment to Respondent's Christian mission by enrolling their own children at Respondent's school. Therefore, Respondent argued, Complainant failed to show that it had any discriminatory motive or animus against her familial status.

Second, Respondent views its policy as an employment benefit and not a burden. Complainant was offered a private education for her child at a reduced rate that Respondent argued was not available to most others in the community. Respondent also argued that Complainant could have asked for financial aid beyond the teacher discount but failed to do so. As a result, Respondent contends, Complainant failed to show that she suffered an adverse employment action with respect to its policy.

Third, Respondent argued that Complainant failed to show that she would have made less money than a similarly situated employee without children since her salary was never agreed upon. Therefore, Respondent argued, Complainant failed to show that she suffered an adverse employment action with respect to compensation.

Complainant demonstrated that the reasons offered by Respondent are a pretext for

- 16 -

JA0727

unlawful discrimination.

First, Human Rights Law § 296.1(a) specifies that unlawful discrimination includes "terms, conditions or privileges of employment." Because Respondent offered Complainant a job does not absolve Respondent from the claim that the offer was discriminatory. Complainant established that there were two hiring standards. Respondent's hiring policy treated applicants with a family differently than those without one. Applicants with children, as defined under the Human Rights Law, were required to have their children enrolled in Respondent's school. Applicants without children or without school age children do not have to make the choice of accepting a job with this condition. Respondent admitted that "as a private organization, we get to make those rules." Respondent's stated goals of promoting its school by having the children of teachers attend the school does not mitigate the discriminatory motive. Plainly put, Respondent's policy clearly imposes a term, condition, or privilege of employment, on an applicant because of her familial class status.

Second, Respondent argued that its policy was a benefit, not a burden, because Complainant was offered the opportunity to have her child receive a private education, at a reduced rate, not available to most others in the community. However, Complainant established that the members of the community at large are not similarly situated to her. The correct comparators are teachers with no children or with children that are not school-age. Similarly situated teachers were not required to make any financial contribution to the school. A financial burden was placed on Complainant because she had a minor child. Complainant's tuition cost, with the teacher discount, would have been $4,500 a year.

Third, Respondent argued that Complainant failed to ask for financial aid beyond the discount. As a result, Respondent posited that Complainant did not prove how Complainant's

JA0728

tuition payment would have impacted her salary or that she was offered a lower salary than other teachers. Complainant showed that these arguments are unavailing. Complainant did not claim she was offered a lower salary. Complainant established that she was required to contribute financially to the school, by way of tuition, while similarly situated teachers were not. In addition, Complainant proved that she was not offered financial aid. At the public hearing, Respondent's head of school, Thad Gaebelein, admitted he made it very difficult to reveal the availability of financial aid. Gaebelein testified, "the financial aid piece – that's that last card we play in, in the process. And we kind of hold that back simply because we're not too eager to give away money…"

Fourth, Respondent also imposed non-financial burdens on Complainant not imposed on similarly situated teachers. Complainant established that she was concerned for her son's academic and emotional well-being if she was required to remove him from his current high school system, halfway during his sophomore year. Complainant's son would have to leave his friends and adjust to a new school. As stated, applicants without children or without school age children did not have to make the same non-financial choices in order to accept the job.

Finally, Complainant's proof shows that Respondent violated Human Rights Law § 296.1(d), which specifies that it is an unlawful discriminatory practice "for any employer…to use any form of application for employment or make any inquiry in connection with prospective employment, which expresses directly or indirectly, any limitation, specification or discrimination as to …familial status ...or any intent to make any such limitation specification or discrimination," unless based upon a bona fide occupational qualification ("BFOQ"). The proof shows that Respondent's inquiries into familial status clearly expressed an unlawful limitation and specification. Respondent's inquiries were not merely informal questions, asked in passing

- 18 -

during an interview, outside a context of unlawful discrimination. *Matter of Delta Airlines v. New York State Division of Human Rights,* 91 N.Y.2d 65, 72 (1997). Respondent gathered unlawful information on familial status for the express purpose of making employment decisions. Applicants were specifically asked if they have minor children to decide whether to apply Respondent's mandatory enrollment policy as a condition of a job offer. The BFOQ is an extremely narrow exception to the anti-discrimination provisions of the Human Rights Law. It is an affirmative defense which must be pleaded and proved by Respondent. In this matter, Respondent neither raised a BFOQ as an affirmative defense nor proved that an applicant's familial status was necessary to perform the duties of a first-grade teacher. *New York State Div. of Human Rights v. New York-Pennsylvania Professional* Baseball League, 36 A.D.2d 364, 320 N.Y.S. 788 (4th Dept. 1971), aff'd 29 N.Y.2d 921, 329 N.Y.S.2d 99 (1972).

Damages

In this matter Complainant did not make any emotional damages or lost wage claims.

Civil Fine and Penalty

Human Rights Law § 297.4(c)(vi) authorizes the Division to assess civil fines and penalties, "in an amount not to exceed fifty thousand dollars, to be paid to the state by a respondent found to have committed an unlawful discriminatory act, or not to exceed one hundred thousand dollars to be paid to the state by a respondent found to have committed an unlawful discriminatory act which is found to be willful, wanton or malicious." Any such civil penalty "shall be separately stated, and shall be in addition to and not reduce or offset any other damages or payment imposed upon a respondent pursuant to this article." Human Rights Law § 297.4(e). In determining the amount of a civil penalty, the Division should consider the goal of deterrence, the nature and circumstances of the violation, the degree of the respondent's

JA0730

culpability, any relevant history of the respondent's actions, the respondent's financial resources, and other matters as justice may require. *Gostomski v. Sherwood Terrace Apartments*, DHR Case Nos. 10107538 and 10107540 (November 15, 2007), *aff'd*, *Sherwood Terrace Apartments v. New York State Div. of Human Rights*, 61 A.D.3d 1333, 877 N.Y.S.2d 595 (4th Dept. 2009).

The goal of deterrence; Respondent's degree of culpability; and the nature and circumstances of Respondent's violation warrant a penalty. Respondent cannot engage in a deliberate practice of considering the familial status of its applicants. Respondent admittedly made inquiries into the familial status of all applicants, including Complainant, that violated Human Rights Law § 296.1(d). Furthermore, Respondent made Complainant a job offer that unlawfully varied her terms and conditions of employment, in violation of Human Rights Law § 296.1(a), because she had a family with children. Respondent imposed burdens on Complainant not imposed on others with no children or no children of school-age. Respondent's job offer required Complainant to remove her minor child from a public high school, to enroll her child in Respondent's school, and to pay Respondent $4,500 a year in tuition. Teachers with no children or with no children of school-age were not required to pay any cost towards tuition or make any financial contribution to the school. Considering these factors, a civil fine in the amount of $3,000 may act as an inducement for Respondent to comply with the Human Rights Law in the future, deter others from future discriminatory action, and present an example to the public that the Division vigorously enforces the Human Rights Law. *See Matter of Li v. New York State Div. of Human Rights*, 147 A.D.3d 1321, 1322, 46 N.Y.S.3d 345, 346 (4th Dept. 2017).

