# 22-75

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

EMILEE CARPENTER, LLC d/b/a/ Emilee Carpenter Photography and
EMILEE CARPENTER,

*Plaintiffs-Appellants*,

v.

LETITIA JAMES, in her official capacity as Attorney General of New
York; MARIA L. IMPERIAL, in her official capacity as Acting
Commissioner of the New York State Division of Human Rights; and
WEEDEN WETMORE, in his official capacity as District Attorney of
Chemung County,

*Defendants-Appellees*.

On Appeal from the United States District Court for the Western
District of New York, Case No. 6:21-cv-06303

## JOINT APPENDIX
## VOLUME 4 (JA769-JA1011)

JONATHAN A. SCRUGGS
BRYAN D. NEIHART
JACOB P. WARNER
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@ADFlegal.org
bneihart@ADFlegal.org

JOHN J. BURSCH
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Ste. 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

jwarner@ADFlegal.org
RAYMOND J. DAGUE
DAGUE & MARTIN, P.C.
4874 Onondaga Road
Syracuse, NY 13215
(315) 422-2052
rjdague@daguelaw.com

*Counsel for Appellants*

MOHAMMAD HYDER HUSSAIN
CHEMUNG COUNTY ATTORNEY'S OFFICE
167 Lake Street
Elmira, NY 14902
(607) 737-2982
hhussain@chemungcountyny.gov

*Counsel for Appellee Weedon Wetmore*

ALEXANDRIA TWINEM
NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
The Capitol
Albany, NY 12224
(518) 776-2015
Alexandria.Twinem@ag.ny.gov

*Counsel for Appellees Letitia James and Maria Imperial*

# TABLE OF CONTENTS

| ECF No. | Document Description | Page |
|---|---|---|
| | **VOLUME 1** | |
| | Docket Report | JA1 |
| 1 | Verified Complaint | JA19 |
| 1-1 | Exhibit 1 to Verified Complaint | JA76 |
| 1-2 | Exhibit 2 to Verified Complaint | JA78 |
| 3 | Plaintiffs' Preliminary Injunction Motion | JA81 |
| 3-4 | Plaintiffs' List of Witnesses and Exhibits to be Presented at Hearing on the Preliminary Injunction Motion | JA86 |
| 3-5 | Declaration of Emilee Carpenter in Support of Plaintiffs' Preliminary Injunction Motion | JA89 |
| 3-6 | Table of Contents: Appendix to Plaintiffs' Brief in Support of Plaintiffs' Preliminary Injunction Motion | JA142 |
| 3-7 | Part 1 of Appendix to Plaintiffs' Brief in Support of Plaintiffs' Preliminary Injunction Motion | JA145 |
| | **VOLUME 2** | |
| 3-7 | Part 2 of Appendix to Plaintiffs' Brief in Support of Plaintiffs' Preliminary Injunction Motion | JA291 |
| 22 | Amici Curiae Brief of States in Support of Plaintiffs' Motion for Preliminary Injunction | JA534 |

| | **VOLUME 3** | |
|---|---|---|
| 24-1 | Affidavit of Jeffrey Walker in Support of a Dismissal, or in the Alternative, Opposing Preliminary Injunction as to Chemung County District Attorney | JA561 |
| 24-2 | Memorandum of Law in Support of a Dismissal, or in the Alternative, Opposing Preliminary Injunction | JA564 |
| 26-1 | Declaration of Johnathan Smith in Support of Defendants' Opposition to Plaintiffs' Preliminary Injunction Motion with Exhibits A-L | JA581 |
| | **VOLUME 4** | |
| 26-2 | Declaration of Heather McKay in Support of Defendants' Opposition to Plaintiffs' Preliminary Injunction Motion with Exhibits M-O | JA769 |
| 26-3 | Declaration of Jessica Clarke in Support of Defendants' Opposition to Plaintiffs' Preliminary Injunction Motion with Exhibits Q-S | JA923 |
| 27-1 | Memorandum of Law in Support of State Defendant's Motion to Dismiss | JA958 |
| 50 | Amicus Curiae Brief of Frederick Douglass Foundation et al. | JA991 |
| | **VOLUME 5** | |
| 51 | Amici Curiae Brief of New York Civil Liberties Union and American Civil Liberties Union in Support of Defendants' Motion to Dismiss | JA1012 |

| 52 | Amici Curiae Brief of Religious and Civil-Rights Organizations in Support of Defendants' Motion to Dismiss | JA1039 |
|----|----|----|
| 55 | Amici Curiae Brief of States in Support of Defendants | JA1067 |
| 59 | County Defendant's Reply Memorandum in Support of a Dismissal, or in the Alternative, Opposing Preliminary Injunction as to Chemung County District Attorney with Affidavit of Weeden A. Wetmore | JA1106 |
| 68 | Decision and Order | JA1115 |
| 69 | Judgment | JA1161 |
| 70 | Notice of Appeal | JA1162 |

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

**Emilee Carpenter, LLC d/b/a**
**Emilee Carpenter Photography** and
**Emilee Carpenter,**

        Plaintiffs,

        v.

**Letitia James**, in her official capacity
as Attorney General of New York;
**Jonathan J. Smith**, in his official
capacity as Interim Commissioner of
the New York State Division of Human
Rights; and **Weeden Wetmore**, in his
official capacity as District Attorney of
Chemung County,

        Defendants.

Case No. 6:21-cv-06303

**Declaration of Heather McKay**
**in Support of Defendants' Opposition to**
**Plaintiffs' Preliminary Injunction Motion**

I, Heather McKay, Assistant Attorney General, Office of the New York State Attorney General, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1. I am an Assistant Attorney General, of counsel to Letitia James, Attorney General of the State of New York and, in that capacity, I represent the State Defendants in the above-captioned proceeding.

2. I make this declaration in support of State Defendants' Opposition to Plaintiffs' Preliminary Injunction Motion. I am familiar with the matters set forth herein, either from personal knowledge or on the basis of documents that have been created by, provided to and/or reviewed by me.

3. Attached hereto and made a part hereof as **Exhibit M** is a true and accurate copy of the Bill Jacket for S2228-A (Laws of 1981, Chapter 870).

4. Attached hereto and made a part hereof as **Exhibit N** is a true and accurate copy of the Bill Jacket for S720/A1971 (Laws of 2002, Chapter 2).

5. Attached hereto and made a part hereof as **Exhibit O** is a true and accurate copy of the Senate Floor Debate for S720/A1971 (dated December 17, 2002).

6. Attached hereto and made a part hereof as **Exhibit P** is a true and accurate copy of the Bill Jacket for the Laws of 1952, Chapter 285.

7. For the reasons detailed in the accompanying Memorandum of Law, State Defendants respectfully request that Plaintiffs' Preliminary Injunction Motion be denied.

Dated: June 16, 2021

LETITIA JAMES
Attorney General for the State of New York

*Attorney for Defendants*
/s/ Heather L. McKay
HEATHER L. MCKAY
Assistant Attorney General of Counsel
NYS Office of the Attorney General
144 Exchange Boulevard, Suite 200
Rochester, New York 14614
Telephone: (585) 546 7430
heather.mckay@ag.ny.gov

JA0770

# EXHIBIT M

CHAPTER *870*

LAWS OF 19 *81*

SENATE BILL *2228-A*          ASSEMBLY BILL _____

2228--A

1981-1982 Regular Sessions

# IN SENATE

February 2, 1981

Introduced by Sens. MARINO, BERMAN--read twice and ordered printed, and
when printed to be committed to the Committee on Government
Operations--committee discharged, bill amended, ordered reprinted as
amended and recommitted to said committee

AN ACT to amend the civil rights law, in relation to discrimination and
the penalties therefor

IN THE ASSEMBLY BY: *A-652-A*
            *ORAZIO*

Bill compared by _____

DATE RECEIVED BY GOVERNOR:
                    *7/22/81*

ACTION MUST BE TAKEN BY:
                    *8/3/81*

GOVERNOR'S ACTION:

DATE        *JUL 3 1 1981*

Memorandum No. _____

**JA0772**

Digitized by the New York State Library from the Library's collections.

Case 6:21-cv-06303-FPG   Document 26-2   Filed 06/16/21   Page 5 of 154
Case 22-75, Document 41, 05/05/2022, 3274176, Page 250 of 280

# SENATE

PAGE 200

The Senate Bill
by Mr. **MARINO** _____   Calendar No. _**1479**_

Senate No. **2228-A**
Assem. Rept. No. _____

Entitled: "

2228 — A        MARINO

An act to amend the civil rights law, in
relation to discrimination and the
penalties therefor

" was read the third time

The President put the question whether the Senate would agree to the final passage of said bill, the same having been printed and upon the desks of the members in its final form at least three calendar legislative days, and it was decided in the affirmative, a majority of all the Senators elected voting in favor thereof and three-fifths being present, as follows:

| AYE | Dist. | | NAY | AYE | Dist. | | NAY |
|-----|-------|--|-----|-----|-------|--|-----|
| | 12 | Mr. Ackerman | | | 52 | Mr. Kehoe | |
| | 47 | Mr. Anderson | | | 15 | Mr. Knorr | |
| | 49 | Mr. Auer | | | 2 | Mr. Lack | |
| | 16 | Mr. Babbush | | | 1 | Mr. LaValle | |
| | 45 | Mr. Barclay | | | 29 | Mr. Leichter | |
| | 18 | Mr. Bartosiewicz | | | 8 | Mr. Levy | |
| | 23 | Mr. Beatty | EXCUSED | | 50 | Mr. Lombardi | |
| | 9 | Mrs. Berman | | | 24 | Mr. Marchi | |
| | 33 | Mr. Bernstein | | | 5 | Mr. Marino | |
| | 28 | Mr. Bogues | | | 19 | Mr. Markowitz | |
| | 41 | Mr. Bruno | | | 55 | Mr. Masiello | |
| | 7 | Mr. Caemmerer | EXCUSED | | 21 | Mr. Mega | |
| | 34 | Mr. Calandra | | | 30 | Mrs. Mendez | |
| | 25 | Mr. Connor | | | 42 | Mr. Nolan | |
| | 48 | Mr. Cook | | | 27 | Mr. Ohrenstein | |
| | 60 | Mr. Daly | | | 17 | Mr. Owens | |
| | 46 | Mr. Donovan | | | 11 | Mr. Padavan | EXCUSED |
| | 6 | Mr. Dunne | | | 53 | Mr. Perry | |
| | 54 | Mr. Eckert | | | 36 | Mr. Pisani | EXCUSED |
| | 44 | Mr. Farley | | | 57 | Mr. Present | |
| | 59 | Mr. Floss | | | 39 | Mr. Rolison | |
| | 35 | Mr. Flynn | | | 31 | Mr. Ruiz | EXCUSED |
| | 32 | Mr. Galiber | | | 40 | Mr. Schermerhorn | |
| | 56 | Mr. Gallagher | | | 51 | Mr. Smith | |
| | 14 | Mr. Gazzara | | | 22 | Mr. Solomon | |
| | 13 | Mr. Gold | | | 43 | Mr. Stafford | |
| | 37 | Mrs. Goodhue | | | 3 | Mr. Trunzo | |
| | 26 | Mr. Goodman | | | 58 | Mr. Volker | |
| | 20 | Mr Halperin | | | 10 | Mr. Weinstein | |
| | 4 | Mr. Johnson | | | 38 | Mrs. Winikow | |

AYES _**55**_

NAYS _**0**_

◄ Ordered, that the Secretary deliver said bill to the Assembly and request its concurrence therein.

JA0773

Digitized by the New York State Library from the Library's collections.

REPRINT NO: 001
DATE: 06/22/81

NEW YORK STATE ASSEMBLY

DATE: 06/22/1981
TIME: 12:24:48 PM

BILL: S2228-A(A652-A)          R.R. NO: 499   SPONSOR: MARINO

AN ACT TO AMEND THE CIVIL RIGHTS LAW, IN RELATION TO DISCRIMINATION AND THE PENALTIES THEREFOR

| | | | | | |
|---|---|---|---|---|---|
| ABS | ABRAMSON,E* | YEA | HAWLEY,RS | ABS | PILLITTERE,JT* |
| EOR | BARBARO,FJ* | YEA | HEALEY,PB | YEA | PRESCOTT,DW |
| ABS | BEHAN,JL | ABS | HEVESI,AG* | YEA | PROUD,G* |
| ABS | BIANCHI,IW* | ABS | HINCHEY,MD* | YEA | RAPPLEYEA,CD |
| ABS | BOYLAND,TS* | ABS | HIRSCH,S* | ABS | RATH,DE |
| YEA | BRAGMAN,MJ* | ABS | HOBLOCK,MJ | YEA | REILLY,JM |
| YEA | BRANCA,JR* | ABS | HOCHBRUECKNER,GJ* | YEA | RETTALIATA,AP |
| YEA | BURROWS,GW | EOR | HOYT,WB* | ABS | RIFORD,LS |
| YEA | BUSH,WE | ABS | JACOBS,RS* | YEA | ROBACH,RJ* |
| ABS | BUTLER,DJ* | ABS | JENKINS,A* | YEA | ROBLES,VL* |
| YEA | CASALE,AJ | ABS | JOHNSON,CR* | ABS | RUGGIERO,RS* |
| YEA | CHESBRO,RT | YEA | KEANE,RJ* | YEA | RYAN,AW |
| YEA | COCHRANE,JC | ABS | KELLEHER,NW | YEA | SALAND,SM |
| ABS | COHEN,DL* | YEA | KENNEDY,RL | ABS | SANDERS,S* |
| ABS | CONNELLY,EA* | ABS | KIDDER,RE* | YEA | SCHIMMINGER,RL* |
| YEA | CONNERS,RJ* | ABS | KISOR,RM | ABS | SCHMIDT,FD* |
| YEA | COOKE,AT | YEA | KOPPELL,GO* | YEA | SEARS,WR |
| YEA | DAMATO,AP | YEA | KREMER,AJ* | ABS | SEMINERIO,AS* |
| YEA | DANDREA,RA | YEA | KUHL,JR | ABS | SERRANO,JE* |
| ABS | DANIELS,GL* | YEA | LAFAYETTE,IC* | YEA | SHAFFER,GS* |
| YEA | DAVIS,G* | YEA | LANE,CD | YEA | SHEFFER,JB |
| ABS | DEARIE,JC* | YEA | LARKIN,WJ | YEA | SIEGEL,MA* |
| ABS | DEL TORO,A* | YEA | LASHER,HL* | ABS | SILVER,S* |
| ELB | DICARLO,DL | ABS | LENTOL,JR* | YEA | SIMEK,CA |
| YEA | DUGAN,EC* | YEA | LEVY,E | YEA | SKELOS,DG |
| YEA | EMERY,JL | YEA | LEWIS,W* | ABS | SMOLER,H* |
| ABS | ENGEL,EL* | YEA | LIPSCHUTZ,GE* | ABS | SPANO,NA |
| YEA | ESPOSITO,JA | YEA | LOPRESTO,JG | YEA | STAVISKY,LP* |
| YEA | EVE,AO* | ABS | MACNEIL,HS | ABS | STEPHENS,WH |
| ABS | FARRELL,HD* | YEA | MADISON,RS | ABS | STRANIERE,RA |
| ABS | FELDMAN,D* | ABS | MARCHISELLI,VA* | ABS | SULLIVAN,EC* |
| ABS | FERRIS,J* | YEA | MAZZA,GR | YEA | SULLIVAN,FM |
| YEA | FINNERAN,WB* | YEA | MCCABE,JW* | YEA | SULLIVAN,PM |
| YEA | FLACK,JT | ABS | MILLER,HM | YEA | TALLON,JR* |
| ABS | FLANAGAN,JJ | ABS | MILLER,MH* | YEA | TALOMIE,FG |
| ABS | FORTUNE,TR* | YEA | MONTANO,A* | ABS | VANN,A* |
| YEA | FOSSEL,JS | YEA | MORAHAN,TP | YEA | VELELLA,GJ |
| ABS | FRIEDMAN,G* | ABS | MURPHY,MJ* | ABS | VIGGIANO,PM* |
| ABS | GOLDSTEIN,R* | YEA | MURTAUGH,JB* | YEA | WALSH,DB* |
| ABS | GORSKI,DT* | ABS | NADLER,J* | ABS | WALSH,SP* |
| ABS | GOTTFRIED,RN* | YEA | NAGLE,JF | YEA | WARREN,GE |
| YEA | GRABER,VJ* | YEA | NEWBURGER,MW* | YEA | WEINSTEIN,HE* |
| YEA | GRANNIS,A* | YEA | NINE,L* | YEA | WEMPLE,CC |
| ABS | GREEN,RL* | YEA | NORTZ,HR | YEA | WEPRIN,S* |
| YEA | GRIFFITH,E* | ABS | ONEIL,JG | YEA | WERTZ,RC |
| ABS | HAGUE,JB | ABS | ORAZIO,AF* | EOR | WILSON,CE* |
| YEA | HANNA,TA | YEA | PAROLA,FE | ABS | WINNER,GH |
| YEA | HANNON,K | ABS | PASSANNANTE,WF* | YEA | YEVOLI,LJ* |
| YEA | HARENBERG,PE* | YEA | PERONE,JM | YEA | ZIMMER,MN* |
| YEA | HARRIS,GH | | | | MR. SPEAKER* |

YEAS:    82               NAYS:    0

CONTROL: 50611012

CERTIFICATION:_____

LEGEND: YEA=YES,NAY=NO,NV=ABSTAIN,ABS=ABSENT,
ELB=EXCUSED FOR LEGISLATIVE BUSINESS,EOR=EXCUSED FOR OTHER REASONS

JA0774

Digitized by the New York State Library from the Library's collections.



A-652
S-2228
JUL 01 198

THE ASSEMBLY
STATE OF NEW YORK
ALBANY

ANGELO F. ORAZIO
ASSEMBLYMAN 16TH DISTRICT
DISTRICT OFFICE
111 HILLSIDE AVENUE
WILLISTON PARK, NEW YORK 11596
(516) 747-0003

CHAIRMAN,
ENERGY COMMITTEE

COMMITTEES
EDUCATION
ENVIRONMENTAL CONSERVATION
LABOR
REAL PROPERTY TAXATION

ASSISTANT MAJORITY WHIP

June 29, 1981

Mr. John G. McGoldrick
Counsel to the Governor
Executive Chamber
Albany, NY    12224

Dear Mr. McGoldrick:

In regard to A.652-A/S.2228-A, which amends the civil
rights law with respect to civil discrimination, I urge
the Governor to sign the bill.

The above bill includes as part of the definition
of discrimination the subjection of a person to harassment
in violation of his civil rights, and increases the penalt-
ies for such discrimination.

This legislation greatly enhances the deterrent
provisions of the civil rights law by clearly including
acts of harassment within the definition of discrimination,
and by making available a range of penalties appropriately
equivalent to the harm inflicted upon the victim. Certainly,
if there is to be a sufficient scope of punishment available
against those who commit acts of racial and religious
harrassment or discrimination, the available penalties must
be properly equated with the severity of the act committed.

I urge you to join us in support of the bill.

Sincerely,

ANGELO F. ORAZIO
Member of Assembly

AFO:lmc

JA0775

Digitized by the New York State Library from the Library's collections.

S.    By Senator Marino  S —2228

LEGISLATIVE MEMORANDUM

TITLE:          AN ACT to amend the civil rights law, in
                relation to discrimination and the penalties
                therefor.

PROVISIONS:     Includes as part of the definition of discrim-
                ination, the subjection of a person to
                intimidation and harassment in his civil
                rights.  Increases the basic penalty for such
                discrimination to the equivalent of a class A
                misdemeanor.  Provides that if in the course
                of such discriminatory acts, the participants
                knowingly or recklessly damage the victim's
                property, the offense is a class E felony.  If
                the participants knowingly or recklessly cause
                physical injury to the victim, the offense is
                a class D felony.

STATEMENT
IN SUPPORT:     Under present law, the seriousness of the
                penalty for discriminatory acts such as racial
                vandalism (e.g., cross-burning) is all too
                often measured chiefly by the monetary damage
                done to the victim's property.  Frequently, the
                available criminal charge for such acts is no
                more than the class A misdemeanor of criminal
                mischief.

                This bill greatly enhances the deterrent pro-
                visions of the civil rights law by clearly
                including acts of intimidation and
                harassment within the definition of dis-
                crimination, and by making available a range
                of penalties appropriately equivalent to the
                harm inflicted upon the victim.  Certainly,
                if there is to be a sufficient scope of
                punishment available against those who
                commit acts of racial and religious harass-
                ment or discrimination, the available
                penalties must be properly equated with the
                severity of the act committed.

FISCAL
IMPLICATIONS:   None.

JA0776

Digitized by the New York State Library from the Library's collections.

B-203 (12/75)     BUDGET REPORT ON BILLS     Session Year 1981

S- 2228-A

SENATE     NO RECOMMENDATION     ASSEMBLY

No. S. 2228-A     JUN 25 1981     No.

Law: civil rights law

Title: AN ACT to amend the civil rights law, in relation to discrimination and
the penalties therefore

The above bill has been referred to the Division of the Budget for
comment. After careful review, we find that the bill has no appreciable
effect on State finances or programs, and this office does not have the
technical responsibility to make a recommendation on the bill.

We therefore make no recommendation.

JA0777

Digitized by the New York State Library from the Library's collections.

*S-2228*



STATE OF NEW YORK
DEPARTMENT OF LAW
TWO WORLD TRADE CENTER
NEW YORK, N.Y. 10047

ROBERT ABRAMS
Attorney General

*JUN 3 0 Recd*

MEMORANDUM FOR THE GOVERNOR

     Re:  Sen. 2228
     ----------------

        This bill amends Civil Rights Law § 40-c by adding a
provision which makes it unlawful to harass any person in the
exercise of civil rights on account of race, creed, color, or
national origin.  Harassment is defined by reference to Penal
Law § 240.25.  Currently, the Civil Rights Law prohibits dis-
crimination on the basis of race, creed, color, or national
origin, but does not specifically include intimidation or harass-
ment within its prohibition.  This bill makes such discrimina-
tion, including harassment, a Class A misdemeanor, and, under
Civil Rights Law § 40-d, individuals injured thereby may bring
actions to recover penalties up to $500.  The Attorney General
must be given notice of all actions brought to redress vio-
lations of Civil Rights Law § 40-c.

        This amendment adds one important protection for indi-
viduals against actions that interfere with the exercise of their
civil rights because of race, creed, color, or national origin.
The notification provision assures that the Attorney General will
be kept apprised of all allegations of such unlawful conduct, and
may take appropriate action.

        For the reasons stated, I urge approval of this bill.

Dated:  June 30, 1981

                Respectfully submitted,

                ROBERT ABRAMS
                Attorney General

JA0778

Digitized by the New York State Library from the Library's collections.



3- 2228-A

STATE OF NEW YORK
EXECUTIVE DEPARTMENT
DIVISION OF HUMAN RIGHTS

WERNER H. KRAMARSKY
Commissioner

TWO WORLD TRADE CENTER
NEW YORK, NEW YORK 10047

JUN 3 0 Rec'd

June 25, 1981

Hon. John G. McGoldrick
Counsel to the Governor
Executive Chamber
State Capitol
Albany, New York 12224

JUN 3 0 Rec'd

Re: S. 2228-A

Dear Mr. McGoldrick:

Thank you for your memorandum requesting comment
on the above-numbered bill to amend the Civil Rights Law
to prohibit harassment because of race, creed, color or
national origin in the exercise of one's civil rights and
to make a violation a Class A misdemeanor.

The bill is endorsed as its aim of strengthening
the Civil Rights Law provision against discrimination is
in accord with the provisions of the Human Rights Law
prohibiting discrimination.

Please communicate with us again if we can be of
further assistance.

Sincerely,

WERNER H. KRAMARSKY
Commissioner

JA0779

Digitized by the New York State Library from the Library's collections.

S-2228-A

WILLIAM D. HASSETT, JR.
COMMISSIONER

**STATE OF NEW YORK**
**DEPARTMENT OF COMMERCE**
99 WASHINGTON AVENUE
ALBANY, NEW YORK 12245

John J. Kelliher
Deputy Commissioner & Counsel
(518) 474-4102

TEN-DAY BILL MEMO

June 30, 1981        JUN 3 0 1981

TO:             JOHN G. McGOLDRICK
                COUNSEL TO THE GOVERNOR

FROM:           John J. Kelliher, Counsel
                Department of Commerce

SUBJECT:        Senate 2228-A (Marino, et al)

RECOMMENDATION: No Position


    The Department of Commerce takes no position on this bill which would
amend the Civil Rights Law in relation to discrimination and the penalties
therefor.

    We note, however, that the bill does not accomplish what the Sponsor's
Memorandum indicates it was intended to accomplish.  The Memorandum
indicates that the proposal was intended originally to make the conduct
which is the subject of this bill a class D or class E felony.  The rationale
for such a proposal, according to the Sponsor, was that "the available
criminal charge for such acts is no more than a class A misdemeanor of
criminal mischief."

    This bill, which has been amended since its introduction, would not
increase the seriousness of the crime.  The conduct would still constitute a
class A misdemeanor.  In addition, to bring a charge of a violation of the
Civil Rights Law may weaken the possibility for successful prosecution by
reason of the vagueness of the term "harassment" and the requirement that
the harassment would have to be found to have been motivated by
discriminatory intent.



J. J. K.

JA0780

Digitized by the New York State Library from the Library's collections.

S-2228A



**DENIS DILLON**
DISTRICT ATTORNEY

JUL 01 1981

THE OFFICE OF THE DISTRICT ATTORNEY
OF
NASSAU COUNTY
262 OLD COUNTRY ROAD
MINEOLA, NEW YORK 11501
TELEPHONE (516) 535-4800

June 26, 1981

Re: S-2228-A  Recommendation:  Approval

    Recently, incidents of racial harassment, such as
swastika paintings and cross burnings, have become all too
common.  Under present law, the seriousness of the penalty
for such discriminatory acts must frequently be measured
chiefly by the monetary damage done to the victim's property.
There have been cases in which such property damage was
minimal or non-existent.  In those instances, existing law
has made prosecution extremely difficult if not impossible.

    This bill will correctly shift the focus of prosecution
in such cases from the amount of property damage to the harm
caused to the victims of such devisive and traumatic acts.
This legislation will greatly enhance the deterrent provisions
of the civil rights law by making available an increased
range of penalties appropriately equivalent to the harm
inflicted upon the victim.  The range of penalties will
be the same as those provided for a class A misdemeanor under
the penal law.  Certainly, if there is to be a sufficient
scope of punishment provided for those who commit acts of
racial and religious harassment, the available penalties must
be properly equated with the severity of the act committed.

    This office has strongly supported this legislation and
therefore strongly urges its approval.

JA0781

Digitized by the New York State Library from the Library's collections.

# Rocklanders outraged by Jewish Center bombing

**By LEN MANIACE**
Staff Writer

Sunday's shock over a pipe bomb explosion at the New City Jewish Center gave way to outrage Monday.

As Clarkstown police continued their search for clues to the early Sunday morning explosion, some Jewish and other civic groups saw the blast as another in a rising number of anti-Semitic acts in Rockland.

The explosion of the crudely-made bomb at the New City Jewish Center on Old Schoolhouse Road shortly after 1:30 a.m. caused structural damage to walls and shattered 11 plate glass windows, but caused no injuries.

"It was a vicious act, committed not only upon the synagogue but upon the whole congregation," said Eugene Zinbarg, president of the center.

It also brought a call by the state B'nai B'rith Anti-Defamation League for the signing into law by Gov. Hugh Carey of a bill that would stiffen the penalty for crimes of harassment against racial, religious or ethnic groups.

"This is a tragic act of vandalism that must not be ignored," said Anne Friedman Glauber, director of the state office of the organization.

The bombing was one of an increasing number of attacks — ranging from graffiti to arson — on houses of worship in Rockland, according to the Rev. Robert Morisseau of St. John's Episcopal Church in New City.

He is a member of a committee set up by the Clarkstown School District to study anti-Semitism and intolerance as it relates to the curriculum.

In the fall, changes in the district's tenth grade studies will focus greater attention on the Holocaust and its implications in the 1980s.

The pipe bomb was originally reported to have

(Please turn to back page)

## New City bomb outrages Rockland,

(Continued from A1)

caused $10,000 in damage, but Zinbarg said Monday the actual damage was much greater, although he could not give an accurate estimate.

The pipe bomb, which was placed outside, along the north wall of the synagogue, pulled down part of the building's ceiling and damaged ceiling beams and masonry.

"The bomb is not only an act against the Jewish community but against the religious community as a whole," said Israel Stern, general chairman of the Rockland County United Jewish Appeal.

The bombing also brought outrage from the Rockland County Human Rights Commission.

"Once again we see that it can happen" in Rockland County," said Shewline Taylor, commission chairman, in a press release.

On March 12, another Clarkstown synagogue, Temple Beth Sholom in New City, was burglarized and a religious scroll stolen. It was never recovered, police said.

And last month, a fire, believed to be arson, destroyed an Orthodox Hebrew School in Monsey.

While not discounting anti-Semitism as a motive for the bombing, Clarkstown police would not attribute the blast to such a motive until additional evidence is gathered, said Det. Gary McDonald.

Monday was spent making neighborhood checks and following leads, he said.

Despite statements by the police and Zinbarg that they saw no evidence the Jewish Defense League was carrying out a pledge to send armed members into the area, a spokesman for the JDL said such patrols had begun.

"If we catch those responsible we will take the matter into our own hands," said JDL member Jerry Schwartz.

Zinbarg said the congregation planned to hold its regular Friday night services at the meeting room at the youth lounge located near the temple.

Digitized by the New York State Library from the Library's collections.

JA0782

A-652
3-2228

**Anti-Defamation League** 🅰DL of B'nai B'rith

MELVIN L. COOPERMAN
*Regional Director*

June 22, 1981

Hon. Hugh Carey
Executive Chambers
State Capital
Albany, New York 11224

JUN 25 1981

Dear Governor Carey:

We are most pleased to learn that Assembly Bill 652 introduced by Assemblyman
Orazio of Nassau County has been acted upon favorably by both the Senate and
Assembly and will shortly be awaiting enactment into law by virtue of your
signature. The Anti-Defamation League was extremely supportive of this
legislation which amends the State's Civil Rights Law to include acts of rel-
igious and racial harassment and which increased penalties upon conviction.
You are, I am sure, will aware of the increasing number of cross burnings and
swastika desecration which have been afflicted upon citizens of this State.
This act of the Legislature serves notice by the State of New York that such
acts are regarded as serious breeches of fundamental Civil Rights.

On March 16 the Anti-Defamation League was joined by the New York Urban League &
New York State Conference of NAACP Branches in urging speedy enactment of
this bill. We are in full accord with its intent and are indebted to the
Legislature and to Nassau County District Attorney Denis Dillon for his im-
portant role in stimulating its introduction. It is now up to you to forge the
final link by signing A652 into law.

Sincerely yours,

Ellen E. Conovitz

Ellen E. Conovitz, Co-Chair
New York State Committee on Public Policy
of the Anti-Defamation League

EEC:cf

cc:  District Attorney Denis Dillon
     Assemblyman Angelo F. Orazio

*Long Island Regional Office
230 Hempstead Turnpike, East Meadow, New York 11554 (516) 741-4400*

JA0783

Digitized by the New York State Library from the Library's collections.



Anti-Defamation League of B'nai Brith

H-652
S-2228

MELVIN I. COOPERMAN
Regional Director

June 25, 1981

Mr. John McGoldrick
Counsel to the Governor
Executive Chamber
State Capitol
Albany, New York 12224

JUN 2 9 1981

Dear Mr. McGoldrick:

Attached is a copy of a letter which was sent to
the Governor in support of Assembly Bill 652 which
was recently passed by both the Senate and the Assembly.

On behalf of the Public Policy Committee of the
Anti-Defamation League of New York State we urge that
the Governor sign this Bill.

Sincerely,

Ellen E. Conovitz, Co-Chair
New York State Committee
on Public Policy
of the Anti-Defamation League

EEC:br

Attachment

Long Island Regional Office
2415 Hempstead Turnpike, East Meadow, New York 11554 (516) 741-4400

Digitized by the New York State Library from the Library's collections.

Howard Weinstein, Director
New York Regional Office
ANTI-DEFAMATION LEAGUE OF B'NAI B'RITH
823 United Nations Plaza
New York, NY 10017
(212) 490-2525

Horace Morris, Executive Director
NEW YORK URBAN LEAGUE
500 East 62nd Street
New York, NY 10020
(212) 730-5200

Hazel Dukes, President
NEW YORK STATE CONFERENCE OF NAACP BRANCHES
1790 Broadway
New York, NY 10019
(212) 221-5283

FOR IMMEDIATE RELEASE

New York, NY, March 16....The Anti-Defamation League of B'nai B'rith, the National Association for the Advancement of Colored People and the New York State Council of Urban Leagues today urged New York State to ban racial and religious terrorism.

The organizations called for "speedy enactment" of a bill amending New York's Civil Rights Law to include acts of racially and religiously motivated intimidation and harassment -- and carrying penalties up to five years imprisonment and a $5,000 fine.  The bill was introduced in the New York State Legislature in January.

The proposed law (Assembly Bill 652), spearheaded by Nassau County District Attorney Denis Dillon and sponsored by the Nassau County legislative delegation, is in response to a two-year wave of cross burnings, swastika daubings, arson cases, synagogue vandalism and threats and harassment directed at blacks and Jews.

In a joint statement, signed by Ellen E. Conovitz and Erwin Corwin, cochairpersons of ADL's Committee on Public Policy in New York State; Hazel Dukes, president of the New York State Conference of NAACP Branches, and Horace Morris, executive director of the New York State Council of Urban Leagues, the groups called the activities "a form of terrorism."

ADL, last December, published an annual audit of anti-Semitic incidents throughout the nation which reported that 120 of the 377 total occurred in New York State.  Police authorities in New York City, Nassau and Suffolk Counties reported that racial and religious assaults on persons and property equalled or exceeded the cases cited in the ADL survey.

(more)

JA0785

Digitized by the New York State Library from the Library's collections.

-2-

The new law would classify such racially and religiously motivated
acts as Class A misdemeanors carrying penalties of a year in prison and a
$1,000 fine. Actions resulting in injury or serious property damage could
bring five-year prison sentences and $5,000 fines.

The full text of the joint statement follows:

"For a two-year period, the black and Jewish communities in this state
have been the victims of attacks on persons and property in the form of
arsons, swastika defacements, cross burnings and mail and telephone threats.

"While the police departments have been responsive, and their efforts
have been rewarded with a higher number of arrests for such offenses than in
the past, offenders frequently escape with little more than a homework assign-
ment. The Anti-Defamation League of B'nai B'rith, the National Association
for the Advancement of Colored People and the New York State Council of Urban
Leagues, recognizing that we are facing a common enemy, urge the New York
State Legislature to act speedily to enact legislation which can deter activ-
ity which can only be described as a form of terrorism designed to evoke fear
and anger in their targets. These targets are the two communities -- black
and Jewish -- and not simply the affected individuals and institutions.

"We commend the Nassau County delegation to the Assembly for its biparti-
san sponsorship of Assembly Bill 652 and Nassau County District Attorney Denis
Dillon for his initiative in proposing the legislation. These public servants
have correctly perceived that burning crosses and destruction of houses of
worship are assaults on the civil rights of the victims."

#

AO.MP,BP,BRTV,BHM-81

JA0786

Digitized by the New York State Library from the Library's collections.

New York State Regional Office

Director, New York State
Regional Office
ANNE FRIEDMAN GLAUBER

NATIONAL COMMISSION
OFFICERS
National Chairman
MAXWELL E. GREENBERG
Chairman, National
Executive Committee
KENNETH J. BIALKIN
Treasurer
CHARLES GOLDRING
Assistant Treasurer
NORMAN J. GRAY
Secretary
MARTIN C. FELDMAN
Assistant Secretary
ALVIN J. SHEINBERG

National Director
NATHAN PERLMUTTER
Associate National Director
ABRAHAM H. FOXMAN

DIVISION DIRECTORS
Assistant National Director
Director of Development
ROBERT C. KOHLER
Administration
HAROLD L. ADLER
Campaign
SHELDON FLIEGELMAN
Civil Rights
JUSTIN J. FINGER
Communications
LYNNE IANNIELLO
Community Service
SHELDON STEINHAUSER
Assistant to the National Director
Leadership
DANIEL S. MARIASCHIN
Program
THEODORE FREEDMAN
General Counsel
ARNOLD FORSTER

ADL FOUNDATION
Executive Vice-President
BENJAMIN R. EPSTEIN

3-2 2282
A-652
2223
A-2223

July 20, 1981

Mr. John McGoldrick
Counsel to the Governor
State Capitol
Albany, N.Y. 12224

JUL 22 Rec'd

Dear Mr. McGoldrick:

I thought you would be interested in seeing the enclosed front-page Journal News article from Rockland County, in which I call for Governor Carey's signing Assembly Bill 652, which would stiffen the penalty for crimes of harassment against racial, religious or ethnic groups.

I made the statement following the disastrous bombing of the New City Jewish Center. The bomb shattered windows and caused extensive damage to the sanctuary. The estimated cost of the destruction is running well over $10,000.

This most recent act of violence, which caused so much fear and pain to a Jewish community in New York State, should alone compel the Governor to sign Assembly Bill 652 into law. I urge that you counsel the Governor to do so.

Sincerely,

Anne Friedman Glauber
Director
New York State Office

AFG/djb

Enc. (1)

cc: Ellen E. Conovitz, Chair
    N.Y.S. ADL Public Policy Committee

823 United Nations Plaza, New York, NY 10017/(212) 490-2525/Cable: ANTIDEFAME/Telex: 649218

JA0787

Digitized by the New York State Library from the Library's collections.

S-2228A

COMMITTEE ON CIVIL RIGHTS

DAVID J. MAHONEY, JR.
CHAIRMAN
1115 STATLER HILTON
BUFFALO, N.Y. 14202

# New York State Bar Association

JUL 02 1981

June 30, 1981

Hon. John G. McGoldrick
Counsel to the Governor
Executive Chambers
State Capitol
Albany, New York 12224

RE:  Senate Bill 2228-A

Dear Mr. McGoldrick:

As you know, I am Chairman of the New York State Bar
Association's Committee on Civil Rights.  Our legislative
subcommittee has considered the above bill, now under consideration
by your office.

Under new subsection 3, a person believing himself aggrieved
could commence a civil action based upon the elements contained in
the harrassment section of the Penal Law.  Establishing a case would
be difficult despite the fact that the burden of proof required would
be eased.

Nevertheless, our legislative subcommittee believes that such
provisions would be useful by providing an additional avenue of
relief.

