# 22-75

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

EMILEE CARPENTER, LLC d/b/a/ Emilee Carpenter Photography and
EMILEE CARPENTER,

*Plaintiffs-Appellants*,

v.

LETITIA JAMES, in her official capacity as Attorney General of New
York; MARIA L. IMPERIAL, in her official capacity as Acting
Commissioner of the New York State Division of Human Rights; and
WEEDEN WETMORE, in his official capacity as District Attorney of
Chemung County,

*Defendants-Appellees*.

On Appeal from the United States District Court for the Western
District of New York, Case No. 6:21-cv-06303

## JOINT APPENDIX
## VOLUME 5 (JA1012-JA1164)

JONATHAN A. SCRUGGS
BRYAN D. NEIHART
JACOB P. WARNER
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@ADFlegal.org
bneihart@ADFlegal.org

JOHN J. BURSCH
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Ste. 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

jwarner@ADFlegal.org
RAYMOND J. DAGUE
DAGUE & MARTIN, P.C.
4874 Onondaga Road
Syracuse, NY 13215
(315) 422-2052
rjdague@daguelaw.com

*Counsel for Appellants*

MOHAMMAD HYDER HUSSAIN
CHEMUNG COUNTY ATTORNEY'S OFFICE
167 Lake Street
Elmira, NY 14902
(607) 737-2982
hhussain@chemungcountyny.gov

*Counsel for Appellee Weedon Wetmore*

ALEXANDRIA TWINEM
NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
The Capitol
Albany, NY 12224
(518) 776-2015
Alexandria.Twinem@ag.ny.gov

*Counsel for Appellees Letitia James and Maria Imperial*

## TABLE OF CONTENTS

| ECF No. | Document Description | Page |
|---|---|---|
| | **VOLUME 1** | |
| | Docket Report | JA1 |
| 1 | Verified Complaint | JA19 |
| 1-1 | Exhibit 1 to Verified Complaint | JA76 |
| 1-2 | Exhibit 2 to Verified Complaint | JA78 |
| 3 | Plaintiffs' Preliminary Injunction Motion | JA81 |
| 3-4 | Plaintiffs' List of Witnesses and Exhibits to be Presented at Hearing on the Preliminary Injunction Motion | JA86 |
| 3-5 | Declaration of Emilee Carpenter in Support of Plaintiffs' Preliminary Injunction Motion | JA89 |
| 3-6 | Table of Contents: Appendix to Plaintiffs' Brief in Support of Plaintiffs' Preliminary Injunction Motion | JA142 |
| 3-7 | Part 1 of Appendix to Plaintiffs' Brief in Support of Plaintiffs' Preliminary Injunction Motion | JA145 |
| | **VOLUME 2** | |
| 3-7 | Part 2 of Appendix to Plaintiffs' Brief in Support of Plaintiffs' Preliminary Injunction Motion | JA291 |
| 22 | Amici Curiae Brief of States in Support of Plaintiffs' Motion for Preliminary Injunction | JA534 |

| | **VOLUME 3** | |
|---|---|---|
| 24-1 | Affidavit of Jeffrey Walker in Support of a Dismissal, or in the Alternative, Opposing Preliminary Injunction as to Chemung County District Attorney | JA561 |
| 24-2 | Memorandum of Law in Support of a Dismissal, or in the Alternative, Opposing Preliminary Injunction | JA564 |
| 26-1 | Declaration of Johnathan Smith in Support of Defendants' Opposition to Plaintiffs' Preliminary Injunction Motion with Exhibits A-L | JA581 |
| | **VOLUME 4** | |
| 26-2 | Declaration of Heather McKay in Support of Defendants' Opposition to Plaintiffs' Preliminary Injunction Motion with Exhibits M-O | JA769 |
| 26-3 | Declaration of Jessica Clarke in Support of Defendants' Opposition to Plaintiffs' Preliminary Injunction Motion with Exhibits Q-S | JA923 |
| 27-1 | Memorandum of Law in Support of State Defendant's Motion to Dismiss | JA958 |
| 50 | Amicus Curiae Brief of Frederick Douglass Foundation et al. | JA991 |
| | **VOLUME 5** | |
| 51 | Amici Curiae Brief of New York Civil Liberties Union and American Civil Liberties Union in Support of Defendants' Motion to Dismiss | JA1012 |

| 52 | Amici Curiae Brief of Religious and Civil-Rights Organizations in Support of Defendants' Motion to Dismiss | JA1039 |
|---|---|---|
| 55 | Amici Curiae Brief of States in Support of Defendants | JA1067 |
| 59 | County Defendant's Reply Memorandum in Support of a Dismissal, or in the Alternative, Opposing Preliminary Injunction as to Chemung County District Attorney with Affidavit of Weeden A. Wetmore | JA1106 |
| 68 | Decision and Order | JA1115 |
| 69 | Judgment | JA1161 |
| 70 | Notice of Appeal | JA1162 |

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

EMILEE CARPENTER, LLC d/b/a EMILEE
CARPENTER PHOTOGRAPHY, and
EMILEE CARPENTER,

*Plaintiffs*,

v.

LETITIA JAMES, in her official capacity as
Attorney General of New York, *et al.*,

*Defendants*.

Case No. 6:21-CV-06303-FPG

---

### BRIEF OF *AMICI CURIAE* NEW YORK CIVIL LIBERTIES UNION AND AMERICAN CIVIL LIBERTIES UNION OPPOSING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

GABRIELLA LARIOS
ROBERT HODGSON
New York Civil Liberties Union Foundation
125 Broad Street, 19th Floor
New York, NY 10004
Phone: (212) 607-3317
Fax: (212) 607-3318
glarios@nyclu.org
rhodgson@nyclu.org

LINDSEY KALEY
RICCA PRASAD
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2500
lkaley@aclu.org
rprasad@aclu.org

*Counsel for Amicus Curiae*

Dated: July 2, 2021
      New York, N.Y.

JA1012

# <u>TABLE OF CONTENTS</u>

STATEMENT OF *AMICI CURIAE* ............................................................. 1

SUMMARY OF ARGUMENT ...................................................................... 1

ARGUMENT ............................................................................................... 4

I.    Refusing to Provide Photography Services to Same-Sex Couples that Are Offered to the Public at Large Is Discrimination Based on Sexual Orientation and Violates the Antidiscrimination Laws................................................................................. 4

II.   The Free Speech Clause Does Not Authorize a Business to Engage in Discrimination Prohibited by a Regulation of Conduct that Incidentally Affects Expression.................................................................................................. 6

    A.   The Antidiscrimination Laws Regulate Commercial Conduct and Affect Expression Only Incidentally..................................................................... 6

        1.   Generally applicable laws that regulate commercial conduct and do not target speech receive minimal First Amendment scrutiny............................ 6

        2.   The Antidiscrimination Laws are content- and viewpoint-neutral, so there is no reason to apply strict scrutiny....................................................... 9

    B.   Any "Compelled Expression" Is Incidental to the Law's Regulation of the Conduct of Sales and Does Not Alter the First Amendment Analysis. ................ 11

    C.   The Free Speech Clause Does Not Protect a Public Accommodation's Right to Publish Its Unlawful Policy of Discrimination. .................................................... 14

III.  The Antidiscrimination Laws are Fully Consistent with the Religion Clauses of the First Amendment. ........................................................................................ 14

IV.  The Antidiscrimination Laws Satisfy Even Strict Scrutiny. ........................................... 16

    A.   New York Has a Compelling Interest in Eradicating Discrimination. ................. 16

    B.   Uniform Enforcement of the Antidiscrimination Laws Is the Least Restrictive Means for Furthering the State's Compelling Interest........................................... 19

CONCLUSION........................................................................................... 20

JA1013

## <u>TABLE OF AUTHORITIES</u>

*303 Creative LLC v. Elenis*,
    No. 16-cv-02372, 2017 WL 4331065 (D. Colo. 2017)......................................................18

*Andrews v. Blick Art Materials, LLC*,
    268 F. Supp. 3d 381 (E.D.N.Y. 2017) ...............................................................................8

*Associated Press v. Nat'l Labor Relations Bd.*,
    301 U.S. 103 (1937)..........................................................................................................7

*Associated Press v. United States*,
    326 U.S. 1 (1945)..............................................................................................................7

*Athenaeum v. Nat'l Lawyers Guild, Inc.*,
    No. 653668/16, 2018 WL 1172597 (N.Y. Sup. Ct. Mar. 06, 2018) ...................................5

*Battaglia v. Buffalo Niagara Introductions, Inc.*,
    No. 10138581, slip op. (N.Y. State Div. of Hum. Rts. Jan. 28, 2012) .............................19

*Bd. of Directors of Rotary Int'l v. Rotary Club of Duarte*,
    481 U.S. 537 (1987)..........................................................................................................9

*Brush & Nib Studio, LC v. City of Phoenix*,
    448 P.3d 890 (Ariz. 2019)........................................................................................ passim

*Burns v. Martuscello*,
    890 F.3d 77 (2d Cir. 2018)...............................................................................................11

*Burwell v. Hobby Lobby Stores, Inc.*,
    573 U.S. 682 (2014)........................................................................................................16

*Chelsey Nelson Photography LLC v. Louisville/Jefferson City Metro Gov't*,
    No. 19-cv-851, 2020 WL 4745771 (W.D. Ky. Aug. 14, 2020)....................10, 12, 17, 18

*Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*,
    561 U.S. 661 (2010)..........................................................................................................9

*Claybrooks v. Am. Broad. Companies*,
    898 F. Supp. 2d 986 (M.D. Tenn. 2012).........................................................................12

*Doe v. Phillips*,
    81 F.3d 1204 (2d Cir. 1996).............................................................................................15

*Elane Photography, LLC v. Willock*,
    309 P.3d 53 (N.M. 2013) ......................................................................................... passim

JA1014

*Emp't Div., Dep't of Human Res. of Oregon v. Smith*,
    494 U.S. 872 (1990) ........................................................................3, 15

*Evergreen Ass'n, Inc. v. City of New York*,
    740 F.3d 233 (2d Cir. 2014) ....................................................................11

*Expressions Hair Design v. Schneiderman*,
    137 S. Ct. 1144 (2017) ............................................................................13

*Fulton v. City of Philadelphia*,
    No. 19-123, slip op. (U.S. June 17, 2021) ..........................................15, 19

*Giboney v. Empire Storage & Ice Co.*,
    336 U.S. 490 (1949) ..................................................................................6

*Gifford v. McCarthy*,
    23 N.Y.S.3d 422 (N.Y. App. Div. 2016) ..................................................18

*Heart of Atlanta Motel, Inc. v. United States*,
    379 U.S. 241 (1964) ..........................................................................17, 18

*Heckler v. Mathews*,
    465 U.S. 728 (1984) ................................................................................17

*Hishon v. King & Spalding*,
    467 U.S. 69 (1984) ...............................................................................2, 7

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
    515 U.S. 557 (1995) .................................................................2, 9, 10, 11

*Jian Zhang v. Baidu.com Inc.*,
    10 F. Supp. 3d 433 (S.D.N.Y. 2014) ........................................................6

*Katzenbach v. McClung*,
    379 U.S. 294 (1964) ..................................................................................2

*Lee v. Weisman*,
    505 U.S. 577 (1992) ................................................................................15

*Legal Services Corp. v. Velazquez*,
    531 U.S. 533 (2001) ..................................................................................7

*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753 (1994) ..................................................................................9

JA1015

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*,
    138 S. Ct. 1719 (2018) ........................................................................................ passim

*Messenger v. State*,
    41 N.W. 638 (Neb. 1889) ................................................................................. 3

*Miami Herald Publ'g Co. v. Tornillo*,
    418 U.S. 241 (1974) .................................................................................... 7, 12

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*,
    460 U.S. 575 (1983) ....................................................................................... 7

*New Hope Family Services, Inc. v. Poole*,
    966 F.3d 145 (2d Cir. 2020) ........................................................................ 13

*Newman v. Piggie Park Enterprises, Inc.*,
    390 U.S. 400 (1968) ....................................................................................... 2

*Norwood v. Harrison*,
    413 U.S. 455 (1973) ....................................................................................... 7

*Ohralik v. Ohio State Bar Ass'n*,
    436 U.S. 447 (1978) ....................................................................................... 6

*Pac. Gas & Electric Co. v. Pub. Utilities Comm'n of Cal.*,
    475 U.S. 1 (1986) ........................................................................................ 12

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*,
    413 U.S. 376 (1973) ..................................................................................... 14

*R.A.V. v. City of St. Paul, Minn.*,
    505 U.S. 377 (1992) ....................................................................................... 5

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
    487 U.S. 781 (1988) ..................................................................................... 20

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984) ............................................................................ 9, 16, 17

*Romer v. Evans*,
    517 U.S. 620 (1996) ....................................................................................... 1

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
    547 U.S. 47 (2006) ............................................................................. 8, 13, 14

JA1016

*Scheiber v. St. John's Univ.*,
    84 N.Y.2d 120 (N.Y. 1994) ...................................................................19

*Swanner v. Anchorage Equal Rights Comm'n*,
    874 P.2d 274 (Alaska 1994)............................................................17, 20

*Tandon v. Newsom*,
    141 S. Ct. 1294 (2021)...................................................................15

*Telescope Media Group v. Lucero*,
    936 F.3d 740 (8th Cir. 2019) .............................................. passim

*Updegrove v. Herring*,
    No. 20-cv-1141, slip op. (E.D. Va. Mar. 30, 2021) .........................18

*United States v. Burke*,
    504 U.S. 229 (1992)........................................................................20

*United States v. O'Brien*,
    391 U.S. 367 (1968).........................................................................6

*Washington v. Arlene's Flowers, Inc.*,
    441 P.3d 1203 (Wash. 2019).......................................................16, 18

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989).......................................................................10

*Warner v. Orange Cty. Dep't of Probation*,
    115 F.3d 1068 (2d Cir. 1996)........................................................15

*Wisconsin v. Mitchell*,
    508 U.S. 476 (1993).........................................................................9

*Wooley v. Maynard*,
    430 U.S. 705 (1977).......................................................................11

## Statutes, Rules and Regulations

N.Y. Civ. Rights Law § 40-c ...............................................................1, 4

N.Y. Exec. Law § 296.2(a) .................................................................1, 4

N.Y. Exec. Law § 296.2(b) ..................................................................19

42 U.S.C. § 3604(c) (1988)..................................................................14

JA1017

## STATEMENT OF *AMICI CURIAE*

The American Civil Liberties Union ("ACLU") is a nationwide, nonprofit, nonpartisan organization with approximately two million members dedicated to defending the principles of liberty and equality embodied in the Constitution. The New York Civil Liberties Union ("NYCLU") is one of the ACLU's statewide affiliates with more than 112,000 members. As organizations that advocate for First Amendment liberties as well as equal rights for lesbian, gay, bisexual, transgender, and queer ("LGBTQ") people, the ACLU, NYCLU, and their members have a strong interest in the application of proper standards when evaluating constitutional challenges to civil rights laws. The NYCLU and ACLU have appeared as either counsel-of-record or *amicus curiae* in a number of cases nationwide in which businesses providing wedding-related services challenge public accommodations on First Amendment grounds, as well as cases implicating related issues in New York.

## SUMMARY OF ARGUMENT

Plaintiffs Emilee Carpenter, LLC and Emilee Carpenter (together, "the Photography Studio") seek a constitutional right to operate a business open to the public that denies equal service to same-sex couples, in violation of the antidiscrimination provisions of New York's Human Rights Law and Civil Rights Law (together, "the Antidiscrimination Laws" or "the Laws"). N.Y. Exec. Law § 296.2(a); N.Y. Civ. Rights Law § 40-c. Like other public accommodation laws, the Antidiscrimination Laws bar businesses that are open to the public from refusing service to customers based on certain aspects of the customers' identities—including, in New York, their sexual orientation and gender identity. *Id*. Such laws help ensure LGBTQ individuals have equal opportunity to participate in the "transactions and endeavors that constitute ordinary civic life in a free society." *Romer v. Evans*, 517 U.S. 620, 631 (1996).

1

JA1018

New York unquestionably has the authority to prohibit businesses within its borders from discriminating against LGBTQ people in the sales of goods and services to the general public. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 572 (1995). The Photography Studio argues, however, that because the services it sells are "expressive" and because Ms. Carpenter objects to marriage for same-sex couples on religious grounds, the First Amendment entitles the Photography Studio to discriminate based on sexual orientation. What is more, the Photography Studio seeks a right to post on its website and tell prospective customers that it will not provide the same services to same-sex couples in violation of New York law.

The Supreme Court has never accepted arguments by businesses open to the public that the First Amendment allows them to avoid complying with antidiscrimination laws. *See Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984); *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402 n.5 (1968) (citing *Katzenbach v. McClung*, 379 U.S. 294 (1964)). Nor can businesses evade antidiscrimination laws and trigger heightened scrutiny by characterizing their services as "expressive conduct." The Antidiscrimination Laws are content- and viewpoint-neutral; they do not restrain or alter the exchange of ideas; and they do not compel businesses to speak a state-selected message. The implications of the Photography Studio's arguments are far-reaching. If the Free Speech Clause were to bar a state from applying an antidiscrimination law to the provision of wedding photography because it involves expression, then photography companies could refuse to serve interracial or interfaith couples, women, Muslims, Black people, or any other group the company's owner objects to serving. *Brush & Nib Studio, LC v. City of Phoenix* ("*B&N*"), 448 P.3d 890, 938–39 (Ariz. 2019) (Timmer, J., dissenting). And under the Photography Studio's proposed rule, because numerous sellers provide goods or services that involve expression (including stationers, printers, and other producers of custom products), a

2

JA1019

wide range of businesses could claim a First Amendment exemption from generally applicable regulations of commercial conduct.

The Photography Studio's free exercise claim fails for the same reasons as its free speech claim. Under *Employment Division, Department of Human Resources of Oregon v. Smith*, the Antidiscrimination Laws are valid, facially neutral, and generally applicable regulations. 494 U.S. 872, 879 (1990). There is no indication that the Laws cannot or would not be applied neutrally to the Photography Studio. Ms. Carpenter's "religious and philosophical objections" to the marriages of same-sex couples do not entitle her business "to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations law." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1727 (2018). Granting such an exemption, even for sincere religious objections, would severely undermine the Laws' purpose of protecting equal opportunity to participate in the marketplace. *See id.*

Finally, even if strict scrutiny applied to the Photography Studio's free speech and free exercise claims, applying the Antidiscrimination Laws to the Photography Studio's provision of commercial services would still be constitutional. The Laws further New York's compelling interest in eradicating invidious discrimination and are the least restrictive means of achieving that goal. As the Supreme Court of Nebraska explained in one of the earliest public accommodation decisions, a barber opening a shop to the public cannot say "You are a slave, or a son of a slave; therefore I will not shave you." *Messenger v. State*, 41 N.W. 638, 639 (Neb. 1889) (internal quotation marks omitted). The Photography Studio's asserted First Amendment objections run counter to the basic principle, reflected in over a century of public accommodation laws, that all people should receive equal service in American commercial life.

JA1020

**ARGUMENT**

I.  **REFUSING TO PROVIDE PHOTOGRAPHY SERVICES TO SAME-SEX COUPLES THAT ARE OFFERED TO THE PUBLIC AT LARGE IS DISCRIMINATION BASED ON SEXUAL ORIENTATION AND VIOLATES THE ANTIDISCRIMINATION LAWS.**

Although framed as a constitutional challenge to the Antidiscrimination Laws, the Photography Studio's brief avows that its proposed course of conduct is not discriminatory. The Photography Studio argues its refusal is not based on sexual orientation because it will provide *other* services to same-sex couples; it just will not photograph their weddings. Pls.' Br. 2, 13–14, ECF 3. But the Antidiscrimination Laws—like other public accommodation laws—do not merely prohibit a complete denial of *all* services to a customer. Rather, the Laws prohibit businesses from denying "*any* of the accommodations, advantages, facilities and privileges" made available to the general public to a customer because of their sexual orientation or other protected characteristic. N.Y. Exec. Law § 296.2(a) (emphasis added); *see also* N.Y. Civ. Rights Law § 40-c. As the Supreme Court of New Mexico explained in a virtually identical case that is noticeably absent from the Photography Studio's briefing, "[I]f a restaurant offers a full menu to male customers, it may not refuse to serve entrees to women, even if it will serve them appetizers." *Elane Photography, LLC v. Willock*, 309 P.3d 53, 62 (N.M. 2013).

The Photography Studio objects to providing a *service* to an entire class of customers: same-sex couples seeking photography services for their weddings. The Photography Studio asserts that it is denying services based on the message of a same-sex couples' wedding, but the so-called message is just the identity of the couple being served. If a business needs to know *who* the service is for to decide whether it will provide those services, that is identity-based discrimination. A company refusing to provide wedding photography for interracial or Jewish couples would be discriminating based on race or religion, not making a decision about any

4

"message" inherent in the product itself, even if the company said it did so because it disapproved of those unions. *See Telescope Media Grp. v. Lucero* ("*TMG*"), 936 F.3d 740, 769 (8th Cir. 2019) (Kelly, J., concurring in part and dissenting in part); *B&N*, 448 P.3d at 938 (Timmer, J., dissenting); *Elane Photography*, 309 P.3d at 78 (Bosson, J., concurring). "Where the government does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy." *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 390 (1992).

The Photography Studio's hypotheticals about what will follow from permitting New York to enforce its Antidiscrimination Laws, *see* Pls.' Br. 15, either do not actually implicate the Laws or misrepresent the relevant case law. For example, the Photography Studio's claim that, in *Athenaeum v. National Lawyers Guild, Inc.*, No. 653668/16, 2018 WL 1172597 (N.Y. Sup. Ct. Mar. 06, 2018), a New York court upheld the Human Rights Law to "force progressive bar associations to publish advertisements promoting Israel," Pls.' Br. 15, is false. The advertisement did not promote Israel; it "simply stated that Plaintiff congratulated the honorees at the dinner and listed an address," which was "not so different from many of the others appearing in the [publication]." The opinion allowed a discrimination claim under the law to proceed finding that there was a colorable claim that the bar association violated the law because it "refused the advertisement solely because Plaintiff was an Israeli corporation"—who the advertiser was, not what the advertisement said—and it was "questionable whether there is a likelihood the Guild would be perceived as endorsing any Israeli government policies as opposed to merely complying with antidiscrimination laws." *Athenaeum* 2018 WL 1172597 at *2, *4. Like the bar

JA1022

association, the Photography Studio impermissibly seeks to discriminate against a protected class

by refusing them the same services it offers others.[1]

## II.  THE FREE SPEECH CLAUSE DOES NOT AUTHORIZE A BUSINESS TO ENGAGE IN DISCRIMINATION PROHIBITED BY A REGULATION OF CONDUCT THAT INCIDENTALLY AFFECTS EXPRESSION.

### A.  The Antidiscrimination Laws Regulate Commercial Conduct and Affect Expression Only Incidentally.

When confronted with First Amendment challenges to neutral laws that regulate

commercial conduct and affect speech only incidentally, the Supreme Court has applied minimal

scrutiny and upheld the law.[2]

### 1.  Generally applicable laws that regulate commercial conduct and do not target speech receive minimal First Amendment scrutiny.

"[I]t has never been deemed an abridgement of freedom of speech or press to make a

course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried

out by means of language, either spoken, written, or printed." *Giboney v. Empire Storage & Ice

Co.*, 336 U.S. 490, 502 (1949); *see also Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456

(1978). The First Amendment is not infringed when the government enforces a generally

applicable regulation of commercial conduct against an "expressive" business. Even newspaper

---

[1] Likewise, the Photography Studio misconstrues the holding of *Jian Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433, 443 (S.D.N.Y. 2014), which declined to require a search engine to promote political statements critical of the Chinese government, where the search engine would not promote such messages regardless of the identity of the poster. *See* Pls.' Br. at 15. Nor would a baker need to include homophobic text on a cake if the baker would not write that text for any customer, regardless of identity. Further, the Antidiscrimination Laws do not make "political belief" a protected class, so the Laws do not require Democratic speechwriters to write speeches for Republican politicians if they would refuse to publish such messages regardless of the requester's identity.

[2] Even outside the commercial context, the Supreme Court has applied the deferential test set forth in *United States v. O'Brien* to determine whether regulation of expressive conduct violates the Constitution. 391 U.S. 367 (1968). Whether the Antidiscrimination Laws are evaluated under the commercial conduct cases or *O'Brien*, the result is the same: The Laws are permissible regulations of conduct that do not violate the First Amendment.

JA1023

publishers, whose very product is protected speech, can be subject "to generally applicable economic regulations" without implicating the First Amendment. *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 581 (1983). "The fact that the publisher handles news while others handle food does not . . . afford the publisher a peculiar constitutional sanctuary in which he can with impunity violate laws regulating . . . business practices." *Associated Press v. United States*, 326 U.S. 1, 7 (1945); *Associated Press v. Nat'l Labor Relations Bd.*, 301 U.S. 103, 132 (1937). In contrast, a law specifically requiring a newspaper to print particular content (or forbidding the same) directly intrudes on the First Amendment. *See, e.g.*, *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974).

Accordingly, the Supreme Court has uniformly rejected businesses' challenges to laws barring discrimination, even where those businesses dealt in expressive goods or services. *See TMG*, 936 F.3d at 762–63 (Kelly, J., concurring in part and dissenting in part) (citing *Norwood v. Harrison*, 413 U.S. 455, 469–70 (1973); *Masterpiece Cakeshop*, 138 S. Ct. at 1723–24)). For example, in *Hishon*, a law firm argued that applying Title VII to require it to consider a woman for partnership "would infringe [its] constitutional rights of expression or association." 467 U.S. at 78. Although a law firm's work product is speech, *see, e.g.*, *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 545 (2001), the *Hishon* Court dismissed the law firm's First Amendment defense, holding that there is "no constitutional right . . . to discriminate." 467 U.S. at 78 (citations omitted). By contrast, a law specifically targeting a law firm's speech by, for example, preventing it from bringing cases that "challenge existing welfare laws," would "implicat[e] central First Amendment concerns." *See, e.g.*, *Velazquez*, 531 U.S. at 547–48.

The Photography Studio asserts that its photography and blog are protected speech. Pls.' Br. 6–8. But the Antidiscrimination Laws do not tell the company how to frame its shots, edit its

7

photographs, which moments to capture, or what to include in its blog posts; they regulate only the sale of its services to the public. Businesses that provide photography services to the public are just as subject to generally applicable regulations of their commercial conduct as newspapers and law firms.[3] As the Supreme Court of New Mexico held, where "[a photography studio] is a public accommodation, its provision of services can be regulated" consistent with the First Amendment, "even though those services include artistic and creative work." *Elane Photography*, 309 P.3d at 66; *see also id.* at 59, 71 ("[T]here is no precedent to suggest that First Amendment protections allow such individuals or businesses to violate antidiscrimination laws."). A video game business, though producing artistic expressions, is not exempt from the Fair Labor Standards Act's prohibition against hiring child laborers. Nor is a tattoo parlor exempt from a health code regulation governing the disposal of needles. Such businesses are likewise not exempt from antidiscrimination laws.

Thus, even though the Photography Studio's work product involves creativity, that "hardly means" that any regulation of its business operations "should be analyzed as one regulating [its] speech rather than conduct." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.* ("*FAIR*"), 547 U.S. 47, 62 (2006). The relevant question is not the nature of a business's product, but whether the Antidiscrimination Laws target expression or prohibit a course of conduct. Here, they prohibit conduct: discrimination in the provision of goods and services. *See id.* (finding no "abridgement of freedom of speech" when a law "make[s] a course of conduct

---

[3] Contrary to the Photography Studio's claims, the Antidiscrimination Laws do not "require special access for certain content" on its website or blog. Pls.' Br. 8–9. Just as with any other business, the Laws regulate customers' access to the website and blog, not content of the blog posts. *See Andrews v. Blick Art Materials, LLC*, 268 F. Supp. 3d 381, 385, 404 (E.D.N.Y. 2017) (holding blind customers have a right to effective access to retailers' websites under the Antidiscrimination Laws).

8

illegal" even where "the conduct was in part initiated, evidenced, or carried out by means of language" (internal quotation marks omitted)).

    2.  <u>The Antidiscrimination Laws are content- and viewpoint-neutral, so there is no reason to apply strict scrutiny.</u>

"[F]ederal and state anti-discrimination laws" are "an example of a permissible content-neutral regulation of conduct." *Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993). Public accommodation laws do not "target speech or discriminate on the basis of its content"; they prohibit "the act of discriminating against individuals in the provision of publicly available goods, privileges, and services." *Hurley*, 515 U.S. at 572*; see also Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 694–95 (2010) (antidiscrimination policies are "textbook viewpoint neutral"); *Bd. of Directors of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987).

Seeking to avoid the minimal scrutiny the Supreme Court has applied to generally applicable regulations of commercial conduct, the Photography Studio argues that the Antidiscrimination Laws are content- and viewpoint-based because they tolerate only viewpoints "celebrating" a same-sex couple's marriage. Pls.' Br. 15–17. But the Laws would *also* prohibit a photography studio from selling wedding photography services to *same-sex* couples while denying those same services to *heterosexual* couples. Instead, the Laws prohibit businesses from refusing to provide goods and services on grounds of customers' sexual orientation, regardless of business' views on marriage or any other subject. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 623–24 (1984); *see also Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 763 (1994) (reasoning that "the fact that [an] injunction cover[s] people with a particular viewpoint does not . . . render the injunction content or viewpoint based").

The Photography Studio also argues that the Antidiscrimination Laws are content-based

9

JA1026

because they are triggered by the business's decision to offer wedding photography services as opposed to photographing other subject matters, such as "wildlife." Pls.' Br. 16. But the Photography Studio misunderstands how the Laws' equal-treatment requirements work; they apply to all photography services, *including* wildlife photography. A company may not refuse to provide wildlife photography services for a Black customer if the company would provide the same for a white customer. That is, the Laws require a company to provide a service only to the extent that it would provide the same service to similarly situated customers without regard to sexual orientation (or race or religion). The relevant inquiry is not whether *application* of a law would cause businesses to create products reflecting content to which they object. The question is whether the *law itself* draws distinctions based on content. The Antidiscrimination Laws do not "target speech or discriminate on [that] basis." *Hurley*, 515 U.S. at 572.

The Photography Studio ignores the unanimous decision in *Elane Photography*, 309 P.3d at 62–63, and relies on the sharply divided rulings in *TMG*, 936 F.3d 740, and *B&N*, 448 P.3d 890, and a district court ruling in *Chelsey Nelson Photography LLC v. Louisville/Jefferson City Metro Government*, No. 19-cv-851, 2020 WL 4745771 (W.D. Ky. Aug. 14, 2020). Pls.' Br. 10–11, 13, 26. Those cases wrongly reasoned that antidiscrimination laws as applied to commercial wedding services were content-based because they required the creation of products related to the topic of same-sex weddings. But as the dissent correctly notes in *TMG*, "just because the [videographers] want to sell services that are in some manner 'expressive' does not mean that [the State's] content-neutral regulation of those services suddenly becomes content based." 936 F.3d at 775–76. Content-neutral regulations of even pure speech are common and uncontroversial. *See, e.g.*, *Ward v. Rock Against Racism*, 491 U.S. 781, 797–98 (1989) (holding municipal noise regulation did not violate free speech rights of music performers).

### B. Any "Compelled Expression" Is Incidental to the Law's Regulation of the Conduct of Sales and Does Not Alter the First Amendment Analysis.

The Photography Studio's objection that the Antidiscrimination Laws compel it to express a message with which it disagrees, Pls.' Br. 8–14, does not alter the analysis. The Laws require no state-mandated messages. Just as it would not impermissibly "compel speech" for a state to prohibit a photography studio that offers corporate headshots to the public from refusing to provide the same portraits for female employees that it provides for male employees, New York does not impermissibly "compel speech" by requiring that the Photography Studio offer same-sex couples the same services it offers heterosexual couples. The Laws do not compel the creation of any content, let alone content on a particular topic.[4]

The Photography Studio's reliance on *Hurley*, *id.* at 4, 8–11, 22, is also misplaced. *Hurley* involved a "peculiar" application of a public accommodation law to a privately organized and "inherent[ly] expressive[]" parade. *Hurley*, 515 U.S. at 568, 572. The Court found this application impermissible because, instead of regulating conduct with only an incidental effect on expression, it regulated nothing *but* expression—the content of the private parade sponsor's speech. *Id.* at 573. Here, the Photography Studio is a business providing services to the public, not a private expressive association. *Hurley* itself distinguished the standard application of public accommodation laws to such businesses as constitutional. *See id.* at 578.[5] To expand *Hurley*'s

---

[4] The Photography Studio mistakenly relies on cases not applicable to this context, as the Antidiscrimination Laws do not target particular kinds of speech or types of public accommodations. Pls.' Br. 8–9 (citing *Burns v. Martuscello*, 890 F.3d 77, 87 (2d Cir. 2018) (challenging a particular prisoner's punishment for refusing to serve as an informant and involving no public accommodation or "generally applicable policy or regulation"); *Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233, 246 (2d Cir. 2014) (challenging not a public accommodations law but a law compelling particular businesses (pregnancy centers) to disclose specific information)).

