# 22-75

## In the United States Court of Appeals for the Second Circuit

———————

EMILEE CARPENTER, LLC D/B/A/ EMILEE CARPENTER PHOTOGRAPHY
AND EMILEE CARPENTER,
PLAINTIFFS-APPELLANTS,

*v.*

LETITIA JAMES, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF NEW YORK;
MARIA L. IMPERIAL, IN HER OFFICIAL CAPACITY AS ACTING COMMISSIONER OF THE
NEW YORK STATE DIVISION OF HUMAN RIGHTS; AND WEEDEN WETMORE,
IN HIS OFFICIAL CAPACITY AS DISTRICT ATTORNEY OF CHEMUNG COUNTY,
DEFENDANTS-APPELLEES.

———————

*APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK,
NO. 21-CV-6303, HON. FRANK P. GERACI, PRESIDING*

———————

**BRIEF FOR LAW AND ECONOMICS SCHOLARS
AS *AMICI CURIAE* IN SUPPORT OF REVERSAL**

———————

ANDREW C. NICHOLS
*Charis Lex P.C.*
*4250 N. Fairfax Dr., Ste. 600*
*Arlington, VA 22203*
*(571) 549-2645*
*anichols@charislex.com*

*Counsel for Amici*

# TABLE OF CONTENTS

**Page**

INTRODUCTION, SUMMARY OF ARGUMENT,
AND INTEREST OF *AMICI CURIAE* ........................................................1

STATEMENT OF THE CASE.................................................................3

ARGUMENT .........................................................................................5

    A.    The decision below flouts basic economics and will chill the
speech of creative professionals...........................................5

        1.    The decision below defies economics as articulated in
Supreme Court precedent..............................................6

        2.    The decision below would justify compelling speech
from any creative professional who serves the public..............10

    B.    Government may not compel speech from creative
professionals even if their "unique" products are considered a
"monopoly" in some hyperliteral sense. .............................15

CONCLUSION....................................................................................17

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative Ltd. Liab. Co. v. Elenis*,
　　6 F.4th 1160 (10th Cir. 2021) ....................................................5, 11

*Brown Shoe Co. v. United States*,
　　370 U.S. 294 (1962)...................................................................6

*Brush & Nib Studios, LC v. City of Phx.*,
　　448 P.3d 890 (Ariz. 2019) ...........................................................11

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*,
　　447 U.S. 557 (1980)......................................................................16

*Chelsey Nelson Photography LLC v. Louisville/Jefferson Cty. Metro Gov't*,
　　479 F. Supp. 3d 543 (W.D. Ky. 2020) ...........................................14

*Consol. Edison Co. v. Pub. Serv. Comm'n*,
　　447 U.S. 530 (1980).......................................................................16

*DSM Desotech Inc. v. 3D Sys. Corp.*,
　　749 F.3d 1332 (Fed. Cir. 2014) ....................................................7

*Eastman Kodak Co. v. Image Tech. Servs.*,
　　504 U.S. 451 (1992).......................................................................10

*Hack v. President & Fellows of Yale Coll.*,
　　237 F.3d 81 (2d Cir. 2000) ...........................................................8

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*,
　　515 U.S. 557 (1995).......................................................................9

*Ill. Tool Works Inc. v. Indep. Ink, Inc.*,
　　547 U.S. 28 (2006).........................................................................8

*LifeWatch Servs. v. Highmark Inc.*,
　　902 F.3d 323 (3d Cir. 2018) ..........................................................7

*Miami Herald Pub. Co., Div. of Knight Newspapers, Inc. v. Tornillo*,
　　418 U.S. 241 (1974).......................................................................15

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018)......................................................................7

*Pepsico, Inc. v. Coca-Cola Co.*,
    315 F.3d 101 (2d Cir. 2002) ...........................................................8

*Queen City Pizza v. Domino's Pizza*,
    124 F.3d 430 (3d Cir. 1997) ...........................................................8

