# 22-75

## United States Court of Appeals
## for the Second Circuit

EMILEE CARPENTER, LLC d/b/a/ Emilee Carpenter Photography and EMILEE CARPENTER,

*Plaintiffs-Appellants,*

v.

LETITIA JAMES, in her official capacity as Attorney General of New York; MARIA L. IMPERIAL, in her official capacity as Acting Commissioner of the New York State Division of Human Rights; and WEEDEN WETMORE, in his official capacity as District Attorney of Chemung County,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Western District of New York

## BRIEF FOR APPELLEES JAMES AND IMPERIAL

BARBARA D. UNDERWOOD
  *Solicitor General*
JEFFREY W. LANG
  *Deputy Solicitor General*
ALEXANDRIA TWINEM
  *Assistant Solicitor General*
    *of Counsel*

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for State Appellees
The Capitol
Albany, New York 12224
(518) 776-2015

Dated: May 9, 2022

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................. iv

PRELIMINARY STATEMENT .............................................................. 1

ISSUES PRESENTED ......................................................................... 3

STATEMENT OF THE CASE ............................................................... 4

    A.   New York's Public Accommodations Laws .............................. 4

    B.   Plaintiff ............................................................................... 9

    C.   Procedural History ............................................................. 13

SUMMARY OF ARGUMENT ............................................................. 17

ARGUMENT .................................................................................... 20

POINT I

NEW YORK'S PUBLIC ACCOMMODATIONS LAWS DO NOT
IMPERMISSIBLY BURDEN PLAINTIFF'S RIGHT TO FREE SPEECH ............ 21

    A.   New York's laws regulate conduct and are thus subject
        to intermediate scrutiny ..................................................... 21

    B.   Plaintiff's arguments for applying strict scrutiny to New
        York's public accommodations laws fail ............................... 25

        1.   New York's laws do not compel plaintiff's speech or
            impede her editorial freedom ....................................... 25

        2.   New York's laws are content- and viewpoint-neutral..... 32

**Page**

3.   New York's Denial and Unwelcome Clauses
     regulate illegal speech ................................................... 36

4.   New York's Unwelcome Clause is not overbroad,
     and plaintiff has not adequately stated such a claim ..... 37

C.  New York's public accommodations laws satisfy
    intermediate scrutiny. .......................................................... 39

D.  New York's public accommodations laws survive strict
    scrutiny ................................................................................ 42

1.   New York has a compelling interest in eradicating
     discrimination based on sexual orientation in the
     provision of public goods and services ............................ 43

2.   New York's laws are narrowly tailored to serve its
     compelling interest ......................................................... 45

POINT II

NEW YORK'S PUBLIC ACCOMMODATIONS LAWS DO NOT
IMPERMISSIBLY BURDEN PLAINTIFF'S RIGHT TO FREE ASSOCIATION ..... 53

POINT III

NEW YORK'S PUBLIC ACCOMMODATIONS LAWS DO NOT
IMPERMISSIBLY BURDEN PLAINTIFF'S RIGHT TO FREELY EXERCISE
HER RELIGION .................................................................................. 56

POINT IV

NEW YORK'S PUBLIC ACCOMMODATIONS LAWS DO NOT REQUIRE
PLAINTIFF TO PARTICIPATE IN RELIGIOUS CEREMONIES IN
VIOLATION OF THE ESTABLISHMENT CLAUSE ....................................... 62

**Page**

POINT V

    NEW YORK'S UNWELCOME CLAUSE DOES NOT VIOLATE THE
    FOURTEENTH AMENDMENT .................................................... 66

POINT VI

    THIS COURT SHOULD NOT GRANT PLAINTIFF A PRELIMINARY
    INJUNCTION ........................................................................ 69

CONCLUSION ....................................................................... 71

ADDENDUM ................................................................... ADD1

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases**          **Page(s)**

*303 Creative LLC v. Elenis,*
  6 F.4th 1160 (10th Cir. 2021) ............................................................ 46

*303 Creative LLC v. Elenis,*
  142 S. Ct. 1106 (2022)......................................................................... 2

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009).............................................................................. 38

*Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte,*
  481 U.S. 537 (1987).................................................................... 53, 55

*Boy Scouts of Am. v. Dale,*
  530 U.S. 640 (2000).................................................................... 51, 53

*Bray v. Alexandria Women's Health Clinic,*
  506 U.S. 263 (1993).............................................................................. 49

*Bronx Household of Faith v. Board of Educ.,*
  331 F.3d 342 (2d Cir. 2003) .............................................................. 70

*Burns v. Martuscello,*
  890 F.3d 77 (2d Cir. 2018) ............................................................... 29

*Cahill v. Rosa,*
  89 N.Y.2d 14 (1989) ............................................................ 6, 29, 44

*Caiola v. Citibank, N.A.,*
  295 F.3d 312 (2d Cir. 2002) .............................................................. 39

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n,*
  447 U.S. 557 (1980).............................................................................. 37

*Christian Legal Soc'y v. Martinez,*
  561 U.S. 661 (2010).................................................................... 32, 48

iv

**Cases**                                                                     **Page(s)**

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993) ............................................................... 57

*City of Dallas v. Stanglin,*
490 U.S. 19 (1989) ................................................................. 50

*Commack Self-Serv. Kosher Meats, Inc. v. Hooker,*
680 F.3d 194 (2d Cir. 2012) ................................................. 57

*Daniel v. Paul,*
395 U.S. 298 (1969) ........................................................ 41, 43

*Elane Photography, LLC v. Willock,*
309 P.3d 53 (N.M. 2013) ................................................. 26, 49

*Florez v. Central Intel. Agency,*
829 F.3d 178 (2d Cir. 2016) ................................................. 52

*Fulton v. City of Philadelphia,*
141 S. Ct. 1868 (2021) ........................................ 57, 58, 60, 62

*Heart of Atlanta Motel, Inc. v. United States,*
379 U.S. 241 (1964) .............................................................. 41

*Hishon v. King & Spaulding,*
467 U.S. 69 (1984) ................................................................. 28

*Holder v. Humanitarian Law Project,*
561 U.S. 1 (2010) ................................................................... 67

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,*
515 U.S. 557 (1995) ....................................................... passim

*Janus v. Am. Fed. of State, Cty., & Mun. Emps.,*
138 S. Ct. 2448 (2018) .......................................................... 29

*Jews for Jesus v. Jewish Cmty. Rels. Council of N.Y.,*
968 F.2d 286 (2d Cir. 1992) .......................................... passim

v

| Cases | Page(s) |
|---|---|

*Katzenbach v. McClung,*
   379 U.S. 294 (1964)..................................................................49

*Lane v. Cotton,*
   12 Mod. 472 (K.B. 1701) ........................................................6

*Lawrence v. Texas,*
   539 U.S. 558 (2003)............................................................48, 49

*Madden v. Queens Cty. Jockey Club, Inc.,*
   296 N.Y. 249 (1947) ...............................................................6, 7

*Madsen v. Women's Health Ctr., Inc.,*
   512 U.S. 753 (1994)..................................................................35

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rts. Comm'n,*
   138 S. Ct. 1719 (2018)....................................................... passim

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue,*
   460 U.S. 575 (1983)..................................................................27

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo,*
   804 F.3d 242 (2d Cir. 2015) ...................................................67

*Nat'l Inst. of Family & Life Advocates v. Becerra,*
   138 S. Ct. 2361 (2018).............................................................42

*Norwood v. Harrison,*
   413 U.S. 455 (1973)..................................................................36

*People v. King,*
   110 N.Y. 418 (1888) ..................................................................7

*Pittsburgh Press Co. v. Human Rel. Comm'n,*
   413 U.S. 376 (1973)............................................................27, 36

*R.A.V. v. City of St. Paul,*
   505 U.S. 377 (1992)..................................................................24

| Cases | Page(s) |
|---|---|

*Ragin v. N.Y. Times Co.*,
   923 F.2d 995 (2d Cir. 1991) ........................................................ 27, 68

*Reed v. Town of Gilbert*,
   576 U.S. 1559 (2015) ........................................................................ 32

*Rex v. Ivens*, 173 Eng. Rep. 94 (N.P. 1835) ............................................... 7

*Roberts v. U.S. Jaycees*,
   468 U.S 609 (1984) .................................................................... passim

*Rumsfeld v. Forum for Acad. & Inst. Rights (FAIR)*,
   547 U.S. 47 (2006) ........................................................ 22, 23, 25, 54

*Santa Fe Indep. Sch. Dist. v. Doe*,
   530 U.S. 290 (2000) ........................................................................ 65

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011) ........................................................................ 22

*State Div. of Hum. Rts. v. McHarris Gift Ctr.*,
   71 A.D.2d 813 (4th Dep't 1979),
   *aff'd*, 52 N.Y.2d 813 (1980) .............................................................. 68

*Thibodeau v. Portuondo*,
   486 F.3d 61 (2d Cir. 2007) ........................................................ 66, 67

*Town of Greece v. Galloway*,
   572 U.S. 565 (2014) .................................................................... 62, 64

*Turner Broadcasting Sys., Inc. v. F.C.C.*,
   512 U.S. 622 (1994) .................................................................... 32, 33

*United States v. O'Brien*,
   391 U.S. 367 (1968) ........................................................................ 27

*United States v. Thompson*,
   896 F.3d 155 (2d Cir. 2018) .............................................................. 38

**Cases**                                                           **Page(s)**

*United States v. Virginia,*
518 U.S. 515 (1996) .......................................................................... 59

*Vincenty v. Bloomberg,*
476 F.3d 74 (2d Cir. 2007) ......................................................... 22, 39

*VIP of Berlin, LLC v. Town of Berlin,*
593 F.3d 179 (2d Cir. 2010) ...................................................... 68, 69

*W. Va. State Bd. of Educ. v. Barnette,*
319 U.S. 624 (1943) .......................................................................... 29

*Ward v. Rock Against Racism,*
491 U.S. 781 (1989) .......................................................................... 32

*We the Patriots USA, Inc. v. Hochul,*
17 F.4th 266 (2d Cir. 2021) ............................................................. 70

*White's Case,* 2 Dyer 343 (1586) ......................................................... 6

*Winter v. Nat. Res. Def. Council, Inc.,*
555 U.S. 7 (2008) .............................................................................. 69

*Wood v. Maguire Auto., LLC,*
508 F. App'x 65 (2d Cir. 2013) ....................................................... 39

*Yang v. Kosinski,*
960 F.3d 119 (2d Cir. 2020) ............................................................ 69

*Zarda v. Altitude Express, Inc.,*
883 F.3d 100 (2d Cir. 2018) ...................................................... 49, 59

## United States Constitution                                    Page(s)

First Amendment ......................................................................... passim

Fourteenth Amendment ................................................................. 66

## Laws

Ch. 910, 1941 N.Y. Laws 2091 ......................................................... 7

Ch. 285, 1952 N.Y. Laws 922 ........................................................... 7

Ch. 2, 2002 N.Y. Laws 46 ................................................................ 7

N.Y. Civ. Rights Law
  § 40 ........................................................................................... 23
  § 40-c(2) ................................................................................. 4, 5
  § 40-d ......................................................................................... 9