JA0731

## **ORDER**

On the basis of the foregoing Findings of Fact, Opinion and Decision, and pursuant to the provisions of the Human Rights Law and the Division's Rules of Practice, it is hereby

ORDERED that Respondent, and its agents, representatives, employees, successors, and assigns, shall cease and desist from discriminatory practices in employment; and it is further

ORDERED that Respondent shall take the following action to effectuate the purposes of the Human Rights Law and the findings and conclusions of this Order:

1. Within 60 days of the date of the Commissioner's Order, Respondent shall pay a civil fine and penalty to the State of New York in the amount of $3,000. This payment shall be made in the form of a certified check made payable to the order of the State of New York and delivered by certified mail, return receipt requested, to Caroline Downey, Esq., General Counsel, New York State Division of Human Rights, One Fordham Plaza, 4th Floor, Bronx, New York, 10458. Interest on this award shall accrue at a rate of nine percent per year from the date of the Commissioner's Order until payment is actually made by Respondent; and

2. Within 60 days of the date of the Commissioner's Order, Respondent shall conform its employment policies and practices to comply with the Human Rights.  In particular, Respondent shall cease and desist from making employment inquiries into the familial status of its applicants and cease and desist from considering the familial status of applicants as part of its employment decisions; and

JA0732

3. Respondent shall cooperate with the representatives of the Division during any investigation into compliance with the directives contained within this Order.

DATED:  March 23, 2018
    Buffalo, New York

*Martin Erazo, Jr.*

Martin Erazo, Jr.
Administrative Law Judge

JA0733

# EXHIBIT J



**Division of
Human Rights**

**NEW YORK STATE
DIVISION OF HUMAN RIGHTS**

| | |
|---|---|
| **NEW YORK STATE DIVISION OF HUMAN RIGHTS**<br> on the Complaint of<br><br>**KATHLEEN LYSEK,**<br><br>                    Complainant,<br><br>         v.<br><br>**CHRISTIAN CENTRAL ACADEMY,**<br><br>                   Respondent. | **NOTICE AND FINAL ORDER**<br><br>Case No. 10180743 |

     **PLEASE TAKE NOTICE** that the attached is a true copy of the Recommended

Findings of Fact, Opinion and Decision, and Order ("Recommended Order"), issued on March

23, 2018, by Martin Erazo, Jr. , an Administrative Law Judge of the New York State Division of

Human Rights ("Division").  An opportunity was given to all parties to object to the

Recommended Order, and all Objections received have been reviewed.

     **PLEASE BE ADVISED THAT, UPON REVIEW, THE RECOMMENDED**

**ORDER IS HEREBY ADOPTED AND ISSUED BY THE HONORABLE HELEN DIANE**

**FOSTER, COMMISSIONER, AS THE FINAL ORDER OF THE NEW YORK STATE**

**DIVISION OF HUMAN RIGHTS ("ORDER")**.  In accordance with the Division's Rules of

Practice, a copy of this Order has been filed in the offices maintained by the Division at One

Fordham Plaza, 4th Floor, Bronx, New York 10458.  The Order may be inspected by any

member of the public during the regular office hours of the Division.

   **PLEASE TAKE FURTHER NOTICE** that any party to this proceeding may appeal this

Order to the Supreme Court in the County wherein the unlawful discriminatory practice that is

the subject of the Order occurred, or wherein any person required in the Order to cease and desist

from an unlawful discriminatory practice, or to take other affirmative action, resides or transacts

business, by filing with such Supreme Court of the State a Petition and Notice of Petition, within

sixty (60) days after service of this Order.  A copy of the Petition and Notice of Petition must

also be served on all parties, including the General Counsel, New York State Division of Human

Rights, One Fordham Plaza, 4th Floor, Bronx, New York 10458.  Please do not file the original

Notice or Petition with the Division.

   **ADOPTED, ISSUED, AND ORDERED**.

DATED:  **MAY 1 6 2018**
         Bronx, New York

_____
HELEN DIANE FOSTER
COMMISSIONER

- 2 -

JA0736



**Division of
Human Rights**

**NEW YORK STATE
DIVISION OF HUMAN RIGHTS**

| | |
|---|---|
| **NEW YORK STATE DIVISION OF HUMAN RIGHTS**<br>on the Complaint of<br><br>**KATHLEEN LYSEK,**<br>Complainant,<br>v.<br><br>**CHRISTIAN CENTRAL ACADEMY,**<br>Respondent. | **RECOMMENDED FINDINGS OF FACT, OPINION AND DECISION, AND ORDER**<br><br>Case No. **10180743** |

## SUMMARY

Respondent's policy unlawfully considers the familial status of job applicants. Respondent unlawfully varied the terms and conditions of its job offer to Complainant because she had a family with children. Respondent is directed to change its familial status policy, and cease and desist from making unlawful inquiries into the familial status of job applicants. Respondent is also assessed a civil fine and penalty.

## PROCEEDINGS IN THE CASE

On March 31, 2016, Complainant filed a verified complaint with the New York State Division of Human Rights ("Division"), charging Respondent with unlawful discriminatory practices relating to employment in violation of N.Y. Exec. Law, art. 15 ("Human Rights Law").

After investigation, the Division found that it had jurisdiction over the complaint and that probable cause existed to believe that Respondent had engaged in unlawful discriminatory practices. The Division thereupon referred the case to public hearing.

After due notice, the case came on for hearing before Martin Erazo, Jr., an Administrative Law Judge ("ALJ") of the Division. A public hearing session was held on November 15, 2017.

Complainant and Respondent appeared at the hearing. The Division was represented by Richard J. Van Coevering, Esq., Senior Attorney. Respondent was represented by Michael J. Balestra, Esq.

The parties were granted permission to file post-hearing briefs by January 19, 2018. Respondent submitted a timely brief. The Division did not submit a brief.