Yours very truly,

OFFERMANN, FALLON, MAHONEY & CASSANO

David J. Mahoney, Jr.

DJM:vor
cc Kent H. Brown


NYSBA

JA0788

Digitized by the New York State Library from the Library's collections.

# EXHIBIT N

JA0789

**JK**

CHAPTER____**2**____

LAWS OF 20 **02**

SENATE BILL _____          ASSEMBLY BILL **1971**

1971

2001-2002 Regular Sessions

# IN ASSEMBLY

January 17, 2001

Introduced by M. of A. SANDERS, GLICK, GOTTFRIED, DiNAPOLI, GRANNIS, BRENNAN, CLARK, ARROYO, BRAGMAN -- Multi-Sponsored by -- M. of A. ALFANO, AUBRY, BOYLAND, CANESTRARI, CHRISTENSEN, A. COHEN, M. COHEN, COOK, DAVIS, DIAZ, DINOWITZ, ENGLEBRIGHT, ERRIGO, ESPAILLAT, EVE, FARRELL, GALEF, GIANARIS, GREEN, GREENE, HOYT, JACOBS, JOHN, LAFAYETTE, LAVELLE, LOPEZ, LUSTER, MATUSOW, McENENY, McLAUGHLIN, MILLMAN, MORELLE, NORMAN, ORTIZ, PERRY, PHEFFER, PRETLOW, RAVITZ RHODD-CUMMINGS. P. RIVERA, SCARBOROUGH, SIDIKMAN, SPANO, STRINGER, P. C. SULLIVAN, SWEENEY, TOWNS, VANN, WEINSTEIN, WEISENBERG, WEPRIN, WRIGHT -- read once and referred to the Committee on Governmental Operations

AN ACT to amend the executive law, the civil rights law and the education law, in relation to prohibiting discrimination based on sexual orientation

S. 720     GOODMAN

DATE RECEIVED BY GOVERNOR:

12 7

ACTION MUST BE TAKEN BY:

12 28

DATE GOVERNOR'S ACTION TAKEN:

12 17

000001

SENATE VOTE ___ Y ___ N          HOME RULE MESSAGE ___ Y ___ N

DATE_____ _____

ASSEMBLY VOTE ___ Y ___ N

DATE _____ _____                    000002

**NEW YORK STATE ASSEMBLY**
**MEMORANDUM IN SUPPORT OF LEGISLATION**
submitted in accordance with Assembly Rule III, Sec 1(e)

**BILL NUMBER:** A1971

**SPONSOR:** Sanders (MS)

**TITLE OF BILL:** An act to amend the executive law, the civil rights law and the education law, in relation to prohibiting discrimination based on sexual orientation

**PURPOSE OR GENERAL IDEA OF BILL:**
To prohibit discrimination based on sexual orientation.

**SUMMARY OF SPECIFIC PROVISIONS:**
Section 1 states the intent of the Legislature to reaffirm the right of every New Yorker to enjoy a full and productive life free of discrimination, including prejudice on account of their sexual orientation. It does not condone or promote any attitude, conduct, or way of life.
Section 2 amends section 291 of the Executive Law to declare the opportunity to obtain employment, education, the use of places of public accommodation and the ownership, use and occupancy of housing accommodations and commercial space without discrimination because of sexual orientation to be a civil right.
Section 3 amends section 292 of the Executive Law to define "sexual orientation" as "heterosexuality, homosexuality, bisexuality, or asexuality, whether actual or perceived. However, nothing contained herein shall be construed to protect conduct otherwise proscribed by law."
Section 4 amends section 295 of the Executive Law to expand the responsibilities of the Division of Human Rights to include studying the problems and working toward the elimination of discrimination because of sexual orientation.
Section 5 amends section 296(1) of the Executive Law to prohibit discrimination based on sexual orientation by employers, licensing agencies, employment agencies and labor organizations. The section also prohibits employment advertisements and applications which express any limitation, specification or discrimination as to sexual orientation.
Section 6 amends section 296(1-a) of the Executive Law to prohibit discrimination based on sexual orientation in the advertisement of and admission to apprenticeship training programs.
Section 7 amends section 296(2) of the Executive Law to prohibit discrimination based on sexual orientation by owners, lessees, proprietors, managers, superintendents, agents or employees of places of public accommodation, resort or amusement.
Section 8 amends section 296(2-a) of the Executive Law to prohibit discrimination based on sexual orientation with respect to publicly assisted housing accommodations.
Section 9 amends section 296(3-b) of the Executive Law to prohibit realtors from inducing the sale of property by representing that a change has occurred or will or may occur in the composition of a neighborhood with respect to the sexual orientation of the neighbors.
Section 10 amends section 296(4) of the Executive Law to prohibit an education corporation or association which holds itself out to the public to be nonsectarian from denying the use of its facilities to any otherwise qualified person by reason of his or her sexual orientation.
Section 11 amends section 296(5) of the Executive Law to prohibit discrimination based on sexual orientation with respect to private housing accommodations and commercial space. The bill does not alter, however, the Executive Law's current exemption for rentals of small, owner-occupied housing accommodations.
Section 12 amends section 296(9) of the Executive Law to prohibit the denial of membership in fire departments or fire companies based on

000003

sexual orientation.

Section 13 amends section 296(13) of the Executive Law to prohibit
commercial boycotts and blacklisting based on sexual orientation.
The bill does not amend section 296(11) of the Executive Law. Therefore,
nothing in the bill is to be construed to bar any religious or denomina-
tional institution or organization, or any organization operated for
charitable or educational purposes, which is operated, supervised or
controlled by or in connection with a religious organization, from
limiting employment or sales or rental of housing accommodations or
admission to or giving preference to persons of the same religion or
denomination or from making such selection as is calculated by such
organization to promote the religious principles for which it is estab-
lished or maintained.
Section 14 amends section 296-a of the Executive Law to prohibit
discrimination in relation to credit based on sexual orientation.
Section 15 amends section 40-c of the Civil Rights Law to provide that
no person shall be subjected to any discrimination in his or her civil
rights because of his or her sexual orientation.
Section 16 amends section 313 of the Education Law to declare that State
policy and the American ideal of equality of opportunity require that
students be admitted to education institutions and be given access to
all educational programs and courses provided by such institutions with-
out regard to sexual orientation. The section also specifically prohib-
its discrimination based on sexual orientation with respect to admission
to education institutions. The bill, however, does not affect the right
of a religious or denominational education institution to select its
students exclusively or primarily from members of such religion or
denomination or from giving preference in such selection to such members
or to make such selection of its students as is calculated by such
institution to promote the religious principles for which it is estab-
lished and maintained.
Section 17 amends section 313(3) of the Education Law to define "unfair
educational practices" to include discrimination on the basis of sexual
orientation.

**JUSTIFICATION:**
Discrimination based on sexual orientation is widespread and commonplace
throughout the State of New York despite our best efforts to eliminate
it. These efforts are hampered substantially because the State's laws do
not prohibit discrimination based on sexual orientation. It exists --
both directly and indirectly -- in employment, in housing, in public
accommodations and services. It affects people of all ages, races,
genders, religions and sexual orientations. It hinders the economic
development of the entire State.
In 1983, Governor Cuomo issued Executive Order No. 28 requiring that no
state agency or department discriminate on the basis of sexual orien-
tation against any individual in the provision of any services or bene-
fits. That Executive Order further provided that all State agencies and
departments prohibit discrimination based on sexual orientation in any
matter pertaining to employment by the State. In 1987, he amended the
Executive Order to direct the Division of Human Rights to review and
promulgate guidelines prohibiting discrimination based on sexual orien-
tation to maintain an environment where only job-related criteria are
used to assess employees and prospective employees of the State.
That Executive Order was an important first step in ridding the State of
discrimination based on sexual orientation. This bill now continues our
vigorous pursuit for equal treatment of all New Yorkers.
The most distinctive aspect of discrimination based on sexual orien-
tation is a resulting all-pervasive climate of fear within which gay and
lesbian New Yorkers are forced to lead their lives. The State has a
moral obligation to do all it can to help dispel this climate. A marked
improvement in this climate would not only benefit the lives of lesbian
and gay New Yorkers; it would also improve the quality of life for all
citizens of the State.

000604

**PRIOR LEGISLATIVE HISTORY:**  Similar legislation has been introduced

IA0793

since 1971.
A. 1336 (1993-94) Passed Assembly
A. 3801 (1995-96) Passed Assembly
A.2826 (1997-98) Passed Assembly
A.811-A (1999-00) Passed Assembly

**FISCAL IMPLICATIONS:**
Enactment of this bill may increase the Division of Human Rights' case
load. However, the overall economic benefit to persons within the State
will more than justify the expenditures required to entertain cases
brought by the newly protected class of individuals.

**EFFECTIVE DATE:**
This bill takes effect 30 days after becoming law.

000005

JA0794



THE CITY OF NEW YORK
OFFICE OF THE MAYOR
NEW YORK, N.Y. 10007

December 17, 2002

A.1971 - by M. of A. Sanders, Glick,
Gottfried, DiNapoli, Grannis,
Brennan, Clark, Arroyo,
Bragman

AN ACT to amend the executive law, the civil
rights law and the education law, in
relation to prohibiting
discrimination based on sexual
orientation_____

APPROVAL RECOMMENDED

Hon. George E. Pataki
Governor of the State of New York
Executive Chamber
Albany, New York  12224

Dear Governor Pataki:

The above-referenced bill is now before you for executive action.

This bill amends Sections 291 et seq of the Executive Law, Section 40C of the Civil Rights Law and Section 313 of the Education Law to prohibit discrimination based on sexual orientation.

The City of New York supports the proposed statutory amendment to the New York State Executive Law, Civil Rights Law and Education Law adding protection against discrimination on the basis of "sexual orientation".

000006

JA0795

Hon. George E. Pataki                                        A.1971
December 17, 2002
Page two


     The need for such legal safeguards against sexual orientation
discrimination is well established.  In 1986, in response to a growing
number of documented incidents of discrimination on the basis of real
or perceived sexual orientation, the City enacted into local law
protection against discrimination on the basis of sexual orientation.
Since its enactment, the number of sexual orientation discrimination
claims filed in the City have dramatically increased.   In FY92, 13
such claims were filed; in FY93, 45 filed; FY94, 62 filed; FY95, 57
filed; FY96, 95 filed; and FY97, 101 filed.

     While residents of New York City enjoy these protections under
current law, an anti-gay and lesbian discrimination law is of such
fundamental importance that it should be passed by the State Legislature
so that all residents of the State can benefit by its protections and
that it should not be incumbent on individual localities to create
protections for their own residents.

     Moreover, the United States Supreme Court, on March 4, 1998 in
Oncale  v.  Sundowner  Offshore  Services  Inc., 118  S.Ct  440(1997),
recognized that sexual discrimination consisting of same-sex sexual
harassment is actionable under Title VII of the Civil Rights Act of
1964.

     The growing trend of sexual orientation claims filed in the City
of New York and the recent United States Supreme Court decision
confirms the need for State legislation to prohibit discrimination
based on sexual orientation.

     Accordingly, it is urged that this bill be approved.


                                  Very truly yours,

                                  MICHAEL R. BLOOMBERG, Mayor


            000007            By: Anthony P. Piscitelli
                                  Legislative Representative


JA0796



# FAMILY DEFENSE COUNCIL

166-15 GRAND CENTRAL PWY., JAMAICA, N.Y. 11432

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

**Board of Directors**
Howard L. Hurwitz, Ph.D.
*Chairman*
Hon. Mary Cummins
Rabbi Abraham Hecht
Albert Lefebvre
Michael Macaluso Jr.
Clark McClain
Herbert McKay
**Officers**
Olga Gomez
*President*
Albert Lefebvre
*Vice President*
Alice May P. Ryan
*Secretary-Treasurer*
**Advisory Board**
William Andrews
Alan D. Berkowitz
Rudolph P. Blaum
Msgr. Joseph P. Bynon
Hon. Richard W. Counitz
James W. Crockett
Irma Epstein
Wilbur Epstein
Virginia Eveleth
Rev. Nathan A. Haughton
James R. Keegan
Scott Lively
Paul J. McGeady, Esq.
Hon. Serphin Maltese
Timothy A. Mitchell, Ph.D.
Robert Peters, Esq.
Frank Russo
Arthur Spear
Christopher T. Slattery
Rev. Kirk van der Swaag
Robert Unger, Esq.

**In Memoriam**
Rev. Edward Hogan, SJ
(1905-1989)
Founder, Council for Com-
munity Consciousness
Donald J. Ryan (1909-99)
Sec'y-Treasurer

October 24, 2002

Hon. George Pataki
Governor, New York State
Albany, N.Y. 12248

Dear Governor Pataki:

In making known your support of a bill amending
the Sexual Orientation Non Discrimination Act to
include special protection for gays, you are
contributing to the decline in morality that is
defacing our state.

Your disgrace is documented by the executive
director of the Empire State Pride Agenda, Matt
Foreman,who declared that you have done more to
promote gay rights than any other New York governor.

Homosexuals constitute two percent of the general
population. Gays (radical homosexuals) are one-
fifth of the total. This is reported in gay pub-
lications. Gays seek to "out" homosexuals who
prefer to keep their perversion private.

Homosexuality is unnatural, immoral and a danger to
the health of those who engage in same-sex relations.

Gays have a political agenda set forth in Chicago,
1972, and Washington, 1993. They demand the right
of "Gay women and men to teach schoolchildren that
homosexuality is normal, viable and an alternative
to heterosexuality."They demand abolition of the
age of sexual consent.

It is hoped that Senator Bruno will remain firm
in opposing amendment of the act. We can expect
that Tarnished Silver in the Assembly will once
again seek approval of this gay offensive which
you are abetting.

You seek reelection. On this issue alone, you deserve
defeat.

Yours truly,

Howard L. Hurwitz

000008

cc. Interested individuals and organizations

*Family Defense Council, Inc. is a non-Sectarian, Not -For-Profit Corporation Primarily to Promote Traditional Family Values*

JA0797

*BJ*



**EAST END GAY ORGANIZATION**

## Out 25!

Marilyn Mehr, Ph.D.
CO-CHAIR

Tom Kirdahy, Esq.
CO-CHAIR

November 20, 2002

Governor George Pataki
The State Capitol Executive Chamber
Albany, N.Y. 12224

**Re:  SEXUAL ORIENTATION NON DISCRMINATION ACT (SONDA)**

Dear Governor Pataki:

I am writing to you as a member of the Board of Directors of East End Gay Organization (EEGO) and additionally as Chair of the EEGO Political Action Committee about pending legislation known as the Sexual Orientation Non Discrimation Act (SONDA).  Our organization represents the interests of hundreds of members living on Eastern Long Island.  Our members unequivocally support the adoption of SONDA as soon as possible.  It is my understanding that you have made a commitment to see this legislation passed in December, 2002.  It is my further understanding that you have obtained a commitment from State Senate Majority Leader Joseph Bruno to allow SONDA to finally be voted on by the full New York State Senate after it is once again passed by the New York State Assembly, and that once adopted, you will sign SONDA so it becomes New York State law.

We at EEGO admire your commitment to the adoption of SONDA in New York State and feel the time has come for the adoption of SONDA.  It is simply unacceptable for Gay, Lesbian, Bisexual or Transgendered persons who are residents of New York State to be discriminated against based on sexual orientation without legal recourse.  You and the New York State Legislature have the ability to make members of our community feel safe from discrimination by enacting SONDA.  I am confident that you will do everything possible to see SONDA enacted before the end of this year.  Your commitment to improving the lives of members of our community is very much appreciated.

Very truly yours,

Adam B. Grossman
member, Board of Directors
East End Gay Organization (EEGO)

ABG:ag

000009

JA0798

*BJ*

THE SCRIBNER HOUSE
791 North Broadway
Saratoga Springs, New York 12866

October 29, 2002

Governor George E. Pataki
State Capitol
Albany, NY 12224

Dear Governor Pataki:

I write to urge your support for the Sexual Orientation Non-Discrimination
Act (SONDA).

Skidmore College includes sexual orientation in our non-discrimination
policy. I have found it a constructive way to make clear Skidmore's
opposition to discrimination and support for fair opportunities for all
members of the College community. I would be proud to add my home
state of New York to the list of states, counties and cities that have
recognized the principle of non-discrimination with respect to all our
citizens regardless of their sexual orientation.

I hope you will sign SONDA into law as soon as it reaches your desk.

Sincerely,

Jamienne S. Studley
President

JSS:saw

cc: Skidmore Pride Alliance

000010

JA0799

# NYTRO

### THE NEW YORK TRANSGENDER RIGHTS ORGANIZATION

JOANN PRINZIVALLI, DIRECTOR
125 LAKE STREET #9MN
WHITE PLAINS, NEW YORK 10604-2419

TEL.: (914)428-7247
E-MAIL: PJPRINZI@MSN.COM

December 12, 2002

By FAX to 518-473-7669

Hon. George E. Pataki
Executive Chamber
Albany, New York 12224

Re: <u>Ask Senate to amend S.720 (SONDA) to include Gender and call the Assembly to convene</u>

Dear Governor Pataki:

I am writing to advocate that you support an amendment to S.720, the Sexual Orientation Non-Discrimination Act (SONDA) that would include gender as a protected class in New York State human rights laws. One way to do this is to substitute the language of S.1985 for that of S.720.

In addition, I ask that you request the Assembly convene to address this and other urgent issues.

Sexual orientation is only a small aspect of the immutable characteristics that make up a person's psychological and physiological sex/gender matrix. The four principal characteristics are Gender Identity (GI), Sex Assignment (SA), Gender Social Role (GSR), and Sexual Orientation (SO). Most New Yorkers are Masculine (GI) Male (SA) Men (GSR) attracted to Women (SO), and Feminine (GI) Female (SA) Women (GSR) attracted to Men (SO). A significant minority of New Yorkers do not fit into the binary division in one or more of these characteristics, and are subject to extreme forms of discrimination as a result. Adding sexual orientation alone to the protected classes of human rights laws will do nothing to protect transgender, intersexed, transsexual and gender-variant New Yorkers from unjust discriminatory practices.

I lost my job as chief underwriting counsel for a major title insurance company in January 2000, because I am a transsexual. My work was exemplary, and I had recently received a promotion to national underwriting counsel for the parent company, but after I discussed transition issues with management, I was fired. Like the immutable characteristics already protected under human rights laws and sexual orientation, the characteristic of having a gender identity at variance with my sex assignment has no bearing on job qualifications or performance and should be protected.

I strongly urge that you do the right thing. Include my people in human rights laws.

Sincerely,

Joann Prinzivalli

000011

JA0800

C 2

# Bethel Baptist Church

Ralph Verdu
512 Shenandoah Road
Hopewell Junction, New York 12533

Phone 845-226-7973

February 05, 2003

Governor George Pataki
Executive Chamber
State Capitol
Albany, NY 12224

Dear Governor Pataki:

Words, by themselves, are inadequate to express the chagrin I experienced upon learning of the passage, with your support and approval, of the piece of legislation nicknamed SONDA.

This bill (S720 and A1971) is an egregious error in government and I oppose it for the three following reasons:

1. It is wrong. Morality, regardless of popular opinion, is not determined *by* popular opinion. As with the rights afforded individuals in our Constitution, morality is not subject to vote, neither the whims of the people. Immoral behavior is always to be opposed and discouraged. New York State legislators, yourself included, are not authorized, let alone qualified to change or void God's laws clearly represented in Holy Scripture.

2. Agreeing with some other opponents of this bill, I attest that SONDA "affords special protection to a group that is not disadvantaged." In effect, the bill discriminates against ME in order that morally peccable people may satisfy their lust at my expense.

3. The Sexual Orientation Non-Discrimination Act effectively criminalized hundreds of thousands of residents of New York, who prior to passage of this calumny of justice, were New York's finest citizens. We bear much of the burden in this State for social reform and relief, intervention with youth, reclamation of prisoners and we often are the "glue" that holds New York together in times of stress and tension. Now, however, we are apparently relegated to the company of child predators, social anarchists and other felonious labels.

This, Governor Pataki, is outrageous. Please understand that I, a law-abiding, authority respecting citizen WILL NOT ABIDE by the principles and practices established by this disgustingly offensive legislation. I declare myself to you in full objection with every intention of deliberate non-compliance.

I implore you, Governor, to change your mind and withdraw this bill. Admit your error and recant. The Psalmists writes in Psalm 2:1-5

"Why do the heathen rage, and the people imagine a rain thing? The Kings of the earth set themselves, and the rulers take counsel together, against the LORD, and against his anointed, saying, Let us break their bands asunder, and cast away their cords from us. He that sitteth in the heavens shall laugh: the Lord shall have them in derision. Then shall he speak unto them in his wrath, and vex them in his sore displeasure."

Sincerely,

*Ralph Verdu*

Pastor Ralph Verdu

000012

JA0801

C 2

A 1971



STATE OF NEW YORK
**DEPARTMENT OF STATE**
41 STATE STREET
ALBANY, NY 12231-0001

RANDY A. DANIELS
SECRETARY OF STATE

M E M O R A N D U M

December 20, 2002

TO:        Honorable James M. McGuire, Esq.
           Counsel to the Governor

FROM:      Joshua B. Toas, Esq.
           Assistant Secretary of State for Legislative Affairs and Deputy Counsel

SUBJECT:   10-day bills

           The Department of State has no comment on the following 10-day bills:

           A01971
           A07535
           A08429
           A08775
           A11460
           A11710
           A11775
           A11835

JBT/sm

000013

# SAMPLE OF

# CORRESPONDENCE

# ONLY

DDDD14

FRANK S FERRARI
34-15 CLEARVIEW EXPY
BAYSIDE NY 11361
30 OCT 2002

DEAR GOVERNOR PATAKI
AFTER LEARNING FROM REV DUANE MOTLEY'S
FREEDOM'S ALERT ABOUT YOUR PROMISE TO EM-
PIRE PRIDE AGENDA TO DO EVERYTHING YOU COULD
TO SEE THE SONDA BILL PASSED I HAD TO WRITE
YOU ABOUT THIS. ONE REALIZES THAT POLITICS
COMPELS ONE TO ASSOCIATE AND DEAL WITH ALL SORTS OF
PEOPLE. I KNOW AND WORK WITH HOMOSEXUALS AND
LESBIANS AND I DO MY UTMOST TO TREAT THEM JUST
AS I DO OTHER PEOPLE. HOWEVER, I NEVER TELL
THEM THAT I AFFIRM OR CONDONE THEIR LIFE STYLE.
IT'S A FACT THAT THEY MAKE UP 'ONLY' 2 TO 3% OF A
POPULATION - NOT 10%! IT IS A FACT THAT THEIR
LIFE STYLE IS QUITE DEADLY - A HIGH PERCENTAGE DO NOT
LIVE TO BE FORTY. HISTORICALLY, ANY CIVILIZATION THAT
LEGITIMIZED SUCH FORMS OF SEXUAL BEHAVIOR SOON
DISAPPEARED. THEY FIRST CLAIMED THAT ALL THEY WANTED
WAS FREEDOM TO BE LEFT ALONE. NOW THAT ISN'T E-
NOUGH! NOW THEY DEMAND THAT OUR CHILDREN BE TOLD
THAT SUCH ABNORMAL SEXUAL HABITS ARE ACTUALLY QUITE
THE NORM. KINDERGARTEN CHILDREN HAVE ABSOLUTELY
NO CONCERNS ABOUT SEX; YES THEY DO KNOW THAT
THERE ARE BOYS AND GIRLS! HOWEVER, THIS STATE OF
INNOCENCE CANNOT BE TOLERATED BY HOMO LESBO
AGENDA! NOW THEY DEMAND THAT THEIR PERVERSION
BE 'TAUGHT' TO KINDERGARTENERS; TO CHILDREN WHO DO
NOT KNOW ANYTHING ABOUT SEX, ESP IT'S MORE PERVERSE
FORMS OR AS TO WHO WOULD DO SUCH THINGS.

Isn't it strange that people who merely yearned to
be left alone do not stop demanding more and
more laws to force the majority of us and our children
to say there is no such thing as sexual perversion!
Well SONDA is just one more nail in our coffin.
I realize that your task as Governor is quite
difficult but do you really think our culture
needs another push down into the void. It's
their business if they want to engage in abnormal
practices behind closed doors but please don't
contribute to this madness by promoting SONDA;
read their* own publications and you'll see that
their goal is to not rest until they sodomize
our entire culture. What sir will you tell your
grandchildren when they say "But grandpa didn't
you say there's nothing wrong with sodomy when you
were the Governor? That a question I pray you
will never hear! Governor Pataki think long and
hard about what you are doing. Is getting re elected
more important than being a man who will stand
for what's true and right?

Respectfully

Frank S. Jenani

* The gay book After the Ball
Brazenly states their goal to
Sodomize our children and there
by destroy all opposition!

000016

JA0805

## Correspondence Profile

**Duane Davis**
850 40th Street, Apt D3
Brooklyn, NY 11232
County
Open

Type
Email          tueroc@aol.com

| | |
|---|---|
| Addressed To | |
| Correspondence Number | |
| Correspondence Type | |
| Date of Correspondence | 12/18/2002 |
| Date Received | 12/18/2002 |
| Date Entered | |
| Date Completed | |
| Referred To | |
| Date Referred | |
| Referred By | |
| Subject | |
| We do not want the SONDA bill to be passed | |

Email Received From Website

Dear Govenor,

I am writting this letter to let you know that I AM FULLY OPPOSED TO
THIS BILL!!! Sexual Orientation Non-Discrimination Act (SONDA). With
all due respect I urge you not to sign this bill as it will not only
distroy the morals of our children, but it will also radically
redefine and reconfigure the historic meaning of both marriage and
family! I BEG YOU NOT TO SIGN THIS BILL!!!!!!!

Your's Sincerely,
Duane Davis & Marcia Brown

000017

JA0806

## Correspondence Profile

**Duane Davis**
850 40th Street, Apt. D3
Brooklyn, NY 11232
County
Open

|  |  |
|---|---|
| Addressed To | |
| Correspondence Number | |
| Correspondence Type | |
| Date of Correspondence | 12/18/2002 |
| Date Received | 12/18/2002 |
| Date Entered | |
| Date Completed | |
| Referred To | |
| Date Referred | |
| Referred By | |
| Subject | |
| We Urge You Not To Sign The S.O.N.D.A Bill | |

Type
Email          yardy_dudz@hotmail.com

Email Received From Website

Dear Governor,

I am writing this letter to let you know that I AM FULLY OPPOSED TO THIS BILL!!! Sexual Orientation Non-Discrimination Act (SONDA). With all due respect I urge you not to sign this bill as it will not only destroy the morals of our children, but it will also radically redefine and reconfigure the historic meaning of both marriage and family! I BEG YOU NOT TO SIGN THIS BILL!!!!!!!

Yours Sincerely,
Duane Davis & Marcia Brown

000018

| Correspondence Profile | | |
|---|---|---|
| **Michael Heilig** | Addressed To | |
| 2 Bills Place | Correspondence Number | |
| Brooklyn, NY 11218 | Correspondence Type | |
| County | | |
| Open | Date of Correspondence | 12/18/2002 |
| | Date Received | 12/18/2002 |
| | Date Entered | |
| | Date Completed | |
| Type | Referred To | |
| Email          heiligm@mindspring.com | Date Referred | |
| | Referred By | |
| | Subject | |
| | Do Not Sign SONDA | |

Email Received From Website
As a voter in this state, I am firmly against this act becoming law
and implore you not to sign it into law.  Please VETO this act.
Gays are already covered under Equal Opportunity and do not require
further coverage.  Again I ask as a voter in this state that you NOT
SIGN SONDA into law and VETO THIS ACTION.

000019

JA0808

## Correspondence Profile

**John Crowe**
132 Kenwood Avenue
Delmar, NY 12054
County
Open

Type
Email      jcrowe@nycap.rr.com

Addressed To
Correspondence Number
Correspondence Type

Date of Correspondence     12/18/2002
Date Received              12/18/2002
Date Entered
Date Completed
Referred To
Date Referred
Referred By
Subject
SONDA

Email Received From Website

Dear Governor Pataki;
I am writing to thank you for your courage in supporting SONDA. I
especially appreciated your comments regarding your vision of a
unified New York where distinctions and divisions among residents are
eliminated. Especially after September 11, our focus needs to be on
healing, equality, and compassion. May you and your family enjoy a
peaceful Holiday season.
Very truly yours,
John F. Crowe

000020

## Correspondence Profile

**Wendy Payne**
1626 Taylor Ave
bronx, NY  10460
County
Open

Type
Email          Wendyac@aol.com

| | |
|---|---|
| Addressed To | |
| Correspondence Number | |
| Correspondence Type | |
| Date of Correspondence | 12/18/2002 |
| Date Received | 12/18/2002 |
| Date Entered | |
| Date Completed | |
| Referred To | |
| Date Referred | |
| Referred By | |
| Subject | |
| SONDA | |

Email Received From Website

I just wrote asking you to veto SONDA, only to now find out that you
passed it yesterday.  Even worse, is that understanding that it was
passed by Republicans by the promise of votes from the Pride
organization.  Where is your ethical standing in this matter?  And
with the outright understanding that this is the first step in
Pride's goal to see same-sex unions legalized.

So you sold yourself for some votes and a re-election.  You should be
ashamed of yourself.

000021

JA0810

## Correspondence Profile

| | |
|---|---|
| **Anthony Sferrazza** | Addressed To |
| 755 44th Street | Correspondence Number |
| Brooklyn , NY 11220 | Correspondence Type |
| County | |
| Open | Date of Correspondence 12/18/2002 |
| | Date Received 12/18/2002 |
| | Date Entered |
| | Date Completed |
| Type | Referred To |
| Email     Asfermusic@aol.com | Date Referred |
| | Referred By |
| | Subject |
| | Sondra Bill |

Email Received From Website

Dear Mr. Pataki,

   I write you this e-mail with the deepest grief concerning the passage of the Sondra Bill. For decades the definition of family has held a special and deeply sacred meaning. This bill will totally redefine the meaning as set out by devine ordinance. As a man of good character and leadership, and a God-fearing Christian (Roman Catholic) please search your conscience and your faith in God before signing this bill into law. God has His own personal opinion about this lifestyle. In the Book of Deuteronomy in the Bible He calls it an abomination. The new testament (the writings of Paul) Paul reiterates this same principle. We love the homosexual but to love them does not mean we need to endorse/encourage their lifestyles and agendas for our society. There are already laws to protect them and all of us. If they choose to be homosexual that is their choice, but we as a society should not be made to overly accomodate them. Signing this bill will cause a dangerous chain reaction by which other groups will want special treatements. Already the trans-genders are stirring concerning the passage of this bill that they too want equal protection. Please search your heart/conscience. What kind of message will this bill send out to our children and to future generations. The saying goes "we shall reap what we have sown."  Thank you for taking the time to read this e-mail. Have a Blessed and Wonderful Christmas and New Year.

 Sincerely,

 Mr. Anthony C. Sferrazza

## Correspondence Profile

| | |
|---|---|
| **Keith Hardy** | Addressed To |
| 7478 St. Rt 12 | Correspondence Number |
| Lowville, NY 13367 | Correspondence Type |
| County | |
| Open | Date of Correspondence      12/18/2002 |
| | Date Received      12/18/2002 |
| | Date Entered |
| | Date Completed |
| Type | Referred To |
| Email     prhardy@hotmail.com | Date Referred |
| | Referred By |
| | Subject |
| | Sexual Orientation Non-Discrimination Act |

Email Received From Website
     Keith  Hardy
     7478 St. Rt 12
     Lowville, NY 13367


     December 18, 2002


     The Honorable George E. Pataki
     State Capitol
     Albany, NY  12224


     Governor Pataki:

Governor Pataki, I urge you to veto the
Sexual Orientation Non-Discrimination Act (S. 720/A. 1971). This bill
would be one more thing which would tear away at the moral foundation of
our nation. Please pray and consider if your God would desire for you to
allow this legislation to be passed. Please consider the words of the Holy
Scriptures 1 Corinthians 6:9, "Do you not know that the wicked will not
inherit the kingdom of God? Do not be deceived: Neither the sexually
immoral nor idolaters nor adulterers nor male prostitutes nor homosexual
offenders" This bill would do more harm to those who are trapped in a
homosexual lifestyle. I implore you to lead with morality as your guide.


     Sincerely,


     Rev. Keith Hardy

000023

JA0812

## Correspondence Profile

**Richard Baldwin**
220 Orlando Ave
Syracuse, NY 13205
County
Open

Type
Email        baldwinrichard@juno.com

| | |
|---|---|
| Addressed To | |
| Correspondence Number | |
| Correspondence Type | |
| Date of Correspondence | 12/18/2002 |
| Date Received | 12/18/2002 |
| Date Entered | |
| Date Completed | |
| Referred To | |
| Date Referred | |
| Referred By | |
| Subject | |
| Homosexual bil | |

Email Received From Website
   Richard  Baldwin
   220 Orlando Ave
   Syracuse, NY 13205


   December 18, 2002

   The Honorable George E. Pataki
   State Capitol
   Albany, NY  12224


   Governor Pataki:

   You'r making a big mistake by signing the homesexual bill.  God condemn
   sexual acts between a man and a man and between a woman and a woman. He
   hates our sin, but loves so much that he sent his son to die for our sin.

   Sincerely,


   Richard Baldwin

060021

JA0813

## Correspondence Profile

**Michael Christensen**
217 Sherman St.
Penn Yan, NY  14527
County
Open

Type
Email          mjcplc@adelphia.net

| | |
|---|---|
| Addressed To | |
| Correspondence Number | |
| Correspondence Type | |
| Date of Correspondence | 12/18/2002 |
| Date Received | 12/18/2002 |
| Date Entered | |
| Date Completed | |
| Referred To | |
| Date Referred | |
| Referred By | |
| Subject | |
| Deputies Binding Arbitration/Gay Rights | |

Email Received From Website
I note with interest that the Governor signed the Gay rights law that
will prevent discrimination of Homosexuals. The Deputies in New York
State have been dicriminated against for years, we do the same job,
and often times better, than our counter parts in the city and
village police departments, we work under the same rules and
requirements, but our pay and benifits are less becuase we are
Deputies. I would hope we could show the same concern for members of
our law enforcement community as we do for members of our community
that are homosexuals!!!!!!

000025

JA0814

## Correspondence Profile

**Liz Rivera**
47 Nugent Avenue
Staten Island, NY 10305
County
Open

Type
Email          erivera@mnr.org

| | |
|---|---|
| Addressed To | |
| Correspondence Number | |
| Correspondence Type | |
| Date of Correspondence | 12/18/2002 |
| Date Received | 12/18/2002 |
| Date Entered | |
| Date Completed | |
| Referred To | |
| Date Referred | |
| Referred By | |
| Subject | |
| Stop Pro-Gay Legislation Now | |

Email Received From Website

Please do not give in on the SONDA bill (Sexual Orientation Non-Discrimination Amendment). The legalization and recognition of ?Gay? Marriages is against the Bible, the Word of God.  In my church we do not discriminate against "gay people", we love and welcome all to partake in worshipping the Lord, but we can not go against the Bible.  It says in the Bible that God appoints position, as He has done with you and it is your responsibility to uphold His Word for all concern.  So I am asking as a person, Constituent, voter and follower of God to please VETO this bill.  Thank you for your time.

000026

## Correspondence Profile

| | |
|---|---|
| **Thomas Yaeger** | Addressed To |
| 36 Rossman Drive | Correspondence Number |
| Webster, NY 14580 | Correspondence Type |
| County | |
| Open | Date of Correspondence 12/18/2002 |
| | Date Received 12/18/2002 |
| | Date Entered |
| | Date Completed |
| Type | Referred To |
| Email Tarmark-TAY@Juno.com | Date Referred |
| | Referred By |
| | Subject |
| | Gay Rights Bill |

Email Received From Website

Dear Governor Pataki:

I am writing to ask that you veto the pending Gay Rights Bill. I believe we need to establish more traditional family values in New York. Endorsement of the Gay lifestyle is not the message we should pass to our children.

Sincerely,

Thomas A. Yaeger

000027

JA0816

# Alexandra K. MacKenzie
40 Henderson Avenue
Staten Island, NY 10301
(718) 727-9690
E-mail: alexandra_mackenzie@yahoo.com

**December 4, 2002**

**Governor George E. Pataki**
**State Capitol**
**Albany, NY** 12224

**Re: Please Amend SONDA (Sexual Orientation Non-Discrimination Act) to Clearly Include**
**Transgendered People or Kill the Bill**

**Dear Governor Pataki,**

Congratulations on your election victory.

We met, briefly, at the Log Cabin Republican Reception held at Greg Morey's home in Manhattan on October 28, 2002. I was the only cross-dresser. I requested that you consider amending SONDA to clearly include transgendered people.

The Sexual Orientation Non-Discrimination Act (SONDA Senate Bill S720), sponsored by Senators Nancy Lorraine Hoffman and Joseph L. Bruno, and promoted by the Empire State Pride Agenda (ESPA) is seriously flawed and should be amended or defeated!

Please allow me to clarify; I am a heterosexual, male, cross-dresser. I was married for twenty-five years and have two sons, ages 30 and 26. As a cross-dresser, I get a profound sense of emotional and psychological satisfaction from wearing clothes normally associated with the other gender.

I have been a cross-dresser most of my life. It has only been in the past few years that I have been brave enough to express that publicly. For me it is a special kind of personal liberation. The freedom to be myself as I have always wished to be! After the attack on the World Trade Center, Mayor Rudolph Giuliani advised everyone go back to living their lives as free citizens. For me, dressing and acting as an elegant women, is the most powerful way that I can say, "I am a free citizen in a free city and I will not be dictated to by fundamentalist religious terrorists."

I am the precisely kind of person who is not properly covered by the current Senate version of SONDA (S270) which addresses, primarily, sexual orientation.

- I do not "pass." Most people quickly perceive me as a male person in women's clothing. That is reality, so I don't mind. I do my best to be a polite, lady-like, gentleperson and hope people will be polite to me. I work at improving my gender presentation.

- Many people assume that I dress as a woman to attract male lovers. That is incorrect. I have no interest in male lovers. I prefer to dress in women's' clothing because it is my personal preference in my gender expression.

- Some people assume that I must be a transvestite prostitute. But I am not a prostitute, nor am I promiscuous. I am currently unemployed but worked for 30 years in the property & casualty insurance industry. (In fact, most cross-dressers are married heterosexual males, who have

JA0817

wives, children, houses, cars, dogs, cats and responsible jobs. Most are faithful to their wives and keep their cross-dressing a closely guarded, personal secret.)