[5] The other compelled speech cases that the Photography Studio cites are not on point. Pls.' Br. 5, 10. *Wooley v. Maynard*, for example, involved a law requiring citizens to display the state-selected message "Live Free or Die" on their license plates. 430 U.S. 705, 715 (1977).

holding would put courts in the impossible "business of deciding which businesses are sufficiently artistic to warrant exemptions from non-discrimination laws." *Elane Photography*, 309 P.3d at 71. Such a result would be contrary to Supreme Court precedent and create an unworkable standard. Indeed, characterizing the Laws as compelling speech based only on the service provided by the business would create the very "limitless principle" that the Photography Business claims to be concerned about. Pls.' Br. at 14.[6]

This case is also dramatically different from cases in which the Supreme Court struck down content-based laws that required businesses to publish particular messages. In *Tornillo*, 418 U.S. 241, a statute required newspapers that published attacks on political candidates to allow the candidates free space for a written reply in the newspaper itself. And in *Pacific Gas & Electric Co. v. Public Utilities Commission of California*, a state agency ordered a utility company to mail the newsletter of an environmental group to its customers. 475 U.S. 1 (1986). Both the challenged laws favored opposing speech in a content-based way: The right of reply was triggered by certain content, and the regulation imposed a content-based penalty. Here, the Antidiscrimination Laws require just that businesses open to the public offer the same goods and services to heterosexual couples as they do to same-sex couples. Any effect on speech is entirely

---

Similarly, *Jian Zhang* rejected plaintiffs' request to force an internet search engine to display political content. 10 F. Supp. 3d at 434, 440. The Antidiscrimination Laws do not require expression of any state-chosen message. The third case cited did not deal with applying antidiscrimination laws to businesses acting as public accommodations. *Claybrooks v. Am. Broad. Companies*, 898 F. Supp. 2d 986, 998–99 (M.D. Tenn. 2012).

[6] The decisions in *TMG*, 936 F.3d 740, *B&N*, 448 P.3d 890, and *Nelson Photography*, 2020 WL 4745771, mistakenly invite courts to apply different First Amendment standards based on the nature of the services sold. Such a shifting standard is neither consistent with precedent nor susceptible to clear or uniform application. Indeed, advocates for treating custom wedding cakes as protected speech failed to articulate a workable test when questioned at oral argument, and the Supreme Court declined to grant them such an exemption. *See* Oral Arg. Tr. 11–19, *Masterpiece Cakeshop*, 138 S. Ct. 1719.

JA1029

incidental and does not compel the creation of content. *See TMG*, 936 F.3d at 772–73 (Kelly, J., concurring in part and dissenting in part); *B&N*, 448 P.3d at 932 (Bales, J., dissenting); *Elane Photography*, 309 P.3d at 63–70. For that reason, the Laws are also distinguishable from the alleged compelled speech at issue in *New Hope Family Services, Inc. v. Poole*, which involved the requirement that an adoption agency state their recommendation as to whether it would be in the best interests of a child to be adopted by particular applicants. 966 F.3d 145, 171 (2d Cir. 2020). Here, the Photography Studio is subject to no such requirement.

Even where, unlike here, a law requires entities to speak particular words or provide access for third-party speakers, the Supreme Court has rejected First Amendment challenges if the law regulates conduct and any compulsion to speak is incidental. In *FAIR*, a coalition of law schools argued that a law requiring them to provide equal access both to military and non-military recruiters compelled them to endorse military recruiters' message of discrimination embodied in the Don't Ask, Don't Tell policy; the schools particularly objected on First Amendment grounds that they would have to send e-mails and post bulletin board messages on those recruiters' behalf. 547 U.S. at 52–54, 61–62. The Supreme Court rejected the claim, reasoning that "[a]s a general matter, the [law] regulates conduct, not speech. It affects what law schools must *do*—afford equal access to military recruiters—not what they may or may not *say*." *Id.* at 60; *cf. Expressions Hair Design v. Schneiderman*, 137 S. Ct. 1144, 1150–51 (2017). (explaining that a law requiring a restaurant to charge $10 for sandwiches would not unconstitutionally compel speech despite the fact that the restaurant will "have to put '$10' on its menus or have its employees tell customers that price").

13

JA1030

### C.  The Free Speech Clause Does Not Protect a Public Accommodation's Right to Publish Its Unlawful Policy of Discrimination.

Just as there is no constitutional right to discriminate, there is no concomitant right to publish a policy of discrimination. The Supreme Court has explicitly disapproved of businesses posting signs saying "no goods or services will be sold if they will be used for gay marriages," as they would "impose a serious stigma on gay persons." *Masterpiece Cakeshop*, 138 S. Ct. at 1728–29. In *FAIR*, the Court explained that the government "can prohibit employers from discriminating in hiring on the basis of race. The fact that this will require an employer to take down a sign reading 'White Applicants Only' hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct." 547 U.S. at 62. Otherwise, longstanding bans on discriminatory advertisements in employment, housing, and public accommodations would have to be struck down on free speech grounds. *See, e.g.*, 42 U.S.C. § 3604(c) (1988); *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 389 (1973) ("Any First Amendment interest . . . is altogether absent when the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity."). Accordingly, the Free Speech Clause does not authorize the Photography Studio to publish a notice on its website of its intent to discriminate.

### III.  THE ANTIDISCRIMINATION LAWS ARE FULLY CONSISTENT WITH THE RELIGION CLAUSES OF THE FIRST AMENDMENT.

The Photography Studio contends that the Antidiscrimination Laws violate the Establishment and Free Exercise Clauses ("Religion Clauses") by compelling it "to participate in and celebrate religious ceremonies [it] objects to." Pls.' Br. 19–21. But the Laws do no such thing. They do not require that Ms. Carpenter "verbally encourage[] the wedding party to celebrate the wedding, follow[] the officiant's instructions, sing[], and engage[] with the prayers." *Id*. at 20. They only require that the Photography Studio offer the same *photography*

14

JA1031

services to same-sex and heterosexual couples.[7] As the Supreme Court explained in *Smith*, "the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." 494 U.S. at 879 (internal quotations omitted).[8]

The Photography Studio's citation of *Masterpiece Cakeshop*, 138 S. Ct. at 1727, *see* Pls.' Br. 19—for the proposition that requiring clergy to perform the wedding of any couple, whether same-sex or heterosexual, violates the Free Exercise Clause—demonstrates this point. The Antidiscrimination Laws do not apply to clergy, and neither Ms. Carpenter nor the Photography Studio is a member of the clergy performing a marriage ceremony. *See Masterpiece Cakeshop*, 138 S. Ct. at 1727. The Photography Studio is a commercial enterprise offering its services to the public and does not receive the same exemptions. The Court in *Masterpiece Cakeshop* also anticipated and rejected the argument that its reasoning applies beyond clergy: to hold that commercial services qualify as participation in the ceremony would raise a host of issues "that

---

[7] The cases cited to support the Photography Studio's argument that the Antidiscrimination Laws violate the Religion Clauses are inapplicable because they involve instances of coercion or mandatory participation in religious acts, where the Laws require no such participation. *See Doe v. Phillips*, 81 F.3d 1204, 1206, 1210 (2d Cir. 1996) (prosecutor coerced individual to swear her innocence on a Bible in a church to have charges dismissed); *Lee v. Weisman*, 505 U.S. 577, 580, 599 (1992) (public school included prayers by clergy in graduation ceremonies and "young graduates who object[ed] [we]re induced to conform"); *Warner v. Orange Cty. Dep't of Probation*, 115 F.3d 1068, 1069 (2d Cir. 1996) (probation conditioned on participation in a religious program).

[8] The recent opinion in *Fulton v. City of Philadelphia*, does not change this analysis, because it simply restates the *Smith* rule that neutral and generally applicable laws—like the Antidiscrimination Laws—do not trigger strict scrutiny. No. 19-123, slip op. at 2 (U.S. June 17, 2021). Unlike the contract at issue in *Fulton*, the Antidiscrimination Laws are generally applicable as they do not contain a mechanism for offering individualized, discretionary exemptions. *Id.* at 8. Indeed, there are no exemptions in the Antidiscrimination Laws that would grant the relief that the Photography Studio seeks. Further, the Court's order in *Tandon v. Newsom* likewise left *Smith* intact, and *Tandon* was not a decision on the merits, as the Court has not granted a petition for writ of certiorari in the case. 141 S. Ct. 1294 (2021) (*per curiam*).

JA1032

seem all but endless." *Id*. at 1723.

Adopting such a broad definition of "participation"—and extending the rules applicable to clergy to all businesses—would, as the Supreme Court has noted, mean that "a long list of persons who provide goods and services for marriages and weddings might refuse to do so for gay persons, thus resulting in a community-wide stigma inconsistent with the history and dynamics of civil rights laws that ensure equal access to . . . public accommodations." *Id*. at 1727. The Religion Clauses do not require that result.[9] The Antidiscrimination Laws leave the Photography Studio to decide "[t]he degree to which [photographers] voluntarily involve[] [themselves] in an event outside the scope of services [they] must provide to all customers on a non-discriminatory basis." *Washington v. Arlene's Flowers, Inc.*, 441 P.3d 1203, 1213 (Wash. 2019), *petition for cert. filed*, No. 19-333 (U.S. Sept. 12, 2019).

## IV. THE ANTIDISCRIMINATION LAWS SATISFY EVEN STRICT SCRUTINY.

Although, as shown above, application of the Antidiscrimination Laws fails to trigger strict scrutiny, application of the Laws would be constitutional even if strict scrutiny applied.

### A. New York Has a Compelling Interest in Eradicating Discrimination.

Antidiscrimination laws ensure "society the benefits of wide participation in political, economic, and cultural life." *Roberts*, 468 U.S. at 625; *see also Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 733–34 (2014). In *Masterpiece Cakeshop*, the Supreme Court affirmed that it is "unexceptional" that the "law can protect gay persons, just as it can protect other classes of individuals, in acquiring whatever products and services they choose on the same terms and conditions as are offered to other members of the public." 138 S. Ct. at 1728. And the Court has

---

[9] Even if the "hybrid rights" claim asserted by the Photography Studio existed—and the Photography Studio acknowledges that such a claim does not, Pls.' Br. 21–22—there is none here because the Photography Studio's free speech claim fails.

JA1033

recognized repeatedly that the government has a compelling interest in "eliminating discrimination and assuring its citizens equal access to publicly available goods and services." *Roberts*, 468 U.S. at 624.

Contrary to the Photography Studio's suggestion, the harm of being refused service because of one's identity is not erased just because a customer might be able to obtain goods elsewhere. *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 250 (1964) (reasoning antidiscrimination laws "vindicate the deprivation of personal dignity that surely accompanies denials of equal access to public establishments" (internal quotation marks omitted)). "The government views acts of discrimination as independent social evils even if the prospective [customers] ultimately find" the goods or services they sought. *Swanner v. Anchorage Equal Rights Comm'n*, 874 P.2d 274, 283 (Alaska 1994).

*TMG*, *B&N*, and *Nelson Photography*, relied on by the Photography Studio, all recognize that the eradication of discrimination in the provision of goods and services is a compelling government interest.[10] But by concluding that this interest does not apply in the context of businesses that provide services to create custom expressive products, those courts misunderstood the nature of the harm addressed by laws against discrimination. "The argument that victims of discrimination are free to go elsewhere carries little force. Antidiscrimination laws . . . were passed to guarantee equal access to *all* goods and services otherwise available to the public." *TMG*, 936 F.3d at 777 (Kelly, J., concurring in part and dissenting in part). *See also Heckler v. Mathews*, 465 U.S. 728, 739 (1984) ("[D]iscrimination itself . . . can cause serious

---

[10] *See TMG*, 936 F.3d at 754 ( "ensuring . . . equal enjoyment of public accommodations . . . is compelling" (internal quotation marks omitted)); *Nelson Photography*, 2020 WL 4745771 at *11 (ensuring same-sex couples "will not be turned away" is "unquestionably compelling" (internal quotation marks omitted)); *B&N*, 448 P.3d at 914 ("ensuring equal access to publicly available goods and services for all citizens, regardless of their status" is "compelling").

JA1034

non-economic injuries."); *Heart of Atlanta Motel*, 379 U.S. at 292 (Goldberg, J., concurring) ("Discrimination is not simply dollars and cents, hamburgers and movies; it is the humiliation, frustration, and embarrassment that a person must surely feel when he is told that he is unacceptable as a member of the public . . ." (internal quotation marks omitted)). And the Photography Studio's assertion that there is no "actual problem" of businesses discriminating against same-sex couples seeking wedding services, Pls.' Br. 22, is belied by the many businesses in recent years seeking court approval to do just that. *See generally Masterpiece Cakeshop*, 138 S. Ct. 1719; *Gifford v. McCarthy*, 23 N.Y.S.3d 422 (N.Y. App. Div. 2016); *Arlene's Flowers*, 441 P.3d 1203; *303 Creative LLC v. Elenis*, No. 16-cv-02372, 2017 WL 4331065 (D. Colo. 2017); *Nelson Photography*, 2020 WL 4745771; *Updegrove v. Herring*, No. 20-cv-1141, slip op. (E.D. Va. Mar. 30, 2021); *B&N*, 448 P.3d 890; *Elane Photography*, 309 P.3d 53; *see also TMG*, No. 16-cv-04094, slip op. at 6 (D. Minn. Apr. 21, 2021) (describing the case as "a smoke and mirrors case or controversy from the beginning, likely conjured up by Plaintiffs to establish binding First Amendment precedent rather than to allow them to craft wedding videos, of which they have made exactly two").

That same compelling interest in ending discrimination remains even where the product at issue is expressive. *See TMG*, 936 F.3d at 776–78 (Kelly, J., concurring in part and dissenting in part); *B&N*, 448 P.3d at 929–931 (Bales, J., dissenting). By contending that New York lacks a compelling interest in prohibiting refusal of wedding-related services to same-sex couples, the Photography Studio essentially disagrees that its conduct is discriminatory. Pls.' Br. 22. But refusing to offer services to same-sex couples on the same basis as it does other clients *is* discrimination. *See supra* Part I.

Contrary to the Photography Studio's assertion, the Antidiscrimination Laws contain only

two narrow exemptions, Pls.' Br. 22–23, which do not undermine the state's compelling

interest.[11] To be clear, the question is not whether there is a compelling governmental interest in

denying the Photography Studio an exemption, *see Fulton*, No. 19-123, slip op. at 14–15,

because there are no existing, discretionary exemptions that are available to others that the state

refused to extend to the Photography Studio. While there are two exceptions in the law, they are

neither applicable to this situation nor comparable to the exemption sought here. The first

permits room rentals based on sex, N.Y. Exec. Law § 296.2(b), which does not apply at all to the

Photography Studio, and concerns people's ongoing housing arrangements that are in no way

analogous to wedding-related services.[12] The second permits barring a person from a public

accommodation based on sex for bona fide public policy considerations where approved by the

division of human rights. *Id.* That too is not applicable to a business like the Photography Studio.

In fact, the Photography Studio is already offering the exact same service to couples including

people of both sexes, so an exemption "barring" customers because of sex does not apply.

### B. Uniform Enforcement of the Antidiscrimination Laws Is the Least Restrictive Means for Furthering the State's Compelling Interest.

Because the most carefully tailored way to ensure equal treatment is to prohibit

---

[11] *Battaglia v. Buffalo Niagara Introductions, Inc.* does not create any exemption as the division of human rights found that the behavior complained of was not discrimination based on disability at all, since the complainant was denied service due to a "legitimate consideration for safety." No. 10138581, slip op. at 5 (N.Y. State Div. of Hum. Rts. Jan. 28, 2012).

[12] Likewise, the exemption contained in N.Y. Exec. Law § 296.11 does not create an exemption from the provisions of the Antidiscrimination Laws at issue here, nor does it apply to businesses like the Photography Studio. That exemption only applies to religious institutions or entities controlled by a religious institution—which the Photography Studio does not claim to be—and merely "carved out a narrow exception for preference * * * in employment, housing, and admissions." *Scheiber v. St. John's Univ.*, 84 N.Y.2d 120, 126–27 (N.Y. 1994) (internal quotation marks omitted). The exemption thus does not apply to the provision of commercial goods and services. Further, it "does not license a religious employer to engage in wholesale discrimination," only permitting such entities to exhibit a "preference . . . for persons of the same faith where that action is calculated by the institution to effectuate its religious mission," *id.* at 126–27, which is not the relief the Photography Studio seeks.

19

discrimination, the Laws are "precisely tailored" to achieve its interest. *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 800 (1988). Every instance of discrimination "causes grave harm to its victims." *United States v. Burke*, 504 U.S. 229, 238 (1992). Because of the harms associated with each instance of invidious discrimination, there is simply no "numerical cutoff below which the harm is insignificant." *Swanner*, 874 P.2d at 282.

The Photography Studio also contends that the Antidiscrimination Laws are not narrowly tailored because New York could choose, as it alleges other jurisdictions have done, to apply the Law only to businesses that are "essential or non-expressive or non-internet businesses" or, alternatively, to *not* apply to "highly selective entities," or "individuals and small businesses that celebrate weddings." Pls.' Br. 23–25. But the Antidiscrimination Laws are tailored to *New York's* interest, which it achieves by applying the Laws to the extent that businesses offer goods and services to the general public. And the existence of unrelated exceptions, as described above, does not undermine the compelling governmental interest in uniform enforcement of the laws here, where there are no applicable exemptions.

Because they are narrowly tailored to serve a compelling interest in eradicating discrimination in the commercial market, the Antidiscrimination Laws satisfy any standard of review, including strict scrutiny.

## **CONCLUSION**

The Photography Studio's motion for a preliminary injunction should be denied and the motion to dismiss should be granted.

JA1037

Respectfully submitted,

*/s/ Gabriella Larios*
GABRIELLA LARIOS
ROBERT HODGSON
New York Civil Liberties Union
125 Broad Street, 19th Floor
New York, NY 10004
Phone: (212) 607-3317
Fax: (212) 607-3318
glarios@nyclu.org
rhodgson@nyclu.org

LINDSEY KALEY
RICCA PRASAD
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2500
lkaley@aclu.org
rprasad@aclu.org

*Counsel for Amici Curiae*

Dated: July 2, 2021
        New York, N.Y.

21

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK
## ROCHESTER DIVISION

EMILEE CARPENTER, LLC *doing business as*
EMILEE CARPENTER PHOTOGRAPHY and
EMILEE CARPENTER,

> *Plaintiffs,*

v.

LETICIA JAMES, *in her official capacity as*
*Attorney General of New York*, JOHNATHAN J.
SMITH, *in his official capacity as Interim*
*Commissioner of the New York State Division*
*of Human Rights*, and WEEDON WETMORE, *in*
*his official capacity as District Attorney of*
*Chemung County*,

> *Defendants.*

Case No. 6:21-cv-06303-FPG

---

**BRIEF OF RELIGIOUS AND CIVIL-RIGHTS ORGANIZATIONS AS *AMICI CURIAE***
**IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**
**AND IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

---

RICHARD B. KATSKEE*
KENNETH D. UPTON, JR.*
SARAH R. GOETZ*
   *Americans United for Separation of*
     *Church and State*
   *1310 L Street NW, Suite 200*
   *Washington, DC 20005*
   *(202) 466-3234*
   *(202) 466-3353 (fax)*
   *katskee@au.org*

FERNANDO SANTIAGO
   *Santiago Burger LLP*
   *2280 East Avenue, 2nd Floor*
   *Rochester, NY 14610*
   *(585)_563-2400*
   *(585) 563-7526 (fax)*
   *fernando@litgrp.com*

*\* Admitted pro hac vice.*

# TABLE OF CONTENTS

**Page(s)**

Table of Authorities ........................................................................................................ ii

Identity and Interests of *Amici Curiae* ............................................................................ 1

Introduction and Summary of Argument .......................................................................... 2

Argument ........................................................................................................................... 3

I.    The Religion Clauses Neither Require Nor Authorize The Exemption That
Plaintiffs Seek. .......................................................................................................... 3

    A.    The Religion Clauses do not require the requested exemption. .................... 4

        1.    The public-accommodations law evinces no hostility toward religion. .............. 4

        2.    The public-accommodations law does not coerce Carpenter to
participate in religious activity. ........................................................ 12

    B.    The Establishment Clause forbids the requested exemption. ....................... 13

II.    Antidiscrimination Laws Protect Religious Freedom ............................................. 17

Conclusion ........................................................................................................................ 20

JA1040

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. ACLU,*
542 U.S. 656 (2004).................................................................................11

*Battaglia v. Buffalo Niagara Introductions, Inc.,*
No. 10138581 (N.Y. Div. Hum. Rights Jan. 28, 2012) ............................8

*Bostock v. Clayton County,*
140 S. Ct. 1731 (2020)............................................................................9

*Bray v. Alexandria Women's Health Clinic,*
506 U.S. 263 (1993).................................................................................10

*Brown v. Bd. of Educ.,*
347 U.S. 483 (1954).................................................................................16

*Cent. Rabbinical Cong. of U.S. & Can. v. N.Y.C.*
*Dep't of Health & Mental Hygiene,*
763 F.3d 183 (2d Cir. 2014)..................................................................5, 6

*Christian Legal Soc'y v. Martinez,*
561 U.S. 661 (2010).................................................................................10

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993).........................................................................2, 4, 5, 6, 10

*Corp. of the Presiding Bishop v. Amos,*
483 U.S. 327 (1987).................................................................................15

*County of Allegheny v. ACLU Greater Pittsburgh Chapter,*
492 U.S. 573 (1989).................................................................................12

*Cutter v. Wilkinson,*
544 U.S. 709 (2005).............................................................................13, 15

*Emp. Div. v. Smith,*
494 U.S. 872 (1990).........................................................................4, 5, 6

*Epperson v. Arkansas,*
393 U.S. 97 (1968)..................................................................................3

*Estate of Thornton v. Caldor, Inc.,*
472 U.S. 703 (1985).........................................................................3, 13, 14

*Fatihah v. Neal,*
No. 6:16-cv-00058-KEW (E.D. Okla. Feb. 17, 2016) ..........................19

JA1041

*Fields v. City of Tulsa*,
    753 F.3d 1000 (10th Cir. 2014) ................................................................13

*Fulton v. City of Philadelphia*,
    __ U.S. __, No. 19-123 (June 17, 2021) .............................................5, 7, 9, 10, 11

*Heart of Atlanta Motel, Inc. v. United States*,
    379 U.S. 241 (1964) ....................................................................11, 12, 16, 17

*Henderson v. Kennedy*,
    253 F.3d 12 (D.C. Cir. 2001) ...............................................................18

*Hernandez v. C.I.R.*,
    490 U.S. 680 (1989) .........................................................................5

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
    565 U.S. 171 (2012) ........................................................................15

*Huri v. Office of the Chief Judge*,
    804 F.3d 826 (7th Cir. 2015) .................................................................19

*Khedr v. IHOP Restaurants, LLC*,
    197 F. Supp. 3d 384 (D. Conn. 2016) ...........................................................19

*Lawrence v. Texas*,
    539 U.S. 558 (2003) ........................................................................10

*Lee v. Weisman*,
    505 U.S. 577 (1992) ........................................................................12

*Leebaert v. Harrington*,
    332 F.3d 134 (2d Cir. 2003) ..................................................................10

*Loving v. Virginia*,
    388 U.S. 1 (1967) ..........................................................................10

*Lyng v. Nw. Indian Cemetery Protective Ass'n*,
    485 U.S. 439 (1988) .........................................................................5

*Martineau v. Ghezzi*,
    389 F. Supp. 187 (N.D.N.Y. 1974) ...............................................................9

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*,
    138 S. Ct. 1719 (2018) ..............................................................10, 11, 15, 16

*McCreary County v. ACLU of Ky.*,
    545 U.S. 844 (2005) .........................................................................3

*McGowan v. Maryland*,
    366 U.S. 420 (1961) .........................................................................5

*Minnesota ex rel. McClure v. Sports & Health Club, Inc.*,
    370 N.W.2d 844 (Minn. 1985) ..................................................................19

JA1042

*Morgan v. Zaharo Cab Corp.*,
No. 10117888 (N.Y. Div. Hum. Rights Nov. 14, 2008) ................................................8

*Nappi v. Holland Christian Home Ass'n*,
No. 11-cv-2832, 2015 WL 5023007 (D.N.J. Aug. 21, 2015) ................................19

*New Hope Family Servs., Inc. v. Poole*,
966 F.3d 145 (2d Cir. 2020) ................................................................................4

*Newman v. Piggie Park Enters., Inc.*,
390 U.S. 400 (1968) ......................................................................................18

*Obergefell v. Hodges*,
576 U.S. 644 (2015) ......................................................................................10

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
140 S. Ct. 2049 (2020) ................................................................................3, 15

*Paletz v. Adaya*,
No. B247184, 2014 WL 7402324
(Cal. Ct. App. Dec. 29, 2014) ................................................................................19

*Prince v. Massachusetts*,
321 U.S. 158 (1944) ......................................................................................14

*Reynolds v. United States*,
98 U.S. 145 (1878) ........................................................................................4

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984) ....................................................................10, 11, 16, 17

*Romer v. Evans*,
517 U.S. 620 (1996) ......................................................................................18

*Sherbert v. Verner*,
374 U.S. 398 (1963) ......................................................................................14

*Stormans, Inc. v. Selecky*,
586 F.3d 1109 (9th Cir. 2009) ................................................................................6

*Tandon v. Newsom*,
141 S. Ct. 1294 (2021) ................................................................................5, 6

*Texas Monthly, Inc. v. Bullock*,
489 U.S. 1 (1989) ....................................................................................14, 15

*Town of Greece v. Galloway*,
572 U.S. 565 (2014) ......................................................................................12

*Turner v. Safley*,
482 U.S. 78 (1987) ........................................................................................10

*United States v. Lee*,
455 U.S. 252 (1982) ....................................................................................6, 14

JA1043

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) ........................................................................................................14

**Constitutions and Statutes**

U.S. Const. amend. I ...................................................................................................... *passim*

N.Y. Exec. Law § 292.9 ..........................................................................................................7

N.Y. Exec. Law § 296.1 ..........................................................................................................7

N.Y. Exec. Law § 296.2 .......................................................................................................2, 3

N.Y. Exec. Law § 296.5 ..........................................................................................................7

N.Y. Exec. Law § 296.11 ........................................................................................................7

2002 N.Y. Sess. Laws A.1971 .................................................................................................8

**Other Authorities**

James Madison, Memorial and Remonstrance Against Religious
    Assessments (1785), reprinted in *Everson v. Bd. of Educ.*,
    330 U.S. 1 (1947) .........................................................................................................14, 15

CHRISTY MALLORY ET AL., WILLIAMS INST., THE IMPACT OF STIGMA
    AND DISCRIMINATION AGAINST LGBT PEOPLE IN TEXAS (2017),
    https://bit.ly/2UtopRq ........................................................................................................17

Brent Staples, *Traveling While Black: The Green Book's Black History*,
    N.Y. TIMES (Jan. 25, 2019), https://nyti.ms/3aaPiAB .........................................................17

JA1044

**IDENTITY AND INTERESTS OF *AMICI CURIAE***

*Amici* are religious and civil-rights organizations that are united in respecting the important but distinct roles of religion and government in our Nation. *Amici* represent diverse faiths and beliefs while sharing a commitment to ensuring that LGBTQ persons, and all people, remain free from officially sanctioned discrimination. When government grants religion-based exemptions from antidiscrimination laws, it favors the benefited religious beliefs over the religious beliefs, core values, and fundamental rights of others. The exemptions thus convey not only governmental preference for the benefited religion, but also official disregard toward other faiths and beliefs—including disfavor for the deep commitment of *amici* and their members to equal respect for and equal treatment of all people. The *amici* are:

- Americans United for Separation of Church and State.

- ADL (Anti-Defamation League).

- Bend the Arc: A Jewish Partnership for Justice.

- Central Conference of American Rabbis.

- Global Justice Institute, Metropolitan Community Churches.

- Hindu American Foundation.

- Men of Reform Judaism.

- Methodist Federation for Social Action.

- National Council of Jewish Women.

- New York Conference, United Church of Christ.

- Reconstructionist Rabbinical Association.

- Union for Reform Judaism.

- Women of Reform Judaism.

1

JA1045

## INTRODUCTION AND SUMMARY OF ARGUMENT

New York law requires that public accommodations serve all comers regardless of their sexual orientation. *See* N.Y. Exec. Law § 296.2(a). The law thus ensures that LGBTQ people do not suffer the stigma and degradation of discrimination when they seek to buy goods and services on the same terms as everyone else.

Because we live in a Nation that is defined by its religious pluralism, the many and varied beliefs among the citizenry make it inevitable that secular laws—including New York's public-accommodations law—will at times offend some people's religious sensibilities. The Supreme Court's Religion Clause jurisprudence specifically addresses those situations.

First of all, while religion and religious practices may not be specially disfavored, there is no Free Exercise Clause violation when a law that regulates conduct for valid secular purposes and in a nondiscriminatory manner incidentally burdens some religious exercise. *See, e.g.*, *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531–32 (1993). Section 296.2 is just such a law. To protect the equal rights and equal dignity of all people, New York prohibits discrimination in places of public accommodation on the basis of "race, creed, color, national origin, sexual orientation, gender identity or expression, military status, sex, disability or marital status," regardless of the motivation for the discrimination. To make good on that guarantee, including its protections against religious discrimination for all New Yorkers, businesses that open themselves to the public must provide equal service to members of those protected classes even if they would prefer not to, whether based on religious motivations or otherwise. As a matter of law, that requirement does not amount to a free-exercise violation.

Indeed, not only is there no free-exercise right to discriminate in the operation of public accommodations, but the Establishment Clause forbids it. For if in exempting religious exercise from general laws, government shifted material costs, burdens, or other harms to third parties, it

2

JA1046

would impermissibly favor the benefited religion and its adherents over the beliefs, rights, and interests of nonbeneficiaries. *See, e.g.*, *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 709–10 (1985). The religious exemption that Carpenter seeks would do exactly that, by elevating the business's religious views over the religious beliefs and equal civil rights of LGBTQ people.

Exempting businesses from the law so that they may refuse service to customers who do not conform to their religious views would undermine, not advance, religious freedom. As noted, § 296.2 prohibits not just sexual-orientation discrimination but also religious, racial, and other forms of invidious discrimination in public accommodations. A sweeping exemption for religiously motivated discrimination to permit Carpenter to deny equal service to same-sex couples would necessarily also permit businesses to deny service to people of the "wrong" religion—or race, or sex, or any other characteristic protected by the law. A ruling in Carpenter's favor would thus hamstring New York's ability to ensure that its citizens can live as equal members of the community regardless of faith or belief.

## ARGUMENT

## I.  THE RELIGION CLAUSES NEITHER REQUIRE NOR AUTHORIZE THE EXEMPTION THAT PLAINTIFFS SEEK.

The First Amendment's Religion Clauses work in tandem to safeguard religious freedom for all by barring both governmental favoritism and governmental antagonism toward religion. *See McCreary County v. ACLU of Ky.*, 545 U.S. 844, 860 (2005) (Religion Clauses mandate "governmental neutrality" (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968))). But the constitutional guarantee of religious freedom does not entitle anyone to "general immunity from secular laws." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020). The Free Exercise Clause is not, and never has been, a free pass to violate the law. Not only does that Clause not require an exemption here, but the Establishment Clause outright forbids it.

JA1047

## A. The Religion Clauses do not require the requested exemption.

### 1. *The public-accommodations law evinces no hostility toward religion.*

Though government cannot regulate a religious practice *because* it is religious (*see Lukumi*, 508 U.S. at 531–33), religion-based disagreement with the law does not excuse noncompliance. "To permit this would be to make the professed doctrines of religious belief superior to the law of the land, . . . permit[ting] every citizen to become a law unto himself." *Emp. Div. v. Smith*, 494 U.S. 872, 879 (1990) (quoting *Reynolds v. United States*, 98 U.S. 145, 166–67 (1878)).