*Right Field Rooftops, LLC v. Chi. Baseball Holdings*, LLC,
    87 F. Supp. 3d 874 (N.D. Ill. 2015)................................................8

*Roberts v. Unites States Jaycees*,
    468 U.S. 609 (1984)........................................................................4

*Rock River Communs., Inc. v. Universal Music Group, Inc.*,
    2011 U.S. Dist. LEXIS 46023 (C.D. Cal. 2011) ...........................9

*Subsolutions, Inc. v. Doctor's Ass'n*,
    62 F. Supp. 2d 616 (D. Conn. 1999) ..............................................9

*Telescope Media Grp. v. Lucero*,
    936 F.3d 740 (8th Cir. 2019) ........................................................11

*Theatre Party AssocsAss'n., Inc. v. Shubert Org., Inc.*,
    695 F. Supp. 150 (S.D.N.Y. 1988) .................................................9

*Turner Broad. Sys. v. FCC*,
    512 U.S. 622 (1994)......................................................................17

*United States v. Cont'l Can Co.*,
    378 U.S. 441 (1964)........................................................................6

*United States v. E. I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956)....................................................................6, 7

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966)........................................................................6

*W. Va. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943)......................................................................17

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*,
    382 U.S. 172 (1965)..................................................................................7

*Wooley v. Maynard*,
    430 U.S. 705 (1977)..................................................................................2

**Statutes**

Ann Arbor, Mich., Code of Ordinances §§ 9:151, 9:153 .........................11

Broward County, Fla., Code of Ordinances §§ 16½-3, 16½-34..............11

Champaign, Ill., Code of Ordinances §§ 17-3, 17-56..............................12

City of College Park, MD, Charter § C1-2 ..............................................12

D.C. Code §§ 2-1401.02(25), 2-1402.31(a)............................................11

Ft. Lauderdale, Fla., Code of Ordinances §§ 29-2, 29-16 .......................12

Harford County, Md., Code of Ordinances §§ 95-3, 95-5........................11

Howard County, Md., Code of Ordinances § 12.210 ...............................11

Lansing, Mich., Code of Ordinances §§ 297.02, 297.04 .........................12

Madison, Wisc., Mun. Code §§ 39.03(1), 39.03(5)..................................12

Miami Beach, Fla., Code of Ordinances §§ 62-31, 62-87 .......................12

N.Y. Exec. Law § 296...............................................................................3

Orange County, N.C., Code of Ordinances §§ 12-52, 12-54 ...................11

Seattle, Wash., Mun. Code §§ 14.06.020, 14.06.030 ..............................12

Shreveport, La., Code of Ordinances §§ 39-1, 39-2.................................12

Sun Prairie, Wisc., Code of Ordinances § 9.21.020 ................................12

Urbana, Ill., Code of Ordinances §§ 12-39, 12-63 ..................................12

Wayne County, Mich., Ordinance No. 2020-586......................................11

## Other Authorities

1 Herbert Hovenkamp, Mark Janis, & Mark Lemley, IP and Antitrust
§ 4.2a (2005 Supp.).........................................................................8

Alex Heigl, *The Many, Many Musicians Who Have Told Politicians to Stop
Using Their Songs*, People Magazine (Oct. 11, 2019)
https://perma.cc/U2EB-WLQ8 ......................................................13

Amanda Gorman
https://perma.cc/T9KE-ULAK ........................................................13

Charles Stockdale & John Harrington, *35 musicians who famously told
politicians: Don't use my song*, USA Today (July 16, 2018)
https://perma.cc/5R6M-Q7LT .......................................................14

History of Coca-Cola Advertising Slogans
https://perma.cc/M2FU-UCXM ......................................................8

Jason Rantz, *Seattle bar tried to deny service to Republicans celebrating
Kavanaugh*, 770 KTTH (Oct. 8, 2018)
https://perma.cc/LPF5-ZL8K. ........................................................12

Laura Snapes, *Tom Petty estate issues cease and desist over Trump's use of
song*, The Guardian (June 21, 2020)
https://perma.cc/DE7H-GPEZ .......................................................13