N.Y. Exec. Law
  § 290(3) ...................................................................................... 5
  § 292(9) ............................................................................... passim
  § 295(6) ...................................................................................... 8
  § 295(7) ...................................................................................... 8
  § 296(2) ............................................................................... passim
  § 297(1) ...................................................................................... 8
  § 297(2) ...................................................................................... 8
  § 297(4) ...................................................................................... 9
  § 297(9) ...................................................................................... 9
  § 299 .......................................................................................... 9

## Regulations

9 N.Y.C.R.R. § 465.12 ................................................................... 9

**Miscellaneous Authorities**                                    **Page(s)**

*Battaglia v. Buffalo Niagara Intro., Inc.*, No. 10138581 (N.Y.
    Div. Hum. Rts. Jan. 28, 2012) ........................................... 61

Corbin, Caroline Mala, *Speech or Conduct?: The Free Speech
    Claims of Wedding Vendors*, 65 Emory L.J. 241 (2015) ................... 31

Dewey, Thomas E., Annual Message to the Legislature (Jan.
    9, 1952), *reprinted in Public Papers of Thomas E. Dewey*
    (1952) ..................................................................... 7

N.Y. Governor's Task Force on Gay Issues, *Discrimination on the
    Basis of Sexual Orientation in the State of New York* (1986) ............. 8

*Morgan v. Zaharo Cab Corp.*, No. 10117888 (N.Y. Div. Hum. Rts.
    July 2, 2014) ............................................................ 61

N.Y. Assembly Mem. in Support, *in* Bill Jacket for 2002 A.B.
    1971, Ch. 2 (2002) .................................................... 8, 59

N.Y. Senate Debate, Dec. 17, 2002 .......................................... 8

Singer, Joseph William, *No Right to Exclude: Public
    Accommodations and Private Property*, 90 Nw. U. L. Rev.
    1283 (1996) ............................................................. 6

## PRELIMINARY STATEMENT

New York, like many other states, has enacted statutes that prohibit places of public accommodation from discriminating on the basis of sexual orientation, among other protected characteristics. Under public accommodations laws, businesses that choose to open their doors to the public may not deny a group of people equal access to the goods and services they sell, particularly if that discrimination is based on individuals' membership in a historically disfavored group. And it is well-settled that discrimination by a public accommodation does not become legal if it is based on religious or philosophical objections to a particular group. *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rts. Comm'n*, 138 S. Ct. 1719, 1727 (2018).

Plaintiff Emilee Carpenter brought this pre-enforcement action in the U.S. District Court for the Western District of New York (Geraci, J.) seeking a ruling that her wedding photography business, which holds itself out as open to the public, can nevertheless decline requests to photograph the weddings of same-sex couples. She alleges that New York's public accommodations laws barring discrimination on the basis of sexual orientation violate her First Amendment rights of free speech,

association, religious expression, and freedom from religious establishment. She now appeals from the district court's order dismissing her complaint.

This Court should affirm the district court's decision. New York's public accommodations laws do not violate the First Amendment, and they play a critical role in ensuring that gay and lesbian individuals, like members of other historically disfavored groups, have equal access to the economic, social, and political life of the nation and are protected from the dignitary harm of being excluded from businesses that are purportedly open to the public.[1]

_____

[1] The United States Supreme Court recently granted certiorari on the question whether "applying a public-accommodation law to compel an artist to speak or stay silent violates the Free Speech Clause of the First Amendment." *303 Creative LLC v. Elenis*, 142 S. Ct. 1106 (2022) (granting certiorari in part). That case involves a wedding web designer and remains pending. This Court previously declined to remove the present case from its expedited calendar despite the pending petition for certiorari in *303 Creative*. *See* Dkt. Nos. 39, 45. A decision in *303 Creative* may or may not be dispositive here. However, because plaintiff raises some claims that are not at issue before the Supreme Court, and because *303 Creative* will not be heard until the October 2022 Term, this Court should decline to delay the resolution of this case pending a decision from the Supreme Court.

## ISSUES PRESENTED

1. Whether New York's public accommodations laws violate a wedding photographer's First Amendment right to free speech by preventing her from discriminating among potential customers on the basis of sexual orientation.

2. Whether New York's public accommodations laws violate a wedding photographer's First Amendment right to expressive association in her commercial business, when she is the only employee.

3. Whether New York's public accommodations laws, which apply to all public businesses and do not exempt discrimination on the basis of sexual orientation in any circumstance, violate plaintiff's First Amendment right to freely exercise her religion.

4. Whether New York's public accommodations laws require plaintiff to participate in religious ceremonies while she is photographing a same-sex wedding, thereby violating the First Amendment's Establishment Clause.

5. Whether New York's Unwelcome Clause, which prohibits businesses from creating notices informing people that their patronage is

unwelcome because of a protected characteristic, is unconstitutionally vague.

6. Whether the district court erred in denying plaintiff's motion for preliminary injunction.

## STATEMENT OF THE CASE

### A.  New York's Public Accommodations Laws

New York, like many other states and the federal government, prohibits public accommodations from discriminating against prospective customers on the basis of statutorily protected characteristics.

These laws are found in the State's Human Rights Law and Civil Rights Law. The Human Rights Law provision, found at N.Y. Exec. Law § 296(2)(a),[2] contains three clauses. First, the "Accommodations Clause" states that it is unlawful for public accommodations to deny or withhold service because of a person's race, creed, color, national origin, sexual orientation, gender identity or expression, military status, sex, disability

---

[2] The complete text of N.Y. Exec. Law § 292(9), § 296(2)(a), and N.Y. Civ. Rights Law § 40-c(2) are reproduced in an addendum to this brief.

or marital status. Second, the "Denial Clause" prohibits public accommodations from creating or displaying any notice suggesting that a person will be refused or denied service based on one of the protected characteristics listed above. Third, the "Unwelcome Clause" prohibits public accommodations from creating or displaying any notice suggesting that a person's patronage is unwelcome or not desired based on a protected characteristic. The purpose of this law is to "assure that every individual within this state is afforded an equal opportunity to enjoy a full and productive life" because discrimination "threatens the peace, order, health, safety and general welfare of the state and its inhabitants." N.Y. Exec. Law § 290(3).

The relevant provision of New York's Civil Rights Law, N.Y. Civ. Rights Law § 40-c(2), states that no person shall "be subjected to any discrimination in his or her civil rights" on the basis of race, creed, color, national origin, sex, marital status, sexual orientation, gender identity or expression, or disability. The Human Rights Law and Civil Rights Law are coextensive as to public accommodations.

New York defines a place of public accommodation broadly to include nearly any place the public uses, including inns, restaurants,

bars, retail and wholesale stores, clinics and hospitals, theaters, barber shops and beauty parlors, parks, gyms, fairs, golf courses, public elevators, and many more. *See* N.Y. Exec. Law § 292(9). New York excludes from the definition of public accommodation any place deemed "distinctly private," *id.*, which is defined by its "selectivity or exclusivity," *Cahill v. Rosa*, 89 N.Y.2d 14, 22 (1989).

New York's public accommodations laws are part of a long-established tradition of prohibiting discrimination by public places. Public accommodations laws have existed since the sixteenth century. *See* Joseph William Singer, *No Right to Exclude: Public Accommodations and Private Property*, 90 Nw. U. L. Rev. 1283, 1304–05 (1996) (citing *White's Case*, 2 Dyer 343 (1586)). "At common law, innkeepers, smiths, and others who 'made profession of a public employment,' were prohibited from refusing, without good reason, to serve a customer." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 571 (1995) (quoting *Lane v. Cotton*, 12 Mod. 472, 484–85 (K.B.1701) (Holt, C.J.)) (collecting cases); *Madden v. Queens Cty. Jockey Club, Inc.*, 296 N.Y. 249, 253 (1947). A business engaged in a public calling "was held to be under a duty to the general public and was obliged to serve, without

discrimination, all who sought service." *Madden*, 296 N.Y. at 253; *Hurley*, 515 U.S. at 571; *Rex v. Ivens*, 173 Eng. Rep. 94, 96 (N.P. 1835).

New York had codified the common-law principle against discrimination by public accommodations by the 1800s. *See People v. King*, 110 N.Y. 418, 420–21 (1888) (upholding state penal law prohibiting innkeepers, common carriers, and places of amusement from excluding individuals "by reason of race, color, or previous condition of servitude"). Over time, New York expanded the types of businesses deemed public accommodations and authorized the State's Commission Against Discrimination to oversee enforcement of the law. *See* Ch. 910, 1941 N.Y. Laws 2091; Ch. 285, 1952 N.Y. Laws 922; Thomas E. Dewey, Annual Message to the Legislature (Jan. 9, 1952), *reprinted in Public Papers of Thomas E. Dewey* (1952). The law now reaches nearly all places that are open to the public, including, as relevant here, "establishments dealing with goods or services of any kind." N.Y. Exec. Law § 292(9).

Over time New York has also expanded the list of prohibited bases for discrimination. In 2003, the New York legislature amended its laws to prohibit discrimination on the basis of sexual orientation. 2002 N.Y. Laws, Ch. 2. The legislature concluded that discrimination on the basis

7

of sexual orientation was "widespread and commonplace throughout the State of New York," despite the State's efforts to eradicate it. N.Y. Assembly Mem. in Support, *in* Bill Jacket for 2002 A.B. 1971, Ch. 2, at 4 (2002). The legislature noted that discrimination on the basis of sexual orientation in public accommodations "hinders the economic development of the entire State" and had resulted in an "all-pervasive climate of fear within which gay and lesbian New Yorkers are forced to lead their lives." *Id.*; *see also* N.Y. Senate Debate, Dec. 17, 2002, at 6793–6863; N.Y. Governor's Task Force on Gay Issues, Discrimination on the Basis of Sexual Orientation in the State of New York (1986).

Any person aggrieved by discrimination may file a complaint against the offending public accommodation with the New York State Division of Human Rights. N.Y. Exec. Law § 297(1). The Division of Human Rights may also initiate a complaint on its own. N.Y. Exec. Law § 295(6)(b). The Division investigates all complaints and determines whether there is probable cause to believe a public accommodation violated New York's Human Rights Law. *Id.* §§ 295(6)(a), 295(7), 297(1), 297(2)(a).

If the Division of Human Rights determines that probable cause exists, it will hold a hearing to determine whether a public accommodation discriminated in violation of the law. *See* 9 N.Y.C.R.R. § 465.12(d)(1), (e), (o). After the hearing, if the Commissioner of the Division of Human Rights determines that a public accommodation engaged in discrimination, he can issue a cease and desist order, order the public accommodation to provide the service denied, award compensatory damages, issue fines against the public accommodation, and mandate compliance reports. N.Y. Exec. Law § 297(4)(c), (e). A public accommodation that violates a Division of Human Rights order may face an additional fine and up to one year in jail. N.Y. Exec. Law § 299.

A victim of discrimination may also file suit directly in civil court seeking damages. N.Y. Exec. Law § 297(9); N.Y. Civ. Rights Law § 40-d.