## **FINDINGS OF FACT**

1.  Complainant had one minor child, Caleb, 15 years of age, during the relevant time-period of the present complaint. (Tr. 17-18, 35)

2.  Complainant has a Master of Science Degree in Childhood Education, holds New York State certifications in childhood and early childhood education that permit her to teach "birth – 2nd" and "pre-k through 6," and has teaching experience in the public school districts of Williamsville, North Tonawanda and Buffalo. (Respondent's Exh. 1)

3.  Respondent is a private school with grades kindergarten through 12, unaffiliated with any church or denomination. (Tr. 44-45)

4.  Respondent is a member of the Association of Christian Schools International and interacts with a variety of local churches and denominations that refer many of its students, but is "not answerable" to any of those. (Tr. 11, 48, 76, 78)

JA0738

5.   Respondent's highest governing body is its own board of trustees and no other organization has direct control over the school.  (Tr. 48, 73, 76-78)

6.   Respondent describes itself as an "intentional Christian community" and "faith based organization."  (Tr. 44-45, 47)

7.   Respondent has a "Statement of Faith" that states its religious creed and a "Philosophy of Christian Education" for its school.  (Tr. 53-54; Respondent's Exhs. 1, 4)

8.   Respondent's academic curriculum includes algebra, English, foreign language and bible class.  (Tr. 45)

9.   Respondent encourages its teachers to incorporate its Statement of Faith and Philosophy of Christian Education into their curriculum.  (Tr. 46, 54)

10.  Respondent begins each school day with prayer as part of a 20-minute service.  Prayers are also performed in class and prior to every athletic practice.  (Tr. 45-46, 56-57)

11.  Prayer sessions can be led by teachers, by the head of school or by a student chaplain. All teachers are required to lead prayer sessions as part of their job duties.  (Tr. 56-57)

12.  All teaching and non-teaching staff are required to "model Christlike virtues" and sign Respondent's Statement of Faith document.  (Tr. 57-58)

13.  Respondent's hiring policy requires all teachers to enroll their school-age children in Respondent's school.  (Tr. 60, 75-76)

14.  Respondent makes inquiries into the familial status of all applicants to determine if they have school-age children.  (Tr. 60, 75-76)

15.  Respondent believes that its enrollment policy is consistent with its Philosophy of Christian Education in that if teachers believe in their mission as a Christian school, they "will invest" their own children into Respondent's school and serve as an example to others of their

JA0739

commitment. Respondent believes that "as a private organization, we get to make those rules." (Tr. 61-62)

16. On August 8, 2002, the Internal Revenue Service ("IRS") confirmed Respondent's tax-exempt status, "as a school," under "section 501 (c) (3)," and other provisions, of the Internal Revenue Code. (Respondent's Exh. 2)

17. The IRS acknowledged Respondent's status as tax-exempt school because the New York State Education Department approved Respondent's charter amendment on June 18, 2002. (Respondent's Exh. 2)

18. Respondent did not submit a copy of its current New York State charter, provisional charter or amended charter. (Tr. 84-85; Respondent's Exhs. 2, 3)

19. I do not give any evidentiary weight to Respondent's document captioned "Secondary School Registration Report," dated June 5, 1987, ostensibly filed with the New York State Education Department, that Respondent offered in support of its argument that its legal status is that of a religious organization. The document is not relevant or reliable as evidence, since it appears to be incomplete, unsigned, contains no verification of authenticity as an official government document, and a plain reading of the document shows that it does not describe Respondent's current legal status. (Tr. 51; Respondent's Exh. 3)

20. On August 3, 2015, Complainant applied for a first-grade teaching position with Respondent. (Tr. 12, 37; Respondent's Exh.1)

21. Respondent's application for the first-grade teaching position asks if the applicant holds a New York State certification to teach and the certification number. (Respondent's Exh. 1)

22. Respondent's application contains a "spiritual qualifications" section that Complainant completed. In that section, Respondent asks Complainant to describe her personal relationship

JA0740

with God; if she subscribes to its Statement of Faith without reservation; and asks her attitude toward liquor, drugs, and matters of environment, and recreation; and asks how the Lord led her toward Christian school teaching. (Respondent's Exh. 1)

23. The duties of a first-grade teacher at Respondent's school "are straightforward in many ways and traditional." The teacher is expected to start work at 7:30 a.m.; greet students as they come in; teach the students the fundamentals of reading, writing, math, science; integrate God where they can; teach them how to follow instructions; test and grade students; keep in close contact with parents; participate in open houses; participate in the life of the school such as engaging in fundraising projects; and model Christian character in their behavior and interactions with others. (Tr. 68-70)

24. On August 3, 2015, Complainant acknowledged that she received and subscribed to Respondent's "Statement of Faith," "Philosophy of Christian Education," and that she would "respect the distinctive doctrinal views of the various churches represented in the school community." (Tr. 22, 37; Respondent's Exh. 1)

25. Thad Gaebelein is Respondent's head of school. (Tr. 41, 44, 55)

26. Gaebelein is responsible for all hiring and firing of personnel, maintaining the budget, enforcing the school's policies, and sustaining quality control of all aspects of the school. Gaebelein answers directly to Respondent's Board of Trustees. (Tr. 55, 59)

27. On August 3, 2015, and March 2, 2016, Complainant was interviewed by Respondent's division head of kindergarten through 12th grade Sue Cooke, Gaebelein, and other faculty members. (Tr. 33, 37, 59, 60, 63)

28. During Complainant's March 2, 2016 interview, Gaebelein asked her if she had any children. (Tr. 37, 60)

**JA0741**

29. Gaebelein informed Complainant that Respondent's policy required teachers to enroll their school-age children in Respondent's school. (Tr. 27, 60, 64)

30. Complainant explained to Gaebelein that she was reluctant to remove her son, Caleb, from his public high school, at the Clarence School District, halfway during his sophomore year, because doing so would be disruptive to his education. Complainant explained that Caleb had previously moved from another school system, had been in the Clarence system since the 5th grade, would have to adjust to a new school, and leave another set of friends. (Tr. 27, 38)

31. Gaebelein replied, "15 year olds shouldn't make the decisions in the household." (Tr. 27)

32. Gaebelein informed Complainant that "there was a 50% discount for faculty sending their child to [Respondent's] school." With the discount, Complainant's yearly tuition would have been $4,500 per year. (Tr. 27, 30, 32-33)

33. Gaebelein did not inform Complainant that there was any other scholarship or discounts that that might be available. (Tr. 35)

34. If a faculty member presses Gaebelein on the need for financial aid he will allow that individual to apply for financial aid beyond the standard discount. (Tr. 60, 65)

35. Gaebelein testified, "That the financial aid piece – that's that last card we play in, in the process. And we kind of hold that back simply because we're not too eager to give away money…" (Tr. 65)

36. Teachers with no children or with children who are not of school-age are not required to make any financial contribution to the school. (Tr. 82)

37. Complainant's salary would have been approximately $30,000 to $33,000 a year given her experience and education. (Tr. 32, 70)

JA0742

38.  Gaebelein found Complainant qualified to teach 2nd grade at Respondent's school, liked her demeanor, found her well-spoken, mature, and found that having her own children was a positive attribute, a "bonus," that spoke to her ability to work with children.  (Tr. 59-60, 65)

39.  On March 2, 2016, Cooke called Complainant and left a voicemail offering her the first-grade teaching position.  (Tr. 12, 28, 38, 59)

40.  Cooke made the job offer contingent on Complainant's son, Caleb, attending Respondent's school, and asked that Complainant call back with a decision.  (Tr. 12, 28, 64)

41.  Complainant returned Cooke's call, left a voicemail, and reiterated the reasons she could not remove Caleb from the Clarence School District.  Complainant also explained that after speaking with her husband, they agreed that they could not afford the $4,500 per year to enroll Caleb in Respondent's school, that they were trying to save for Caleb's college costs, and that they were paying education expenses for their eldest son who was already in college.  (Tr. 28)