- Some people react to me as though something awful or terrible was going on. Others laugh and ridicule me when I am out in public. I guess they are uncomfortable. I don't meet their gender expectations. Why am I required to meet their gender expectations? Part of my personal activism is to go out in public, be seen and be a polite citizen. How will the greater society ever become accustomed to me if I stay hidden in my closet?

- Others say things like, "What shall we tell the children?" Once again, I prefer to wear lovely, elegant women's clothing (mostly skirts-suits and dresses) and act as a lovely lady-like gentleperson. I love and admire women. I had two older sisters that I loved and admired and I wanted to be just like them. Many of my personal heroes are women. Why is that so difficult to explain to children?

- Some people have religious objections to me, and site Deuteronomy 22:5 which prohibits cross-dressing. I am told it is the only Biblical reference to cross-dressing. My rabbinical friends advise me that there are 613 Talmudic laws listed in the Torah, only 278 of which can be followed outside of the Great Temple of Israel, and that modern Christians do not follow most of the those because they concern ritual purity, circumcision and dietary matters that St. Paul and St. Peter invalidated during the first century CE. So I follow one less Talmudic law from the Old Testament. I am perhaps $1/613^{th}$ less spiritual than the next Christian. That is an issue between God and me. It should not be an issue between New York State and me, or my employer and me, or my landlord and me.

Yet transgendered people are commonly discriminated against because they do not conform to social expectations about gender. The very reason we were specifically not included in the version of SONDA currently before the State Senate (S270) was because certain key leaders (mostly gay, white, males) in the Empire State Pride Agenda (ESPA) believed it was not expedient to include us. They said, "The conservative Republicans in the Senate are not ready to approve of civil rights for cross-dressers, transgenderists and transsexuals." We refer to these gay, white males as "assimilationists." They are often wealthy or very successful people who conform closely to social gender norms, except for their sexual preferences. They have done well by looking normal and fitting in the overall heterosexual culture, while being privately gay. They are sort of the "Uncle Toms" of the gay rights movement. Transgendered people are an embarrassment to them.

The problem for nearly all transgendered people is that we often do not, and cannot "look normal" to fit in. I do not "pass." Most people quickly perceive me as a man in a dress. For many years I kept my cross-dressing hidden and a deep, private secret. My ex-wife did not know for the first ten years of our marriage. When I am in male clothes, I come off as a very masculine male and most people never expect that I was a cross-dresser. My situation is not uncommon. Most cross-dressers keep their cross-dressing a closely guarded, personal secret.

I was laid off from a position in 1999, in part because a fellow employee saw me purchasing a dress and lingerie at Macy's and advised my manager that I "must be a transvestite." The next Friday, I was given a buy-out package and the personnel manager advised me, "You are exactly the kind of person we need to get rid of." (I later got a job with another firm in the World Trade Center, but was laid off, due to a reduction in force, just before the September 11 Terrorists Attack.)

New York City passed Law Number 24 of April 30, 2002 which amended the local human rights statutes to include gender and gender expression. I still find that most employers, especially those in the

property & casualty insurance industry, are unwilling to consider hiring a cross-dressed male. All fear that somehow the reputation of their multi-billion dollar corporation will be irreparably besmirched if they hire a cross-dressed male. My friends advise me that I should apply in male clothes, work for six months or a year, wait for my first positive review, then announce that I am making "a change." To me that seems unethical, although pragmatically practical. As a cross-dresser, I could do that.

However, transsexuals under go several years of hormone therapy, hair removal, plastic surgery and sexual reassignment surgery. There is a transition period of several years when they must live and work in a transgendered state. Many people become comfortable in a transgendered state and never complete all the surgeries. Others, for medical reasons, are unable to complete the entire process. Even if the person can "pass" for their preferred gender, due to a recent change, the Social Security Administration will act as a national "outing" service. A prospective employer will ask a transgendered person's sex on an employment application. The Social Security Administration will complain to the employer if the answer does not match the sex marker in the social security computer records. The transgendered person can be fired for a misrepresentation of their sex. Yet they will "out" themselves if they include their birth sex on a job application. And the transgendered person can only have that sex marker in the social security computer records changed if they have already completed all sexual reassignment surgeries.

The Sexual Orientation Non-Discrimination Act (SONDA S720), sponsored by Senators Nancy Lorraine Hoffman and Joseph L. Bruno, and promoted by the Empire State Pride Agenda (ESPA) is seriously flawed be amended or defeated!

The current version of SONDA does not include gender and gender identity as a protected class. Therefore, SONDA excludes coverage for discrimination based on gender and gender identity as well as discrimination against many of gays and lesbians who are gender nonconformists. Under the current version of SONDA, transgendered people will still be without strong legal protections against blatant and unjust discrimination in housing, employment, access to health care and public accommodations.

I do not blame Ms. Hoffman or Mr. Bruno. They are and were, ill advised by leaders in ESPA. These same leaders assured us that we would be included in SONDA, then they drafted language to clearly exclude us. Now there is a litany from them of why we are really covered any way; why a clarifying amendment is too difficult, unnecessary or impossible. Now they tell us that since they have gotten their version of SONDA nearly passed, we should be good little soldiers and march to support their deceptive and discriminatory bill. After all, we wouldn't want to deny them their chance at civil rights, would we? Now they promise us that at some time in the future they will support a separate gender-issued bill. But in New York City, it took 16 years to get the local ordinance modified to clearly include gender issues. It will be more years before the courts clarify the effectiveness of the new law.

ESPA leaders also tell us that such a bill is unnecessary and we should pursue existing legal remedies. They are lying from every corner of their mouth to gain passage of their deliberately discriminatory bill.

If you want to know who needs the protection the most, study the people being arrested for prostitution in your city. They are the most desperately unemployed people, who cannot find reasonable employment. In many cases you will find those persons to be young, black and transgendered. Young transgendered blacks are often excluded from black community resources because of macho-male, anti-gay, cultural attitudes and conservative, anti-gay, religious attitudes. They are also often not included in gay community resources because they are black, young and poor, and the focus of gay community resources is more toward the needs of white gays and lesbians.

Want another test? Study the people who are suffering most from a rise in reported incidences of AIDS and HIV. Once again, young, black, transgendered youth top the list. For the same reasons as above. And next to them are young black women who are their occasional lovers. This is an important issue for the black community in New York City.

If you want another test, study the people who are suffering most from employment problems. Many transgendered persons are educated and skilled but suffer constantly from unemployment and under employment. Many transsexuals are forced into prostitution at some point during their transition because they cannot get jobs as a transitioning transgendered person. (In fact one of the easiest ways to limit transgendered prostitution in New York State would be to clearly include transgendered people in SONDA and then insist that employers hire them at worthwhile jobs! I know one transsexual who was a C++ programmer and UNIX administrator before she began her transition. She lost her job and for a while was forced to work as a prostitute in the Meat Market District of New York City. Her observation was, "Being a transgendered prostitute in New York City is like flying a crop duster. If you make one error in judgment you will be killed. And there is a high probability that you will be contaminated by a deadly pollutant.")

If you want yet another test, study the people who are suffering most from housing problems and housing discrimination. Obvious transgendered persons are often discriminated against while trying to rent apartments. Public homeless shelters are dangerous places for transgendered male-to-female persons who are classified by the system as "males" and are often attacked and sexually assaulted by aggressive macho males in public shelters.

Local laws and ordinances are addressing some of this across New York State. But this is a patchwork quilt, a clearly worded state law would be much more effective, and would underscore New York State's commitment to nondiscrimination toward all gays, lesbians, bisexuals and transgendered people, even if ESPA lacks the moral fiber to make that full commitment.

Some people argue that another "included category" is not needed. The terms "sex" or "sexual orientation" are broad and can can be inferred to include transgendered people. Our experience, across the country, is that state courts are reluctant to interpret laws to cover people who are not specifically included. Their argument is that they are the court and not the legislature. They do not make the laws they merely interpret them. If the legislature intended transgendered people to be included they would have specifically included them in the law. If they did not include them, especially where the issue was discussed during passage of the law, then the legislature must have intended such people not be covered.

Here are some comparisons of why the exclusion of transgendered people from SONDA is morally foul:

- It is like light complexioned "high yellow" mulattos writing a racial non-discrimination law that is carefully worded to only cover light complexioned people who can pass for white. Then claiming that dark complexioned black people "look funny" and you can't really expect conservative Republicans in the New York State Senate to pass a racial non-discrimination act that covers dark complexioned people who "look funny."

- It is like Reformed Jews writing a religious non-discrimination law that is carefully worded to cover Reformed Jews but not Hassidic Jews who "dress funny." Then claiming that you can't expect conservative Republicans in the New York State Senate to pass a religious non-discrimination law that covers Hassidic Jews who "dress funny."

- It is like a human rights group, writing a national origins non-discrimination act, but carefully wording it to exclude people who dress in national costumes. Take those Irish for example!

Parading around the city in ridiculous kilts while playing screechy bagpipes! You really can't expect conservative Republicans in the New York State Senate to pass a national origins non-discriminations act that covers ridiculous Irish people parading in kilts and playing bagpipes!

In just the same way, gay male assimilationsts in the Empire State Pride Agenda have conspired to write a sexual orientation non-discrimination act that is carefully worded to include themselves but exclude transgendered people who "dress funny," then claiming that you can't really expect conservative Republicans in the New York State Senate to pass a sexual orientation non-discrimination act that covers ridiculous transgendered people who dress funny.

You have every right to be deeply offended that the leadership of ESPA is abusing the good intentions of the Republican Party in this manner.

Therefore, I conclude, the Sexual Orientation Non-Discrimination Act (SONDA S720) as it is currently written, is seriously flawed and should be amended or defeated! It should not be passed with its current language.

**Sincerely,**

*Alexandra K. MacKenzie*

**Alexandra K. MacKenzie**
**a.k.a William J. Keck, III**

cc: Senator Joseph L. Bruno, Senate Majority Leader
    Each State Senator

000032

**Printed: 12/4/2002**

Jeff Maier
20 Kellogg St.
Clinton, NY 13323

Governor George E. Pataki
New Your State Capitol
Albany, NY 12224

Dear Governor Pataki:

I'd like to take a moment to urge you NOT to sign the pro-gay and pro-homosexuality law that is circulating in Albany for your signature later this year.

This law will only serve to place another nail in the coffin of common sense and freedom of speech in this country. It will effectively silence those decent citizens who have moral and religious objections as to why homosexuality is wrong and their rightful ability to say so. That of course, is the major purpose of this bill, and why also the extremist gay-rights movement wants it to be even more stiffly worded against those who would oppose their pan-gay agenda.

Politically speaking, this is not the kind of law a conservative republican should be signing either. Let the government stay out of our bedrooms and allow the general self-governing forces within society to address these kinds of issues. Aside from the obvious moral considerations here, I'm sure the founding fathers would agree. This is not good law nor is it the proper place of government to coming down in favor of one side or the other in matter like this.

Current laws deal more then sufficiently well with issues like harassment and violence against of one individual by another. The last thing we need is more (bad) law intended to address designer issues. As John Stuart Mill observed, what we need (and also need to enforce) is general laws governing general public behavior for the general good of the productive citizen. This kind of customized, style-based law for a select few has no place in our omni-pluralistic America. Once again I urge you to either not sign or veto this bad law.

A republican and conservative in good standing

Jeff Maier

Jeff Maier

000033

JA0822

Anthony & Grace Ruck
242-27 130th Road
Rosedale NY 11422-1144

December 6, 2002
Bill # S.720

Honorable Governor Pataki
State Governor of New York
Albany NY 12224

RE: SONDA

Dear Governor Pataki;

You have many constituents that we know of that share our
views about the Sexual Orientation Non-Discrimination Act.
We believe on the Lord Jesus and are praying that you vote
no to this bill. It is intended to further the rights of
persons who have perverted the normal male-female relationship
over against freedom of religion. Our conscience would not
let us associate with such a one who pursues vile lust...
working shame.

Our immigration laws forbid those who want to engage in "immoral
sexual acts", sodomites. Immigration & Naturalization Service
publication M-50, page 10.

We write as husband and wife, biological parents of four sons,
business owner, employee, homeowner, and minority ethnic group.

We plead with you to use your influence to maintain the prosperity
of normal family conditions in our great state of New York!

Sincerely;

O. M        Grace Ruck        000034

JA0823







| Date and Time: | Monday, December 16, 2002 |
| To: | George Pataki, Governor |
| Company: | |
| Fax No.: | 518-474-3767 |
| From: | Noreen Sevret |
| Company: | |
| Phone No.: | 607-562-7309 |
| Fax No.: | 607-562-8664 |
| No. of Pages: | 1 |

Dear Governor Pataki,

I just heard today about SONDA (S. 720) and the Dignity for all Students Act (S. 1628) and that it will be voted on tomorrow, Dec. 17th. I need to express my opinion to you on behalf of my family.

I am **appalled** to think that the state I live in, and the Governor I voted in office, would be considering the passage of these two bills. I tried to figure out why the homosexual activist groups were endorsing you this past election – it didn't make sense. Now it does. I **respectfully ask that you do not sign SONDA or the Dignity for All Students Act.**

I have a son who is in 1st grade. It disgusts me and makes me angry to think of the damage that will be done to our children if S. 1628 is passed and public schools are forced to teach the "appropriateness of homosexuality to grade school children". I will not allow my son to be part of that. In my opinion, it is NOT okay, at 6 years of age, to be taught about homosexuality, bisexuality, or any other lifestyle. At his young age, he is looking to his daddy to teach him how to grow up to be a man of **honor** and **integrity** – the last thing he needs is for the public schools to be teaching him about homosexuality. Talk about brainwashing and being destructive to our children. What we sow now in our children, is what we will reap later – it won't be a pretty picture.

I feel that it will be a very sad and shameful day for New York, and for the children of New York, if these two bills cross your desk and are signed into law.

Respectfully,


Noreen Sevret

11955 River Road

Corning, NY 14830


000035

JA0824

2740 Woodlawn Avenue
Niagara Falls, NY 14301
December 11, 2002

Governor George E. Pataki
Executive Chamber
Albany, NY 12224

Dear Sir:

I urge you to oppose the *Sexual Orientation Non-Discrimination* and *Dignity for All Students* Acts, and to give careful consideration to the destructive impact of such laws. If passed gay activists will use them to achieve their ultimate goal—filing criminal charges against anyone who expresses opposition to their lifestyle and using the schools to teach children that homosexuality is normal and harmless. There is a real danger that people like myself may be charged with the crime of "hate speech" just for calling homosexual acts sinful. In San Francisco the legal groundwork is being laid to coerce religious organizations, employers, and individuals into silence on the issue of homosexuality. It is also happening in the private sector—Kodak recently fired 23-year company veteran Rolf Szabo for a memo he wrote expressing opposition to the company's promotion of "Coming Out Day" for homosexuals. Passing SONDA will give the thought police free reign in New York State. Freedom of speech and our children's moral formation cannot be sacrificed for political expedience.

Through this legislation, homosexual activists are seeking not civil rights (which they already have) but a new right to be "comfortable" in their sexual practices and to live free of criticism. If the Senate feels it must give special protections to homosexuals, then it should at least amend the bill to state explicitly that it cannot be used to intimidate and punish those who speak out against the homosexual lifestyle and that schools cannot be forced to teach children that gay sex is normal.

But with or without that amendment, the assumptions underlying this legislation are flawed. First of all, the bill is misnamed. It is not "orientation" that is at issue here. Orientation merely describes one's private desires and it need never become an issue unless it is manifested in behavior—behavior condemned by the major monotheistic religions. Unlike race and gender, the fact that this case involves behavior generally regarded as immoral makes it totally unlike race and gender discrimination—and this is where the notion of the homosexual agenda as a civil rights struggle breaks down.

Homosexual activists demand that we accept and enshrine into law, the idea that those who engage in gay sex are in the same category with those who are born black or female. American history reveals the absurdity of this view. When were homosexuals as a class denied the right to vote? When were they sold into slavery and beaten or killed by "owners"? When did the Supreme Court deny them legal personhood and the rights of citizenship? Homosexuals in America have not suffered this egregious form of institutionalized discrimination. As terrible as are the acts of violence and other crimes against homosexuals, they are no worse than other violent crimes committed for various reasons or no reason at all. We must remember that crimes targeting gays and lesbians are isolated incidents that can be punished and prevented just by enforcing the laws we already have. Since there is no compelling need for such legislation, it has is no justification—for the law would give homosexuals legal advantages over those who oppose their social and political agenda. Radical homosexuals would ride in on the coattails of genuine civil rights movements, taking all the benefits for themselves while infringing upon the rights of others—namely the free speech of conservative Christians who are not being given any comparable safeguards against "politically correct" discrimination. The law would elevate homosexuals to a special protected status, giving their lifestyle official recognition and approval.

But I ask you, why should the government recognize and "normalize" a lifestyle that has brought untold death, suffering and devastation to the very communities in which it is practiced? It is like alcohol abusers demanding special protections for their drinking habit, and insisting that tolerance of alcohol abuse be taught in schools. This type of legislation is a veiled but very real attack on the rights of Christians and others who teach that homosexuals must remain chaste. Their attempts to banish our teaching of traditional morality are tragically ironic when we consider one undeniable fact: Had the homosexual community adopted even one of our basic sexual moral tenets—either the prohibition of gay sex or even the mere requirement of monogamy—the deadly AIDS virus would never have spread throughout their community. In labeling our religious views "intolerant," in branding our sexual philosophy "homophobic," in seeking to criminalize our moral discretion and free-speech as a form of "discrimination"—it is the radical homosexuals who are provoking a confrontation, and New York State should not be taking their side.

Most Sincerely,
Kelly G. Smith

000036

JA0825

Nov 18, '02

Honorable Governor Pataki

While I appreciate the good you do for Jewish Institutions, I am appalled by the reports that you are going to introduce a Homosexual special privileges bill in the State Senate.

Our heroes of the past gave up their lives for honor. It seems you have accepted disgrace for the purpose of insuring your position. I understand it was a difficult test, but you will have relegated yourself to the eternal hall of shame if you go ahead with SONDA.

You needn't bother sending me a letter that homosexuals also have rights. They don't need more rights than anyone else. They are wealthier and more politically influential than anybody else. Their objective is to foist their obnoxious, unwholesome lifestyle on others.

You may have forgotten that NAMBLA was a member of national gay organizations. They want their sex taught to children and see nothing wrong with corrupting them. I am somewhat shocked that a person whom I thought was an honorable man would support such things, even for some additional votes.

Congratulations on your election and please restore this states confidence in you and do away with SONDA.

Most Sincerely,

Joseph Friedman
1501 East 17th Street
Brooklyn, N.Y. 11230
(718) 336-0640

060037
JA0826

2 December 02

Dear Governor Pataki,

I am writing this letter to ask for your support for the SONDA (Sexual Orientation Non-Discrimination Act) vote coming up on December 17.

I wish to thank you for your past support of SONDA and ask that you encourage other Republicans in the State to vote yes on December 17 for SONDA!

Thank you and Sincerely yours,

Albert P Hofford
146 Woodridge Court Apt 7
Rochester, New York 14622

000038

JA0827

THE HONORABLE
GOVERNOR GEORGE E. PATAKI
STATE OF NEW YORK, ALBANY NY 12247

December 2  2002

DEAR GOVERNOR PATAKI

Militant feelings are needed to serve notice on S 720.

Senate Bill S 720 proposes to set aside a standard
of moral values upheld since the early days of this
great Country, where a man and his wife nurture  their
'brood' by showing them the good and right way.

Parents, together, have watched over their EDUCATION
in the love atmosphere of a family, pure and right.

EMPLOYMENT, materially, even today, often involves
father and son  working side by side in a joint effort
to make a living before God but not so with Bill S 720.

Not pacifist but resolute refusal of the proposed
'Orientation Bill S 720' is called for in New York State.

> "...because of vile lusts...females
> changed the natural use...and males
> also...inflamed...males with males
> working shame...without natural
> affection...who knowing the righteous
> judgment of God...not only practice
> but have fellow delight in those
> who do them".   Bible reference:Romans 1
>                             Verses 26,27,31,32

My wife and I are believers in the Lord Jesus Christ.

We believe that Government is set up by God and we
seek to be subject to it.  We are in constant prayerful
support of the Authorities in their immense taskto
restrain evil and violence, without, but also within.

                    Sincerely and Respectfully,

                    Arthur Walker  Dorothy Walker
                    Arthur & Dorothy Walker

49 Forest Avenue
Valley Stream N Y 11581

000039

JA0828

November 30, 2002

Governor George Pataki
Executive Chamber
Albany, New York  12224


Dear Gov. Pataki,

   I am very concerned about even the possibility of a Senate
vote on the Sexual Orientation and Discrimination Act (SONDA,
bill S720). It is also understood that you have promised to
sign this bill into law if passed. I am shocked and dismayed that
you would support such a bill. It is against Christian teach-
ing. I remind you that we are "one nation, under God". The
Senate has refused to pass this type of legislation in the
past. You are being counted on, supported, and prayed for to
stop it once again.

   I am a Christian, married, with six children, believing on
God and that Jesus Christ is His Son and my Savior. I base
my beliefs on the Bible, the inspired Word of God. My life is
patterned after these teachings.

   Many types of "sexual orientation" are wrong, as can be
shown from Scripture, including homosexual behaviour. The
Apostle Paul in the epistle to the Romans (ch.1:v26-28) says
"For this reason God gave them up to vile lusts; for both their
females changed the natural use into that contrary to nature;
and in like manner the males also, leaving the natural use of the
female, were inflamed in their lust towards one another; males
with males working shame, and receiving in themselves the re-
compense of their error which was fit". This is a destructive
and immoral lifestyle, against the family as we were created
by God.

   We are attempting to condone a lifestyle that cannot be
supported by Scripture. I would also like to say that I support
government as being ordained of God (Romans 13:v1-4 "Let every
soul be subject to the authorities that are above him, etc.")
and public servants sush as yourself have the impossible job of
trying to please everyone. We must keep before us that "God must
be obeyed, rather than men" Acts 5:v29).

   Thank you for your consideration, support, and hours of
hard work. The government of this country is in our prayers.

                          Sincerely Yours,

                          Kenneth and Marion Parr
                          489 Helendale Road
                          Rochester, New York 14609-3103


000040
JA0829

**ROBERT & JEAN SCOTT**
49 Meyer Ave
Valley Stream, NY 11580

November 15, 2002

Honorable George Pataki
GOVERNOR
Albany, NY 12247

**RE: SONDA**

Dear Governor Pataki:

We are writing to you about an ill-advised bill; **S720** - the Sexual Orientation
Non-Discrimination Act.

This bill is a thinly-disguised attempt to advance the homosexual agenda. It is
opposed by many of your constituents: family-oriented men and women whose
moral values cause them to 'resent this attempt to legislate our society into a
zone of moral neutrality.

The bill is unconstitutional, in that it threatens the free-exercise of religion.
It permits, for instance, a Christian employer to disassociate from a homosexual
when attending church services, yet compels him to employ such a person
when outside of the house of worship. Similarly, a mother may choose not to
take communion with a homosexual teacher, but cannot legally keep her child
out of that teacher's class in school. This is a denial of Christian conscience
which governs every area of a believer's life; both the secular, and the
spiritual.

As believers on our Lord Jesus Christ, we pray constantly for you in your
your important position in Government. We were thankful that you were
re-elected. We urge you to "rule in the fear of God" (2 Samuel 23: 3), and
use your influence and, if necessary, your veto, to defeat this bill.

Sincerely.

*Bert Scott  Jean Scott*

**000041**

JA0830

# GOVERNOR GEORGE PATAKI
## EXECUTIVE CHAMBER
### STATE CAPITOL
### ALBANY, NY 12224

Dear Governor,                                                                11-14-02

     I am writing you about the bill SONDA that is in the Senate. I have been reading about it's passage through the Senate in a paper I receive called Freedom's Alert. I was disappointed when I heard on the radio that you pressured Senator Bruno to get this bill voted on, equally disappointed when I heard he succumbed to the pressure and called a special session in December. Another thing I did not like is the fact that you were endorsed by the Empire Pride Agenda. I do not think that there should be a law that protects these individuals from discrimination. Neither should there be a law which gives them privileges that other normal people do not have. Both of these things are in the bill that you are pushing to get through the Senate. This bill contains a special protection to a group that is not eligible for it. It would cause churches to hire homosexuals even though that is against our beliefs. It would make it illegal for a daycare center to deny a job to someone because he is a queer. It would force the Boy Scouts into hiring queers. This is plainly not in the best interest of New Yorkers. This would make New York less attractive to businesses with any sort of morals. I hope you think about what I am writing you about. It is very important that you do not sign this bill into law. What a devastating effect it would have in New York. On behalf of our state, our economy, and our well being please veto this bill if it ever makes it to your desk.

     I do not think that this bill is a bill that you want to back. You know what's right and what's wrong. I think you also know that this bill should be at the top of the wrong list (and veto list). Please do what you know is right and stop this bill dead in its tracts. Do not make it so people look around and say this was authorized by Gov. Pataki when they see the acceptance of homosexuals forced upon churches, upon the boy scouts, upon everybody in general. Please don't do it. Don't sign it with your pen. Thanks for your time. We will be praying that you make the right decision.

Sincerely,

Nathan M. Varner

NATHAN M. VARNER
3907 Rippleton Rd.
Cazenovia, NY
13035-9602
315-655-8379
mdjdnvarner@juno.com

Righteousness exalteth a nation: but sin is a reproach to any people.
Proverbs 14:34

000042

JA0831

Mr. & Mrs. James Taylor III
52 Heatherfield Road
Valley Stream, NY 11581
December 3, 2002

Honorable Governor George E. Pataki
Governor of New York State
Albany, NY 12224

Dear Governor Pataki:          Re:  S.720  Sonda bill

    We urge you to be governed by what you know to be right, rather than
political pressures, and ask you to use your influence to defeat the
Sonda bill S.720 in its present form.

    We realize that many persons choose a life style (for instance, "gay"
or sodomy) different than ours.  While we openly preach the gospel of God,
seeking to enlighten all men, we would not interfere with what others are
doing.  Rather otherwise, we are enjoined in the Holy Scriptures to "withdraw"
from iniquity (2 Timothy 2:19), in other words, to keep aloof from it.  This
is what Abraham did (Genesis 19).

    As believers on the Lord Jesus, it is our duty to keep ourselves pure
(1 Timothy 5:23), and to protect our households and persons in our employ,
particularly young people;  therefore we abhor the suggestion of having a
perverted  (according to Scripture) person in our employ.  For many years
we have had a small family business;  how could it be fair or right for
New York State to force us in violation of our conscience before God, to
employ someone who would be a damaging influence morally?  We would be
obliged to go out of business.  Why should the State discriminate against us
in this way?

    Our prayers, and those in Christian fellowship with us, go up to God
constantly for government and those in authority under God, and we are
thankful for their services.  Please take a stand against the Sonda bill
S720 in its present form.  Thank you very much for your consideration.

            Respectfully,

            James Taylor III
            James Taylor III

000043

JA0832

To:     Governor George Pataki
From:   Raymond McArthur
Subj:   SONDA S.720

Dear Governor Pataki:

It's hard to believe the radical, amoral, left wing political correctors have this much power! Please have the fortitude to oppose them.

The Sexual Orientation bill (SONDA S.720) amends the Human Rights Law, which was originally designed for powerless persons who had unchangeble traits (like race). Not only do many homosexuals change from that lifestyle, but they also have incredible political power (otherwise, the Senate would not be convening a special session for them).

Both SONDA and the Dignity For All Students Act (which mandates teaching the appropriateness of homosexuality to grade school children) must be rejected because to support positions like these the government would be supporting controversial choices which are medically proven as dangerous to the participants and expensive to the community which has to absorb the cost of increased medical attention.

To teach such controversial practices as being normal to children or protecting the same as legal behavior under NY law offends the moral sensibilities of the majority of New Yorkers.

Sincerely,

Raymond McArthur
4056 Bay Park Dr
Liverpool, NY 13090

000D41

To:     Governor George Pataki
From:   Richard Neckers
Subj:   SONDA S.720

Dear Governor Pataki:

The Sexual Orientation bill (SONDA S.720) amends the Human Rights Law, which
was originally designed for powerless persons who had unchangeble traits (like race).
Not only do many homosexuals change from that lifestyle, but they also have
incredible political power (otherwise, the Senate would not be convening a special
session for them).

Both SONDA and the Dignity For All Students Act (which mandates teaching the
appropriateness of homosexuality to grade school children) must be rejected because
to support positions like these the government would be supporting controversial
choices which are medically proven as dangerous to the participants and expensive to
the community which has to absorb the cost of increased medical attention.

To teach such controversial practices as being normal to children or protecting the
same as legal behavior under NY law offends the moral sensibilities of the majority
of New Yorkers.

Sincerely,

Richard Neckers
7640 Bliss Rd
Westfield, NY 14787



000045

To:     Governor George Pataki
From:   Michele Matecki
Subj:   SONDA S.720

Dear Governor Pataki:

Please please please don't let the homosexuals have one more inch. Please fight to preserve the heterosexual family unit. It's the best way to raise a healthy next generation.

The Sexual Orientation bill (SONDA S.720) amends the Human Rights Law, which was originally designed for powerless persons who had unchangeble traits (like race). Not only do many homosexuals change from that lifestyle, but they also have incredible political power (otherwise, the Senate would not be convening a special session for them).

Both SONDA and the Dignity For All Students Act (which mandates teaching the appropriateness of homosexuality to grade school children) must be rejected because to support positions like these the government would be supporting controversial choices which are medically proven as dangerous to the participants and expensive to the community which has to absorb the cost of increased medical attention.

To teach such controversial practices as being normal to children or protecting the same as legal behavior under NY law offends the moral sensibilities of the majority of New Yorkers.

I will be praying for your vote for the FAMILY.

Thank you-

Sincerely,

Michele Matecki
104 East Ave
Falconer, NY 14733

D000046

To:     Governor George Pataki
From:   Diana Nygard
Subj:   SONDA S.720

Dear Governor Pataki:

The Sexual Orientation bill (SONDA S.720) amends the Human Rights Law, which
was originally designed for powerless persons who had unchangeble traits (like race).
Not only do many homosexuals change from that lifestyle, but they also have
incredible political power (otherwise, the Senate would not be convening a special
session for them).

Both SONDA and the Dignity For All Students Act (which mandates teaching the
appropriateness of homosexuality to grade school children) must be rejected because
to support positions like these the government would be supporting controversial
choices which are medically proven as dangerous to the participants and expensive to
the community which has to absorb the cost of increased medical attention.

To teach such controversial practices as being normal to children or protecting the
same as legal behavior under NY law offends the moral sensibilities of the majority
of New Yorkers.

Thank you for taking the time to learn the views of concerned New Yorkers.

Sincerely,

Diana Nygard
157 E 6th St
Oswego, NY 13126

000047

To:      Governor George Pataki
From:   Nick Felice
Subj:    SONDA S.720

Dear Governor Pataki:

The Sexual Orientation bill (SONDA S.720) amends the Human Rights Law, which
was originally designed for powerless persons who had unchangeble traits (like race).
Not only do many homosexuals change from that lifestyle, but they also have
incredible political power (otherwise, the Senate would not be convening a special
session for them).

Both SONDA and the Dignity For All Students Act (which mandates teaching the
appropriateness of homosexuality to grade school children) must be rejected because
to support positions like these the government would be supporting controversial
choices which are medically proven as dangerous to the participants and expensive to
the community which has to absorb the cost of increased medical attention.

To teach such controversial practices as being normal to children or protecting the
same as legal behavior under NY law offends the moral sensibilities of the majority
of New Yorkers.

Are you people crazy!!!! You outlaw the teaching of Religion and now you want to
replace it in the schools with perversion. If I ever knew that Pataki had made a deal
with the so called Gay community he would have never got mine or my families
vote.

Sincerely,

Nick Felice
55 Miller St
Seneca Falls, NY 13148

000048

To:     Governor George Pataki
From:   Tammie Swaney
Subj:   SONDA S.720

Dear Governor Pataki:

Don't take away our religious freedoms and beliefs. As a Christian and a mother of 3, we raise our children on Biblical truth. Whether you belive the truth of the Holy Bible or not, you are taking away our right to adhere to our firm beliefs.

The Sexual Orientation bill (SONDA S.720) amends the Human Rights Law, which was originally designed for powerless persons who had unchangeble traits (like race). Not only do many homosexuals change from that lifestyle, but they also have incredible political power (otherwise, the Senate would not be convening a special session for them).

Both SONDA and the Dignity For All Students Act (which mandates teaching the appropriateness of homosexuality to grade school children) must be rejected because to support positions like these the government would be supporting controversial choices which are medically proven as dangerous to the participants and expensive to the community which has to absorb the cost of increased medical attention.

To teach such controversial practices as being normal to children or protecting the same as legal behavior under NY law offends the moral sensibilities of the majority of New Yorkers.

I ask you, please do not vote to instill your beliefs mandating that these be taught in our schools.

God teaches love. Not acceptance of sin. Our prayers are that God's way will prevail in this issue.

Sincerely,

Tammie Swaney
22 Fraser Dr
Hilton, NY 14468

000049

JA0838

To:     Governor George Pataki
From:   Bev Chartrand
Subj:   SONDA S.720

Dear Governor Pataki:

The SONDA W.720 bill that is before you is of great concern to me.

The Sexual Orientation bill (SONDA S.720) amends the Human Rights Law, which was originally designed for powerless persons who had unchangeble traits (like race). Not only do many homosexuals change from that lifestyle, but they also have incredible political power (otherwise, the Senate would not be convening a special session for them).

Both SONDA and the Dignity For All Students Act (which mandates teaching the appropriateness of homosexuality to grade school children) must be rejected because to support positions like these the government would be supporting controversial choices which are medically proven as dangerous to the participants and expensive to the community which has to absorb the cost of increased medical attention.

To teach such controversial practices as being normal to children or protecting the same as legal behavior under NY law offends the moral sensibilities of the majority of New Yorkers.

Please do not support this bill

Sincerely,

Bev Chartrand
760 County Route 25
Oswego, NY 13126

000050

JA0839

To:      Governor George Pataki
From:    Walter Duffy
Subj:    SONDA S.720

Dear Governor Pataki:

The Sexual Orientation bill (SONDA S.720) amends the Human Rights Law, which
was originally designed for powerless persons who had unchangeble traits (like race).
Not only do many homosexuals change from that lifestyle, but they also have
incredible political power (otherwise, the Senate would not be convening a special
session for them).

Both SONDA and the Dignity For All Students Act (which mandates teaching the
appropriateness of homosexuality to grade school children) must be rejected because
to support positions like these the government would be supporting controversial
choices which are medically proven as dangerous to the participants and expensive to
the community which has to absorb the cost of increased medical attention.

To teach such controversial practices as being normal to children or protecting the
same as legal behavior under NY law offends the moral sensibilities of the majority
of New Yorkers.

Sorry you voted for this unnessary legislation.
Please DO NOT vote for Dignity For All Students Act which flies in the face of all
with family values.

Sincerely,

Walter Duffy
8 Fawn St
Saranac Lake, NY 12983

000051

JA0840

To:      Governor George Pataki
From:  Clara M. Neckers
Subj:   SONDA S.720

Dear Governor Pataki:

The Sexual Orientation bill (SONDA S.720) amends the Human Rights Law, which was originally designed for powerless persons who had unchangeble traits (like race). Not only do many homosexuals change from that lifestyle, but they also have incredible political power (otherwise, the Senate would not be convening a special session for them).

Both SONDA and the Dignity For All Students Act (which mandates teaching the appropriateness of homosexuality to grade school children) must be rejected because to support positions like these the government would be supporting controversial choices which are medically proven as dangerous to the participants and expensive to the community which has to absorb the cost of increased medical attention.

To teach such controversial practices as being normal to children or protecting the same as legal behavior under NY law offends the moral sensibilities of the majority of New Yorkers.

Sincerely,

Clara M. Neckers
7640 Bliss Rd
Westfield, NY 14787

000052

JA0841

To:     Governor George Pataki
From:   Gertrude Valk
Subj:   SONDA S.720

Dear Governor Pataki:

ALERT

The Sexual Orientation bill (SONDA S.720) amends the Human Rights Law, which
was originally designed for powerless persons who had unchangeble traits (like race).
Not only do many homosexuals change from that lifestyle, but they also have
incredible political power (otherwise, the Senate would not be convening a special
session for them).

Both SONDA and the Dignity For All Students Act (which mandates teaching the
appropriateness of homosexuality to grade school children) must be rejected because
to support positions like these the government would be supporting controversial
choices which are medically proven as dangerous to the participants and expensive to
the community which has to absorb the cost of increased medical attention.

To teach such controversial practices as being normal to children or protecting the
same as legal behavior under NY law offends the moral sensibilities of the majority
of New Yorkers.

I sincerely ask you to REJECT these bills that is against GOD and COUNTRY- and
all our MORALS. HONOR, and the very FOUNDATION of our country. AND NOT
WANTED BY THE MAJORITY OF CITIZENS. WHETHER THEY ARE JUST
GOOD CITIZENS OR DEVOUT GOD-FEARING CHRISTIANS!!!

Sincerely,

Gertrude Valk
2313 Albany Post Rd
Walden, NY 12586

000053

JA0842

To:     Governor George Pataki
From:   Rhonda Perkins
Subj:   SONDA S.720

Dear Governor Pataki:

I am opposed to the SONDA bill.

The Sexual Orientation bill (SONDA S.720) amends the Human Rights Law, which
was originally designed for powerless persons who had unchangeble traits (like race).
Not only do many homosexuals change from that lifestyle, but they also have
incredible political power (otherwise, the Senate would not be convening a special
session for them).

Both SONDA and the Dignity For All Students Act (which mandates teaching the
appropriateness of homosexuality to grade school children) must be rejected because
to support positions like these the government would be supporting controversial
choices which are medically proven as dangerous to the participants and expensive to
the community which has to absorb the cost of increased medical attention.

To teach such controversial practices as being normal to children or protecting the
same as legal behavior under NY law offends the moral sensibilities of the majority
of New Yorkers.

I agree fully with the above statement. I know people who have formerly been
homosexual, but I've never met anyone who used to be white, black, hispanic, etc.
(Michael Jackson being the exception, of course:)

Sincerely,

Rhonda Perkins
3256 Bassett Rd
Savannah, NY 13146

000054

JA0843

To:      Governor George Pataki
From:    Stan Kent
Subj:    SONDA S.720

Dear Governor Pataki:

As a minister in New York State, I oppose the
Sexual Orientation Bill because it goes against
Biblical mandates and principles on which this
nation was found. We were not founded as a
gay or lesbian nation, so that monies from
state taxes should be spent to encourage and
even edify such behavior and lifestyles. Christians should not be forced to pay taxes
so
that others can continue in unbiblical and
perverted behavior.