The Supreme Court has therefore held that laws that apply generally and are neutral with respect to religion need satisfy only rational-basis review, even if they "ha[ve] the incidental effect of burdening a particular religious practice." *Lukumi*, 508 U.S. at 531. Strict scrutiny is reserved for laws that disfavor religion or a religious practice *because* it is religious. *Id.* at 531–32. New York's public-accommodations law does neither. Thus, Carpenter's religious motivations cannot excuse noncompliance, and the free-exercise claim fails as a matter of law.

*a.* The neutrality requirement means that a law must not "restrict practices because of their religious motivation." *Id*. at 533. Discriminatory intent may be apparent on the face of a law; or it may be revealed through the law's practical effects, as when legal requirements have been "gerrymandered with care to proscribe" religious conduct *qua* religious conduct. *See id.* at 533–34, 542. But neutrality is not undermined just because a law *affects* a claimant's religious exercise. Rather, to trigger strict scrutiny the claimant must show that the state has targeted specific religious conduct for maltreatment. *See id.*; *New Hope Family Servs., Inc. v. Poole*, 966 F.3d 145, 162–63 (2d Cir. 2020). General applicability is the closely related requirement that the state, "in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief." *Lukumi*, 508 U.S. at 543. It thus may not burden religious conduct while affording more favorable treatment to nonreligious conduct that is as detrimental to the underlying state

JA1048

interests. *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam); *cf. Lukumi*, 508 U.S. at 543–44. Nor may the state establish "a mechanism for individualized exemptions" that would allow it to reject an exemption just because a person's conduct is religiously motivated. *Fulton v. City of Philadelphia*, __ U.S. __, No. 19-123, slip op. at 6 (June 17, 2021) (quoting *Smith*, 494 U.S. at 884).

*b.* New York's public-accommodations law is neutral and generally applicable. Far from "*purposefully* singl[ing] out religious conduct" for discriminatory treatment (*see Cent. Rabbinical Cong. of U.S. & Can. v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 194 (2d Cir. 2014)), it bars discrimination in all places of public accommodation. A business's motivations for denying service, religious or otherwise, are immaterial. And Carpenter offers no evidence that the law was "specifically directed at . . . religious practice" (*id.* (quoting *Smith*, 494 U.S. at 878)). At most, it asserts that the public-accommodations law conflicts with its religious beliefs. But the fact that a law may affect some religiously motivated conduct is an unavoidable result of how law operates in a religiously diverse society. *Cf. Smith*, 494 U.S. at 888–89; *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 452 (1988) ("[G]overnment simply could not operate if it were required to satisfy every citizen's religious needs and desires."). Such incidental effects do not amount to religious targeting or render a law non-neutral. *See Lukumi*, 508 U.S. at 533–34.

Accordingly, New York may enact and enforce laws when, as here, it acts on "a legitimate concern of government for reasons quite apart from [religious] discrimination." *Id.* at 535. That is true even if the law disproportionately affects some religious exercise.[1] *See, e.g.*, *id.* at 531 (a law

---

[1] Nor does a law cease to be neutral just because some religious (or secular) beliefs are *un*affected by it. Incidental alignment of the state's secular aims with some people's beliefs does not amount to an unconstitutional religious preference any more than incidental disagreement does. *See Hernandez v. C.I.R.*, 490 U.S. 680, 696 (1989) ("[A] statute primarily having a secular effect does not violate the Establishment Clause merely because it 'happens to coincide . . . with the tenets of some or all religions.'" (quoting *McGowan v. Maryland*, 366 U.S. 420, 442 (1961))). Carpenter's

JA1049

may be neutral and generally applicable "even if [it] has the incidental effect of burdening *a particular religious practice*" (emphasis added)). "The Free Exercise Clause is not violated even though a group motivated by religious reasons may be more likely to engage in the proscribed conduct." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1131 (9th Cir. 2009).

A free-exercise jurisprudence that instead treated neutral, generally applicable laws as impermissibly targeting religion whenever a religious individual or group happened to be affected (or felt more burdened than other groups) would "open the prospect of constitutionally required religious exemptions from civic obligations of almost every conceivable kind," from drug laws to traffic laws. *See Smith*, 494 U.S. at 888–89. The Supreme Court has thus flatly rejected that approach: "[T]he right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" *Id.* at 879 (quoting *United States v. Lee*, 455 U.S. 252, 263 n.3 (1982) (Stevens, J., concurring in the judgment)). So has the Second Circuit: "[A] state can determine that a certain harm should be prohibited generally, and a citizen is not, under the auspices of her religion, constitutionally entitled to an exemption." *Cent. Rabbinical Cong.*, 763 F.3d at 196.

Nor is the neutrality and general applicability of New York's public-accommodations law undermined by any asserted system of exemptions for secular activities (*cf.* Compl. ¶¶ 314–317; Mot. 21). As the Supreme Court recently clarified, a law may fail the requirements of neutrality and general applicability if it treats religious activity more harshly than some secular activities that equally undermine the underlying state interests. *See Tandon*, 141 S. Ct. at 1296. The law at issue in *Tandon*, for example, was not neutral and generally applicable because it

---

insistence that § 296.2 favors businesses with beliefs that do not call for discrimination against LGBTQ people (*see* Compl. ¶ 345) is irrelevant as a matter of law.

JA1050

imposed more severe restrictions on religious gatherings to limit the transmission of COVID-19 than on secular gatherings that posed the same risk of spreading the virus. *Id.* at 1296–97. If § 296.2 prohibited religiously motivated denials of service but permitted nonreligious denials that equally undermined the law's purpose of promoting a fair and free marketplace and eradicating discrimination in public accommodations against LGBTQ people, heightened scrutiny would apply. But the statute does no such thing.

That the public-accommodations law does not encompass "private accommodations" (Compl. ¶ 314) is irrelevant. An entity that is "in its nature distinctly private" (N.Y. Exec. Law § 292.9) definitionally does not risk subjecting the citizens of New York to the stigma and degradation of being denied equal access to goods and services in the public marketplace.

Nor do purported carve-outs in *other* state antidiscrimination laws undermine the neutrality and general applicability of *this* law. *Contra* Compl. ¶ 314. Whether there might be statutory exceptions for employment (*e.g.*, N.Y. Exec. Law § 296.1), housing (*e.g.*, N.Y. Exec. Law § 296.5), or any other sphere is of no moment because the public-accommodations law regulates the particular relationship between businesses and customers to promote free and fair access to goods and services in the marketplace. The employer-employee relationship is different in kind and entails different considerations and governmental objectives, so it is governed by an entirely different suite of regulations. Section 296.11's special employment and housing provisions for religious organizations are immaterial for the same reasons. The pertinent legal question is whether the *challenged* law is neutral and generally applicable, not whether some *other* law falls short. Carpenter casts the State's antidiscrimination interests at too "high [a] level of generality" for the free-exercise analysis, contrary to Supreme Court mandate. *Cf. Fulton*, slip op. at 13–14. And

because "[a]ll laws are selective to some extent," that does not automatically defeat neutrality and general applicability. *See Lukumi*, 508 U.S. at 542–43.[2]

Though § 296.2(b) allows that "the division [may] grant[] an exemption based on bona fide considerations of public policy" for limiting access "because of the sex of [the] person," that does not create a system of exemptions that would entitle Carpenter to a religious exemption from the requirement to serve same-sex couples. As a matter of statutory interpretation under the canon *expressio unius est exclusio alterius*, the legislature's choice to enumerate "sex," "sexual orientation," "race," "creed," and the other characteristics as discrete, individually protected classes and to authorize exemptions solely with respect to the first of those signifies that exemptions are *not* available for the others. Had the legislature intended for the exemption to apply to sexual-orientation discrimination, it would have amended the text of § 296.2(b) accordingly when it added "sexual orientation" as a protected class. But it did not. *See* 2002 N.Y. Sess. Laws A.1971.

The possibility of exemptions from the bar on one category of discrimination does not trigger a right to a religious exemption from the *absolute* bans on *other* categories of discrimination, because since no one may be exempted from *those* prohibitions for nonreligious

---

[2] As for the two administrative proceedings to which Carpenter points (Compl. ¶ 291; Mot. 23), they simply do not involve exemptions from the public-accommodations law, religious or otherwise. Rather, the factfinders in both cases determined that the defendants had not denied service on the basis of protected characteristics. *See Morgan v. Zaharo Cab Corp.*, No. 10117888 (N.Y. Div. Hum. Rights Nov. 14, 2008) (no evidence that taxi driver was aware that complainant tried to enter cab, much less that driver knew complainant's race and religion and refused service because of them); *Battaglia v. Buffalo Niagara Introductions, Inc.*, No. 10138581 (N.Y. Div. Hum. Rights Jan. 28, 2012) (matchmaker refused service based on prospective client's refusal to share personal information, not his disability). In other words, the cases do not excuse violations of an otherwise-applicable antidiscrimination law but instead find that the law had not been violated in the first place. It's the difference between turning away customers seeking wedding-photography services because they are a same-sex couple (which the State bars to ensure equal access to goods and services in the marketplace), and turning away a couple because they want the photographer to travel across the country for the ceremony (which the law does not address).

reasons, there is no equal-treatment rationale for requiring religious exemptions from them either.[3] A legal requirement may cease to be generally applicable only if the state establishes a system of individualized exemptions from *that* requirement. *See Fulton*, slip op. at 5–6. (And even if the possibility of exemptions from the prohibition against sex-based discrimination had any bearing here, the requirement of a public-policy rationale is in no way parallel to the absolute discretion that compromised the antidiscrimination scheme in *Fulton*.[4])

New York seeks to eradicate discrimination by regulating all public accommodations equally and absolutely. Carpenter does not plausibly allege that the State has singled out for unfavorable treatment those that refuse service for religious reasons while allowing others to refuse service for nonreligious reasons. Neither does it plausibly allege that the State has in any other respect treated it worse than similarly situated covered entities. Nor does it identify any exemptions from the public-accommodations law that undermine the State's interests in eradicating sexual-orientation discrimination and promoting equal access to the marketplace in the way or to the

---

[3] That is so regardless of whether in other respects or as a general matter the meaning of "sex" encompasses sexual orientation or discrimination on the basis of sex encompasses sexual-orientation discrimination. *Cf., e.g.*, *Bostock v. Clayton County*, 140 S. Ct. 1731, 1739–43 (2020). The legislature plainly expressed its intention to treat sexual orientation like race, religion, and the other protected classes—not like sex—for purposes of the exemption power.

[4] The high bar that the public-policy requirement demands is in all events a far cry from the absolute discretion that gave rise to a right to a religious exemption in *Fulton*. The sole application of it that we have found was a determination that because of distinct licensure requirements for barbers (who are licensed to cut men's hair) and cosmetologists (who are licensed to cut women's hair), "a licensed [shop owner] must provide services to any person regardless of sex in the shop, provided the owner has licensed operators in each category to perform the services required by the patron." *Martineau v. Ghezzi*, 389 F. Supp. 187, 192 (N.D.N.Y. 1974). In other words, a limited exemption was created solely because two laws, both serving compelling interests (eradicating discrimination in public accommodations, on the one hand, and safeguarding citizens' health and safety, on the other) were incompatible in a particular circumstance. Shop owners could take the exemption only if they could not comply with both laws—i.e., if they were not licensed to serve both men and women. The exception was, moreover, merely a temporary one, to allow the state to resolve the conflict between the statutes. And even during that period, the State would continue to investigate and resolve violations of the public-accommodations law. *Id.*

JA1053

degree that Carpenter's requested exemption would—or indeed at all. And there is no whiff of religious animus, either on the law's face or in its application. Neither *Lukumi*, nor *Tandon*, nor any other authority supports application of heightened scrutiny under these circumstances.[5]

   *c.* Because § 296.2 is neutral and generally applicable and evinces neither favoritism nor animus toward any religion, it is subject to rational-basis review only (*see Lukumi*, 508 U.S. at 531). And it more than satisfies that test: It serves not just a legitimate state interest but a compelling one, prohibiting invidious discrimination and its associated harmful effects in depriving New Yorkers of fair and free access to goods and services in the marketplace (*see Fulton*, slip op. at 14–15 (recognizing that "this [antidiscrimination] interest is a weighty one, for '[o]ur society has come to the recognition that gay persons and gay couples cannot be treated as social outcasts or as inferior in dignity and worth'" (quoting *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1727 (2018))); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 624 (1984) ("[E]liminating discrimination and assuring its citizens equal access to publicly available goods and services . . . plainly serves compelling state interests of the highest order.")).[6] And it is not just

---

[5] Nor is heightened scrutiny triggered by adding a free-speech claim to the legally insupportable free-exercise claim. As Carpenter acknowledges (Mot. 21–22), the Second Circuit has straightforwardly rejected that so-called hybrid-rights approach (*Leebaert v. Harrington*, 332 F.3d 134, 144 (2d Cir. 2003)).

[6] Carpenter insists that it refuses service based not on sexual orientation but on the same-sex character of marriages. *See* Compl. ¶¶ 128–140. But the Supreme Court has "declined to distinguish between status and conduct in this context," because the two are so closely linked. *Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 689 (2010); *accord Lawrence v. Texas*, 539 U.S. 558, 583 (2003) (O'Connor, J., concurring in the judgment); *cf. Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993) ("A tax on wearing yarmulkes is a tax on Jews.").

   Carpenter's desire to create sub-classes of marriages based on the (protected) characteristics of the partners undermines the value of the civil status of marriage for members of a protected class. A fundamental right is defined by the nature of the right itself, not by the identity of those who seek to exercise it or have been excluded from doing so in the past. *See Obergefell v. Hodges*, 576 U.S. 644, 671 (2015); *see generally, e.g.*, *Loving v. Virginia*, 388 U.S. 1 (1967) (rejecting separate category for marriages of interracial couples); *Turner v. Safley*, 482 U.S. 78 (1987) (same as to prisoner marriages). Allowing businesses to close their doors to same-sex couples who exercise

10

rationally related but narrowly tailored to achieving that end, because prohibiting the discrimination sought to be eradicated "abridges no more [activity] than is necessary to accomplish that purpose" (*Roberts*, 468 U.S. at 628–29). New York need not substitute Carpenter's proposed alternatives (*see* Mot. 23–25) where they "will not be as effective" in achieving the State's objective to eradicate discrimination (*see Ashcroft v. ACLU*, 542 U.S. 656, 665 (2004)).

The Supreme Court's decision in *Fulton* changes none of this. *Fulton* held that Philadelphia's asserted interests in equal treatment of parents and children in its foster-care system were undermined by the City's absolute discretion to grant exemptions written into the antidiscrimination requirements in the contracts with child-placement agencies; and hence, the refusal of a comparable religious exemption did not survive strict scrutiny. Slip op. at 14–15. For the reasons already explained, no such system of exemptions mars New York's public-accommodations law. Moreover, the *Fulton* Court took pains to explain that in Philadelphia, foster-care agencies are *not* public accommodations—a consideration apparently significant to the Court's reasoning. *See id.* at 10–13. That distinction matters, because whatever the governmental interests in regulating a "uniquely selective" system like foster care in Philadelphia (*id.* at 12), they are different from the interests in regulating public accommodations that provide "a benefit to the general public allowing individual members of the general public to avail themselves of that benefit" (*id.* at 11–12 (citation omitted)). As explained further in Section I.B., *infra*, a public accommodation's discrimination against a prospective patron not only carries dignitary harm to the individual (*see Masterpiece*, 138 S. Ct. at 1729), but also has "a substantial and harmful effect" on both local and interstate commerce (*see Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 258 (1964)). The State therefore has compelling interests in "completely obliterat[ing]"

---

their fundamental right to marry would revive the second-class status that the Supreme Court forbade in *Obergefell*. New York has a compelling interest in ensuring that that does not happen.

JA1055

discrimination "as to all public accommodations." *Id.* at 260. And because the State makes no distinction whatever between religious and nonreligious denials of service to same-sex couples, allowing none of them, the free-exercise claim fails as a matter of law.

> ### 2. *The public-accommodations law does not coerce Carpenter to participate in religious activity.*

Carpenter's contention that the law is unconstitutionally coercive in violation of both the Free Exercise and Establishment Clauses (*see* Mot. 19–21) likewise fails as a matter of law.

"It is an elemental First Amendment principle that government may not coerce its citizens 'to support or participate in any religion or its exercise.'" *Town of Greece v. Galloway*, 572 U.S. 565, 586 (2014) (plurality opinion) (quoting *County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 659 (1989) (Kennedy, J., concurring)). Whether a law coerces religious exercise is an objective question for the courts. *See, e.g.*, *Lee v. Weisman*, 505 U.S. 577, 592–94 (1992) (making fact-specific determination that prayer at public-school event was coercive); *Town of Greece*, 572 U.S. at 588–89 (plurality opinion) (rejecting plaintiffs' argument that official prayers were coercive, based on Court's interpretation of factual record). A plaintiff's subjective feelings, standing alone, are legally insufficient.

Emilee Carpenter says that she "always actively participates in the wedding ceremonies she photographs," "rejoicing with and congratulating the couple and their family on the new union." Compl. ¶¶ 119, 120. But the law does not require her to officiate a wedding ceremony, swear to the validity of a marriage, or "rejoice" in it. Rather, the law requires only that a business, having chosen to offer the service of wedding photography to the public, must provide that same service—taking photos—regardless of the sexual orientation (or race or religion) of the marrying couple. The wedded couple is paying the photographer to memorialize their wedding, not to participate in it. Merely being present to do a job while invited guests celebrate a significant religious activity in their lives does not constitute legal coercion to join the religious practice. *See*

JA1056

*Fields v. City of Tulsa*, 753 F.3d 1000, 1010–12 (10th Cir. 2014) (no coercion where police officer ordered to attend event at Islamic community center, when attending events hosted by secular and religious organizations was regular aspect of his duties). It would take voluntary additional acts not required by the law to create even the appearance of "participation" in the religious exercise. And the business here can, and presumably does, make clear that it and its photographer are not participants in any religious activities merely by photographing those activities for a fee.

That a business or its proprietor believes that the statute coerces religious activity, whether because "all wedding ceremonies are inherently religious and solemn events" (Compl. ¶ 116) or otherwise, does not make it so. This Court must decide, from an objective standpoint, whether the requirement to provide services on an equal basis coerces the contracting business to engage in religious exercise at each and every client's wedding. From that perspective, Carpenter is no more forced to participate in religious activity with which it disagrees when it is hired for a wedding of a same-sex couple than it is when hired for a wedding of a Hindu, Jewish, or interfaith couple. To state the obvious: a photographer is paid to take pictures—not to join in the couple's faith practice.

### B. The Establishment Clause forbids the requested exemption.

Not only does the Free Exercise Clause not mandate the exemption sought here, but the Establishment Clause flatly forbids it.

*a.* The rights to believe, or not, and to practice one's faith, or not, are sacrosanct. But they do not entail a right to impose on others by operation of law the obligation to subsidize one's own beliefs. Government should not, and under the Establishment Clause cannot, favor the religious beliefs of some at the expense of the beliefs and rights of others. For if religious exemptions from general laws detrimentally affect nonbeneficiaries, they amount to unconstitutional preferences for the benefited religious beliefs and their adherents. *See, e.g.*, *Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005); *Caldor*, 472 U.S. at 709–10.

13

Thus, in *Caldor*, the Supreme Court invalidated a law requiring employers to accommodate Sabbatarians in all instances, because "the statute t[ook] no account of the convenience or interests of the employer or those of other employees who do not observe a Sabbath." 472 U.S. at 709. The Court held that "unyielding weighting in favor of Sabbath observers over all other interests" had "a primary effect that impermissibly advances a particular religious practice." *Id.* at 710. Similarly, *Texas Monthly, Inc. v. Bullock* invalidated a sales-tax exemption for religious periodicals in part because it "burden[ed] nonbeneficiaries" by making them underwrite the "benefit bestowed on subscribers to religious publications." 489 U.S. 1, 18 n.8 (1989) (plurality opinion).

Free-exercise jurisprudence likewise reflects this fundamental limitation. In *United States v. Lee*, 455 U.S. at 261, the Court rejected an Amish employer's request for an exemption from paying social-security taxes because the exemption would "operate[] to impose the employer's religious faith on the employees." And in *Prince v. Massachusetts*, 321 U.S. 158, 170 (1944), the Court denied an exemption from child-labor laws that would have allowed minors to distribute religious literature because parents are not free "to make martyrs of their children." In contrast, the Court recognized a Seventh-Day Adventist's right to an exemption from a restriction on unemployment benefits in *Sherbert v. Verner*, 374 U.S. 398, 409 (1963), because the exemption would not "serve to abridge any other person's religious liberties." And the Court partially exempted Amish parents from state compulsory-education laws in *Wisconsin v. Yoder*, 406 U.S. 205, 235–36 (1972), only after they demonstrated the "adequacy of their alternative mode of continuing informal vocational education" to meet the children's educational needs.

"[T]he limits [on religious exercise] begin to operate whenever activities begin to affect or collide with liberties of others or of the public." *Prince*, 321 U.S. at 177 (Jackson, J., concurring); *see generally* James Madison, Memorial and Remonstrance Against Religious Assessments ¶¶ 3, 15 (1785) (requiring support for another's faith infringes "the equal right of every citizen to the

JA1058

free exercise of his Religion according to the dictates of conscience"), reprinted in *Everson v. Bd. of Educ.*, 330 U.S. 1, 63–72 (1947) (appendix to dissent of Rutledge, J.). Hence, a religious accommodation "must be measured so that it does not override other significant interests" (*Cutter*, 544 U.S. at 722) or "impose substantial burdens on nonbeneficiaries" (*Texas Monthly*, 489 U.S. at 18 n.8 (plurality opinion)). Otherwise, it would violate the fundamental constitutional protections for religious freedom embodied in the Establishment Clause.

*b.* In only one narrow category of circumstances has the Supreme Court upheld religious exemptions that materially burdened third parties—namely, when core Establishment and Free Exercise Clause protections for the ecclesiastical authority of religious institutions together required the exemption. In *Our Lady of Guadalupe*, 140 S. Ct. at 2055, and *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171, 196 (2012), the Court held that employment-discrimination laws cannot be enforced in a way that would interfere with a church's selection of its ministers. And in *Corporation of the Presiding Bishop v. Amos*, 483 U.S. 327, 330, 339 (1987), the Court upheld, under Title VII's statutory religious exemption, a church's firing of an employee who was not in religious good standing. These exemptions did not amount to impermissible religious favoritism because they embodied the "special solicitude" for the rights of churches to select clergy and control their internal operations (*Hosanna-Tabor*, 565 U.S. at 189).

This ecclesiastical-authority doctrine has no bearing on whether a for-profit business in the public marketplace may ignore antidiscrimination laws because it holds conflicting religious views. Indeed, in *Masterpiece* the Supreme Court warned against expanding this tightly circumscribed doctrine, lest "a long list of persons who provide goods and services for marriages and weddings . . . refuse to do so for gay persons, thus resulting in a community-wide stigma inconsistent with the history and dynamics of civil rights laws that ensure equal access to goods, services, and public accommodations." 138 S. Ct. at 1727.

JA1059

*c.* Recognizing that LGBTQ people "cannot be treated as social outcasts or as inferior in dignity and worth" (*id.*), New York's public-accommodations law ensures that sexual orientation is not a barrier to "acquiring whatever products and services [one] choose[s] on the same terms and conditions as are offered to" everyone else (*id.* at 1728). And it protects LGBTQ people "from a number of serious social and personal harms," including deprivation "of their individual dignity" (*Roberts*, 468 U.S. at 625). Granting a religious exemption would license Carpenter, and by extension, all other public accommodations, to discriminate against customers because of their sexual orientation—and any other protected characteristics—as long as the business asserted a religious reason for doing so. LGBTQ people and members of other vulnerable groups would then suffer the social, psychological, and economic harms that the law was designed to prevent.

To suggest that exempting Carpenter would pose no "actual problem" because other photographers in New York provide services to same-sex couples (Mot. 22) misses the point. Even assuming that there are comparable wedding vendors throughout the State, telling a couple suffering the pain and humiliation of discrimination to "just go someplace else" is no remedy for the grave stigmatic harms. For "[d]iscrimination is not simply dollars and cents, hamburgers and movies; it is the humiliation, frustration, and embarrassment that a person must surely feel when he is told that he is unacceptable as a member of the public." *Heart of Atlanta*, 379 U.S. at 292 (Goldberg, J., concurring); *see id.* at 250 (majority opinion) (antidiscrimination laws "vindicate the deprivation of personal dignity that surely accompanies denials of equal access to public establishments" (citation omitted)); *cf. Brown v. Bd. of Educ.*, 347 U.S. 483, 493–95 (1954).

Moreover, that some (or even most) wedding vendors in New York might serve same-sex couples does nothing to alleviate the "serious stigma" (*Masterpiece*, 138 S. Ct. at 1729) of living in a community in which businesses can publicly bar the doors to LGBTQ people. Were the requested exemption granted, same-sex couples and other disfavored classes would awaken each

JA1060

day knowing that, wherever they go, they might be turned away from public accommodations that deem them unfit and unworthy to be served; and they would have no legal recourse as long as the denials were explained in religious terms.

Allowing discrimination by public accommodations also inflicts economic harms well beyond the standalone discriminatory event. *See Heart of Atlanta*, 379 U.S. at 258; *cf.* CHRISTY MALLORY ET AL., WILLIAMS INST., THE IMPACT OF STIGMA AND DISCRIMINATION AGAINST LGBT PEOPLE IN TEXAS 56 (2017), https://bit.ly/2UtopRq (explaining that "state economies benefit from more inclusive legal and social environments"). Must LGBTQ people and members of other historically disfavored classes carry around a Green Book to find establishments that will serve them? *Cf.* Brent Staples, *Traveling While Black: The Green Book's Black History*, N.Y. TIMES (Jan. 25, 2019), https://nyti.ms/3aaPiAB. And must New York allow businesses to force them to do so, at so great a cost to the State, its economy, and the dignity and well-being of its citizens?

Put simply, "acts of invidious discrimination in the distribution of publicly available goods [and] services . . . cause unique evils" (*Roberts*, 468 U.S. at 628), which New York has chosen to exorcise. To accept Carpenter's arguments would instead give official imprimatur to those acts. It would deny LGBTQ people the fundamental American promise of equality for all and diminish their standing in society. These grave harms are ones that the Establishment Clause forbids government to impose in the name of religious accommodation.

## II.  ANTIDISCRIMINATION LAWS PROTECT RELIGIOUS FREEDOM.

This case does not pit religion against only secular rights and interests. For public-accommodations laws like New York's also protect religion and its exercise: The challenged law advances the State's strong interests in preventing discrimination of all kinds, *including religious discrimination*, in the provision of goods and services, thereby ensuring that all people can believe and worship according to their conscience, without fear that they will be denied equal treatment in

JA1061

the public marketplace. The religious freedom of all is therefore threatened, not served, by efforts to misuse the First Amendment to license discrimination.

Though Carpenter may assert an objection solely to weddings of same-sex couples, the drastic revision of free-exercise law that it seeks could not be so cabined. For in our pluralistic society, there is an almost limitless variety of religious motivations, interests, and potential objections. What is more, many religious adherents view themselves as guided by religion in everything they do. *See Henderson v. Kennedy*, 253 F.3d 12, 17 (D.C. Cir. 2001). Emilee Carpenter is a case in point: She asserts that her religious beliefs "shape every aspect of her life, including her identity, her relationship with others, . . . her understanding of creation, truth, morality, purity, beauty, and excellence," and "how she treats others." Compl. ¶¶ 21, 43. And antidiscrimination laws "protect[] against exclusion from an almost limitless number of transactions and endeavors that constitute ordinary civic life in a free society." *Romer v. Evans*, 517 U.S. 620, 631 (1996). If this Court were to interpret the Religion Clauses to license violations of these laws whenever one has a religiously based desire not to obey, all manner of discrimination would become permissible: Anyone could be denied service in a restaurant, hotel, shop, or other public establishment, for no reason other than that they are gay, Black, Jewish, or disabled, and the proprietor states a religious reason for barring the doors to them. *Cf., e.g.*, *Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 402 n.5 (1968) (per curiam) (restaurant owner's refusal to serve Black patrons based on belief that federal public-accommodations law "contravenes the will of God" (citation omitted)).

These harms are not merely theoretical. The case law shows—and the experiences of *amici* and our members confirm—that disfavor toward, unequal treatment of, and denials of service to members of minority faiths and nonbelievers are all too common. And religious discrimination, like other forms of discrimination, is often premised on the discriminator's religious views.

18

In *Paletz v. Adaya*, No. B247184, 2014 WL 7402324 (Cal. Ct. App. Dec. 29, 2014), for example, a hotel owner closed a poolside event after learning that it was hosted by a Jewish group. The hotelier told an employee, "I don't want any [f—ing] Jews in the pool" (*id.* at *2 (alteration in original)); said that her family would cut off funding to the business if they learned of the gathering (*id.* at *4); and directed hotel staff to remove the Jewish guests from the property (*id.* at *2). In *Khedr v. IHOP Restaurants, LLC*, 197 F. Supp. 3d 384 (D. Conn. 2016), a restaurant refused service to a Muslim family because of their faith. The father recounted: "The restaurant manager started to look at us up and down with anger, hate, and dirty looks because my wife was wearing a veil, as per our religion of Islam." *Id.* at 385. In front of the family's 12-year-old child, the manager told his staff "not to serve 'these people' any food." *Id.* And in *Fatihah v. Neal*, the owners of a gun range posted a sign declaring the facility a "MUSLIM FREE ESTABLISHMENT," armed themselves with handguns when a Muslim man wanted to use the range, and accused him of wanting to murder them because "'[his] Sharia law' required" it. *See* Compl. ¶¶ 24, 32, 34, No. 6:16-cv-00058-KEW (E.D. Okla. Feb. 17, 2016).[7]

It follows that if the Religion Clauses were construed to grant businesses a license to violate antidiscrimination laws whenever they profess a religious motivation, religious discrimination would receive governmental sanction and could become commonplace across New York.

---

[7] The context of employment discrimination further illuminates the danger. *See, e.g.*, *Huri v. Office of the Chief Judge*, 804 F.3d 826, 830, 834 (7th Cir. 2015) (supervisor called Muslim employee who wore hijab "evil," denied her time off for Islamic religious holidays, and engaged in "social shunning, implicit criticism of non-Christians, and uniquely bad treatment of [the employee] and her daughter"); *Nappi v. Holland Christian Home Ass'n*, No. 11-cv-2832, 2015 WL 5023007, at *1–3 (D.N.J. Aug. 21, 2015) (Catholic maintenance worker subjected to harassment by colleagues—who encouraged him to leave his church, put religious literature in his locker, "wanted to shoot [him]," and ultimately fired him "because, as a Roman Catholic, he was an 'outsider' who did not 'fit in.'"); *Minnesota ex rel. McClure v. Sports & Health Club, Inc.*, 370 N.W.2d 844, 846–47 (Minn. 1985) (en banc) (gym excluded job applicants and employees not living according to owners' faith, based on owners' "religious belief that they are forbidden by God, as set forth in the Bible, to work with 'unbelievers'").

JA1063

Suppose that an interfaith couple wished to marry, and in keeping with the religion of one partner, the couple planned to serve kosher or halal food. But the only kosher or halal caterer in town refused to prepare food for the wedding based on its religious belief that interfaith marriages are sinful. Should the caterer have the right, in the face of public-accommodations protections against religious discrimination, to force the couple to choose between forgoing a catered reception, on the one hand, and violating one spouse's sincere religious beliefs, on the other?

What of children who are part of a family that, in the opinion of a businessowner, should not exist because the parents are of different faiths or were married within a faith that the merchant's religion rejects? Might the children be denied a birthday cake or a party celebrating a bar or bat mitzvah or a communion?

And more broadly, may a restaurant turn away a Muslim woman who wears a hijab, because the owner's religion forbids associating with members of other faiths? May a grocer refuse to sell food to an unmarried pregnant woman because his religion tells him that he would be facilitating someone else's living in sin? And what about the recently widowed Catholic whose Protestant spouse wanted a Protestant funeral? May a Protestant funeral director bar the widow from the memorial, leaving her unable to say goodbye in a way that respects her beloved's faith?

If the Religion Clauses license religiously motivated denials of service to same-sex couples, as Carpenter contends, then they also sanction all other religiously motivated denials, including exclusions based on the customer's faith. One could be refused employment, thrown out of a hotel, or barred from purchasing a hamburger just for being of the "wrong" religion. And no state or local authority or law could do anything to remedy the situation. Such a system would devastate religious freedom, not protect it.

## CONCLUSION

A preliminary injunction should be denied and the motion to dismiss should be granted.