Lauren Dukoff, *Amanda Gorman Talks Writing, the Power of Change and
Her Own Presidential Aspirations*, Variety Magazine
https://perma.cc/QEP2-MSWW ....................................................12

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law,
¶563a (3d. ed. 2007) ......................................................................7

The Poetry Society of New York
https://perma.cc/WZ5K-MK4W ....................................................13

## INTRODUCTION, SUMMARY OF ARGUMENT,
## AND INTEREST OF *AMICI CURIAE*[1]

This case presents a pressing question at the intersection of antidiscrimination law and the right to free speech: Does the government's interest in equal access to public accommodations justify compelling speech from creative professionals by deeming their products monopolies?

The court below said yes—even while conceding that such products involve "protected expression." Yet it held that compulsion is justified by the "economic interest" in ensuring "nondiscriminatory access" to the products of every "business operating in the public marketplace." According to the court, even if consumers can get similar products from thousands of other providers, the work of creative professionals is "unique" and "nonfungible." Effectively, the court reasoned that each creative individual enjoys a monopoly. And their speech may be compelled to ensure that protected classes may access that monopoly market.

This definition of monopoly is unprecedented. As the Supreme Court has long recognized, under fundamental economic principles, there is no monopoly when there are market alternatives. And those alternatives (i.e., substitutes) may

---

[1] No party or counsel for a party authored this brief in whole or in part. No one other than *Amici* or their counsel made a monetary contribution to preparing or submitting this brief. *Amici* gave timely notice, and each of the parties has consented to the filing of this amicus brief.

differ.  They need not be fungible but only "reasonably interchangeable."  Or, in economic terms, the products need only have a reasonable cross-elasticity of demand:  If Product 1 drops enough in price, consumers will switch to Product 1 from Product 2.  When that is the case, there is no monopoly.  Ignoring this basic principle, the court below created a unique definition of monopoly just to compel speech.

Now imagine courts combining this sweeping definition of monopoly with the expansive protected categories under many antidiscrimination laws.  They will have *carte blanche* to force creative professionals to speak on diverse topics.  That is what happened here.  The court below held that the State's interest in ensuring access to services justified compelling a creative professional to "create artistic expression that celebrates same-sex marriages," despite her religious convictions.  That reasoning has no logical stopping point.  Other personal convictions—for example, political affiliations and opinions—will be invaded.  Creative professionals inevitably will be compelled to speak in violation of their political views.

That result contradicts the Supreme Court's First Amendment jurisprudence. Indeed, in the cases of newspapers and public utilities, the presence of *actual* monopoly cannot justify requiring entities to "foster" "religious, political, and ideological causes." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977).

If allowed to stand, the decision below will not only chill speech, but it will result in fewer creative professionals offering their services to the public. That is not in the interests of the marketplace of ideas or goods and services.

*Amici curiae*, listed in the Appendix, are scholars in law, economics, and philosophy who study, teach, and have published on applying economic principles to the law and public policy. *Amici* submit this brief to highlight the flawed economic reasoning of the court below, which will chill speech and diminish social welfare.

## STATEMENT OF THE CASE

Emilee Carpenter is a photographer in Chemung County, New York, who offers wedding photography as well as other photography services. Special Appendix ("SA") 4. She operates her business through Emilee Carpenter LLC, which is one of thousands of such photography businesses in New York. *Id.* at 4, 34. Carpenter "has no qualms with photographing 'LGBT individuals' or working with them as clients," but because of her religious beliefs, she "will decline projects that promote or celebrate same-sex marriage." *Id.* at 5–6. New York law prohibits places of public accommodation from refusing to provide services because of "sexual orientation" (N.Y. Exec. Law § 296(2)(a)), which, in "practical effect," compels Carpenter "to create artistic expression that celebrates same-sex marriages and to associate

herself with same-sex marriages, contrary to her desire and beliefs." SA18. Carpenter brought an action to determine whether she could offer wedding-photography services but decline to offer those services for same-sex weddings. *Id.* at 7–8.