## B.    Plaintiff

The following facts are taken from the complaint and assumed true for purposes of this appeal. Plaintiff Emilee Carpenter is a photographer who accepts commissions to photograph weddings and engagements. JA 25. In November 2019, she reorganized her business into a limited

9

liability company called Emilee Carpenter, LLC,[3] based in Chemung County, on the southern-central border between New York and Pennsylvania, to take advantage of the benefits of the corporate form. JA 23, 25. Plaintiff offers, solicits, and receives inquiries for engagement and wedding photography services from the general public. JA 26. In addition to wedding photography, plaintiff offers branding photography, which promotes businesses and their services. *Id.*

As part of her wedding-photography business, plaintiff runs a website that includes a blog. *Id.* Plaintiff publishes a blog post about each engagement and wedding she photographs, in which she displays photos, encourages the couple, and communicates her beliefs about marriage to the public. JA 26, 32. Plaintiff describes this blog as an "integral part of her business" in which to celebrate her clients' marriages and promote her business, artistic style, and approach to photography. JA 32.

Plaintiff is a Christian who uses her creative talents to honor God through her photography. JA 24–25. She believes that God designed marriage to be between one man and one woman, and she wants to use

---

[3] For simplicity, Emilee Carpenter and Emilee Carpenter, LLC are referred to as "plaintiff" or "she" throughout this brief.

10

her photography to positively portray this view of marriage. JA 27–28.

For that reason, plaintiff will not photograph same-sex weddings or any

other project (such as a "staged wedding shoot" featuring two models of

the same sex) that she thinks promotes or celebrates same-sex marriage.[4]

JA 35, 38. Plaintiff believes accepting these assignments would express

messages contrary to her beliefs. JA 35. When plaintiff receives a request

for engagement or wedding photography, she researches the individuals

online to determine whether they are a same-sex couple. JA 27–28, 52. If

plaintiff determines through research that the couple are the same sex,

or if she cannot confirm the couple's sexes, she ignores the request. JA

52–53.

When plaintiff agrees to photograph an engagement or wedding,

she requires clients to sign a service agreement stating that plaintiff has

"full artistic license and total editorial discretion over all aspects of" her

photography. JA 28. This discretion includes creating photographs that

evoke joyful emotions in "warm and earthy color tones," prompting the

---

[4] In accordance with her beliefs, plaintiff would also decline projects
that demean others, promote violence, or praise vulgarity. JA 36. And she
will not photograph weddings with "irreverent" themes such as
Halloween or vampires. JA 35.

couple to laugh and smile while she shoots them, encouraging them to act spontaneously, and directing them on how to pose. JA 28–29, 31.

Plaintiff photographs certain standard shots at every wedding, including the officiant delivering the homily, the couple exchanging vows, the couple kissing before wedding guests, and the officiant announcing the couple being joined in marriage. JA 29. Unless she is photographing an elopement, plaintiff also shoots the bride getting ready, the couple and their families, the bridal party, and the bride walking down the aisle. *Id.* After she photographs a wedding or engagement, plaintiff culls the number of photos and adjusts the tone and brightness of the selected photographs to make the images more emotive. JA 31.

While plaintiff will not photograph same-sex marriages, she states that she will create branding photographs for gay individuals and businesses owned and operated by gay people. JA 37. She will also accept wedding-photography projects where she is hired by a gay or lesbian wedding planner, vendor, or friend or family of the couple so long as the people to be married are an opposite-sex couple. *Id.*

In order to clarify and formalize her policy against photographing same-sex couples' engagements and weddings, plaintiff wants to amend

12

her company's operating agreement to include a "Beliefs and Practices" statement. JA 51–52, 77. She also wants to directly ask prospective clients whether they are a same-sex couple and, if so, tell them that she will not photograph their wedding. JA 52. And she wants to post a statement on her website explaining her beliefs and identifying the services she will not provide. JA 53–54, 79–80.

## C.  Procedural History

Plaintiff initiated the present suit in April 2021 by filing a complaint in the U.S. District Court for the Western District of New York. *See* JA 1, 19–80. Her complaint alleged that New York's public accommodations laws violate her First Amendment rights of free speech, free association, free exercise of her religion, and her right to be free from the establishment of another religion. She further alleged that defendants violated her due process right under the Fourteenth Amendment to be free from enforcement of unconstitutionally vague statutes. She sought injunctive and declaratory relief to prohibit the laws' enforcement against her. JA 65–73. Plaintiff also moved for a preliminary injunction on her claims. JA 81–84.

13

The State and County defendants moved to dismiss and opposed plaintiff's motion for a preliminary injunction. On December 13, 2021, the district court issued a thorough, 46-page opinion granting the State's motion to dismiss the complaint, *sua sponte* dismissing the complaint against the County defendant, and denying plaintiff's motion for a preliminary injunction. JA 1115–60. After concluding that plaintiff had standing to bring suit against the defendants,[5] the court considered each of plaintiff's constitutional claims and found them unsuccessful.

Turning first to plaintiff's free speech and free association claims, the court assumed without deciding that strict scrutiny would apply to plaintiff's claims "on the theory that the Accommodation clause [of New York's Human Rights Law] compels speech and expressive association." JA 1135–37. The court concluded that it did not need to "make any definitive determination on the matter" because New York's laws satisfied even the most exacting standard. JA 1137–46. The court found that New York has a compelling interest in eliminating discrimination in the provision of public accommodations, including discrimination based

---

[5] State defendants do not challenge plaintiff's standing on appeal.

on sexual orientation. JA 1140–46. And it further concluded that New York's Accommodation Clause is narrowly tailored to serve that interest. JA 1146–49. The court upheld New York's Denial and Unwelcome Clauses against plaintiff's free-speech challenge because a state may prohibit speech that promotes unlawful activity, including discrimination. JA 1149–50.

Second, the court found no merit in plaintiff's free exercise claim. It concluded that New York's laws are neutral and generally applicable, and therefore are subject only to rational basis review. JA 1151–56. The court rejected plaintiff's assertion that the law is not generally applicable because it contains exemptions, noting that the plaintiff identified only irrelevant statutory exemptions that did not apply either to public accommodations or to discrimination on the basis of sexual orientation. JA 1154–56. And because New York's laws survive strict scrutiny, they easily survive rational basis review. JA 1156.

Third, the district court found no merit in plaintiff's establishment clause claim, which alleged that plaintiff was forced to participate in religious exercises against her will when photographing same-sex weddings. JA 1156–57. Plaintiff is hired only to photograph weddings,

not participate in the religious ceremony, and therefore, the court held, New York law does not compel her religious participation. JA 1157. The court also recognized that plaintiff, as a wedding vendor, is not part of the audience for the wedding ceremony, and she is therefore not coerced into participating in the religious ceremony. *Id.*

Fourth, the court rejected plaintiff's challenge to New York's Unwelcome Clause as unconstitutionally vague, concluding that plaintiff's desired conduct was clearly proscribed by the statute, and she therefore could not challenge how the statute might apply to others in future cases. JA 1157–58. The court dismissed this claim, along with an alleged "overbreadth claim" that plaintiff did not plead in her complaint, on the additional ground that plaintiff failed to sufficiently brief and argue the claim to the court. JA 1158; *see also* JA 1150 n.15 (overbreadth analysis).

Finally, because the court dismissed all of plaintiff's claims, it dismissed plaintiff's motion for preliminary injunction as moot. JA 1160.

This appeal followed. JA 1162.

## SUMMARY OF ARGUMENT

New York's public accommodations laws do not violate any of the constitutional rights invoked by plaintiff here. First, the laws do not violate plaintiff's First Amendment right to free speech. Because the laws prohibit conduct—the act of discriminatory denial of access—and only incidentally burden speech, they are subject to intermediate scrutiny. The laws survive intermediate scrutiny because New York has a substantial interest in preventing public accommodations from discriminating on the basis of sexual orientation. This interest is unrelated to the suppression of speech and is instead concerned with (1) ensuring members of historically disfavored groups have equal access to goods and services, and (2) preventing the stigma and humiliation associated with being denied entry to businesses purportedly open to all. And New York's laws further this substantial interest by prohibiting public accommodations from discriminating against potential customers or patrons on the basis of sexual orientation.

Thus, New York's laws simply do not violate plaintiff's rights against compelled speech, and against the regulation of speech on the basis of its content or viewpoint. Plaintiff is mistaken in characterizing

17

the public accommodations laws as compelling or regulating speech, and therefore New York's laws need not satisfy strict scrutiny. However, even if the Court applies strict scrutiny to the public accommodations laws, they satisfy this exacting standard because the laws are narrowly tailored to further the State's compelling interest in eradicating discrimination on the basis of sexual orientation by public accommodations.

Second, New York's public accommodations laws do not burden plaintiff's freedom of expressive association. In running her for-profit photography business, plaintiff is an individual engaged in a commercial enterprise, not an expressive association, and New York's laws thus do not interfere in an expressive organization's affairs. Nor is the right of private individuals to associate applicable to businesses serving the public. But even if the First Amendment did protect a public business's associational rights, New York's laws would satisfy constitutional requirements because they serve a compelling state interest unrelated to the suppression of ideas that cannot be achieved through less restrictive means.

Third, New York's public accommodations laws do not violate plaintiff's freedom to exercise her religion. These provisions are neutral laws of general applicability subject to rational-basis review. Although plaintiff attempts to identify exceptions that would render the law not generally applicable, none of these exceptions applies to discrimination on the basis of sexual orientation by a public accommodation and thus plaintiff could not make use of them even if they were extended to cases of religious hardship. New York's laws easily satisfy rational basis review.

Fourth, New York's public accommodations laws do not violate the Establishment Clause of the First Amendment because they do not obligate plaintiff to participate in any exercise of religion. Plaintiff is hired to photograph weddings, not to participate in any religious aspect of the wedding ceremony, and the public accommodations laws therefore do not obligate her to practice religion.

Fifth, Plaintiff cannot challenge New York's Unwelcome Clause as vague because her desired conduct—telling same-sex couples orally, in print, and in contracts that she will not photograph their weddings—is clearly prohibited by the law. But even if plaintiff could challenge the law

19

as vague, the challenge would fail. A reasonable person of ordinary intelligence would be able to determine whether a statement conveys that a prospective customer's patronage is unwelcome because of a protected characteristic.

Finally, this Court should not revive plaintiff's motion for a preliminary injunction. She is unlikely to succeed on the merits of her claims because each fails as a matter of law. For the same reason, she does not face irreparable harm to a constitutional right. And the public interest weighs in favor of preventing discrimination in places of public accommodation.

## ARGUMENT

The district court correctly dismissed plaintiff's complaint for failure to state a claim on which relief could be granted and dismissed plaintiff's motion for preliminary injunction as moot. The Court should affirm the decision below.