42.  Complainant also called Gaebelein and left him the same message as she did with Cooke and asked if he would make an exception in Caleb's case.  (Tr. 30)

43.  Cooke returned Complainant's call and told her that "Gaebelein was not willing to budge on that issue and that [Complainant] had to send [her] child to [Respondent's school] in order to get the job."  (Tr. 30, 64)

44.  On March 3, 2016, Complainant declined Respondent's offer of employment.  (Tr. 12, 38)

45.  At the public hearing, Complainant did not offer any proof of economic or emotional damages, as she was not seeking any damages.  (Tr. 31-32)

JA0743

## OPINION AND DECISION

Ministerial Exception Defense

Respondent raised the affirmative defense of "ministerial exception" in employment discrimination matters and argued that it is not subject to N.Y. Exec. Law, art. 15 ("Human Rights Law"). *Hosanna-Taber Evangelical Lutheran Church and School v. E.E.O.C.*, 132 S.Ct. 694 (2012). The ministerial exception is based on the Free Exercise Clause of the First Amendment to the United States Constitution that restricts the government's ability to intrude into ecclesiastical matters or to interfere with a church's governance of its own affairs. *Equal Employment Opportunity Commission v. Mississippi College*, 626 F.2d 477 (5th Cir. 1980), *cert. denied*, 453 U.S. 912, 101 S.Ct. 3143 (1981). In *Hosanna-Taber* the United States Supreme Court held that for the "ministerial exception" to bar an employment discrimination claim, two factors must be present: (1) the employer must be a religious institution, and (2) the employee must be a ministerial employee. *Hosanna-Tabor at 709*. There has been much litigation on the issue of what constitutes a religious institution and a ministerial employee. Courts have wrestled with each of those questions based on the unique, particular circumstances of each case.

With respect to the first element in *Hosanna-Tabor,* there was no question that the Hosanna-Tabor Evangelical Lutheran Church and School was a "church." The Court held that the ministerial exception prohibits courts from interfering with religious decisions regarding whom to employ within the "church." *Id. at 705*. The Court explained that, "the exception ensures that the authority to select and control who will minister to the faithful – a matter 'strictly ecclesiastical' – is the church's alone." *Id. at 709*. With respect to the second element in *Hosanna-Tabor*, the Court considered several factors to determine if Cheryl Perich, who

- 8 -

JA0744

worked for Hosanna-Tabor as a teacher, was also a minister. Perich was classified as a "called" teacher, meaning that she was "regarded as having been called to [her] vocation by God through a congregation." Perich worked at the church's school that had as its mission to offer a "Christ-centered education." Hosanna-Tabor held Perich out as a minister and Perich held herself out as a minister at Hosanna-Tabor. Perich had also completed certain academic requirements. Hosanna-Tabor issued Perich a "diploma of vocation" that gave her the title "Minister of Religion, Commissioned." Perich completed eight ministerial-related college-level courses, obtained endorsement of her local Synod district, passed an oral examination, and claimed a special housing allowance on her taxes that was only available to individuals earning compensation for ministry. *Id. at 669-700, 707-08.*

Respondent claims that it is a religious institution with a school. However, there is no credible evidence in this record to support that position. Although Respondent points to the status and history of its predecessor institutions that were founded by a church, Respondent itself is not a church, a church with a school, or a religious institution with a school. Respondent's own proof established that its current legal status is that of a 501(c)(3) tax-exempt school, answerable only to its own board of trustees. Respondent established that, as a school, it has chosen to immerse Christian values and principles into its curriculum. However, Respondent made it very clear that it is not operated, supervised, controlled by, or connected with any religious organization, church, congregation or denomination. During the public hearing, Respondent did not provide any other evidence or clarity regarding its legal status although encouraged by the presiding ALJ to do so. Ultimately, the nature or character of a corporation is properly to be determined by the laws under which it was created, and by its certificate of incorporation or charter, and not by what activity it has chosen to engage in. *In re Beekman's*

JA0745

*Estate*, 232 N.Y. 365, 134 N.E. 183 (1921); *In re De Peyster's Estate*, 210 N.Y. 216, 104 N.E. 714 (1914); *In re McCormick's Estate*, 206 N.Y. 100, 99 N.E. 177 (1912); *In re Kennedy's Estate*, 240 A.D. 20, 269 N.Y.S. 136 (1st Dep't 1934), aff'd, 264 N.Y. 691, 191 N.E. 629 (1934); *In re Loeb*, 167 A.D. 588, 152 N.Y.S. 879 (1st Dep't 1915). *In re White's Estate*, 118 A.D. 869, 103 N.Y.S. 688 (1st Dep't 1907).

Respondent also did not establish that Complainant was a minister. Respondent references a U.S. Fourth Circuit Court of Appeals case (case name and citations were not provided) for the general proposition that "if the employee's primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision of participation in a religious ritual and worship, he or she should be considered clergy." Respondent references several cases where courts found that employees were ministers, in support of its argument that Complainant was also a minister: "*Starkman v. Evans*, 198 F. 3d 173 (5th Cir. 1999) (lay choir director); *Catholic Univ.*, 317 U.S. App. D.C. 343, 83 F. 3d 455 (member of university canon law faculty); *Rayburn*, 772 F. 2d 1164 (non-ordained associate in pastoral care); *EEOC v. Southwestern Baptist Theological Seminary*, 651 F. 2d 277 (5th Cir. 1981) (faculty of seminary)." However, the court in *Hosanna-Tabor* made it clear that it declined to adopt a "rigid formula" for deciding when an employee is a minister within the meaning of the ministerial exception. *Hosanna-Tabor at 706.* As the voluminous decisions on the issue demonstrate, courts have wrestled with the fact sensitive nature of each case. This matter is distinguishable from the cases cited by Respondent. The essential facts in this matter are more closely related to the cases of *Emily Herx v. Diocese of Fort-Wayne-South Bend, Inc. and St. Vincent De Paul School*, 48 F. Supp. 3d 1168 (N.D. Ind. 2014) and *Richardson v. Northwest Christian University* 242 F. Supp. 3d 1132 (2017).

JA0746

Herx, who is a female, was a language arts teacher at a Catholic junior high school.