The Sexual Orientation bill (SONDA S.720) amends the Human Rights Law, which
was originally designed for powerless persons who had unchangeble traits (like race).
Not only do many homosexuals change from that lifestyle, but they also have
incredible political power (otherwise, the Senate would not be convening a special
session for them).

Both SONDA and the Dignity For All Students Act (which mandates teaching the
appropriateness of homosexuality to grade school children) must be rejected because
to support positions like these the government would be supporting controversial
choices which are medically proven as dangerous to the participants and expensive to
the community which has to absorb the cost of increased medical attention.

To teach such controversial practices as being normal to children or protecting the
same as legal behavior under NY law offends the moral sensibilities of the majority
of New Yorkers.

If this bill passes and is not repealed, I will hold my republican representatives guilty
of not speaking out and taking a stand.

Sincerely,

Stan Kent
10470 Bantle Rd
North Collins, NY 14111

D000055

JA0844

To:    Governor George Pataki
From:  jessie malecki
Subj:   SONDA S.720

Dear Governor Pataki:

I am AGAINST the anti-gay bias law - I think it is absolutely disgraceful! No one should get this preferential treatment!!!!!!

The Sexual Orientation bill (SONDA S.720) amends the Human Rights Law, which was originally designed for powerless persons who had unchangeble traits (like race). Not only do many homosexuals change from that lifestyle, but they also have incredible political power (otherwise, the Senate would not be convening a special session for them).

Both SONDA and the Dignity For All Students Act (which mandates teaching the appropriateness of homosexuality to grade school children) must be rejected because to support positions like these the government would be supporting controversial choices which are medically proven as dangerous to the participants and expensive to the community which has to absorb the cost of increased medical attention.

To teach such controversial practices as being normal to children or protecting the same as legal behavior under NY law offends the moral sensibilities of the majority of New Yorkers.

Thank You for whatever you can do to CHANGE this.

Sincerely,

jessie malecki
21 North St
Schenectady, NY 12305

000056

JA0845

To:     Governor George Pataki
From:   Anthony Palow
Subj:   SONDA S.720

Dear Governor Pataki:

The Sexual Orientation bill (SONDA S.720) amends the Human Rights Law, which
was originally designed for powerless persons who had unchangeble traits (like race).
Not only do many homosexuals change from that lifestyle, but they also have
incredible political power (otherwise, the Senate would not be convening a special
session for them).

Both SONDA and the Dignity For All Students Act (which mandates teaching the
appropriateness of homosexuality to grade school children) must be rejected because
to support positions like these the government would be supporting controversial
choices which are medically proven as dangerous to the participants and expensive to
the community which has to absorb the cost of increased medical attention.

To teach such controversial practices as being normal to children or protecting the
same as legal behavior under NY law offends the moral sensibilities of the majority
of New Yorkers.

Thank you for your attention in this matter.

Sincerely,

Anthony Palow
Pastor
Faith Assembly of God
254 Spackenkill Rd
Poughkeepsie, NY 12603

000057



**Gloria Galea**

12/20/02 02:51 PM

To: Legislative Secretary/NYEC@NYEC

cc:

Subject: s720

| Correspondence Profile | | |
|---|---|---|
| **Arthur Hult** | Addressed To | |
| 6154 Cowie Rd | Correspondence Number | |
| Wyoming, NY 14591 | Correspondence Type | |
| County | | |
| Open | Date of Correspondence | 12/20/2002 |
| | Date Received | 12/20/2002 |
| | Date Entered | |
| | Date Completed | |
| Type | Referred To | |
| Email    dflm@msn.com | Date Referred | |
| | Referred By | |
| | Subject | |
| | S720 | |

Incoming--->

Outgoing--->

Email Received From Website
Dear Governor Pataki,
First, I like to say I believe you have done a lot of good things for
the state of NY in the past. For those things I thank you. But, in
recent years I have become more disenchanted with some of your
decision making concerning gambling, casinos, etc. Dr. Earl Grinols,
Economics Professer, U of Illinois,"states that gambling's social
costs outweighs its social benefits by a margin of at least 2 to I,
and probably closer to 5 1/2 to I. The signing of SONDA, S720 was the
last straw for me. I have never voted Democrat before and I am 61
years old; but I really believe you have jumped ship on a lot of us
who put you in office with the signing of S720 into law and if you
run for reelection, I WILL vote Democrat. You would do well to open a
Bible and turn to the Book of Romans, chapter 1, verse 18 and read to
the end of the chapter, because in the end it is God who are you
going to answer to. I know that you are my governor for now and I
will continue to pray you and your decision making in the future.

(c) 1995-2001 ComputerWorks. All Rights Reserved.



 **Gloria Galea**
12/23/02 10:33 AM

To: Legislative Secretary/NYEC@NYEC
cc:
Subject: s720

| Correspondence Profile | |
|---|---|
| **Gloria Chaves** | Addressed To |
| 3666 Bowen Rd | Correspondence Number |
| Lancaster, NY 14086 | Correspondence Type |
| County | |
| Open | Date of Correspondence  12/20/2002 |
| | Date Received  12/20/2002 |
| | Date Entered |
| | Date Completed |
| Type | Referred To |
| Email    gchaves@juno.com | Date Referred |
| | Referred By |
| | Subject |
| | S.720/A.1971 |

Incoming--->
Outgoing--->

Email Received From Website
Dear Governor Pataki,
  I voted for you in the last election because I believe you have
done many good things for New York State, and as a Republican, I
believed that you would take a conservative approach to most issues.
I was disappointed that you were not endorsed by the pro-life party
but I still believed that you would support most of the conservative
Republican viewpoints.  I therefore implore you to veto S.720/A.1971,
the Sexual Orientation Non-Discrimination Act.  Please consider the
state and nation we will have if the homosexual agenda continues to
grow.  Do you want your children and grandchildren to live in the
kind of nation which you will have had a part in forming, if you sign
this bill?  For the sake of our nation's families, I again ask you to
please veto this bill.  Thank you.  Sincerely, Gloria Chaves

(c) 1995-2001 ComputerWorks. All Rights Reserved.



060059

**EXHIBIT O**

JA0849

NEW YORK STATE SENATE


THE STENOGRAPHIC RECORD



ALBANY, NEW YORK

December 17, 2002

11:55 a.m.



REGULAR SESSION




LT. GOVERNOR MARY O. DONOHUE, President

STEVEN M. BOGGESS, Secretary

Candyco Transcription Service, Inc.

THE PRESIDENT:    The Secretary
will read Calendar Number 1705.

THE SECRETARY:    Calendar Number

1705, substituted earlier today by Member of
the Assembly Sanders, Assembly Print Number
1971, an act to amend the Executive Law, the
Civil Rights Law, and the Education Law, in
relation to prohibiting discrimination.

THE PRESIDENT:    Senator
Dollinger.

SENATOR DOLLINGER:    Explanation,
Madam President.

THE PRESIDENT:    Senator Hoffmann,
an explanation has been requested by Senator
Dollinger.

SENATOR HOFFMANN:    Thank you,
Madam President.

My first order of business is to
acknowledge the original prime sponsor of this
measure, who has left this chamber to take on
a new responsibility with the City of
New York, working with the United Nations.
And all of us are indeed indebted to Senator
Roy Goodman for his diligence in this area
over the last 30 years.

This marks the 31st year that this
bill has been before the Legislature, but the
first time that it's been before this house.

        I think it's appropriate to read
briefly from Senator Goodman's original
preamble, to perhaps set to rest a few of the
misconceptions about this bill, which is known
as the Sexual Orientation Nondiscrimination
Act.

        In his preamble, Senator Goodman
wrote:  "The Legislature reaffirms that the
State has the responsibility to act to assure
that every individual within this state is
afforded an equal opportunity to enjoy a full
and productive life, and that the failure to
provide such equal opportunity, whether
because of discrimination, prejudice,
intolerance, or inadequate education,
training, housing, or health care not only
threatens the rights and proper privileges of
its inhabitants but menaces the institutions
and foundations of a free, democratic state."

        I think that with that preamble we
understand that this is indeed a compassionate
and wholly appropriate measure that is before
us today.  The summary of its provisions
include, in Section 1, the intent to reaffirm
the right of every New Yorker to a full and

productive life free of discrimination.

Section 2 amends Section 291 of the Executive Law to declare the opportunity to obtain employment, education, and the use of places of public accommodation, as well as ownership, use, and occupancy of housing accommodation without discrimination because of sexual orientation, to be a basic civil right.

Section 3 amends Section 292 of the Executive Law to define "sexual orientation" as "heterosexuality, homosexuality, bisexuality, or asexuality, whether actual or perceived.  However, nothing contained herein shall construed to protect conduct otherwise proscribed by law."

Section 4 amends Section 295 of the Executive Law to expand the responsibilities of the Division for Human Rights to include studying the problem and working toward the elimination of discrimination because of sexual orientation.

Section 5 amends Section 296, Subsection 1, of the Executive Law to prohibit discrimination based on sexual orientation by

employers, licensing agents, employment agencies, and labor organizations.  This section also prohibits employment advertisements and applications which express any limitation, specification, or discrimination as to sexual orientation.

Section 6 also amends the Executive Law to prohibit discrimination based on sexual orientation in the advertisement of apprenticeship training programs.

Section 7 also amends the Executive Law to prohibit discrimination based on sexual orientation by owners, lessees, proprietors, managers, superintendents, agents or employers of places of public accommodation, resort, or amusement.

Section 8, also amending the Executive Law, prohibits discrimination based on sexual orientation with respect to publicly assisted housing accommodations.

Section 9, also amending the Executive Law, prohibits realtors from inducing the sale of property by representing that a change has occurred or will -- or may occur in the composition of a neighborhood

with respect to the sexual orientation of the neighbors.

Section 10, also amending the Executive Law, prohibits an education corporation or association which holds itself out to the public to be nonsectarian from denying the use of its facilities to any otherwise qualified person by reason of his or her sexual orientation.

Sections 11, 12, 13, 14 and 15 also amend other sections of existing law with similar provisions, all designed to create equal opportunity in this state for people of diverse sexual orientation.

The bill does not amend -- and this is very important for those people who are concerned about what this bill does do -- this bill would not amend the Human Rights Law, Article 15, Section 11. "Nothing contained in this section shall be construed to bar any religious or denominational institution or organization or any organization operated for charitable or educational purposes which is operated, supervised or controlled by or in connection with a religious organization from

limiting employment or sales or rental of
housing accommodations or admission to or
giving preference to persons of the same
religion or denomination or from taking such
action as is calculated by such organizations
to promote the religious principles for which
it is established or maintained."

There are those who have lobbied
vigorously against this bill, claiming that it
would dictate to religious entities how they
must conduct their internal practices.  And it
is very important to establish that that would
not be the case.  But where the general public
is affected, in the practice of virtually
every other aspect of our activities in this
state, it would no longer be an acceptable
course of action to discriminate against any
citizen of New York State on the basis of
their sexual orientation, real or perceived.

I want to thank the Governor for
his strong commitment to this measure.  He has
established a mark of leadership that all of
us in this chamber must admire for many, many
reasons.  But today is in fact a proud day
because he is going into an important area

with his leadership in this measure, and we
admire him for his leadership in leading us
forward in SONDA's discussion today and in the
previous months.

I also would like to thank Senator
Bruno for his willingness to acknowledge that
the times have changed.  And he said yesterday
the time has come to bring this measure to the
floor for a vote, and he committed his own
support for it at that time.

I thank all of the people who have
been patiently waiting for more than 30 years
for this measure to come to a vote in the
Senate.  I thank those people who kindly and
compassionately shared their own personal
history, their own stories of discrimination,
and helped spark in those members of this
chamber a new sense of compassion and
awareness as to why we should have a law
addressing prohibition of any discrimination
for sexual orientation in New York State.

This is indeed a proud day for the
New York State Senate, Madam President.  Thank
you.

THE PRESIDENT:    Senator Paterson.

Candyco Transcription Service, Inc.

          SENATOR PATERSON:     Thank you,

Madam President.

          I want to thank Senator Hoffmann

for quite a meticulous and detailed

explanation, particularly the specificity of

Article 15, Section 11, which had become

somewhat controversial, brilliantly stated and

really underscoring that the time has come.

          And like Senator Hoffmann, I want

to thank Senator Bruno for acknowledging that

the time has come by allowing this bill to

come to the floor.

          In many ways, this is really the

Federal Civil Rights Act of 1964 finally

applying to Americans who live in New York

State who in spite of that passage were not

afforded the same protections as those who

were benefited some 38 years ago.  The fact is

that there are people in this state who are

gay and lesbian and bisexual who haven't had

the opportunity to receive fair housing and

equal opportunity in employment, credit, and

educational opportunities because of the way

they conduct their lives.

          We're talking about people that

Candyco Transcription Service, Inc.

have committed no offenses against society,
people who believe in the same ideals that we
do, people who believe in the same values that
we do, and yet we have, as a society, imposed
our judgment upon them.

So it's not only a legal victory
today, it's kind of a celebration. It's a
celebration of the right of people to live the
way they should want to live. In many
respects, it's the type of a life as may have
been described in the Bible in the story of
David and Jonathan that Plato made the very
basis of his philosophy: It is a deep
affection that is as pure as it is perfect.
It dictates, pervades great works of art, like
those of Shakespeare, Michelangelo and, on the
lower frequencies, those people in this state
who are just looking for fair housing and
equal employment. It is misunderstood in this
century, but it is actually fine.

We come here today to make sure
that those rights are extended and that this
historic day gives those rights to Americans
who, just by their birth and their belief in
our American system, should have had those

Candyco Transcription Service, Inc.

protections for over 225 years.

And I'm proud to be standing here as part of it.  It's a day that I'll remember in this chamber as much as any other one.  And I'm very glad to speak in favor of the bill.

I want to thank all of those who have lobbied, all of those who have lent not only their voices but their reputations to passing this legislation.  This really is a time not only to celebrate but to remember those who 31 and a half years ago first tried to enact this legislation when they introduced a bill.  Not all of them are here to see it, but I know wherever they are that they are smiling on us, who finished a job that those Americans, not only gays and lesbians but people who are not, struggled unremittingly and courageously over the years to try to achieve.

We'll all remember we were here today, and I'll bet more of us will say one day that they voted for this bill.

(Laughter.)

THE PRESIDENT:    Senator Duane.

SENATOR DUANE:    Thank you, Madam

JA0861

President.  On the bill.

THE PRESIDENT:    You may proceed
on the bill, Senator.

SENATOR DUANE:    I'd first like to
say that it's quite a challenge to be the only
openly gay person in the State Senate.  It's
hard to be the only one.  There are times when
I'm tempted to remain quiet and not speak out
against those issues which are harmful to the
gay, lesbian, bisexual and transgender
community.

And honestly, every time I speak
out, it's like coming out all over again.
Maybe it's gotten a little bit easier over
time.  But I always have to make the decision
whether to come out by speaking out.

And if I didn't, I guess I wouldn't
get the hate mail and those horrible phone
calls and, you know, hear about jokes which
are not funny at all.  You know, sometimes
when I've been in the press -- and I'm often
asked on these issues -- all of a sudden, in
the middle of the night, I'll get phone calls,
people will ring my door buzzer.  And I
thought that that came with the territory.

And when I started to go out with
my now partner, Louis, the first time that I
was in the paper when we were together and the
phone started ringing and the doorbell
started, he said:  "What is going on?  What is
this?"  And as I say, I just kind of thought
it came with the territory.

So to put his mind at ease, and I
guess, you know, to be smart, I took my name
off the buzzer and I took my name off my
mailbox so that -- I wouldn't take my address
or phone number out of the phone book, but I
wanted to make it a little bit harder --
actually, something else.  What happened was,
one night when we came home from the movies,
there was a person sitting outside our door.
And even I was frightened then.

And so I took my name off the
mailbox and the doorbell, but I didn't take my
name out of the phone book and I didn't take
my address out.  So now if someone wants to
get to me in my apartment building, they're
going to have to check on all the doors.

But when I talk to other gay
elected officials from around the country and

right here in New York State, we're all
subjected to the same thing.  And you can only
imagine what it's like for people to come out
who aren't that high-profile, who don't have
the protection of a public office.  I mean, it
comes with the territory.  And I don't want
you to feel badly for me, because I have a job
which I love.  But I say it as an example of
what happens in the world.

          You know, when I was elected I
vowed that I would bring my voice to the halls
of government, and especially for those who
had no voice, and to demand justice for people
that don't have a voice.  And I think it's the
right thing to do, and I'm still committed to
doing it.

          You know, history is being made in
New York State today.  Today we're voting on
the Sexual Orientation Nondiscrimination Act,
which will protect New Yorkers from being
denied employment, housing, public
accommodations, education and credit simply
due to their sexual orientation.  But this
will improve the quality of life for all
New Yorkers, just as it did when we created

these exact same protections for citizens
based on race, sex, creed, color, national
origin, disability, age, and marital status.

New York now joins 12 other states,
including the District of Columbia, in
protecting citizens from discrimination based
on sexual orientation.  With your vote today,
we can hold our heads up high, knowing that
for so many of you this will be a politically
courageous thing for you to do as well as the
right thing to do.  And I'd like to thank so
many of you in advance for your
open-mindedness, your courage, and your
support.

Sadly, this is also a bittersweet
day for me as well as for many New Yorkers who
wanted to include freedom from discrimination
for everyone as part of today's vote.  On the
one hand, we are witnessing an event on the
floor of the State Senate that has been over
30 years in the making.  Gay and lesbian
New Yorkers will no longer have to risk losing
their basic necessities merely because of who
they are.  And, yes, votes such as this are
the main reason why I entered public service.

There's a glaring omission, though,
which overshadows this bill, and it is of such
importance that it made me pause before
deciding to vote for this bill.  And that's
something I never dreamed could happen.  The
bill that we are voting on today excludes
those who probably could use these protections
the most, our transgendered citizens.

Madam President, I believe there's
an amendment at the desk and I ask that we
waive its reading and I ask to be heard on the
amendment.

THE PRESIDENT:    There is,
Senator, and you may proceed on the amendment.
The reading is waived.

SENATOR DUANE:    Thank you, Madam
President.  Thank you.

The amendment is quite simple but
its implications are enormous.  This amendment
replaces the language of the bill and replaces
it with my version of SONDA, S1985.  My
amendment is exactly identical to the bill
before us and provides the exact same
protections based on sexual orientation.
However, my bill adds one more category,

gender identity and expression.

"Gender" is defined in my bill as gender identity, self-image, appearance, behavior or expression, whether or not that gender identity, self-image, appearance, behavior or expression is different from that traditionally associated with the legal sex assigned to that person at birth.

This language should be included in the current SONDA legislation to ensure that our transgendered citizens are protected from discrimination. It is vitally important.

"Transgender" refers to transsexuals, including male and female preoperative, postoperative, and nonoperative, as well as drag performers, cross-dressers and others who do not strictly adhere to traditional gender roles and expressions. It includes gays, lesbians, bisexuals, and heterosexuals, including those with effeminate or masculine presentation.

Gender-inclusive civil rights is needed to protect both those who identify as transgender and gender-variant lesbians and gay men who are routinely denied access to

basic health care, service in restaurants or stores, housing, employment, and contractual services because of their gender identity and expression.

Many preoperative and postoperative transsexuals are fired the moment their employers find out about their plan to undergo sex reassignment surgery or learn they already have undergone such surgery. Transgender people often face severe discrimination when attempting to find a place to live. Many transgender and gender-variant people are denied equal treatment in public accommodations. They are asked to leave restaurants, hotels, stores, medical facilities, and educational institutions. They are denied credit and even refused access to rest-room facilities.

Even those who do not express their gender variance in the workplace live in fear that their employer will discover the fact that they cross-dress in their private lives and fire them because of it.

The leading fact for HIV infections among people of transgender experience is

discrimination.  Every day homeless people are
not afforded a shelter bed because of their
gender expression.  Many are forced into
high-risk activities such as prostitution, if
only to obtain a safe place to sleep for
another night.

      It's heartbreaking.  In fact,
there's a whole category of children who I
call the port kids because they live and work
around New York City's Port Authority.  They
have no place to live, they've been thrown out
of their homes, and they make their living in
ways that they do not even want to discuss
because of the shame.  And yet they go back
and do it again the next night, because that's
how they survive.  The port people live and
work at night around the Port Authority Bus
Terminal.

      So affording protections to
transgendered people is not a new idea, and
it's an idea whose time has come in New York.
Two states, Minnesota and Rhode Island,
already afford these protections, and 37
cities have passed nondiscrimination laws
which protect transgendered people.  I firmly

believe that the only hope many transgendered
individuals have for a decent, safe and
rewarding life is to pass legislation which
protects them from discrimination.  Amending
SONDA can make a really difference in their
lives today, and we should not miss this
opportunity.

          By voting for this amendment, we
will send a powerful message that no
New Yorker deserves to be discriminated
against, that no New Yorker deserves to be
homeless and hungry simply because they do not
conform to traditional views of gender
identity.

          I offer this amendment today with a
heavy heart.  There are those small but
powerful groups in the gay community who are
willing to turn their backs on the transgender
community simply to ensure that a watered-down
version of SONDA passes today.  I personally
have been a victim of a vicious and
mean-spirited campaign which accuses me of
trying to kill SONDA merely because I am in
favor of transgender inclusion.

          And I want everyone to know I have

no interest in killing SONDA.  SONDA is
something which has been a major part of my
platform since before the day I got here.  And
I want to make this crystal-clear, that while
I support SONDA wholeheartedly -- and I hope
all of you will -- I will not be bullied,
shamed, or threatened into retracting my
support for the transgender community, and no
amount of money or threats to withhold money
will ever convince me otherwise.

      I'm embarrassed today for my
community.  Instead of banding together to
ensure protection for all, we are fighting
among ourselves and greedily seeking our own
self-interested version of SONDA.  This is
tragic, especially in light of the example
given to us by the African-American,
Puerto Rican, and Hispanic caucuses in their
dealings on hate crime legislation.  Hate
crime legislation finally became law in
New York in 2000.  It could have been law in
1990, but courageous legislators, including
and especially David Paterson, stood their
ground and insisted that they would not
support any version of hate crimes which did

not include the gay and lesbian community.

Because of their convictions, we
today have a comprehensive hate crimes law in
New York.  Thank you.  I want you to know that
although some of the gay and lesbian community
have chosen not to follow your example, there
are those including me who will never forget
it and will always fight to include those less
fortunate than ourselves when considering
legislation.

So I urge my colleagues today to do
the right thing and vote for this amendment.
We were elected to the Legislature to protect
all of our citizens, and I believe I have
outlined how essential it is to protect our
transgendered citizens.

SENATOR HEVESI:    Madam President.

THE PRESIDENT:    Senator Duane,
are you moving that the bill be so amended?

SENATOR DUANE:    Yes, Madam
President.

THE PRESIDENT:    All right.

Senator Hevesi.

SENATOR HEVESI:    Thank you, Madam
President.  I'd like an opportunity to be

Candyco Transcription Service, Inc.

heard on the amendment.

THE PRESIDENT:    On the amendment.
You may proceed.

SENATOR HEVESI:    Thank you, Madam
President.

I rise today in support of Senator
Duane's amendment, and I do so in the context
of being arguably the most conservative
Democrat within the Democratic conference,
possibly with the exception of Senator
Gentile.

And I understand that this entire
issue of SONDA is very complicated, there are
lots of nances to it, and when you add the
transgender component, it becomes even more
complicated for many people.

So let me simplify it for everybody
where I'm coming from so, since I am a
conservative Democrat and my district is a
fairly solidly Democratic district, but a
moderate district, and I've got religious
organizations in my district, and rabbis, and
many of whom have contacted me opposed to not
only a transgendered component but SONDA in
and of itself.  So let me simplify it.

6815

I oppose anyone for any reason being discriminated against.  I don't care whether or not that individual is being judged by what the color of their skin is or their gender or their age or their sexual orientation.  I don't care either, Madam President, whether or not that individual has a predisposition to some behavior or a lifestyle that they were born with or whether they choose to engage in that behavior.  I don't care.

What I care about is that the people that we attempt to protect through hate crimes, and through what we're doing today, are the people who are consistently victimized because of those characteristics.  It's irrelevant to me whether, even though it's distasteful to some people, whether they may find it personally distasteful or whether the dictates of someone's religion -- and I have great respect for everyone's opinions on this -- but whether the religion says that there is something wrong with a particular behavior.

In my opinion, as long as the

JA0874

behavior doesn't harm anybody, even if it offends somebody's sensibilities, and the person who practices it through their own choice or because they don't have a choice, is victimized consistently and targeted because of that behavior, then we in the government have to step in and protect them. That's what SONDA does.

And I too am disappointed, Senator Duane pointed out, that the transgendered community is not included in this bill, for the reasons that I've just stated. But particularly because the way this all came about really was reprehensible.

And, Madam President, let me be very clear on this, and I'll speak on the main component of SONDA in a similar context: We didn't get this bill on the floor today because we had an open debate and discussion and people can, if there's a consensus, move a bill to the floor and vote on it. And I'll use the hate crimes example. When finally hate crimes was allowed out onto the floor, it passed with a strong majority. It even passed with the majority of the Republican

conference.  Yet it had been bottled up for
years.

So the way this came to the floor
today was not through some democratic process,
although I commend the Republican leadership a
little bit -- I want to be a little bit
charitable, because they are finally doing
it -- for bringing it here.  But it was done
because Governor Pataki contacted the Empire
State Pride Agenda and essentially said to
them:  If you endorse me, I'll push Senator
Bruno to go ahead and bring this to the floor.

I mean, this is not Dan Hevesi
saying this.  This has been reported in the
New York Times.  And the problem I see is that
we have become so complacent that this is now
just accepted.  It's somewhat shameless.

And the Empire State Pride Agenda,
I don't know whether to fault them for their
actions here, because they are trying to
achieve an ends.  I don't know whether they
pressed the Governor to include transgendered
individuals.  I don't know what they did.

But I will tell you this.  When I
first ran for the Senate in 1998, I filled out

a questionnaire for the Empire State Pride
Agenda, a voluminous questionnaire.  And I
thought I had agreed with them on almost every
issue.  I didn't on one, one question.  And
they withheld their endorsement of me in 1998
because of it.  They were very principled at
the time.

            But Governor Pataki -- and I guess
I applaud him somewhat for finally moving on
this, even though it was done exclusively in
the name of political expediency -- the
Governor has been in office for eight years
now and hasn't done anything on this.  And so
the Empire State Pride Agenda gets boxed into
a position at the end where they have to make
a terrible choice.  And they made that choice.
And it may be the right choice; I'm not sure.

            But the reason I'm saying all this,
Madam President, is that the process here is
just awful.  And this is my final day in the
Legislature here.  And I guess I'll use this
moment to just beg everybody, we've got to
change the process here.  This is just bad,
bad government.

            So having said all that, I support

Senator Duane's amendment on transgendered individuals. They're being targeted. I'm sorry if it offends some people, their behavior. It doesn't hurt anybody. The only people being hurt are the people who are being targeted. Transgendered people are being targeted. Gay people are being targeted. Let's protect them.

It is not an intellectual injustice to both oppose homosexuality on religious grounds or because you personally find it distasteful and at the same time suggest that even though I have those feelings, I don't want anybody victimized. Nobody should be thrown out on the street from their housing because they're gay or transgendered or a lesbian or bisexual. They shouldn't. They shouldn't be denied education. And you can oppose homosexuality and still support this bill. And you can still support the amendment that includes transgendered individuals.

And I respect all the people in this house who are going to vote against the amendment, and I respect the people who are going to vote against SONDA. That is your

right to do it.  And God bless us for at least
having the opportunity today, though it came
about through a really bad process, of having
an open discussion about it.

So having said that, I applaud
Senator Duane for his years of advocacy on
this and reject any insinuation that he was
trying to tank SONDA for some improper reason.
I commend Senator Nancy Larraine Hoffmann,
Republican State -- former Republican State
Senator Roy Goodman, who carried this for many
years, and everybody who just keeps an open
mind about this, even if you wind up
disagreeing with the way the vote winds up
going today.

So I support this amendment here
today, and I will be supporting SONDA also.

Thank you, Madam President.

THE PRESIDENT:    Those Senators in
agreement with the amendment, please signify
by raising your hand.

THE SECRETARY:    Those recorded in
agreement are Senators Andrews, Breslin,
Brown, Connor, Dollinger, Duane, Gonzalez,
Hassell-Thompson, Hevesi, L. Krueger,

Montgomery, Onorato, Paterson, Sampson,
Santiago, Schneiderman, A. Smith, Stachowski,
and Senator Stavisky.

THE PRESIDENT:    The amendment is
lost.

Senator Maltese, on the bill.

SENATOR DUANE:    Madam President.

THE PRESIDENT:    Senator Maltese,
Senator Duane has indicated he'd still like to
speak on the bill.

Senator Duane, you may proceed on
the bill.

SENATOR DUANE:    Thank you, Madam
President, to continue on the bill.

Obviously I'm not surprised at the
outcome, and I'm disappointed that the
amendment failed.  But I am encouraged by the
good number of votes and pleased about the
progress that we've seen today.

You know, when I first entered the
Senate in 1999, I don't really think that many
of my colleagues knew very much about the
transgender community.  And I think I might
have been the first person to actually say
"transgender" on the floor of the Senate.  I'm

not betting on that, but I think it's probably
true.  And I think I might have been the first
person to bring someone of transgender
experience onto the floor when I brought on
Barbara Ann Perina.

So we've come a long way in the
short years that I've been here in the Senate.
And just last week Senate Majority Leader
Bruno held a press conference where SONDA and
the issue of transgender inclusion was
addressed.  I mean, who could have imagined
that five years ago?

So anyway, I promise the
transgender community I'm not going to forget
and I'm not going to give up the fight for
your inclusion.  The battle for that begins
right away.

And on the bill, I am very, very
happy that thousands and thousands of
New Yorkers will no longer have to face fear
of discrimination based on their sexual
orientation.  And I can assure you, everyone,
that this legislation will impact the lives of
thousands of New Yorkers.

When I first started to come here,

I would drive along 90 -- or 787, actually --
or right where they meet (laughter), and I
would see a big sign for Cracker Barrel.
Cracker Barrel is a restaurant that fires
people if they think that they're gay or
wouldn't hire people if they thought they were
gay.  Now, they did succumb to the pressure of
the shareholders and based on a shareholder
vote, they just a couple of weeks ago changed
their policies.  But every time I passed that
Cracker Barrel billboard, I thought:  Look at
that, a company here in New York State that's
allowed to discriminate based on sexual
orientation.

      So I'm glad that that will no
longer be the case, I hope, and I think, in
New York State today.  And I'm very grateful
and I feel an awful lot of humility to be a
member of this body on such a historic day.

      You know, the discrimination
against gay people starts at such a young age.
Think about it.  If a child is
African-American or Jewish and they're in the
playground and some other child says something
horrible to them, makes some kind of bigoted

remark, what happens?  Well, that child goes
home to their parents, whoever the adult is in
their lives, and they say:  This terrible
thing happened today, this child called me
this horrible name, my friend, they were
making fun of me in the playground, I can't
take it.

     And that parent, who probably looks
like that child, maybe Asian like that child
is Asian, or is raising the child in the same
religion, will say:  That's terrible.  You
should be proud of who you are.  Hopefully
that parent will go to the school, talk to the
teacher, the principal, find out why this is
happening to their child that they're being
made fun of.

     Well, what happens if you're a gay
kid -- or not a gay kid, but someone taunts
you because they think you are?  What happens
to you?  You go home that night and you don't
say anything to anyone because you think what
you are is so terrible that you can't tell the
parent or the adult in your life what happened
to you.  And for many of us, that kind of scar
takes a lifetime to overcome.  And sadly, some

people never overcome that.

And so what we're doing today is so very important. Passing SONDA is very, very important. I would be remiss if I didn't point out, though, that there are glaring problems with the New York Division of Human Rights. Currently, there's a huge backlog there. Years and years go by before cases are resolved. With the passage of SONDA, the challenge in that agency will be even greater.

And so I hope that we will also take to heart how important it is to reform that agency, which is the place in New York State where you can go if you have been discriminated against, no matter what the reason.

I also think we ought to have a private right of action for people who are discriminated against. But I'll save that for another day, and I'm sure you're glad to hear that. (Laughter.)

I want to conclude by thanking the early activists of the gay, lesbian, bisexual and transgender community, those brave and farsighted individuals who fought so hard and

suffered so much so that we could get to this point today.  There are those who lived proud lives before Stonewall, those who fought against oppression at Stonewall, and those who struggled to found organizations, many of which still support us today, though with different configurations and many more members and supporters.  Unfortunately, a lot of those early people, early pioneers, have died before this bill came to the floor today.

I want to thank the parents of gay people who have stood with us, as well as the nongay people who have supported us and fought for us.  I'd like to thank the activists and organizations, including the Empire State Pride Agenda, members and staff from the early days before it was even called the Pride Agenda, and those who are with the organization today.  In the movement, we're all family members, we all fight with each other, we all work with each other, and today we will celebrate the passage of this legislation today.

I also want to thank all the legislators, past and present, who supported

JA0885

our civil rights.  I want to thank Governor
Pataki and Senator Joe Bruno.  And I want to
thank those who have supported these civil
rights, especially my friend, the pioneering
Assembly Member Deborah Glick, and Steve
Sanders, the Assembly sponsor of this
legislation.  And I want to thank in advance
everyone who is going to vote for this bill.

          Today is a day for us to celebrate.
And let's celebrate with those who are now
going to have statewide protections.  And you
know what?  Tomorrow starts another chapter of
fighting for equality for all New Yorkers.

          Thank you.

          THE PRESIDENT:    Senator Maltese.
On the bill?

          SENATOR MALTESE:    Madam
President, on the bill.

          First of all, I would like to
express our appreciation to the leader for
making it very clear to us who oppose this
legislation that this was a question of
conscience and would be determined as a
question of conscience without pressure of any
kind.

I'll be relatively brief, since all of us have had in excess of 30 years, and perhaps longer, to study and listen to the arguments, pro and con.  I'd like to express a couple of concerns that we have, or I have as an attorney.

My first concern is that while the legislation specifically excludes owner-occupied two-family houses from the -- from this legislation, it does not exclude owner-occupied premises that may be larger and have more families.  In addition, it does not exempt any non-owner-occupied premises.  And I think that's something that could very well lead to disquiet in communities that I represent and other communities, and in the feelings of many, many people who regard homosexuality as immoral.

Next, I would like to bring up the concern that has been expressed to me by religious leaders, that while the exemptions do apply to religious educational institutions as far as the selection of prospective students, there does not appear to be, in the advice of counsel, any exemption for religious

Candyco Transcription Service, Inc.

institutions in their hiring practices.  And
this seems to be an infringement upon their
religious rights and probably would be cause
for court litigation in the future.

There are many, many New Yorkers
that feel that by conferring these rights on
homosexual men and women, they are infringing
on their rights as Catholics or those that are
members and see themselves as the inheritors
of 2000 years of Judeo-Christian morality.

The statute itself in the preamble
cites that it is not intended to promote a
particular course of conduct or a way of life.
I respectfully submit that the passage of this
legislation would in fact do that very thing.

Homosexuals or anyone else, for
that matter, do not have the right to have no
one disagree with them as to the morality of
homosexuality.  Nor do they have a right to be
free from what would be called attitudinal
discrimination against their sexual
orientation.

Society will respond to this
legislation as it has responded to
homosexuality over the years.  There has been

Candyco Transcription Service, Inc.

a definite change in the feelings and emotions
generated by not only homosexuality but this
specific piece of legislation.

The Catholic Church and the
Catholic Conference, which has made its views
well known, have indicated and alluded to the
Catholic catechism, which speaks about
respect, compassion and sensitivity for
everyone, including specifically homosexuals.

The other groups that have come
forward I feel deserve to be respected here in
this house.  The church groups, the many
church groups that are concerned about
children and about the morality of their
members have expressed severe concerns and
reservations about the passage of this
legislation.

The bill, there is no question the
bill has profound social, legal, and moral
aspects.  The bill itself is, I feel, a step
in the wrong direction.  We cannot legislate
politeness.  We cannot legislation courtesy.
We cannot legislate the way people feel.  I
think that comes through mutual respect.

I do not think that everyone who

opposes this bill can be called a bigot, as
has been done in some quarters, and certainly
not in these chambers, or lacks compassion or
tolerance. Much has been said over the last
few years about the fact that all of us know
or -- know people who are gay or that all of
us, perhaps, in our family or close friends,
have people who are gay. I don't think that
that necessarily means that we have to accept
that as a grounds for voting for this
legislation.

          At the same time, because this is
such an emotional issue, I think that we who
oppose the bill can oppose it in good
conscience. As I said at the very beginning,
this has been termed a question of conscience
by the Majority Leader and some of us. And
over the some 30 years that I've been here in
various capacities, I've seen that the three
issues that arouse these same emotions are
abortion, the death penalty, and homosexual
rights.

          I think that the persons across the
state and across the nation that feel that
this confers a special status on homosexuals,

I think they're correct.  I think that this will lead to an attitudinal change that not only still provides for compassion for all of our citizens, irrespective of sexual orientation; at the same time, this is a watershed issue, there's no question.  I share that reasoning with the supporters of this bill.

This is something that we as legislators should take a good, hard look at before we decide to vote whichever way we decide to vote.  In the course of the years that I've been here, I've had occasion to speak to legislators, as I indicated, on the question especially of abortion and the death penalty, legislators who were sorry that or expressed remorse -- and as a matter of fact, even a governor who had expressed sorrow or remorse at a prior position.  And I just ask respectfully my colleagues, no matter how they vote, to treat this as a question of conscience and vote their conscience.

THE PRESIDENT:    Senator Krueger.

SENATOR LIZ KRUEGER:    Thank you, Madam President.

THE PRESIDENT:    On the bill?

SENATOR LIZ KRUEGER:    Yes, on the bill, thank you.  Excuse me, I was listening to Senator Maltese.

We talk about this as a question of conscience, or some talk about it as a question of conscience.  And I will make the argument, and I will make the argument up front, that I will of course be voting for this bill.  This is simple.  We're trying make this too complicated.

If you ask yourself the question do you believe that anyone in our state should be discriminated against, you have to answer no, you don't believe in discrimination.  No one who sits in this body is going to stand up and say yes, I want people to be discriminated against because of who they are.  I challenge that none of you will.

That's all this bill is.  Perhaps 31 years ago it was a more complex issue in people's lives.  Times have changed.  We do learn.  Sixty years ago, in this country, you still had people debating the right to discriminate against people because of the

color of their skin.  If you were

African-American in this country, it was okay

to be discriminated against in statehouses.