20

JA1064

Respectfully submitted,

/s/ Fernando Santiago

RICHARD B. KATSKEE*
KENNETH D. UPTON, JR.*
SARAH R. GOETZ*
   *Americans United for Separation of*
      *Church and State*
   *1310 L Street NW, Suite 200*
   *Washington, DC 20005*
   *(202) 466-3234*
   *(202) 466-3353 (fax)*
   *katskee@au.org*

FERNANDO SANTIAGO
   *Santiago Burger LLP*
   *2280 East Avenue, 2nd Floor*
   *Rochester, NY 14610*
   *(585)_563-2400*
   *(585) 563-7526 (fax)*
   *fernando@litgrp.com*

 * *Admitted pro hac vice.*

Date:     July 2, 2021.

JA1065

## CERTIFICATE OF SERVICE

I hereby certify that on July 2, 2021, the foregoing brief was filed using the Court's

CM/ECF system, through which counsel for all parties will be served.

*/s/ Fernando Santiago*

FERNANDO SANTIAGO
*Santiago Burger LLP*
*2280 East Avenue, 2nd Floor*
*Rochester, NY 14610*
*(585)_563-2400*
*(585) 563-7526 (fax)*
*fernando@litgrp.com*

JA1066

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

EMILEE CARPENTER, LLC d/b/a
Emilee Carpenter Photography and
Emilee Carpenter,

                              Plaintiffs,

                -vs-

LETITIA JAMES, in her official capacity as
Attorney General of the State of New York;
JONATHAN J. SMITH, in his official capacity
as Interim Commissioner of the New York State
Division of Human Rights; and
WEEDEN WETMORE, in his official capacity as
District Attorney of Chemung County,

                            Defendants.
_____

**21-CV-6303**

**BRIEF OF AMICI CURIAE MASSACHUSETTS, CALIFORNIA, CONNECTICUT, DELAWARE, THE DISTRICT OF COLUMBIA, HAWAI'I, ILLINOIS, MAINE, MARYLAND, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, VIRGINIA, AND WASHINGTON IN SUPPORT OF DEFENDANTS**

Maura Healey
  *Attorney General*
  *Commonwealth of Massachusetts*
Elizabeth N. Dewar
  *State Solicitor*
Adam M. Cambier*
  *Assistant Attorney General*
One Ashburton Place
Boston, Massachusetts 02108
Tel.: 617-963-2278
Email: adam.cambier@mass.gov

* Counsel of Record, admitted *pro hac vice*

JA1067

# TABLE OF CONTENTS

INTRODUCTION AND INTERESTS OF AMICI .................................................................. 1

ARGUMENT ............................................................................................................................. 2

    I.     States across the country have enacted laws to combat discrimination against LGBTQ people in public accommodations. ......................................................................................... 2

        A.    LGBTQ Americans are a historically disadvantaged group. ........................................... 3

        B.    States prohibit discrimination against LGBTQ people in public accommodations to prevent severe economic, personal, and social harms. ......................................................... 4

    II.    The First Amendment does not exempt businesses open to the public from state anti-discrimination laws. ...................................................................................................................... 8

        A.    State public accommodations laws do not violate the Free Speech Clause when applied to people with objections to serving LGBTQ customers. ....................................................... 9

        B.    State public accommodations laws do not violate the Free Exercise Clause. ................ 17

    III.   A First Amendment exemption to public accommodations laws of the kind sought by Plaintiffs would dramatically undermine anti-discrimination laws. ......................................... 19

CONCLUSION ........................................................................................................................ 20

ADDENDUM .......................................................................................................................... 23

Table A: State Laws ............................................................................................................... 23

Table B: Local Laws .............................................................................................................. 24

Table C: Discriminatory Advertising Laws ........................................................................... 30

JA1068

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Treadwell*,
294 F.3d 453 (2d Cir. 2002)..........................................................................12

*Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*,
481 U.S. 537 (1987)................................................................................ 14-16

*Bostock v. Clayton County, Georgia*,
140 S. Ct. 1731 (2020)...................................................................................6

*Burt v. Gates*,
502 F.3d 183 (2d Cir. 2007).............................................................................9

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014).....................................................................................15

*Cervelli v. Aloha Bed & Breakfast*,
415 P.3d 919 (Haw. Ct. App. 2018) ................................................................14

*Christian Legal Soc. v. U.C. Hastings*,
561 U.S. 661 (2010)..................................................................................8, 14

*City Council of Los Angeles v. Taxpayers for Vincent*,
466 U.S. 789 (1984)....................................................................................6-7

*Daniel v. Paul*,
395 U.S. 298 (1969)....................................................................................4-5

*Elane Photography, LLC v. Willock*,
309 P.3d 53 (N.M. 2013) ..............................................................................12

*Employment Div. v. Smith*,
494 U.S. 872 (1990).....................................................................................18

*Fulton v. City of Philadelphia*,
__ U.S. __, No. 19-123 (June 17, 2021) ............................................................2

*Gay Rights Coal. of Georgetown Univ. Law Ctr. v. Georgetown Univ.*,
536 A.2d 1 (D.C. 1987) ................................................................................14

*Giboney v. Empire Storage & Ice Co.*,
336 U.S. 490 (1949).....................................................................................11

JA1069

*Gifford v. McCarthy*,
    137 A.D.3d 30 (N.Y. App. Div. 2016) ............................................................14

*Goodpaster v. City of Indianapolis*,
    736 F.3d 1060 (7th Cir. 2013) ....................................................................12

*Goodridge v. Dep't of Pub. Health*,
    798 N.E.2d 941 (Mass. 2003) ...................................................................2-3

*Heart of Atlanta Motel, Inc. v. United States*,
    379 U.S. 241 (1964) ...............................................................2, 4-5, 16-17

*Holcomb v. Iona Coll.*,
    521 F.3d 130 (2d Cir. 2008) ........................................................................8

*Hurley v. Irish American Gay, Lesbian & Bisexual Group of Boston*,
    515 U.S. 557 (1995) ..........................................................................11, 19

*Int'l Bhd. of Teamsters v. United States*,
    431 U.S. 324 (1977) .................................................................................13

*Katzenbach v. McClung*,
    379 U.S. 294 (1964) ...........................................................................8, 17

*Lawrence v. Texas*,
    539 U.S. 558 (2003) ...................................................................................8

*Lombard v. Louisiana*,
    373 U.S. 267 (1963) ...................................................................................5

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*,
    138 S. Ct. 1719 (2018) ..........................................................2, 4-5, 14-16, 20

*N. Coast Women's Care Med. Grp., Inc. v. San Diego Cty. Super. Ct.*,
    189 P.3d 959 (Cal. 2008) ..........................................................................14

*Obergefell v. Hodges*,
    576 U.S. 644 (2015) .........................................................................2-3, 16

*Pittsburgh Press Co. v. Human Relations Comm'n*,
    413 U.S. 376 (1973) .................................................................................12

*Pruneyard Shopping Ctr. v. Robins*,
    447 U.S. 74 (1980) ...................................................................................11

JA1070

*Ragin v. New York Times Co.*,
923 F.2d 995 (2d Cir. 1991)..............................................................................7, 13

*Roberts v. United States Jaycees*,
468 U.S. 609 (1984).......................................................2, 4, 6-7, 12, 14-17

*Romer v. Evans*,
517 U.S. 620 (1996)....................................................................................2, 15

*Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*,
547 U.S. 47 (2006)....................................................................................9-13

*Snyder v. Phelps*,
562 U.S. 443 (2011)........................................................................................20

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011)........................................................................................13

*Soules v. Dep't of Hous. & Urb. Dev.*,
967 F.2d 817 (2d Cir. 1992)..........................................................................13

*State v. Arlene's Flowers, Inc.*,
441 P.3d 1203 (Wash. 2019)..........................................................................17

*Telescope Media Grp. v. Lucero*,
936 F.3d 740 (8th Cir. 2019) .........................................................................13

*Wooley v. Maynard*,
430 U.S. 705 (1977)........................................................................................10

*Zarda v. Altitude Express, Inc.*,
883 F.3d 100 (2d Cir. 2018)............................................................................8

**Constitutional Provisions, Statutes, and Rules**

U.S. Const. amend. 1 .......................................................................... *passim*

42 U.S.C. § 3604...............................................................................................7

42 U.S.C. § 2000e-3..........................................................................................7

Act Forbidding Unjust Discrimination on Account of Color or Race,
1865 Mass. Acts, ch. 277 (May 16, 1865) .......................................................5

Mass. Gen. Laws ch. 272, § 92A .....................................................................7

JA1071

Mont. Code Ann. § 49-2-304(1)(b).................................................................7

N.Y. Exec. Law § 296.2(a) .................................................................7, 18

N.Y. Sexual Orientation Non-Discrimination Act of 2002, ch. 2, § 1.........................6

Or. Rev. Stat. § 659A.409.................................................................7

Va. Code § 2.2-3904 .................................................................7

Florida Commission on Human Relations, *Notice: Sexual Discrimination*
(2021).................................................................6

**Miscellaneous**

Center for the Study of Inequality, Cornell University, What Does the Scholarly
Research Say About the Effects of Discrimination on the Health of
LGBT People?, What We Know Project (2019) .................................................4

Tim Fitzsimons, *Nearly 1 in 5 Hate Crimes Motivated by Anti-LGBTQ Bias,
FBI Finds*, NBC News (Nov. 12, 2019) .................................................3

Mark L. Hatzenbuehler, *Structural Stigma: Research Evidence and Implications
for Psychological Science*, 71 Am. Psychologist 742 (2016)...............................4

Mark L. Hatzenbuehler, *The Social Environment and Suicide Attempts in
Lesbian, Gay, and Bisexual Youth*, 127 Pediatrics 896 (2011)............................4

Mark L. Hatzenbuehler et al., *State-Level Policies and Psychiatric Morbidity in
Lesbian, Gay, and Bisexual Populations*, 99 Am. J. Pub. Health 2275
(2009).................................................................4

Christy Mallory & Brad Sears, *Refusing to Serve LGBT People: An Empirical
Assessment of Complaints Filed under State Public Accommodations
Non-Discrimination Laws*, 8 J. Res. Gender Stud. 106 (2018) ...........................3

Christy Mallory & Brad Sears, *LGBT Discrimination, Subnational Public
Policy, and Law in the United States*, in Oxford Research Encyclopedia
of Politics 1 (2020).................................................................3

Tasseli McKay et al., *Understanding (and Acting On) 20 Years of Research on
Violence and LGBTQ + Communities*, 20 Trauma, Violence, & Abuse 665
(2019).................................................................3

JA1072

Julia Raifman et al., *Association of State Laws Permitting Denial of Services to Same-Sex Couples with Mental Distress in Sexual Minority Adults: A Difference-in-Difference-in-Differences Analysis*, 75 JAMA Psychiatry 671 (2018)............................................................................................................4

Julia Raifman et al., *Difference-in-Differences Analysis of the Association Between State Same-Sex Marriage Policies and Adolescent Suicide Attempts*, 171 JAMA Pediatrics 350 (2017) .......................................................4

Brief for Appellees, *Katzenbach v. McClung*, No. 543, 1964 WL 81100 (U.S. Oct. 2, 1964) ........................................................................................................17

*Reuters/Ipsos/UVA Center for Politics Race Poll* (Sept. 11, 2017) .............................................20

JA1073

## INTRODUCTION AND INTERESTS OF AMICI

The *Amici* States—Massachusetts, California, Connecticut, Delaware, the District of Columbia, Hawaiʻi, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, and Washington—file this brief in support of New York's motion to dismiss and in opposition to Plaintiffs' request for a preliminary injunction because we share sovereign and compelling interests in protecting our residents and visitors from discrimination. Like New York, we support civil rights protections for LGBTQ people, including prohibitions on discrimination in places of public accommodation: the diners, stores, and other businesses that are part of daily life in a free society. Such public accommodations laws respond to the pervasive discrimination LGBTQ people have long suffered and continue to suffer today, ensuring equal enjoyment of goods and services and combatting the severe personal, economic, and social harms caused by discrimination.

The *Amici* States also share interests in upholding the rights protected by the First Amendment. We respect and do not seek to abridge the right to hold and express views regarding the nature of marriage, including views founded in religious faith. But neither the Free Speech Clause nor the Free Exercise Clause shields businesses from content-neutral, generally applicable civil rights laws like the one Emilee Carpenter, LLC (together with its proprietor, Ms. Emilee Carpenter, "Plaintiffs") proposes to violate.

Exempting businesses from public accommodations laws on the basis of the First Amendment would undermine the vital benefits these laws provide to residents and visitors. Many Americans would face exclusion from a host of everyday businesses or, at the very least,

1

JA1074

the ever-present threat that any business owner could refuse to serve them when they walk in the door—simply because of their sexual orientation, or their race, religion, or gender.

The *Amici* States therefore join New York in asking this Court to deny Plaintiffs' request for a preliminary injunction and to dismiss the complaint for failure to state a claim.

## ARGUMENT

**I.     States across the country have enacted laws to combat discrimination against LGBTQ people in public accommodations.**

The States have sovereign and compelling interests in protecting their residents, and particularly members of historically disadvantaged groups, from the economic, personal, and social harms caused by invidious discrimination. *See Roberts v. United States Jaycees*, 468 U.S. 609, 624 (1984). Since the mid-nineteenth century, statutes focused on places of public accommodation have been a centerpiece of state efforts to combat discrimination. *See Romer v. Evans*, 517 U.S. 620, 627-28 (1996). These statutes have long been held constitutional as applied to a range of public accommodations, including commercial businesses. *See, e.g.*, *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 260 (1964).

Because "'[o]ur society has come to the recognition that gay persons and gay couples cannot be treated as social outcasts or as inferior in dignity and worth'" and because this "interest is a weighty one," many States and other jurisdictions throughout the country expressly protect LGBTQ people from discrimination in places of public accommodation. *Fulton v. City of Philadelphia*, __ U.S. __, No. 19-123, slip op. at 14-15 (June 17, 2021) (quoting *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1727 (2018)); *see* Addendum Tables A and B, *infra* (collecting laws). These statutes recognize and work to redress the discrimination that continues to afflict LGBTQ Americans.

JA1075

## A.  LGBTQ Americans are a historically disadvantaged group.

LGBTQ Americans have faced a long history of invidious discrimination—including legally sanctioned discrimination.  *See Obergefell v. Hodges*, 576 U.S. 644, 660-61, 673-74, 677-78 (2015); *Goodridge v. Dep't of Pub. Health*, 798 N.E.2d 941, 967-68 (Mass. 2003).  LGBTQ people have been fired from their jobs, evicted from their homes, targeted by police, and denied service by businesses across the country simply because of their "distinct identity."  *Obergefell*, 576 U.S. at 660.

Discrimination against LGBTQ people is a severe and continuing problem.  LGBTQ Americans are still much more likely to be bullied, harassed, and attacked in hate crimes than their non-LGBTQ peers.[1]  LGBTQ people also report overt discrimination, particularly in the form of denial of service by businesses, at rates comparable to, or greater than, those for other historically disadvantaged groups.[2]

This continuing discrimination harms the health and well-being of LGBTQ people, their families, and their communities.  A large and growing body of evidence shows that discriminatory social conditions have severe negative health impacts on LGBTQ people, including increased rates of mental health disorders and suicide attempts, especially for LGBTQ

---

[1]     *See* Tasseli McKay et al., *Understanding (and Acting On) 20 Years of Research on Violence and LGBTQ + Communities*, 20 Trauma, Violence, & Abuse 665, 669-70 (2019); Tim Fitzsimons, *Nearly 1 in 5 Hate Crimes Motivated by Anti-LGBTQ Bias, FBI Finds*, NBC News (Nov. 12, 2019), https://www.nbcnews.com/ feature/nbc-out/nearly-1-5-hate-crimes-motivated-anti-lgbtq-bias-fbi-n1080891.

[2]     *See* Christy Mallory & Brad Sears, *Refusing to Serve LGBT People: An Empirical Assessment of Complaints Filed under State Public Accommodations Non-Discrimination Laws*, 8 J. Res. Gender Stud. 106, 113-16 (2018); Christy Mallory & Brad Sears, *LGBT Discrimination, Subnational Public Policy, and Law in the United States*, *in* Oxford Research Encyclopedia of Politics 1, 2-8 (2020), https://oxfordre.com/politics/view/10.1093/acrefore/ 9780190228637.001.0001/acrefore-9780190228637-e-1200?rskey=tI5wxr&result=7.

JA1076

youth.[3]  Notably, these outcomes are less severe and pervasive in communities that provide

LGBTQ people with legal protection against discrimination.[4]

**B.      States prohibit discrimination against LGBTQ people in public accommodations to prevent severe economic, personal, and social harms.**

Discrimination by places of public accommodation causes unique and severe economic,

personal, and social harms.  It denies equal access to important goods and services and, by

segregating the market, has a well-established "substantial and harmful effect" on the economy.

*Heart of Atlanta*, 379 U.S. at 258 (acknowledging broad impacts of seemingly local

discrimination); *see also Roberts*, 468 U.S. at 625-26.  Such discrimination also stigmatizes its

victims, causing them intense dignitary injuries, and encourages social fragmentation and

conflict.  *See Roberts*, 468 U.S. at 625-26; *Daniel v. Paul*, 395 U.S. 298, 306 (1969); *Heart of

Atlanta*, 379 U.S. at 250; *see also Masterpiece*, 138 S. Ct. at 1727 (allowing wedding service

providers to refuse to provide goods and services to same-sex couples would create "a

community-wide stigma inconsistent with the history and dynamics of civil rights laws").

---

[3]      Center for the Study of Inequality, Cornell University, *What Does the Scholarly Research Say About the Effects of Discrimination on the Health of LGBT People?*, What We Know Project (2019), https://whatweknow.inequality.cornell.edu/ topics/lgbt-equality/what-does-scholarly-research-say-about-the-effects-of-discrimination-on-the-health-of-lgbt-people/ (detailing findings from 300 peer-reviewed studies); *see also, e.g.*, Julia Raifman et al., *Association of State Laws Permitting Denial of Services to Same-Sex Couples with Mental Distress in Sexual Minority Adults: A Difference-in-Difference-in-Differences Analysis*, 75 JAMA Psychiatry 671, 673-75 (2018); Julia Raifman et al., *Difference-in-Differences Analysis of the Association Between State Same-Sex Marriage Policies and Adolescent Suicide Attempts*, 171 JAMA Pediatrics 350, 353-55 (2017); Mark L. Hatzenbuehler, *Structural Stigma: Research Evidence and Implications for Psychological Science*, 71 Am. Psychologist 742, 745-46 (2016); Mark L. Hatzenbuehler, *The Social Environment and Suicide Attempts in Lesbian, Gay, and Bisexual Youth*, 127 Pediatrics 896, 899-901 (2011); Mark L. Hatzenbuehler et al., *State-Level Policies and Psychiatric Morbidity in Lesbian, Gay, and Bisexual Populations*, 99 Am. J. Pub. Health 2275, 2277-78 (2009).

[4]      *See* Raifman et al. (2018), *supra* n.3; Raifman et al. (2017), *supra* n.3; Hatzenbuehler et al., *supra* n.3.

JA1077

As the Supreme Court has long recognized, "no action is more contrary to the spirit of our democracy and Constitution—or more rightfully resented by a . . . citizen who seeks only equal treatment"—than a denial of equal service by a business "ostensibly open to the general public." *Daniel*, 395 U.S. at 306-08 (quotations omitted); *see also Heart of Atlanta*, 379 U.S. at 292 (Goldberg, J., concurring) ("Discrimination is not simply dollars and cents, hamburgers and movies; it is the humiliation, frustration, and embarrassment that a person must surely feel when he is told that he is unacceptable as a member of the public because of his race or color." (quoting S. Rep. No. 88-872, at 16 (1964)). Accordingly, the Supreme Court has instructed the lower courts to resolve public accommodations cases "without subjecting gay persons to indignities when they seek goods and services in an open market." *Masterpiece*, 138 S. Ct. at 1732.

The American legal and political system has long recognized the importance of public accommodations being open to all. Modern statutes codify and expand upon a common law doctrine, dating back at least to the sixteenth century, that generally required public accommodations to serve all customers. *See Heart of Atlanta*, 379 U.S. at 261 (recognizing that such statutes "codify the common-law innkeeper rule"); *see also, e.g.*, *Lombard v. Louisiana*, 373 U.S. 267, 275-77 & n.6 (1963) (Douglas, J., concurring) (collecting references dating back to 1558. States began enacting public accommodations statutes in 1865 to prohibit discrimination against African Americans. *See* Act Forbidding Unjust Discrimination on Account of Color or Race, 1865 Mass. Acts, ch. 277 (May 16, 1865). Although there is some variation across the States, "public accommodations" laws generally guarantee that when customers enter a business that has opened its doors to the public, they will not be denied service

5

JA1078

simply because of the color of their skin, their gender, their disability, or—under many state and local laws—their sexual orientation.

A majority of Americans now live in communities that "carr[y] forward [this] tradition," *Masterpiece*, 138 S. Ct. at 1725, by prohibiting places of public accommodation from discriminating on the basis of sexual orientation. Twenty-two States and the District of Columbia have laws expressly protecting their residents against discrimination in public accommodations on the basis of sexual orientation. *See* Addendum Table A, *infra*.[5] These state-level protections are supplemented by local laws and ordinances enacted by hundreds of cities, towns, and counties across the country. *See* Addendum Table B, *infra* (collecting citations to roughly 100 local laws and ordinances in the States that do not have statewide laws protecting against discrimination in public accommodations based on sexual orientation). All told, according to U.S. Census Bureau data, the number of Americans living in jurisdictions that have such statewide or local protections is over 189 million (or 57.6% of the national population). *See* Addendum Tables A & B, *infra*.

These laws—including the New York statute at issue before this Court—reflect recognition of the strong evidence of discrimination against LGBTQ people. As New York's Legislature found in extending the State's antidiscrimination protections, prejudice on account of sexual orientation "has severely limited or actually prevented access to employment, housing and other basic necessities of life, leading to deprivation and suffering," and "fostered a general

---

[5]     In addition to these twenty-three jurisdictions with express statutory protections, in Florida, the State's Commission on Human Relations has recently announced that, based on the Supreme Court's decision in *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731 (2020), the Commission would interpret Florida's public accommodations law's prohibition of discrimination on the basis of sex to prohibit discrimination on the basis of sexual orientation. *See* Florida Commission on Human Relations, *Notice: Sexual Discrimination* (2021), https://fchr.myflorida.com/sexual-discrimination.

6

climate of hostility and distrust, leading in some instances to physical violence." N.Y. Sexual Orientation Non-Discrimination Act of 2002, ch. 2, § 1. And such public accommodation laws ban the very "acts of . . . discrimination" that "cause [the] unique evils that government has a compelling interest to prevent," thereby "'respond[ing] precisely to the substantive problem which legitimately concerns' the State[.]" *Roberts*, 468 U.S. at 628-29 (quoting *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 810 (1984)) (describing gender discrimination).

In conjunction with bans on acts of discrimination, state public accommodations laws commonly also prohibit posting notices and advertisements that indicate that services will be denied on the basis of a protected characteristic. At least twenty-three States and the District of Columbia expressly prohibit such discriminatory advertising by public accommodations. *See* Addendum Table C, *infra*. Twenty of those laws include terms similar to New York's provisions making it unlawful for public accommodations "to publish, circulate, issue, display, post or mail any written or printed communication, notice or advertisement to the effect that any of the accommodations, advantages, facilities and privileges of such place shall be refused, withheld from or denied to any person on account of . . . sexual orientation" or "that the patronage or custom thereat of any person of or purporting to be of any particular . . . sexual orientation . . . is unwelcome, objectionable or not acceptable, desired or solicited." N.Y. Exec. Law § 296.2(a).[6]

---

[6]       Of the list of twenty-four laws included in Table C, *infra*, only four States' public accommodations laws do not use similar "unwelcome" terms. *See* Mass. Gen. Laws ch. 272, § 92A; Mont. Code Ann. § 49-2-304(1)(b); Or. Rev. Stat. § 659A.409; Va. Code § 2.2-3904. As argued by New York in its motion to dismiss, Dkt. 25-1 at 25, Plaintiffs' vagueness challenge to this prohibition fails for the simple reason that their proposed conduct plainly violates the law's terms—which in any case are of a kind long recognized as readily understandable by ordinary people. *See, e.g.*, *Ragin v. New York Times Co.*, 923 F.2d 995, 1002 (2d Cir. 1991) (rejecting vagueness challenge to similar Fair Housing Act provision).

Prohibitions against discriminatory advertising are also commonly included in anti-discrimination measures directed at housing and employment. *See, e.g.*, 42 U.S.C. § 3604 (barring housing advertising that "indicates any preference, limitation, or discrimination based on" a protected characteristic); 42 U.S.C. § 2000e-3(b) (similar prohibition for employment advertisements).

## II.   The First Amendment does not exempt businesses open to the public from state anti-discrimination laws.

There is no real dispute that Plaintiffs' stated intent to refuse services to LGBTQ customers would violate New York's anti-discrimination law: Plaintiffs "offer[], solicit[], and receive[] inquiries for engagement and wedding-photography services from the general public and provide[] these services to the general public," while categorically refusing to "provide wedding photography which . . . promotes or celebrates any engagements, weddings, or marriages not between one man and one woman, such as same-sex . . . engagements or marriages." Compl. ¶¶ 32, 117. An objection to two people of the same sex marrying cannot reasonably be divorced from the status of being LGBTQ. *See Christian Legal Soc. v. U.C. Hastings*, 561 U.S. 661, 689 (2010); *Lawrence v. Texas*, 539 U.S. 558, 583 (2003); *Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 125-27 (2d Cir. 2018); *cf. Holcomb v. Iona Coll.*, 521 F.3d 130, 138-39 (2d Cir. 2008) (recognizing that "where an employee is subjected to adverse action because an employer disapproves of interracial [marriage], the employee suffers discrimination because of the employee's own race"). Nor is it a defense to provide photography services to LGBTQ parents and planners associated with opposite-sex weddings or to LGBTQ clients of Plaintiffs' branding photography business. *Cf.* Dkt. 3-1 (Pls.' PI Mem.) at 13-14. Public accommodations laws exist to prevent not only outright exclusion, but also separate and unequal treatment. Otherwise, our country would be blighted by segregated businesses that serve in

8

perniciously unequal ways, reserving some services only for customers who are members of preferred groups. *See Katzenbach v. McClung*, 379 U.S. 294, 296-97 (1964) (discussing restaurant that served African American customers through a take-out window but refused to serve them in the dining area).

The First Amendment does not require permitting such unequal treatment by businesses that offer their services to the public. No matter the sincerity of a business owner's religious beliefs or other deeply held views, the Free Speech Clause does not allow a business to pick and choose its customers in violation of laws that prohibit discriminatory conduct. Nor does the Free Exercise Clause excuse a business from complying with neutral and generally applicable civil rights laws based on its owner's religious beliefs.

### A.    State public accommodations laws do not violate the Free Speech Clause when applied to people with objections to serving LGBTQ customers.

The application of New York's content- and viewpoint-neutral public accommodations law to prevent a commercial business from denying the full and equal enjoyment of their services to LGBTQ customers does not violate the Free Speech Clause of the First Amendment.

### 1.    Prohibiting businesses from discriminating against customers does not compel speech.

Although the First Amendment prohibits States from "telling people what they must say" or requiring them to "speak the government's message," *Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47, 61, 63 (2006) ("*FAIR*"), public accommodations statutes like New York's do neither.

Indeed, New York's public accommodations law does not regulate speech at all. In *FAIR*, the Supreme Court rejected the argument that a prohibition on law schools discriminating against military recruiters when providing campus access to outside employers regulated the law schools' speech. *Id.* at 60. The Court concluded that the prohibition regulated "conduct, not

9

JA1082

speech" given that "[i]t affects what law schools must *do*—afford equal access to military recruiters—not what they may or may not *say*." *Id.*; *see also, e.g.*, *Burt v. Gates*, 502 F.3d 183, 191-92 (2d Cir. 2007) (because Solomon Amendment regulates conduct, it does not interfere with First Amendment right to academic freedom). That reasoning applies equally to this case. State anti-discrimination laws like New York's affect what public accommodations "must *do*"— provide equal access to LGBTQ people—"not what they may or may not *say*." *FAIR*, 547 U.S. at 60. In other words, New York's law does not require speaking or endorsing a government motto, pledge, or message. *See id.* at 62. Rather, the law simply prohibits refusing to "afford equal access" to the full range of a business's services to LGBTQ couples. *Id.* at 60.

Moreover, even assuming that wedding photography is a form of speech, New York law does not "compel" wedding photography or blog posts, nor does it regulate the process of wedding photography in any particular way. Plaintiffs are under no legal obligation to offer wedding photography or blog posts as a service of their broader photography business, *see* Compl. ¶¶ 36-39 (noting that Plaintiffs also offer branding photography services), nor to take photographs or prepare blog posts in any specific manner. And New York law *certainly* does not compel Plaintiffs to "follow[] the officiant's instructions, sing[], and engage[] with . . . prayers" or otherwise practice religion when attending the weddings themselves. Pls.' PI Mem. 20 (claiming, in connection with Free Exercise and Establishment Clause arguments, that Plaintiffs "must also participate in same-sex weddings in the same ways she does for opposite sex weddings"); *see also* Compl. ¶ 71. New York law simply requires that businesses offering their services to the public make wedding photography for LGBTQ customers if, and to the extent that, they provide wedding photography for other customers—just as under the Solomon Amendment at issue in *FAIR*, recruiting assistance involving "elements of speech" like posting

10

notices of employer visits was "only 'compelled' if, and to the extent, the school" chose to assist "other recruiters." 547 U.S. at 61-62. This type of non-discrimination requirement is a "far cry" from laws "dictat[ing] the content of . . . speech." *Id.* (distinguishing cases like *Wooley v. Maynard*, 430 U.S. 705 (1977)). As the *FAIR* Court noted with an example also apposite here, "prohibit[ing] employers from discriminating in hiring on the basis of race" does not compel speech, and "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Id.* (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)).[7]

This doctrine also lays bare why Plaintiffs are wrong to rely on *Hurley v. Irish American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557 (1995), in arguing that New York's public accommodations law unlawfully compels their speech. *See, e.g.*, Pls.' PI Mem. 8-11, 14. Plaintiffs' argument relies on the premise that commercial businesses' refusal to serve customers from a historically disadvantaged group should receive the same First Amendment protection afforded to private, non-commercial organizations engaged in expressive associational activities at the core of the First Amendment's protections. But this premise elides the fundamental distinction between a private speaker sharing its own message and a public accommodation that offers services to the general public. While *Hurley* noted that "business corporations generally" enjoy a speaker's "autonomy to choose the content of his *own* message," and that a private

---

[7]     Public accommodations laws also leave businesses like Plaintiffs' free to disclaim any message they worry may be communicated by providing non-discriminatory service. So long as businesses treat all customers equally, they may, for example, create and disseminate a disclaimer stating that the provision of a service does not constitute an endorsement or approval of any customer or conduct. *See FAIR*, 547 U.S. at 64-65; *Pruneyard Shopping Ctr. v. Robins*, 447 U.S. 74, 86-88 (1980).

parade organizer may "customar[ily] determin[e]" which expressive units it wishes to present, 515 U.S. at 573-75 (emphasis added), *Hurley* nowhere suggested that a business that offers as a service to the general public the creation of a product could refuse to provide the service to customers on the basis of their sexual orientation, nor that laws requiring such service compel any form of speech. *See FAIR*, 547 U.S. at 63 ("The expressive nature of a parade was central to our holding in *Hurley*."). Rather, just as a commercial business has no protected expressive interest in its relationship with its customers, *see Roberts*, 468 U.S. at 638 (O'Connor, J., concurring); *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1073 (7th Cir. 2013), a business offering services to the general public does not have the right to express a message by only offering particular services to clients of particular sexual orientations and is not unlawfully compelled to speak when it is required to offer those clients all of its services on equal footing, *see Elane Photography, LLC v. Willock*, 309 P.3d 53, 68 (N.M. 2013) ("While photography may be expressive, the operation of a photography business is not.").

> **2.    The First Amendment does not protect advertisements giving notice that public accommodations will refuse service on the basis of a protected characteristic.**

Public accommodations laws' restrictions on discriminatory advertising do not violate the free speech rights of business owners who wish to post notices of their intent to deny services on the basis of a protected characteristic—as Plaintiffs do here. *See* Compl. ¶¶ 229-232 (describing intent to add policy statement to operating agreement "bind[ing] Emilee Carpenter Photography to not photograph same-sex weddings"); *id.* ¶¶ 246-252 (describing intent to post statement to website "explaining her religious reasons for why she only promotes marriages between one man and one woman"). Such advertisements may be prohibited for at least two reasons.