The district court held that she could not. Although the court found that New York's antidiscrimination law "compels her to create speech," the court still held that the State could compel Carpenter to speak against her religious convictions because of its interest in ensuring "'equal access to publicly available goods and services.'" *Id.* at 22, 24 (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 624 (1984)). Compelling Carpenter's "protected expression" was purportedly justified by the State's "economic interest" in ensuring "nondiscriminatory access" to services available "in the public marketplace." *Id.* at 30–32.

According to the court, compelling Carpenter to celebrate same-sex weddings was necessary even though there are "thousands of wedding photographers in New York that will photograph same-sex weddings." SA34. The court held that forcing Carpenter to express ideas contrary to her religious beliefs was justified because her "photography is the product of her unique artistic style and vision." *Id.* In other words, Carpenter's wedding-photography services are "nonfungible": While "other photographers may operate in the same market," those photographers could not "deliver the *same* photographs [Carpenter] does." *Id.*

-4-

In short, the court held that Carpenter effectively is a monopoly. And failing to compel her to speak in support of same-sex marriage "would relegate same-sex couples to an inferior market." *Id.* (internal brackets omitted).

## ARGUMENT

### A. The decision below flouts basic economics and will chill the speech of creative professionals.

The lower court justified its compulsion of speech by relying on the State's "economic interest" in ensuring "nondiscriminatory access" to services available "in the public marketplace." SA31–32. But the court's reasoning perverts the very economic concepts on which it relies. The court recognized that LGBT consumers could obtain wedding-photography services from thousands of businesses other than Carpenter's. *Id.* at 34. Yet it held that compelling Carpenter to speak in favor same-sex weddings was justified because her photography services are "unique" and "non-fungible." *Id.* In effect, the court held that Carpenter is a monopoly: "While other photographers may operate in the same market, [Carpenter] does not allege that they would deliver the *same* photographs she does." *Id.* (emphasis in original); *see also 303 Creative Ltd. Liab. Co. v. Elenis*, 6 F.4th 1160, 1180 (10th Cir. 2021) (reasoning that such situations are "similar to a monopoly").

This reasoning dangerously misconstrues economics. If not corrected, it will chill speech in many professions and reduce marketplace alternatives.

      **1.     The decision below defies economics as articulated in Supreme Court precedent.**

What defines a monopoly—a market with only one provider—is not the uniqueness of a product or service but a lack of alternatives. "When a product is controlled by one interest, *without substitutes available in the market*, there is monopoly power." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 394 (1956) (emphasis added); *see also Nat'l Collegiate Athletic Ass'n v. Bd. of Regents*, 468 U.S. 85, 112 (1984) (same). So long as "there are market alternatives that buyers may readily use," a "monopoly does not exist merely because the product said to be monopolized differs from others." *du Pont*, 351 U.S. at 394.

Thus, contrary to the decision below, alternatives need not be exactly the same or fungible. *du Pont*, 351 U.S. at 394 (substitutes not limited to "identical products"); *see also United States v. Cont'l Can Co.*, 378 U.S. 441, 449 (1964) (substitutes need not be "fungible"). Rather, the test is whether products or services are "reasonably interchangeable." *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966). In economic terms, a product is a substitute if there is "cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).

Under this test, courts combine "different products or services into 'a single market' when 'that combination reflects commercial realities.'" *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018). In other words, consistent with commercial realities, products and services that are unique—i.e., differentiated—may still be reasonably interchangeable. *E.g.*, *LifeWatch Servs. v. Highmark Inc.*, 902 F.3d 323, 339 (3d Cir. 2018) ("differentiation is often present among competing products in the same market"); *DSM Desotech Inc. v. 3D Sys. Corp.*, 749 F.3d 1332, 1339–40 (Fed. Cir. 2014) ("When products are not identical or fungible, they still may be in the same market as differentiated products."); Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, ¶563a at 383–84 (3d. ed. 2007) ("Many machines performing the same function—such as copiers, computers, or automobiles—differ not only in brand name but also in performance, physical appearance, size, capacity, cost, price, reliability, ease of use, service, customer support, and other features. Nevertheless, they generally compete with one another[.]").