## POINT I

### NEW YORK'S PUBLIC ACCOMMODATIONS LAWS DO NOT IMPERMISSIBLY BURDEN PLAINTIFF'S RIGHT TO FREE SPEECH

This Court has recognized that New York's public accommodations laws regulate conduct and only incidentally burden speech and are therefore subject to intermediate scrutiny. New York's laws prohibit discrimination in providing access to public accommodations, and only indirectly—if at all—result in plaintiff having to convey a message she would rather not. Plaintiff's attempts to recast the laws as content- and viewpoint-based restrictions or laws compelling speech are foreclosed by binding precedent, and she is thus wrong that strict scrutiny applies. Regardless of what level of scrutiny applies, New York's laws survive.

### A. New York's laws regulate conduct and are thus subject to intermediate scrutiny

The district court assumed, without deciding, that New York's bar on discrimination on the basis of sexual orientation compels plaintiff's speech and warrants strict scrutiny because (a) wedding photography is expressive, and thus a type of speech; and (b) plaintiff is required to photograph same-sex weddings if she photographs opposite-sex weddings. As demonstrated below, this assumption is not justified.

21

"[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). Thus, a law regulating conduct that only incidentally burdens speech is subject to intermediate scrutiny. *Vincenty v. Bloomberg*, 476 F.3d 74, 84 (2d Cir. 2007). By prohibiting discrimination, New York's public accommodations laws regulate conduct rather than speech. *See Hurley*, 515 U.S. at 572 (the "focal point" of public accommodations laws is prohibiting "the act of discriminating against individuals" rather than targeting speech).

A law regulates conduct if it dictates what an entity must *do* rather than what it must *say*. *Rumsfeld v. Forum for Acad. & Inst. Rights (FAIR)*, 547 U.S. 47, 60 (2006). Thus, in *Rumsfeld*, the Supreme Court held that the Solomon Amendment, which required law schools to allow the military to recruit on campus to the same extent they allowed other employers to recruit, was subject to intermediate scrutiny. As the Court explained, "the Solomon Amendment regulates conduct, not speech. It affects what law schools must *do*—afford equal access to military recruiters—not what they may or may not *say*." *Id.* And although the Court acknowledged that law schools would be compelled to speak in

22

favor of military recruiters under the Amendment by sending emails or posting notices on bulletin boards about military recruitment, the Court concluded that this burden was "plainly incidental" to the regulation of conduct. *Id.* at 62. Moreover, because the Solomon Amendment granted military recruiters equal access to law students, law schools were only compelled to speak if, and only to the extent that, they provided similar speech about non-military recruiters. *Id.* The Court also dismissed the significance of this compelled speech because law schools were free to disassociate themselves from it by expressing their disagreement with military policy. *Id.* at 65.

New York's public accommodations laws, like the Solomon Amendment in *Rumsfeld*, regulate conduct, and thus are subject to intermediate scrutiny. This Court has held that New York's public accommodations laws, codified at Civil Rights Law § 40 and Executive Law § 296(2)(a), "are plainly aimed at conduct, *i.e.*, discrimination, not speech." *Jews for Jesus v. Jewish Cmty. Rels. Council of N.Y.*, 968 F.2d 286, 295 (2d Cir. 1992). These laws affect what plaintiff must do—provide equal access to her photography to all couples—not what she must say or how she must say it.

23

Of course, as a result of New York's prohibition on discrimination, plaintiff may be required to produce wedding photographs for same-sex couples that she would not otherwise choose to create. But this burden on plaintiff's expression is an incidental effect of prohibiting discrimination. Because New York's laws, like the Solomon Amendment, require only equal access to services for everyone, plaintiff is only compelled to create photographs for same-sex couples to the extent she chooses to provide that service at cost to opposite-sex couples. Like the law schools in *Rumsfeld*, plaintiff is free to disassociate herself from this compelled expression, such as by stating on her website that she believes that marriage should only be between persons of opposite sex, as long as she affirms that she welcomes all clients regardless of their sexual orientation.

And although the Denial and Unwelcome Clauses prohibit businesses from making certain discriminatory statements, these clauses too prohibit conduct rather than speech. Words can violate laws directed not against speech but against conduct. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 389 (1992); *see also Jews for Jesus*, 968 F.2d at 295–96 (collecting cases holding same). That is the case here. When New York

24

prohibits signs stating that disfavored groups are unwelcome at a business, it is prohibiting a discriminatory *action*, albeit one carried out through speech. Similarly in *Rumsfeld*, the Supreme Court recognized that when a law prohibits employers from discriminating on the basis of race in hiring, it is prohibiting conduct, albeit conduct that is carried out in part through speech. "The fact that this will require an employer to take down a sign reading 'White Applicants Only' hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct." *Rumsfeld*, 547 U.S. at 62.

## B.  Plaintiff's arguments for applying strict scrutiny to New York's public accommodations laws fail

Plaintiff argues that New York's laws are subject to strict scrutiny because they compel speech and because they are content- and viewpoint-based regulations. *See* Br. 23–36. These arguments are foreclosed by current case law, and plaintiff provides no reason to reach a different conclusion here.

### 1.  New York's laws do not compel plaintiff's speech or impede her editorial freedom

Plaintiff argues (Br. 23–31) that New York's public accommodations laws are subject to strict scrutiny because they compel

25

her to speak by creating wedding photographs for same-sex couples. While laws that compel speech are subject to strict scrutiny, New York's laws regulate conduct, and any effect they have in compelling speech is incidental to their purpose of barring discrimination. For this reason, the one state high court to have considered the question has rejected the claim that a bar against sexual-orientation discrimination by public accommodations compels the speech of a wedding photographer. *See Elane Photography, LLC v. Willock*, 309 P.3d 53, 62–65 (N.M. 2013). Plaintiff's claim that New York's antidiscrimination laws compel her speech is mistaken for at least four reasons.

First, New York's public accommodations laws directly regulate conduct and not speech; they do not directly require plaintiff, or any other business, to speak on any topic. Instead, these laws prohibit businesses from discriminating against potential clients on the basis of protected characteristics. The law applies equally to a person who runs a photography studio, a fast food restaurant, a hardware store, or a factory. In nearly all instances, the laws will not compel a business to express anything. But as a byproduct of New York's public accommodations laws, businesses selling expressive products and services may be required to

transact with customers with whom they would prefer not to transact. The First Amendment does not prohibit that kind of indirect regulation of expression, resulting from a prohibition on discriminatory conduct. *See, e.g.*, *United States v. O'Brien*, 391 U.S. 367, 375–77 (1968) (upholding ban on destruction of Selective Service certificates despite expressive aspect of such destruction).

New York's generally applicable laws are not analyzed differently when they are enforced against businesses engaged in expression. Expressive activities are subject to "generally applicable economic regulations" without running afoul of the First Amendment. *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 581 (1983). And this includes generally applicable antidiscrimination laws. Thus, the First Amendment rights of newspaper editors and publishers were not violated by prohibitions on discriminatory advertising contained in the federal Fair Housing Act, *Ragin v. N.Y. Times Co.*, 923 F.2d 995, 1003 (2d Cir. 1991), and the federal employment discrimination law, *Pittsburgh Press Co. v. Human Rel. Comm'n*, 413 U.S. 376, 378 (1973), even though the laws restricted the ability of newspaper editors to decide which advertisements to publish. In neither case did the court apply

27

strict scrutiny to the laws. Likewise, in *Hishon v. King & Spaulding*, 467 U.S. 69 (1984), the Supreme Court rejected a First Amendment challenge to a law requiring law firms to consider women for partnership. *Id.* at 78. Although the Court recognized that lawyers' work is expressive, it nevertheless concluded that the expressive aspect of lawyers' work did not give rise to a constitutional right to discriminate in hiring, and the Court therefore declined to apply strict scrutiny. *Id.* Plaintiff's argument for applying strict scrutiny is inconsistent with these precedents. If engaging in an expressive business were sufficient to exempt a person from the relevant antidiscrimination laws, then newspapers and law firms would be free to discriminate in hiring or publishing advertisements, contrary to *Ragin*, *Pittsburgh Press*, and *Hishon*.

Second, New York's public accommodations laws do not compel speech because they apply only to those who avail themselves of the privilege of doing business in New York, and only when those businesses hold themselves out to the public. And the laws implicate expression only if a public business chooses to sell expressive goods and services. This indirect impact on speech is utterly unlike state laws obligating private individuals to express statements with which they do not agree without

28

providing those individuals a ready way to avoid the compulsion. *See, e.g.*, *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 626, 634 (1943) (public school student compelled to salute American flag); *Burns v. Martuscello*, 890 F.3d 77, 81, 89 (2d Cir. 2018) (incarcerated person punished for refusing to serve as an informant); *Janus v. Am. Fed. of State, Cty., & Mun. Emps.*, 138 S. Ct. 2448, 2459–64 (2018) (public employees required to pay union fees).

Unlike the student in *Barnette*, the incarcerated person in *Burns*, and the employees in *Janus*, plaintiff can readily place herself beyond the reach of New York's public accommodations laws. Plaintiff could choose not to sell her expressive services to the public by photographing weddings as a hobby or by operating as a "distinctly private" accommodation. *See* N.Y. Exec. Law § 292(9); *Cahill*, 89 N.Y.2d at 22. She could also create and sell photographs that she conceptualizes and stages rather than offer a photography service. This would grant her complete control of the content, message, and aesthetic of her photographs.[6] New

---

[6] A photographer who sells photographs to the public is still prohibited by the public accommodations laws from discriminating among customers, on the basis of protected characteristics, in the *sale* of her works.

York's public accommodations laws do not apply to a photographer's selection of subjects in these circumstances and therefore would not compel any expression as plaintiff conceives it.

Third, New York's public accommodations laws do not compel speech because they do not dictate what message an expressive business must convey. New York requires that plaintiff photograph same-sex weddings if she photographs opposite-sex weddings, not what she must express in her photographs. Plaintiff chooses to photograph weddings in a way that she feels endorses the union, but the law no more requires her to endorse the union than it requires her to endorse the religious validity of a ceremony she photographs. She may make any artistic choices regarding color, lighting, posing, and emotion that she wants in shooting and editing the photos. And she is free to profess her faith, including her belief that a marriage is between a man and a woman, in public and in her advertising materials.

Fourth, New York's public accommodations laws do not compel plaintiff's speech because wedding photographs are not generally viewed as conveying the personal beliefs of the photographer. If the photographs express anyone's beliefs, it is those of the couple. While wedding

photographers may add certain touches, the content of the photographs is largely dictated by the marrying couple in their choice of venue, decorations, outfits, and more. And wedding photography is highly dependent on industry conventions. Plaintiff admits that she photographs the same parts of a wedding for every couple. *See supra* p.12. And as the photographs submitted by plaintiff (*see* Br. 29) demonstrate, many of the subjects and moments captured by wedding photographers, and even the light, color, and camera position, are common among photographers. Although photographic style may differ, the message conveyed is similar: the ceremony was a joyful affair, whatever the photographer's personal beliefs about marriage. *See* Caroline Mala Corbin, *Speech or Conduct?: The Free Speech Claims of Wedding Vendors*, 65 Emory L.J. 241, 276–78 (2015) (describing role of professional standards in wedding photography). And especially in the absence of a First Amendment-based exemption from public accommodations laws compelling businesses to serve the public on equal terms, no one would infer plaintiff's personal endorsement of a marriage from her wedding photographs.