Herx's contract with the diocese specifically stated that:

"Acknowledging and accepting the religious and moral nature of the Church's teaching mission, the undersigned agrees to conduct herself or himself at all times, professionally and personally, in accordance with the episcopal teaching authority, law and governance of the Church." *Id. at 1171-1172.*

The diocese's education policy stated that:

"Since the distinctive and unique purpose of the Catholic school is to create a Christian education community, enlivened by a shared faith among the administrator(s), teachers, students and parents, the highest priority is to hire Catholics in good standing in the Catholic Church who demonstrate a commitment to Christian living, are endowed with and espouse a Catholic philosophy of life, and believe in the Catholic Church and her teachings. Both Catholic and non-Catholic teachers who are employed in a Catholic school must as a condition of employment, have a knowledge of and respect for the Catholic faith, abide by the tenets of the Catholic Church as they apply to that person, exhibit a commitment to the ideals of Christian living, and be supportive of the Catholic faith." *Id. at 1172.*

The Catholic diocese in *Herx* argued that, based on the tenets of the church, it did not renew Herx's teaching contract because she underwent *in vitro* fertilization treatments. The Catholic diocese argued that although Herx was not employed as a religion teacher, she qualified as a "minister" because the "Church, the School, and the parents of students at the school expected and relied on her to perform the function of a minister every day while teaching her students." The Catholic diocese also argued that "even Mrs. Herx agreed that she was to provide students with an example how to live their faith to share her devotion to God whenever she could." *Id. at 1176.*

The court in *Herx* determined that Herx was not a "minister" for purposes of the ministerial exception to Title VII's non-discrimination mandate. The *Herx* court followed the same logic applied by the U.S. Supreme Court in *Hosanna-Tabor*. The *Herx* court determined that Herx, unlike Perich in *Hosanna-Tabor*, never had, nor was not required to have, any

JA0747

religious instruction or training in order to be a teacher at the school, did not hold title with the Catholic church, and never held herself as a priest or minister. The court found that deeming Herx a minister "would expand the scope of the ministerial exception too far and, in fact would moot the religious exemptions of Title VII and the ADA." The court allowed Herx to proceed with her Title VII sex discrimination claim and ADA claim based on disability.

As in *Herx*, Complainant was not hired as a religion teacher, did not receive any specialized training or have any religious instruction, was required to model Christian behavior, was required to help create a Christian community with students and staff, but was not a "called teacher" by a congregation as in *Hosanna-Tabor*. Also, as in *Herx*, Complainant was required to comport her behavior to Respondent's "Statement of Faith" and "Philosophy of Christian Education." However, Respondent's own hiring literature restricted Complainant's role as a teacher in the area of faith by cautioning Complainant to "respect the distinctive doctrinal views of the various churches represented in the school community."

The plaintiff in *Richardson*, was a "professor of exercise science." Coty Richardson, an unmarried female, was fired when she became pregnant after refusing Respondent's options of either no longer living with the father of the child or marrying him. The court held that the ministerial exception did not apply to Richardson's discrimination claims of pregnancy and sex because she held a secular title and did not undergo any specialized religious training before assuming her position. The Court in *Richardson* found that, although Richardson held herself out as a Christian, there was no evidence she held herself out as a minister. The Court found that Richardson performed some important religious functions in her capacity as a professor as she was expected to integrate her Christianity into her teaching and demonstrate a maturing Christian faith but nonetheless found that her religious role was secondary to her secular role. *Richardson*

JA0748

*at 1145.* The Court in *Richardson* held that if it found Richardson "was a minister, it is hard to see how any teacher at a religious school would fall outside the exception. Courts have properly rejected a broad reading of *Hosanna-Tabor,* which would permit the ministerial exception to swallow the rule that religious employers must follow federal and state employment laws," citing to *Dias v. Archdiocese of Cincinnati*, 2013 WL 360355, *4 (S.D. Ohio Jan. 30, 2013). *Id. at 1145-1146.*

Ultimately, Respondent failed to meet its evidentiary burden to establish an affirmative defense on both elements that are necessary to establish a ministerial exception. Respondent is a school rather than a church. Complainant was not a minister. See *Winbery v. Louisiana College*, 124 So. 3d 1212 (3rd Cir. 2013) and *Mississippi College at 485*. (among other factors, in both matters, the courts found that Respondents were not a church, that the faculty and staff did not function as ministers, that the faculty members were not intermediaries between a church and its congregation. Although faculty members were expected to serve as exemplars of practicing Christians, that fact did not serve to make the terms and conditions of their employment, matters of church administration, or of "ecclesiastical concern."); see also *Puri v. Khalsa*, 844 F.3d 1152 (9th Cir. 2017) (in a dispute over two nonprofit entities within the Sikh Dharma religious community, the court found that the district court erred in dismissing this matter. The ministerial exception did not apply because the defendants were not churches and the duties of the board members in question were not religious or ecclesiastical in nature comparable to those found in *Hosanna-Tabor*.)

Human Rights Law § 296.11 Exemptions

Respondent also argues that its actions are exempted under the Human Rights Law § 296.11, which states: "Nothing contained in this section shall be construed to bar any religious

JA0749

or denominational institution or organization, or any organization operated for charitable or educational purposes, which is operated, supervised or controlled by or in connection with a religious organization, from limiting employment or sales or rental of housing accommodations or admission to or giving preference to persons of the same religion or denomination or from taking such action as is calculated by such organization to promote the religious principles for which it is established or maintained." Human Rights Law § 296.11 is consistent with the provisions of *Hosanna-Tabor*, but, outside the ministerial exception, this provision also permits preferences to persons of the same religion or denomination. Complainant's creed is not an issue in this matter, therefore this statutory provision is inapplicable. Human Rights Law § 296.11 also permits the specified institutions from "taking such action as is calculated by such organization to promote the religious principles for which it is established or maintained." Respondent's actions are not exempted under the Human Rights Law § 296.11 because it is not a covered institution. As stated above, contrary to Respondent's arguments, the only credible evidence it provided regarding its legal status was that of a tax-exempt school. Respondent's own proof established that is not operated, supervised, controlled by, connected with any religious organization, or that is was a denominational institution or organization.

<u>Familial Status Analysis</u>

Human Rights Law § 296.1(a) states that it shall be "…an unlawful practice… [f]or an employer … because of an individual's … familial status…to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

Human Rights Law § 292.26 defines familial status as (a) any person who is pregnant or has a child or is in the process of securing legal custody of any individual who has not attained

JA0750

the age of eighteen years, or (b) one or more individuals (who have not attained the age of eighteen years) being domiciled with: (1) a parent or another person having legal custody of such individual or individuals, or (2) the designee of such parent.

Complainant may establish a prima facie case of discrimination by demonstrating that she is a member of a protected class, she was qualified for her job, and she was terminated or suffered an adverse employment action under circumstances giving rise to an inference of discrimination. *Rainer N. Mittl, Ophthalmologist, P.C. v. New York State Div. of Human Rights*, 100 N.Y.2d 326, 330, 763 N.Y.S.2d 518, 520 (2003). If Complainant establishes a prima facie case, the burden shifts to Respondent to articulate a legitimate non-discriminatory reason for its actions. Thereafter, Complainant must demonstrate that the reasons offered by Respondent are merely a pretext for unlawful discrimination. *Ferrante v. American Lung Ass'n.,* 90 N.Y.2d 623, 665 N.Y.S.2d 25 (1997).