And it was wrong then, but there were people

in statehouses all over this country who were

prepared to discriminate against people

because of the color of their skin.

          This country has a history -- not a

proud history, but a history of discriminating

against people based on their religious

beliefs.  And yet today there is no one in

this house, I would argue, who would stand up

and say:  Yes, I support discrimination

because of someone's religion.

          And there have been points in the

history of this country where people felt it

was okay to discriminate because of your

gender.  Women could be discriminated against

under the law.

          So this is a progressive process

we've been going through in this country.  But

again, it is the year 2002.  It is way past

the time when I would argue anyone sitting in

a statehouse anywhere in this country would

stand up for discrimination.

Case 6:21-cv-06303-FPG Document 26-22 Filed 06/16/21 Page 128 of 154

And so for me, I have to ask anyone who thinks that it is an issue of conscience to support discrimination: How are you defining that for yourself today? This is not a bill that's talking about asking religious organizations to change their religious teachings. This is a bill saying that in the State of New York we will not tolerate discrimination. It is simple. It is way past due.

I am sorry that Tom Duane's amendment to include transgender members of our community was not included, because I would argue it's exactly the same question: Do you support discrimination? We can't support discrimination. No one in this house supports it.

And again, don't overcomplicate the issue. No one should be thrown out of their job or thrown out of their house or fail to get equal rights under the laws of New York State because of their sexual orientation or their gender identification. It's simply not okay. It's simply past time that we move this bill.

Candyco Transcription Service, Inc.

I appreciate Dan Hevesi's comments earlier from a conservative perspective about why this bill may or may not have gotten here and his support for it. I will applaud everyone for their support for this bill today to get it done, because we need to move forward. And we need to not continue to debate in the State of New York whether or not it is ever okay to discriminate against any of our citizens.

So thank you to everyone who does vote for this bill today. And ask yourself the question, if you vote no, what is your definition of conscience? Thank you very much.

Thank you, Madam President.

THE PRESIDENT: Senator Montgomery. On the bill?

SENATOR MONTGOMERY: Yes, Madam President.

I would just like to join my other colleagues in thanking the sponsor. Certainly, Senator Hoffmann, you can take credit, but we do know that Senator Goodman carried it many years before. And our

Majority Leader, for allowing this process to
take place. I wish we could have this process
for every single issue we have to deal with
that's difficult, that we can open it up and
those of us who decide we can support, do
that, and those of us who can't, vote no.

But today is really a very special
day because I think it reflects one of the
issues that this nation has, from the very
almost inception and certainly very beginning
of our democratic government, has had to deal
with. And that is what do we do to make sure
that every single individual that we consider
an American be granted equal rights. It's
what our Civil War was about. We had to go
through years of struggle for civil rights and
voting rights for women and for
African-Americans, for 18-year-olds. We've
had to deal with this issue. What do we do
about the rights of all individuals to make
sure that what I believe to be -- even though
the Constitution had an error in it, it
referred to some people as 3/5th, we have
essentially, our country has had to live that
down in many, many respects.

Candyco Transcription Service, Inc.

JA0896

So this I think today is an
indication.  And there are hundreds and
thousands of people who live in my district --
they are my neighbors, they are my friends, my
staff, my family -- these are the people who
are going to be extremely happy because we are
doing what has been given a charge to us, and
that is to make a legal contract between two
people valid, not based on anything except
that they are a legal family.

And so I feel very good about this.
It removes a sort of weight from our
shoulders.  I know that we still have a little
bit more to do -- a lot more to do, actually.
But certainly this is a great step.  It's in
the tradition of what America represents.  And
I believe that we all can take pride in the
fact that -- certainly those of us who support
this legislation can take pride in that we're
taking this step today.

Thank you, Madam President.

THE PRESIDENT:    Senator Stavisky.

SENATOR STAVISKY:    Madam
President, many of you in this chamber
remember my husband.  What some of you may not

Case 6:21-cv-00303-FJS Document 26-2 Filed 06/16/21 Page 135 of 154
Case 6:21-cv-00303-FJS Document 26-2 Filed 06/16/21 Page 135 of 154

6839

know is that he wrote his master's thesis and
Ph.D. dissertation on skilled black labor in
the antebellum South.  He subsequently taught
black history.  And people would ask Leonard,
Why black history?  And he always had a very
simple answer:  Discrimination against one is
discrimination against everyone.

      Reminds me of the commercial "You
don't have to be Jewish to like Levy's rye
bread."  (Laughter.)  And you don't have to be
gay, et cetera, to understand that
discrimination is wrong.

      Take a look at the bill we have
before us.  It only adds two words to the
various sections that deal with
discrimination.  Those two words are "sexual
orientation."  Not a very dramatic change, but
I believe a change long overdue.

      I vote aye.

      THE PRESIDENT:    Senator Breslin.

      SENATOR BRESLIN:    Thank you,
Madam President.

      I join with many of my fellow
Democrats in applauding the sponsors of this
bill and those who support it.  And as my

JA0898

fellow Democrats have said, whenever there's a
little bit of prejudice against any one of us,
there's prejudice against all of us.

And even though many of us don't
remember actually, we remember by reading when
there were signs in Boston in windows which
said "No Catholics need apply" or when Jews
were precluded from joining clubs or blacks
weren't allowed in West Point.  All within
recent memory.  And again, whenever there's
discrimination against one of us, there's
discrimination against all of us.

And even though I don't agree that
he's the most conservative member of our
Democratic side, Senator Hevesi was eloquent
in saying that based upon the discrimination,
discrimination against anyone is sufficient
for us to rise and say if we can't do it
amongst ourselves, we must do it by statute.

This statute by the addition, as
Senator Stavisky has said, of including the
words "sexual orientation," makes it the law.
Again, it would be much better if we could do
it between and among ourselves.  But when that
isn't possible, when that discrimination

continues to exist, and continues to exist on

a day-in-day-out basis, as Senator Duane so

beautifully expressed, then it's time for us

to come together as a body and time for us to

come together as Democrats and Republicans and

pass this very monumental legislation.

          And I urge all of my fellow

Senators to vote in the affirmative.

          Thank you, Madam President.

          THE PRESIDENT:    Senator

Schneiderman.

          SENATOR SCHNEIDERMAN:    Thank you,

Madam President.  On the bill.

          I must say that as I've listened to

the debate and people have come forward to

lobby on this piece of legislation, something

has struck me fairly dramatically.  And what

struck me is how much the arguments against

this legislation have in common with arguments

that were made against the efforts to end

discrimination based on race and the efforts

to end discrimination based on religion.

Senator Breslin spoke about this briefly.

          But I think that in all honesty I

must agree with Senator Krueger.  I think that

as a matter of conscience I don't really
understand the basis for saying we should
discriminate against one group of New Yorkers
because of what they are as opposed to what
they do.

          We all discriminate.  We
discriminate when we make decisions about what
kind of car we want.  The word
"discrimination" is not in and of itself evil.
But there's a difference between
discriminating against someone because they've
committed some sort of act that harms another
and discriminates against someone because of
the way they were born.  And that is what this
has in common with discrimination against
religion, discrimination against people based
on race.  And I have not heard one argument
that in any way changes my mind on that
central issue.

          There are arguments made that this
will disrupt religious institutions and
organizations.  Well, in New York City we've
had a law, essentially the same law on the
books since 1986.  There's been no such
disruption.  Everyone is going on with

business.  And the people who are gay in the
City of New York have that additional
protection, that additional assurance that if
they commit some sort of act of misconduct,
then they may face consequences.  But just
because of what they are, how they are born
and how they are living their lives, with no
harm to anyone else, they cannot be
discriminated against.

       I would urge that any religious
objections to this should really focus in on
the centrality of the legislation and the
moderate nature of this bill.  The Republican
mayor of New York City, who's been supervising
the administration of this bill since he was
elected, has submitted a memo in support.  The
Republican governor of New Jersey, Christine
Whitman, and I want to quote from her when
they were enacting legislation:
"Discrimination regardless of reason in any
aspect of daily life must be identified,
fought and eliminated.  Diminishing the rights
of any individual or any group will inevitably
lead to the diminishing of us all.

       So this is not something that is a

partisan issue as a matter of conscience.  And
I would respectfully submit it's not a
religious issue as a matter of conscience.  I
don't want to let this debate pass without
recognizing the fact that many of the major
religious organizations in the state of
New York support this bill, including the
New York State Council of Churches, including
the Episcopal Diocese of New York, the
American Jewish Congress, the Central
Conference of American Rabbis, New York
Conferences of the United Methodist Church and
the United Church of Christ.

I think that this is a fundamental
step forward.  I'm sorry it took so long.  I'm
sorry that our transgendered brothers and
sisters are left out.  We are not abandoning
that fight here today with the passing of this
bill.

But I would respectfully request
that all of my colleagues who are looking at
this legislation and thinking about it as a
matter of conscience, as Senator Maltese said,
to the extent that you are thinking about your
religious issue views, your fundamental

understanding of what it is to be an American
and what this country stands for on the issue
of discrimination, that you really take a
close look at the reality of life in the city
of New York.

       This doesn't hurt anyone.  This
protects people.  And I don't disrespect
people who have different views from me, but I
certainly do not in any way, shape, or form
accept the argument that there our religions
should require us to accept discrimination
against people based on what they are.  There
were arguments like that made against efforts
to integrate the races.  There were arguments
like that made against efforts to end
discrimination against Jews and Catholics.

       And I think that we're seeing here
today the passing of another barrier.  I hope
it passes overwhelmingly.  I think it should
pass overwhelmingly.  It's been a long time
coming.  There are other steps still to take.
But I think that it's important for us as a
state and as a body in the Senate to send a
strong signal that we do not support
discrimination against people based on what

they are as opposed to what they do.

Thank you, Madam President.

THE PRESIDENT:    Senator
Dollinger.

SENATOR DOLLINGER:    Thank you,
Madam President.

I want to just comment on the
politics that brought this here, address for a
couple of minutes the arguments that have been
made against this bill, and then talk about
what I think this bill means.

I want to thank Senator Bruno for
allowing this bill to come to the floor 32
years, 30 years after its first drafting.  It
seems to me that we've waited a long time to
create freedom in this state.  But I commend
Senator Bruno for his courage in bringing this
to the floor.

To those who have advocated for
this bill, I would simply like to quote an old
line from something my children sang in
kindergarten:  "Make new friends, but keep the
old.  One is silver, the other's gold."  And
those who have stood up, from Senator
Ohrenstein all the way that this bill has been

in this house, I think the gold support of
those who have stood up and argued for this
bill for decades must be recognized.

Secondly, the two arguments that
I've heard most often against this bill in my
judgment, when analyzed in detail, don't hold
water.  The first is that this bill creates
special rights for one particular group.  Let
me just remind everyone of the history of
New York State's Human Rights Law.

After the bill was first passed in
the '60s, which included just race and color,
there was a question about whether religion,
religious beliefs were protected or whether
you could discriminate against someone, as
Senator Schneiderman said, because they were
Jewish or Catholic or fundamentalist Christian
or Seventh Day Adventist.

The State Legislature in 1967
amended the bill and specifically included
religion.  No one on that day said we're
creating special rights for religious people.
No one said that.  What they said was, we're
going to prevent people's religious beliefs
from being held against them when they want to

rent an apartment or when they want to take a
job.  Because what you believe on Sunday
doesn't affect how you work on Monday.

In 1984, we again amended the law,
and we included provisions about marital
status, so that you couldn't be discriminated
against whether you were married or single.
And no one said we are creating special rights
for those who are married or we're creating
special rights for those who are single.

Then, sure enough, we added a
provision that I think Senator LaValle argued
for:  Genetic predisposition.  We specifically
included in our Human Rights Law the notion
that your genetic predisposition could not be
held against you, that that which you
inherited from your mother and your father
could not be used as a basis for someone to
say we're not going to allow you or we won't
rent an apartment to you or we won't allow you
to build a house.

And no one said in this chamber
we're creating special rights for people who
suffer from genetic predispositions.  No one
said it.  It wasn't talked about then.

And lastly, we made changes that
dealt with issues of disability -- blind
people, people who had hearing problems.  And
we specifically said you can't discriminate
against them if they have hearing aids or if
they have visual aids, because we said those
are fundamental rights, they're not special
rights.  And no one in this chamber said we
were creating special rights for those people.

Why is it today when we extend this
to sexual orientation does anyone say we're
creating a special right?  We're not creating
a special right.  We're simply extending the
same protections that we now extend on the
basis of -- and I'll read from it -- age,
race, creed, color, national origin, sex,
disability, genetic predisposition or carrier
status, or marital status of any individual.

I would suggest, ladies and
gentlemen, that every person in this chamber
today, every single person, is protected in
one way or another by our Human Rights Law,
because we won't allow other individuals to
prejudge you by what you believe, by what you
look like, by what genes you inherit from your

parents.  And neither today should we do that
on the basis of sexual orientation.  We're not
creating special rights; we're simply creating
human rights.

> The second argument that I've heard
that people have said:  This bill today will
somehow condone a lifestyle, that we will
somehow give the power of government to a
particular lifestyle.  I would just suggest to
you that when you set people free, when you
give them free will, when you give them free
choice, you are not condoning what they do.
You are telling them that they are free to
make their own choices, to live their own
lives.  Government, by simply saying you are
free, isn't being held accountable for what
you do with that freedom.

> It seems to me, ladies and
gentlemen, that this bill is all about
freedom.  And I'm quite disappointed that
people would say New York should not be a
freer place.

> The law of freedom is very simple.
In our Bill of Rights we said that government
cannot do certain things, cannot take away

freedoms for the people.  And that Bill of
Rights says that government can't do these
things.  And we amended it with the 13th,
14th, and 15th Amendment.  And we expanded the
protections that people had so that they could
be free.

        And then we decided in the late
1950s that it wasn't enough just to make
people free, but government actually had to
intervene to be an ensurer of that freedom,
that government had to tell private
individuals that they could not interfere with
other people's freedom, with their freedom of
choice, with their freedom of personhood, with
their right to live their own lives without
hurting anyone else and make their own choices
about what they do.  Live their own lives.

        Ladies and gentlemen, I'm going to
leave this chamber after today and I will not
come back as a member.  But today I'm
enormously proud that in one of the last votes
I ever am going to cast, I'm going to make
New York State a freer place.  I'm going to
take the words of that old song that we sing
all the time, "My Country 'Tis of Thee:" "from

every mountainside, let freedom ring."

        When we pass this bill and it becomes law, as it should, the freedom to be free from prejudice for those who have been discriminated against will become a reality. New York, in a small way, will be a freer place.

        I'm proud, Madam President, that one of the last votes I cast will be to make that freedom a reality for those who have been denied it in the past. Celebrate freedom, ladies and gentlemen. Vote for this bill that sets another group of New Yorkers free from the stain and the hatred of prejudice.

        Thank you.

        THE PRESIDENT:    Senator Connor, to close for the Minority.

        SENATOR CONNOR:    Thank you, Madam President.

        Madam President, I certainly through college and law school knew people who were gay and who certainly in the rarefied environs of academia, you know, did not appear to be discriminated against. It didn't seem that political then.

Candyco Transcription Service, Inc.

But very soon after I was out of
law school, I got involved in this funny
business called politics.  And we had a
Democratic Club, what you would call pretty
far on the left then.  And I bring this out
because I don't view this as a left or right
issue on the political spectrum.  And I found
myself very quickly the president of this
club.  And literally the first meeting, and
we're in the early '70s, we're getting ready
for the next year's presidential race.  And
they used to have couples could join at a
different rate than individuals.  You know,
different rate of dues.

       And the then membership secretary
rushed up to me at the end of a meeting, and
she was what you would call old
left-left-left, and said, "These four guys
want to join as two couples."  And I said, "$7
a couple."  "But they're guys."  I said, "I
don't care.  If they're a couple, they're a
couple.  Take the dues."

       That next year, I was very proud to
be part of a campaign that elected one of the
first gay or lesbian -- in our slate, it was

lesbian.  I think in the slate in Manhattan it
was a gay person -- to the national
convention, openly.

       This all became important to me
several years later, in 1978, late '77, when
there was a big club meeting to pick the
nominee for the State Senate.  And several
hundred people crowded into a large hall in a
very closely contested endorsement meeting.
And I looked out there, and the two couples
that I once had invited to join were there,
and they spoke for me, and I won a very narrow
victory.

       I pledged during that campaign to
make one of my priorities, one of my
priorities as a senator the passage of a gay
civil rights bill.  It had already been an
issue in New York City.  What later became
Intro 1 started out as Intro -- and I forget
the number.  I forget any number that has more
than two digits in it.  And I remember
testifying in the early '70s in favor of that.
But I said one of my priorities will be to
support the passage of -- we didn't call it
SONDA then, it was the gay civil rights bill.

One of the first bills I introduced
when I got here in 1978 was a bill that banned
discrimination in the civil service on account
of sexual orientation.  That later was mooted
out by an Executive Order which this governor,
Governor Pataki, has continued as well.  The
need for that.  I should say.

But here we are, nearly 25 years
later, and I'm proud to say I'm still working
on one of my two or three legislative
priorities.  One of the others was election
law reform.  We still have to do that one.

But in the meantime -- and let
me -- I want to acknowledge someone who I was
proud to serve with when I first got here,
someone in the Assembly.  I remember a couple
of times giving him a ride home to New York,
Bill Passannante.  He told great stories.  He
had been here for many, many years.  And he
was, I believe, the sponsor way, way back,
decades ago, of the first gay civil rights
bill.  And Bill has passed on.  Many of us
knew Bill.  I think he's probably smiling now.
He was way, way ahead of his time.

And, you know, when I first

circulated that nondiscrimination bill in the
civil service, I didn't get so many sponsors
on this side of the aisle at the time.  Not
too many.  A handful of Democrats.  I think
there was actually a couple of Republicans --
certainly Senator Goodman was one of them --
who cosponsored that.

        We've come a long way since then,
and America has come a long way, and New
York's come a long way.  And New York State
has fallen behind where everybody else has
come.  It should not have taken 25 years.
Indeed, while I'm going to support this bill,
I am very, very disappointed that it is not
all-inclusive, that it doesn't include
transgendered people, because there is real
discrimination going on there.

        In some respects, you know, the
good side and the bad side get ahead.  There
is now, if you will, probably less
discrimination than there used to be, when
this bill was first filed, against gay and
lesbian people than there is against the
transgendered.  I mean, if you want to look at
where the real heavy-duty discrimination is

now coming down.  Not that there isn't
discrimination otherwise.

          But the one thing I've learned in
those 25 years is you take your priorities and
grab them when you can, one step at a time.

          So while I certainly support a more
inclusive bill that includes transgendered, I
am going to vote for this.  And I'm going to
vote for this because I believe it's the right
thing to do.  I'm going to do this for someone
who is one of the closest persons to me, who
I'm happy to say I will be having dinner with
tomorrow night as he visits New York with his
friend.  And I want to tell him, I want to
tell him that New York passed SONDA.  It will
mean a lot to him.

          And if the cameras weren't on and
my mother weren't watching, I'd tell you who
I'm talking about.  But the fact is it will
mean very, very much to him and mean very much
to my family.  It means a lot to a lot of
New Yorkers that we've passed this.

          And I want to thank Senator Bruno
for bringing this bill to a vote.  It may have
languished for 25 years, but Senator Bruno got

it out here in eight years, so that's pretty
good.  Can't blame him for the other 17 years,
that was a backwards-looking leadership in
those days.

        But here we are.  I'm just
delighted, I'm just delighted that we can
adopt this.  But I really -- my colleagues,
you'll find out -- and I say this to those who
will oppose this -- you'll find out, we're
going to be back here not so long making it a
more inclusive bill.  And you'll find out this
wasn't so bad and the amendments we're going
to do in the future aren't so bad from the
standpoint of public reaction.  The public
supports this.  It's about time the
Legislature adopts it.

        Thank you, Madam President.

        THE PRESIDENT:    Senator Bruno, to
close for the Majority.

        SENATOR BRUNO:    Thank you, Madam
President, colleagues.

        We have been eight years getting
here to this vote.  And over those eight
years, this issue has been talked about,
written about, viewed -- the media -- debated.

And after all of this time, we have the bill before us on the floor. And I guess you can say better late than never. And it's here.

Now, over these years, I, as I have lived my life and gotten older each year, as we all do, maybe I have become more enlightened. But over the years, I've always felt that the present antidiscrimination laws in this state were adequate and they prevented discrimination against everyone that lives here in New York State. And that was my feeling. And I thought legislation like this was maybe counterproductive, unnecessary.

But as I have moved along, my feelings have become that if there's such strong feelings out there that this is necessary, it just adds "sexual orientation" to a law that is very expansive and, when you look at that Human Rights Law here in this state, covers almost everyone. Race, creed, color, sex. So we are where we are.

And I am going to vote for this legislation and have decided that I would vote for it to express tolerance, antidiscrimination, and just to recognize that

people are free to live their lives as they
see fit.

So, Madam President, I would
encourage my colleagues to vote in favor.  It
is timely.  The time has come.  And timing in
our lives is everything.  Politically, timing
is everything.  I think the time has come to
move on with our lives, to get this issue
behind us.  And I will, when the vote is
taken, vote in favor.

THE PRESIDENT:    Read the last
section.

THE SECRETARY:    Section 18.  This
act shall take effect on the 30th day.

THE PRESIDENT:    Call the roll.

(The Secretary called the roll.)

THE PRESIDENT:    Senator Balboni,
to explain your vote.

SENATOR BALBONI:    Madam
President, the debate today has been lopsided
on behalf of those who are in favor of the
bill.  I know that those people who wish to
vote against this bill have very valid and
sincere concerns.  In our attempt to protect
classifications, we dilute those protections

Candyco Transcription Service, Inc.

already given.  We raise expectations that a
bill such as this will end discrimination or
hatred or prejudice, and it will not.

Many years ago, when I was in the
Assembly, I debated against this bill.  And on
that day my mind was full with the intricacies
and the constitutional consequences of this
act.  Today my mind is full with the images of
the day the tower fell, how the people running
in terror were of every race, creed, and
religion, rich or poor, fat and skinny, all
New Yorkers, all Americans.

And I'm reminded of the preamble
that says "We the people of the United States,
in order to form a more perfect union, to
ensure domestic tranquility, provide for the
common defense, promote the general welfare,
and to secure to ourselves the blessings of
liberty for our families and for those who
follow, do ordain and establish this
Constitution."

Madam President, it's "we, the
people," not "some people."  I vote against
discrimination, and I vote for the bill.

Thank you, Madam President.

6862

        THE PRESIDENT:    Senator Balboni,
you will be recorded as voting in favor of the
bill.

        Senator Farley, to explain your
vote.

        SENATOR FARLEY:    Thank you, Madam
President.

        I think everybody in this chamber
is opposed to discrimination.  But I think
there's a flaw in this bill that I'd at least
like to reiterate.  It's the lack of a
comprehensive religious exemption.  Religious
organizations, ministries, businesses, and so
forth are not exempted.  And I think that
alone is enough to make someone vote no.

        I vote no.

        THE PRESIDENT:    Senator Farley,
you will be so recorded as voting in the
negative on this bill.

        The Secretary will announce the
results.

        THE SECRETARY:    Those recorded in
the negative on Calendar Number 1705 are
Senators Alesi, Bonacic, Farley, Fuschillo,
Gentile, Kuhl, Lachman, Larkin, Leibell,

JA0921

Libous, Maltese, Marcellino, Maziarz, McGee,
Meier, Morahan, Nozzolio, Padavan, Rath,
Seward, Skelos, Stachowski, Velella, Volker,
and Wright.  Also Senator Hannon.  Ayes, 34.
Nays, 26.

          THE PRESIDENT:    The bill is
passed.

          (Applause.)

          THE PRESIDENT:    Senator Bruno.

          SENATOR BRUNO:    Madam President,
can we ask for an immediate meeting of the
Finance Committee in the Majority Conference
Room.

          THE PRESIDENT:    There will be an
immediate meeting of the Finance Committee in
the Majority Conference Room.

          Senator Bruno.

          SENATOR BRUNO:    And can we at
this time take up Calendar Number 1741.

          THE PRESIDENT:    The Secretary
will read.

          Can we please have order.  If the
individuals would take their conversation
outside the chamber, please.  We have to
proceed with business.

Candyco Transcription Service, Inc.

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

**Emilee Carpenter, LLC d/b/a**
**Emilee Carpenter Photography** and
**Emilee Carpenter,**

           Plaintiffs,

     v.

**Letitia James**, in her official capacity
as Attorney General of New York;
**Jonathan J. Smith**, in his official
capacity as Interim Commissioner of
the New York State Division of Human
Rights; and **Weeden Wetmore**, in his
official capacity as District Attorney of
Chemung County,

           Defendants.

Case No. 6:21-cv-06303

**Declaration of Jessica Clarke**
**in Support of Defendants' Opposition to**
**Plaintiffs' Preliminary Injunction Motion**

I, Jessica Clarke, the Bureau Chief of the Civil Rights Bureau of the Office of the New York State Attorney General, declare as follows:

1.     I respectfully submit this Declaration in support of Defendants' Opposition to Plaintiffs' Preliminary Injunction Motion. I am familiar with the matters set forth herein, either from personal knowledge or on the basis of documents that have been created by, provided to and/or reviewed by me.

2.     I have served as the Bureau Chief of the Civil Rights Bureau of the Office of the New York State Attorney General ("OAG") since August 2019.

3.     The mission of the OAG is to safeguard the legal rights of the citizens and organizations of New York.

4.     In preparing this declaration, I reviewed Civil Rights Bureau records, complaints received by the OAG, and the OAG's website. I also conferred with other staff from the Civil Rights Bureau.

5.     The OAG has long enforced the antidiscrimination laws, respecting the rights of all citizens to practice their faith freely.

6.     The OAG receives complaints from the public about instances of discrimination in places of public accommodation within the state.

7.      The OAG also works with advocates to identify civil rights priorities of New Yorkers.

8.      The OAG develops cases based on such public reporting.

9.      Under N.Y. Exec. Law § 63(12), the OAG has the authority to file a civil action against persons engaging in "repeated fraudulent or illegal acts…in the carrying on, conducting or transaction of business." N.Y. Exec L. § 63(12). In these cases, the NYAG has authority to "take proof and make a determination of the relevant facts."  N.Y. Exec. L. § 63(12).

10.     Under this provision, the OAG investigates and prosecutes instances of religious discrimination in employment, housing, and places of public accommodation.

11.     In 2011, the OAG established a Religious Rights Initiative to target faith-based discrimination and violations of religious rights. The Initiative addressed religious rights issues and enforced anti-discrimination law through public education, outreach, and litigation. *See* https://ag.ny.gov/press-release/2011/ag-schneiderman-launches-new-initiative-protect-religious-rights.

12.     In 2019, the OAG intervened in a case to enforce the Fair Housing Act, ensuring that a town did not block Hasidic Jewish families from purchasing and occupying homes. Because of the OAG's intervention, the town agreed not to interfere with the development or acquisition of housing because of religious status and not to discriminate because of religion in any aspect of the administration of zoning or land use. *See Greens at Chester LLC v. Town of Chester, et al.*, No. 19-cv-6770, D.E. 208 (S.D.N.Y. April 30, 2021).

13.     The OAG has repeatedly fought to guarantee the religious freedom of New Yorkers over the years. *See* Ex. E, *In the Matter of the Investigation by Eric T. Schneiderman of New York City Health and Hospitals Corporation and Jacobi Medical Center*, AOD No. 12-022 (mandating a hospital to comply with New York Executive and Human Rights Law, adopt and implement written religious accommodation policy and procedures, enstate a religious accommodation training program for all managerial staff, and create an employee complaint system for instances of religious discrimination); *See* Ex. F, *In the Matter of the Investigation by Eric T. Schneiderman of Milrose Consultants, Inc.*, AOD No. 12-007 (mandating a business to comply with New York State Executive and Human Rights Law, create and implement a religious accommodations policy, provide training to partners and Human Resources staff on the new religious accommodations policy, and report employee complaints of religious discrimination directly to the OAG).

14.     Attached hereto and made a part hereof as **Exhibit Q** is a true and accurate copy of the Assurance of Discontinuance in *Jacobi*, AOD No. 12-022.

15. Attached hereto and made a part hereof as **Exhibit R** is a true and accurate copy of the Assurance of Discontinuance in *Milrose*, AOD No. 12-007.

16. Attached hereto and made a part hereof as **Exhibit S** is a true and accurate copy of screenshots from Plaintiff's website.

17. Prior to the filing of her lawsuit, the OAG had never received any reports of Plaintiff's efforts to deny services to same-sex couples.

18. The OAG has not received any complaints from the public about Plaintiff's efforts to discriminate against same-sex couples.

19. The OAG has not exercised its authority under N.Y. Exec. Law § 63(12) to take proof or make a determination of relevant facts pertaining to Plaintiff's conducting of her business.

20. The OAG has not exercised its authority under N.Y. Exec. Law § 63(12) to file a civil action against Plaintiff related to any illegality in the conducting of her business.

21. I am not aware of the OAG ever initiating an enforcement action against an individual because of that individual's religious belief or practice.

## DECLARATION UNDER PENALTY OF PERJURY

I, Jessica Clarke, a citizen of the United States and a resident of the State of New York, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed this 16 day of June 2021 at New York, New York.

/s/ Jessica Clarke

Jessica Clarke

JA0925

# EXHIBIT Q

OFFICE OF THE ATTORNEY GENERAL
OF THE STATE OF NEW YORK
CIVIL RIGHTS BUREAU

IN THE MATTER OF THE INVESTIGATION BY
ERIC T. SCHNEIDERMAN, ATTORNEY GENERAL
OF THE STATE OF NEW YORK,                          **AOD No. 12-022**

OF

NEW YORK CITY HEALTH AND HOSPITALS
CORPORATION and JACOBI MEDICAL CENTER

<u>**ASSURANCE OF DISCONTINUANCE**</u>

In July 2011, pursuant to the provisions of Executive Law § 63(12), Eric T. Schneiderman,

Attorney General of the State of New York ("OAG"), began to investigate whether Jacobi Medical

Center ("Jacobi") failed to provide reasonable accommodations of religious observance in violation

of the New York State Human Rights Law, New York Executive Law §§ 290 <u>et seq.</u>; Title VII, 42

U.S.C. §§ 2000e <u>et seq.</u>; the New York City Human Rights Law, New York City Administrative

Code §§ 8-101 <u>et seq.</u>; and related civil rights statutes.

This Assurance of Discontinuance ("Assurance") contains the OAG's Findings in connection

with its investigation of Jacobi and the relief agreed to by the OAG and Jacobi and New York City

Health and Hospitals Corporation ("the parties").

1

JA0927

## DEFINITIONS

1.  As used throughout this Assurance of Discontinuance, the terms set forth below shall mean as follows:

    a.  "Assurance" means this Assurance of Discontinuance.

    b.  "Jacobi" or "Center" means Jacobi Medical Center, which is located at 1400 Pelham Parkway South Bronx, New York 10461 and is licensed by the State of New York pursuant to Article 28 of the New York Public Health Law, and all of its former and present officers, directors, employees, agents, consultants, or independent contractors, subsidiaries or assigns who have conducted business at Jacobi or on its behalf. In addition, to the extent that Jacobi engages any agent, consultant or independent contractor who has authority to hire, fire or set the work schedules of Employees ("Covered Activities"), then solely with respect to such agent's, consultant's or independent contractor's Covered Activities, "Jacobi" or "Center" shall include such agent, consultant or independent contractor.

    c.  "Health and Hospitals Corporation" or "HHC" means New York City Health and Hospitals Corporation, the municipal healthcare organization in New York City, which encompasses, among other facilities, 11 hospitals, including Jacobi Medical Center.

    d.  "Undue hardship" means a significant difficulty or expense, as defined by the New York State Human Rights Law, New York Executive Law § 296(10).

    e.  "Effective Date" means the date this Assurance of Discontinuance is fully executed by the parties.

    f.  "Employee" means any full-time or part-time employee of HHC .

2

JA0928

g.   "Managerial staff" means all HHC Associate Executive Directors, Senior Associate Executive Directors, Deputy Executive Directors, Executive Director(s), and Senior Vice President(s) at each HHC Hospital and/or Center.

h.   "Prospective Employee" means any individual who applies for a full-time or part-time position with HHC.

i.   "Human Resources Director" means the head or overseer of a human resources/human relations department (including the "Chief People Officer" at Jacobi).

j.   The use of the singular form of any word includes the plural and vice versa.

## OAG FINDINGS

2.   Jacobi is a public hospital and part of HHC, New York City's municipal healthcare organization.  Certain of Jacobi's policies, including its policies regarding religious accommodations for employees, are created and adopted centrally by HHC and apply to all HHC network/facilities.

3.   In July 2011, the OAG received several complaints from full-time nurses employed by Jacobi in multiple units.  The complainants alleged that Jacobi had repeatedly denied these nurses' requests for religious accommodations to modify their work schedules in order to observe the Sabbath each week without making any reasonable effort to find alternatives beyond authorizing the employees to attempt to swap shifts on their own.

4.   In response, the OAG commenced an investigation, which included interviewing multiple complainants about their requests for religious accommodations, reviewing Jacobi's practices and policies for assessing and responding to employees' religious accommodation requests, and conducting a subpoena hearing with the Jacobi manager responsible for implementing Jacobi's religious accommodations policy and reviewing employees' religious

3

accommodation requests. After the investigation began and the OAG brought this issue to HHC's attention, both parties sought to resolve the matter and agreed to enter into the instant Assurance for settlement purposes.

5.    The investigation has revealed that Jacobi's policies and procedures did not ensure that religious accommodations requests were properly evaluated as to whether they constituted an undue hardship to the Center before a decision to grant or deny them was made, and that Jacobi did not provide adequate training or guidance to supervisors and managers on how to evaluate and respond to requests for religious accommodations in violation of the New York State Human Rights Law, New York Executive Law §§ 290 et seq.; New York Civil Rights Law §40-c; Title VII, 42 U.S.C. §§ 2000e et seq.; and the New York City Human Rights Law, New York City Administrative Code §§ 8-101 et seq.

## PROSPECTIVE RELIEF

WHEREAS, HHC and Jacobi are subject to Executive Law § 63(12); the New York State Human Rights Law, New York Executive Law §§ 290 et seq.; New York Civil Rights Law §40-c; Title VII, 42 U.S.C. §§ 2000e et seq.; and the New York City Human Rights Law, New York City Administrative Code §§ 8-101 et seq.; which require, inter alia, employers to make reasonable accommodations of employees' sincerely held religious practices, including but not limited to requests for a period of religious observance, unless it would impose an undue hardship on the conduct of the employers' business;

WHEREAS, the New York State Human Rights Law, New York Executive Law § 296(10) requires an employer to engage in a bona fide effort to accommodate employees' requests for religious accommodation, including making reasonable efforts to accommodate a Sabbath observing employee beyond merely authorizing the employee to find her or his own shift swap;

4

WHEREAS, the OAG is willing to accept the terms of this Assurance pursuant to New York Executive Law § 63(15) and to discontinue its investigation; and

WHEREAS, the parties believe that the obligations imposed by this Assurance are prudent and appropriate, and will improve and strengthen HHC's policy with respect to providing accommodations to employees requesting leave for religious observance;

IT IS HEREBY UNDERSTOOD AND AGREED, by and between HHC, Jacobi, and the OAG, as follows:

## COMPLIANCE WITH THE LAW

6. Jacobi and HHC shall comply fully with the obligations, terms, and conditions of the New York State Human Rights Law, New York Executive Law §§ 290 et seq.; New York Civil Rights Law §40-c; Title VII, 42 U.S.C. §§ 2000e et seq.; and the New York City Human Rights Law, New York City Administrative Code §§ 8-101 et seq., including but not limited to New York Executive Law § 296(10).

## RELIGIOUS ACCOMMODATION POLICY AND PROCEDURES

7. Jacobi shall adopt the written religious accommodation policy and procedures, annexed as "Exhibit A" and fully incorporated herein, regarding requests for religious accommodations such as time off or modified schedules for religious observances (the "Religious Accommodation Policy") prior to its implementation. Within fifteen (15) days after completion of the training period provided for in Paragraph 15 below, Jacobi shall implement the Religious Accommodation Policy at Jacobi. Following such implementation, when a Jacobi Employee or Jacobi Prospective Employee requests an accommodation to engage in a sincerely held religious observance or practice, the Center shall follow the procedures and requirements set forth in the Religious Accommodation Policy. Jacobi shall

5

JA0931

not make any changes to the Religious Accommodation Policy without the express written permission of the OAG, whose consent shall not be unreasonably withheld.

8.   Each HHC network/facility (except Jacobi) shall adopt the Religious Accommodation Policy, annexed as "Exhibit A" and fully incorporated herein, regarding requests for religious accommodations such as time off or modified schedules for religious observances (the "Religious Accommodation Policy") prior to its implementation.  Within forty-five (45) days after completion of the training period provided for in Paragraph 16 below, HHC shall implement the Religious Accommodation Policy at each HHC network/facility (except Jacobi).  Following such implementation, when a HHC Employee or HHC Prospective Employee requests an accommodation to engage in a sincerely held religious observance or practice, the relevant network/facility shall follow the procedures and requirements set forth in the Religious Accommodation Policy.  HHC shall not make any changes to the Religious Accommodation Policy without the express written permission of the OAG, whose consent shall not be unreasonably withheld.

9.   Within fifteen (15) days after completion of the training period provided for in Paragraph 15 below, Jacobi shall (a) distribute the Religious Accommodation Policy  in the same manner that it distributes all new policies to its employees that concern employee policies, *i.e.*, through hard copy transmittal to relevant departmental and managerial staff and posting of the new policy on HHC's internal intranet in its database of corporate policies and procedures; and (b) include the Religious Accommodation Policy in all policy manuals or materials distributed or made available that concern employee policies, including all orientation and new hire distributions, to its Employees.  The Human Resources Director at Jacobi must additionally certify to the OAG in writing that the aforesaid distribution of the

JA0932

Religious Accommodation policy was made. Additionally, for the first pay period after fifteen (15) days after completion of the training period provided for in Paragraph 15 below, Jacobi shall attach to each Jacobi employee's paycheck or paystub a copy of the Religious Accommodation Policy.