First, to the extent the notices constitute commercial speech, they can be banned outright simply because they advertise unlawful, discriminatory activities. *Pittsburgh Press Co. v.*

12

JA1085

*Human Relations Comm'n*, 413 U.S. 376, 388-89 (1973) (employment discrimination ordinance validly prohibited newspaper from publishing sex-segregated employment advertisements); *see also Anderson v. Treadwell*, 294 F.3d 453, 460 (2d Cir. 2002) ("Even a communication combining commercial and noncommercial elements, if it is an advertisement…is properly characterized as commercial speech.").

Second, commercial speech doctrine aside, a state may prohibit such signs as part and parcel of, and incidental to, the public accommodations law's restriction on discriminatory conduct. Such laws in essence prohibit discriminatory refusals of service that are communicated preemptively in a notice, rather than only after service is requested by the customer. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) ("That is why a ban on race-based hiring may require employers to remove 'White Applicants Only' signs." (quoting *FAIR*, 547 U.S. at 62) (internal quotation marks omitted)); *cf. Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365 (1977) ("If an employer should announce his policy of discrimination by a sign reading 'Whites Only' on the hiring-office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs."). Indeed, even some of the case law Plaintiffs themselves cite, *see* Pls.' PI Mem. 18, recognizes that, insofar as a state can constitutionally prohibit a discriminatory refusal to provide services, the state can also "forbid the [business owners] from advertising their intent to engage in discriminatory conduct." *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 757 n.5 (8th Cir. 2019) (citing *FAIR*, 547 U.S. at 62). This is why courts repeatedly hold that even in expressive contexts, discriminatory advertising is not entitled to First Amendment protection. *See, e.g.*, *Soules v. Dep't of Hous. & Urb. Dev.*, 967 F.2d 817, 824 (2d Cir. 1992); *Ragin v. New York Times Co.*, 923 F.2d 995, 1003 (2d Cir. 1991).

13

### 3. Public accommodations laws like New York's satisfy any level of constitutional scrutiny.

For all the reasons above, New York's neutral and generally applicable statute regulates conduct and commercial speech, and therefore is not subject to strict scrutiny.[8] The law would, however, survive even strict scrutiny. As the Supreme Court has found time and again, "public accommodations laws 'plainly serv[e] compelling state interests of the highest order.'" *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987) (quoting *Roberts*, 468 U.S. at 624).

#### a. States have a compelling interest in eliminating sexual orientation discrimination in public accommodations.

States have a "compelling interest of the highest order" in eradicating invidious discrimination against historically marginalized groups, *Duarte*, 481 U.S. at 549 (quoting *Roberts*, 468 U.S. at 624)—including LGBTQ persons. *See Masterpiece*, 138 S. Ct. at 1727 ("The exercise of their freedom on terms equal to others must be given great weight and respect by the courts."). Courts across the country, including in New York, have recognized as much. *See, e.g.*, *Cervelli v. Aloha Bed & Breakfast*, 415 P.3d 919, 931, 935 (Haw. Ct. App. 2018); *Gifford v. McCarthy*, 137 A.D.3d 30, 40 (N.Y. App. Div. 2016); *N. Coast Women's Care Med. Grp., Inc. v. San Diego Cty. Super. Ct.*, 189 P.3d 959, 968 (Cal. 2008); *Gay Rights Coal. of Georgetown Univ. Law Ctr. v. Georgetown Univ.*, 536 A.2d 1, 31-37 (D.C. 1987).

As discussed above, LGBTQ Americans continue to suffer severe and pervasive discrimination in employment, housing, and places of public accommodation, among other facets of their everyday lives. *See* Part I, *supra*, at 2-4 & nn.1-4. And research bears out the terrible

---

[8] Plaintiffs' contention that New York's statute is somehow *not* viewpoint-neutral, *see* Pls.' PI Mem. 17-19, defies both common sense and decades of precedent. *See, e.g.*, *Christian Legal Soc.*, 561 U.S. at 695 ("all-comers requirement" is "textbook viewpoint neutral"); *see also infra* at 18 (explaining why New York's law is neutral for free exercise purposes).

14

injuries this discrimination inflicts on LGBTQ people, their families, and their communities—

not only lost employment or housing, but also severe harms to their health and wellbeing.  *See*

Part I, *supra*, at 2-4 & nn.1-4.  Plaintiffs' assertion that refusals of service on the basis of sexual

orientation are not an "actual problem" in light of the existence of other photographers who will

provide services for same-sex weddings, Pls.' PI Mem. 22, thus belies the lamentable reality that

is exemplified by Plaintiffs' own expressed intention to discriminate.  And the Supreme Court

has long recognized the significant harm caused by such discrimination, as well as the States'

concomitant compelling interests in preventing these harms.  *See, e.g.*, *Masterpiece*, 138 S. Ct. at

1728-29; *Duarte*, 481 U.S. at 549.

> **b.** **Public accommodations laws are narrowly tailored to serve the States' compelling interest in combatting discrimination.**

Just as employment discrimination laws are "precisely tailored" to advance a state

interest in providing "equal opportunity to participate in the workforce," *Burwell v. Hobby Lobby*

*Stores, Inc.*, 573 U.S. 682, 733 (2014), public accommodations laws like New York's are

precisely tailored to advance a state interest in ensuring equal access to the businesses that

sustain our everyday life.  *See Roberts*, 468 U.S. at 628.  New York's law is therefore

constitutional.

Public accommodations laws directly combat the economic, personal, and social harms

caused by discrimination.  By guaranteeing full and equal access to the commercial marketplace,

these laws ensure that LGBTQ residents are not denied—or forced to overcome artificial barriers

to acquire—"tangible goods and services."  *Id.* at 625-26; *see also Romer*, 517 U.S. at 631

("[T]hese are protections against exclusion from an almost limitless number of transactions and

endeavors that constitute ordinary civic life.").  Public accommodations laws also provide

protection from the "stigmatizing injury" and "deprivation of personal dignity" that necessarily

JA1088

"accompanies denials of equal access to public establishments." *Roberts*, 468 U.S. at 625 (quoting *Heart of Atlanta*, 379 U.S. at 250); *see Masterpiece*, 138 S. Ct. at 1727, 1729, 1732.  By ensuring that such public establishments are indeed open to the entire public, these laws foster not only the economic, but also the social and political integration of residents.  *Roberts*, 468 U.S. at 625-26.  In so doing, these laws deliver many benefits, including counteracting the negative health effects caused by stigmatization and social exclusion, *see supra* nn.3-4.  In short, New York's law and its analogues across the country serve to vindicate the "equal dignity" of LGBTQ people.  *Obergefell*, 576 U.S. at 681.

Given these "compelling state interests of the highest order" directly served by public accommodations laws, they are constitutional, including as applied to business owners who would prefer to discriminate based on their personal views.  *Duarte*, 481 U.S. at 549 (quoting *Roberts*, 468 U.S. at 624).  Plaintiffs' assertion that LGBTQ people can simply find other wedding website designers to serve them, Pls.' PI Mem. 22, ignores this central animating purpose of anti-discrimination laws:  to ensure that people will *not* be turned away from a business on account of their race, gender, religion, or sexual orientation.  Plaintiffs' "just go elsewhere" argument would hearken back to the days when Black travelers relied on the "Negro Motorist Green Book" to find accommodations that would serve them while on the road, thus reinforcing exactly the kind of social disintegration and economic balkanization that public accommodation laws like New York's are intended to combat.

For the same reason, the numerous examples of further tailoring that Plaintiffs propose, Pls.' PI Mem. 23-25, fundamentally hamstring New York's public accommodations law.  Exceptions for businesses like Plaintiffs' would not constitute better tailoring; rather, they would frustrate the laws' very purpose.  To take one example, Plaintiffs propose that New York limit its

public accommodations law to apply "only to essential, non-expressive, or non-internet businesses." *Id.* at 24-25. But this ill-defined restriction removes from the scope of the law's protections countless businesses that could be deemed "expressive" (to take just one of Plaintiffs' proposed exempted categories)—including web designers, architects, sign makers, hairdressers, make-up artists, chefs, and more. Exempting businesses like these from public accommodations laws leaves LGBTQ people (and Black people, and Jews, and women, and myriad other protected groups) vulnerable to discrimination across the marketplace. Laws like New York's effectively ensure equal access and combat discrimination's harms only when they comprehensively cover places open to the public; States cannot both combat discrimination and, at the same time, license businesses to discriminate. *See State v. Arlene's Flowers, Inc.*, 441 P.3d 1203, 1235 (Wash. 2019) ("carv[ing] out a patchwork of exceptions for ostensibly justified discrimination" would "fatally undermine[]" this interest).

Accordingly, for well over a century, courts have upheld the constitutionality of public accommodations laws against challenges by businesses seeking to discriminate based on personal convictions. *See, e.g.*, *McClung*, 379 U.S. at 298 n.1 (rejecting argument that restaurant could discriminate against African Americans based on "personal convictions and…choice of associates," as argued in the Brief for Appellees, No. 543, 1964 WL 81100, at *32-33 (U.S. Oct. 2, 1964)). The Supreme Court has long decried discrimination in public establishments as a "unique evil" entitled to "no constitutional protection," *Roberts*, 468 U.S. at 628-29, and has described state laws prohibiting such discrimination as "unquestionab[ly]" constitutional, *Heart of Atlanta*, 379 U.S. at 260-61. So too here.

**B.     State public accommodations laws do not violate the Free Exercise Clause.**

Prohibiting a business from refusing to provide wedding photography services to LGBTQ customers also does not violate the Free Exercise Clause.

JA1090

The Free Exercise Clause does not excuse businesses from complying with neutral laws of general applicability, including public accommodations laws like New York's. *Employment Div. v. Smith*, 494 U.S. 872, 879 (1990); *Masterpiece*, 138 S. Ct. at 1727 (While a person's "religious and philosophical objections are protected, it is a general rule that such objections do not allow business owners and other actors in the economy and in society to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations law."). For free exercise purposes, a law is neutral and generally applicable if it does not target religion and "prohibit[s] conduct the State is free to regulate." *Smith*, 494 U.S. at 878-79. Plaintiffs do not seriously challenge that public accommodations laws like New York's, on their face, meet this requirement.

Rather, Plaintiffs allege that the laws "are not neutral because New York interprets its law to target [Plaintiffs'] religious beliefs for adverse treatment." Pls.' PI Mem. 21. Nothing could be further from the truth. Nothing in New York's public accommodations laws targets religious belief; the laws instead prohibit businesses from refusing to serve potential customers, or denying any person the full and equal enjoyment of their services, "*because of*" certain characteristics, like their race, sex, or sexual orientation. N.Y. Exec. Law § 296.2(a) (emphasis added). Whether a person's desire to discriminate on the basis of sexual orientation is grounded in religious reasons or in secular ones, the law treats it the same: A business that refuses to provide a service for same-sex couples that it would provide to other customers violates the law. Consistent with this facial neutrality, Plaintiffs do nothing to demonstrate bias in the law's application; they are unable to point to a single instance in which discrimination on the basis of sexual orientation has been permitted for secular reasons but forbidden based on religious ones.

18

Because New York's law is neutral and generally applicable, Plaintiffs' Free Exercise claim should be rejected.

**III.** **A First Amendment exemption to public accommodations laws of the kind sought by Plaintiffs would dramatically undermine anti-discrimination laws.**

Although the claim here on its face relates to just one photography business, the consequences of ruling in its favor would have far broader consequences for our public accommodations laws, our residents, and our society.

As discussed above, *supra* at 16-17, Plaintiffs offer no principled basis for distinguishing a photography business from myriad other businesses that may seek to claim an exemption from public accommodations laws. An architect, sign-maker, hairdresser, make-up artist, chef: Each is engaged in a business that its operator may view as involving "expressive" activity. Indeed, there is no reason that Plaintiffs' sweeping view of *Hurley* would be limited to their category of "expressive" businesses, as opposed to other businesses that offer services with potentially expressive aspects—like a hotel ballroom that posts signs to announce its events. Under Plaintiffs' view of *Hurley*'s reach, LGBTQ people could be exposed to discrimination in a broad swath of the commercial marketplace, particularly when attempting to exercise their fundamental right to marry or to celebrate other important life events.

Moreover, the free-speech exemption Plaintiffs seek would not be limited to opposition to marriage between same-sex couples or to beliefs rooted in religious convictions. Under their theory, for example, a baker opposed to mixed-race relationships could refuse to bake wedding cakes for interracial couples, or a real estate agent opposed to racial integration could refuse to represent non-white couples. It remains a sad fact of American society that such views remain

19

disturbingly prevalent.[9]  Although the First Amendment tolerates all manner of odious speech in the public square, *see, e.g.*, *Snyder v. Phelps*, 562 U.S. 443 (2011), it does not require insulating from liability businesses that violate content-neutral laws by turning away customers because of their race, religion, gender, or sexual orientation.

This Court should heed the Supreme Court's instruction to ensure that LGBTQ persons are not subjected "to indignities when they seek goods and services in an open market." *Masterpiece*, 138 S. Ct. at 1732.  The States must be permitted to preserve their residents' social and economic well-being and protect all within their borders from the manifest harms of discrimination.

## CONCLUSION

For the foregoing reasons, this Court should grant Defendants' motion to dismiss and deny Plaintiffs' motion for a preliminary injunction.

---

[9]     *See, e.g.*, *Reuters/Ipsos/UVA Center for Politics Race Poll* (Sept. 11, 2017), http://www.centerforpolitics.org/crystalball/wp-content/uploads/2017/09/2017-Reuters-UVA-Ipsos-Race-Poll-9-11-2017.pdf (showing 16% of U.S. adults—*i.e.*, approximately 35 million people—agree that "[m]arriage should only be allowed between people of the same race," and 5% of adults—*i.e.*, approximately 12 million people—disagree that "[p]eople of different races should be free to live wherever they choose").

Dated: July 6, 2021

/s/ Adam M. Cambier

MAURA HEALEY
  Attorney General
  Commonwealth of Massachusetts
Elizabeth N. Dewar
  State Solicitor
Adam M. Cambier*
  Assistant Attorney General
One Ashburton Place
Boston, Massachusetts 02108
Tel.: 617-963-2278
Email: adam.cambier@mass.gov

* Counsel of Record, admitted *pro hac vice*

ROBERT BONTA
*Attorney General of California*
1300 I Street
Sacramento, CA 95814

WILLIAM TONG
*Attorney General of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
*Attorney General of Delaware*
820 North French Street
Wilmington, DE 19801

KARL A. RACINE
*Attorney General for the District of Columbia*
400 6th Street NW
Washington, D.C. 20001

CLARE E. CONNORS
*Attorney General of Hawaiʻi*
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
*Attorney General of Illinois*
100 West Randolph Street, 12th Floor
Chicago, IL 60601

AARON M. FREY
*Attorney General of Maine*
6 State House Station
Augusta, ME 04333

BRIAN E. FROSH
*Attorney General of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

DANA NESSEL
*Attorney General of Michigan*
P.O. Box 30212
Lansing, MI 48909

21

JA1094

KEITH ELLISON
*Attorney General of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Boulevard
St. Paul, MN 55155

AARON D. FORD
*Attorney General of Nevada*
100 North Carson Street
Carson City, NV 89701

GURBIR S. GREWAL
*Attorney General of New Jersey*
25 Market Street
Trenton, NJ 08625

HECTOR BALDERAS
*Attorney General of New Mexico*
P.O. Drawer 1508
Santa Fe, NM 87504

JOSHUA H. STEIN
*Attorney General of North Carolina*
114 W. Edenton Street
Raleigh, NC 27603

ELLEN F. ROSENBLUM
*Attorney General of Oregon*
1162 Court Street N.E.
Salem, OR 97301

JOSH SHAPIRO
*Attorney General of Pennsylvania*
16th Floor, Strawberry Square
Harrisburg, PA 17120

PETER F. NERONHA
*Attorney General of Rhode Island*
150 South Main Street
Providence, RI 02903

THOMAS J. DONOVAN, JR.
*Attorney General of Vermont*
109 State Street
Montpelier, VT 05609

MARK R. HERRING
*Attorney General of Virginia*
202 North 9th Street
Richmond, VA 23219

ROBERT W. FERGUSON
*Attorney General of Washington*
P.O. Box 40100
Olympia, WA 98504

JA1095

**ADDENDUM**

**Table A: State Laws**

The following States have laws expressly prohibiting discrimination on the basis of sexual orientation in places of public accommodation.  The population data is taken from the United States Census Bureau's estimate of State populations as of July 1, 2020.[10]

| State | Population | State Law |
|-------|-----------|-----------|
| California | 39,368,078 | Cal. Civ. Code § 51 (2018). |
| Colorado | 5,807,719 | Colo. Rev. Stat. § 24-34-601 (2014). |
| Connecticut | 3,557,006 | Conn. Gen. Stat. § 46a-64 (2019). |
| Delaware | 986,809 | Del. Code Ann. tit. 6, § 4504 (2013). |
| District of Columbia | 712,816 | D.C. Code § 2-1402.31 (2001). |
| Hawaii | 1,407,006 | Haw. Rev. Stat.  § 489-3 (2006). |
| Illinois | 12,587,530 | 775 Ill. Comp. Stat. 5/1-102, 5/5-102 (2015). |
| Iowa | 3,163,561 | Iowa Code § 216.7 (2007). |
| Maine | 1,350,141 | Me. Rev. Stat. tit. 5, § 4592 (2019). |
| Maryland | 6,055,802 | Md. Code Ann., State Gov't § 20-304 (West 2018). |
| Massachusetts | 6,893,574 | Mass. Gen. Laws. ch. 272, § 98 (2018). |
| Minnesota | 5,657,342 | Minn. Stat. § 363A.11 (2019). |
| Nevada | 3,138,259 | Nev. Rev. Stat. § 651.070 (2011). |
| New Hampshire | 1,366,275 | N.H. Rev. Stat. § 354-A:17 (2009). |
| New Jersey | 8,882,371 | N.J. Stat. § 10:5-12(f) (West 2013). |
| New Mexico | 2,106,319 | N.M. Stat. § 28-1-7 (2008). |
| New York | 19,336,776 | N.Y. Exec. Law § 291 (McKinney 2010). |
| Oregon | 4,241,507 | Or. Rev. Stat. § 659A.403 (2019). |
| Rhode Island | 1,057,125 | R.I. Gen. Laws § 11-24-2 (2019). |
| Vermont | 623,347 | Vt. Stat. tit. 9, § 4502 (2019). |
| Virginia | 8,590,563 | Va. Code § 2.2-3904 (2020). |
| Washington | 7,693,612 | Wash. Rev. Code § 49.60.030 (2019). |
| Wisconsin | 5,832,655 | Wis. Stat. § 106.52 (2018). |

---

[10]     *See* U.S. Census Bureau, *Annual Estimates of Resident Population for the United States, Regions, States, and Puerto Rico: April 1, 2010 to July 1, 2020* (Dec. 2020), https://www.census.gov/programs-surveys/popest/technical-documentation/research/evaluation-estimates/2020-evaluation-estimates/2010s-state-total.html

**Table B: Local Laws**

The following local jurisdictions have laws or ordinances prohibiting discrimination on the basis of sexual orientation in places of public accommodation and are jurisdictions *not* covered by the State-level public accommodations laws listed in Table A. The list is not exhaustive but includes the laws and ordinances that could be readily identified and reviewed through publicly available sources. The population data is taken from the U.S. Census Bureau's estimates of local populations as of July 1, 2018.[11] (This table omits the numerous local non-discrimination ordinances in the States listed in Table A.)

| Population | Ordinance |
|---|---|
| **Alabama** | |
| 209,403 | Birmingham, Ala., Ordinance No. 17-121 (2017). |
| **Alaska** | |
| 288,000 | Anchorage, Alaska, Anchorage Municipal Code tit. 5, ch. 5.20, § 5.20.050 (2015). |
| 31,974 | Juneau, Alaska, Compiled Laws of the City and Borough of Juneau, Alaska tit. 41, ch. 41.05, § 41.05.020 (2019). |
| **Arizona** | |
| 1,680,992 | Phoenix, Ariz., Phx. City Code art 1, ch. 18, §18-4 (2013). |
| 548,073 | Tucson, Ariz., Tucson City Code ch. 17, art. 3, § 17-12 (1999). |
| 195,805 | Tempe, Ariz., Tempe City Code ch. 2, § 2-603(1) (2019). |
| 75,038 | Flagstaff, Ariz., Flagstaff City Code ch. 14-02-001-0003(A) (2013). |
| **Florida** | |
| 2,716,940 | Miami-Dade County, Fla., The Code of Miami-Dade County ch. 11A, art. 3, § 11A-19 (2014). |
| 1,952,778 | Broward County, Fla., Broward County, Fla., Code of Ordinances ch. 16½, §§ 16½-3(p), 16½-34 (2011). |
| 1,471,968 | Hillsborough County, Fla., Hillsborough County Code of Ordinances and Laws ch. 30, § 30-23 (2014). |
| 1,393,452 | Orange County, Fla., Orange County Code of Ordinances ch. 22, art. 3, § 22-42 (2013). |
| 974,996 | Pinellas County, Fla., Pinellas County Code of Ordinances ch. 70, art. 2, § 70-214 (2014). |
| 553,284 | Volusia County, Fla., Municipal Code of Ordinances ch. 36, art. 3, § 36-41 (2019). |

---

[11] U.S. Census Bureau, *Annual Estimates of the Resident Population for Incorporated Places of 50,000 or More, Ranked by July 1, 2019 Population: April 1, 2010 to July 1, 2019* (April 2021) (data accessible at https://www.census.gov/data/tables/time-series/demo/popest/2010s-total-cities-and-towns.html); U.S. Census Bureau, *Annual Estimates of the Resident Population for Minor Civil Divisions: April 1, 2010 to July 1, 2019* (April 2021) (accessible at same link); U.S. Census Bureau QuickFacts: United States (Dec. 2019) (https://www.census.gov/quickfacts/).

24

JA1097

| | |
|---|---|
| 293,582 | Leon County, Fla., Leon County Code of Ordinances ch. 9, art. 3, § 9-42 (2019). |
| 269,043 | Alachua County, Fla., Alachua County Code of Ordinances ch. 111, art. 1, § 111.06 (2013). |
| **Georgia** | |
| 506,811 | Atlanta, Ga., Atlanta Code of Ordinances ch. 94, art. 3, § 94-68 (2000). |
| **Idaho** | |
| 228,959 | Boise, Idaho, Boise City Code ch. 6, § 6-02-03(B) (2012). |
| 56,637 | Pocatello, Idaho, City Code tit. 9, ch. 9.36, § 9.36.030(B) (2013). |
| 52,414 | Coeur D'Alene, Idaho, Coeur d'Alene, Idaho City Code tit. 9, ch. 9.56, § 9.56.030(B) (2019). |
| 25,702 | Moscow, Idaho, Moscow City Code tit. 10, ch. 19, § 19-23(B) (2013). |
| **Indiana** | |
| 964,582 | Indianapolis-Marion County, Ind., Rev. Code of the Consolidated City and County ch. 581, art. 1, § 581-101 (2008). |
| 270,402 | Fort Wayne, Ind., Fort Wayne City Code tit. 9, ch. 93, § 93.018 (2003). |
| 195,732 | Tippecanoe County, Code of Tippecanoe County tit. 3, ch. 31, §§ 31.75, 31.76 (2001). |
| 181,451 | Vanderburgh County, Ind., Vanderburgh County Code tit. 2, ch. 2.56, § 2.56.020 (2020). |
| 148,431 | Monroe County, Ind., Monroe County Code ch. 520-2 (2020). |
| 102,026 | South Bend, Ind., Municipal Code of South Bend, Ind. ch. 2, art. 9, § 2-127.1 (2012). |
| 75,522 | Hammond, Ind., City of Hammond, Ind. Code of Ordinances tit. 3, ch. 37, § 37.057 (2019). |
| 67,999 | Muncie, Ind., Code of Ordinances tit. 3, ch. 34, div. 5, § 34.87(F) (2015). |
| 33,897 | Valparaiso, Ind. Ordinance No. 16-09 (2017). |
| 31,015 | Michigan City, Ind., Michigan City Code ch. 66, div. 3, § 66-114 (2019). |
| 28,357 | Zionsville, Ind., Zionsville Town Code tit. 9, ch. 103, § 103.07 (2019). |
| **Kansas** | |
| 98,193 | Lawrence, Kan., City Code of Lawrence ch. 10, art. 1, § 10-110 (2019). |
| 54,604 | Manhattan, Kan., Code of Ordinances City of Manhattan, Kan. ch. 10, art. 3, § 10-17 (2019). |
| **Kentucky** | |
| 617,638 | Louisville-Jefferson County, Ky., Metro Code tit. 9, ch. 92, § 92.05 (2004). |
| 323,152 | Lexington-Fayette County, Ky., Charter and Code of Ordinances Lexington-Fayette Urban County Gov't ch. 2, art. 2, § 2-33 (1999). |

| | |
|---|---|
| 40,341 | Covington, Ky., Covington, Ky. Code of Ordinances tit. 3, ch. 37, § 37.07 (2003). |
| 27,755 | Frankfort, Ky., City of Frankfort, Ky. Code of Ordinances tit. 9, ch. 96, § 96.08 (2013). |
| 7,562 | Morehead, Ky., City of Morehead, Ky. Code of Ordinances tit. 9, ch. 96, § 96.07 (2013). |
| **Louisiana** | |
| 390,144 | New Orleans, La., Code of the City of New Orleans, Louisiana ch. 86, art. 6, § 86-33 (1999). |
| 187,112 | Shreveport, La., City Code of Ordinances City of Shreveport ch. 39, art. 1, § 39-2 (2013). |
| **Michigan** | |
| 670,031 | Detroit, Mich., Detroit City Code ch. 27, art. 6, § 27-6-1 (2008). |
| 119,980 | Ann Arbor, Mich., Code City of Ann Arbor tit. 9, ch. 112, §§ 9:150, 9:153 (2020). |
| 118,210 | Lansing, Mich., Codified Ordinances of Lansing, Mich. tit. 12, ch. 297.04 (2019). |
| 76,200 | Kalamazoo, Mich., Kalamazoo City Code ch. 18, art. 2, § 18-20 (2009). |
| 48,145 | East Lansing, Mich., Code of Ordinances City of East Lansing, Mich. ch. 22, art. 2, § 22-35 (2012). |
| 20,033 | Ferndale, Mich., Code of Ordinances City of Ferndale, Mich. ch. 28, §28-4 (2006). |
| 15,738 | Traverse City, Mich., Codified Ordinances of Traverse City, Mich. Pt. 6, ch. 605, § 605.04 (2010). |
| 2,425 | Pleasant Ridge, Mich., Code of Ordinances City of Pleasant Ridge, Mich. ch. 40, § 40-4 (2013). |
| **Mississippi** | |
| 160,628 | Jackson, Miss., Code of Ordinances City of Jackson, Miss. ch. 86, art. 10, § 86-302 (2019). |
| **Missouri** | |
| 994,205 | St. Louis County, Mo., Code of Ordinances, tit. 7, ch. 718, § 718.020 (2012). |
| 495,327 | Kansas City, Mo., Code of Ordinances of Kansas City, Mo. vol. 1, ch. 38, art. 3, § 38-113 (2013). |
| 300,576 | St. Louis, Mo., The Charter, the Scheme, and the General Ordinances of the City of St. Louis, Mo. tit. 3, ch. 3.44, § 3.44.080(E) (2003). |
| 123,195 | Columbia, Mo., Code of Ordinances ch. 12, art. 3, div. 1, §12-35 (2012). |
| 71,028 | St. Charles, Mo., Code of Ordinances of the City of St. Charles ch. 240, art. 3, § 240.090 (2019). |
| **Montana** | |
| 75,516 | Missoula, Mont., Missoula Municipal Code tit. 9, ch. 64, §9.64.040 (2010). |

| 49,831 | Bozeman, Mont., Municipal Code of the City of Bozeman, Mont. Ch. 24, art. 10, § 24.10.050 (2014). |
|---|---|
| 34,207 | Butte-Silver Bow, Mont., Butte-Silver Bow Municipal Code tit. 5, ch. 5.68, §5.68.040 (2014). |
| 33,124 | Helena, Mont., Municipal Code of the City of Helena, Mont. tit. 1, ch. 8, § 1-8-4 (2019). |
| 8,295 | Whitefish, Mont., The City Code of the City of Whitefish, Mont. tit. 1, ch. 10, § 1-10-4 (2019). |
| **Nebraska** | |
| 478,192 | Omaha, Neb., Omaha Municipal Code, Charter, and General Ordinances of the City vol. I, ch. 13, art. 3, div. 1, § 13-84 (2012). |
| **Ohio** | |
| 898,553 | Columbus, Ohio, Columbus – City Code of Ordinances tit. 23, ch. 2331, § 2331.04 (2008). |
| 381,009 | Cleveland, Ohio, Code of Ordinances § 667.01 (2019). |
| 303,940 | Cincinnati, Ohio, Municipal Code of Cincinnati, Ohio § 914-7 (2006). |
| 272,779 | Toledo, Ohio, Toledo Municipal Code § 554.05 (2019). |
| 197,597 | Akron, Ohio, Code of Ordinances tit. 3, ch. 38, § 38.04 (2019). |
| 140,407 | Dayton, Ohio, Code of Ordinances City of Dayton, Ohio tit. III, div. I, § 32.04 (2007). |
| 65,469 | Youngstown, Ohio, Codified Ordinances of the City of Youngstown, Ohio pt. 5, ch. 147, § 547.04 (2019). |
| 49,678 | Lakewood, Ohio, Codified Ordinances of Lakewood, Ohio pt. 5, § 516.04 (2019). |
| 50,315 | Newark, Ohio, City of Newark Code of Ordinances pt. 6, ch. 632, §632.03(c) (2007). |
| 43,992 | Cleveland Heights, Ohio, Codified Ordinances of the City of Cleveland Heights, Ohio pt. 7, ch. 749, § 749.15 (2019). |
| 31,504 | Bowling Green, Ohio, City of Bowling Green Code of Ordinances tit. 3, ch. 39, §§ 39.01, 39.03 (2018). |
| 24,536 | Athens, Ohio, Code of Ordinances tit. 3, ch. 3.07, §3.07.62 (2019). |
| 23,110 | Oxford, Ohio, Codified Ordinances of the City of Oxford, Ohio pt. 1, ch. 143, § 143.04 (2019). |
| 13,770 | Bexley, Ohio, Bexley City Codes ch. 637, § 637.04 (2018). |
| 11,051 | Coshocton, Ohio, Codified Ordinances of the City of Coshocton, Ohio pt. 1, tit. 5, ch. 159, § 159.03(c) (2014). |
| **Oklahoma** | |
| 124,880 | Norman, Okla., Norman, Oklahoma - Code of Ordinances, ch. 7, § 7-104 (2020). |
| **Pennsylvania** | |
| 1,584,064 | Phila., Pa., The Philadelphia Code tit. 9, § 9-1106 (2016). |
| 1,216,045 | Allegheny County, Pa., Administrative Code div. 2, ch. 215, art. 5, § 215-35 (2009). |

JA1100

| | |
|---|---|
| 269,728 | Erie County, Pa., Erie County Code, ord. 59, art. 11 (2004). |
| 121,442 | Allentown, Pa., The Ordinances of the City of Allentown, Pa. tit. 11, art. 181, § 181.06 (2019). |
| 88,375 | Reading, Pa., Reading, Pa. Code of Ordinances pt. 5, ch. 23, § 23-509 (2019). |
| 49,271 | Harrisburg, Pa., The Harrisburg Municipal Code tit. 4, pt. 1, ch. 4-101, § 4-105.3 (2018). |
| 42,160 | State College, Pa., Borough Codification of Ordinances ch. 5, pt. E, § 505 (2018). |
| 40,766 | Wilkes-Barre, Pa., Code of Ordinances City of Wilkes-Barre, Pa. ch. 14, §§ 14-1, 14-3 (2018). |
| 2,530 | New Hope, Pa., Code of the Borough of New Hope ch. 129, art. 1, § 129-4 (2007). |
| **South Carolina** | |
| 415,759 | Richland County, S.C., Code of Ordinances of Richland County, S.C. ch. 16, art. 6, §16-68 (2017). |
| 137,566 | Charleston, S.C., Code of the City of Charleston, S.C. ch. 16, art. IV, § 16-29 (2019). |
| **South Dakota** | |
| 24,415 | Brookings, South Dakota, Brookings, South Dakota - Code of Ordinances, ch. 2, art. V, div. 2, § 2-143(5) (2019). |
| **Texas** | |
| 1,547,253 | San Antonio, Tex., Code City of San Antonio Tex. ch. 2, art. 10, div. 5, § 2-592 (2018). |
| 1,343,573 | Dallas, Tex., The Dallas City Code vol. II, ch. 46, art. II, § 46-6.1 (2019). |
| 978,908 | Austin, Tex., The Code of the City of Austin, Tex. Tit. 5, ch. 5-2, § 5-2- 4 (1992). |
| 909,585 | Fort Worth, Tex., City of Fort Worth Code of Ordinances pt. 2, ch. 17, art. 2, § 17-48 (2019). |
| 681,728 | El Paso, Tex., A Codification of the General Ordinances of El Paso, Tex. Tit. 10, ch. 10.16, § 10.16.010 (2003). |
| 287,677 | Plano, Tex., Code of Ordinances City of Plano, Tex. ch. 2, art. I, § 2-11(d) (2019). |
| **West Virginia** | |
| 46,536 | Charleston, W. Va., Code of the City of Charleston, W. Va. Ch. 62, art. 3, § 62-81(6) (2007). |
| 45,110 | Huntington, W. Va., Codified Ordinances of Huntington, W. Va. pt. 1, ch. 5, art. 147, § 147.08(f) (2018). |
| 6,029 | Charles Town, W. Va., Codified Ordinances of Charles Town pt. 1, ch. 5, art. 154, § 154.03(6) (2018). |
| 3,807 | Lewisburg, W. Va., Codified Ordinances of Lewisburg, W. Va. Pt. 1, ch. 5, art. 137, § 137.08(f) (2019). |
| | |

| Wyoming | |
|---|---|
| 32,711 | Laramie, Wyo., Laramie, Wyo. Municipal Code tit. 9, ch. 9.32, § 9.32.040 (2015). |

JA1102

**Table C: Discriminatory Advertising Laws**

The following States prohibit discriminatory advertising or notices as part of their public accommodations laws.

| *State* | *State Law* |
| --- | --- |
| **Alaska** | Alaska Stat. § 18.80.230 (2000). |
| **Colorado** | Colo. Rev. Stat. §§ 24-34-601(2)(a), 701 (2021). |
| **Delaware** | Del. Code Ann. tit. 6, § 4504(b) (West 2019). |
| **District of Columbia** | D.C. Code § 2-1402.31(a)(2) (2006). |
| **Idaho** | Idaho Code Ann. § 67-5909(5)(b) (2005). |
| **Illinois** | 775 Ill. Comp. Stat. § 5/5-102(B) (2007). |
| **Iowa** | Iowa Code § 216.7(1)(b) (2019). |
| **Kentucky** | KY. Rev. Stat. Ann. § 344.140 (West 1992). |
| **Maine** | Me. Rev. Stat. tit. 5, § 4592(2) (2019). |
| **Massachusetts** | Mass. Gen. Laws ch. 272, § 92A (2016). |
| **Michigan** | Mich. Comp. Laws § 37.2302(b) (1977). |
| **Montana** | Mont. Code Ann. § 49-2-304(1)(b) (1993). |
| **New Hampshire** | N.H. Rev. Stat. Ann. § 354-A:17 (2019). |
| **New Jersey** | N.J. Stat. Ann. § 10:5-12(f)(1) (West 2020). |
| **New York** | N.Y. Civ. Rights Law § 40 (McKinney 1945). |
| **North Dakota** | N.D. Cent. Code § 14-02.4-16 (1995). |
| **Oregon** | Or. Rev. Stat. § 659A.409 (2007). |
| **Pennsylvania** | 43 Pa. Cons. Stat. § 955(i)(2) (2009). |
| **Rhode Island** | R.I. Gen. Laws § 11-24-2 (2001). |
| **South Dakota** | S.D. Codified Laws § 20-13-25 (1986). |

JA1103

| | |
|---|---|
| **Tennessee** | Tenn. Code Ann. § 4-21-502 (West 1978). |
| **Virginia** | Va. Code § 2.2-3904 (2021). |
| **West Virginia** | W. Va. Code § 5-11-9(6)(B) (2016). |
| **Wisconsin** | Wis. Stat. § 106.52(3)(3)-(3m) (2016). |

**CERTIFICATE OF SERVICE**

I certify that on July 6, 2021, the foregoing motion was filed electronically using the

Court's CM/ECF system, through which counsel for all parties will be served.