Indeed, products may have substitutes even when they are recognized as unique by the government's grant of a trademark or patent. *E.g.*, *du Pont*, 351 U.S. at 393 (substitutes may exist for trademarked products); *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 178 (1965) ("[t]here may be effective substitutes" for a patented product); *see also Ill. Tool Works Inc. v. Indep. Ink, Inc.*,

547 U.S. 28, 45–46 (2006) ("a patent does not necessarily confer market power upon the patentee"); *id.* at 43 n.4 ("'[C]overage of one's product with an intellectual property right does not confer a monopoly'") (quoting 1 Herbert Hovenkamp, Mark Janis & Mark Lemley, IP and Antitrust § 4.2a (2005 Supp.)).

Simply put, unique does not equal monopoly. It may be that "The Only Thing Like Coca-Cola is Coca-Cola Itself,"[2] but Coca-Cola is not a monopoly. *Pepsico, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 107 (2d Cir. 2002). An education from Yale is undoubtedly "unique," but Yale is not a monopoly; other prestigious universities are substitutes. *Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 86 (2d Cir. 2000). The UCLA women's soccer program may be "unique," but it competes with other programs for student-athletes; and thus the programs are "interchangeable." *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063–64 (9th Cir. 2001).

Indeed, courts across the country have rejected the unique-equals-monopoly fallacy. *See, e.g.*, *Queen City Pizza v. Domino's Pizza*, 124 F.3d 430, 438 (3d Cir. 1997) (no monopoly market for pizza ingredients and supplies "approved by Domino's Pizza, Inc. for use by Domino's franchisees"); *Right Field Rooftops, LLC v. Chi. Baseball Holdings*, LLC, 87 F. Supp. 3d 874, 886–87 (N.D. Ill. 2015) (live Cubs baseball games at Wrigley field not a monopoly market); *Subsolutions, Inc. v.*

---

[2] History of Coca-Cola Advertising Slogans, https://perma.cc/M2FU-UCXM.

*Doctor's Ass'n*, 62 F. Supp. 2d 616, 625 (D. Conn. 1999) (market could not be limited to Subway franchises). And the Supreme Court essentially did so as well in the context of compelled free speech. *Hurley v. Irish-Am. Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 577–78 (1995) ("True, the size and success of petitioners' parade makes it an enviable vehicle for the dissemination of GLIB's views, but that fact, without more, would fall far short of supporting a claim that petitioners enjoy an abiding monopoly of access to spectators.").

Products produced by artists and other creative professionals, including world-famous artists, are no different. *E.g.*, *Theatre Party Ass'n, Inc. v. Shubert Org., Inc.*, 695 F. Supp. 150, 155 (S.D.N.Y. 1988) (tickets to Phantom of the Opera not a monopoly market). Even the unique, and some say world-changing, music of the iconoclastic Bob Marley is not a monopoly; it competes with other reggae music. *See Rock River Communs., Inc. v. Universal Music Grp., Inc.*, 2011 U.S. Dist. LEXIS 46023, at *47 (C.D. Cal. 2011); Mikal Gilmore, *The Life and Times of Bob Marley: How he changed the world*, Rolling Stone (Mar. 10, 2005) (describing Marley's body of music as "unlike any other we've ever known" and his lyrical talent as "like nobody before or since"), https://perma.cc/SK9L-JS3T.

-9-

This is not to say that a unique product can *never* be a monopoly. In certain circumstances, the market for replacement parts for a specific brand of good may be monopolized. *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 482 (1992).

But no such circumstances exist here. Given the conceded availability of thousands of wedding-photography providers willing to photograph same-sex weddings, it cannot be said that compelling Carpenter to speak in support of same-sex weddings is necessary to ensure "access to goods and services available in the public marketplace." SA29. Adopting the district court's hyperliteral view of monopoly power would not only have profound implications for free-speech rights, it could also affect other areas of law, such as antitrust.