## 2. New York's laws are content- and viewpoint-neutral

Plaintiff also argues, incorrectly, that the public accommodations laws constitute content- and viewpoint-based discrimination. The "principal inquiry" when determining whether a law is content-based is "whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Laws that "confer benefits or impose burdens on speech without reference to the ideas or views expressed" are generally content-neutral. *Turner Broadcasting Sys., Inc. v. F.C.C.*, 512 U.S. 622, 643 (1994). And laws are viewpoint-neutral as long as they do not regulate speech based on the specific motivating ideology or opinion of the speaker. *Reed v. Town of Gilbert*, 576 U.S. 155, 168–69 (2015). Laws requiring a public-facing group to accept all comers are "textbook viewpoint neutral" laws permissible under the First Amendment. *Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 694–95 (2010). Because New York's laws are content- and viewpoint-neutral, they do not trigger strict scrutiny.

New York's laws are content- and viewpoint-neutral; they impose the same burden on all public businesses without reference to the

business's product or service and do not discriminate based on the business's opinion. The Supreme Court has declined to apply strict scrutiny under just these conditions, holding that a law equally burdening all cable providers "regardless of the programs or stations they now offer or have offered in the past" is content- and viewpoint-neutral and subject to intermediate scrutiny. *Turner Broadcasting*, 512 U.S. at 644. In that case, the Court further concluded the law was content- and viewpoint-neutral because Congress's overriding purpose in its enactment "was not to favor programming of a particular subject matter, viewpoint, or format, but rather to preserve access to free television programming for the 40 percent of Americans without cable." *Id.* at 646.

So too here. New York's laws apply to plaintiff no matter what type of photography she offers, who she photographs, or what message she expresses in those photographs. She will still be prevented from turning away clients based on their protected characteristics. And New York's purpose in enacting the law is not to favor or disfavor any message or position on the proper religious view of marriage, but rather to preserve access to goods and services for all people regardless of their protected characteristics.

Plaintiff challenges this conclusion (Br. 32), arguing that the laws compel her to "celebrate same-sex weddings." But plaintiff chooses the content of her photography; New York's laws just require her to offer that photography to all. The laws would equally apply if plaintiff did portrait photography and would prevent her from turning away subjects because they were disabled or active-duty military. So too if plaintiff were a landscape photographer, she would be prohibited from declining to photograph landscapes for clients because they were straight, transgender, or born in Ecuador. And the laws do not require plaintiff to *celebrate* any weddings, either in her personal speech or through her contracted photographs. If plaintiff chooses to convey that message through her photographs, that is her choice.

Plaintiff also argues (Br. 32) that New York's laws are content-based because her choice to talk about opposite-sex marriage compels her to talk about same-sex marriage. This misunderstands New York's laws. The public accommodations laws are triggered by plaintiff *offering a service to the public*, not creating certain photographs. If she does not offer wedding photography, New York does not force her to photograph any weddings. Because she has chosen to offer that service, however, she

34

must offer it on equal terms regardless of sexual orientation, and regardless of whether she ever photographs an opposite-sex wedding. In addition, whether plaintiff is required to photograph a same-sex marriage ceremony will ultimately depend on whether any same-sex couple hires her for that service.

Plaintiff also argues (Br. 35) that New York's laws restrict her speech based on viewpoint because they allow her to say she photographs all weddings but do not allow her to say that she only photographs opposite-sex weddings. But New York's laws do not regulate her speech because of her views on same-sex marriage. The law prohibits all proprietors of public accommodations from limiting access on the basis of sexual orientation—and from saying they limit access in that way—regardless of the business owner's opinions. The fact that a law primarily burdens those with a certain viewpoint does not render the law viewpoint based. *See Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 763 (1994).

Finally, plaintiff alleges (Br. 33) that the public accommodations laws "aim to suppress the 'particular views' on marriage that New York disfavors." But as already explained, *see supra* p.34, New York's laws neither aim to suppress, nor result in the suppression of, communication

35

of any ideas. They require plaintiff to offer a service on equal terms. She may communicate her views on marriage both privately and publicly consistent with the law.

### 3.   New York's Denial and Unwelcome Clauses regulate illegal speech

Plaintiff argues that the Denial and Unwelcome Clauses in particular are content- and viewpoint-based because they prohibit her from making certain statements. Because these laws regulate conduct, *see supra* pp.21–28, they are subject to only intermediate scrutiny even if they specify what conduct is prohibited. But even if these clauses do regulate speech (which they do not), the Supreme Court has held that states are free to prohibit speech that advertises unlawful conduct.

There is no First Amendment protection for commercial statements that are illegal, including discriminatory advertisements. *Pittsburgh Press Co*, 413 U.S. at 389; *see also Norwood v. Harrison*, 413 U.S. 455, 470 (1973) (private discrimination "has never been accorded affirmative constitutional protections"). The Court recently reaffirmed this distinction in the specific context of same-sex weddings, recognizing that purveyors of goods and services should not "in effect be allowed to put up

signs saying 'no goods or services will be sold if they will be used for gay marriages'" because such signs "impose a serious stigma on gay persons." *Masterpiece Cakeshop*, 138 S. Ct. at 1728–29; *see also Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 563, 566 (1980) (holding that commercial speech is not protected if it does not concern "lawful activity").

That is what the Denial and Unwelcome Clauses prohibit. Plaintiff wants to amend her operating agreement to provide that she will not photograph same-sex weddings, ask prospective clients questions to ensure she will not be photographing same-sex weddings, and advertise on her website that she does not photograph same-sex weddings. JA 51, 52, 77, 79–80. She seeks to create digital, verbal, and paper notices advising prospective customers "straight couples only." Because these statements advertise illegal discrimination, New York can prohibit them without running afoul of the First Amendment.

### 4. New York's Unwelcome Clause is not overbroad, and plaintiff has not adequately stated such a claim

Plaintiff also argues (Br. 59) that the Unwelcome Clause is overbroad. But plaintiff did not bring an overbreadth claim in her

37

complaint. Instead, plaintiff stated cursorily in a single paragraph that the Unwelcome Clause is "overbroad" as part of a laundry list of ways in which she alleges that the clause is unconstitutional. *See* JA 67. This bare legal conclusion is insufficient to allege a facial First Amendment challenge to the law based on its alleged overbreadth. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In bringing a facial overbreadth challenge, the burden is on plaintiff to demonstrate that in a substantial number of instances the law cannot be applied constitutionally and that these instances are significant relative to the statute's legitimate sweep. *United States v. Thompson*, 896 F.3d 155, 163 (2d Cir. 2018). Plaintiff has not alleged a single fact in the complaint that would satisfy this requirement.

And, as the district court concluded, plaintiff similarly failed to "undertake any meaningful statutory analysis of the clause" in her briefing on the State's motion to dismiss. JA 1150 n.15. Indeed, plaintiff's briefing on the issue of overbreadth was one paragraph that asserted without analysis that the Unwelcome Clause "could cover any critical statement related to protected classes on a public accommodation's website" without explaining why that would be true or whether these

allegedly unconstitutional applications were significant relative to the statute's legitimate applications. Opp. to State Defs' Mot. to Dismiss at 24, *Emilee Carpenter, LLC v. James*, No. 6:21-cv-06303-FPG (W.D.N.Y. July 7, 2021), ECF No. 57. Plaintiff repeats this error in her brief to this Court, failing to present any basis for her assertion that the law "bans too much" (Br. 60), particularly in light of the district court's sound reasoning that the law only reaches statements that a protected group's *patronage* is unwelcome. Accordingly, plaintiff's overbreadth claim is not adequately presented to this Court. *Caiola v. Citibank, N.A.*, 295 F.3d 312, 328 (2d Cir. 2002); *Wood v. Maguire Auto., LLC*, 508 F. App'x 65, 66 (2d Cir. 2013).

## C. New York's public accommodations laws satisfy intermediate scrutiny.

Laws like New York's that target conduct rather than speech are subject to intermediate scrutiny, and they are constitutional so long as (1) they further an "important or substantial government interest" that is unrelated to the suppression of speech, and (2) the substantial government interest would be achieved less effectively absent the regulation. *Vincenty*, 476 F.3d at 84.

39

This Court has already held that New York's public accommodations laws "easily satisfy" intermediate scrutiny. *Jews for Jesus*, 968 F.2d at 295. First, the laws further the "substantial, indeed compelling, interest in prohibiting" discrimination in seeking public accommodations. *Id.* Courts have repeatedly recognized that ending discrimination is not just a substantial interest, but a "compelling state interest[] of the highest order." *Roberts v. U.S. Jaycees*, 468 U.S 609, 624 (1984); *see also id.* at 632 (O'Connor, J., concurring in part and concurring in judgment) (describing elimination of discrimination as a "profoundly important goal"). The Supreme Court has recognized that the right of gay couples in particular to be treated equally "must be given great weight and respect by the courts." *Masterpiece Cakeshop*, 138 S. Ct. at 1727.

And the state's compelling interest in eliminating discrimination is not directed at or related to suppressing speech. *Jews for Jesus*, 968 F.2d at 295. Ending discrimination serves two functions. First, it ensures that historically disfavored groups can access public goods and services on the same terms and conditions as other members of the public, enabling them to participate fully in the political, economic, and cultural life of the nation. *Hurley*, 515 U.S. at 578; *Masterpiece Cakeshop*, 138 S. Ct. at 1727;

40

*Roberts*, 468 U.S. at 624–25; *see also Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 252–53 (1964) (describing economic and logistical burdens Black Americans faced due to racial discrimination). Second, public accommodations laws remove the "daily affront and humiliation" individuals face when they are denied access to facilities that are "ostensibly open to the general public." *Daniel v. Paul*, 395 U.S. 298, 307–08 (1969); *Masterpiece Cakeshop*, 138 S. Ct. at 1728–29 (recognizing that denial of access to public accommodations imposes "a serious stigma on gay persons"); *Heart of Atlanta Motel*, 379 U.S. at 279 (Goldberg, J., concurring) ("Discrimination is not simply dollars and cents, hamburgers and movies; it is the humiliation, frustration, and embarrassment that a person must surely feel when he is told that he is unacceptable as a member of the public . . . ."). These ends relate not to suppression of speech, but only to preventing the denial of public access.

Finally, the State's interest in eradicating discrimination based on sexual orientation would be achieved less effectively absent New York's public accommodations laws. Prohibiting public businesses from discriminating on the basis of sexual orientation ensures gay and lesbian persons equal access to public goods and services and prevents them from

41

facing the humiliation and stigma that comes from being denied access. *See supra* pp.7–8. New York's public accommodations laws "are no broader than necessary to further the legitimate goal of eradicating discrimination." *Jews for Jesus*, 968 F.2d at 296.

Because New York's laws further the substantial state interest of eradicating discrimination, which is unrelated to suppressing speech, the laws survive intermediate scrutiny and thus satisfy the First Amendment.

## D.    New York's public accommodations laws survive strict scrutiny

Even if this Court were to conclude that New York's public accommodations laws are subject to strict scrutiny (which they are not), the laws would satisfy this exacting standard, as the district court concluded. A law satisfies strict scrutiny if the government demonstrates that it is narrowly tailored to serve a compelling government interest. *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018).