Complainant has established a prima facie case of familial status discrimination. Complainant had a minor child. Complainant was qualified for the position of first-grade teacher. Respondent offered Complainant the position based on her academic credentials and performance during her interviews. Complainant suffered an adverse employment action under circumstances that gave rise to an inference of unlawful discrimination. Respondent's policy required it to offer Complainant a position as a first-grade teacher with terms and conditions that were different than employment offers made to teachers with no children or with children over the age of eighteen. Specifically, Respondent required Complainant to remove her minor child from a public high school, to enroll her child in Respondent's school, and to pay Respondent $4,500 a year in tuition. Teachers with no children or with children over the age of eighteen were not required to pay any cost towards tuition or make any financial contribution to the

- 15 -

JA0751

# EXHIBIT K

NEW YORK STATE
DIVISION OF HUMAN RIGHTS

---

NEW YORK STATE DIVISION
OF HUMAN RIGHTS
    on the Complaint of

**MUZETTE EMILY MORGAN,**

                        Complainant,

           v.

**ZAHARO CAB CORPORATION, ZAHARO CAB
CORP.,**

                       Respondents.

**NOTICE AND
FINAL ORDER**

Case No. 10117888

---

**PLEASE TAKE NOTICE** that the attached is a true copy of the Recommended

Findings of Fact, Opinion and Decision, and Order ("Recommended Order"), issued on

November 14, 2008, by Robert J. Tuosto, an Administrative Law Judge of the New York State

Division of Human Rights ("Division"). An opportunity was given to all parties to object to the

Recommended Order, and all Objections received have been reviewed.

    <u>PLEASE BE ADVISED THAT, UPON REVIEW, THE RECOMMENDED</u>

<u>ORDER IS HEREBY ADOPTED AND ISSUED BY THE HONORABLE GALEN D.</u>

<u>KIRKLAND, COMMISSIONER, AS THE FINAL ORDER OF THE NEW YORK STATE</u>

<u>DIVISION OF HUMAN RIGHTS ("ORDER") WITH THE FOLLOWING</u>

<u>AMENDMENT</u>:

- The analysis in the Recommended Order is not adopted. The case is hereby

  dismissed because Complainant failed to present any evidence that she was

  denied access to Respondent's taxi, or otherwise treated unlawfully, due to her

  race or religion. Ultimately, the burden of persuasion of the issue of unlawful

<div align="right">JA0753</div>

discrimination always remains with the Complainant. *See Stephenson v. Hotel Employees and Restaurant Employees Union Local 100 of the AFL-CIO*, 6 N.Y.3d 265, 811 N.Y.S.2d 633 (2006). Complainant has failed to meet this burden.

In accordance with the Division's Rules of Practice, a copy of this Order has been filed in the offices maintained by the Division at One Fordham Plaza, 4th Floor, Bronx, New York 10458. The Order may be inspected by any member of the public during the regular office hours of the Division.

**PLEASE TAKE FURTHER NOTICE** that any party to this proceeding may appeal this Order to the Supreme Court in the County wherein the unlawful discriminatory practice that is the subject of the Order occurred, or wherein any person required in the Order to cease and desist from an unlawful discriminatory practice, or to take other affirmative action, resides or transacts business, by filing with such Supreme Court of the State a Petition and Notice of Petition, within sixty (60) days after service of this Order. A copy of the Petition and Notice of Petition must also be served on all parties, including the General Counsel, New York State Division of Human Rights, One Fordham Plaza, 4th Floor, Bronx, New York 10458. Please do not file the original Notice or Petition with the Division.

**ADOPTED, ISSUED, AND ORDERED.**

DATED: FEB 10 2009
Bronx, New York

_____
GALEN D. KIRKLAND
COMMISSIONER

- 2 -

JA0754

**NEW YORK STATE**
**DIVISION OF HUMAN RIGHTS**

---

**NEW YORK STATE DIVISION OF HUMAN RIGHTS**
    on the Complaint of

**MUZETTE EMILY MORGAN,**
                            **Complainant,**

              v.

**ZAHARO CAB CORPORATION, ZAHARO CAB CORP.,**
                          **Respondents.**

---

**RECOMMENDED FINDINGS OF FACT, OPINION AND DECISION, AND ORDER**

Case No. **10117888**

## SUMMARY

Complainant alleged that she was denied transportation in a New York City taxi cab on account of her race and religion. However, Complainant has failed to prove her case and the complaint is dismissed.

## PROCEEDINGS IN THE CASE

On May 17, 2007, Complainant filed a verified complaint with the New York State Division of Human Rights ("Division"), charging Respondents with unlawful discriminatory practices relating to public accommodation in violation of N.Y. Exec. Law, art. 15 ("Human Rights Law").

After investigation, the Division found that it had jurisdiction over the complaint and that probable cause existed to believe that Respondents had engaged in unlawful discriminatory practices. The Division thereupon referred the case to public hearing.

JA0755

After due notice, the case came on for hearing before Robert J. Tuosto, an Administrative Law Judge ("ALJ") of the Division. Public hearing sessions were held on June 17, 2008, August 29, 2008 and September 24, 2008.

Complainant and Respondents appeared at the hearing. The Division was represented by Toni Ann Hollifield, Esq. Respondents were represented by Eugene F. Haber, Esq., of the law firm of Cobert, Haber & Haber, Garden City, N.Y.

Permission to file post-hearing briefs was granted and Respondent's counsel filed Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. Complainant, an African-American, Christian female, alleged that she was denied transportation in a New York City taxi cab on account of her race and religion. (ALJ Exh. 1: Tr. 11, 21)

2. Respondents denied unlawful discrimination in their verified Answer. Respondents lease a medallion cab to an independent driver pursuant to a written agreement. (ALJ Exh. 4; Respondent's Exh. 2)

3. On the evening of April 20, 2007, Complainant and her daughter attempted to enter Respondents' taxi while two passengers were in the process of leaving the same cab. Complainant, unlike her daughter, moved to the rear, driver's side passenger door and placed one leg inside the vehicle. The vehicle started to accelerate with its original passengers after the driver said something to the passenger seated on the rear passenger side; in response, that passenger put her leg back in the cab and closed her door. Complainant was then thrown to the ground and injured after the cab accelerated. (Complainant's Exh. 2; Respondent's Exh. 3; Tr.