10.    Within forty-five (45) days after completion of the training period provided for in Paragraph 16 below, HHC shall for each network/facility (except Jacobi) (a) distribute the Religious Accommodation Policy in the same manner that it distributes all new policies to its employees that concern employee policies, *i.e.*, through hard copy transmittal to relevant departmental and managerial staff and posting of the new policy on HHC's internal intranet in its database of corporate policies and procedures; and (b) include the Religious Accommodation Policy in all policy manuals or materials distributed or made available through its networks/facilities that concern employee policies, including all orientation and new hire distributions, to its Employees. The HHC Central Office Human Resources Director must additionally certify to the OAG in writing that the aforesaid distribution of the Religious Accommodation policy was made. Additionally, for the first pay period after forty-five (45) days after completion of the training period provided for in Paragraph 16 below, HHC shall attach to each HHC employee's paycheck or paystub a copy of the Religious Accommodation Policy.

11.    In addition to the distribution provided for in Paragraph 9 above, within fifteen (15) days after completion of the training period provided for in Paragraph 15 below, Jacobi shall post the Religious Accommodation Policy Statement in at least two conspicuous locations at Jacobi's main campus. In each location where the Religious Accommodation Policy Statement is posted, it shall be accompanied by the following notice: "Employees should

7

consult the Hospital's website, Human Resources, and/or the Religious Accommodation Policy distributed to employees for an explanation of the procedures for requesting a religious accommodation and the Hospital's religious accommodation review process."

12.     In addition to the distribution provided for in Paragraph 10 above, within forty-five (45) days after completion of the training period provided for in Paragraph 16 below, HHC shall for each network/facility (except Jacobi) post the Religious Accommodation Policy Statement in at least two conspicuous places accessible to all employees at each network/facility's main campus. In each location where the Religious Accommodation Policy Statement is posted, it shall be accompanied by the following notice: "Employees should consult the Hospital's website, Human Resources, and/or the Religious Accommodation Policy distributed to employees for a detailed explanation of the procedures for requesting a religious accommodation and the Hospital's religious accommodation review process."

13.     Each HHC network/facility shall designate its Human Resources Director, or his or her designee, to serve as the Religious Accommodation Officer, who will be responsible for making certain that all requests for religious accommodations are handled in accordance with the Religious Accommodation Policy, with this Assurance, and with applicable law.

**TRAINING**

14.     Within thirty (30) days of the Effective Date, HHC shall submit a proposed religious accommodation training program to the OAG for approval, which shall not be unreasonably withheld.

15.     Within thirty (30) days of OAG approval of the religious accommodation training program, all Jacobi Managerial staff will receive training on (a) the legal obligations of employers under New York Executive Law § 296(10) to individuals who request an accommodation for

8

JA0934

their religious practices or observances; (b) the Religious Accommodation Policy; and (c) the record-keeping and reporting requirements set forth in this Assurance. These topics shall also be included in any general and regular Human Resources training regarding employment discrimination issues provided to these staff members.

16. Within ninety (90) days of OAG approval of the religious accommodation training program, all Managerial staff at HHC networks/facilities (except Jacobi) will receive training on (a) the legal obligations of employers under New York Executive Law § 296(10) to individuals who request an accommodation for their religious practices or observances and (b) the Religious Accommodation Policy. These topics shall also be included in any general and regular Human Resources training regarding employment discrimination issues provided to these staff members.

17. All Managerial staff hired by Jacobi after the Effective Date shall receive the training described in paragraph 15 within the longer of (i) thirty (30) days of his or her start date, and (ii) the time provided in Paragraph 15 for such training.

18. All Managerial staff hired after the Effective Date by any HHC network/facility (except Jacobi) shall receive the training described in paragraph 16 within the longer of (i) thirty (30) days of his or her start date, and (ii) the time provided in Paragraph 16 for such training.

19. Each Religious Accommodation Officer at each HHC network/facility shall maintain attendance records for all training sessions for the duration of this Assurance.

## **COMPLAINTS**

20. The Religious Accommodation Officer at each HHC network/facility shall review and handle complaints regarding religious accommodation requests in accordance with the terms of the Religious Accommodation Policy and the law.

9

JA0935

21. If a Managerial staff member receives a complaint, whether written or oral, from an Employee or Prospective Employee that a request for a religious accommodation was improperly denied, the Managerial staff member shall promptly inform the Religious Accommodation Officer, who shall provide the complainant with a copy of the Religious Accommodation Complaint Form, annexed to the Religious Accommodation Policy.

22. Within fifteen (15) business days of receiving a completed Religious Accommodation Complaint Form, or otherwise becoming aware of any conduct by any Employee that he/she believes violates New York Executive Law § 296(10) or the requirements of this Assurance, the Human Resources Director, or his or her designee, shall conduct a complete and thorough investigation into the complaint and take appropriate action to resolve the complaint in accordance with the Religious Accommodation Policy, with this Assurance, and with applicable law. Each HHC network/facility shall maintain all records regarding each religious accommodations complaint, the investigation and the resolution for the duration of this Assurance.

## REPORTING

23. Jacobi shall provide six (6) semi-annual monitoring reports to the OAG, with the first due five months after the Effective Date and the others due every six months thereafter. Each report shall include:

   a. All religious accommodation requests made during the preceding reporting period by any Jacobi Employee or Jacobi Prospective Employee, and the efforts undertaken by the Center to make such accommodations. Specifically, the report shall identify (i) the names, work addresses, and work telephone numbers of all individuals who requested a religious accommodation during the six-month period; (ii) the unit or

10

JA0936

department where the individual worked or applied to work at Jacobi; (iii) the date the request was made; (iv) the nature of the accommodation requested; (v) the specific efforts undertaken by Jacobi to accommodate the request and the Employees involved in making those efforts; and (vi) what, if any, accommodation was provided.

b. All religious accommodation requests denied during the preceding reporting period and reasons for the denial of the request. If Jacobi denied the request in whole or in part due to economic hardship, it shall provide all calculations made or copies of other information assessed in reaching that determination. If Jacobi denied the request in whole or in part, on any ground other than undue economic hardship, Jacobi shall explain the reasons why the requested accommodation was not granted, providing any relevant supporting documentation and information identifying the undue hardship had the requested accommodation been granted.

c. Copies of all Religious Accommodation Complaint Forms submitted during the preceding reporting period and a written description of (i) the investigation into the complaint; (ii) the results of the investigation; and (iii) any actions taken in response.

24. Within twenty-one (21) days after receiving a written request from the OAG, Jacobi shall provide to the OAG any documents Jacobi is required to maintain under the terms of this Assurance and any documents the OAG believes relate to Jacobi's compliance with this Assurance. This Assurance does not in any way impair or affect the right of the OAG to obtain documents from Jacobi pursuant to subpoena.

11

JA0937

## PROHIBITION AGAINST RETALIATION

25.    Jacobi and HHC agree that they shall not in any manner discriminate or retaliate against any current or former Employees, including those persons who cooperated or may be perceived to have cooperated with the OAG's investigation, in any of their terms or conditions of employment because of such cooperation or perceived cooperation. Jacobi and HHC agree not to discharge, suspend, give negative evaluations about, refuse the religious accommodation requests of, or take any adverse employment action against any of these Employees, except for legitimate, non-discriminatory reasons unrelated to the OAG's investigation or to any past, present or future participation in any activities involving the exercise of their legal rights under any laws referred to in this Assurance.

## SCOPE OF THE ASSURANCE, JURISDICTION, AND ENFORCEMENT PROVISIONS

26.    The OAG has agreed to the terms of this Assurance based on, among other things, the representations made to the OAG by Jacobi, HHC, and their counsel and the results of the OAG's investigation. To the extent that any material representations are later found to be inaccurate or misleading, this Assurance is voidable by the OAG in its sole discretion.

27.    This Assurance will expire three (3) years after the Effective Date.

28.    No representation, inducement, promise, understanding, condition, or warranty not set forth in this Assurance has been made to or relied upon by Jacobi and/or HHC in connection with their agreeing to abide by this Assurance.

29.    This Assurance binds Jacobi, HHC, their principals, directors, beneficial owners, officers, shareholders, successors, assigns, "d/b/a" companies, subsidiaries, and affiliates, if any, to the extent that they engage in Covered Activities.

30.    Jacobi and HHC represent and warrant, through the signatures below, that the terms and

12

JA0938

conditions of this Assurance are duly approved, and execution of this Assurance is duly authorized. Jacobi and HHC agree not to take any action or make any statement denying, directly or indirectly, (i) the propriety of this Assurance, or (ii) expressing the view that this Assurance is without factual basis. Nothing in this paragraph affects Jacobi's or HHC's (i) testimonial obligations or (ii) right to take legal or factual positions in defense of litigation or other legal proceedings to which the OAG is not a party. This Assurance is not intended for use by any third party in any other proceeding and is not intended, and should not be construed, as an admission of wrongdoing or of liability by Jacobi or HHC.

31. This Assurance may not be amended except by an instrument in writing signed on behalf of all the parties to this Assurance.

32. This Assurance shall be binding on and inure to the benefit of the parties to this Assurance and their respective successors and assigns, provided that no party, other than the OAG, may assign, delegate, or otherwise transfer any of its rights or obligations under this Assurance without the prior written consent of the OAG, which shall not be unreasonably withheld.

33. In the event that any one or more of the provisions contained in this Assurance shall for any reason be determined to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Assurance, and the remaining clauses shall continue to be in effect.

34. To the extent not already provided under this Assurance, Jacobi and HHC agree to, upon request by the OAG, provide all documentation and information necessary for the OAG to verify compliance with this Assurance.

35. All notices, reports, requests, and other communications to any party pursuant to this Assurance shall be in writing and shall be directed as follows:

JA0939

OAG:

Allegra Chapman
Assistant Attorney General
Civil Rights Bureau
New York State Office of the Attorney General
120 Broadway, 23rd Floor
New York, New York, 10271-0332
Allegra.Chapman@ag.ny.gov
(212) 416-8250
(212) 416-8074 (Fax)

HHC and Jacobi Medical Center:

Salvatore J. Russo, Esq.
New York City Health and Hospitals Corporation
Office of Legal Affairs
125 Worth Street, Room 527
New York, New York 10013-4006
Salvatore.Russo@nychhc.org
(212) 788-3300

Any changes in the person to whom communications should be directed shall be made in writing in advance of the change.

36. Acceptance of this Assurance by the OAG shall not be deemed approval by the OAG of any of the practices or procedures referenced herein, and Jacobi and HHC agree not to make any representation to the contrary.

37. Pursuant to Executive Law § 63(15), evidence of a violation of this Assurance shall constitute prima facie proof of a violation of the applicable law in any action or proceeding thereafter commenced by the OAG.

38. If a court of competent jurisdiction determines that Jacobi and/or HHC has breached this Assurance, Jacobi and/or HHC agrees to pay to the OAG the costs, if any, tied to such determination and costs tied to enforcement of this Assurance, including without limitation reasonable legal fees, expenses and reasonable court costs.

14

JA0940

39.     The OAG finds the relief and agreements contained in this Assurance appropriate and in the
public interest. The OAG is willing to accept this Assurance pursuant to Executive Law
§ 63(15), in lieu of commencing a statutory proceeding.  This Assurance shall be governed
by the laws of the State of New York without regard to any conflict of laws principles.

40.     Nothing contained herein shall be construed so as to deprive any person of any private right
under the law.

IN WITNESS WHEREOF, this Assurance is executed by the parties hereto.

**ERIC T. SCHNEIDERMAN**
Attorney General of the State of New York


By: _____          By: _____
**KRISTEN CLARKE**                                        **SPENCER FREEDMAN**
Bureau Chief                                                   Chief Counsel for Civil Rights

**ALLEGRA CHAPMAN**
Assistant Attorney General

Civil Rights Bureau
120 Broadway
New York, New York 10271
Phone:  (212) 416-6280
Fax:  (212) 416-8074

Dated:  June ___, 2012

15

JA0941

**JACOBI MEDICAL CENTER**

By: _____

**WILLIAM P. WALSH**
Executive Director
Jacobi Medical Center
1400 Pelham Parkway
South Bronx, New York 10461

Dated: June 29, 2012

**NEW YORK CITY HEALTH AND HOSPITALS CORPORATION**

By: _____

**ALAN D. AVILES**
President
125 Worth Street
New York, New York 10013

Dated: June 29, 2012

16

JA0942

# EXHIBIT R

OFFICE OF THE ATTORNEY GENERAL
OF THE STATE OF NEW YORK
CIVIL RIGHTS BUREAU

IN THE MATTER OF THE INVESTIGATION BY
ERIC T. SCHNEIDERMAN, ATTORNEY GENERAL OF
THE STATE OF NEW YORK,                                    **AOD No. 12-007**

OF

MILROSE CONSULTANTS, INC.

## ASSURANCE OF DISCONTINUANCE

In April 2011, pursuant to the provisions of § 63(12) of the New York State Executive Law, Eric T. Schneiderman, Attorney General of the State of New York ("OAG") began to investigate whether Milrose Consultants, Inc. ("Milrose Consultants") violated the New York State Human Rights Law, New York Executive Law §§ 290 et seq.; Title VII, 42 U.S.C. §§ 2000e et seq.; the New York City Human Rights Law, New York City Administrative Code §§ 8-101 et seq.; and related civil rights statutes. Specifically, the OAG investigated allegations that Milrose Consultants has failed to provide reasonable accommodations of religious observance.

This Assurance of Discontinuance ("Assurance") contains the OAG's Findings in connection with its investigation of Milrose Consultants and the relief agreed to by the OAG and Milrose Consultants ("the parties").

1

JA0944

## DEFINITIONS

1.   As used throughout this Assurance of Discontinuance ("Assurance"), the terms set forth below shall mean as follows:

   a.   "Assurance" means this Assurance of Discontinuance.

   b.   "Milrose Consultants, Inc.," or "Milrose Consultants," means Milrose Consultants, Inc., and all of its former and present officers, directors, employees, agents, consultants, or independent contractors, subsidiaries or assigns.

   c.   "Effective Date" means the date this Assurance is fully executed by the parties.

   d.   "Employee" means any person performing work for and on the payroll of Milrose Consultants in the State of New York.

   e.   "Applicant" means any person applying or considered for employment by Milrose Consultants.

   f.   Terms of construction:

      i.   "And" and "or" shall be construed conjunctively or disjunctively as necessary to make the meaning inclusive rather than exclusive.

      ii.  "All" means "any and all" and "any" means "any and all."

      iii. "Concerning" means relating to, referring to, describing, evidencing, regarding, reflecting, or constituting.

      iv.  "Day" refers to a calendar day, not a business day.

      v.   "Including" means without limitation.

      vi.  The singular of any word included the plural; the plural of any word includes the singular.

2

JA0945

## FINDINGS

2.   Milrose Consultants is an architectural and engineering consulting firm with offices in New York, New Jersey, and Pennsylvania. Milrose Consultants operates two offices within the State of New York: 498 Seventh Avenue, New York, NY 10018, and 66 West Barclay Street, Hicksville, NY 11801, and employs over one hundred (100) employees.

3.   In 2011, the OAG received a complaint alleging that Milrose Consultants discriminated against a new hire by failing to make any effort to accommodate religious observance. Specifically, the complaint alleged that Milrose Consultants rescinded its employment offer after discovering that the employee observed a Saturday Sabbath and would occasionally require an accommodation to leave work early in order to return home before sundown on Fridays. The complaint alleges Milrose Consultants rescinded its employment offer without taking any steps to determine whether the employee's religious observance could be reasonably accommodated.

4.   In response to this complaint, the OAG commenced an investigation. The OAG reviewed and analyzed Milrose Consultants' existing policies, procedures, and practices governing requests for and decisions granting or denying religious accommodations, and obtained information from Milrose Consultants.

5.   The investigation revealed that Milrose Consultants maintains no religious accommodations policy, no formal policy or procedure for employees to request religious accommodations or for supervisors or managers to evaluate such requests, and no directives or training for managers and supervisors to ensure that requests for religious accommodations are properly reviewed and assessed. In addition, the investigation revealed that Milrose Consultants maintains no records to demonstrate

3

whether requests for religious accommodations have been appropriately and timely considered.

6.   Based on this investigation, the OAG found evidence that Milrose Consultants has not implemented policies and procedures to address requests for religious accommodations received pursuant to New York State Human Rights Law, New York Executive Law §§ 290 et seq.; Title VII, 42 U.S.C. §§ 2000e et seq.; and the New York City Human Rights Law, New York City Administrative Code §§ 8-101 et seq.

**PROSPECTIVE RELIEF**

WHEREAS, Milrose Consultants is subject to Executive Law § 63(12); the New York State Human Rights Law, New York Executive Law §§ 290 et seq.; Title VII, 42 U.S.C. §§ 2000e et seq.; the New York City Human Rights Law, New York City Administrative Code §§ 8-101 et seq.; which require, inter alia, employers to make reasonable accommodations of employees' sincerely held religious practices, including but not limited to requests for a period of religious observance, unless it would impose an undue hardship on the conduct of the employers' business;

WHEREAS, Milrose Consultants neither admits nor denies the OAG's Findings (2) – (6);

WHEREAS, the OAG is willing to accept the terms of this Assurance pursuant to New York Executive Law § 63(15) and to discontinue its investigation; and

WHEREAS, the parties believe that the obligations imposed by this Assurance are prudent and appropriate;

IT IS HEREBY UNDERSTOOD AND AGREED, by and between Milrose Consultants and the OAG, as follows:

4

**Compliance with Federal, State, and Local Anti-Discrimination Laws**

7.    Milrose Consultants agrees to comply fully with the obligations, terms, and conditions of the New York State Human Rights Law, New York Executive Law §§ 290 et seq.; Title VII, 42 U.S.C. §§ 2000e et seq.; and the New York City Human Rights Law, New York City Administrative Code §§ 8-101 et seq., and all other applicable federal, state and local anti-discrimination laws.

**Religious Accommodations Policy**

8.    Within thirty (30) days of the Effective Date, Milrose Consultants shall create and submit for the OAG's approval a Religious Accommodations Policy which shall comply fully with the obligations, terms and conditions of the New York State Human Rights Law, Title VII, and the New York City Human Rights Law. The Religious Accommodations Policy shall include, but not be limited to:

a.    A statement that Milrose Consultants shall make a reasonable accommodation for an employee's sincerely held religious beliefs, including religious practices or observances, unless doing so would cause undue hardship to the conduct of the business;

b.    A procedure for employees to make requests for religious accommodation;

c.    Timelines for review of requests for religious accommodation by supervisors and managers; and

d.    Procedures regarding the filing, investigation, and resolution of complaints regarding religious accommodations, which shall require that all investigations of such complaints be reduced to a written statement including a description of the allegations, the steps taken to investigate the complaint, recommendations

5

for action, and a statement of the outcome.

The Religious Accommodations Policy shall be subject to approval of the OAG.

9. Within fourteen (14) days of the OAG's approval, Milrose Consultants shall disseminate the Religious Accommodations Policy to all employees.

10. Upon the OAG's approval of the Religious Accommodations Policy, Milrose Consultants shall provide the Religious Accommodations Policy to all new employees within fourteen (14) days of their hire date.

11. Milrose Consultants shall designate an employee to serve as the Religious Accommodations Officer, who will be responsible for ensuring that all requests for religious accommodations are handled in accordance with the Religious Accommodations Policy, with this Assurance, and with applicable law; developing religious accommodation training materials required by this Assurance; and conducting the training of employees in accordance with the requirements of this Assurance. Within fifteen (15) days of the Effective Date, Milrose Consultants will submit the name and resume of the designated Religious Accommodations Officer to the OAG for approval, which shall not be unreasonably withheld.

## Training

12. Within sixty (60) days of the OAG's approval of the Religious Accommodations Policy, the Religious Accommodations Officer shall train all Milrose Consultants partners, Human Resources staff, and any other managers or supervisors on the new Religious Accommodations Policy. All Milrose Consultants partners, Human Resources staff, and any other managers or supervisors shall acknowledge in writing that they have received training on the Religious Accommodations Policy, using the acknowledgement form

6

annexed as Exhibit A.

### **Reporting**

13.   Six (6) months after the Effective Date, and semiannually for the duration of this Assurance, Milrose Consultants agrees to provide copies of the following records to the OAG:

    a.   All documents related to all complaints brought to its attention concerning religious discrimination, including all complaints concerning religious accommodations made by applicants or employees, and all documents summarizing any investigation and resolution by Milrose Consultants; and

    b.   Signed acknowledgement forms indicating that all Milrose Consultants partners, Human Resources staff, and any other managers or supervisors have received training on the Religious Accommodations Policy, as required by Paragraph 12 of this Assurance.

### **Scope of the Assurance, Jurisdiction and Enforcement Provisions**

14.   The OAG has agreed to the terms of this Assurance based on, among other things, the representations made to the OAG by Milrose Consultants and its counsel and the OAG's own factual investigation as set forth in Findings (2) – (6) above. To the extent that any material representations are later found to be inaccurate or misleading, this Assurance is voidable by the OAG in its sole discretion.

15.   This Assurance will expire three (3) years after the Effective Date, except that the OAG may, in its sole discretion, extend the Assurance term upon a good-faith determination that Milrose Consultants has not complied with this Assurance, which non-compliance the OAG will discuss and attempt to resolve with Milrose Consultants in good faith

7

**JA0950**

before making such determination.

16. No representation, inducement, promise, understanding, condition, or warranty not set forth in this Assurance has been made to or relied upon by Milrose Consultants in agreeing to this Assurance.

17. This Assurance binds Milrose Consultants, its principals, directors, beneficial owners, officers, shareholders, successors, assigns, "d/b/a" companies, subsidiaries, affiliates, and any other business entities whom any such individuals may hereafter form or control.

18. Milrose Consultants represents and warrants, through the signatures below, that the terms and conditions of this Assurance are duly approved, and execution of this Assurance is duly authorized. Milrose Consultants agrees not to take any action or make any statement denying, directly or indirectly, the propriety of this Assurance or expressing the view that this Assurance is without factual basis. Nothing in this paragraph affects Milrose Consultants' (i) testimonial obligations or (ii) right to take legal or factual positions in defense of litigation or other legal proceedings to which the OAG is not a party. This Assurance is not intended for use by any third party in any other proceeding and is not intended, and should not be construed, as an admission of liability by Milrose Consultants.

19. This Assurance may not be amended except by an instrument in writing signed on behalf of all the parties to this Assurance.

20. This Assurance shall be binding on and inure to the benefit of the parties to this Assurance and their respective successors and assigns, provided that no party, other than the OAG, may assign, delegate, or otherwise transfer any of its rights or obligations under this Assurance without the prior written consent of the OAG.

21.    In the event that any one or more of the provisions contained in this Assurance shall for

any reason be determined to be invalid, illegal, or unenforceable in any respect, in the

sole discretion of the OAG such invalidity, illegality, or unenforceability shall not affect

any other provision of this Assurance.

22.    To the extent not already provided under this Assurance, Milrose Consultants agrees to,

upon request by the OAG, provide all documentation and information necessary for the

OAG to verify compliance with this Assurance.

23.    All notices, reports, requests, and other communications to any party pursuant to this

Assurance shall be in writing and shall be directed as follows:

OAG:

Kayla Gassmann
Assistant Attorney General
Civil Rights Bureau
New York State Office of the Attorney General
120 Broadway, 23rd Floor
New York, New York, 10271-0332
(212) 416-8250
(212) 416-8074 (Fax)

Milrose Consultants:

Donna Jordan
Director of Human Resources
Milrose Consultants, Inc.
498 Seventh Avenue, 8th Floor
New York, NY 10018
(212) 894-0170

Any changes in the person to whom communications should be directed shall be made in

writing in advance of the change.

24.    Acceptance of this Assurance by the OAG shall not be deemed approval by the OAG of

any of the practices or procedures referenced herein, and Milrose Consultants agrees not

to make any representation to the contrary.

9

25.    Pursuant to Executive Law § 63(15), evidence of a violation of this Assurance shall
       constitute prima facie proof of a violation of the applicable law in any action or
       proceeding thereafter commenced by the OAG.

26.    If a court of competent jurisdiction determines that Milrose Consultants has breached
       this Assurance, Milrose Consultants agrees to pay to the OAG the costs, if any, tied to
       such determination and costs tied to enforcement of this Assurance, including without
       limitation legal fees, expenses, and court costs.

27.    The OAG finds the relief and agreements contained in this Assurance appropriate and in
       the public interest. The OAG is willing to accept this Assurance pursuant to Executive
       Law § 63(15), in lieu of commencing a statutory proceeding. This Assurance shall be
       governed by the laws of the State of New York without regard to any conflict of laws
       principles.

28.    Nothing contained herein shall be construed so as to deprive any person of any private
       right under the law.

JA0953

IN WITNESS WHEREOF, this Assurance is executed by the parties hereto on
February ___, 2012.

**ERIC T. SCHNEIDERMAN**
Attorney General of the State of New York

By: _____

**KRISTEN CLARKE**
Bureau Chief

**KAYLA GASSMANN**
Assistant Attorney General

Civil Rights Bureau
120 Broadway
New York, New York 10271
Phone: (212) 416-6280
Fax: (212) 416-8074

Dated: February ~~May~~ 24, 2012

By: _____

**SPENCER FREEDMAN**
Chief Counsel for Civil Rights

**MILROSE CONSULTANTS, INC.**

By: _____

Domenick Chieco
Sr. Vice President/Managing Partner
Dated: February 17, 2012

1

JA0954

# EXHIBIT S



## MY VISION

As a self-identified creative, my ultimate goal in life is to glorify the one *true* Creator - God. The One who paints His glories in the contours of the Grand Canyon, announces His mystery in the brilliance of the universe, and etches His majesty in the vastness of the night sky. "It's as if the stars and the skies are saying simply by their being, 'Don't stay too long staring at us: look at Him. We are but creatures, He is the Creator. We are but lights, He *is* the Light. We are beautiful, but He *is* Beauty.'" (Melvin Tinker)



## MY PHILOSOPHY

I believe that marriage is a picture of the gospel and demonstrates the redemptive love of Jesus Christ, who willingly gave Himself up for us by going to the cross, paying the debt for our sins, and paving a way for us to be united with Him. He died to His own interests, looking to our own needs, and painted a picture of sacrificial love in action.

JA0956

God is self-existent. Infinite. Eternal. And the evidence of Him is all around us – the regularity of nature, the vastness of the cosmos, the miracle of human life – they're all traces of His divine fingerprints.

Put by John Piper, "The created universe is all about glory. The deepest longing of the human heart and the deepest meaning of heaven and earth are summed up in this: the glory of God. The universe was made to show it, and we were made to see it and savour it."

The experience of marriage will unveil the beauty and depths of the gospel; it shows that, though we are more sinful and flawed in ourselves than we ever dared believe, we at the very same time are more loved and accepted in Jesus Christ more than we ever dared hope. The gospel can fill our hearts with God's love so that we can handle it when our spouse fails to love us as he or she should, and it frees us to see our spouse's sins and flaws to the bottom – and yet still love and accept our spouse fully.

I believe that the essence of marriage is that it's a covenant, a commitment, a promise of future love.

AND THOUGH PASSION MAY LEAD YOU TO MAKE A WEDDING PROMISE, I BELIEVE IT'S THE PROMISE ITSELF THAT MAKES YOUR PASSION WISER, RICHER, AND DEEPER OVER THE YEARS.

THAT IS WHAT I SEEK TO DO WITH MY PHOTOGRAPHY – SAVOUR GOD'S GLORY, POINT TO IT, AND PUT IT ON DISPLAY FOR ALL TO SEE.

MY ULTIMATE AIM IS THAT THE STORIES I CAPTURE AND MESSAGES I CREATE WILL BE TO THE PRAISE OF HIS GLORIOUS NAME.

"SO WHETHER YOU EAT OR DRINK OR WHATEVER YOU DO, DO IT ALL FOR THE GLORY OF GOD." 1 CORINTHIANS 10:31

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

EMILEE CARPENTER, LLC d/b/a
Emilee Carpenter Photography and
Emilee Carpenter,

                Plaintiffs,

       -vs-

LETITIA JAMES, in her official capacity as
Attorney General of the State of New York;
JONATHAN J. SMITH, in his official
capacity as Interim Commissioner of the New York State
Division of Human Rights; and
WEEDEN WETMORE, in his official capacity as
District Attorney of Chemung County,

                Defendants.

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

                      21-CV-6303

## MEMORANDUM OF LAW IN SUPPORT OF
## STATE DEFENDANTS' MOTION TO DISMISS

**LETITIA JAMES**
New York State Attorney General
144 Exchange Boulevard, Suite 200
Rochester, New York 14614
Telephone: (585) 546-7430

By:    */s/ Heather L. McKay*
       HEATHER L. MCKAY
       Assistant Attorney General
       SANDRA PULLMAN
       Senior Counsel, Civil Rights Bureau
       RICK SAWYER*
       Special Counsel, Civil Rights Bureau
       SWATI R. PRAKASH**
       Assistant Attorney General
       HANNAH BERNARD**
       Volunteer Assistant Attorney General
       * Application for admission forthcoming.
       ** Of counsel.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

FACTS ALLEGED IN THE COMPLAINT ........................................................... 2

STANDARD OF REVIEW .................................................................................... 5

ARGUMENT ......................................................................................................... 5

I.  The Court lacks jurisdiction over Plaintiff's claims. .................................. 5

A.  Plaintiff lacks standing, and her speculative claims are not ripe. .................... 5

II.  The Court lacks jurisdiction over claims against the Attorney General. ............................ 7

III.  New York's antidiscrimination laws do not regulate religion. ......................................... 9

A.  Plaintiff has not pleaded any example of anti-religious hostility in the "interpretation" of New York's neutral accommodations laws ......................... 11

B.  Plaintiff cannot show that State Defendants treat religion differently. ......................... 12

C.  State Defendants have not compelled Plaintiff's religious practice ............................. 15

D.  The "hybrid rights" doctrine is not recognized in the Second Circuit. ......................... 16

IV.  New York's antidiscrimination laws do not impermissibly regulate speech. ............... 16

A.  Denying service to same-sex couples is not an "editorial judgment." ......................... 17

B.  New York's restrictions on discriminatory advertising and unlawful policies are permissible ............................................................................ 20

C.  New York's antidiscrimination laws do not compel Plaintiff to speak ......................... 21

D.  New York's antidiscrimination laws do not restrict Plaintiff's associational rights ...... 22

E.  The laws survive any level of review .......................................................... 23

i

V. Plaintiff's Due Process claim must be dismissed. ............................................................. 25

CONCLUSION ...................................................................................................................... 25

JA0960

# TABLE OF AUTHORITIES

**Cases**

*303 Creative LLC v. Elenis*, 385 F.Supp.3d 1147 (D. Colo. 2019). ............................................. 25

*303 Creative LLC v. Elenis*, No. 16-cv-02372-MSK-CBS, 2017 WL 4331065 (D. Colo. Sept. 1, 2017) ....................................................................................................................................... 5

*Anderson v. Treadwell*, 294 F.3d 453 (2d Cir. 2002) ................................................................... 20

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................................................. 5, 12

*Battaglia v. Buffalo Niagara Intro., Inc.*, No. 10138581 (DHR Jan. 28, 2012) .......................... 13

*Bd. of Directors of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537 (1987) ......................... 23

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .......................................................................... 5

*Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000) ........................................................................ 22

*Burnette v. Carothers*, 192 F.3d 52 (2d Cir. 1999) ...................................................................... 8

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557 (1980) .......................... 21

*Christian Legal Soc'y v. Martinez*, 561 U.S. 661 (2010) .................................................. 16, 17, 23

*Chrysafis v. James*, No. 21-cv-998 (JS)(ARL), 2021 WL 1405884 (E.D.N.Y. Apr. 14, 2021) ..... 9

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) ............ 10, 11, 12

*Commack Self-Serv. Kosher Meats, Inc. v. Hooker*, 680 F.3d 194 (2d Cir. 2012) ...................... 10

*Elane Photography, LLC v. Willock*, 309 P.3d 53 (N.M. 2013) ...................................... 17, 18, 19

*Emp. Div. v. Smith*, 494 U.S. 872 (1990) .................................................................................. 10

*Ex parte Young*, 209 U.S. 123 (1908) ......................................................................................... 8

*Expressions Hair Design v. Schneiderman*, 137 S. Ct. 1144 (2017) ............................................ 25

*Fields v. City of Tulsa*, 753 F.3d 1000 (10th Cir. 2014) ............................................................. 15

*Gifford v. McCarthy*, 137 A.D.3d 30 (3d Dep't 2016) ................................................................ 13

*Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366 (S.D.N.Y. 2020) ........................... 12

JA0961

*HealthNow New York, Inc. v. New York*, 739 F. Supp. 2d 286 (W.D.N.Y. 2010)......................... 9

*Heart of Atlanta Motel, Inc. v. U.S.*, 379 U.S. 241 (1964) ...................................................... 24

*Hishon v. King & Spalding*, 467 U.S. 69 (1984) ................................................................... 19

*Holcomb v. Iona Coll.*, 521 F.3d 130 (2d Cir. 2008).............................................................. 18

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ....................................................... 25

*Holve v. McCormick & Co., Inc.*, 334 F. Supp. 3d 535 (W.D.N.Y. 2018)..................................... 5

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995)....................... 22

*Jones v. Scheniderman*, 974 F. Supp. 2d 322 (S.D.N.Y. 2013).................................................. 9

*Jones v. Schneiderman*, 101 F. Supp. 3d 283 (S.D.N.Y. 2015)................................................. 6

*Katzenbach v. McClung*, 379 U.S. 294 (1964) ..................................................................... 18

*Leebaert v. Harrington*, 332 F.3d 134 (2d Cir. 2003) ............................................................ 16

*Madsen v. Women's Health Ctr.*, 512 U.S. 753 (1994) ........................................................... 24

*Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*, 138 S.Ct. 1719 (2018) .................. passim

*Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241 (1974) ........................................................ 22

*Morgan v. Zaharo Cab Corp.*, No. 10117888, (DHR July 2, 2014) ............................................ 13

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) .............................. 25

*Nassau & Suffolk Cnty. Taxi Owners Ass'n, Inc. v. State*, 336 F. Supp. 3d 50 (E.D.N.Y. 2018) .. 9

*Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803 (2003)........................................ 7

*Newdow v. Peterson*, 753 F.3d 105 (2d Cir. 2014)................................................................. 15

*Newman v. Piggie Park Enter., Inc.*, 390 U.S. 400 (1968)........................................................ 10

*Norwood v. Harrison*, 413 U.S. 455 (1973) .......................................................................... 2

*Obergefell v. Hodges*, 135 S.Ct. 2584 (2015)....................................................................... 12

*Orange Transportation Servs., Inc. v. Volvo Grp. N. Am., LLC*, 450 F. Supp. 3d 311 (W.D.N.Y.

JA0962

2020) .......................................................................................................................... 5

*Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of California*, 475 U.S. 1 (1986) ...................... 22

*Phillips v. City of New York*, 775 F.3d 538 (2d Cir. 2015) ........................................................ 10

*PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74 (1980) ......................................................... 22

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ...................................................................... 20

*Ragin v. New York Times Co.*, 923 F.2d 995 (2d Cir. 1991) ............................................ 18, 24, 25

*Riley v. Cuomo*, No. 2:17-cv-01631, 2018 WL 1832929 (E.D.N.Y. Apr. 16, 2018) ................... 9

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ................................................................... 23, 24

*Robinson v. Sessions*, 260 F. Supp. 3d 264 (W.D.N.Y. 2017)................................................ 6, 8

*Rumsfeld v. Forum for Acad. & Institutional Rts.*, 547 U.S. 47 (2006)..................... 19, 20, 21, 22

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ................................................................. 16, 17

*Soules v. Dep't of Hous. & Urb. Dev.*, 967 F.2d 817 (2d Cir. 1992)......................................... 20

*State v. Arlene's Flowers, Inc.*, 441 P.3d 1203 (Wash. 2019) ............................................ 12, 23

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)........................................................ 6

*Telescope Media Grp. v. Lucero*, Civ. No. 16-04094 (JRT/LIB) (D. Minn. Apr. 21, 2021) ......... 6

*Town of Greece v. Galloway*, 572 U.S. 565 (2014).................................................................. 15

*Trump v. Hawaii*, 138 S.Ct. 2392 (2018)............................................................................... 12

*Updegrove v. Herring*, No. 1:20-cv-1141, 2021 WL 1206805 (E.D. Va. Mar. 30, 2021) ............ 6

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ............................................................... 16

*West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ........................................ 21

*Wooley v. Maynard*, 430 U.S. 705 (1977) ............................................................................. 21

*Zarda v. Altitude Express, Inc.*, 883 F.3d 100 (2d Cir. 2018)................................................. 17

JA0963

**Statutes**

N.Y. Civ. Rts. Law § 40-c ............................................................................ 4, 10

N.Y. Dom. Rel. Law § 10-b ........................................................................... 14

N.Y. Exec. Law § 296 ............................................................................. passim

N.Y. Exec. Law § 297 ..................................................................................... 8

N.Y. Exec. Law § 63 ....................................................................................... 9

JA0964

## PRELIMINARY STATEMENT

State Defendants, New York's Division of Human Rights and Attorney General, protect all New Yorkers from discrimination in the marketplace through New York's public accommodations laws. The laws ensure that no New Yorker will be denied service because of the God they worship, their race, their gender, or the person they love. The laws carry serious penalties because the harm is serious. Without reciprocal respect in the marketplace for people with diverse beliefs and backgrounds, no individual can be guaranteed the dignity that all New Yorkers deserve by right. A society in which one vendor can turn away religious customers while another turns away LGBT customers is one where prosperity and dignity are guaranteed to none. So, State Defendants enforce the public accommodations laws neutrally, protecting both the Christian and the LGBT customer alike, to preserve the dignity of all.

As alleged in the Complaint, Plaintiff Emilee Carpenter is a wedding photographer with a deeply held religious belief that same-sex couples should not marry. She takes issue with New York's public accommodations laws because they require her company to offer the same photography services to same-sex couples that it offers to opposite-sex couples and forbid her from preemptively turning away same-sex customers.

But religious and philosophical objections "do not allow business owners…to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations law." *Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*, 138 S.Ct. 1719, 1727 (2018). New York's public accommodations laws place the same burden on Plaintiff as on any other business offering its services to the public: a restriction against discrimination. The laws regulate Plaintiff's *conduct*—prohibiting her company from picking and choosing its customers based on protected characteristics—but say nothing about how she should worship

1

JA0965

God or what she can say or think.

That doesn't stop Carpenter from calling State Defendants "government bureaucrats" who "demand ideological purity," D.E. 1 at 1–2, but such rhetoric does not make a case or controversy. Plaintiff has not identified a single action State Defendants have taken to abridge her freedom. She does not allege that she is under investigation or that investigation is imminent. Nor has she identified a single instance of State Defendants misusing their authority in any way to enforce a political or religious orthodoxy.