/s/ Adam M. Cambier

Adam M. Cambier

JA1105

UNITED STATES DISTRICT COURT
WESTERN DISTRCIT OF NEW YORK

Case No. 6:21-cv-06303-FPG

**Emilee Carpenter, LLC, d/b/a**
**Emilee Carpenter Photography**
and **Emilee Carpenter**

Plaintiffs,

vs.

**Letitia James**, in her official capacity
As Attorney General of New York;
**Johnathan J. Smith**, in his official
Capacity as Interim Commissioner of
the New York State Division of Human
Rights; and, **Weeden Wetmore**, in his
Official capacity as District Attorney of
Chemung County,

Defendants.

**REPLY MEMORANDUM OF LAW**
**in support of a Dismissal, or in the alternative, Opposing Preliminary Injunction**
**as to Chemung County District Attorney**

County of Chemung Department of Law
Attorneys for Respondent, Weeden Wetmore,
District Attorney of Chemung County
167 Lake Street
Elmira, New York 14902
By: Jeffrey D. Walker, Esq.

JA1106

This Reply Memorandum, submitted with the Affidavit of the Defendant, the District

Attorney of Chemung County, Weeden Wetmore, are made in furtherance of said Defendant's

motion to dismiss, or in the alternative in opposing a Preliminary Injunction as to said

Defendant.

### Dismissal of Complaint as against Chemung County District Attorney for Failure to State a Cause of Action

The Complaint should be dismissed because Plaintiffs have not demonstrated any

credible threat of prosecution from the Defendant moving hereunder.

Although it is conceded that a Plaintiff testing the constitutionality of a criminal statute

does not need to first expose themselves to actual arrest or prosecution to be entitled to challenge

such a statute (see, e.g., Babbitt v. United Farm Workers Nat. Union, 442 U.S. 289, 298 [1979],

citing Steffel v. Thompson, 415 U.S. 452, 459 [1974]), such a pre-prosecution challenge may

only be entertained by this Court when that Plaintiff shows that "*... there exists a credible*

*threat of prosecution thereunder.*" Babbitt, *supra* citing Doe v. Bolton, 410 U.S. 179, 188

(1973) [emphasis supplied].

A federal court may only adjudge the legal rights of litigants in actual controversies;

persons having no fears of state prosecution except those that are imaginary or speculative, are

not to be accepted as appropriate plaintiffs. Roe v. Butterworth, 958 F.Supp. 1569, 1572 (United

States District Court, S.D. Florida, 1997) [internal citations omitted]. "The basic inquiry is

whether the 'conflicting contentions of the parties ... present a real, substantial controversy

between parties having adverse legal interests, a dispute definite and concrete, not hypothetical

or abstract.'" *Id.* citing Railway Mail Assn. v. Corsi, 326 U.S. 88, 93 (1945); Evers v. Dwyer,

JA1107

358 U.S. 202, 203 (1958); Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273,

(1941); Babbitt v. United Farm Workers Nat. Union, *supra* at 297-298.

In a case like Steffel v. Thompson, *supra*, where police have threatened a Plaintiff with

arrest, a credible threat of prosecution exists. However, as in the Roe case, the Plaintiffs here do

not allege having ever been prosecuted before for these matters; and further, there is not any

evidence beyond their mere fears that they may face a pending threat of prosecution for violating

the challenged statutes from the District Attorney Defendant. See, Roe at 1572. In Roe, a

credible threat of prosecution was nonetheless established because the Petitioner there alleged a

desire to engage in conduct prohibited by a Statute; alleged that she was at the time refraining

from doing so out of fear of prosecution; and, the proof demonstrated that the Respondent in that

case had *previously enforced that ordinance* and, most importantly, that Respondent "…

indicated that it will continue to enforce the challenged ordinance." *Id.*

In this case, however, there is no evidence that the Chemung County District Attorney

has any intention to pursue any action against Plaintiff for alleged violations of the Civil Rights

laws, *nor any evidence that any local District Attorney in this State* has ever initiated an action

against any party for an alleged Civil Rights Law violation, unless the same also accompanied

allegations of traditional crimes, such as: Assault, Harassment, Menacing, or other penal law

violations.[1]   As such, it is submitted that Plaintiffs have not sufficiently shown any credible

threat of prosecution by the County Defendant.  Babbitt, *supra*. Therefore, this Complaint should

be dismissed as against the County Defendant.

---

[1] See Memorandum of Law from the County of Chemung submitted on or about 6/16/2021 in the section entitled:
"New York State's Civil Rights Laws" on pages 6-9

### Disavowal of Intent

Page 4 of the "Combined Memorandum of Law in Response to County Defendant's Motion to Dismiss and Reply in Support of Plaintiffs' Preliminary Injunction" states, among other things, that: "The District Attorney hasn't explicitly disavowed enforcing the law against Emilee," and thereafter cites cases referencing "disavowal" statements from prosecutors, plus an accompanying Footnote which states that: "Without an express disavowal, Emilee still 'face[s] a clear Hobson's choice' of risking prosecution or refraining from speaking."

In specific response to this section, Defendant submits the accompanying affidavit of District Attorney Wetmore, confirming that his Office would not prosecute an action under the State Civil Rights Law absent contemporaneous violations of the Penal Law, or absent allegations indicating another explicit criminal violation (such as a Defendant resisting, preventing, impeding or interfering with employees from the Division of Human Rights, and /or a Defendant being in noncompliance with an existing enforcement order from the State Human Rights Board, as codified in Executive Law Sect. 299). Moreover, District Attorney Wetmore confirms that the alleged possible scenarios presented in Plaintiffs' complaint would *not* be prosecuted by the Chemung County District Attorney's office. It is submitted that this affidavit from the District Attorney, if not treated as being an express "disavowal" of intent by the District Attorney to engage in any alleged prosecution of the Plaintiffs for the behavior outlined in their Complaint, should at any rate be sufficient for this Court to find that there is "another reason to conclude that no such intent existed" in this case. See, Hedges v. Obama, 724 F.3d 170, 197 (United States Court of Appeals, Second Circuit, 2013).

There exists no credible claim of prosecution from the Chemung County District Attorney for the behavior Plaintiffs allege they seek to engage in as stated in the Complaint.

Therefore, respectfully, Plaintiffs can offer nothing more than a "chimerical" fear of enforcement of the cited provisions of law from the District Attorney of Chemung County. See, Poe v. Ullman, 367 U.S. 497, 508 (1961). The federal court is not empowered to give plaintiff advisory opinions where there is no actual controversy. Shell Oil Co. v. Noel, 608 F.2d 208, 213 (U.S. Ct. of Appeals, 2nd Cir., 1979).

Accordingly, the Complaint should be dismissed as against the Chemung County District Attorney, either for failure to state a plausible claim against the Chemung County District Attorney, or due to a lack of subject matter jurisdiction as to said Defendant.

If the inclusion of this Affidavit is necessary to resolve this Motion in favor of the moving Defendant, Defendant requests the motion originally filed as under FRCP 12(b) to be treated as one for summary judgment under Rule 56, as permitted by FCRP 12(d) by virtue of considering matters outside of the pleadings (to wit: the Chemung County District Attorney's Affidavit). See, e.g., Larson v. Agos, 449 Fed. Appx. 725, 729 (United States Court of Appeals, Tenth Circuit, 2011).

Further, if the motion to dismiss as requested herein is granted, Defendant Wetmore further requests that the court strike all references in the pleadings with respect to Weeden Wetmore. [See: FCRP 12(b)(f)].

### If Dismissal is not granted, a demand for a more definitive pleading is requested

The arguments previously submitted as well as the ones above are adopted and re-incorporated herein as if fully pled. It is reasserted that the possible scenarios presented within the complaint do not form a recognizable action against Plaintiffs from the Chemung County District Attorney[2]. [See: FCRP 12(e)]. The District Attorney would not bring an action against

---

[2] See also accompanying affidavit for District Attorney, Weeden Wetmore

the plaintiffs under the circumstances as described in the Complaint; therefore the Chemung County District Attorney would be unable to reasonably prepare a response without a more definite statement or pleading.

## Opposing Preliminary Injunction

The arguments previously submitted as well as the ones above are adopted and re-incorporated herein as if fully pled. If this matter is not dismissed as to the Chemung County District Attorney, then the District Attorney opposes the plaintiffs' preliminary injunction request.

The possible prosecution by the Chemung County District Attorney is not real or imminent under the facts recited in the Complaint. Therefore, the extraordinary remedy of a preliminary injunction should not be granted. See, Distribution Sys. Of Am., Inc. v. Vill. Of Old Westbury, 785 F.Supp.347, 352 (E.D.N.Y. 1992), *quoting* JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75, 79 (2nd Cir. 1990).

JA1111

## Conclusion

For the reasons stated herein, Defendant Weeden Wetmore, who is being sued in his

official capacity as Chemung County District Attorney, requests an Order granting:

- A Dismissal of the complaint for failure to state a claim upon which relief can be granted [See: FRCP 12(b)(6), 12(h)(2)(B)] and /or;
- A Dismissal for lack of subject matter jurisdiction as to this defendant, because any dispute involving Weeden Wetmore is not ripe for adjudication [See: FRCP 12(b)(1)];
- Requesting the Court to strike all references in the pleadings with respect to Weeden Wetmore if the dismissal motion is granted [See: FRCP 12(b)(f)];
- If the motions to dismiss are not granted, in the alternative, a request for a more definite statement or pleading, [See: FRCP 12(b)(e)];
- Extending the time to answer, either within 14 days after the more definite statement is served or as otherwise ordered [See: FRCP 12(a)(4)]; and
- Seeking a Denial of the request for a preliminary injunction as to Weeden Wetmore.

Dated: Elmira, New York

July 21, 2021

**CHEMUNG COUNTY LAW DEPARTMENT**

M. Hyder Hussain, Esq.
By: Jeffrey Walker
Attorneys for Petitioners-Plaintiffs
203 Lake Street
Elmira, NY 14902
(607) 737-2982
jwalker@chemungcountyny.gov

JA1112

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

Emilee Carpenter, LLC, d/b/a Emilee Carpenter
Photography and Emilee Carpenter,

                    Plaintiffs,

                                        AFFIDAVIT OF WEEDEN A. WETMORE
                                        District Attorney of Chemung County

        -against-

Letitia James, in her official capacity as Attorney          Case NO.  6:21-cv-06303
General of New York; Johnathan J. Smith, in his
official capacity as Interim Commissioner of the
New York State Division of Human Rights; and,
Weeden Wetmore, in his official capacity as
District Attorney of Chemung County,

                    Defendants.

STATE OF NEW YORK        )
COUNTY OF CHEMUNG    )ss:

        **WEEDEN A. WETMORE**, being duly sworn, deposes and says:

1.  I am the District Attorney for the County of Chemung.  I am a Defendant in this matter.

2.  It is not a local district attorney's job to enforce Civil Rights Law generally; those

    enforcements rest with the State Attorney General or the Division of Human Rights.

3.  The District Attorney's Office would not prosecute an action under the State Civil Rights

    Law, absent contemporaneous violation of the Penal Law (like the existing case law

    demonstrating local district attorneys in New York only prosecuting Civil Rights Law

    violations if they are accompanied by other violations of the Penal Law), or absent

    allegations indicating another explicit criminal violation (such as a Defendant resisting,

    preventing, impeding or interfering with employees from the Division of Human Rights,

    and /or a Defendant being in noncompliance with an existing enforcement order from the

1

JA1113

State Human Rights Board)[1].

4. None of the possible scenarios which Plaintiffs claim would allegedly result in prosecution as drafted in the Complaint would be prosecuted by this office.

Dated:     Elmira, New York

7/21, 2021

Weeden A. Wetmore

Sworn before me on this
21 day of July 2021

Notary Public

ALICIA A KURCOBA
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01KU6405528
Qualified in Chemung County
Commission Expires March 9, 20 24

---

[1] See Executive Law Sect. 299

2

JA1114

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

EMILEE CARPENTER, LLC, *et al.*,

                                    Plaintiffs,                    Case # 21-CV-6303-FPG

v.
                                                                  DECISION & ORDER

LETITIA JAMES, *et al.*,

                                    Defendants.

## INTRODUCTION

Our nation was founded on a principle of "inherent equality"—that it is not merely true, but "self-evident," that "all men are created equal" and "endowed by their Creator with certain unalienable Rights," including "Life, Liberty, and the pursuit of Happiness." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 240 (1995) (Thomas, J., concurring in part and concurring in judgment). Historically, it is an aspiration that has been subject to a variety of caveats, restrictions, and provisos when applied to certain groups, persons, and classes. But it is also an aspiration that "could not forever tolerate" such limitations. *City of Mobile v. Bolden*, 446 U.S. 55, 104 (1980) (Marshall, J, dissenting). Throughout our history, Americans have struggled and suffered in order to extend that principle of equality to the excluded, armed with the belief that our society should fully reflect our most cherished values. The Supreme Court's landmark decisions memorialize the necessary, but oftentimes painful, process of reconciling our values and our practices. *See Brown v Bd. of Educ. of Topeka, Shawnee Cnty., Kan.*, 347 U.S. 483 (1954); *Loving v. Virginia*, 388 U.S. 1 (1967); *J.E.B. v. Alabama*, 511 U.S. 127 (1994); *Lawrence v. Texas*, 539 US 558 (2003); *Obergefell v. Hodges*, 576 U.S. 644 (2015). It is a necessary process, one which is contemplated by our Constitution. *Obergefell*, 576 U.S. at 664 ("The generations that

1

wrote and ratified the Bill of Rights and the Fourteenth Amendment did not presume to know the extent of freedom in all of its dimensions, and so they entrusted to future generations a charter protecting the right of all persons to enjoy liberty as we learn its meaning.").

As it has elsewhere, this process has unfolded in the arena of the public marketplace. Since the end of the Civil War, states and localities have enacted and expanded legislation to ensure that historically underserved, disfavored, or disadvantaged classes of persons have the same access to the American marketplace's great bounty as that afforded to the public at large. Without such access, private discrimination in the marketplace could "perpetuate a caste system in the United States," *Bell v. Maryland*, 378 U.S. 226, 288 (1964) (Goldberg, J., concurring), preventing certain groups from "achieving prosperity, health, development or happiness." *Gibbs v. Arras Bros.*, 222 N.Y. 332, 336 (1918). The Supreme Court has repeatedly and unequivocally found that such legislative efforts serve valid, and indeed compelling, interests, including in the context of sexual orientation discrimination. At bottom, these laws simply seek to guarantee that businesses purporting to serve the public truly do serve the public. "[G]ay persons and gay couples" are a part of that public. *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rts. Comm'n*, 138 S. Ct. 1719, 1727 (2018). Therefore they, like all other members of the public in the marketplace, are entitled to be treated in a manner consistent with their inherent equality, "dignity[,] and worth." *Id.* With all this in mind, the Court turns to the present dispute.

JA1116

Plaintiffs are Emilee Carpenter and the entity through which she operates her for-profit wedding-photography business, "Emilee Carpenter, LLC."[1]  Plaintiff brings this civil rights action pursuant to 42 U.S.C. § 1983, arguing that, as applied to her business, New York's public-accommodations laws compel her to "violate her conscience by professing the state's [favorable] view about [same-sex] marriage."  ECF No. 1 at 3.  She seeks declaratory and injunctive relief against Defendants Letitia James (in her official capacity as the Attorney General of New York), Jonathan J. Smith (in his official capacity as Interim Commissioner of the N.Y.S. Division of Human Rights ("DHR")),[2] and Weedon Wetmore (in his official capacity as District Attorney of Chemung County, New York).  Currently before the Court are three motions: (1) Plaintiff's motion for a preliminary injunction (ECF No. 3), (2) Wetmore's motion to dismiss under Rule 12(b)(1) (ECF No. 24), and (3) the State's motion to dismiss under Rules 12(b)(1) and 12(b)(6) (ECF No. 27).  The motions have been fully briefed, and the Court has also received *amicus* briefs from dozens of entities and organizations.[3]  The Court thanks all involved for their thorough

---

[1] Except where context dictates otherwise, the Court refers to Emilee Carpenter and Emilee Carpenter LLC as "Plaintiff."

[2] The Court refers to James and Smith collectively as "the State."

[3] These entities include: the States of Nebraska, Alabama, Arkansas, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Oklahoma, South Carolina, Texas, Utah, and West Virginia (ECF No. 22); the New Yorker's Family Research Foundation and New Yorkers for Constitutional Freedoms (ECF No. 23); the Coalition of African American Pastors, Conservative Clergy of Color, Frederick Douglass Foundation, and the Restoration Project (ECF No. 50); New York Civil Liberties Union and American Civil Liberties Union (ECF No. 51); Americans United for Separation of Church and State, Anti-Defamation League, Bend the Arc: A Jewish Partnership for Justice, Central Conference of American Rabbis, Global Justice Institute – Metropolitan Community Churches, Hindu American Foundation, Men of Reform Judaism, Methodist Federation for Social Action, National Council of Jewish Women, New York Conference – United Church of Christ, Reconstructionist Rabbinical Association, Union for Reform Judaism, and Women of Reform Judaism (ECF No. 52); and the States of Massachusetts, California, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, and Washington, and the District of Columbia (ECF No. 55).

JA1117

submissions. The magnitude of these briefs, coupled with the passion with which their positions are articulated, demonstrate the importance of the issues under discussion.

For the reasons that follow, Wetmore's motion is DENIED; the State's motion is GRANTED insofar as all claims are dismissed with prejudice for failure to state a claim upon which relief may be granted; the Court *sua sponte* dismisses with prejudice the claims against Wetmore for failure to state a claim upon which relief may be granted; and Plaintiff's motion for a preliminary injunction is DENIED AS MOOT.

## BACKGROUND

The following facts are taken from the complaint, unless otherwise noted. Plaintiff describes herself as a "photographer, natural people person, [] storyteller," and "Christian." ECF No. 1 at 3. Based in Chemung County, Plaintiff has been a for-profit wedding photographer since 2012, and has operated her business through "Emilee Carpenter, LLC" since 2019. *Id.* ¶¶ 25, 27. In addition to wedding photography,[4] Plaintiff provides "branding-photography" services, which "depict and promote businesses and their services" for marketing purposes. *Id.* ¶¶ 36, 37.

Living by the biblical admonition that one should "do it all for the glory of God," Plaintiff's religious beliefs "shape every aspect of her life," including her photography. *Id.* ¶¶ 20, 21. In order to "honor God's glory in His creation and display God's beauty, artistry, and truth," she only accepts projects in which she can "portray the subject(s) or content of the photograph in a positive, appealing, and uplifting manner." *Id.* ¶¶ 41, 42. Similarly, to convey her beliefs that "marriage is a gift from God that should be treasured and celebrated," Plaintiff "seeks to create photographs

---

[4] Plaintiff also provides engagement photography. ECF No. 1 ¶ 32. When the Court refers to Plaintiff's "wedding photography services," it means both engagement and wedding photography.

4

that evoke joyful emotions and . . . positively portray the couple, their wedding (or engagement), and God's design for marriage." *Id.* ¶¶ 48, 55.

Plaintiff also uses her photography services to celebrate and promote her view of marriage. On her business's website, Plaintiff maintains a blog. Plaintiff provides a "complimentary blog post for the client[s]" of each wedding she photographs, in which she posts pictures of the wedding, "encourage[s] the couple, and communicate[s] her views on marriage to the couple and to the general public." ECF No. 1 ¶¶ 35, 89. Plaintiff believes her blog is "an integral part of her business" that allows her to "publicly associate herself" with her photography and promote "her business, artistic style, and approach to photography." *Id.* ¶¶ 91, 92.

In providing her wedding photography services, Plaintiff demands "full artistic license and total editorial discretion" from her clients and uses that discretion to "create her desired image[s] consistent with her artistic style and religious beliefs." *Id.* ¶¶ 53, 77. To that end, Plaintiff would not accept any projects that required her to portray "the couple, their marriage, or their wedding in a negative way," *id.* ¶ 103, use certain aesthetic styles inconsistent with her "artistic judgment," *id.* ¶ 111, or take photographs celebrating "anything immoral" or "dishonorable to God." *Id.* ¶ 113. As is relevant here, Plaintiff will decline projects that promote or celebrate same-sex marriage, whether that be a request from a same-sex couple looking for a wedding photographer, or a "staged wedding shoot" for an advertisement that depicts a same-sex wedding. ECF No. 1 ¶¶ 117, 138. She believes that accepting such assignments would, in effect, "promote activities contrary to her beliefs [and] express messages contradicting her beliefs." *Id.* ¶ 118. Plaintiff maintains that the issue is not the people involved in the project, but the topic of same-sex marriage itself. She claims that she has no qualms with photographing "LGBT individuals" or working with

5

them as clients in other contexts; her concern is that she does not wish to "participate in a ceremony or express a message [through her photography] that violates her religious beliefs." *Id.* ¶¶ 130, 136.

Plaintiff initiated the present suit after learning about New York's public accommodation laws. She believes that those laws "threaten[] her ability to operate her business according to her faith" and "restrict[] what she could post on her studio's website and social media sites and what she could say to prospective clients." *Id.* ¶ 144. There are four provisions in dispute; three contained in the New York Human Rights Law and one contained in the New York Civil Rights Law.

The first provision is what Plaintiff refers to as the "Accommodation clause." New York's Human Rights Law provides: "It shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation, resort or amusement, because of the race, creed, color, national origin, sexual orientation, gender identity or expression, military status, sex, disability or marital status of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof." N.Y. Exec. Law § 296(2)(a). Plaintiff does not dispute that her business is a "public accommodation" subject to the law. ECF No. 1 ¶ 153.

The second provision is the "Denial clause," which makes it unlawful to "publish, circulate, issue, display, post or mail any written or printed communication, notice or advertisement, to the effect that any of the accommodations, advantages, facilities and privileges of any such place [of public accommodation] shall be refused, withheld from or denied to any person on account of race,

6

creed, color, national origin, sexual orientation, gender identity or expression, military status, sex, disability or marital status."  N.Y. Exec. Law § 296(2)(a).

The third provision is the "Unwelcome clause," which prohibits a public accommodation from publishing, circulating, issuing, displaying, posting, or mailing any written or printed communication to the effect that "the patronage or custom [] of any person of or purporting to be of any particular race, creed, color, national origin, sexual orientation, gender identity or expression, military status, sex or marital status, or having a disability is unwelcome, objectionable or not acceptable, desired or solicited."  *Id.*

The fourth provision is found in New York Civil Rights Law § 40-c.  That statute reads: "No person shall, because of race, creed, color, national origin, sex, marital status, sexual orientation, gender identity or expression, or disability, as such term is defined in section two hundred ninety-two of the executive law, be subjected to any discrimination in his or her civil rights, . . . by any other person or by any firm, corporation or institution, or by the state or any agency or subdivision of the state."  N.Y. Civ. Rights Law § 40-c(2); *see also id.* § 40 (stating that "[a]ll persons within . . . this state shall be entitled to the full and equal accommodations, advantages, facilities and privileges of any places of public accommodations").  Plaintiff agrees that this law is co-extensive with the Human Rights Law and does not require separate analysis. *See* ECF No. 3-1 at 11 n.1; *see also Ganzy v. Allen Christian Sch.*, 995 F. Supp. 340, 350 (E.D.N.Y. 1998) (collecting cases).

By her own admission, Plaintiff is currently refusing requests to photograph same-sex weddings, while acknowledging that New York's public-accommodation laws prohibit her from doing so.  In the last year, Plaintiff has received seven requests for same-sex weddings, and she

7

has effectively declined those requests by not responding to them. *See* ECF No. 1 ¶¶ 266-67. Furthermore, based on her understanding of these laws, Plaintiff has yet to take some actions related to her business that she would have taken absent these laws. *See id.* ¶¶ 123-25. For example, Plaintiff would like to amend her LLC's operating agreement to prohibit it from providing wedding photography services to same-sex couples. She would like to do overtly what she is currently doing surreptitiously: screen prospective clients to ensure that she does not agree to photograph a same-sex wedding. And she would like to explicitly advertise her business's limitations on her website, through social media, and with prospective clients directly.

Both for the actions she has already taken and for those she intends to take, Plaintiff fears prosecution by the three named defendants—James, Smith, and Wetmore. Both James and Smith can file administrative complaints with DHR for violations of Section 296. *See* N.Y. Exec. Law §§ 295(6)(b), 297(1). Those complaints trigger an investigation by DHR, which, if jurisdiction and probable cause exist, leads to administrative proceedings. *Id.* §§ 295(7), 297(1), 297(4)(a). If, after a hearing, a public accommodation is found to have violated the Human Rights Law, Smith is empowered to, *inter alia*, issue cease-and-desist orders, award compensatory damages, and assess civil fines up to $50,000 or (if the violation is willful, wanton, or malicious) up to $100,000. *Id.* § 297(4)(c). Once an order is entered against a public accommodation, it is subject to criminal penalties if it willfully violates the order, *id.* § 299, which a district attorney may prosecute. *See* N.Y. County Law 700(1); *see also* N.Y. Exec. Law § 299 (stating that violation of a DHR order is a misdemeanor "punishable by imprisonment . . . for not more than one year, or by a fine of not more than five hundred dollars"). Under certain circumstances, James may initiate civil actions to enforce DHR orders and criminally prosecute violators. N.Y. Exec. Law §§ 63(9), (10). In

8

addition, a violation of Civil Rights Law § 40-c constitutes a class A misdemeanor, N.Y. Civ. Rights Law § 40-d, which may be prosecuted by a district attorney or, if not, by James. N.Y. County Law 700(1); N.Y. Exec. Law § 63(10).

On April 6, 2021, Plaintiff brought this pre-enforcement challenge to New York's public accommodation laws. She alleges that the laws violate (1) her free-speech and free-association rights; (2) her right to freely exercise her religion; (3) the Establishment Clause of the First Amendment; and (4) her right to due process. ECF No. 1 at 47-53. On June 16, 2021, Wetmore filed a motion to dismiss under Rule 12(b)(1), arguing that any action against him is not ripe for adjudication and that Plaintiff lacks standing to bring a pre-enforcement challenge. ECF No. 24. On June 17, 2021, the State moved to dismiss under Rule 12(b)(1) and Rule 12(b)(6). ECF No. 27. It argues that Plaintiff lacks standing, that her claims are not ripe for adjudication, and that the Court lacks jurisdiction over James. The State also argues that Plaintiff has failed to plead any sufficient constitutional claim.

## DISCUSSION

The Court concludes that Plaintiff has standing to bring her pre-enforcement challenge, and it denies Defendants' motions to that extent. On the merits, however, the Court concludes that Plaintiff fails to state a claim for relief, dismisses her claims with prejudice, and will not grant leave to amend. Because the claims are dismissed, Plaintiff's motion for a preliminary injunction is denied as moot.

### I.    Standard of Review

A complaint will survive a motion to dismiss under Rule 12(b)(6) when it states a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). A claim for relief is plausible when

JA1123

the plaintiff pleads sufficient facts that allow the Court to draw the reasonable inference that the defendant is liable for the alleged misconduct. *Id.* at 678. In considering the plausibility of a claim, the Court must accept factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011). At the same time, the Court is not required to accord "[l]egal conclusions, deductions, or opinions couched as factual allegations . . . a presumption of truthfulness." *In re NYSE Specialists Secs. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007). Where a defendant makes a "facial" Rule 12(b)(1) motion challenging the plaintiff's standing to sue, the plaintiff has no "evidentiary burden," and "[t]he task of the district court is to determine whether the [complaint] alleges facts that affirmatively and plausibly suggest that the plaintiff has standing to sue." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (internal quotation marks and brackets omitted); *Gelmart Indus., Inc. v. Eveready Battery Co.*, 120 F. Supp. 3d 327, 330 (S.D.N.Y. 2014) (same for ripeness challenge under Rule 12(b)(1)).

## II. Standing

Defendants argue that Plaintiff does not have standing to maintain this action.[5] The State contends that Plaintiff has only alleged a "speculative fear of enforcement," in light of the absence of "any past enforcement actions against her company" or the possibility "that an investigation will be started any time soon." ECF No. 27-1 at 13. Furthermore, Plaintiff's claims "rest on speculation" about whether and how an enforcement action might occur. *Id.* at 14. The State also suggests that Plaintiff's putative injury is not traceable to James, insofar as anyone can "initiate a

---

[5] Defendants frame their arguments both in terms of standing and in terms of ripeness. *See* ECF No. 24-2 at 2, 10-13; ECF No. 26 at 12; ECF No. 59 at 2-3. Because the Court addresses and resolves the question of standing, it need not separately address ripeness. *See Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 689 n.6 (2d Cir. 2013).