### 2. The decision below would justify compelling speech from any creative professional who serves the public.

The lower court's holding is not just wrong, it is dangerous. By the terms of that holding, all that is needed to justify compulsion of a professional is that her product be "unique" in some sense. It will thus chill speech in diverse professions.

For starters, the court's holding means that antidiscrimination laws may be used to compel speech from religious creative professionals serving the public. According to the logic of the court below, any product or service resulting from an individual's "unique artistic style and vision" is subject to compulsion. SA34. Thus, "the State could wield [antidiscrimination laws] as a sword, forcing an unwilling

-10-

Muslim movie director to make a film with a Zionist message or requiring an atheist muralist to accept a commission celebrating Evangelical zeal." *303 Creative*, 6 F.4th at 1199 (Tymkovich, C.J., dissenting). Religious videographers and calligraphers could be compelled to create speech that violates their religious convictions. *See id.* at 1182 (agreeing that custom wedding invitations are "speech" but disagreeing with the holding in *Brush & Nib Studios, LC v. City of Phx.*, 448 P.3d 890, 916 (Ariz. 2019), that antidiscrimination laws cannot be used to compel such speech); *cf. Telescope Media Grp. v. Lucero*, 936 F.3d 740, 758 (8th Cir. 2019) (holding that a state antidiscrimination law "interferes with [videographers'] message by requiring them to say something they otherwise would not").

But the breadth of the lower court's holding is not limited to sweeping aside religious convictions. It will sweep aside political convictions, as well.

Many county and municipal public-accommodation ordinances, as well as the District of Columbia Code, prohibit discrimination based on political opinion or affiliation.[3] And such laws have been used to require proprietors to open their venues

---

[3] *E.g.*, D.C. Code §§ 2-1401.02(25), 2-1402.31(a) ("political affiliation"); Broward County, Fla., Code of Ordinances §§ 16½-3, 16½-34 ("political affiliation"); Orange County, N.C., Code of Ordinances §§ 12-52, 12-54 ("political affiliation"); Harford County, Md., Code of Ordinances §§ 95-3, 95-5 ("political opinion") Howard County, Md., Code of Ordinances § 12.210 ("political opinion"); Wayne County, Mich., Ordinance No. 2020-586 ("political affiliation"); Ann Arbor, Mich., Code of

for politically charged events. *See, e.g.*, Jason Rantz, *Seattle bar tried to deny service to Republicans celebrating Kavanaugh*, 770 KTTH (Oct. 8, 2018), https://perma.cc/LPF5-ZL8K.

Given the lower court's reasoning, it is easy to see the broad scope of professionals whose speech could be compelled. Just think of artists such as Amanda Gorman, the poet for the most recent presidential inaugural, whose work reflects her convictions about "the world's social ills, be it racism, sexism, police brutality, the climate crisis, human trafficking or animal cruelty." Lauren Dukoff, *Amanda Gorman Talks Writing, the Power of Change and Her Own Presidential Aspirations*,

---

Ordinances §§ 9:151, 9:153 ("political beliefs," which includes a person's "opinion, whether or not manifested in speech or association, concerning the social, economic, and governmental structure of society and its institutions"); Champaign, Ill., Code of Ordinances §§ 17-3, 17-56 ("political affiliation," which includes "belonging to or endorsing any political party or organization or taking part in any activities of a political nature"); City of College Park, MD, Charter § C1-2 ("political affiliation"); Ft. Lauderdale, Fla., Code of Ordinances §§ 29-2, 29-16 ("political affiliation"); Lansing, Mich., Code of Ordinances §§ 297.02, 297.04 ("political affiliation or belief"); Madison, Wisc., Mun. Code §§ 39.03(1), 39.03(5) ("political beliefs"); Miami Beach, Fla., Code of Ordinances §§ 62-31, 62-87 ("political affiliation," which includes "ideological support of or opposition to … an organization or person which is engaged in supporting or opposing candidates for public office …"); Seattle, Wash., Mun. Code §§ 14.06.020, 14.06.030 ("political ideology"); Shreveport, La., Code of Ordinances §§ 39-1, 39-2 ("political … affiliations"); Sun Prairie, Wisc., Code of Ordinances § 9.21.020 ("political affiliation"); Urbana, Ill., Code of Ordinances §§ 12-39, 12-63 ("political affiliation").