1.  **New York has a compelling interest in eradicating discrimination based on sexual orientation in the provision of public goods and services**

It is well settled that states have a compelling interest in eradicating discrimination. *Roberts*, 468 U.S at 624; *Jews for Jesus*, 968 F.2d at 295; *see also supra* p.40. Plaintiff largely concedes this point, arguing only that a dignitary interest alone cannot justify compelling or suppressing speech. Br. 45. This is mistaken. In support, plaintiff cites (Br. 45) cases acknowledging that the First Amendment protects speech even if it is hurtful. Courts have recognized, however, that the dignitary harm caused by discrimination goes beyond exposure to hurtful words. Absent the protection of public accommodations laws, members of disfavored groups are subjected to humiliation and exclusion from society on a daily basis and suffer community-wide stigma, being treated as "social outcasts." *Masterpiece Cakeshop*, 138 S. Ct. at 1727; *Daniel*, 395 U.S. at 307–08. This constant, widespread, systematic exclusion from social life is a far cry from a single or intermittent exposure to speech that is hurtful.

In any event, New York does not justify its public accommodations laws solely on dignitary harm. Rather, New York has a compelling

interest in eradicating discrimination both because that discrimination subjects individuals to the persistent stigma *and* because discrimination denies individuals equal access to public accommodations. *See supra* pp.40–41.

And plaintiff's argument (Br. 45) that *her* dignitary interest will be harmed if she is forced to create photography for same-sex weddings is incorrect. As the district court recognized, the "demeaning" character of compelled speech is not present in public accommodations because those businesses have chosen to invite the public at large to make use of their expressive capacities through a commercial transaction. Thus a wedding photographer who finds it demeaning to photograph same-sex weddings can avoid that result by declining to offer her services to the public by operating as a "distinctly private" accommodation. *See* N.Y. Exec. Law § 292(9); *Cahill*, 89 N.Y.2d at 22. And of course, she could avoid having to photograph same-sex weddings by offering only non-wedding photography or selling photographs rather than offering a photography service to prospective clients. And because a wedding photographer can never ensure that she will photograph only aesthetics and actions she

44

endorses, she accepts this alleged risk of dignitary harm in opening any photography studio that offers services to the public.

### 2. New York's laws are narrowly tailored to serve its compelling interest

The public accommodations laws are narrowly tailored to serve the State's compelling interest in eradicating discrimination based on sexual orientation in the provision of public goods and services. Prohibiting discrimination by public-serving businesses is the least restrictive means of preventing discrimination by public-serving businesses. *See Roberts*, 468 U.S. at 628–29. That is what New York law does. It applies only to businesses that offer goods and services to the public. *See* N.Y. Exec. Law § 292(9) (exempting distinctly private accommodations from the regulation). And the laws do not attempt to regulate conscience, belief, private speech, or public speech except in the narrow circumstances where that speech either advertises that a public accommodation will discriminate against certain groups or attempts to dissuade that group from patronizing a public accommodation by stating that their patronage is unwelcome. *See supra* pp.34–37.

45

Plaintiff raises numerous possible exemptions to the public accommodations laws, but none of them satisfies the State's compelling interest.

First, she argues (Br. 44–45) that New York could achieve its interests in a more narrowly tailored way by exempting *her* because there are thousands of other photographers in New York willing to photograph same-sex weddings. But New York's interest is ensuring all people have full and equal access to all goods and services in the marketplace, not access to some of those goods and services. *Roberts*, 468 U.S. at 624. Shrinking the market available to same-sex couples, even by exempting a single business, undermines that goal. This concern is particularly apt for an artistic service like plaintiff's because aesthetic preferences are personal and subjective. For some same-sex couples, plaintiff may be the only photographer whose work suits their taste, and exempting plaintiff from serving them would limit these couples to less desirable services based on their sexual orientation. *See 303 Creative LLC v. Elenis*, 6 F.4th 1160, 1181 (10th Cir. 2021) (recognizing that harm would result where "a wide range of custom-made services are available to a favored group

of people, and a disfavored group is relegated to a narrower selection of generic services").

Moreover, excepting plaintiff's business does not actually mean shrinking the market of wedding photographers available to same-sex couples by one. Plaintiff's proposed exemption would require New York to exempt *every* wedding photographer who objected to photographing people based on a protected characteristic. While there may be two thousand New York photographers who currently photograph same-sex weddings, *see* JA 62, those photographers, like plaintiff, are currently compelled to do so by the State's public accommodations laws and cannot discourage or turn away same-sex couples. But the history of discrimination against gay and lesbian people in New York and elsewhere demonstrates that the proposed exemption could result in fewer businesses being open to same-sex couples.[7] *See supra* pp.7–8; JA 1076–77 (outlining history of discrimination against LGBTQ people).

---

[7] And although there are "thousands" of photographers in the state of New York, the available market of photographers in any part of the state, particularly away from large cities, is only a fraction of that overall total. In these locales, if even a single wedding photographer declines to serve a couple based on their sexual orientation, race, religion, or other

(*continued on the next page*)

Likewise, if photographers enjoy a First Amendment-based exemption from New York's public accommodations laws barring discrimination based on sexual orientation, it would open the door to similar permission to discriminate based on other protected characteristics, such as religion, race, national origin, or transgender status. Thus other historically disfavored groups could find themselves excluded from the market for otherwise-public services. For instance, a photographer, depending on her personal beliefs, could refuse to photograph the wedding of an interracial or interfaith couple, or a couple where one or both members are transgender. As a result, same-sex couples and other disfavored groups would be subject to the humiliation of being turned away from businesses that are allegedly open to the public but are not open to them.

Second, plaintiff asserts (Br. 48) that New York could achieve its interests by a more narrowly tailored law that "stop[s] status discrimination, not message-based objections." That is what New York law does. New York prohibits a business from denying an available

---

characteristic, it will drastically reduce or eliminate the couple's access to the wedding photography market.

service, including engagement and wedding photography, to same-sex couples. And because same-sex marriage is inextricably tied to sexual orientation, refusing to photograph same-sex marriages is status-based discrimination. *See Martinez*, 561 U.S. at 689 (rejecting a distinction between a person's homosexuality and homosexual conduct); *Lawrence v. Texas*, 539 U.S. 558, 575 (2003); *id.* at 583 (O'Connor, J., concurring in judgment); *Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 127 (2d Cir. 2018); *Elane Photography, LLC*, 309 P.3d at 62; *see also Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993) ("A tax on wearing yarmulkes is a tax on Jews.").

Plaintiff's choice to offer only branding services to gay and lesbian customers only highlights that she engages in status-based discrimination. Offering only *some* services to customers based on a protected classification is discrimination. *See Elane Photography*, 309 P.3d at 62 (rejecting a similar argument and concluding, "if a restaurant offers a full menu to male customers, it may not refuse to serve entrees to women, even if it will serve them appetizers"); *see also Katzenbach v. McClung*, 379 U.S. 294, 296–99 (1964) (prohibiting serving Black customers only through a take-out window).

49

Third, plaintiff argues (Br. 48) that New York's laws are not narrowly tailored because they do not exempt "expressive businesses" or "individuals and small businesses that celebrate weddings." What plaintiff proposes as an "exemption" would seem to cover a good portion of the wedding industry, such as wedding florists, chefs, or even venue operators. Such exemptions would undermine the State's compelling interests by limiting or eliminating disfavored groups' access to markets for expressive or wedding-related goods. And these exemptions would create hopeless line-drawing problems, requiring the State to individually analyze whether businesses are "expressive," "small," or sufficiently service weddings. *See City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989) ("It is possible to find some kernel of expression in almost every activity a person undertakes . . . .").

Fourth, plaintiff argues that New York's laws are not narrowly tailored because they are underinclusive. Neither of the supposed forms of underinclusiveness has merit. Plaintiff faults New York law for not banning discrimination in private and not-for-profit organizations. Br. 46–47. But New York does prohibit discrimination in not-for-profit organizations to the extent allowed by law. *See* N.Y. Exec. Law § 292(9)

50

(broadly defining "place of public accommodation, resort or amusement"). New York cannot be faulted for not regulating private activity that it is constitutionally prohibited from regulating.[8] And discrimination by private persons, while unfortunate, does not undermine New York's compelling interest in stopping discrimination *by public accommodations*. *See supra* pp.40–41. Plaintiff's argument that New York's laws are underinclusive because they contain exemptions (Br. 47) also fails. The exemptions she cites do not apply to public accommodations and do not apply to discrimination on the basis of sexual orientation. *See* Br. 47 (citing provisions of housing and employment law that allow discrimination on the basis of disability or gender under narrow circumstances). The public policy considerations that allow discrimination on the basis of other, different characteristics in contexts unrelated to public-serving businesses are not relevant here because they do not undermine New York's compelling interest in this case.

---

[8] S*ee Hurley*, 515 U.S. at 559 (First Amendment prohibits state from regulating private parade organizers' speech); *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 644 (2000) (First Amendment prohibits state from requiring private expressive group to accept gay member).

Finally, plaintiff faults the district court (Br. 52) for not requiring New York to provide evidence that its laws are narrowly tailored. But given the nature of the State's interests, as described above, there is no way to advance those interests except by prohibiting, without exception, public accommodations from discriminating on the basis of sexual orientation. And New York considered significant evidence before passing the law. *See supra* pp.7–8. Plaintiff would have the State interview every public accommodation to find out what groups they would like to discriminate against and weigh whether certain accommodations could be allowed to discriminate without causing "too much" discrimination. This would fail to serve the State's interests, *see supra* pp.40–41, and is not a practical task for any state to undertake, much less one with as many public accommodations as New York. Narrow tailoring does not set such an impossible threshold.[9]

---

[9] If this Court determines that the district court erred by not requiring evidence regarding narrow tailoring, it should send the case back to the district court to take and weigh that evidence in the first instance. *See Florez v. Central Intel. Agency*, 829 F.3d 178, 189 (2d Cir. 2016) (collecting cases).

52

In sum, New York's laws are narrowly tailored to serve the State's compelling interest, and thus satisfy strict scrutiny.

## POINT II

### NEW YORK'S PUBLIC ACCOMMODATIONS LAWS DO NOT IMPERMISSIBLY BURDEN PLAINTIFF'S RIGHT TO FREE ASSOCIATION

The Supreme Court has recognized that certain private organizations that engage in "expressive association" have a right under the First Amendment to freely associate with others to advocate for their viewpoints. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000). An expressive group is equally free *not* to associate with individuals lest their inclusion "impair the ability of the original members to express only those views that brought them together." *Roberts*, 468 U.S. at 623. Protection for expressive association stems from a person's right "to enter into and maintain certain intimate or private relationships," *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 544 (1987), as well as the right to engage in collective effort to "shield[] dissident expression from suppression by the majority," *Roberts*, 468 U.S. at 622. Plaintiff does not have a cognizable claim that New York's public accommodations laws burden her right to association.