- 2 -

JA0756

11-18, 33, 34, 41, 78-79, 81-82, 85, 87, 116, 121-122, 144, 176-83, 186-187, 192, 194, 250-60, 264, 266, 277-279, 281, 284, 289, 291, 294-295)

4. At the time of this incident the cab was stopped in traffic, with a red light at the corner, and was double-parked on 6th Avenue between 44th and 45th Streets. The driver had directed the original passengers, who had not fully exited the cab, to close the doors as it was his intention to drop them off at the curb on the corner of 6th Avenue and 45th Street. (Tr. 74, 77, 85, 127-28, 131, 176-83, 192, 194, 203, 216, 226, 229, 268, 310-311)

5. Complainant's daughter credibly testified that the driver never looked over his left shoulder in the direction of where Complainant was standing. (Tr. 297, 314-15)

6. Complainant conceded that the driver could not have known her religious affiliation. Complainant also conceded that the driver was not able to see her when she moved to the driver's side passenger door, and may not have known that she was attempting to enter the cab. (Tr. 94-95, 123)

## OPINION AND DECISION

The Human Rights Law makes it an unlawful discriminatory practice for "…any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation…because of the race [and ]creed…of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof…or that the patronage or custom thereat of any person of or purporting to be of any particular race [or] creed…is unwelcome, objectionable or not acceptable, desired or solicited." Human Rights Law §296.2.(a).

The term "place of public accommodation" includes, in pertinent part, "all public

JA0757

conveyances operated on land..." Human Rights Law §292.9.

In discrimination cases a complainant has the burden of proof and must initially establish a prima facie case of unlawful discrimination. Once a complainant establishes a prima facie case of unlawful discrimination, a respondent must produce evidence showing that its action was legitimate and nondiscriminatory. Should a respondent articulate a legitimate and nondiscriminatory reason for its action, a complainant must then show that the proffered reason is pretextual. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502 (1993). The burden of proof always remains with a complainant and conclusory allegations of discrimination are insufficient to meet this burden. *Pace v. Ogden Services Corp.,* 257 A.D.2d 101, 692 N.Y.S.2d 220 (3d Dep't., 1999).

In order to establish a prima facie case based upon public accommodation discrimination, a complainant must show: 1) membership in a protected class; 2) that she was qualified to use the public accommodation; and 3) that she was denied the opportunity to use the public accommodation; and 4) that the public accommodation remained available thereafter. *See e.g., Broome v. Biondi,* 17 F. Supp.2d 211 (1997)(similar prima facie case elements used in case alleging violation of Human Rights Law involving a public accommodation).

First, Respondent's taxi cab was a "public accommodation", as that term is used in the Human Rights Law.

Second, the record shows that Complainant made out a prima facie case. Complainant was clearly a member of several protected classes based on her race and religion, was qualified to use Respondent's taxi cab and was denied the opportunity to do so, and the taxi cab subsequently remained available for others to use.

However, Respondent's legitimate, nondiscriminatory reason for the action of its driver,

JA0758

namely, that he pulled away to drop off his original passengers in a more appropriate location, was unrebutted. Further, Respondent's driver was likely unaware of Complainant's presence given that she was attempting to enter the taxi directly behind him rather than on the other side of the vehicle. Likewise as to religious discrimination, Complainant's conceded that Respondent's driver could not have known of her particular religious affiliation. Nothing in the record suggests that, in the few moments Complainant was standing with her daughter, Respondent's driver observed any outward manifestation of Complainant's religion.

Therefore, the complaint must be dismissed.

## ORDER

On the basis of the foregoing Findings of Fact, Opinion and Decision, and pursuant to the provisions of the Human Rights Law and the Division's Rules of Practice, it is hereby

ORDERED, that the complaint be, and the same hereby is, dismissed.

DATED: November 14, 2008
Bronx, New York

Robert J. Tuosto
Administrative Law Judge

- 5 -

# EXHIBIT L



**ANDREW M. CUOMO**
GOVERNOR

**NEW YORK STATE
DIVISION OF HUMAN RIGHTS**

---

**NEW YORK STATE DIVISION
OF HUMAN RIGHTS**
   on the Complaint of

**DAVID BATTAGLIA,**
                                    Complainant,

                    v.

**BUFFALO NIAGARA INTRODUCTIONS, INC.,**
                                    Respondent.

---

**NOTICE AND
FINAL ORDER**

Case No. 10138581

---

      **PLEASE TAKE NOTICE** that the attached is a true copy of the Recommended

Findings of Fact, Opinion and Decision, and Order ("Recommended Order"), issued on January

28, 2012, by Martin Erazo, Jr., an Administrative Law Judge of the New York State Division of

Human Rights ("Division"). An opportunity was given to all parties to object to the

Recommended Order, and all Objections received have been reviewed.

      <u>**PLEASE BE ADVISED THAT, UPON REVIEW, THE RECOMMENDED**</u>

<u>**ORDER IS HEREBY ADOPTED AND ISSUED BY THE HONORABLE GALEN D.**</u>

<u>**KIRKLAND, COMMISSIONER, AS THE FINAL ORDER OF THE NEW YORK STATE**</u>

<u>**DIVISION OF HUMAN RIGHTS ("ORDER")**</u>. In accordance with the Division's Rules of

Practice, a copy of this Order has been filed in the offices maintained by the Division at One

Fordham Plaza, 4th Floor, Bronx, New York 10458. The Order may be inspected by any

member of the public during the regular office hours of the Division.

JA0761

**PLEASE TAKE FURTHER NOTICE** that any party to this proceeding may appeal this Order to the Supreme Court in the County wherein the unlawful discriminatory practice that is the subject of the Order occurred, or wherein any person required in the Order to cease and desist from an unlawful discriminatory practice, or to take other affirmative action, resides or transacts business, by filing with such Supreme Court of the State a Petition and Notice of Petition, <u>within sixty (60) days after service of this Order</u>.  A copy of the Petition and Notice of Petition must also be served on all parties, including the General Counsel, New York State Division of Human Rights, One Fordham Plaza, 4th Floor, Bronx, New York 10458.  <u>Please do not file the original Notice or Petition with the Division</u>.

       **ADOPTED, ISSUED, AND ORDERED**.

DATED:     MAR 0 8 2012

       Bronx, New York

                                 GALEN D. KIRKLAND
                                 COMMISSIONER

JA0762



**ANDREW M. CUOMO**
GOVERNOR

**NEW YORK STATE**
**DIVISION OF HUMAN RIGHTS**

| | |
|---|---|
| **NEW YORK STATE DIVISION OF HUMAN RIGHTS**<br>    on the Complaint of<br><br>**DAVID BATTAGLIA,**<br>                            Complainant,<br>        v.<br><br>**BUFFALO NIAGARA INTRODUCTIONS,**<br>**INC.,**<br>                            Respondent. | **RECOMMENDED FINDINGS OF**<br>**FACT, OPINION AND DECISION,**<br>**AND ORDER**<br><br>Case No. **10138581** |

## SUMMARY

Complainant alleged that Respondent, a dating service, denied his application because of his disabilities. Complainant failed to meet his burden of proof. Accordingly, this matter must be dismissed.

## PROCEEDINGS IN THE CASE

On January 7, 2010, Complainant filed a verified complaint with the New York State Division of Human Rights ("Division"), charging Respondent with unlawful discriminatory practices relating to public accommodation in violation of N.Y. Exec. Law, art. 15 ("Human Rights Law").

After investigation, the Division found that it had jurisdiction over the complaint and that probable cause existed to believe that Respondent had engaged in unlawful discriminatory practices. The Division thereupon referred the case to public hearing.