In the absence of an actual controversy, Plaintiff has built a house of cards, constructing an "interpretation" of the law that radically restricts her religious and speech rights and attributing it to State Defendants. But nothing can be further from reality. Despite alleging religious hostility, Plaintiff cannot muster one example—out of hundreds of annual investigations—where Defendants have throttled religion. Despite alleging differential treatment, Plaintiff offers no example where sexual orientation discrimination was permitted for secular but not religious reasons. And Plaintiff's efforts to transform conduct—refusing service to same-sex couples—into an "editorial judgment" protected by the First Amendment ignores decades of cases foreclosing that argument. Private discrimination "has never been accorded affirmative constitutional protections." *Norwood v. Harrison*, 413 U.S. 455, 470 (1973). The Court should not start doing so here.

## FACTS ALLEGED IN THE COMPLAINT

Plaintiff operates a public accommodation, Emilee Carpenter Photography, offering wedding photography services to the general public through its website. ¶¶ 26, 151, 157.[1] On the

---

[1] All paragraph citations refer to the Complaint, D.E. 1. This brief refers to Plaintiffs Emilee Carpenter and her businesses collectively as "Plaintiff."

JA0966

website, Plaintiff promotes and advertises her company through a blog comprising photographs and writings. ¶¶ 89, 91.

Carpenter is a Christian who holds an honest belief that marriage is a sacred institution created by God exclusively for one man and one woman. ¶¶ 19, 69. She believes that because of that religious view, she cannot offer wedding photography to same-sex couples. ¶¶ 117–18. She believes that if she offered such services, she would be "coerced to remain silent and respectful during the ceremony and to express her approval of the wedding by rejoicing with and congratulating the couple and their family on the new union," which she does not want to do. ¶ 120.

Plaintiff alleges that it is her "policy and practice to…decline any photography requests celebrating…same-sex engagements or weddings—no matter who asks her." ¶ 123. She asserts that this policy is an "editorial judgment," akin to refusing to shoot in a "light, bright, and airy style," or to declining requests to shoot vampire-themed and polyamorous weddings. ¶¶ 111–16, 234, 329, 342. To carry out this policy, Plaintiff researches every request her company receives to determine whether the couple seeking her services is a same-sex couple. ¶¶ 50, 236–41. She does this by searching online or through her personal and professional network. ¶ 50. If she cannot confirm that the couple consists of one man and one woman, she ignores the request. ¶¶ 240–41. In the past year, Plaintiff claims to have ignored more than ten requests because she could not confirm whether the engagement or wedding was for one man and one woman or a same-sex couple. ¶ 242. Plaintiff further alleges that she received and ignored at least seven requests for same-sex wedding photography services in the last year. ¶ 266. Notably, Plaintiff does not allege that any couple has directly represented that they were seeking her services for a same-sex wedding or that she has declined such a request.

3

Plaintiff acknowledges that her actions could violate New York's antidiscrimination laws. D.E. 1 at 1–2, ¶¶ 160–61, 169, 173, 246, 258–29.[2] But she does not allege that any enforcement action has ever been taken against her or that she is the subject of a complaint or under investigation for any violation of New York law.

If not for New York's antidiscrimination laws, Plaintiff alleges that she would take additional actions motivated by her religious beliefs that would have the effect of discriminating against a protected class of persons. ¶ 256. First, she would adopt a policy of categorically denying requests for photographs that "promote any marriage besides marriage between one man and one woman." D.E. 1-1 § 2.7(e); ¶ 124. Second, through an agreement attached as Exhibit 1 to the Complaint, she would legally bind her company and any future members or employees to refuse such requests. ¶¶ 124, 229–31; D.E. 1-1. Third, she would make this policy known to the public by publishing on her company's website the statement "I can't photograph a same-sex or polyamorous wedding." ¶¶ 247–49; D.E. 1-2 at 1.

Plaintiff alleges that she competes on an "uneven playing field" with wedding photographers who comply with the law and photograph same-sex weddings. ¶ 310. She asserts that she will be better able to compete in the market by publicly refusing to photograph same-sex weddings and promoting her religious beliefs. ¶¶ 92, 94, 310. Finally, publicizing her

---

[2] Under the Human Rights Law, it is "an unlawful discriminatory practice" for any "place of public accommodation" to refuse service "because of the race, creed, color, national origin, sexual orientation, gender identity or expression, military status, sex, disability or marital status of any person," or to "publish…any written or printed communication…to the effect that any of the accommodations…shall be refused," or that the patronage of such persons "is unwelcome, objectionable or not acceptable, desired, or solicited." N.Y. Exec. Law § 296(2)(a). And under the Civil Rights Law, "No person shall, because of race, creed, color, national origin, sex, marital status, sexual orientation, gender identity or expression, or disability…be subjected to any discrimination in his or her civil rights…by any other person." N.Y. Civ. Rts. Law § 40-c(2).

4

discriminatory policy would allegedly save Plaintiff the "additional time and effort" of researching customers to exclude same-sex couples, which she claims causes lost profit and reputational damage. ¶¶ 254–55.

## STANDARD OF REVIEW

To survive a motion to dismiss, a complaint must contain enough facts, accepted as true, to "state a claim to relief that is plausible on its face." *Orange Transportation Servs., Inc. v. Volvo Grp. N. Am., LLC*, 450 F. Supp. 3d 311, 318 (W.D.N.Y. 2020), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a complaint's allegations are generally taken as true, a plaintiff must provide "more than labels and conclusions…. Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "[B]are assertions" that a government defendant "adopted a policy because of, not merely in spite of, its adverse effects upon an identifiable group" must be rejected as conclusory. *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009) (cleaned up).

## ARGUMENT

**I. The Court lacks jurisdiction over Plaintiff's claims.**

**A. Plaintiff lacks standing, and her speculative claims are not ripe.**

Preliminarily, this case does not satisfy Article III because Plaintiff lacks standing. It is proper to address this issue first "[b]ecause standing is a jurisdictional matter." *Holve v. McCormick & Co., Inc.*, 334 F. Supp. 3d 535, 544 (W.D.N.Y. 2018) (Geraci, C.J.). By failing to identify an injury-in-fact, Plaintiff has not pleaded a live "case or controversy," and this Court lacks jurisdiction over her claims. *See, e.g.*, *303 Creative LLC v. Elenis*, No. 16-cv-02372-MSK-CBS, 2017 WL 4331065, at *6 (D. Colo. Sept. 1, 2017) (partially dismissing a similar lawsuit for standing); *Updegrove v. Herring*, No. 1:20-cv-1141, 2021 WL 1206805 (E.D. Va. Mar. 30,

JA0969

2021) (same).[3]

Standing requires the plaintiff to plead an injury-in-fact. *Robinson v. Sessions*, 260 F.

Supp. 3d 264, 271–72 (W.D.N.Y. 2017) (Geraci, C.J.), *aff'd*, 721 F. App'x 20 (2d Cir. 2018). In a

*pre-enforcement* challenge, the plaintiff can only meet that requirement by pleading both an

intention to engage in prohibited conduct "affected with a constitutional interest," *and* the

existence of "a credible threat of prosecution." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149,

159 (2014) (quotation omitted). While "an actual arrest, prosecution, or other enforcement action

is not a prerequisite to challenging the law," the threatened enforcement must be "sufficiently

imminent." *Id.* at 158–59. Importantly, "[a] government official's statement that a statute

prohibits a type of conduct in the abstract—even where the official also states her intent to

enforce the statutory prohibition against the public generally—is usually insufficient, without

more, to establish that prosecution is imminent against a particular plaintiff." *Jones v.*

*Schneiderman*, 101 F. Supp. 3d 283, 291 (S.D.N.Y. 2015) (collecting cases). And "standing

theories that rest on speculation about the decisions of independent actors" do not meet

constitutional requirements. *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 414 (2013).

Here, Plaintiff has only a speculative fear of enforcement and makes no allegations to

suggest a credible fear of investigation. Plaintiff does not allege any past enforcement actions

against her company. And Plaintiff has not pleaded facts suggesting that an investigation will be

started any time soon. Any enforcement relies on speculations about the actions of independent

---

[3] Standing is particularly important in a matter such as this to avoid "a smoke and mirrors case and controversy…likely conjured up by Plaintiffs to establish binding First Amendment precedent." *See, e.g., Telescope Media Grp. v. Lucero*, Civ. No. 16-04094 (JRT/LIB), D.E. 82 at 6 (D. Minn. Apr. 21, 2021) (granting wedding videographer's unusual motion to voluntarily dismiss its challenge to the Minnesota Human Rights Act with prejudice after it received the state defendant's first set of discovery requests).

JA0970

actors. Before New York could enforce the accommodations law against Plaintiff, the Division

of Human Rights would have to have reason to suspect discrimination and an investigator would

need to choose to go forward with an investigation, weighing both the specific facts and law at

issue. *See* ¶¶ 189–90. Plaintiff has given no reason to suspect her company has been identified

for investigation among the 2,300 New York-based wedding photographers reportedly listed on

the online service "Wedding Wire" alone. *See* ¶ 301. And Plaintiff's speculative assertion that

"testers" might uncover some wrongdoing is not plausible. ¶¶ 189–90. Thus, because Plaintiff's

theories "rest on speculation about the decisions of independent actors," *Clapper*, 568 U.S. at

414, she lacks standing to challenge the Accommodations, Publications, and Discrimination

Clauses.

Nor has Plaintiff come to the Court with ripe claims. "Ripeness is a justiciability doctrine

designed to prevent the courts, through avoidance of premature adjudication, from entangling

themselves in abstract disagreements over administrative policies, and also to protect the

agencies from judicial interference until an administrative decision has been formalized and its

effects felt in a concrete way by the challenging parties." *Nat'l Park Hospitality Ass'n v. Dep't of*

*Interior*, 538 U.S. 803, 807–08 (2003) (cleaned up). Without the complex weighing of facts and

law that would accompany any hypothetical enforcement decision, the Court is left with

"abstract disagreements" over enforcement of the antidiscrimination laws and should decline to

review them.

## II.     The Court lacks jurisdiction over claims against the Attorney General.

The standing principles discussed above apply with even more force to Plaintiff's claims

against the Attorney General, who is also entitled to Eleventh Amendment immunity. In addition

to the injury-in-fact described above, standing requires "the plaintiff [to] demonstrate a fairly

7

traceable causal connection between the plaintiff's injury and the complained-of conduct of the defendant," *Robinson*, 260 F. Supp. 3d at 271–72 (cleaned up), which Plaintiff cannot do against Attorney General James. Additionally, the Eleventh Amendment ordinarily prohibits a federal court from exercising jurisdiction over lawsuits brought by a private party against a state official, *see Burnette v. Carothers*, 192 F.3d 52, 57 (2d Cir. 1999), *cert. denied*, 531 U.S. 1052 (2000), and the narrow exception carved out by *Ex parte Young*, 209 U.S. 123 (1908), does not apply here.

The Complaint does not establish any harm that is "fairly traceable" to the Attorney General. Plaintiff cites N.Y. Exec. Law § 297(1) to hold Attorney General James liable, but that provision allows "[a]ny person" at all to initiate a claim under the Human Rights Law. Although the Attorney General is mentioned by name, the law expressly confers the same authority on the Commissioner of Labor and the "chair of the commission on quality of care for the mentally disabled"—and any other resident aggrieved in the state. Since almost anybody can file such a complaint, this provision hardly establishes standing to sue Attorney General James in this case.

Not to be deterred, Plaintiff further alleges that "Attorney General James may also intervene in any hearing before the Division involving a complaint filed under the human rights law," citing "N.Y. Exec. Law § 297.4(4)(a)." ¶ 11. But no such provision exists. As best State Defendants can ascertain, Plaintiff may be referring to the clause in N.Y. Exec. Law § 297(4)(a), which provides only that "[t]he [DHR] hearing examiner may in his or her discretion permit any person who has a substantial personal interest to intervene as a party, and may require that necessary parties not already parties be joined." Notably, the Company does not cite a single example of the Attorney General having intervened in such a proceeding, which would be highly unlikely given the "substantial personal interest" requirement.

JA0972

Nor can the Attorney General be held liable simply based on her authority under Executive Law § 63(12). As courts have repeatedly found, the Eleventh Amendment bars suit against the Attorney General absent *both* a "particular duty" to enforce a statute *and* a threat of enforcement. *See Riley v. Cuomo*, No. 2:17-cv-01631, 2018 WL 1832929, at *5 (E.D.N.Y. Apr. 16, 2018); *HealthNow New York, Inc. v. New York*, 739 F. Supp. 2d 286, 294 (W.D.N.Y. 2010), *aff'd* 448 F. App'x 79 (2d Cir. 2011); *see also Nassau & Suffolk Cnty. Taxi Owners Ass'n, Inc. v. State*, 336 F. Supp. 3d 50, 68 (E.D.N.Y. 2018). The Attorney General's discretionary power to enforce state law under § 63(12) does not satisfy that test. *See HealthNow*, 739 F. Supp. 2d at 295 ("[T]he Attorney General's general authority to investigate and enforce the laws of New York State pursuant to Executive Law § 63(12) is not a sufficient connection to support an exception to sovereign immunity under *Ex parte Young* for the Attorney General to be a proper party in the instant case."); *Jones v. Scheniderman*, 974 F. Supp. 2d 322, 352–53 (S.D.N.Y. 2013) (holding Attorney General's general responsibility to enforce New York laws is insufficient connection for *Ex parte Young* exception); *Chrysafis v. James*, No. 21-cv-998 (JS)(ARL), 2021 WL 1405884, at *20 (E.D.N.Y. Apr. 14, 2021) (holding Attorney General's guidance regarding the interpretation of a law also insufficient). Accordingly, all claims against Attorney General James should be dismissed.

## III. New York's antidiscrimination laws do not regulate religion.

Even assuming she can show standing, Plaintiff's religion claims fail at the first step: New York's antidiscrimination laws do not regulate or target religion, but rather discrimination. "[I]t is a general rule that [religious] objections do not allow business owners…to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations law." *Masterpiece Cakeshop*, 138 S.Ct. at 1727; *see also Newman v. Piggie*

9

*Park Enter., Inc.*, 390 U.S. 400, 402 n.5 (1968) (finding a free exercise challenge to a public accommodations law "patently frivolous"). When such a law is "neutral and generally applicable," State Defendants "need only demonstrate a rational basis for its enforcement, even if enforcement of the law incidentally burdens religious practices." *Commack Self-Serv. Kosher Meats, Inc. v. Hooker*, 680 F.3d 194, 212 (2d Cir. 2012). A law is neutral, and its burdens are incidental, if the law does not "infringe or restrict practices *because of* their religious motivation." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531, 533 (1993) (emphasis added).

Plaintiff concedes, as she must, that New York's antidiscrimination laws are facially neutral toward religion. *See, e.g.*, ¶ 343; Pls.' PI Mot. at 21–25 (bringing an as-applied challenge). The laws target *all* discrimination in the marketplace based on *any* protected characteristic, regardless of motivation—whether secular or religious. *See* N.Y. Exec. Law § 296(2)(a); N.Y. Civ. Rts. Law § 40-c. Any impact on Plaintiff's religious exercise is therefore "incidental" to the laws' antidiscrimination purpose and permissible under the First Amendment. *See, e.g.*, *Commack*, 680 F.3d at 212 (upholding consumer protection law that applied to *any* manufacturer, secular or religious, labeling a product "kosher"); *Phillips v. City of New York*, 775 F.3d 538, 543 (2d Cir. 2015) (per curiam) (upholding neutral public-school vaccination mandate).[4]

---

[4] Plaintiff's definition of religious "exercise" far exceeds anything recognized by the law. *Compare* ¶ 342 ("Plaintiffs exercise their religion…when they operate their business, adopt [business] policies…, exercise their editorial judgment…, honestly communicate with clients…, participate in wedding ceremonies, and celebrate marriages between one man and one woman.") *with Emp. Div. v. Smith*, 494 U.S. 872, 877 (1990) (Religious exercise includes "assembling with others for a worship service, participating in sacramental use of bread and wine, proselytizing, abstaining from certain foods or certain modes of transportation."). The Court need not define religious "exercise," however, because any alleged restriction on Plaintiff's exercise (no matter how broadly considered) is incidental to the challenged laws' non-discrimination purpose.

Nor can Plaintiff bring a proper as-applied challenge—because the laws have never been applied to her. Unlike in *Masterpiece Cakeshop*, there is no unfair enforcement action to attack. *See* 138 S.Ct. at 1732 (invalidating state enforcement action because it was not carried out with "religious neutrality"). Plaintiff does not allege that State Defendants have taken any action, opened any investigation, or mistreated her in any way because of her religion.

### A. Plaintiff has not pleaded any example of anti-religious hostility in the "interpretation" of New York's neutral accommodations laws.

Ignoring both the laws themselves and the lack of any enforcement, Plaintiff tries to find fault in the way State Defendants "*interpret*" the laws. ¶¶ 285–96 (emphasis added). But her allegations lack any factual basis. For one, Plaintiff has not identified any regulation or official guidance setting forth the anti-religious "interpretation" she alleges. *See* ¶¶ 174–227 (describing in detail Defendants' enforcement jurisdiction). Nor has she identified a history of enforcement actions enacting that "interpretation." State Defendants process hundreds of complaints every year—nearly 2,000 between 2012 and 2018, ¶ 219—but Plaintiff cannot name a *single* enforcement action, public statement, or other official act manifesting hostility to religion. *Cf. Masterpiece Cakeshop*, 138 S.Ct. at 1729–31; *Lukumi*, 508 U.S. at 534–38.[5]

In the absence of genuine hostility, Plaintiff tries to manufacture hostility using isolated quotations taken from briefs written or joined by State Defendants. But those quotations themselves disprove her allegations. A government may always enforce a generally applicable law if it acts with "religious neutrality." *Masterpiece Cakeshop*, 138 S.Ct. at 1728, 1732. "Hostility" requires, at a minimum, that government acted "because of, not merely in spite of"

---

[5] The opposite is true. State Defendants devote significant time and resources to protecting the free and open practice of religion, including by enforcing the public accommodations laws. *See* State Defs.' Prelim. Inj. Opp. at 5–7.

JA0975

the effect on religion. *Lukumi*, 508 U.S. at 540 (cleaned up). None of the statements Plaintiff

cites violates that rule:

- "*[N]o matter* the sincerity of a business owner's religious beliefs," same-sex discrimination is unlawful. ¶¶ 286, 295 (emphasis added).[6]

- "*[E]ven based on* religious objections to same-sex marriage," a public accommodations law should be upheld. ¶ 287 (emphasis added) (cleaned up).

- "*[E]ven though* the policy was a result of the owners' specific religious belief," DHR fined a wedding venue for refusing to host same-sex weddings. ¶¶ 288–90 (emphasis added) (cleaned up).

The Supreme Court has rejected, as conclusory, allegations that government officials acted

"because of, not merely in spite of…adverse effects upon an identifiable group." *Iqbal*, 556 U.S.

at 681 (cleaned up). Plaintiff's error is worse: she *explicitly pleaded* that Defendants acted "in

spite of" the effect on religion. Her complaint itself absolves Defendants of any wrongdoing. *Id.*;

*Lukumi*, 508 U.S. at 540.[7]

> **B.** **Plaintiff cannot show that State Defendants treat religion differently.**

As a fallback, Plaintiff alleges that New York's public accommodations law disfavors

---

[6] The Complaint also misquotes the briefs it cites. Nowhere does the *303 Creative* brief equate "an objection" to same-sex marriage with discrimination. *See* ¶ 295. Rather, the cited pages explain that same-sex marriage "cannot reasonably be divorced from [a couple's] status of LGBTQ," a point the Supreme Court has repeatedly endorsed. Amici Br. for Attys. Gen., *303 Creative v. Elenis*, No. 19-1413 (10th Cir. Apr. 29, 2020) at 9–10; *see, e.g.*, *Masterpiece Cakeshop*, 138 S.Ct. at 1727; *Obergefell v. Hodges*, 135 S.Ct. 2584 (2015). The Court can take judicial notice of such inaccuracies when a document is incorporated by reference. *See Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 383 (S.D.N.Y. 2020) ("If a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control[s.]").

[7] Carpenter also cites an isolated comment made on AG James's personal Twitter account concerning *Masterpiece Cakeshop*. ¶ 296. Not only does the tweet say nothing about religion, Plaintiff has alleged no connection to any official enforcement action or guidance undertaken by the AG's office. *Cf. Trump v. Hawaii*, 138 S.Ct. 2392, 2418 (2018); *see also State v. Arlene's Flowers, Inc.*, 441 P.3d 1203, 1217–18 (Wash. 2019) (holding any alleged "lack of neutrality" by Attorney General was irrelevant when Attorney General did not adjudicate discrimination claim).

JA0976

religious as compared to secular conduct. But that is just grasping at straws. Once again, Plaintiff has not identified a *single* instance, out of hundreds of annual complaints, where sexual orientation discrimination was excused for secular, but not religious, reasons. And Plaintiff has not found a *single* exemption to the laws against sexual orientation discrimination that applies to secular but not religious objections. The exemptions Plaintiff did identify (in other parts of the statute) fall far short of establishing anti-religious bias.

Plaintiff baldly asserts that DHR has excused discrimination based on secular justifications but has not mustered a single instance where that is true. In the two cases she does cite, ¶ 291, DHR determined that *no discrimination had taken place*—not that discrimination was justified for secular reasons. *See Morgan v. Zaharo Cab Corp.*, No. 10117888, at 3–5 (DHR July 2, 2014) (concluding driver never saw claimant and thus had no way of knowing her race or faith); *Battaglia v. Buffalo Niagara Intro., Inc.*, No. 10138581, at 5–6 (DHR Jan. 28, 2012) (concluding dating company had rejected applicant because he lied on his application form, not his disability). These cases stand in stark contrast to the single example Plaintiff found of sexual orientation discrimination enforcement, where the owners of a wedding venue had a blanket policy of denying service to same-sex couples. ¶¶ 214, 290; *see also Gifford v. McCarthy*, 137 A.D.3d 30, 37 (3d Dep't 2016).

Nor has Plaintiff identified any secular exemptions to the Human Rights Law that could even remotely apply to her proposed course of conduct. Here, the pertinent inquiry is whether the law exempts a course of conduct for secular reasons but not religious ones. *See Lukumi*, 508 U.S. at 542–43. New York's law does not. Plaintiff identifies a smattering of limited public policy exemptions in other contexts, including employment, N.Y. Exec. Law §§ 296(1)(d) (employers may advertise bona fide job qualifications), 296(3)(b) (limited disability exemption if employer

shows "undue burden" based on three-factor test), 296(10)(a) (limited religious accommodation exemption for employers who can show "undue hardship" after engaging in "bona fide effort" to accommodate), and housing, N.Y. Exec. Law § 296(5)(a) (allowing owners to rent rooms to members of same sex). *See* ¶ 314. But those exemptions are not relevant here because they regulate completely different activity. Plaintiff is not asking for an exemption in providing employment or housing, only in offering wedding photography.

Plaintiff identified one exemption in the public accommodations law, but that, too, is inapplicable. Under that clause, a business may request an exemption to bar a person because of *sex* from a *place* of public accommodation based on "bona fide considerations of public policy" (such as preventing sexual assault). N.Y. Exec. Law § 296(2)(b). But that is not what Plaintiff proposes to do. She seeks to withhold *services* because of *sexual orientation*, an entire protected category under the Human Rights Law. N.Y. Exec Law § 296(2)(a). More than failing to plead unequal treatment in exempting such activity, she has not pleaded a single example of State Defendants *ever* permitting sexual orientation discrimination based on *any* reason—secular or religious.

Finally, New York law exempts religious organizations from conducting same-sex weddings, but that exemption does not and need not apply to Plaintiff. *See* ¶ 316; N.Y. Dom. Rel. Law § 10-b. Under that exemption, a religious order may decline to celebrate weddings that do not reflect its religion or denomination. N.Y. Dom. Rel. Law § 10-b. The exemption does not apply to for-profit businesses like Plaintiff's. Nor should it. As the Supreme Court explained, such exemptions properly respect *the clergy's* religious exercise but must be confined to religious orders or else "a long list of persons who provide goods and services for marriages and weddings might refuse to do so for gay persons, thus resulting in a community-wide stigma

14

inconsistent with the history and dynamics of civil rights laws." *Masterpiece Cakeshop*, 138 S.Ct. at 1727.

### C.     State Defendants have not compelled Plaintiff's religious practice.

Plaintiff's compelled-religion claim similarly falters at the outset—no law or regulation forces Plaintiff to practice religion. She asserts that photographing a wedding equates to religious practice—because it requires presence at a ceremony with religious significance—but courts have repeatedly rejected similar claims where there is no compelled *participation* in prayer or other religious observance. *See, e.g.*, *Town of Greece v. Galloway*, 572 U.S. 565, 587–88 (2014) (plurality) (rejecting claim that mere presence at public prayer was coercive where public was not "directed" to participate in prayers); *Newdow v. Peterson*, 753 F.3d 105, 109–10 (2d Cir. 2014) (rejecting claim that carrying currency reading "In God We Trust" was compelled religious practice); *Fields v. City of Tulsa*, 753 F.3d 1000, 1010–12 (10th Cir. 2014) (an officer's mere presence at religious center was not compelled religious practice).

New York law requires only that Plaintiff offer the same services to same-sex couples that she offers to opposite-sex couples. It does not compel her to sing, pray, or worship with the celebrants—or even to wish them well. *Cf.* ¶ 120. The compelled-practice doctrine does not apply to her conduct simply because she chooses to define her religious practice to include operating her business. Photographing a same-sex wedding is no more compelled religious practice than photographing *any* wedding of a faith other than Plaintiff's, whether Catholic, Jewish, Hindu, or Muslim. Photography does not oblige Plaintiff to worship the celebrants' God—or to endorse their religious beliefs about marriage. She may sing or pray (or not) as her own conscience dictates. On that, as on other matters of faith, New York law is silent.

JA0979

### D. The "hybrid rights" doctrine is not recognized in the Second Circuit.

Plaintiff concedes that the "hybrid rights" doctrine is not recognized in the Second Circuit. *See* D.E. 3-1 (Pls.' Mem. of Law) at 21–22; *Leebaert v. Harrington*, 332 F.3d 134, 143–44 (2d Cir. 2003). Plaintiff's claim under this theory must therefore be dismissed.

## IV. New York's antidiscrimination laws do not impermissibly regulate speech.

Like her religion claims, Plaintiff's free speech claims fail because New York's antidiscrimination laws are facially neutral and regulate conduct—discrimination—not speech. *See* N.Y. Exec. Law § 296.2(a); N.Y. Civ. Rts. Law § 40-c-; *Masterpiece Cakeshop*, 138 S.Ct. at 1727. "[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). As in the religion context, "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Public accommodations laws like New York's are "textbook viewpoint neutral" and permissible under the First Amendment. *Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 694–95 (2010); *Masterpiece Cakeshop*, 138 S.Ct. at 1727.

Plaintiff concedes that New York's antidiscrimination laws regulate conduct—illegal discrimination. ¶ 158. She alleges, however, that "as interpreted" by the State Defendants or "as applied" to her those laws violate her First Amendment rights. But, of course, Plaintiff has not alleged any enforcement action against her. Nor has she pleaded a history of State Defendants enforcing the law to suppress speech. Her assertions of how New York purportedly interprets these laws are therefore largely speculative. But because the laws regulate conduct, not speech,

any restriction on Plaintiff's speech would be nothing more than an example of an *incidental* impact on speech, and permissible under the First Amendment. *Sorrell*, 564 U.S. at 567.

### A.    Denying service to same-sex couples is not an "editorial judgment."

To avoid the law's facial neutrality, Plaintiff asserts that her policy about *which customers to serve* is itself an aspect of her expression—speech, not conduct. She claims her categorical refusal to photograph same-sex weddings is an "editorial judgment," like shooting only in "warm, earthy, and moody tones" or refusing to photograph "Vampire--themed weddings." ¶¶ 111–16, 234, 329, 342. She asserts that her policy is not discrimination because she will photograph "those in the LGBT community"—just not if they are getting married. D.E. 1 at 1. In that way, Plaintiff hopes to analogize her choice of customers to an "editorial judgment" subject to First Amendment protection and beyond the reach of antidiscrimination laws.

But Plaintiff cannot transform the act of picking and choosing customers into speech just by enacting an "editorial" policy against same-sex weddings. Such a policy refuses service to LGBT customers on the basis of their protected characteristic. The law recognizes discrimination even when it is directed at what a person *does*, not just who a person *is. See, e.g.*, *Christian Legal Soc'y* 561 U.S. at 689; *Elane Photography, LLC v. Willock*, 309 P.3d 53, 62 (N.M. 2013) (finding "no basis for distinguishing between discrimination based on sexual orientation and discrimination based on...committing to a person of the same sex"). Just as an "editorial" policy against photographing chuppahs would be a policy against serving Jews, so, too, a policy against photographing same-sex weddings is a policy against LGBT customers. *See, e.g.*, *Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 125–27 (2d Cir. 2018) (rejecting the act-status distinction as applied to sexual orientation discrimination). Plaintiff could no more defend an "editorial" policy

JA0981

refusing to photograph interracial marriages—even if she agreed to photograph white and Black people in different contexts. *See, e.g.*, *Holcomb v. Iona Coll.*, 521 F.3d 130, 138–39 (2d Cir. 2008).

Nor is it relevant that Plaintiff offers LGBT customers other services. The Human Rights Law prohibits denying *any* service based on a protected characteristic. N.Y. Exec. Law § 296(2). Such laws properly prevent businesses from offering services in grossly unequal ways. *See, e.g.*, *Katzenbach v. McClung*, 379 U.S. 294, 296–97 (1964) (prohibiting serving Black customers only through a take-out window); *Elane Photography*, 309 P.3d at 62 (rejecting a similar argument and concluding, "if a restaurant offers a full menu to male customers, it may not refuse to serve entrees to women, even if it will serve them appetizers."). An "editorial" policy restricting LGBT clients' menu of services—especially one excluding Plaintiff's primary service, wedding photography—is discriminatory conduct, not a mode of speech.

And it is clear from how Plaintiff enforces her "editorial" policy that it is conduct, not speech. She scours social media to determine whether potential clients are LGBT. ¶¶ 240–41. If she "determine[s]" that they are, she simply refuses service—without asking anything about the services they seek, including whether they are for a same-sex wedding. ¶¶ 238-42, 266. In other words, she uses the customer's perceived LGBT status as the *only* basis for denying service. The First Amendment protects the right to express views—not to pick and choose customers. "Invidious private discrimination…has never been accorded affirmative constitutional protections." *Norwood*, 413 U.S. at 470. Accordingly, courts have rejected such First Amendment arguments again and again—even when the business's services are primarily expressive. *See, e.g.*, *Ragin v. New York Times Co.*, 923 F.2d 995, 1003 (2d Cir. 1991) (rejecting newspaper's First Amendment challenge to prohibition on discriminatory advertising); *Hishon v.*

18

*King & Spalding*, 467 U.S. 69, 78 (1984) (rejecting law firm's First Amendment challenge to prohibition on discriminatory hiring); *Rumsfeld v. Forum for Acad. & Institutional Rts.* (*FAIR*), 547 U.S. 47, 61 (2006) (rejecting law school's First Amendment challenge to public funding requirement to host military recruiters); *Elane Photography*, 309 P.3d at 66 (rejecting a wedding photographer's challenge to same-sex antidiscrimination law).

The law is clear and its limitations modest. If Plaintiff's business offers wedding photography services to opposite-sex couples, it must offer the same services to same-sex couples. The fact that the final products are creative does not transform them into her own protected expression. Plaintiff may always create artistic statements advancing her views on religion and marriage; New York law protects such speech. But she cannot offer a service to the general public and then claim that her choice of customers is itself protected speech. Plaintiff's argument that her commercial services should be understood as a form of art entitled to an exemption from antidiscrimination regulations elides the distinction between private artistic expressions and services offered to the public on the open market. *See Elane Photography*, 309 P.3d at 66–67 ("It may be that [the plaintiff] expresses its clients' messages in its photographs, but only because it is hired to do so.").

No interpretation of New York's antidiscrimination laws that would *permit* Plaintiff to refuse to photograph the weddings of same-sex couples based on Plaintiff's "stylistic preference and artistic judgment," ¶ 111, would *prohibit* another photographer from refusing to photograph the weddings of elderly, disabled, active-duty military, or interracial couples for similar, purportedly aesthetic considerations. The exception Plaintiff requests would eventually swallow the entire law for broad swathes of "expressive" services.

JA0983

**B.** **New York's restrictions on discriminatory advertising and unlawful policies are permissible.**

Just as Plaintiff cannot discriminate in the services she offers, she also cannot adopt and advertise a policy of discrimination. Prohibitions on discriminatory advertising have repeatedly survived First Amendment challenges because they regulate conduct—discrimination—put into action through words. *See FAIR*, 547 U.S. at 62 (prohibiting a sign reading "White Applicants Only" hardly means that a law regulates "the employer's speech rather than conduct"); *Soules v. Dep't of Hous. & Urb. Dev.*, 967 F.2d 817, 824 (2d Cir. 1992) (holding that facially discriminatory ads and statements merit "straightforward treatment" and do not violate First Amendment); *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 389 (1992) (holding that "words can…violate laws directed not against speech but against conduct (a law against treason, for example, is violated by telling the enemy the Nation's defense secrets)"); *see also Masterpiece Cakeshop*, 138 S.Ct. at 1728 (rejecting the notion that "purveyors of goods and services who object to gay marriages for moral and religious reasons…be allowed to put up signs saying 'no goods or services will be sold if they will be used for gay marriages'").

Plaintiff's proposed policy warrants "straightforward treatment" because it is unlawful discrimination beyond the reach of the First Amendment. *Soules*, 967 F.2d at 824. She wants to publicize a policy categorically refusing to photograph same-sex weddings and to bluntly state, "I can't photograph a same--sex…wedding." ¶¶ 124, 247–49.; D.E. 1-1 § 2.7(e); D.E. 1-2 at 1. Those statements are facially discriminatory because they deny service to one class of people, LGBT customers, based on their protected status. *Soules*, 967 F.2d at 824. Further, New York may also prohibit Plaintiff from making such statements on her blog, which promotes her business, ¶ 92, because the blog is commercial speech. *See Anderson v. Treadwell*, 294 F.3d 453, 460 (2d Cir. 2002) ("Even a communication combining commercial and noncommercial

JA0984

elements, if it is an advertisement…is properly characterized as commercial speech."). As commercial speech, her website and blog cannot be used to promote an illegal policy of discrimination or used as a digital alternative to the shop sign reading "opposite-sex customers only." *See FAIR*, 547 U.S. at 62; *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980) (holding that commercial speech is not protected if it does not concern "lawful activity").

### C. New York's antidiscrimination laws do not compel Plaintiff to speak.

Plaintiff's allegation that New York's antidiscrimination laws "effectively requires Emilee to accept projects promoting messages contrary to her beliefs," ¶ 234, is a "far cry" from the direct compulsion to speak or agree with certain concepts that is firmly prohibited by the First Amendment. *See FAIR*, 547 U.S. at 62 (citing *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) and *Wooley v. Maynard*, 430 U.S. 705, 717 (1977)). The pleadings make clear that the laws do not "dictate the content of [her] speech" or "force [her] to host or accommodate another speaker's message." *FAIR*, 547 U.S. at 62–64. Plaintiff's claims equate the laws' prohibitions on refusals to provide goods or services because of sexual orientation with being forced to speak a message or express an idea. *See* D.E. 1 at 1 ("New York laws require Emilee to create photographs and blogs celebrating same-sex marriage because she creates photographs and blogs celebrating opposite-sex marriage."). But in contrast to the plaintiffs in *Wooley* and *Barnette*, private citizens who were penalized for remaining silent rather than "speaking" a government-mandated message, the Complaint makes clear that Plaintiff is free to remain silent: New York's antidiscrimination laws impose no requirements to engage in any form of expression, and Plaintiff is free, in her private capacity, to create photographs and blogs exclusively featuring opposite-sex weddings or otherwise "celebrating" opposite-sex marriage.

21

Plaintiff's allegation that the antidiscrimination laws "compel them to sell, publish, and disseminate speech they object to," ¶ 329, thus depends on drawing an equivalence between the services and goods Plaintiff provides to the public for a fee, with the expressive content of a publisher's own private message. The First Amendment prohibits the government from requiring a private speaker or publisher to "host or accommodate another speaker's message." *FAIR*, 547 U.S. at 63; *see Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 256–57 (1974) ("right of reply" statute requiring newspapers to publish responses to their own editorial content infringed newspaper's speech); *Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of California*, 475 U.S. 1, 13 (1986) (statute requiring electric utility to include specific content in billing envelopes mailed to customers impermissibly burdened utility's speech). But where the regulated entity is a public accommodation that "is not limited to the personal use of" the business owner, and the "speech" in question is "views expressed by members of the public…[that] will not likely be identified with those of the owner," and "no specific message is dictated by the State," then a law that simply requires that the public be afforded access to a public accommodation business does not burden that business's speech. *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 87 (1980).

**D.** **New York's antidiscrimination laws do not restrict Plaintiff's associational rights.**

Nor can the provision of goods and services on an equal basis to all customers be equated with forced association. Private organizations that engage in "expressive associations" have limited First Amendment rights to curate their membership in a manner consistent with their organizational identity. *See Boy Scouts of Am. v. Dale*, 530 U.S. 640, 659 (2000) (state public accommodations law could not require membership-based private association to accept a gay person as a member); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 565 (1995) (public accommodations law could not require private citizens who organized a

22

parade to admit participants who expressed a message not of the private organizers' choosing). But the "expressive association" engaged in by these organizations—derived from constitutional rights to intimate relationships, *see Bd. of Directors of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 545–46 (1987) and to the protection of "collective effort on behalf of shared goals," *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984)—has never been extended to businesses that hold their goods and services out to the general public for sale or hire.

Plaintiff attempts to analogize her commercial business to a private association, and to cast would-be customers as potential association members. Even if a sole proprietorship could somehow be compared to the Boy Scouts or to an annual parade, the customers who pay for and receive a service or good—typically without any interaction with other customers—are not members of that business, and prohibitions against excluding would-be customers based on protected status is not equivalent to prohibitions against excluding members of an expressive association. *See Arlene's Flowers*, 441 P.3d at 1226–27 and n.18 (rejecting florist's similar claim conflating "clearly commercial entities" with "membership organizations," such as the Boy Scouts) (quoting *Boy Scouts*, 530 U.S. at 657). Even if such a strained analogy could be made, it is difficult to see how providing goods and services to a customer associates a business with that customer's protected status.