10

claim under the Human Rights Law." *Id.* at 15.

For his part, Wetmore contends that Plaintiff has not alleged a credible threat of enforcement *by him* pursuant to either the Human Rights Law or Civil Rights Law. He notes that he may criminally prosecute an individual under the Human Rights Law only if the individual interferes with DHR in the performance of its duties or violates a DHR order—neither of which Plaintiff has done or intends to do. *See* N.Y. Exec. Law § 299. In addition, Wetmore reads Civil Rights Law § 40-d to permit a district attorney to criminally prosecute a public accommodation for violation of Civil Rights Law § 40-c only if the violation occurs "alongside a traditional Penal Law violation." ECF No. 24-2 at 8. He has gone so far as to file an affidavit averring that his office "would not prosecute an action under the State Civil Rights Law[] absent contemporaneous violation of the Penal Law" or other criminal violation. ECF No. 59 at 8.

The Court concludes that Plaintiff has plausibly alleged standing to bring this pre-enforcement challenge against all three defendants.

"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (citing U.S. Const. art. III, § 2). "The doctrine of standing gives meaning to these constitutional limits by identifying those disputes which are appropriately resolved through the judicial process." *Id.* (internal quotation marks and brackets omitted). "To establish Article III standing, a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Id.* (internal quotation marks and brackets omitted). Defendants contend that Plaintiff cannot satisfy the injury requirement, insofar as she has not sufficiently alleged a credible threat of prosecution

11

by them under the relevant laws. *See* ECF No. 27-1 at 13-14; ECF No. 59 at 2-3. Standing is a jurisdictional question that is adjudicated under Rule 12(b)(1), not Rule 12(b)(6). *See All. for Env't Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 n.6 (2d Cir. 2006).

"For an alleged injury to support constitutional standing, it must be 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Knife Rts., Inc. v. Vance*, 802 F.3d 377, 383 (2d Cir. 2015) (internal quotation marks omitted). Where the plaintiff alleges "injury based on the threat of prosecution, the plaintiff need not expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced." *Adam v. Barr*, 792 F. App'x 20, 21 (2d Cir. 2019) (summary order) (internal quotation marks omitted); *see also Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) ("[I]t is not necessary that [the individual] first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his constitutional rights."). "Rather, in the context of pre-enforcement challenges . . . imminent injury can be established by plausible allegations that a plaintiff intends to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a credible threat of prosecution thereunder." *Knife Rts.*, 802 F.3d at 384 (internal quotation marks, brackets, and ellipsis omitted). The same analysis applies whether the plaintiff faces the threat of criminal prosecution, a civil action, or the institution of administrative proceedings. *See Driehaus*, 573 U.S. at 165 ("[A]dministrative action, like arrest or prosecution, may give rise to harm sufficient to justify pre-enforcement review."); *Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 382 (2d Cir. 2000) ("The fear of civil penalties can be as inhibiting of speech as can trepidation in the face of threatened criminal prosecution."); *see also Kearns v. Cuomo*, 981 F.3d 200, 210 (2d Cir.

12

JA1126

2020) (no credible threat of prosecution where plaintiff failed to allege that challenged laws imposed "criminal or civil penalties").

"The identification of a credible threat sufficient to satisfy the imminence requirement of injury in fact necessarily depends on the particular circumstances at issue." *Knife Rts.*, 802 F.3d at 384. A credible threat of prosecution cannot rest "on fears that are imaginary or speculative," *id.* (internal quotation marks omitted), and it "will not be found where plaintiffs do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible." *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016) (internal quotation marks omitted). Nevertheless, courts generally presume "that the government will enforce the law as long as the relevant statute is recent and not moribund." *Hedges v. Obama*, 724 F.3d 170, 197 (2d Cir. 2013). The Second Circuit has observed that the relevant standard "sets a low threshold and is quite forgiving to plaintiffs seeking [such] preenforcement review," *Cayuga Nation*, 824 F.3d at 331, especially when First Amendment rights are in play. *See Walsh*, 714 F.3d at 689.

In this case, the actions in which Plaintiff has engaged and intends to engage are "arguably affected with a constitutional interest[] but proscribed by statute." *Knife Rts.*, 802 F.3d at 384. As alleged in the complaint, Plaintiff operates her business in part to act out her religious beliefs, and in doing so she creates photographs and blog posts that seek to celebrate God and her views on marriage. *See* ECF No. 1 ¶¶ 23, 40, 48. Plaintiff's First Amendment rights are arguably implicated in that conduct. *See Chelsey Nelson Photography LLC v. Louisville/Jefferson Cnty. Metro. Gov't*, 479 F. Supp. 3d 543, 550 (W.D. Ky. 2020). Plaintiff alleges that she is presently refusing to provide photography services for same-sex weddings, and she intends to continue that policy, ECF

13

No. 1 ¶¶ 123, 242, 266, 267, actions which arguably constitute sexual-orientation discrimination and thus violate the Human Rights Law and Civil Rights Law.[6]  Plaintiff has also alleged that she intends to engage in other conduct: in connection with her business, Plaintiff would like to advertise her views on same-sex marriage and notify potential clients that she will not provide services therefor.  ECF No. 1 ¶¶ 246, 247; ECF No. 1-2 at 2.  Arguably, that course of conduct implicates Plaintiff's First Amendment rights, *N.Y.S. Rest. Ass'n v. N.Y.C. Bd. of Health*, 556 F.3d 114, 131 (2d Cir. 2009), and violates the plain language of the Denial and Unwelcome clauses—and by extension, Civil Rights Law 40-c.[7]  *See* N.Y. Exec. Law § 296(2)(a) (prohibiting a public accommodation from advertising that "any of [its] accommodations" will be denied "to any person on account of . . . sexual orientation" or from communicating that "the patronage . . . of any person . . . of any particular . . . sexual orientation . . . is unwelcome"); *see also Elenis*, 6 F.4th at 1183-83; *Chelsey Nelson*, 479 F. Supp. 3d at 550-51.

Finally, Plaintiff has sufficiently alleged a "credible threat of prosecution" under these provisions.  *Knife Rts.*, 802 F.3d at 384.  As discussed above, all three defendants possess varying

---

[6] True, Plaintiff alleges that her refusal to undertake such projects results from her religious objection to same-sex marriage specifically, rather than any sort of discriminatory animus to LGBT individuals more generally.  *See* ECF No. 1 ¶¶ 128-40.  But given the obvious, intrinsic link between same-sex couples and same-sex marriage, courts have not found that distinction material.  *See, e.g.*, *303 Creative LLC v. Elenis*, 6 F.4th 1160, 1173 (10th Cir. 2021) ("[A]lthough [the business's] 'ultimate goal' might be to only discriminate against same-sex marriage, to do so [the business] might also discriminate against same-sex couples.  As a result, [the business's] refusal may be 'because of' the customers' sexual orientation."); *Elane Photography, LLC v. Willock*, 309 P.3d 53, 62 (N.M. 2013) ("[W]hen a law prohibits discrimination on the basis of sexual orientation, that law similarly protects conduct that is inextricably tied to sexual orientation.").

[7] The Court has repeatedly used the modifier "arguably" in this section to make clear that the inquiry into standing does not involve a definitive assessment of the merits of Plaintiff's allegations.  *See Davis v. United States*, 564 U.S. 229, 249 n.10 (2011) (cautioning that "weakness on the merits [should not be confused] with absence of Article III standing"); *Driehaus*, 573 U.S. at 161-62 (sufficient injury where intended conduct was "arguably affected with a constitutional interest" and "arguably proscribed" by statute).

14

authority to investigate, prosecute, and file complaints against public accommodations that discriminate against protected classes. *See* N.Y. Exec. Law §§ 295(6)(b), 297(1); N.Y. Exec. Law § 63(9), (10); N.Y. County Law § 700(1). Sanctions for violations range from civil fines to criminal penalties. N.Y. Exec. Law § 297(4)(c); N.Y. Civ. Rights Law § 40-d. The provisions Plaintiff challenges are not moribund, and, by their plain language, they are reasonably read to prohibit the kinds of conduct in which Plaintiff has engaged and intends to engage. Under the circumstances, it is fair to presume "an intent by [Defendants] to enforce the law against [her]." *Hedges*, 724 F.3d at 197; *see also Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 71 (2d Cir. 2019) ("Where a statute specifically proscribes conduct, the law of standing does not place the burden on the plaintiff to show an intent by the government to enforce the law against it." (internal quotation marks omitted)). Other facts bolster this conclusion: in other litigation, James and DHR have publicly taken the position that conduct like Plaintiff's violates public-accommodation laws and is not protected under the First Amendment, *see* ECF No. 1 ¶¶ 287, 288 (citing cases), and at least one business with similar objections to Plaintiff's has been administratively prosecuted and penalized under the Human Rights Law. *See Matter of Gifford v. McCarthy*, 23 N.Y.S.3d 422, 433 (3d Dep't 2016) (upholding DHR order, which found wedding venue guilty of sexual-orientation discrimination, and affirming awards of $1,500 in compensatory damages and $10,000 in civil fines).

Defendants' arguments to the contrary are not persuasive. The State cites *Jones v. Schneiderman*, 101 F. Supp. 3d 283 (S.D.N.Y. 2015), for the proposition that "[a] government official's statement that a statute prohibits a type of conduct in the abstract—even where the official also states her intent to enforce the statutory prohibition against the public generally—is

15

usually insufficient, without more, to establish that prosecution is imminent against a particular plaintiff." ECF No. 27-1 at 13. In the context of pre-enforcement constitutional challenges, the Second Circuit has explicitly rejected the rule stated in *Jones*. *See Cayuga Nation*, 824 F.3d at 332 n.9 (stating that "an individual plaintiff [can] establish standing even where there [is] no express threat of prosecution specifically directed at the plaintiff"). No specific threat of enforcement is necessary to confer standing. *See Tong*, 930 F.3d at 70-71 (rejecting the claim that "standing [was] not available . . . because [the State] has made no overt threat to enforce the [s]tatute").

The State next contends that James is an improper defendant because, although she can file administrative complaints for violations of the Human Rights Law, so can "almost anybody." ECF No. 27-1 at 15. But to show that her injury will be "redressed by a favorable decision," *Driehaus*, 573 U.S. at 157, Plaintiff need not prove that "a favorable decision will relieve [her] *every* injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982). The fact that Plaintiff could obtain partial relief through an injunction against James is sufficient.[8] *See Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 903 (10th Cir. 2012) ("[A] favorable decision would relieve [the plaintiffs'] problem 'to some extent,' which is all the law requires."); *281 Care Comm. v. Arneson*, 638 F.3d 621, 631 (8th Cir. 2011) (fact that anyone could institute complaint did not undercut redressability as to county attorneys and attorney general, since granting injunctive relief "would redress a discrete injury to plaintiffs").

As for Wetmore, he has filed an affidavit stating that he would not prosecute a person under

---

[8] Because James is a proper defendant on this basis, the Court need not address whether James may be sued based on her authority under Executive Law § 63. *See* ECF No. 27-1 at 16.

Civil Rights Law § 40-d "absent a contemporaneous violation of the Penal Law" or other allegations "indicating another explicit criminal violation." ECF No. 59 at 8. These caveats are derived from Wetmore's belief that, historically, district attorneys have only prosecuted violations of the Civil Rights Law when those violations have been "accompanied by other [legal] violations." ECF No. 24-2 at 6.

The Court is not convinced. Even if Wetmore's view finds support in the prosecution history of the statute, it remains the case that Civil Rights Law § 40-d makes it a criminal offense to "violate any of the provisions of [Civil Rights Law § 40-c]." N.Y. Civ. Rights Law § 40-d. There is no explicit exception or caveat of the kind Wetmore seeks to include. Plaintiff reads Civil Rights Law § 40-d to render her criminally liable if she is found "to have discriminated against any other person because of sexual orientation," ECF No. 1 ¶ 224, and that straightforward interpretation is "reasonable enough" for her to "legitimately fear . . . enforcement of the statute." *Pac. Capital Bank, N.A. v. Connecticut*, 542 F.3d 341, 350 (2d Cir. 2008). And while Wetmore purports to disavow any intent to prosecute Plaintiff based on his interpretation of the law, "there is nothing that prevents [him] from changing [his] mind." *Sorrell*, 221 F.3d at 383. He is "not forever bound, by estoppel or otherwise, to the view of the law that [he] asserts in this litigation."[9] *Id.*

In sum, Plaintiff has standing because she has plausibly alleged that she engaged and intends to engage "in a course of conduct arguably affected with a constitutional interest, but

---

[9] Because Plaintiff's theory as to the threat of prosecution is fairly discernible from her complaint, the Court denies Wetmore's request for "a more definite statement [clarifying] . . . how [he] could be in controversy with the plaintiff." ECF No. 24-2 at 14 (citing Fed. R. Civ. P. 12(e)).

JA1131

proscribed by statute, and there exists a credible threat of prosecution thereunder." *Knife Rts.*, 802 F.3d at 384 (internal ellipsis omitted). This conclusion is consistent with the recent decisions of two federal circuit courts. *See Elenis*, 6 F.4th at 1171-75 (website designers who refused to create websites "that celebrate same-sex marriages" had standing to challenge Colorado public accommodation law); *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 749-50 (8th Cir. 2019) (same for wedding videographers in Minnesota). With the standing issues resolved, the Court turns to the merits.

## III.    Free Speech/Free Association Claim

Plaintiff's first claim proceeds as follows. Through her photography, Plaintiff seeks to express the "love, intimacy, and sacrifice of God's design for marriage," which, in her view, can only exist in marriages "between one man and one woman." ECF No. 1 ¶¶ 47, 48, 57, 117. She claims that, because she offers her wedding-photography services to opposite-sex couples, the Accommodation clause applies to her business and compels her to offer those same expressive services to same-sex couples. In practical effect, this means that the Accommodation clause compels her to create artistic expression that celebrates same-sex marriages and to associate herself with same-sex marriages, contrary to her desire and beliefs. Plaintiff argues that this statutory mandate is subject to strict scrutiny and violates her speech and associational rights under the First Amendment. In a similar vein, Plaintiff asserts that the Denial and Unwelcome clauses unconstitutionally prohibit her from advertising her religious views and her business's policies on same-sex marriage.

The State responds that the purpose of the Accommodation clause is not to compel speech as such, but rather to prohibit businesses from discriminating against certain protected classes of

18

JA1132

potential customers. Any effect that prohibition may have on the kinds of expression that Plaintiff ultimately produces is merely incidental to the antidiscriminatory purpose of the law. The State therefore argues that the Accommodation clause is subject to "a deferential standard of review," and that it satisfies that standard in light of the State's "compelling governmental interest" in eradicating discrimination. ECF No. 26 at 23.

### a.    Accommodation Clause

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits laws that abridge the freedom of speech." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018). "Some of [the Supreme] Court's leading First Amendment precedents have established the principle that freedom of speech prohibits the government from telling people what they must say." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 61 (2006); *see, e.g.*, *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (state law requiring schoolchildren to recite Pledge of Allegiance and salute the flag held unconstitutional). This freedom to decide "what not to say" is an "important manifestation of the principle of free speech," *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995), and has been held to limit "the government's ability to force [a] speaker to host or accommodate another speaker's message." *Rumsfeld*, 547 U.S. at 63. Because compelled speech alters the content of one's speech, it is considered a "content-based regulation" subject to strict scrutiny. *Becerra*, 138 S. Ct. at 2371; *see also Riley v. Nat'l Fed'n of the Blind of North Carolina, Inc.*, 487 U.S. 781, 795 (1988); *Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233, 244 (2d Cir. 2014). Content-based regulations of speech "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling

19

state interests." *Becerra*, 138 S. Ct. at 2371.

The Supreme Court has imposed a lesser degree of scrutiny on regulations that only "incidentally burden[] speech." *United States v. Albertini*, 472 U.S. 675, 688 (1985); *see, e.g.*, *United States v. O'Brien*, 391 U.S. 367 (1968) (upholding conviction for destruction of draft card, notwithstanding that defendant burned draft card as symbolic protest). "The appropriate standard by which to evaluate the constitutionality of a content-neutral regulation that imposes only an incidental burden on speech is the intermediate level of scrutiny." *Vincenty v. Bloomberg*, 476 F.3d 74, 84 (2d Cir. 2007). "Such a restriction will be sustained under this standard if it (1) advances important governmental interests unrelated to the suppression of free speech and (2) does not burden substantially more speech than necessary to further those interests." *Time Warner Cable Inc. v. F.C.C.*, 729 F.3d 137, 160 (2d Cir. 2013) (internal quotation marks omitted).

The Supreme Court has also held that the Constitution protects one's "freedom of expressive association"—that is, "[the] right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984). "Freedom of association . . . presupposes a freedom not to associate," *id.* at 623, and "[t]he forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." *Boy Scouts of America v. Dale*, 530 U.S. 640, 648 (2000). But the freedom of expressive association can be overridden "by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Id.*; *see also Tabbaa v. Chertoff*, 509 F.3d 89, 102 (2d

20

JA1134

Cir. 2007).

For purposes this order, the Court will assume that strict scrutiny applies on the theory that the Accommodation clause compels speech and expressive association. It is true that the Accommodation clause does not *facially* regulate a public accommodation's speech or other expressive activity; it simply prohibits public accommodations from withholding their goods or services for discriminatory reasons. *See* N.Y. Exec. Law § 296(2)(a); *see also Hurley*, 515 U.S. at 572. For the vast majority of businesses, the obligation to serve a customer pursuant to antidiscrimination legislation does not implicate a cognizable First Amendment interest. *See Masterpiece Cakeshop*, 138 S. Ct. at 1727; *Hurley*, 515 U.S. at 572. Relying on this logic, the State and some *amici* conceptualize Plaintiff's challenge simply as an attack on her obligation to serve customers without discrimination. *See, e.g.*, ECF No. 26 at 19-20; ECF No. 51 at 12-14; ECF No. 55 at 17.

Plaintiff's theory is a bit more nuanced than that. The complaint alleges—and the Court must accept—that Plaintiff does not intend to wholly discriminate against LGBT individuals as such, and she is willing to provide a variety of photography services to LGBT individuals. *See* ECF No. 1 ¶¶ 128-32. What Plaintiff is challenging is the Accommodation clause's prohibition on "limited menus." It is well-settled that the Accommodation clause not only prohibits a public accommodation from wholly denying a person its services on the basis of a protected characteristic, but also from withholding "*any* of the . . . advantages . . . or privileges" it offers to the public. N.Y. Exec. Law § 296(2)(a) (emphasis added). As a result, "[t]he statute does not permit businesses to offer a limited menu of goods and services to customers on the basis of a status that fits within one of the protected categories." *Gifford*, 23 N.Y.S.3d at 429 (internal

21

quotation marks omitted); *see, e.g.*, *Batavia Lodge No. 196, Loyal Ord. of Moose v. N.Y.S. Div. of Hum. Rts.*, 35 N.Y.2d 143, 145 (1974) (lodge violated statute when it permitted black customers to attend fashion show but refused to serve them at the bar); *Joyner v. Moore-Wiggins Co., Ltd.*, 136 N.Y.S. 578, 579 (4th Dep't 1912) (theater violated Civil Rights Law § 40 when it refused to seat an African-American customer in the orchestra section but permitted her to sit in the balcony).

Plaintiff argues that, as applied to her, the prohibition on "limited menus" compels her to create photographs for same-sex couples that celebrate their marriages if she creates photographs for opposite-sex couples that celebrate their marriages. *See* ECF No. 1 ¶ 160. The Court does not consider this a strained interpretation of the Accommodation clause or an unlikely target of the State's enforcement efforts. Just a few years ago, the Appellate Division, Third Department, interpreted the Accommodation clause to prohibit "limited menus" and upheld a DHR determination that a wedding venue violated that prohibition when it refused to host a same-sex wedding ceremony, even if it "would 'happily' host wedding receptions, parties or other events for couples in same-sex relationships." *Gifford*, 23 N.Y.S.3d at 429.

Plaintiff thus makes a plausible case that the "limited menu" prohibition compels her to create speech—*i.e.*, photographs celebrating the marriage of same-sex clients[10]—to the same

---

[10] In addition to the photography itself, Plaintiff claims that she engages in a variety of other activities in connection with each wedding she photographs. For example, she writes a blog post about the wedding, she acts "personally excited" at the wedding, she "verbally encourag[es]" the wedding party, and she "personally and joyfully interact[s]" with the bride and groom. ECF No. 1 ¶¶ 65, 68. Taken to an extreme, the "limited menu" prohibition might be interpreted to compel these activities in addition to the photography service itself. *See* ECF No. 3-1 at 28. But the Court is skeptical of the proposition that, merely because Plaintiff does these things in conjunction with the opposite-sex weddings she photographs, the Accommodation clause compels her to do the same at same-sex weddings. The Accommodation clause only mandates equal access to the "accommodations, advantages, facilities or privileges" of the public accommodation, *i.e.*, the goods or services the accommodation provides to the public. N.Y. Exec. Law. § 296(2)(a). The service that Plaintiff provides to the public is wedding photography. She is not hired to "joyfully

extent she creates such speech for opposite-sex clients. In analogous circumstances, two federal circuit courts have agreed that, as applied, public accommodation laws can operate to compel speech in this manner. *See Elenis*, 6 F.4th at 1177 (in case of website designer who did not wish to promote same-sex marriage, concluding that public accommodation law compelled the business "to serve customers [it] would otherwise refuse," and thereby force the business "to create websites—and thus, speech—that [it] would otherwise refuse"); *Lucero*, 936 F.3d at 753-54 ("[Minnesota's public accommodation law] compels [wedding videographers] to speak favorably about same-sex marriage if they choose to speak favorably about opposite-sex marriage.").

Regardless, the Court need not make any definitive determination on the matter. The Court will simply assume that, as applied, the Accommodation clause operates to compel Plaintiff to speak in the manner she claims, and it will therefore apply strict scrutiny to assess the constitutionality of that statutory command. *See Becerra*, 138 S. Ct. at 2371. It will likewise assume that the Accommodation clause interferes with her right to expressive association. *See Dale*, 530 U.S. at 648.

As noted, content-based regulations of speech "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Becerra*, 138 S. Ct. at 2371. The State asserts that it has a "compelling governmental interest" in "[t]he eradication of discrimination." ECF No. 27-1 at 31. The Court

---

interact" with the couple or to "encourage" wedding guests, so the Accommodation clause does not compel equal access to those activities. The blogposts are a closer call, as Plaintiff sometimes claims that blogging is a "service" she provides to couples, though elsewhere she suggests that its purpose is to advocate for her own religious beliefs and market her business. ECF No. 1 ¶¶ 35, 91, 92, 93, 156; *see also* ECF No. 3-5 ¶¶ 116-41. While the Court frames its analysis in terms of compelled photography, this equally applies to Plaintiff's blogging, assuming it could be deemed an accommodation, advantage, facility or privilege of her business.

23

agrees, though that interest must be delineated with more precision than the State's formulation. Specifically, the Court agrees that New York has a compelling interest in ensuring that individuals, without regard to sexual orientation, have "equal access to publicly available goods and services." *Roberts*, 468 U.S. at 624; *Elenis*, 6 F.4th at 1179.

This economic interest is consistent with one of the earliest justifications for public accommodation laws. At common law, "a person engaged in a public calling, such as innkeeper or common carrier, was held to be under a duty to the general public and was obliged to serve, without discrimination, all who sought service." *Madden v. Queens Cnty. Jockey Club, Inc.*, 296 N.Y. 249, 253 (1947); *see also Hurley*, 515 U.S. at 571. This duty set such businesses apart from other "proprietors of private enterprise," who were "under no such obligation" and "enjoy[ed] an absolute power to serve whom they pleased." *Madden*, 296 N.Y. at 253; *see also Aaron v. Ward*, 203 N.Y. 351, 355-56 (1911). In the nineteenth century, legislative enactments modified those common-law categories to address the societal ills associated with race discrimination. *See Hurley*, 515 U.S. at 571.

In New York, these changes were upheld as consistent with the State's police power. For example, in *People v. King*, 110 N.Y. 418 (1888), the New York Court of Appeals upheld a penal law that prohibited innkeepers, common carriers, places of amusements, schools, and cemetery associations from excluding individuals "by reason of race, color, or previous condition of servitude." *King*, 110 N.Y. at 420-21. The proprietor of a skating rink was indicted under the law and challenged it as an "unconstitutional interference with private rights." *Id.* at 422. The court noted that the law promoted the public good: "Both justice and the public interest concur in a policy which shall elevate [African Americans] as individuals, and relieve them from oppressive

24

or degrading discrimination, and which shall encourage and cultivate a spirit which will make them self-respecting, contented, and loyal citizens, and give them a fair chance in the struggle of life." *Id.* at 426. Exclusion "from places of public resort on account of [patrons'] race" tended to "fix their position as a servile and dependent people." *Id.* at 426-27; *see also Gibbs*, 222 N.Y. at 336 (noting that a public accommodation is a facility "created and operated for the common advantage, aid and benefit of the people, the denial of which to any person would be a discriminatory obstruction or deprivation in achieving prosperity, health, development or happiness"). The *King* court found any interference in the proprietor's property rights permissible because, by "devot[ing] his property" to a "*quasi* public use," the proprietor furnished the State with a "right to interfere" to further the public interest. *King*, 110 N.Y. at 428; *see also Munn v. Illinois*, 94 U.S. 113, 113 (1876) ("When the owner of property devotes it to a use in which the public has an interest, he in effect grants to the public an interest in such use, and must to the extent of that interest, submit to be controlled by the public, for the common good, as long as he maintains the use."); Lisa G. Lerman & Annette K. Sanderson, *Discrimination in Access to Public Places: A Survey of State and Federal Public Accommodations Laws*, 7 N.Y.U. Rev. L. & Soc. Change 215, 218 (1978) ("Proscription of discrimination in public accommodations is premised on the notion that many privately-owned establishments are to some extent public. Citizens' rights of access to public places must, therefore, be balanced against the right of the owner to control his or her property.").

In other words, one of the objects of public accommodation law is "to ensure by statute for [individuals in historically disadvantaged or disfavored classes] desiring to make use of public accommodations what the old common law promised to any member of the public wanting a meal

25

at the inn"—namely, "that accepting the usual terms of service, they will not be turned away merely on the proprietor's exercise of personal preference." *Hurley*, 515 U.S. at 578. This justification animates New York's public accommodation laws in the context of sexual orientation discrimination. When, in 2003, the New York legislature amended the Human Rights Law and Civil Rights Law to add sexual orientation as a protected category, it declared "that many residents of this state have encountered prejudice on account of their sexual orientation, and that this prejudice has severely limited or actually prevented access to employment, housing and other basic necessities of life, leading to deprivation and suffering." *See* 2002 N.Y. Sess. Laws ch. 2, § 1. The purpose of the legislation was to dismantle the economic barriers that hindered LGBT individuals' opportunities to enjoy a "full and productive life," rather than to "promote any particular attitude, course of conduct or way of life." *Id.*

The Supreme Court has long found this interest compelling. A state's interest in "eliminating discrimination" so as to ensure that "its citizens [have] equal access to publicly available goods and services" is one of the "highest order." *Roberts*, 468 U.S. at 624. In her concurrence in *Roberts*, Justice Sandra Day O'Connor wrote of the "profoundly important goal of ensuring nondiscriminatory access to commercial opportunities in our society." *Roberts*, 468 U.S. at 632 (concurring in part and concurring in judgment). This compelling interest applies not only to race discrimination, *see Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 252-53 (1964), but also to sex discrimination, *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987), and sexual orientation discrimination, *Masterpiece*, 138 S. Ct. at 1727-28. In *Masterpiece*, the Supreme Court unequivocally recognized that society had historically treated "gay persons and gay couples . . . as social outcasts" who were "inferior in dignity and worth." *Id.*

26

at 1727.  In light of that history, the court found it "unexceptional" that states were empowered to "protect gay persons, just as it can protect other classes of individuals, in acquiring whatever products and services they choose on the same terms and conditions as are offered to other members of the public."  *Id.* at 1728.  Indeed, it would be "inconsistent with the history and dynamics of civil rights laws," which "ensure equal access to goods, services, and public accommodations," to exempt from those laws all public accommodations that object to same-sex marriage.  *Id.*

Nevertheless, some courts appear to have concluded that, while parity of access to publicly available goods and services is a compelling interest as a general matter, it is not compelling enough to justify a public accommodation law that compels speech or forces inclusion in a manner that impairs the accommodation's expressive activity.  *See Lucero*, 936 F.3d at 755-56 (arguing that the First Amendment "prevent[s] the government from requiring [a business's] speech to serve as a public accommodation for others"); *Chelsey Nelson*, 479 F. Supp. 3d at 558-59; *Brush & Nib Studio, LC v. City of Phoenix*, 448 P.3d 890, 915 (Ariz. 2019) ("[T]he Supreme Court [has] rejected any suggestion that a public accommodations law could justify compelling speech.").  But the cases on which these courts primarily rely—*Boy Scouts of America v. Dale*, 530 U.S. 640 (2000), and *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 616 U.S. 557 (1995)—do not stand for so broad or bright-line a proposition.

In *Dale*, the Supreme Court held that New Jersey's public accommodation law was applied in an unconstitutional manner when it required the Boy Scouts—a "private, not-for-profit organization engaged in instilling its system of values in young people"—to accept James Dale, an "avowed homosexual and gay rights activist," as a member.  *Dale*, 530 U.S. at 644.

27

"[H]omosexual conduct" was "inconsistent with the values" that Boy Scouts taught and worked to instill. *Id.* at 650. The Supreme Court recognized the compelling interest "in eliminating discrimination" in public accommodations, but it observed that "[a]s the definition of 'public accommodation' has expanded from clearly commercial entities, such as restaurants, bars, and hotels, to membership organizations such as the Boy Scouts, the potential for conflict between state public accommodations laws and the First Amendment rights of organizations has increased." *Id.* at 657. By forcing the Boy Scouts to include Dale, New Jersey had "significantly affect[ed]" the organization's expression, *id.* at 656, and "such a severe intrusion on the Boy Scouts' rights to freedom of expressive association" could not be justified by the state's antidiscrimination interests. *Id.* at 659.

In *Hurley*, the Supreme Court drew a similar line with respect to compelled speech. In that case, the Massachusetts Supreme Judicial Court had interpreted the state's public accommodation law to require "private citizens who organize a parade to include among the marchers a group imparting a message the organizer do not wish to convey." *Hurley*, 515 U.S. at 559. Specifically, a group of gay, lesbian, and bisexual activists sought to march in a St. Patrick's Day parade with their own banner so as to, among other things, "express pride in their Irish heritage as openly gay, lesbian, and bisexual individuals [and] to demonstrate that there are such men and women among those so descended." *Id.* at 561. The organizers appealed to the Supreme Court, arguing that the forced inclusion of the group compelled their speech in violation of the First Amendment. *See id.* at 566.

The Supreme Court agreed. The parade was a form of expression protected by the First Amendment, *see id.* at 569-70, and the Court was of the opinion that Massachusetts's public

28

accommodation law "ha[d] been applied in a peculiar way," insofar as it did not merely compel "openly gay, lesbian, or bisexual individuals" to be admitted into the parade, but required "the admission of [the group] as its own parade unit carrying its own banner." *Id.* at 572. In the Court's view, this had the effect of "essentially requiring [the organizers] to alter the expressive content of their parade" and of "declaring the [organizers'] speech itself to be the public accommodation." *Id.* at 572-73. This expansive application of public accommodation law "violate[d] the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message." *Hurley*, 515 U.S. at 573.

Both *Dale* and *Hurley* involved, in the Supreme Court's view, expansive applications of public accommodation laws that reached beyond their core, economic justification. As originally envisioned, public accommodation laws sought to extend the "old common law" rule—which promised "to any member of the public wanting a meal at the inn [that] . . . they will not be turned away merely on the proprietor's exercise of personal preference"—to a wider swath of publicly available goods and services. *Id.* at 578. But the laws originally did no more than compel an economic relationship between proprietor and customer, a relationship that is not clothed with a significant level of constitutional protection. *See Roberts*, 468 U.S. at 634 (O'Connor, J., concurring in part and concurring in judgment) ("The Constitution does not guarantee a right to choose employees, customers, suppliers, or those with whom one engages in simple commercial transactions, without restraint from the State. A shopkeeper has no constitutional right to deal only with persons of one sex."). Over time, however, public accommodation laws were extended to compel not only access to goods and services available in the public marketplace, but also to membership in organizations. *See id.* at 616, 625-26. Standing alone, this was not irrational or

29

unjustified, as membership in a private organization can confer various privileges and benefits. *See id.* at 626.  But the Supreme Court believed that, "[a]s the definition of 'public accommodation' [] expanded [beyond] clearly commercial entities," the potential "for conflict between state public accommodations laws and the First Amendment rights of organizations [] increased."  *Dale*, 530 U.S. at 657.  Individuals have a First Amendment right to "combine with others to advance [their] views," and compelling a group to accept others as members or participants can conceivably interfere with the group's ability "to advocate its desired viewpoints."  *New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 13 (1988).