Variety Magazine, https://perma.cc/QEP2-MSWW.  Ms. Gorman has written several commissioned poems.  *See* Amanda Gorman, https://perma.cc/T9KE-ULAK.  Under the lower court's reasoning, given that she offers her services to the public, what would stop a county or municipality from requiring Ms. Gorman to accept a commission for a poem supporting political opinions contrary to her own?

Perhaps a court would find that Ms. Gorman has not accepted sufficient commissions to be a public accommodation.  But what about the Poetry Society of New York, which offers commissioned poetry to the public and even provides poets for "public events, private parties, and commercial environments"?  The Poetry Society of New York, https://perma.cc/WZ5K-MK4W.

Or take the many famous musicians who have refused to allow political candidates to use their music for campaigns but license it for other purposes, such as commercials.  *See* Alex Heigl, *The Many, Many Musicians Who Have Told Politicians to Stop Using Their Songs*, People Magazine (Oct. 11, 2019) (chronicling refusals by Rihanna, Bruce Springsteen, John Mellencamp, Bobby McFerrin, Tom Petty, Sting, and others), https://perma.cc/U2EB-WLQ8.  Many of these artists freely explain their reasons for such refusals:  disagreement with the candidate's political views or affiliation. *See, e.g.*, Laura Snapes, *Tom Petty estate issues cease and desist over Trump's use of song*, The Guardian (June 21, 2020),

-13-

https://perma.cc/DE7H-GPEZ; Charles Stockdale & John Harrington, *35 musicians who famously told politicians: Don't use my song*, USA Today (July 16, 2018), https://perma.cc/5R6M-Q7LT. These refusals would be unlawful under the lower court's reasoning. After all, according that court, "unique goods and services are where public accommodation laws are most necessary to ensuring equal access." SA34 (quotation omitted).

These examples are not far-fetched. One municipality has already contended that the "First Amendment would not stop a government from compelling a freelance speechwriter … 'to provide that service to the climate change deniers' even if she wants to work only for environmentalist causes." *Chelsey Nelson Photography LLC v. Louisville/Jefferson Cty. Metro Gov't*, 479 F. Supp. 3d 543, 558 n.119 (W.D. Ky. 2020). The decision below gives such municipalities license to compel speech.

Left to stand, the decision will hurt consumers by distorting the market in one of two ways. It will either: (a) force unwilling market participants to associate; or (b) drive out a class of participants. Distortion (a) mismatches providers and consumers. Distortion (b) removes merchants from the market whom some consumers may prefer (regardless of the merchant's religious or political views). A smaller marketplace is necessarily less diverse and less competitive.

-14-

**B.      Government may not compel speech from creative professionals even if their "unique" products are considered a "monopoly" in some hyperliteral sense.**

Even if one were to accept the lower court's redefinition of monopoly, this Court should clarify that the presence of a so-called monopoly in products created by creative professionals cannot justify compelling their speech.

After all, the Supreme Court has held that the First Amendment precludes restrictions on or compulsion of speech, even in the presence of an *actual* monopoly. For instance, the First Amendment prevented a State from requiring newspapers to print political candidates' replies to press criticisms, even though press, television, and radio companies had consolidated, creating a "monopoly of the means of communication." *Miami Herald Pub. Co., Div. of Knight Newspapers, Inc. v. Tornillo*, 418 U.S. 241, 250 (1974). It did not matter that, thanks to this monopoly, reaching the public through print media was "almost impossible." *Id.* at 251. The statute could not be justified even by the "concededly important interest of ensuring free and fair elections by means of an electorate informed about the issues." *Id.* at 260 (White, J., concurring).