53

Plaintiff is not an expressive group. She is the sole owner and employee of Emilee Carpenter Photography, LLC and does not engage in expressive association. JA 23. As one person, she is not part of a collective effort to express a message or maintain a private relationship. Although plaintiff argues that she is being forced to associate "with messages" about marriage (Br. 37), that is just a repackaged version of her compelled speech argument and fails for the same reason.

Nor is plaintiff in an expressive association with her customers. *See* Br. 37. Plaintiff does not allege that her previous or current customers intend to express a message concerning the nature of marriage or opposition to same-sex marriage. Customers may not even be aware of plaintiff's intended message, let alone share it. Instead, clients contract with plaintiff on a time-limited basis in order to receive a specific service for a specific occasion. They are outside plaintiff's business and not members of it. *Rumsfeld*, 547 U.S. at 69 (applying same logic to legal recruiters who were not members of law school).

Even if a single person could be deemed an expressive organization, the right of expressive association has never been extended to a publicly available commercial business. The Supreme Court in *Hurley* recognized

54

this distinction, concluding that Massachusetts had applied its public accommodations law "in a peculiar way" by stretching the law beyond businesses that offered goods or services and applying it to organizers of a private parade where participation in the event was itself treated as a public accommodation. 515 U.S. at 572–73. A business that holds itself open to all customers and exists to make a profit is not an expression of intimate relationships, *Duarte*, 481 U.S. at 544, nor are the business's owners, employees, and customers brought together for the purpose of expressing shared ideas, *Roberts*, 468 U.S. at 622.

And treating for-profit public businesses as private expressive organizations would vitiate much business regulation. Extending an expressive association's First Amendment right to exclude members in this way would authorize businesses to exclude customers and discriminate against prospective employees based on protected characteristics. And any state or federal law regulating wages and hours, occupational safety, corporate governance, or a host of other topics could be deemed to violate the First Amendment's prohibition against "interfere[nce] with the internal organization or affairs" of an expressive group. *Roberts*, 468 U.S. at 623. Even antitrust laws would likely conflict

55

with the First Amendment by limiting the right of businesses-as-expressive-associations to join together to amplify their purported message. The First Amendment does not require such a result.

But even if this Court were to conclude that plaintiff had a right to freely associate with messages or her customers, this right can be overcome by laws that "serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts*, 468 U.S. at 623. As explained above, New York's laws satisfy this standard. *See supra* pp.39–52.

## POINT III

### NEW YORK'S PUBLIC ACCOMMODATIONS LAWS DO NOT IMPERMISSIBLY BURDEN PLAINTIFF'S RIGHT TO FREELY EXERCISE HER RELIGION

Plaintiff argues (Br. 38) that New York's laws burden her right to express her religion by requiring her to serve same-sex couples. But she provides no basis to depart from the "general rule" that religious objections "do not allow business owners and other actors in the economy and in society to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations

56

law." *Masterpiece Cakeshop*, 138 S. Ct. at 1727. If a law is neutral and generally applicable, a state need only demonstrate a rational basis for its enforcement. *Commack Self-Serv. Kosher Meats, Inc. v. Hooker*, 680 F.3d 194, 212 (2d Cir. 2012).

Plaintiff does not dispute the district court's conclusion that New York's public accommodations laws are neutral both facially and as applied. JA 1152–53. Nor could she; New York's public accommodations laws do not "infringe upon or restrict practices because of their religious motivation." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993). Instead, the laws target all discrimination based on any protected characteristic regardless of whether the discrimination is religiously motivated. Because the parties agree that New York's laws are neutral, the only question is whether they are generally applicable. They are.

Courts have recognized two scenarios in which a law is not generally applicable. First, a law is not generally applicable if it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021). Second, a law

57

lacks general applicability if it invites the government to consider the particular reasons for each person's conduct by providing a mechanism for individualized exemptions from the law. *Id.* If a law permits individualized exemptions, a state must extend the exemption to cases of "religious hardship" unless it has a compelling reason not to. *Id.* Because neither circumstance applies to New York's public accommodations laws, they are generally applicable and subject only to rational basis review.

New York's public accommodations laws do not prohibit religious conduct while allowing secular conduct that undermines its interests. The laws prohibit *all* discrimination based on sexual orientation regardless of whether it is motivated by religious or secular purposes. As the district court found, plaintiff has not pled "a single example" of New York ever permitting sexual orientation discrimination for any reason. JA 1154. Instead, plaintiff argues (Br. 40–41) that New York favors secular motivations for discrimination because it allows certain exemptions[10] for *sex* discrimination. But plaintiff is not asking to

---

[10] New York Executive Law § 296(2)(b) allows a person to be barred from a public accommodation because of sex "if the division grants an exemption based on bona fide considerations of public policy." The same

(*continued on the next page*)

discriminate on the basis of sex, and these exemptions do not apply to discrimination on the basis of sexual orientation. *See* N.Y. Exec. Law § 296(2)(b). Plaintiff responds (Br. 40) that New York's interest in its public accommodations law is to eradicate *all* discrimination and therefore any exemption undermines the law's purpose. But New York's purpose in prohibiting discrimination based on sexual orientation is to eradicate discrimination *on the basis of sexual orientation*. *See* N.Y. Assembly Mem. in Support, *in* Bill Jacket for 2002 A.B. 1971, Ch. 2, at 4 (2002). A narrow exemption for sex-based discrimination does not undermine that purpose.

And plaintiff's reliance on an exception based on sex is particularly inapt: the Supreme Court has recognized that sex remains a valid means of classifying, and even separating, people as long as that classification is not used to perpetuate the inferiority of women. *United States v. Virginia*, 518 U.S. 515, 533–34 (1996); *see also Zarda*, 883 F.3d at 118–19 (collecting cases upholding sex-specific policies that did not disadvantage one gender). Plaintiff's interpretation—that no exemptions

---

section also allows landlords who rent individual rooms within a housing accommodation to restrict the rentals to individuals of one sex.

can apply to *any* classification without undermining the efficacy of the antidiscrimination law as to *all* protected classes—ignores the reality that each protected characteristic has unique policy considerations that might justify exemptions.

New York law also does not create a system of individualized exemptions that would render it not generally applicable. Indeed, nothing in Executive Law § 296(2)(a) creates any mechanism for considering individualized circumstances, nor does any other provision of the law. In contrast, laws have been held not generally applicable where the text of the rule itself creates an express exception. *See, e.g.*, *Fulton*, 141 S. Ct. at 1878 (regulation prohibited discrimination on the basis of sexual orientation "unless an exception is granted by the Commissioner or the Commissioner's designee, in his/her sole discretion.").

Failing to find such an exception, plaintiff cites (Br. 38) to an amicus brief joined by the State of New York in *Masterpiece Cakeshop*, as well as two cases in which the New York Division of Human Rights concluded that no discrimination had occurred. These examples do not demonstrate that New York *allows* discrimination under a system of exemptions, but rather define certain conduct as not being discrimination

60

at all. The amicus brief argues that declining to create a certain message, if a baker would not create that message for anyone, is *not* discrimination under New York's statute because this type of refusal does not deny service based on a protected characteristic. *See* Amicus Br. of Mass. et al., *Masterpiece Cakeshop*, 138 S. Ct. 1719 (2018), 2017 WL 5127307, at *28–*29. Similarly, in the cases cited by plaintiff (Br. 38 (citing JA 60)), the Division of Human Rights concluded that no discrimination had taken place rather than, as plaintiff alleges, that the discrimination was justified on secular bases. *See Morgan v. Zaharo Cab Corp.*, No. 10117888, at 3–5 (N.Y. Div. Hum. Rts. July 2, 2014) (concluding driver never saw claimant and thus had no way of knowing her race or faith); *Battaglia v. Buffalo Niagara Intro., Inc.*, No. 10138581, at 5–6 (N.Y. Div. Hum. Rts. Jan. 28, 2012) (concluding dating company had rejected applicant because he lied on his application form, not due to his disability).

Plaintiff also cites to formal exemptions that do not occur in New York's public accommodations laws, do not concern discrimination on the basis of sexual orientation, and do not allow case-by-case determinations that would render New York's law not generally applicable. *See* JA 64

(citing law that defines the term "places of public accommodation, resort or amusement," as well as unrelated provisions of New York employment and housing law). These exemptions are irrelevant to this case, and even if New York extended them to cases of religious hardship, *see Fulton*, 141 S. Ct. at 1877, none of them would permit plaintiff to deny her services to same-sex couples.

Thus New York's public accommodations laws are both neutral and generally applicable, and therefore subject only to rational basis review. The laws easily satisfy this minimal burden. Because New York has a legitimate, indeed compelling, interest in eradicating discrimination on the basis of sexual orientation, and because New York's laws further that goal by banning public accommodations from refusing to serve individuals on this basis, New York's laws have a rational basis.

## POINT IV

### NEW YORK'S PUBLIC ACCOMMODATIONS LAWS DO NOT REQUIRE PLAINTIFF TO PARTICIPATE IN RELIGIOUS CEREMONIES IN VIOLATION OF THE ESTABLISHMENT CLAUSE

Plaintiff argues (Br. 42) that New York's laws violate the Establishment Clause by obligating her to attend wedding ceremonies, follow the officiant's instructions, act as a witness before God of the

62

weddings she photographs, and express approval toward the marriage. While it is true that the First Amendment protects people from being coerced to "support or participate in any religion or its exercise," *Town of Greece v. Galloway*, 572 U.S. 565, 586 (2014) (citation omitted), New York's public accommodations laws do not obligate plaintiff to support or participate in any religion and therefore do not violate the Constitution.

As an initial matter, New York's public accommodations laws do not obligate any person to attend any religious service. Instead, it was plaintiff's choice to open a public business that would require her to attend events that she views as "inherently religious." JA 35. In opening such a business, plaintiff assumed the risk that she would attend and photograph weddings that conflicted with her own faith.[11] Indeed, even if plaintiff only photographed Christian weddings of opposite-sex couples, she might nevertheless photograph a ceremony in which an officiant expressed beliefs contrary to hers. According to plaintiff, she would feel obligated to follow this officiant's instructions, express approval for his message, and act as a witness to this view of marriage. *See* Br. 42.

---

[11] Plaintiff has not alleged that she discriminates on the basis of religion in choosing which weddings she will photograph.

63

Moreover, as the district court correctly held, New York's public accommodations laws do not require plaintiff to provide anything other than the service she offers to the public—photographing the wedding. To the extent plaintiff, in addition to her photography, chooses to sing, pray, follow the officiant's instructions, and express approval at an opposite-sex wedding, *see* Br. 42; JA 29–30, she may decline to take those actions at a same-sex wedding. And these religious activities are not directed at the photographer or any other vendor at the wedding—they are directed at the marrying couple and the couple's invited family and friends. *See Galloway*, 572 U.S. at 587 (concluding that town's legislative prayer did not compel the public to engage in religious observance because the "principal audience" for the prayer was not the public, but instead lawmakers). In *Masterpiece Cakeshop*, the Supreme Court recognized this distinction, acknowledging that a member of the *clergy* would have a protected right to refuse to "perform the ceremony," but warning that this exception must be "confined" so that it would not apply to "a long list of persons who provide goods and services for marriages and weddings." 138 S. Ct. at 1727.