After due notice, the case came on for hearing before Martin Erazo, Jr., an Administrative Law Judge ("ALJ") of the Division. A public hearing session was held on October 18, 2011.

Complainant and Respondent appeared at the hearing. The Division was represented by Richard J. Van Coevering, Esq., Senior Attorney. Respondent was represented by the law offices of Chiaccia and Fleming, L.L.P., Andrew P. Fleming, Esq., of counsel.

The parties made closing arguments on the record in lieu of post-hearing briefs.


## FINDINGS OF FACT

1. Complainant suffers from anxiety and depression. (Tr. 27, 35)

2. Complainant takes Bupropion, Zoloft, Inderal, Klonopin and Esgic. Complainant has been under the treatment of a psychiatrist since 1999 and has received Social Security Disability since 2000. (Tr. 35-36)

3. Patricia Novak is the owner of Buffalo Niagara Introductions, Inc. (Tr. 10, 23-24, 37)

Respondent's Dating Service

4. Respondent runs a dating service. It is a business that is very personal in nature. The purpose of Respondent's dating service is to match the personal preferences of male and female applicants. (Tr. 58, 60) All applicants are "paying clients looking for love." (Tr. 59)

5. Respondent conducts a personal interview with all applicants and learns of an applicant's personal preferences for a match which may include, among other issues, religion, race, age, income, educational level or other personal considerations. (Tr. 60-63)

JA0764

6.     In addition, Respondent conducts personal interviews of all applicants in order "to understand their background for the safety purposes of bringing somebody on." This includes information about criminal backgrounds, disabilities, or medications. (Tr. 57-58, 77)

7.     Respondent seeks as many persons in its dating service as possible to allow for a larger diverse matching pool. (Tr. 58-64)

8.     In addition, more applicants equal greater income for Respondent's business. Respondent charges $795 for a six month program and $995 for a 12 month program. Respondent may have to refund monies depending on Respondent's success in matching an applicant. Two hundred dollars of the program charge is a non-refundable processing fee. (Tr. 72, 85-89)

9.     Respondent has clients with physical disabilities, mental disabilities, and clients who take medications for their mental health. (Tr. 56-57, 78)

10.   At times, Respondent encounters an applicant with a disability who prefers a match with another individual with a similar disability. (Tr. 63-62)

11.   On the other hand, Respondent denied a particular applicant with uncontrolled bipolar episodes because of the safety concerns to other persons in the dating service. (Tr. 79-80)

12.   Given the intimate nature of the service, Respondent is always concerned about "the safet[y] of the people, both the male and female"   (Tr. 78-79)

<u>Complainant's Application</u>

13.   On June 15, 2009 Complainant filled out an internet application to join Respondent's dating service. (Tr. 9, 21-21)

14.   Respondent's internet application asks if the applicant has a disability. (Tr. 10, 22)

JA0765

15.   Complainant wrote that he was "a working disabled person."  Complainant did not provide any more information about his disability.  (Tr. 22-23)

16.   In June, 2009, in response to Complainant's internet application, Respondent scheduled Complainant for an in-person interview.   (Tr. 22)

17.   Complainant was interviewed by Respondent's employee, Ms. Trimper.  During the interview Ms. Trimper asked Complainant about the nature of his disability.  (Tr. 10)

18.   Complainant was evasive in his answers.  Complainant only responded that he was a person who receives Social Security Disability and that it was not a physical disability.  (Tr. 10, 23-24)

19.   Ms. Trimper proceeded to place Respondent's owner, Ms. Novak, on the telephone. (Tr. 10, 24-25)

20.   Complainant informed Ms. Trimper and Ms. Novak that he would not disclose his disability or medications.  (Tr. 10, 74-75)

21.   Ms. Novak informed Complainant that if he did not disclose the information, Respondent would be unlikely to match Complainant to others.  (Tr. 10-11, 64)

22.   Complainant eventually revealed that he suffers from depression but refused to provide any other information.  (Tr. 28-29,  32, 75-77)

23.   Complainant did not reveal that he suffered from anxiety.  (Tr. 81)

24.   Contrary to Complainant's allegations, Respondent never stated that if it took him on as a client Respondent would have to hide his disability.  (Tr. 72)

25.   Complainant was denied membership into Respondent's dating service because of his unwillingness to be forthright with information surrounding his disability, not because he is disabled.  (Tr. 76-77)

JA0766

26.  Respondent did not accept Complainant's application and did not take any money from him.  (Tr.  85-86)

## OPINION AND DECISION

Human Rights Law § 296.2(a) states that "it shall be an unlawful discriminatory practice for any person, being the owner … of any place of public accommodation … because of the … disability … of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof  …"

Respondent's dating service qualifies as a place of public accommodation under the Human Rights Law § 292.9

Complainant's dating service application was not denied because of his disabilities of anxiety and depression.  Complainant was denied because he refused to be clear about information he placed in the application.  This prevented Respondent from screening for issues of safety.

A respondent's legitimate consideration for safety is well-established law.  *See Munsiff v. Office of Court Administration*, 31 A.D.3d 114, 816 N.Y.S.2d 455 (1st Dept. 2006) (Munsiff, an attorney, was denied a secure pass due to his criminal background and potentially uncontrolled paranoid schizophrenia); *Blum v. New York Stock Exchange*, 298 A.D.2d 343, 751 N.Y.S.2d (2nd Dept. 2002) (Blum was denied the continued use of a free standing stool for his medical condition because it was located on a major evacuation route).

Respondent's business is a dating service.  The service is unique given the highly personalized nature of its function.   Respondent matches individuals placing them in potentially vulnerable situations.  Complainant refused to be forthright.  The proof established that

JA0767

Complainant gave shifting and evasive answers to Respondent. Initially Complainant gave a vague answer that he was a working disabled individual. Subsequently, Complainant explained his initial answer by stating he receives Social Security Disability. After further discussion Complainant revealed to Respondent that he suffered from depression. Complainant never indicated that he suffers from anxiety. Complainant never revealed his medications.

Respondent is not screening for the class of mental health disabilities. The proof established that Respondent has an ongoing history of accepting persons with mental health disabilities. Respondent has applicants who have mental health conditions similar to Complainant. Respondent generates greater profit by having a larger matching pool. Furthermore, the proof established that there are some applicants who have a preference for other individuals who have similar mental health conditions. The proof established that Respondent would have accepted Complainant's application if he had been clear about the condition of his mental health. Given Complainant's lack of candor, Respondent was unable to satisfy its legitimate concern for the safety of any potential match.

## **ORDER**

On the basis of the foregoing Findings of Fact, Opinion and Decision, and pursuant to the provisions of the Human Rights Law and the Division's Rules of Practice, it is hereby dismissed.

DATED:   January 28, 2012
           Buffalo, New York

Martin Erazo, Jr.
Administrative Law Judge

\

JA0768