### E. The laws survive any level of review.

In an attempt to subject New York's antidiscrimination laws to strict scrutiny, Plaintiff makes the tenuous claim that the laws are viewpoint-based regulations targeting their speech. ¶ 331. But public accommodations laws and other "all-comers" policies are "textbook viewpoint neutral" and reviewed under a lower level of scrutiny. *Christian Legal Soc'y*, 561 U.S. at 680, 694–95; *Roberts*, 468 U.S. at 623. Such laws are valid even if they disproportionately affect a

particular viewpoint; what matters is the government's intent in enacting the regulation. *See, e.g.*, *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 763 (1994) (holding that a regulation's disproportionate impact on a particular viewpoint does not render it "viewpoint based" but "suggests only that those in the group *whose conduct* violated the court's order happen to share the same opinion").

For these reasons, New York's public accommodation laws cannot be held to strict scrutiny. But they would survive even if they could be. The eradication of discrimination is a compelling governmental interest. *See, e.g.*, *Masterpiece Cakeshop*, 138 S.Ct. at 1728 (holding that the "law can protect gay persons, just as it can protect other classes of individuals, in acquiring whatever products and services they choose on the same terms and conditions as are offered to other members of the public"); *Roberts*, 468 U.S. at 624 (public accommodation law "reflects the State's strong historical commitment to eliminating discrimination and assuring its citizens equal access to publicly available goods and services," a goal "which is unrelated to the suppression of expression" and "plainly serves compelling state interests of the highest order"); *Heart of Atlanta Motel, Inc. v. U.S.*, 379 U.S. 241, 250 (1964) (holding antidiscrimination laws "vindicate the deprivation of personal dignity" entailed by discrimination (cleaned up)).

And any restriction on Plaintiff's alleged First Amendment freedoms is minimal. Plaintiff is free, in her private capacity, to say whatever she wants about religion or marriage. The law requires only that she offer services to same-sex and opposite-sex couples on an equal footing and prohibits her from openly discriminating in her commercial speech. Such modest restrictions are permissible. *See, e.g.*, *Ragin*, 923 F.2d at 1003 (upholding ordinance prohibiting racial discrimination in advertising against newspaper's First Amendment challenge). And the laws are tailored narrowly with specific allowances for religious organizations that object to same-sex

24

marriage. *See* N.Y. Exec. Law § 296(11).

**V.    Plaintiff's Due Process claim must be dismissed.**

New York's Executive Law § 296(2)(a) does not violate the Fourteenth Amendment's Due Process Clause for vagueness. *See* ¶¶ 359–65. It prohibits a "written or printed communication" that a person's patronage is "unwelcome, objectionable, or not acceptable, desired or solicited" because of a protected characteristic, including sexual orientation. N.Y. Exec. Law § 296.2(a). A person of ordinary intelligence can understand what it means when a business says someone is "unwelcome." *See, e.g.*, *Ragin*, 923 F.2d at 1002 (rejecting a vagueness challenge to a similar provision of the Fair Housing Act); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 267–68 (2d Cir. 2015) (denying a vagueness challenge to, among other things, the words "copies or duplicates" and "interfere"). But the Court need not even reach that question. *See 303 Creative LLC v. Elenis*, 385 F.Supp.3d 1147, 1156 (D. Colo. 2019). "A plaintiff whose speech is clearly proscribed cannot raise a successful vagueness claim." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 20 (2010). Under any interpretation of N.Y. Exec. Law § 296.2(a), Plaintiff's categorical statement denying photography services to same-sex couples is forbidden. Because the law unambiguously proscribes this behavior, it is not vague as to Carpenter, and she cannot successfully challenge it on vagueness grounds. *See Expressions Hair Design v. Schneiderman*, 137 S. Ct. 1144, 1151–52 (2017). This claim must be dismissed.

**CONCLUSION**

For the reasons set forth above, the Complaint should be dismissed in its entirety. In the event any claims survive, State Defendants respectfully request 30 days to submit an answer.

Dated: June 16, 2021

LETITIA JAMES
Attorney General for the State of New York
*Attorney for State Defendants*

s/ Heather L. McKay
HEATHER L. MCKAY
Assistant Attorney General of Counsel
NYS Office of the Attorney General
144 Exchange Boulevard, Suite 200
Rochester, New York 14614
Telephone: (585) 546-7430
heather.mckay@ag.ny.gov

26

JA0990

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **Emilee Carpenter, LLC d/b/a Emilee Carpenter Photography** and **Emilee Carpenter**,<br><br>    Plaintiffs,<br><br>    v.<br><br>**Letitia James**, in her official capacity as Attorney General of New York; **Jonathan J. Smith**, in his official capacity as Interim Commissioner of the New York State Division of Human Rights; and **Weeden Wetmore**, in his official capacity as District Attorney of Chemung County,<br>    Defendants. | Case No. 6:21-CV-06303<br><br>AMICUS CURIAE BRIEF |

## INTRODUCTION

This brief first argues that New York misapplied its antidiscrimination statute, a misstep partly caused by New York's misinterpretation of *Obergefell v. Hodges*. New York is part of a larger national trend in which authorities are using antidiscrimination statutes as swords to punish already marginalized people (such as supporters of the conjugal understanding of marriage), rather than as shields to protect people from unjust discrimination (such as African Americans in the wake of Jim Crow and today). Second, this brief argues that support for marriage as the union of husband and wife is essentially different from opposition to interracial marriage, and that the status of African Americans is importantly different from that of Americans who identify as gay. As a result, First Amendment protections for people who act on the belief that marriage unites husband and wife differ in critical ways from hypothesized First Amendment protections for racists—and the courts can distinguish the two cases. Third and finally, this brief argues that protections for citizens who support the conjugal understanding of marriage bear much more similarity to protections for pro-life citizens. Just as

protections for pro-life citizens have not been deemed "discriminatory" on the basis of sex or otherwise anti-woman because pro-life medicine isn't sexist, so too should pro-conjugal marriage actions be treated as non-discriminatory because such actions aren't anti-gay.

In *Obergefell v. Hodges*, the Supreme Court correctly noted that "[m]any who deem same-sex marriage to be wrong reach that conclusion based on decent and honorable religious or philosophical premises, and neither they nor their beliefs are disparaged here."[1] At stake in this case is whether these people and their decent and honorable beliefs may, consistent with the protections of the U.S. Constitution, be so disparaged by state governments. Advocates argue that, if the Court finds a First Amendment right to decline to use one's artistic talents to photograph a same-sex wedding, then the Court would also have to protect a photographer's choice to refuse to photograph an interracial wedding.

But no such conclusion follows.

Opposition to interracial marriage developed as one aspect of a larger system of racism and white supremacy. Such opposition is an outlier from the historic understanding and practice of marriage, founded not on decent and honorable premises but on bigotry. By contrast, support for marriage as the conjugal union of husband and wife has been a human universal until just recently, regardless of views about sexual orientation. That view of marriage is based on the capacity that a man and a woman possess to unite in a conjugal act, create new life, and unite that new life with both a mother and a father. Whether ultimately sound or not, this view of marriage is reasonable, is based on decent and honorable premises, and disparages no one.

Exemptions from laws banning discrimination on the basis of race run the risk of

---

[1] 135 S. Ct. 2584, 2602 (2015).

JA0992

undermining the valid purposes of those laws—such as eliminating the public effects of racist bigotry—by perpetuating the myth that blacks are inferior to whites. This myth contributes to a culture where the badges and incidents of slavery persist, as African-Americans continue to confront a host of disadvantages. But First Amendment protections for people who act in accordance with the conjugal understanding of marriage need not undermine the valid purposes of laws that ban discrimination on the basis of sexual orientation—such as eliminating the public effects of anti-gay bigotry—because support for conjugal marriage isn't anti-gay. A ruling in favor of Emilee Carpenter sends no message about the supposed inferiority of people who identify as gay—indeed, it sends no message about them or their sexual orientations at all. It would simply say that citizens who support the historic understanding of marriage are not bigots, and that the state may not drive them out of business or civic life. Such a ruling doesn't threaten the social status of people who identify as gay or their community's profound and still-growing political influence.

A better comparison for this case is to laws that ban discrimination on the basis of sex. If a state applied such a law in a way that forced a Catholic hospital to perform abortions or forced a crisis pregnancy center to advertise abortion, a ruling by the Supreme Court in favor of a right to not perform or promote abortion would not undermine the valid purposes of a sex nondiscrimination policy—such as eliminating the public effects of sexism—because pro- life medicine isn't sexist. Pro-life convictions need not flow from or communicate hostility to women. A ruling in favor of a pro-life citizen sends no message about patriarchy or female subordination; it says simply that pro-life citizens are not bigots and that the state may not exclude them from public life. A ruling to protect the liberties of citizens who support a conjugal understanding of marriage would do the same for those citizens.

But a District Court ruling against Carpenter would tar citizens who support the conjugal understanding of marriage with the charge of bigotry. The court's refusal to grant First Amendment protections to Carpenter would teach that her reasonable convictions and associated conduct are so gravely unjust that they cannot be tolerated in a pluralistic society. If *Obergefell* was about respecting the freedom of people who identify as gay to live as they wish, then Americans who believe in the conjugal understanding of marriage should enjoy that same freedom. No doubt many people oppose Carpenter's beliefs. But, as the Supreme Court noted in *Obergefell*, when that "personal opposition becomes enacted law and public policy, the necessary consequence is to put the imprimatur of the State itself on an exclusion that soon demeans or stigmatizes those whose own liberty is then denied."[2] The District Court should not allow New York to so demean and stigmatize supporters of conjugal marriage. It should not allow the state to "punish the wicked."[3]

In short, pro-life conscience protections do not undermine *Roe v. Wade* or women's equality.[4] Neither do conscience protections for conjugal marriage supporters undermine *Obergefell* or gay equality.[5] By contrast, conscience protections for opponents of interracial marriage could undermine the purposes of *Loving v. Virginia, Brown v. Board of Education,* and the Civil Rights Act of 1964: racial equality.[6]

---

[2] *Id.*

[3] *See* Tim Gill, Andy Kroll, *Meet the Megadonor Behind the LGBTQ Rights Movement*, ROLLING STONE (June 23, 2017), http://www.rollingstone.com/politics/features/meet-tim-gill-megadonor-behind- lgbtq-rights-movement-wins-w489213 [https://perma.cc/8E9G-4BSS].

[4] *See* 410 U.S. 113 (1973).

[5] *See* 135 S. Ct. at 2602.

[6] *See* 78 Stat. 241 (1964); 388 U.S. 1 (1967); Brown v. Bd. of Educ., 347 U.S. 483 (1954), *supplemented sub nom.* Brown v. Bd. of Educ., 349 U.S. 294 (1955).

JA0994

# I. SHIELDS OR SWORDS? THE USES AND ABUSES OF ANTIDISCRIMINATION LAW: IMPOSING SEXUAL ORTHODOXY

States can avoid First Amendment showdowns by refusing to classify support for traditional marriage as "discrimination." The Supreme Court stated in its majority opinion in *Obergefell* that belief in marriage as the union of husband and wife is held "in good faith by reasonable and sincere people here and throughout the world."[7] It noted that "many who deem same-sex marriage to be wrong reach that conclusion based on decent and honorable religious or philosophical premises, and neither they nor their beliefs are disparaged here."[8] The states should not disparage these people and their decent and honorable beliefs, either.

A big part of the problem is that sexual-orientation antidiscrimination laws are now being used to "punish the wicked," in the words of Tim Gill, their biggest financial backer (to the tune of $500 million).[9] But antidiscrimination policies should serve as shields, not swords. These laws are meant to shield people from unjust discrimination that might prevent them from flourishing in society, not to punish people for acting on reasonable beliefs.

We apply other antidiscrimination statutes in a more fair and nuanced way. Bans on religion-based discrimination are not used to force secular organizations to violate their beliefs. Religious antidiscrimination policies have not been used, for example, to force Planned Parenthood to hire pro-life Catholics. Religion antidiscrimination laws simply do not seek to impose *religious* orthodoxy on the country.

But sexual orientation and gender identity (SOGI) antidiscrimination policies *are* used to impose *sexual* orthodoxy. They're used to try to force Catholic schools to employ people who undermine the schools' sexual values and to coerce Christian photographers to lend their

---

[7] 135 S. Ct. at 2594.
[8] *Id.* at 2602.
[9] *See* Kroll, *supra* note 4.

artistic talents to messages about marriage with which they disagree. SOGI laws are used to punish people of good will who simply seek the freedom to lead their lives in accordance with their beliefs about human sexuality.

But this is a mistake. Discrimination in the broad sense is simply the making of distinctions. It's a necessity of life. Discrimination in the familiar moralized sense, however, involves mistreatment based on irrelevant factors. For clarity, this brief uses "distinguish" to mean conduct neutrally, and "discriminate" to mean wrongful distinctions. We distinguish or discriminate based on X when we take X as a reason for treating someone differently. We "distinguish" based on relevant factors—as when we require recipients of driver's licenses to be able to see. We "discriminate" based on *irrelevant* factors—as when many states once required voters to be white.[10] Of course, there might be some traits on which we both distinguish and discriminate, and disentangling the two can take work: We distinguish on the basis of sex when we have separate male and female bathrooms; we discriminate on the basis of sex when we say men should take economics and women take home economics in high school.[11]

Invidious discrimination is rooted in unfair, socially debilitating attitudes or ideas about individuals' worth, proper social status, abilities, or actions. Bans on interracial marriage were paradigms of invidious discrimination.[12] They were based on beliefs about African Americans, especially their supposed incompetence and threat to whites (especially women). A photographer refusing to photograph an interracial wedding discriminates invidiously on the basis of race. He takes that factor—race—into consideration where it is irrelevant and mistreats

---

[10] *See* John Corvino, Ryan T. Anderson & Sherif Girgis, Debating Religious Liberty and Discrimination, 163–168 (2017).

[11] *See*, *e.g.*, 45 C.F.R. §§ 618.405, 618.410 (2017) (implementing Title IX).

[12] *See* Loving v. Virginia, 388 U.S. 1 (1967).

JA0996

people on that basis, and thus his behavior serves to perpetuate myths about African Americans that are unfair and socially debilitating.

Emilee Carpenter, by contrast, doesn't discriminate—nor does she even distinguish—on the basis of sexual orientation. Rather, she refuses to photograph a same-sex wedding because she objects to same-sex marriage, based on her common Christian belief that a same-sex wedding isn't marital (along with many other relationships—e.g., sexual and not, dyadic and larger, same- and opposite-sex).[13] Nowhere need Carpenter's reasoning even refer to the partners' sexual orientation—or any ideas or attitudes about gay people, good or bad, explicit or implicit.

Some people's refusals to photograph same-sex weddings might be ill-motivated. However, as Section 3 demonstrates, it's unfair to assume that actions based on the conjugal understanding of marriage are premised on ideas hostile to people who identify as gay. Indeed, refusals to photograph same-sex wedding celebrations needn't be based on beliefs or attitudes about people who identify as gay at all, good or bad. Though such actions might have disparate impact, they need not discriminate *or distinguish* on the basis of sexual orientation.

That convictions about marriage (and parenting) need not be based on convictions about sexual orientation is seen most clearly in the case of Catholic Charities adoption agencies. They decline to place the children entrusted to their care with same-sex couples—not because of the individuals' sexual orientations, but because of the agencies' conviction that children deserve both a mother and a father. These agencies believe that men and women are not interchangeable, that mothers and fathers are not replaceable, that the two best dads in the

---

[13] *See* 3 JOHN FINNIS, HUMAN RIGHTS AND COMMON GOOD: COLLECTED ESSAYS 315–388 (2011); JOHN WITTE JR., FROM SACRAMENT TO CONTRACT: MARRIAGE, RELIGION, AND LAW IN THE WESTERN TRADITION (2d ed. 2012); SCOTT YENOR, FAMILY POLITICS: THE IDEA OF MARRIAGE IN MODERN POLITICAL THOUGHT (2011).

world cannot make up for a missing mom, and that the two best moms in the world cannot make up for a missing dad. These beliefs have nothing to do with sexual orientation.[14] Catholic Charities does not say that people who identify as gay cannot love or care for children; it does not consider sexual orientation *at all*. Its preference for placing children with mothers and fathers is not an instance of discrimination based on sexual orientation.[15]

Therefore, affirming Carpenter's First Amendment rights here would not undermine any of the valid purposes of the state's sexual orientation nondiscrimination law. By contrast, an exemption from such a law for a hospital that refused to perform chemotherapy because the patient identified as gay could undermine the valid purpose of such a law—as could an exemption for Emilee Carpenter had she refused to create business branding photographs for customers who identify as gay. When the underlying act discriminates on the basis of sexual orientation per se, and has no root in "decent and honorable" beliefs, an exemption could, like exemptions in the cases of racism, send the signal that citizens who identify as gay count as less than other citizens. But acting in accordance with the conviction that marriage is the union of husband and wife sends no such message.

## II. THE CONTEXT OF RACE-BASED REFUSALS

Comparisons to a case involving a hypothetical racist go wrong right from the start because social context matters for claims of discrimination, and the social contexts for these two cases are profoundly different. Emilee Carpenter has always served all customers—black and white, gay and straight—but has had to turn down certain orders because of the nature of the occasion being celebrated and the message she'd be forced to communicate. By contrast,

---

[14] *See* RYAN T. ANDERSON, TRUTH OVERRULED: THE FUTURE OF MARRIAGE AND RELIGIOUS FREEDOM (2015); SHERIF GIRGIS, RYAN T. ANDERSON & ROBERT P. GEORGE, WHAT IS MARRIAGE? MAN AND WOMAN: A DEFENSE (2012).
[15] *See* CORVINO, ANDERSON & GIRGIS, *supra* note 13.

JA0998

photographers who declined to photograph interracial weddings also declined to treat African Americans equally in a host of circumstances: They refused to serve them at all. Racists did not and do not simply object to interracial marriage; they objected and object to contact with African Americans on an equal footing.

History makes this fact clear. Before the Civil War, a dehumanizing regime of race-based chattel slavery existed in many states. After abolition, Jim Crow laws enforced race-based segregation. Those laws mandated the separation of blacks from whites, preventing them from associating or contracting with one another. Even after the Court struck down Jim Crow laws, integration did not come easily or willingly in many instances. Public policy, therefore, sought to eliminate racial discrimination even when committed by private actors on private property.

Before the enactment of the Civil Rights Act of 1964, racial segregation was rampant and entrenched, and African Americans were treated as second-class citizens. Individuals, businesses, and associations across the country excluded blacks in ways that caused grave material and social harms without justification, without market forces acting as a corrective, and with the government's tacit and often explicit backing. As the NAACP points out in its brief filed with the Colorado Court of Appeals in the *Masterpiece* case:

> African Americans were relegated to second-class citizenship by a system of laws, ordinances, and customs that segregated white and African-American people in every possible area of life, including places of public accommodation. This system of segregation was designed to prevent African Americans from breaking the racial hierarchy established during slavery.[16]
>
> African Americans were denied loans, kept out of decent homes, and denied job

---

[16] Brief of NAACP Legal Defense & Educational Fund, Inc., as Amici Curiae Supporting Appel- lees, Charlie Craig v. Masterpiece Cakeshop, Inc. et al, No. 2014CA135 (Colo. App. Ct. Feb. 17, 2015), https://www.aclu.org/sites/default/files/field_document/0007-2015-02-17_09-05-34_2015.02.13_ldf_amicus_brief_as_filed.pdf [https://perma.cc/EHE8-3Y7D].

opportunities—except as servants, janitors, and manual laborers. These material harms both built on and fortified the social harms of a culture corrupted by views of white supremacy that treated blacks as less intelligent, less skilled, and in some respects less human. Making it harder for blacks and whites to mingle on equal terms was not just incidental: It was the whole point. Discrimination was so pervasive that the risks of lost economic opportunities or sullied reputation were nonexistent to those who engaged in it. Social and market forces, instead of punishing discrimination, rewarded it through the collusion of many whites, with a heavy assist from the state. Given the irrelevance of race to almost any transaction, and given the widespread and flagrant racial animus of the time, no claims of benign motives are plausible.[17]

The context of Carpenter's case could not be more different. There is no heterosexual-supremacist movement akin to the movement for white supremacy. There has never been an equivalent of Jim Crow for people who identify as gay. There are no denials of their right to vote, no lynching campaigns, no signs over water fountains saying "Gay" and "Straight." This is not to deny that those identified as gay have experienced bigotry or that they still do. Anti-gay bigotry exists. As with other forms of mistreatment, our communities must fight it. But Carpenter's conduct is not an instance of bigotry, as explained below, and the actual instances of anti-gay bigotry that remain simply cannot be compared to the systematic material and social harms wrought by racism. As a result, enforcing Carpenter's First Amendment rights would undermine neither the social standing of people who identify as gay, nor the valid purposes of a sexual orientation nondiscrimination policy.

---

[17] *See* CORVINO, ANDERSON & GIRGIS, *supra* note 13, at 162–184.

JA1000

## III. OPPOSITION TO INTERRACIAL MARRIAGE WAS PART OF A RACIST SYSTEM; SUPPORT FOR CONJUGAL MARRIAGE IS NOT ANTI- ANYTHING

Bans on interracial marriage were the exception in world history. They have existed *only* in societies with a race-based caste system, in connection with race-based slavery. Opposition to interracial marriage was based on racism and belief in white supremacy, and thus contributed to a dehumanizing system treating African Americans first as property and later as second-class citizens.

The understanding of marriage as the union of a man and a woman, on the other hand, has been the norm throughout human history, shared by the great thinkers and religions of both East and West, and by cultures with a wide variety of viewpoints about homosexuality. Likewise, many religions reasonably teach that human beings are created male and female, and that male and female are created for each other in marriage.[18] Nothing even remotely similar is true of race and legally enforced racial separation.

Interracial marriage bans were unknown to history until colonial America. English common law, which the U.S. inherited, imposed no barriers to interracial marriage.[19] Anti-miscegenation statutes, which first appeared in Maryland in 1661, were the result of African slavery.[20] Since then, they've existed *only* in societies with a race-based caste system. Thus, Harvard historian Nancy Cott observes:

> It is important to retrieve the singularity of the racial basis for these laws. Ever since ancient Rome, class-stratified and estate-based societies had instituted laws against intermarriage between individuals of unequal social or civil status, with the aim of preserving the integrity of the ruling class. But the English colonies stand out as the first secular authorities to nullify and criminalize intermarriage on the

---

[18] *See* ANDERSON, *supra* note 18; GIRGIS, ANDERSON & GEORGE, *supra* note 18.

[19] Irving G. Tragen, *Statutory Prohibitions against Interracial Marriage*, 32 CAL. L. REV. 269 (1944); *see also* Francis Beckwith, *Interracial Marriage and Same-Sex Marriage*, PUB. DISCOURSE (May 21, 2010), http://www.thepublicdiscourse.com/2010/05/1324/./ [https://perma.cc/F9C7-PTCX].

[20] Beckwith, *supra* note 24.

basis of race or color designations.[21]

This history shows that anti-miscegenation laws were part of an effort to hold a race of people in a condition of economic and political inferiority and servitude. They were openly premised on the idea that contact with African Americans on an equal plane was wrong. That idea, and its basic premises in the supposed inferiority of African Americans, is the essence of bigotry. Actions based on such bigotry contribute to the wider culture of dehumanization and subordination that antidiscrimination law is justly aimed to combat.

The convictions behind Emilee Carpenter's conscience claims could not form a sharper contrast with the rationale of racism. Her conviction about marriage has been present throughout human history. As one historian observes: "Marriage, as the socially recognized linking of a specific man to a specific woman and her offspring, can be found in all societies. Through marriage, children can be assured of being born to both a man and a woman who will care for them as they mature."[22]

Great thinkers, too, affirm the special value of male-female unions as the foundations of family life. Plato wrote favorably of legislating to have people "couple[], male and female, and lovingly pair together, and live the rest of their lives" together.[23] Plutarch wrote of marriage as "a union of life between man and woman for the delights of love and the begetting of children."[24] He considered marriage a distinct form of friendship embodied in the "physical union" of intercourse.[25] For Musonius Rufus, the first-century Roman Stoic, a "husband and wife" should "come together for the purpose of making a life in common and of procreating

---

[21] NANCY F. COTT, PUBLIC VOWS: A HISTORY OF MARRIAGE AND THE NATION 483 (2000).

[22] G. ROBINA QUALE, A HISTORY OF MARRIAGE SYSTEMS 2 (1988).

[23] 4 PLATO, THE DIALOGUES OF PLATO 407 (Benjamin Jowett trans. & ed., Oxford Univ. 1953) (c. 360 B.C.).

[24] Plutarch, *Life of Solon*, *in* 20 PLUTARCH'S LIVES 4 (Loeb ed. 1961) (c. 100 A.D.).

[25] Plutarch, *Erotikas*, *in* 20 PLUTARCH'S LIVES 769 (Loeb ed. 1961) (c. 100 A.D.).

JA1002

children, and furthermore of regarding all things in common between them even their own
bodies."[26]

Not one of these thinkers was Jewish or Christian or in contact with Abrahamic
religion. Nor were they ignorant of same-sex sexual relations, which were common in their
societies. These thinkers were not motivated by sectarian religious concerns, ignorance, or
hostility of any type toward anyone. They and other great thinkers—of both East and West,
from Augustine and Aquinas, Maimonides and al-Farabi, and Luther and Calvin, to Locke and
Kant, Confucius, Gandhi and Martin Luther King—held the honest and reasoned conviction
that male-female sexual bonds had distinctive value for individuals and society.

To note this history is not merely to say something about the past but to shed light on
the present. Today's beliefs about conjugal marriage aren't isolated. They grew organically out
of millennia-old religious and moral traditions that taught the distinct value of male-female
union; of mothers and fathers; of joining man and woman as one flesh, and generations as one
family.[27] Whether those principles are ultimately sound or unsound, they continue to provide
intelligible reasons to affirm conjugal marriage that have nothing to do with animus.

Emilee Carpenter and many other citizens today are shaped by, and find guidance and
motivation in, those traditions—be it the classical Western legal-philosophical traditions
stretching from Plato to our day, or the Jewish or Christian or Muslim traditions. History
demonstrates that these intellectual streams do not have bigotry as their source. It is therefore
unfair to assume that the citizens they nourish are bigots. Thus, a First Amendment ruling in
favor of believers in conjugal marriage need not send any negative social message about

---

[26] Musonius Rufus, *Discourses XIIIA*, *in* CORA E. LUTZ, MUSONIUS RUFUS "THE ROMAN SOCRATES" (Yale Univ. Press 1947), *available at* https://sites.google.com/site/thestoiclife/the_teachers/musonius- rufus/lectures/13-0 [https://perma.cc/VU9D-JVE3].
[27] *See* GIRGIS, ANDERSON & GEORGE, *supra* note 18; ANDERSON, *supra* note 18.

anyone. The only message sent in protections for such citizens is that Americans of good will reasonably disagree about marriage, whereas the message sent in opposition to interracial marriage is that one group of citizens is inferior to another.

Some critics say that, while it might have been possible for Aristotle, Kant, or Gandhi to hold such views without animus, it isn't for us—knowing what we do now about sexuality. Not so. These traditions teach that there is distinct value in the one-flesh union that only man and woman can form, and in the kinship ties that such union offers children. Those ideals don't hang precariously on empirical assumptions about sexual orientation. Nor does the recent trend toward a more flexible marriage-as-simple-companionship model make it irrational to continue to affirm these ideals.

No doubt bigotry motivates some traditionalists. But not Carpenter. It would be unfair to punish her and similar professionals who believe in conjugal marriage. After all, as George Chauncey and other historians of the LGBT experience, who submitted their research to advance gay rights litigation, noted, "widespread discrimination" based on "homosexual status developed only in the twentieth century and peaked from the 1930s to the 1960s."[28] Bigotry is not the reasonable, much less the most natural, motive to read into Phillips' decision to decline a custom cake order. And ruling in his favor would not have negative social costs, as the next sections explain.

---

[28] Brief for Professors of History George Chauncey, Nancy F. Cott et al., as Amici Curiae Supporting Petitioners, Lawrence v. Texas, 539 U.S. 558 (2003) (No. 02-102), http://cdm16035. contentdm.oclc.org/cdm/ref/collection/p16035coll2/id/23; [https://perma.cc/3QKF-MN6E]; *see also* George Chauncey, Gay New York: Gender, Urban Culture, and the Making of the Gay Male World, 1890–1940 173, 337 (1994).

JA1004

## IV. THE SOCIAL COSTS OF PROTECTIONS FOR RACISTS

Exemptions from laws banning discrimination on the basis of race run the risk of undermining the valid purposes of those laws—such as eliminating the public effects of racist bigotry—by perpetuating the myth that blacks are inferior to whites. Indeed, actions based on religious beliefs justifying white supremacy were part of the racism that the laws were meant to combat. The NAACP brief mentioned above notes the "religious arguments justifying slavery, defending Jim Crow segregation, implementing anti-miscegenation laws, and, of course, supporting laws and practices that denied African Americans the full and equal enjoyment of places of public accommodation."[29] The purpose of such practices was to retain the wicked system of white supremacy: "Proprietors unwilling to serve African-American customers relied on religious arguments that validated fears of racial integration."[30] As the NAACP notes, "[t]hese laws, policies, and customs were designed to dehumanize African Americans and maintain the racial hierarchy established during the time of slavery."[31] The Vice President of the Confederate States of America exemplified the way in which religion was perverted to justify racism and slavery:

> With us, all of the white race, however high or low, rich or poor, are equal in the eye of the law. Not so with the negro. Subordination is his place. He, by nature, or by the curse against Canaan, is fitted for that condition which he occupies in our system. It is, indeed, in conformity with the ordinance of the Creator.[32]

This belief system was geared precisely to racial subordination. We should not minimize how pervasive and destructive white supremacy was, and is. Dr. Martin Luther King, Jr., in his *Letter from a Birmingham Jail*, aptly highlighted the overarching purpose of

---

[29] Brief of NAACP Legal Defense & Educational Fund, Inc., *supra* note 21, at 4.
[30] *Id.*
[31] *Id.* at 6.
[32] Alexander H. Stephens, Corner Stone Speech (Mar. 21, 1861), *available at* http://teachingamericanhistory.org/library/document/cornerstone-speech [https://perma.cc/X4HV-ZTHL].

segregation and racial discrimination:

> [W]hen you suddenly find your tongue twisted and your speech stammering as you seek to explain to your six year old daughter why she can't go to the public amusement park that has just been advertised on television, and see tears welling up in her eyes when she is told that Funtown is closed to colored children, and see ominous clouds of inferiority beginning to form in her little mental sky, and see her beginning to distort her personality by developing an unconscious bitterness toward white people; when you have to concoct an answer for a five year old son who is asking: "Daddy, why do white people treat colored people so mean?"; when you take a cross county drive and find it necessary to sleep night after night in the uncomfortable corners of your automobile because no motel will accept you; when you are humiliated day in and day out by nagging signs reading "white" and "colored"; when your first name becomes "nigger," your middle name becomes "boy" (however old you are) and your last name becomes "John," and your wife and mother are never given the respected title "Mrs."; when you are harried by day and haunted by night by the fact that you are a Negro, living constantly at tiptoe stance, never quite knowing what to expect next, and are plagued with inner fears and outer resentments.[33]

These are the realities that laws banning discrimination on the basis of race were meant to combat. And combatting racial discrimination is a compelling government interest pursued in narrowly tailored ways. As the Supreme Court noted in *Burwell v. Hobby Lobby Stores, Inc.*, "[t]he Government has a compelling interest in providing an equal opportunity to participate in the workforce without regard to race, and prohibitions on racial discrimination are precisely tailored to achieve that critical goal."[34] What the Court said regarding employment law could also apply to public accommodations law. An exemption to a law prohibiting racial discrimination in public accommodations could undermine the purpose of that law by sending the message that intentional racism is protected conduct. In sending that message, such an exemption would amplify existing messages that say African Americans count for less, are subhuman, and may be treated as such. In doing so, it increases the odds that people engage in

---

[33] Martin Luther King, Jr., *Letter from a Birmingham Jail*, AFR. STUD. CTR.—UNIV. PA. (Apr. 16, 1963), https://www.africa.upenn.edu/Articles_Gen/Letter_Birmingham.html [https://perma.cc/K59G- M2D5].
[34] 134 S. Ct. 2751, 2783 (2014).

JA1006

deplorable acts based on notions of white supremacy.

Therefore, comparing First Amendment protections for Carpenter to protections for a racist ignores the differing social context and how that context shapes the relevant legal analysis. For not only are the acts of the racist and of Carpenter different, so too are the messages that rulings in favor of each would send—and the harms that those messages could contribute to.

Moreover, these concerns about racist messages and ensuing material harms are by no means obsolete as sadly witnessed by recent events. Combatting racism is a compelling state interest given not just the history of government- endorsed white supremacy but also its current effects, the badges and incidents of slavery. Despite the progress made in combatting racism, African Americans continue to face both outright discrimination and systemic disadvantages.

The United States is still confronting racism and its effects. The persistence of the badges and incidents of slavery demonstrates the need for racial nondiscrimination laws and how exemptions from race nondiscrimination laws could undermine those laws' purpose by spreading the idea that African Americans are inferior and may be treated as such.

These important social and historical differences help explain why the Court could rule in favor of Carpenter but not in favor of a racist photographer. Combatting racism through a nondiscrimination statute that is applied without exemptions may be the least restrictive means of achieving compelling interests because any exemption could allow the cancer of racism to grow, spread the idea that African Americans are inferior, and thus cause the harms it was meant to combat.

JA1007

# CONCLUSION

The United States has reached compromises on similarly difficult moral and cultural issues before. Following *Roe v. Wade*, Americans refused to use sex antidiscrimination law as a sword to punish pro-lifers. In 1993, in *Bray v. Alexandria Women's Health Clinic*, the Supreme Court resolutely rejected the argument that pro-lifers are inherently discriminatory: "Whatever one thinks of abortion, it cannot be denied that there are common and respectable reasons for opposing it, other than hatred of, or condescension toward (or indeed any view at all concerning), women. "[35]

The same is true when it comes to marriage as the union of husband and wife: there are common and respectable reasons for supporting it that have nothing to do with hatred or condescension. But this is not true when it comes to opposition to interracial marriage—and this is where the analogies to racism break down. When the Supreme Court struck down bans on interracial marriage, it did not say that opposition to interracial marriage was based on "decent and honorable premises" and held "in good faith by reasonable and sincere people here and throughout the world."[36] It did not say it, because it could not say it.

Opposition to interracial marriage developed as one aspect of a larger system of racism and white supremacy, as part of an effort to hold a race of people in a condition of economic and political inferiority and servitude. It was based on the idea that contact with African Americans on an equal plane is wrong.

That idea, and its premise of the supposed inferiority of African Americans, is the essence of bigotry. Photographers who declined to photograph interracial weddings also declined to treat African Americans equally in a host of circumstances. Racists did not simply

---

[35] 506 U.S. 263, 270 (1993).
[36] *Obergefell*, 135 S. Ct. at 2594.

JA1008

object to interracial marriage; they objected to contact with African Americans on an equal footing.

By contrast, marriage as the union of husband and wife has been a universal human practice until just recently, regardless of views about sexual orientation. This vision of marriage is based on the capacity that a man and a woman possess to unite as one flesh, create new life, and unite that new life with both a mother and a father. Whether ultimately sound or not, this view of marriage is reasonable, based on decent and honorable premises, and disparaging of no one. A lack of disparagement also explains why photographers like Emilee Carpenter have been serving gay customers faithfully for years.

Sparing people such as Carpenter from the sword does not undermine the valid purposes of anti-discrimination law—eliminating the public effects of anti-gay bigotry— because support for conjugal marriage is not anti-gay. Protecting freedom here sends no message about the supposed inferiority of those identifying as gay; it sends no message about sexual orientation at all.

It does say that citizens who support the historic understanding of sex and marriage are not bigots. It ensures their equal social status and opportunities. It protects their businesses, livelihoods, and professional vocations. And it benefits the rest of society by allowing these citizens to continue offering their services, especially social services, charities, and schools.

Faithful professionals and the faith-based social services of any religion that believes we are created male and female, and that male and female are created for each other, are at stake. A line of questioning on the comparisons to interracial marriage brought up the case of Bob Jones University, a school that lost its nonprofit tax status because it prohibited interracial dating and marriage. But do we really want to live in a country where acting on a belief about

marriage that people have held throughout all of recorded history—that it is a union of male and female—is treated as the functional and legal equivalent of racism?

All of us should work to prevent such an outcome. Which is why Carpenter need not have ended up in court. We must refuse to use antidiscrimination laws as swords to impose sexual orthodoxy on the nation. As Americans continue to disagree about sex, we must refuse to weaponize the redefinition of marriage. Anti-gay bigotry exists and should be condemned. But support for marriage as the union of husband and wife is not anti-gay. Just as we have combated sexism without treating pro-life medicine as sexist, we can combat anti-gay bigotry without treating Orthodox Jews, Roman Catholics, Muslims, Evangelicals, and Latter-day Saints as bigots.

Professor Koppelman says that he has "worked very hard to create a regime in which it's safe to be gay" and for similar reasons "would also like that regime to be one that's safe for religious dissenters."  Not every disagreement is discrimination. And our law should not say otherwise.

Dated: July 1, 2021

*/s/ Philip J. Vecchio, Esq.*

Philip J. Vecchio, P.C.
**Attorney At Law**
24 Huntswood Lane
East Greenbush, New York 12061
Email:  PVecchio@nycap.rr.com
Telephone: (518) 857-2897
Facsimile: (518) 479-4335
*Attorney for Amici Curiae: Frederick Douglass Foundation, Coalition of African American Pastors, The Restoration Project and Conservative Clergy of Color*

JA1010

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

**Emilee Carpenter, LLC d/b/a Emilee Carpenter Photography** and **Emilee Carpenter**,

                        Plaintiffs,

    v.

**Letitia James**, in her official capacity as Attorney General of New York; **Jonathan J. Smith**, in his official capacity as Interim Commissioner of the New York State Division of Human Rights; and **Weeden Wetmore**, in his official capacity as District Attorney of Chemung County,
                        Defendants.

Case No. 6:21-CV-06303

---

### Certificate of Service

I certify that on July 1, 2021, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system and that all participants in the case are registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Philip J. Vecchio, Esq.*

Philip J. Vecchio, P.C.
Attorney At Law
24 Huntswood Lane
East Greenbush, New York 12061
Email: PVecchio@nycap.rr.com
Telephone: (518) 857-2897
Facsimile: (518) 479-4335
*Attorney for Amici Curiae: Frederick Douglass Foundation, Coalition of African American Pastors, The Restoration Project and Conservative Clergy of Color*

JA1011