So it came to pass in *Dale*.  Compelling the Boy Scouts to accept Dale as a member would "derogate from the organization's expressive message" and was thus unconstitutional.  *Dale*, 530 U.S. at 661.  The constitutional infirmity was even more pronounced in *Hurley*.  The private parade was deemed a public accommodation in which participation could be compelled, notwithstanding that, unlike other private organizations, the parade appeared to offer no public "benefit" beyond its expression itself.  *See Hurley*, 515 U.S. at 572, 578, 580-81.  In short, *Hurley* and *Dale* both considered the First Amendment constraints on a state's ability to compel membership or participation in an entity's private expressive activities via public accommodation law.  Neither case considered the First Amendment constraints on a state's ability to compel a commercial transaction between proprietor and customer via public accommodation law.  To the Court, there are good reasons for a distinction, even if the commercial transaction involves "expressive" goods or services.  *See Evergreen Ass'n*, 740 F.3d at 249 ("When evaluating compelled speech, [courts] consider the context in which the speech is made.").

A mandate that a business operating in the public marketplace provide equal,

30

nondiscriminatory access to its goods and services is a faithful application of, not a departure from, the "old common law" duties applicable to quasi-public entities like inns. *Hurley*, 515 U.S. at 571-72, 578; *see also Donnell v. State*, 48 Miss. 661, 680 (1873) ("Among those customs which we call the common law, that have come down to us from the remote past, are rules which have a special application to those [businesses] who sustain a quasi public relation to the community."). If the good or service in question involves protected expression, it may be that such a mandate compels speech. But it lacks the "demeaning" character usually associated with compelled speech, *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2464 (2018), as it only applies to those businesses that have *chosen* to invite the public at large to make use of their expressive capacities through a commercial transaction. *See Cahill v. Rosa*, 89 N.Y.2d 14, 21 (1996) (stating that a public accommodation is a business that "provide[s] services to the public" and is "generally open to all comers")[11]; *see also Elenis*, 6 F.4th at 1180 ("[Colorado's public accommodation law] only applies here because [the business] intend[s] to sell [its] unique services *to the public*." (emphasis added)); *cf. Dale*, 530 U.S. at 657 (distinguishing those accommodations "where the public is invited" from those that "may not carry with them open invitations to the public"). To paraphrase *Hurley*: to the extent a public accommodation law has the effect of declaring the "speech" of a business dealing in expressive goods or services to be the "accommodation," it is only because the business has already invited the public at large to treat it as such. *Hurley*, 515 U.S. at 573. In that context, public accommodation laws do no more than

---

[11] The antecedent question—whether a business has sufficiently opened its doors to the public such that it is a public accommodation—is not at issue in this case. Plaintiff concedes that her business is a public accommodation. ECF No. 1 ¶¶ 150, 153.

31

police the markets and ordinary commercial transactions in which publicly accessible businesses, including those dealing in custom-made goods and services, have decided to engage. *Accord Elenis*, 6 F.4th at 1179 ("When regulating commercial entities . . . public accommodations laws help ensure a free and open economy."). That economic interest, unrelated to the suppression of ideas or the codification of orthodoxy, is one which neither *Hurley* nor *Dale* had occasion to consider (given the nature of the accommodations at issue in those cases), and is one which the Supreme Court has repeatedly and unequivocally deemed compelling. *See, e.g.*, *Masterpiece*, 138 S. Ct. at 1727-28, 1732; *Roberts*, 468 U.S. at 624-26. So it is here.[12]

Thus, New York has a compelling interest in ensuring that individuals, without regard to sexual orientation, have "equal access to publicly available goods and services." *Roberts*, 468 U.S. at 624. The only remaining question is whether the Accommodation clause is "narrowly tailored," as applied to Plaintiff, to serve that interest. *Becerra*, 138 S. Ct. at 2371. The Court finds that it is.

---

[12] Plaintiff argues that the claimed importance of New York's interest is undermined by the fact that it provides exemptions from its antidiscrimination laws in certain instances of sex and disability discrimination. *See* ECF No. 3-1 at 30-31. Even if that were true, the Court is not persuaded that any underinclusiveness with respect to other forms of discrimination renders the laws underinclusive with respect to sexual orientation discrimination.

In addition, Plaintiff and some *amici* point out that New York exempts religious entities and benevolent orders from its public accommodation laws. *See* ECF No. 1 ¶ 316; ECF No. 22 at 25 (citing N.Y. Dom. Rel. Law § 10-b(1)). However, no argument has been made that these ostensibly private entities engage in public commercial activities to such a degree that an exemption limits LGBT individuals' access to publicly available goods and services. *Cf. New York State Club Ass'n v. City of New York*, 487 U.S. 1, 16 (1988) (discussing same exemption under city ordinance and finding exemption rational in light of city council's belief that such entities "have not been identified . . . as places where business activity is prevalent"). New York's decision not to regulate certain entities at the fringes of the public marketplace, especially given the countervailing considerations attaching to private religious or associational endeavors, does not fatally undermine its interest in affording equal market access without regard to sexual orientation. *See Williams-Yulee v. Florida Bar*, 575 U.S. 433, 449 (2015) ("Although a law's underinclusivity raises a red flag, the First Amendment imposes no freestanding 'underinclusiveness limitation.' A State need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns." (internal citation omitted)).

32

New York's public accommodation laws apply only to those businesses that choose to "provide services to the public" and are "open to all comers." *Cahill*, 89 N.Y.2d at 21 (defining "public accommodation"). As applied to the present case, there is a tight fit between the kinds of businesses regulated—those that, like Plaintiff's, provide their goods or services to the public— and New York's interest—ensuring that businesses that provide goods or services to the public do not discriminate on the basis of sexual orientation. The laws are not intended to regulate issues of conscience or belief. *See Aaron*, 203 N.Y. at 357 ("[A] man's prejudices may be part of his most cherished possessions, which cannot be invaded except when displayed in the conduct of public affairs or quasi public enterprises."); *King*, 110 N.Y. at 428; *see also* 2002 N.Y. Sess. Laws ch. 2, § 1 ("[T]he legislature makes clear its action is not intended to promote any particular attitude, course of conduct or way of life."). To sharpen the distinction between public-facing businesses and other endeavors, the laws expressly exclude all "distinctly private" accommodations from regulation.[13] N.Y. Exec. Law § 292(9); N.Y. Civ. Rights Law § 40; *see also U.S. Power Squadrons v. State Hum. Rts. Appeal Bd.*, 59 N.Y.2d 401, 412 (1983).

Nevertheless, Plaintiff asserts that the Accommodation clause is not the least restrictive means of achieving the State's interest. *See* ECF No. 3-1 at 31-32; *see also United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000) ("If a less restrictive alternative would serve the

---

[13] Because Plaintiff concedes that she serves the public at large and is a public accommodation, ECF No. 1 ¶¶ 151, 153, the Court need not delineate the precise scope of the "distinctly private" exemption. Still, it is worth noting that this exemption seems particularly well-suited to artists who must be selective in their clientele in order to express their desired message. *See Cahill*, 89 N.Y.2d at 22 ("The hallmark of a 'private' place within the meaning of the Human Rights Law is its selectivity or exclusivity."). Given the existence of that exemption, the Court is not convinced by Plaintiff's assertion that the Accommodation clause "condition[s] [her] ability to participate in the wedding industry and to create wedding photography promoting [opposite-sex marriage] . . . on the requirement that [she] also create wedding photography promoting [same-sex marriage]." ECF No. 1 ¶ 330.

33

Government's purpose, the legislature must use that alternative.").  Plaintiff notes that there are several ways in which New York could exempt her business from public accommodation law, and she asserts that such an exemption would not harm same-sex couples, as there are thousands of wedding photographers in New York that will photograph same-sex weddings.  *See* ECF No. 1 ¶ 303; ECF No. 3-1 at 30, 32.

The Court is not persuaded.  As Plaintiff concedes, an "expressive" service like hers is not fungible.  *See* ECF No. 57 at 28.  Her photographs are a product of her personal "artistic discretion," "technical proficiency," and "moral standards," and it is her "faith and eye for beauty" that "shape her photography—from first click to final edit." ECF No. 1 at 3; *id.* ¶¶ 54, 77, 80. While other photographers may operate in the same market, Plaintiff does not allege that they would deliver the *same* photographs she does.  *Cf. Elenis*, 6 F.4th at 1180 ("LGBT consumers may be able to obtain wedding-website design services from other businesses; yet, LGBT consumers will never be able to obtain wedding-related services of the same quality and nature as those that Appellants offer.").  To the contrary, the crux of Plaintiff's claims is that her photography is the product of her unique artistic style and vision.  Thus, an exemption for Plaintiff's unique, nonfungible services would necessarily undermine, not serve, the State's purpose, as it would "relegate [same-sex couples] to an inferior market" than that enjoyed by the public at large.  *Id.* The Court concurs with the Tenth Circuit's observation: "It is not difficult to imagine the problems created where a wide range of custom-made services are available to a favored group of people, and a disfavored group is relegated to a narrower selection of generic services. Thus, unique goods and services are where public accommodation laws are most necessary to ensuring equal access." *Id.* at 1181.

34

JA1148

Accordingly, the Court concludes that New York has a compelling interest in ensuring that individuals, without regard to sexual orientation,[14] have equal access to publicly available goods and services, and that the Accommodation clause is narrowly tailored, as applied to Plaintiff, to serve that interest. As a result, even if the Accommodation clause compels speech or expressive association in a manner that implicates Plaintiff's free-speech and free-association interests, the provision survives strict scrutiny.

**b.    Denial/Unwelcome Clauses**

Plaintiff's free-speech challenge to the Denial and Unwelcome clauses does not require significant analysis. It is well-established that a state "may prohibit speech that promotes unlawful activity, including unlawful discrimination." *Elenis*, 6 F.4th at 1182; *see also Jews for Jesus, Inc. v. Jewish Cmty. Rels. Council of N.Y., Inc.*, 968 F.2d 286, 296 (2d Cir. 1992) (collecting cases for proposition that "the First Amendment provides no defense to persons who have used otherwise protected speech or expressive conduct to force or aid others to act in violation of a valid conduct-regulating statute"). In *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376 (1973), the Supreme Court held that "[a]ny First Amendment interest which might be served by

---

[14] The analysis may well be different with respect to other protected classes. Over the years, "[p]ublic accommodations laws have [] broadened in scope to cover more groups" beyond "those groups that have been given heightened equal protection scrutiny under [Supreme Court precedent]." *Dale*, 530 U.S. at 656 n.2 (citing as examples characteristics "such as prior criminal record, prior psychiatric treatment, military status, personal appearance, source of income, place of residence, and political ideology"). Whether equal access to the public marketplace is a compelling interest as to those groups is a distinct question that will depend in part on the historical inequities and economic discrimination faced by those groups. The Court's opinion should not be understood to mean that public accommodation laws may compel a public accommodation's speech for the benefit of *any* group that is deemed to be a protected class under such laws. For this reason, the Court does not find salient the Eighth Circuit's fear of a slippery slope. *See Lucero*, 936 F.3d at 756 (expressing concern that, if "political affiliation or ideology" is deemed to be a protected characteristic, "a Democratic speechwriter [could be forced] to provide the same services to a Republican, or . . . a professional entertainer [could be required] to perform at rallies for both the Republican and Democratic candidates for the same office").

advertising an ordinary commercial proposal and which might arguably outweigh the governmental interest supporting the regulation is altogether absent when the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity." *Pittsburgh Press*, 413 U.S. at 389.

In this case, Plaintiff seeks to post a statement advertising the fact that she will not photograph same-sex weddings, and she wishes to make similar statements directly to prospective clients. *See* ECF No. 1 ¶¶ 246, 251. But it is unlawful for Plaintiff to discriminate on that basis, so New York may permissibly prohibit Plaintiff from advertising that "unlawful activity." *Elenis*, 6 F.4th at 1182; *see also Lucero*, 936 F.3d at 757 n.5. Plaintiff does not dispute this logic. *See* ECF No. 57 at 19-20, 30 (discussing the "intertwinement" of her claims and agreeing that "Emilee's right to post depends on her right to control her photography"). Accordingly, the Denial and Unwelcome clauses are not unconstitutional to the extent they would prohibit Plaintiff from making the identified statements.

In light of the foregoing, Plaintiff has failed to state a viable free speech/free association claim on any of the theories she raises.[15]

---

[15] In addition, Plaintiff attacks the Unwelcome clause as facially overbroad. *See* ECF No. 1 ¶ 333; ECF No. 57 at 33. In her view, that provision "could cover any critical statement related to protected classes on a public accommodation's website—statements like 'Israel commits murder' or 'Catholicism is wrong.'" ECF No. 57 at 33. The Court dismisses this claim. In her briefing, Plaintiff fails to undertake any meaningful statutory analysis of the clause to support her claimed interpretation. *See Adams v. Zenas Zelotes, Esq.*, 606 F.3d 34, 38 (2d Cir. 2010) ("[I]t is impossible to determine whether a statute reaches too far without first knowing what the statute covers."). It is not incumbent upon the Court to do so on her behalf. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."). But the Court notes that, by its plain language, the clause does not target offensive speech *per se*, but only communications "to the effect that" the "patronage" of certain protected groups is unwelcome. N.Y. Exec. Law § 296(2)(a); *see also State Div. of Hum. Rts. on Complaint of Gladwin v. McHarris Gift Ctr.*, 419 N.Y.S.2d 405, 406 (4th Dep't 1979) (sale of novelty items that "demeaned persons of Polish extraction," although "offensive and in poor taste," were not communications to the effect that those of Polish origin were

36

## IV.    Free Exercise

Plaintiff next asserts that New York's public accommodation laws violate her First Amendment right to free exercise of religion.  Plaintiff maintains that she exercises her religion when she operates her business, takes photographs of weddings, and participates in wedding ceremonies.  ECF No. 1 ¶ 342.  She claims that, as applied to her, the laws "substantially burden [her] sincerely held religious beliefs by requiring [her] to either operate [her] expressive business in a way that violate[s] [her] religious beliefs or to close [her] business."  *Id.* ¶ 343.  The Court concludes, however, that the laws are neutral and generally applicable and survive rational basis review.

"[L]aws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable."  *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876 (2021); *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) ("[A] law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice.").   "Neutrality and general applicability are interrelated and . . . failure to satisfy one requirement is likely an indication that the other has not been satisfied."  *Lukumi*, 508 U.S. at 531.

In terms of neutrality, the Supreme Court has been clear that the "[g]overnment fails to act

---

"unwelcome" under the Human Rights Law), *aff'd*, 52 N.Y.2d 813 (1980).  Furthermore, Plaintiff does not dispute that the clause is plainly legitimate as applied to advertisements or communications intended to deter persons in protected classes from patronizing the accommodation.  *See Pittsburgh Press Co.*, 413 U.S. at 389.  Plaintiff's conclusory claim that the Unwelcome clause may "deter protected speech to some unknown extent" is insufficient to "justify invalidating [the provision] on its face and so prohibiting [the] State from enforcing [it] against conduct that is admittedly within [the State's] power to proscribe."  *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973); *accord Elenis*, 6 F.4th at 1189.

JA1151

neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices *because of their religious nature*." *Fulton*, 141 S. Ct. at 1877 (emphasis added). In other words, "if the object of a law is to infringe upon or restrict practices *because of their religious motivation*, the law is not neutral." *Lukumi*, 508 U.S. at 533 (emphasis added). "Factors relevant to the assessment of governmental neutrality include 'the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body.'" *Masterpiece*, 138 S. Ct. at 1731 (quoting *Lukumi*, 508 U.S. at 540).

New York's public accommodation laws are neutral. By only bringing an as-applied challenge, Plaintiff virtually concedes that the laws are facially neutral. *See* ECF No. 1 ¶ 343. She raises no non-conclusory factual allegations that the laws were enacted with any kind of religious (or anti-religious) motivation. And while Plaintiff attempts to assert that the State "punishes" and "manifests hostility towards" religiously motivated objectors, *id.* ¶¶ 292, 293, she does not marshal sufficient factual allegations to make that assertion plausible. The indicia cited—*e.g.*, administrative decisions in which DHR found that public accommodations had not denied service for discriminatory reasons, *id.* ¶ 291; the State's position that religious motivations do not exempt public accommodations from public accommodation laws, *id.* ¶¶ 288, 289, 295; and a tweet by James in which she expresses disagreement with the *Masterpiece* decision, *id.* ¶ 296—do not support Plaintiff's assertion and are unlike the sort of hostile conduct that might support a claim. *See, e.g.*, *Masterpiece*, 138 S. Ct. at 1729-30 (commission's treatment of public accommodation evinced "clear and impermissible hostility toward [] sincere religious beliefs," where one commissioner implied that "religious beliefs and persons are less than fully welcome in Colorado's

38

JA1152

business community," another commissioner compared the accommodation's views on same-sex marriage to slavery and the holocaust, and the commission departed from its earlier rationales concerning "conscience-based objections").

The mere fact that a state enforces its public accommodation laws notwithstanding the religious motivations of the accommodation does not evince impermissible hostility. *See id.* at 1727 ("[Religious and philosophical objections] do not allow business owners and other actors in the economy and in society to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations law."); *Newdow v. Peterson*, 753 F.3d 105, 109 (2d Cir. 2014) ("[T]he Free Exercise Clause does not normally inhibit enforcement of otherwise valid laws of general application that incidentally burden religious conduct." (internal quotation marks omitted)).

Plaintiff focuses her attention more on the argument that New York's public accommodation laws are not generally applicable. "The principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause." *Lukumi*, 508 U.S. at 543. Accordingly, a law is not generally applicable "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 141 S. Ct. at 1877. "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam). As is relevant here, a law is also not generally applicable "if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individual exemptions."

39

*Fulton*, 141 S. Ct. at 1877 (internal quotation marks and brackets omitted). "[W]here the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason." *Id.*

For example, in *Lukumi*, the City of Hialeah enacted several ordinances that prohibited religious sacrifice of animals but exempted secular slaughterhouses, kosher slaughterhouses, hunting, fishing, extermination of pests, and euthanasia of animals. *Lukumi*, 508 U.S. at 526-28, 536, 543-44. The Supreme Court concluded that this scheme was not neutral because "few if any killings of animals [were] prohibited other than Santeria sacrifice," and that it was not generally applicable because it burdened "only . . . conduct motivated by religious belief." *Id.* at 545. Applying strict scrutiny, the court concluded that the laws were unconstitutional.

That is not, however, the case here. New York's public accommodation laws prohibit sexual orientation discrimination and equally burden *both* discriminatory conduct motivated by religious belief *and* discriminatory conduct motivated by secular considerations. In other words, New York does not permit discrimination against same-sex couples for secular purposes but prohibit discrimination against same-sex couples for religious purposes. Indeed, Plaintiff has not pled a single example of New York "*ever* permitting sexual orientation discrimination [for] *any* reason—secular or religious." ECF No. 27-1 at 21.

Plaintiff identifies several exemptions from the Human Rights Law and argues that these exemptions make the laws not generally applicable. *See* ECF No. 1 ¶¶ 314-16. Most of these exemptions are not relevant, as they apply to discrimination in employment and housing. But, as Defendants correctly observe, "Plaintiff is not asking for an exemption in providing employment or housing, only in offering wedding photography." ECF No. 27-1 at 21. For the same reason,

40

Section 296(2)(b), which excuses only *sex* discrimination by public accommodations based on "bona fide considerations of public policy," is not relevant.[16]

The only relevant exemption Plaintiff identifies is New York Domestic Relations Law § 10-b, which exempts religious entities and benevolent orders from being required to provide services for "the solemnization or celebration of a marriage." ECF No. 1 ¶ 316. Plaintiff fails to plausibly allege that this exemption undermines the State's interest in providing equal access to the public marketplace. *See* note 11 *supra*; *see also Fulton*, 141 S. Ct. at 187. In any case, the Supreme Court has long given special solicitude to exemptions like Section 10-b, and they do not render antidiscrimination laws not generally applicable. *See, e.g.*, *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 132 S. Ct. 694, 705-06 (2012) (holding that the First Amendment precludes the application of employment discrimination laws to disputes between religious organizations and their ministers); *Hobbie v. Unemp't Appeals Comm'n of Fla.*, 480 U.S. 136, 144-45 (1987) (observing that the United States Supreme Court "has long recognized that the government may (and sometimes must) accommodate religious practices" and listing examples); *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos,* 483 U.S. 327, 329-30 (1987) (upholding religious exemption to Title VII of the Civil Rights Act of 1964 against an Establishment Clause challenge). As the Supreme Court recently explained in *Masterpiece*, such exemptions must be limited to religious organizations lest, as is relevant here,

---

[16] In *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731 (2020), the Supreme Court held that sexual orientation discrimination is a form of sex discrimination under Title VII of the Civil Rights Act of 1964. *See Bostock*, 140 S. Ct. at 1743 ("For an employer to discriminate against employees for being homosexual . . . the employer must intentionally discriminate against individual men and women in part because of sex."). That may be true as a general matter, but because the Human Rights Law treats sex and sexual orientation discrimination as distinct categories, the Court does not read Section 296(2)(b) to excuse sexual orientation discrimination based on "bona fide considerations of public policy." N.Y. Exec. Law § 296(2)(b).

JA1155

"a long list of persons who provide goods and services for marriages and weddings might refuse to do so for gay persons, thus resulting in a community-wide stigma inconsistent with the history and dynamics of civil rights laws." *Masterpiece*, 138 S. Ct. at 1727.

Accordingly, Plaintiff has failed to plausibly allege that New York's public accommodation laws are either not neutral or not generally applicable. As a result, rational basis, not strict scrutiny, applies. *See Cent. Rabbinical Congress of U.S. & Canada v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 193 (2d Cir. 2014). The laws easily pass muster under that standard.[17] *See Masterpiece*, 138 S. Ct. at 1727. Furthermore, as explained above, the laws would survive even strict scrutiny and therefore do not offend the Free Exercise Clause of the First Amendment.

## V.     Establishment Clause

Plaintiff asserts that New York's public accommodation laws force her to "participate in religious exercises contrary to [her] sincere religious beliefs." ECF No. 1 ¶ 356; ECF No. 56 at 7-8 (arguing that "New York's laws also force [Plaintiff] to participate in and attend sacred ceremonies she objects to"). In her view, equal access under public accommodation law requires her to "celebrate the wedding," "follow[] the officiant's instructions," "sing," and pray at same-sex weddings to the same extent she does so at opposite-sex weddings. ECF No. 3-1 at 28. "It is an elemental First Amendment principle that government may not coerce its citizens to support or

---

[17] Plaintiff cannot succeed under a "hybrid rights" theory, ECF No. 1 ¶ 348, because the Second Circuit does not recognize such claims. *See Leebaert v. Harrington*, 332 F.3d 134, 144 (2d Cir. 2003) ("We too can think of no good reason for the standard of review to vary simply with the number of constitutional rights that the plaintiff asserts have been violated. [T]herefore, at least until the Supreme Court holds that legal standards under the Free Exercise Clause vary depending on whether other constitutional rights are implicated, we will not use a stricter legal standard to evaluate hybrid claims." (internal quotation marks omitted)).

participate in any religion or its exercise." *Town of Greece, N.Y. v. Galloway*, 572 U.S. 565, 586 (2014) (internal quotation marks omitted).  That principle has no application here.  Insofar as those activities are not services that Plaintiff is hired to provide, the laws would not compel Plaintiff to participate in any religious exercises at same-sex weddings just because she *chooses* to actively and religiously participate in them when she photographs opposite-sex weddings.  *See* note 9, *supra*.  The religious activities occurring at a wedding, whether for a same-sex couple or an opposite-sex couple, are directed at the couple, the friends, the family, and any other invitees in attendance.  They are not directed at the caterer, the florist, or the photographer.  *See Galloway*, 572 U.S. at 587 (legislative prayer did not coerce religious participation, where, *inter alia*, the "principal audience for [the] invocations" was not "the public" but "lawmakers themselves").  The Court respects Plaintiff's sincere religious objections to even her presence at a same-sex wedding, but that is not enough to make out a claim.  *Cf. id.* at 589 ("Offense . . . does not equate to coercion. Adults often encounter speech they find disagreeable; and an Establishment Clause violation is not made out any time a person experiences a sense of affront from the expression of contrary religious views . . . .").

Therefore, this claim must be dismissed.

## VI.    Vagueness/Due Process

Plaintiff has also raised a claim alleging violation of the Due Process Clause of the Fourteenth Amendment.  ECF No. 1 ¶ 360.  She alleges that the Unwelcome clause is facially vague and grants officials "unbridled discretion."  ECF No. 57 at 33.  Her theory is that because the Unwelcome clause fails to define words like "unwelcome" or "objectionable," Defendants can employ its language "in a way that discriminates against content, viewpoints, and actions

JA1157

Defendants disfavor."  ECF No. 1 ¶ 364; ECF No. 57 at 33-34.

"[A] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others."  *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18-19 (2010).  Thus, "[w]e consider whether a statute is vague as applied to the particular facts at issue."  *Id.*  As discussed above, the Unwelcome clause is constitutional as applied to Plaintiff's proposed statements/advertisements: it is unlawful for Plaintiff to discriminate on the basis of sexual orientation, so New York may permissibly prohibit Plaintiff from advertising that "unlawful activity."  *Elenis*, 6 F.4th at 1182; *see also Lucero*, 936 F.3d at 757 n.5.  Since her as-applied challenge fails, she cannot raise a facial vagueness challenge.  *See Holder*, 561 U.S. at 18-19; *Expressions Hair Design v. Schneiderman*, 137 S. Ct. 1144, 1151-52 (2017); *accord Elenis*, 6 F.4th at 1190.  And even if that alone were not enough to bar her claim, Plaintiff engages in no meaningful statutory analysis to show that this clause could be interpreted or wielded by enforcement officials in the manner she claims.  *Compare* ECF No. 57 at 33, *with* note 14, *supra*, *and McHarris Gift Ctr.*, 419 N.Y.S.2d at 406.  This claim is dismissed.

## VII. *Sua Sponte* Dismissal of Claims against Wetmore

Although Wetmore has not moved to dismiss Plaintiff's claims on the merits, the reasons justifying dismissal of the claims against the State apply equally to him.  The Court "has the power to dismiss a complaint sua sponte for failure to state a claim on which relief can be granted," so long as it gives "the plaintiff an opportunity to be heard."  *Thomas v. Scully*, 943 F.2d 259, 260 (2d Cir. 1991).  Plaintiff has had an opportunity to be heard on the legal viability of her claims in conjunction with the State's motion to dismiss.  *See Ali v. Ramos*, No. 16-CV-1994, 2018 WL 1353210, at *1 n.1 (S.D.N.Y. Mar. 14, 2018).  Accordingly, the Court *sua sponte* dismisses all

JA1158

claims against Wetmore for the reasons discussed above.

## VIII. Leave to Amend

Finally, the Court dismisses all claims with prejudice and will not give Plaintiff leave to amend. The defects in Plaintiff's claims are primarily ones of law, not of fact. In that circumstance, a court may deny leave to amend. *See Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) ("Where it appears that granting leave to amend is unlikely to be productive . . . it is not an abuse of discretion to deny leave to amend."). And as to any claims that suffer from a pleading deficiency, Plaintiff does not seek leave to amend, and so the Court need not provide it. *See Ritchie Cap. Mgmt., L.L.C. v. Gen. Elec. Cap. Corp.*, 821 F.3d 349, 351-52 (2d Cir. 2016). Therefore, the Court dismisses all claims with prejudice and enters judgment in Defendants' favor.

45

**CONCLUSION**

For the foregoing reasons, Defendant Wetmore's motion to dismiss under Rule 12(b)(1) (ECF No. 24) is DENIED. The State's motion to dismiss (ECF No. 27) is GRANTED insofar as all claims against Defendants Letitia James and Johnathan J. Smith are dismissed, with prejudice, for failure to state a claim upon which relief may be granted. In addition, all claims against Defendant Weedon Wetmore are *sua sponte* dismissed, with prejudice, for failure to state a claim upon which relief may be granted. Plaintiff's motion for a preliminary injunction (ECF No. 3) is DENIED AS MOOT. The Clerk of Court is directed to enter judgment and close this case.

IT IS SO ORDERED.

Dated: December 13, 2021
   Rochester, New York

                HON. FRANK P. GERACI, JR.
                United States District Judge
                Western District of New York

JA1160

AO 450 (Rev. 11/11) Judgment in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

<u>Western</u> District of <u>NY</u>

| | |
|---|---|
| EMILEE CARPENTER, LLC, et al., | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.    21-CV-6303-FPG |
| LETITIA JAMES, et al., | ) |
| *Defendant* | ) |

## JUDGMENT IN A CIVIL ACTION

The court has ordered that *(check one)*:

☐ the plaintiff *(name)* _____ recover from the
defendant *(name)* _____ the amount of
_____ dollars ($ _____ ), which includes prejudgment
interest at the rate of _____ %, plus post judgment interest at the rate of _____ % per annum, along with costs.

☐ the plaintiff recover nothing, the action be dismissed on the merits, and the defendant *(name)* _____
_____ recover costs from the plaintiff *(name)* _____
_____ .

☒ other:   The State's motion to dismiss is GRANTED insofar as all claims against Defendants Letitia James and Johnathan J.
Smith are dismissed, with prejudice, for failure to state a claim upon which relief may be granted. In addition, all claims against
Defendant Weedon Wetmore are sua sponte dismissed, with prejudice, for failure to state a claim upon which relief may be
granted. The Clerk of Court is directed to enter judgment and close this case.                                   .

This action was *(check one)*:

☐ tried by a jury with Judge _____ presiding, and the jury has
rendered a verdict.

☐ tried by Judge _____ without a jury and the above decision
was reached.

☒ decided by Judge    Frank P. Geraci, Jr.                       on a motion for dismissal in
favor of defendants'.                                                                                  .

Date:    _____12/14/2021_____          *CLERK OF COURT*

_____
*Signature of Clerk or Deputy Clerk*

# JA1161

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

**Emilee Carpenter, LLC d/b/a Emilee Carpenter Photography** and **Emilee Carpenter**,

Plaintiffs,

v.

**Letitia James**, in her official capacity as Attorney General of New York; **Johnathan J. Smith**, in his official capacity as Interim Commissioner of the New York State Division of Human Rights; and **Weeden Wetmore**, in his official capacity as District Attorney of Chemung County,

Defendants.

Case No. 6:21-cv-06303

**NOTICE OF APPEAL**

PLEASE TAKE NOTICE that Plaintiffs Emilee Carpenter, LLC, and Emilee Carpenter hereby appeal to the United States Court of Appeals for the Second Circuit from the final Judgment (ECF No. 69) entered on December 14, 2021, and from the Decision and Order (ECF No. 68) both granting Defendants' 12(b)(6) motions to dismiss and denying Plaintiffs' motion for a preliminary injunction, entered on December 13, 2021.

1

JA1162

Respectfully submitted this 12th day of January, 2022.

By: <u>s/ Jonathan A. Scruggs</u>

Raymond J. Dague
New York Bar No. 1242254
**Dague & Martin, P.C.**
4874 Onondaga Road
Syracuse, New York 13215
(315) 422-2052
(315) 474-4334 (facsimile)
rjdague@daguelaw.com

Jonathan A. Scruggs
Arizona Bar No. 030505
Bryan D. Neihart*
Arizona Bar No. 035937
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 (facsimile)
jscruggs@ADFlegal.org
bneihart@ADFlegal.org

ATTORNEYS FOR PLAINTIFFS

*Admitted *Pro Hac Vice*

JA1163

**CERTIFICATE OF SERVICE**

I hereby certify that on the 12th day of January, 2022, I electronically filed the foregoing document with the Clerk of Court and that the foregoing document will be served via the CM/ECF system on all counsel of record.

*s/ Jonathan A. Scruggs*
Jonathan A. Scruggs

*Attorney for Plaintiffs*

JA1164