Likewise, the Supreme Court found unconstitutional a government order requiring a utility to "include in its billing envelopes speech of a third party with which the utility disagrees." *Pac. Gas & Elec. Co. v. Pub. Utils. Com.*, 475 U.S. 1, 4 & n.1

-15-

(1986). As the Court explained, the same concerns that required invalidating "the compelled-access rule in *Tornillo* apply to [the utility] as well as to the institutional press." *Id.* at 11.

By the same token, a utility could not be *barred* from including in monthly bills "inserts discussing controversial issues of public policy," even though the utility was a "government regulated monopoly." *Consol. Edison Co. v. Pub. Serv. Comm'n*, 447 U.S. 530, 532 & n.1 (1980). The regulation was not justified by state interests in protecting the privacy of the utility's "captive audience" of customers, ensuring that limited resources were allocated in the public interest, or ensuring that customers were not forced to subsidize the utility's speech. *Id.* at 540–43.

What is more, the presence of a monopoly does not justify restricting *commercial* speech. In *Central Hudson*, the Supreme Court struck down a regulation banning advertising by a public utility that promoted electricity use, reasoning that "[e]ven in monopoly markets, the suppression of advertising … defeats the purpose of the First Amendment." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 567 (1980). The restriction was not justified even by a "direct link" to the State's "important" interest in "energy conservation." *Id.* at 569–70.

Here, of course, we are not dealing with faceless public utilities but flesh-and-blood creative individuals. As the Supreme Court has recognized, laws that compel

-16-

speech "invade the sphere of intellect and spirit which is the purpose of the First Amendment to our Constitution to reserve from all official control." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Indeed, at "the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 641 (1994).

The question here is whether the government may invade the spirit and intellect of individuals precisely *because* they are especially talented, thereby producing "unique" goods and services offered to the public. Under a sound reading of the First Amendment and the Supreme Court's precedents, it may not.

## CONCLUSION

The judgment below should be reversed.

March 11, 2022                                    Respectfully submitted,

    /s/ Andrew C. Nichols

ANDREW C. NICHOLS
*Charis Lex P.C.*
*4250 N. Fairfax Dr., Ste. 600*
*Arlington, VA  22203*
*(571) 549-2645*
*anichols@charislex.com*

*Counsel for* Amici Curiae

-17-

# Appendix
## List of *Amici Curiae**

- Lloyd Cohen, J.D., Ph.D., is Professor of Law at the Antonin Scalia Law School, George Mason University.

- Catherine R. Pakaluk, Ph.D., is Associate Professor of Social Research and Economic Thought, The Busch School of Business and Economics, The Catholic University of America.

- Allen Mendenhall, M.A., J.D., LL.M., Ph.D., is Associate Dean and Grady Rosier Professor in the Sorrell College of Business at Troy University.

- Eric Rasmusen is the former Dan and Catherine Dalton Professor of Business Economics and Public Policy, Kelley School of Business, Indiana University and is a Director of the MIT Free Speech Alliance.

- R. Neil Rodgers is Professor of Law at Trinity Law School, Trinity International University.

- Lisa A Runquist is Adjunct Professor of Law at Trinity Law School, Trinity International University.

\* *Amici* appear in their individual capacities.  Institutional affiliations are listed for identification purposes only.

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Local Rule 29.1(c) because, excluding the portions exempted by Federal Rule of Appellate Procedure 32(f), it contains 3,767 words.  The brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: March 11, 2022

 /s/ Andrew C. Nichols
ANDREW C. NICHOLS

## CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2022, this brief was filed electronically with the Clerk of the Court for the U.S. Court of Appeals for the Second Circuit through the Court's CM/ECF system. I certify that all participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: March 11, 2022

/s/ Andrew C. Nichols
ANDREW C. NICHOLS