64

Plaintiff disputes the district court's characterization of her claims, stating (Br. 42) that she has alleged in her complaint that an officiant's instructions are directed at her because she is part of the wedding's "audience." The district court was not required to accept this conclusory allegation. But even if she could be deemed to be part of the audience, she is only there as a commercial photographer, and like other persons who may be hired for the occasion such as musicians, she may participate in the ceremony or not, as she sees fit. New York's laws cannot reasonably be said to require plaintiff to participate in religious ceremonies despite her conclusory allegations to the contrary.

Plaintiff also argues (Br. 42–43) that she would be subject to immense social pressure to participate in and express approval for the weddings she photographs. The Supreme Court acknowledged the risk of "immense social pressure" in the context of teenage high school students feeling compelled to participate in their school's football team and pregame prayer. *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 311–12 (2000). There is no reason to believe that an adult professional would feel the same social pressure at an event where she was hired to perform a job separate from the religious proceedings. Moreover, plaintiff is free to

inform her prospective clients that she will not participate in the religious aspects of the weddings she photographs and decline any couple who pressures her to sing, pray, follow the officiant's instructions, or otherwise participate in the religious ceremony rather than documenting it. Her Establishment Clause claim therefore fails.

## POINT V

### NEW YORK'S UNWELCOME CLAUSE DOES NOT VIOLATE THE FOURTEENTH AMENDMENT

Plaintiff claims (Br. 60–62) that New York's Unwelcome Clause is unduly vague and thus unconstitutional. But the law provides sufficient guidance that a reasonable person of ordinary intelligence would know what is prohibited. And, regardless, the Clause clearly prohibits plaintiff's desired conduct, which prevents her from challenging the law. The district court thus properly dismissed her claim.

The void-for-vagueness doctrine stems from the Due Process Clause and "requires that 'laws be crafted with sufficient clarity to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited and to provide explicit standards for those who apply them.'" *Thibodeau v. Portuondo*, 486 F.3d 61, 65 (2d Cir. 2007) (citations

66

omitted). The vagueness doctrine "does not require 'meticulous specificity' of statutes, recognizing that 'language is necessarily marked by a degree of imprecision.'" *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 265 (2d Cir. 2015) (quoting *Thibodeau*, 486 F.3d at 66).

It is axiomatic that a plaintiff cannot challenge a statute as vague if her conduct clearly falls within the statute's prohibition. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18–19 (2010) ("[A] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." (citation omitted)). This rule applies even when the conduct at issue is speech: "[A] plaintiff whose speech is clearly proscribed cannot raise a successful vagueness claim under the Due Process Clause of the Fifth Amendment for lack of notice. And he certainly cannot do so based on the speech of others." *Id.* at 20.

Here, plaintiff's proposed conduct—advertising that she will not photograph same-sex weddings, asking prospective clients whether they are a same-sex couple in order to determine whether to reject their request, and amending her contract to prohibit her company from photographing same-sex weddings—all clearly fit within the core of the

67

Unwelcome Clause's prohibition. Plaintiff does not dispute this conclusion, instead providing (Br. 59, 61) a litany of hypothetical examples of signs that other types of business owners could put up that *might* violate the ordinance. This case provides no opportunity for this Court to analyze whether these "certain hypothetical conduct or situations," not present here, would violate the statute. *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 189 (2d Cir. 2010).

But even if plaintiff could bring a vagueness challenge, the Unwelcome Clause provides sufficient guidance about the conduct prohibited. The law prohibits only statements that suggest that "patronage" by a group of individuals is unwelcome, objectionable, or undesired. N.Y. Exec. Law § 296(2)(a); *see also State Div. of Hum. Rts. v. McHarris Gift Ctr.*, 71 A.D.2d 813, 813 (4th Dep't 1979) (demeaning or offensive items do not violate the Unwelcome Clause), *aff'd*, 52 N.Y.2d 813 (1980). A reasonable business owner of ordinary intelligence knows the difference between a sign professing the owner's personal beliefs, even if those beliefs may be offensive to others, and a sign stating that certain customers' business is unwanted. The Unwelcome Clause's language fits comfortably within the types of statutory language that

68

courts uphold. *See, e.g.*, *Ragin*, 923 F.2d at 998, 1002 (rejecting vagueness challenge to a statute banning real estate advertisements that "indicate[] any preference . . . based on race" (quoting 42 U.S.C. § 3604(c)); *VIP of Berlin*, 593 F.3d at 187 (rejecting vagueness challenge to statute regulating businesses with a "substantial or significant portion" of sexually oriented merchandise).

## POINT VI

### THIS COURT SHOULD NOT GRANT PLAINTIFF A PRELIMINARY INJUNCTION

A preliminary injunction is an extraordinary remedy that is never awarded as of right. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain a preliminary injunction against government enforcement of a statute, the movant must demonstrate (1) a likelihood of success on the merits, (2) an imminent risk of irreparable harm absent injunctive relief, and (3) public interest in favor of granting the injunction. *Yang v. Kosinski*, 960 F.3d 119, 127 (2d Cir. 2020).

Plaintiff is not entitled to a preliminary injunction. Plaintiff is unlikely to succeed on the merits of her claims, each of which fails as a matter of law. *See supra*. And for similar reasons, plaintiff does not face

irreparable harm because New York's public accommodations laws do not "directly limit" her speech; rather, any burden on plaintiff's speech is incidental to the regulation of her conduct. *See Bronx Household of Faith v. Board of Educ.*, 331 F.3d 342, 349 (2d Cir. 2003). Finally, the public interest weighs in favor of denying an injunction. Preventing discrimination ensuring gay and lesbian New Yorkers have equal access to goods and services is in the public interest. *See We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 295–96 (2d Cir. 2021) (concluding that State's "compelling interest" in protecting citizens outweighed moving party's difficult choice about whether to violate their beliefs or risk consequences).

At most, if the Court concludes that plaintiff may proceed with any of her claims, it should remand the case to the district court to consider the issue of the preliminary injunction in the first instance. This will give State Defendants an opportunity to submit evidence in support of New York's laws and let the district court weigh that evidence and issue a thorough decision for this Court's review.

# CONCLUSION

For the foregoing reasons, this Court should affirm the district court's decision dismissing the complaint and denying plaintiff's motion for a preliminary injunction as moot.

Dated: Albany, New York
May 9, 2022

Respectfully submitted,

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for State Defendants

By: /s Alexandria Twinem
Alexandria Twinem
Assistant Solicitor General

BARBARA D. UNDERWOOD
  *Solicitor General*
JEFFREY W. LANG
  *Deputy Solicitor General*
ALEXANDRIA TWINEM
  *Assistant Solicitor General*
    *of Counsel*

The Capitol
Albany, New York 12224
(518) 776-2015

71

# ADDENDUM

## New York Executive Law § 292. Definitions.

…

9. The term "place of public accommodation, resort or amusement" shall include, regardless of whether the owner or operator of such place is a state or local government entity or a private individual or entity, except as hereinafter specified, all places included in the meaning of such terms as: inns, taverns, road houses, hotels, motels, whether conducted for the entertainment of transient guests or for the accommodation of those seeking health, recreation or rest, or restaurants, or eating houses, or any place where food is sold for consumption on the premises; buffets, saloons, barrooms, or any store, park or enclosure where spirituous or malt liquors are sold; ice cream parlors, confectionaries, soda fountains, and all stores where ice cream, ice and fruit preparations or their derivatives, or where beverages of any kind are retailed for consumption on the premises; wholesale and retail stores and establishments dealing with goods or services of any kind, dispensaries, clinics, hospitals, bath-houses, swimming pools, laundries and all other cleaning establishments, barber shops, beauty parlors, theatres, motion picture houses, airdromes, roof gardens, music halls, race courses, skating rinks, amusement and recreation parks, trailer camps, resort camps, fairs, bowling alleys, golf courses, gymnasiums, shooting galleries, billiard and pool parlors; garages, all public conveyances operated on land or water or in the air, as well as the stations and terminals thereof; travel or tour advisory services, agencies or bureaus; public halls, public rooms, public elevators, and any public areas of any building or structure. Such term shall not include kindergartens, primary and secondary schools, high schools, academies, colleges and universities, extension courses, and all educational institutions under the supervision of the regents of the state of New York; any such kindergarten, primary and secondary school, academy, college, university, professional school, extension course or other education facility, supported in whole or in part by public funds or by contributions solicited from the general public; or any institution, club or place of accommodation which proves that it is in its nature distinctly

private.   In no event shall an institution, club or place of accommodation be considered in its nature distinctly private if it has more than one hundred members, provides regular meal service and regularly receives payment for dues, fees, use of space, facilities, services, meals or beverages directly or indirectly from or on behalf of a nonmember for the furtherance of trade or business.   An institution, club, or place of accommodation which is not deemed distinctly private pursuant to this subdivision may nevertheless apply such selective criteria as it chooses in the use of its facilities, in evaluating applicants for membership and in the conduct of its activities, so long as such selective criteria do not constitute discriminatory practices under this article or any other provision of law.   For the purposes of this section, a corporation incorporated under the benevolent orders law or described in the benevolent orders law but formed under any other law of this state or a religious corporation incorporated under the education law or the religious corporations law shall be deemed to be in its nature distinctly private.

No institution, club, organization or place of accommodation which sponsors or conducts any amateur athletic contest or sparring exhibition and advertises or bills such contest or exhibition as a New York state championship contest or uses the words "New York state" in its announcements shall be deemed a private exhibition within the meaning of this section.

ADD2

**New York Executive Law § 296. Unlawful discriminatory practices.**

…

2. (a) It shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation, resort or amusement, because of the race, creed, color, national origin, sexual orientation, gender identity or expression, military status, sex, disability or marital status of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof, including the extension of credit, or, directly or indirectly, to publish, circulate, issue, display, post or mail any written or printed communication, notice or advertisement, to the effect that any of the accommodations, advantages, facilities and privileges of any such place shall be refused, withheld from or denied to any person on account of race, creed, color, national origin, sexual orientation, gender identity or expression, military status, sex, disability or marital status, or that the patronage or custom thereat of any person of or purporting to be of any particular race, creed, color, national origin, sexual orientation, gender identity or expression, military status, sex or marital status, or having a disability is unwelcome, objectionable or not acceptable, desired or solicited.

**New York Civil Rights Law § 40-c. Discrimination.**

1. All persons within the jurisdiction of this state shall be entitled to the equal protection of the laws of this state or any subdivision thereof.

2. No person shall, because of race, creed, color, national origin, sex, marital status, sexual orientation, gender identity or expression, or disability, as such term is defined in section two hundred ninety-two of the executive law, be subjected to any discrimination in his or her civil rights, or to any harassment, as defined in section 240.25 of the penal law, in the exercise thereof, by any other person or by any firm, corporation or institution, or by the state or any agency or subdivision of the state.

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Alexandria Twinem, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 13,800 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7).

*/s/ Alexandria Twinem*