# 22-75

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

——— ◆ ◆ ———

EMILEE CARPENTER, LLC, DBA EMILEE
CARPENTER PHOTOGRAPHY, EMILEE CARPENTER,

*Plaintiffs-Appellants,*

—against—

LETICIA JAMES, in her official capacity as Attorney General of New York,
MARIA L. IMPERIAL, in her official capacity as the Acting Commissioner of the
New York State Division of Human Rights, WEEDON WETMORE, in his official
capacity as District Attorney of Chemung County,

*Defendants-Appellees.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

## BRIEF FOR *AMICI CURIAE* ASSOCIATION OF THE BAR OF THE CITY OF NEW YORK, THE LGBT BAR ASSOCIATION OF GREATER NEW YORK (LeGaL), AND THE NEW PRIDE AGENDA IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE

DONALD N. DAVID
ALEXANDER D. NEWMAN
AKERMAN LLP
1251 Avenue of the Americas, 37th Floor
New York, New York 10020
(212) 880-3800

*Counsel for Amici Curiae*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Fed. R. App. P. 26.1, the **Association of the Bar of the City of New York** (a/k/a the New York City Bar Association) certifies that it is a voluntary bar association with no parent corporation or subsidiaries, and no corporation or publicly held entity owns 10% or more of its stock. The New York City Bar Association has one affiliate, the Association of the Bar of the City of New York Fund, Inc.

The **Lesbian and Gay Law Association of Greater New York, Inc.** (a/k/a the LGBT Bar Association of Greater New York) certifies that it is a voluntary bar association with no parent corporation or subsidiaries, and no corporation or publicly held entity owns 10% or more of its stock. The LGBT Bar Association of Greater New York has one affiliate, The Lesbian and Gay Law Association Foundation of Greater New York, Inc.

The **NEW Pride Agenda, Inc.** certifies that is a not-for-profit corporation with no parent corporation or subsidiaries, and no corporation or publicly held entity owns 10% or more of its stock.

# <u>TABLE OF CONTENTS</u>

**Page**

CORPORATE DISCLOSURE STATEMENT...................................................... i

INTERESTS OF *AMICI CURIAE*...................................................1

ARGUMENT SUMMARY...................................................2

ARGUMENT...................................................4

I.   There Is a Long History of Regulating Places of Public
     Accommodation for the Common Good and Expanding Protections,
     Including to the LGBTQ Community, Particularly in New York. ..............4

     A.   The Regulation of Places of Public Accommodation Dates
          Back to Fundamental Common Law Principles..............................5

     B.   New York's Pioneering Human Rights Law Has a Long and
          Evolving History of Protecting Vulnerable Groups.........................9

     C.   The Legislature Has Made It Clear that LGBTQ New Yorkers
          Deserve Protection Under the NYSHRL .....................................13

II.  The NYSHRL Is Vital to Protecting LGBTQ New Yorkers from
     Ongoing Discrimination.........................................................17

III. Introducing an Exception to the NYSHRL Would Expose All New
     Yorkers to Discrimination.....................................................20

     A.   Any Carveout to the NYSHRL Threatens All Protected
          Persons.......................................................................20

     B.   The Vulnerable People Protected by the NYSHRL Would Lose
          Protections in Public Accommodation if Appellants' Argument
          Succeeds.....................................................................22

CONCLUSION.........................................................................24

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*1 Toms Point Lane Corp. v. New York State Div. of Hum. Rts.*,
    176 A.D.3d 930 (2d Dep't 2019) ............................................................. 21

*Bostock v. Clayton Cty., Georgia*,
    140 S. Ct. 1731 (2020) ........................................................................... 14

*Cahill v. Rosa*,
    89 N.Y.2d 14 (1996) ................................................................................. 8

*City of Schenectady v. State Div. of Hum. Rts.*,
    37 N.Y.2d 421 (1975) ............................................................................. 12

*Holland v. Edwards*,
    307 N.Y. 38 (1954) ................................................................................. 12

*JPK Imports/Oneonta, Inc. v. New York State Div. of Hum. Rts.*,
    193 A.D.3d 1230 (3d Dep't 2021) .......................................................... 20

*Li v. New York State Div. of Hum. Rts.*,
    147 A.D.3d 1321 (4th Dep't 2017) ......................................................... 21

*Margerum v. City of Buffalo*,
    24 N.Y.3d 721 (2015) ....................................................................... 10, 12

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*,
    715 F.3d 102 (2d Cir. 2013) ..................................................................... 4

*Munn v. People of State of Illinois*,
    94 U.S. 113 (1876) ............................................................................... 5, 6

*New York Inst. of Tech. v. State Div. of Hum. Rts.*,
    40 N.Y.2d 316 (1976) ............................................................................. 12

Notice and Final Order, *State Div. of Human Rights v. Refrigerated Transportation Solutions, LLC*,
    No. 10152706 (N.Y. Div. Hum. Rts. 2013) ............................................. 21

*Obergefell v. Hodges*,
    576 U.S. 644 (2015) ................................................................ 15

*People v. King*,
    110 N.Y. 418 (1888)................................................. 5, 6, 7, 22

Recommended Findings of Fact, Opinion and Decision, and Order, *State Div. of Human Rights v. City of Niagara Falls*,
    No. 10166975 (N.Y. Div. Hum. Rts. 2015)................................ 21

*U.S. Power Squadrons v. State Hum. Rts. Appeal Bd.*,
    59 N.Y.2d 401 (1983) ................................................................ 8

**Statutes**

N.Y. Civ. Rights Law §§ 40, 40-c .................................................... 9

N.Y. Exec. Law § 290(2) ........................................................... 9, 20

N.Y. Exec. Law § 292(9) ........................................................... 8, 22

N.Y. Exec. Law § 296(2)(a) ............................................................ 4

**Bills and Legislative Materials**

1945 N.Y. Sess. Law ch. 118 § 125.................................................. 9

1952 N.Y. Sess. Law ch. 285 §§ 4, 6 ............................................... 7

1958 N.Y. Sess. Law ch. 738 § 1 ................................................... 12

1960 N.Y. Sess. Law ch. 779 § 1 ..................................................... 7

1962 N.Y. Sess. Law ch. 370 § 1 ..................................................... 8

1965 N.Y. Sess. Law ch. 516 § 1 ................................................... 12

1968 N.Y. Session Law ch. 958 § 2 .................................................. 9

1968 N.Y. Session Law ch. 958 § 4.................................................. 10

1974 N.Y. Sess. Law ch. 988 § 2 ................................................... 12

1975 N.Y. Sess. Law ch. 803 § 291 ................................................ 12

iv

1996 N.Y. Sess. Law ch. 204 § 4 .................................................................. 12

2002 N.Y. Sess. Law ch. 2 § 1 .................................................................... 14

2003 N.Y. Sess. Law ch. 106 §§ 13-19 ........................................................ 12

2005 N.Y. Sess. Law ch. 75 § 2 .................................................................. 12

2009 N.Y. Sess. Law ch. 80 § 1 .................................................................. 12

2011 N.Y. Sess. Law ch. 95 ........................................................................ 15

2019 N.Y. Sess. Law ch. 8 §§ 5-13 ............................................................. 16

N.Y. State Assemb., Memorandum In Support of A.B. 1971, 225th Leg. (2002) . 14

N.Y. State Assemb., Memorandum In Support of A.B. 8354, 234th Leg. (2011) . 15

Transcript of January 15, 2019 Session, N.Y. State Assembly (2019) ........... 16, 17

**Other Authorities**

*Black LGBTQ People and Compounding Discrimination*, HUMAN RIGHTS CAM-
    PAIGN FOUNDATION (2021) ...................................................................... 19

Brad Sears et al., *LGBT People's Experiences of Workplace Discrimination and
    Harassment*, UCLA SCHOOL OF LAW WILLIAMS INSTITUTE (Sept. 2021) ........ 18

David McBride, *Fourteenth Amendment Idealism: The New York State Civil Rights
    Law, 1873-1918*, 71 N.Y. History 207 (1990) ......................................... 6, 7

Diane K. Levy et al., *A Paired-Testing Pilot Study of Housing Discrimination
    against Same-Sex Couples and Transgender Individuals*, URBAN INSTITUTE
    (June 2017) ......................................................................................... 19

Editorial, *Fresh Food for Urban Deserts*, N.Y. TIMES (March 20, 2009) ........... 23

Henry C. Turner, *Tolerance on Trial: How New York's Fair-Employment Law Is
    Working After Eight Months in Operation*, THE AMERICAN MAGAZINE, June
    1946 .................................................................................................... 11

Jaime M. Grant et al., *Injustice at Every Turn: A Report of the National
    Transgender Discrimination Survey*, NATIONAL CENTER FOR TRANSGENDER
    EQUALITY & NATIONAL GAY AND LESBIAN TASK FORCE (2011) ................... 19

Kerith J. Conron et al., *LGBT Adults in Large US Metropolitan Areas*, UCLA SCHOOL OF LAW WILLIAMS INSTITUTE (Mar. 2021) ...................................... 17

Kerith J. Conron & Shoshana K. Goldberg, *LGBT Protections From Discrimination: Employment and Public Accommodations*, UCLA SCHOOL OF LAW WILLIAMS INSTITUTE (June 2019) .................................................................. 18

Logan S. Casey et al., *Discrimination in the United States: Experiences of lesbian, gay, bisexual, transgender, and queer Americans*, 54 HEALTH SERV. RES. 1454 (2019) ............................................................................................. 18, 20

M.H. Morton et al., *Missed Opportunities: Youth Homelessness in America*, CHAPIN HALL AT THE UNIVERSITY OF CHICAGO (2017) ...................................... 19

Michael Gold, *The ABCs of L.G.B.T.Q.I.A.+*, N.Y. TIMES (June 21, 2018) ........... 3

Morroe Berger, *New York State Law Against Discrimination Operation and Administration*, 35 CORNELL L. REV. 747 (1950) ....................................... 10, 11

N.Y. State Bar Ass'n Committee on LGBT People and the Law, *Report of the Special Committee to Study Issues Affecting Same-Sex Couples - 2004* (2004) .................................................................................................. 15

*The New York State Commission Against Discrimination: A New Technique for an Old Problem*, 56 YALE L.J. 837 (1947) ....................................................... 11

Nick Reisman, *How rural New Yorkers face health care challenges*, SPECTRUM NEWS 1 (Feb. 22, 2022) ............................................................................ 23

Office of the New York City Comptroller Scott M. Stringer, Bureau of Policy and Research, *Results of a Survey of LGBTQ New Yorkers* (2017) ...................... 18

Ryan Thoreson, *"You Don't Want Second Best" Anti-LGBT Discrimination in US Health Care*, HUMAN RIGHTS WATCH (2018) ............................................. 23

Sharita Gruberg et al., *The State of the LGBTQ Community in 2020*, CENTER FOR AMERICAN PROGRESS (Oct. 6, 2020) ................................................... 19, 22

Stephen J. Clark *et. al.*, *An Oral History of the Marriage Equality Act in New York*, 5 ALB. GOV'T L. REV. 651 (2012) ........................................................... 16

Susan D. Carle, *How Myth-Busting About the Historical Goals of Civil Rights Activism Can Illuminate Future Paths*, 7 STAN. J. CIV. RTS. & CIV. LIBERTIES 167, 173 (2011)..................................................................................................9

Terry Lichtash, *Ives-Quinn Act - The Law Against Discrimination*, 19 ST. JOHN'S L. REV. 170 (1945)..........................................................................10, 11

## INTERESTS OF *AMICI CURIAE*[1]

The **Association of the Bar of the City of New York** (the "Association"), through its Lesbian, Gay, Bisexual, Transgender and Queer Rights Committee, submits this *amici curiae* brief in support of Defendants-Appellees in this case. The Association is a professional organization of approximately 24,000 attorneys and law students who practice not only in the New York City metropolitan area, but also across the United States and internationally. The Association seeks to promote legal reform and improve the administration of justice through its more than 150 standing and special committees. The Association's Lesbian, Gay, Bisexual, Transgender and Queer Rights Committee addresses legal and policy issues that are of particular concern for gay, lesbian, bisexual, transgender, and queer individuals.

The **Lesbian and Gay Law Association of Greater New York, Inc.** ("LeGaL") was one of the nation's first bar associations of the LGBT legal community and remains one of the largest and most active organizations of its kind in the country. Serving the New York metropolitan area, LeGaL is dedicated to improving the administration of the law, ensuring full equality for members of the LGBT

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E) and Local Rule 29.1(b), *amici* affirm that no party's counsel authored this brief in whole or in part; that no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person—other than the *amici*, their members, or their counsel—contributed money that was intended to fund preparing or submitting this brief. Counsel for all parties have consented to the filing of this brief.

community, and promoting the expertise and advancement of LGBT legal profes-
sionals. LeGaL, whose membership includes attorneys that regularly represent
LGBT individuals in cases of discrimination in public accommodations and else-
where, has a fundamental interest in ensuring that the New York Human Rights
Law's protections extend to all LGBT individuals.

The NEW Pride Agenda, Inc. ("The NEW Pride Agenda") is a New York state
education and advocacy organization whose mission is to advance the economic,
health, racial, and gender identity justice needs of the most marginalized
LGBTQIA+ individuals in the state of New York. The NEW Pride Agenda has ad-
vocated for the passage of the Gender Expression Non-Discrimination Act, which
added gender identity and expression to the State's human rights law, and thus has
an interest in protecting the human rights of LGBTQIA+ New Yorkers.

## ARGUMENT SUMMARY

New York State's pioneering Human Rights Law, N.Y. Exec. Law § 290 *et
seq.* (the "NYSHRL"), protects vulnerable New Yorkers against discrimination and
deprivation of their rights—including discrimination based on, among other things,
race, religion, and sex—in places of public accommodation and elsewhere within
the state. In 2002, the legislature extended the law's protections to prohibit discrim-
ination based on sexual orientation, and expanded it again in 2019 to explicitly add
gender identity and gender expression to the list of protected groups. The expansions

to the law continued a long tradition of broadening the protections of the NYSHRL for the common good of all New Yorkers. *Amici* write to provide this Court with the important history and application of the NYSHRL to demonstrate why the law's protections against discrimination based on sexual orientation—among other categories—are essential.

Allowing exceptions or carveouts to the carefully considered protections passed by the legislature would undermine the law's protections, not only for LGBTQ[2] individuals, but for all groups protected by the law. Once that door is opened, it will be impossible to shut—it would allow business owners to exclude protected groups in all types of establishments, whether wedding vendors, grocery stores, or medical facilities. This Court should not allow such a result, and should therefore affirm the District Court's order and rule in favor of Defendants-Appellees.

---

[2] The first four letters of the acronym LGBTQ stands for "lesbian, gay, bisexual, transgender." The "Q" stands for "queer," "a catchall term" that can be used to both describe one's gender identity and/or their sexual orientation "that has shed its derogatory origins and is gaining acceptance." Michael Gold, *The ABCs of L.G.B.T.Q.I.A.+*, N.Y. TIMES (June 21, 2018), https://www.nytimes.com/2018/06/21/style/lgbtq-gender-language.html. Additional variations on the acronym also exist, generally in order to be more inclusive of the sexuality and gender spectrum. *See id.*

## **ARGUMENT**

I. **There Is a Long History of Regulating Places of Public Accommodation for the Common Good and Expanding Protections, Including to the LGBTQ Community, Particularly in New York.**

There is a long history of regulating places of public accommodation for the common good. The NYSHRL[3] codified some of those common law principles, first in the employment context, and then its protections were expanded to include places of public accommodation. Over time, the legislature has expanded both the definition of "public accommodation"—the areas in which protections are conferred—and the list of protected groups—the people protected. The legislature has repeatedly emphasized expanding protections offered to LGBTQ people, particularly in recent years. This Court cannot create an exception for any one group without undermining the protections of the law for all other protected groups—whether based on sex, religion, race, or other status.

---

[3] As set forth above, the NYSHRL is codified at N.Y. Exec. Law § 290 *et seq.* At issue in this case are particular provisions of the NYSHRL that forbid, generally, discrimination in places of public accommodation based on certain protected classes or publicizing the denial of goods or services at such place of public accommodation based on those protected factors. *See* N.Y. Exec. Law § 296(2)(a). The NYSHRL is not to be confused with the separate but similarly named New York City Human Rights Law, which is not at issue here. The New York City law is construed separately from the New York State law, and often confers even broader protections than the New York State law. *See generally Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 108–09 (2d Cir. 2013).

**A.    The Regulation of Places of Public Accommodation Dates Back to Fundamental Common Law Principles.**

The United States, and New York in particular, have a long history of regulating places of public accommodation to protect the common good. That tradition can be traced back to a common law principle that allows private property to be regulated by the state in order to further a collective interest:

> Looking, then, to the common law, from whence came the right which the Constitution protects, we find that when private property is 'affected with a public interest, it ceases to be *juris privati* only.' . . . When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created.

*Munn v. People of State of Illinois*, 94 U.S. 113, 125–26 (1876) (citation omitted). Originally, common law required common carriers and innkeepers to be open to all without imposing unreasonable conditions. Over time the common law rule has expanded both as to the classes of property subject to such protections and to the persons entitled to rely on such protections. When a service is offered to the public at large, individuals should be able to rely on such an offering without the concern that they will be excluded based on race, religion, or other protected characteristics. *See People v. King*, 110 N.Y. 418, 427 (1888) (public accommodations "are bound to

furnish equal facilities to all, without discrimination, because public policy requires them so to do").[4]

New York's prohibition on discrimination in places of public accommodation has evolved and grown over the years, with deep roots within the state. Even as far back as the 19th century, the New York Court of Appeals held that the common law requirements for innkeepers and common carriers applied to other types of privately held businesses:

> In the judgment of the legislature, the public had an interest to prevent race discrimination between citizens on the part of persons maintaining places of public amusement; and the *quasi* public use to which the owner of such a place devoted his property gives the legislature a right to interfere.

*King,* 110 N.Y. at 428. The court accordingly found that the owners of an ice skating rink—a place of public amusement—had been properly convicted for refusing admission based on customers' race, and rejected a challenge to the civil rights statute under which the owners were convicted. *Id.*; *see also* David McBride, *Fourteenth Amendment Idealism: The New York State Civil Rights Law, 1873–1918*, 71 N.Y. HISTORY 207, 215 (1990). The court rejected the rink owners' argument that the individuals to whom they denied entry could have simply built their own rink. *King,*

---

[4] In *Munn*, for example, the Supreme Court applied this logic to public Chicago grain warehouses. The Supreme Court held the grain warehouses were working for the "common good" just like the "common carrier, or the miller, or the ferryman, or the innkeeper, or the wharfinger, or the baker, or the cartman, or the hackney-coachman," and thus should similarly be subject to regulation. *Munn*, 94 U.S. at 131–32.

110 N.Y. at 419; *see also* McBride, *supra*, at 215. The court's decision was heavily rooted in public policy:

> Both justice and the public interest concur . . . . It is evident that to exclude colored people from places of public resort on account of their race is to fix upon them a brand of inferiority . . . . It is, of course, impossible to enforce social equality by law. But the law in question simply insures to colored citizens the right to admission, on equal terms with others, to public resorts and to equal enjoyment of privileges of a *quasi* public character.

*King*, 110 N.Y. at 426–27. The court made it clear that it is the legislature's prerogative to use the state's police power to regulate private businesses, and such decisions should not easily be set aside:

> [T]he **promotion of the public good is the main purpose for which the police power may be exerted**; and whether, in a given case, it shall be exerted or not, **the legislature is the sole judge, and a law will not be held invalid because, in the judgment of a court, its enactment was inexpedient or unwise**.

*Id.* at 427 (emphasis added).

Although certain protections were afforded to patrons of places of public accommodation in the 19th and early 20th centuries, in 1952 the NYSHRL was modified to explicitly forbid discrimination in a "place of public accommodation, resort or amusement" (as discussed further below). 1952 N.Y. Sess. Law ch. 285 §§ 4, 6. While the definition of "place of public accommodation, resort or amusement" was purposefully limited at first, *see id.* § 4, it was significantly expanded by the legislature over the following years. *See* 1960 N.Y. Sess. Law ch. 779 § 1 (removing

limiting definition and expanding the definition to include a long list of types of locations including, *inter alia*, "any place where food is sold for consumption on the premises" and "retail stores"); 1962 N.Y. Sess. Law ch. 370 § 1 (expanding definition to include, *inter alia*, "retail stores and establishments ***dealing with goods or services of any kind***" (emphasis added)); *see also U.S. Power Squadrons v. State Hum. Rts. Appeal Bd.*, 59 N.Y.2d 401, 410 (1983) (the 1960 change was "a clear indication that the Legislature intended that the definition of place of accommodation should be interpreted broadly"). Accordingly, the NYSHRL's definition of "public accommodation" now generally includes places which "provide services to the public," even if "they may be conducted on private premises and by appointment, [so long as] such places are generally open to all comers." *Cahill v. Rosa*, 89 N.Y.2d 14, 21 (1996) (finding a dentist's office to be a place of public accommodation).

Though broad, the definition of "public accommodation" does exclude, *inter alia*, "any institution, club or place of accommodation which proves that it is in its nature distinctly private." N.Y. Exec. Law § 292(9). A "distinctly private" institution is one which is selective or exclusive in its membership or to whom it offers goods or services, such that it is "not generally held open to the public." *Cahill*, 89 N.Y.2d at 23; *see also U.S. Power Squadrons*, 59 N.Y.2d at 412–15. Thus, the NYSHRL strikes a balance between protecting consumers visiting businesses generally open to all, without burdening those businesses which are truly exclusive.

### B.     New York's Pioneering Human Rights Law Has a Long and Evolving History of Protecting Vulnerable Groups.

The NYSHRL has long protected vulnerable New Yorkers from discrimination.[5] It is "an exercise of the police power of the state for the protection of the public welfare, health and peace of the people of this state, and in fulfillment of the provisions of the constitution of this state concerning civil rights." N.Y. Exec. Law § 290(2).

The NYSHRL was first enacted in 1945 and at the time was called the Ives-Quinn Anti-Discrimination Law.[6] The law was a pioneer, and proclaimed "practices of discrimination against any of its inhabitants because of race, creed, color or national origin are a matter of state concern, that such discrimination threatens not only the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free democratic state." 1945 N.Y. Sess. Law ch. 118 § 125. What is now the NYSHRL is credited as the nation's first state law prohibiting discrimination by private-sector employers. Susan D. Carle, *How Myth-Busting About the Historical Goals of Civil Rights Activism Can Illuminate Future Paths*, 7 STAN. J. CIV.

---

[5] New York's Civil Rights Law also forbids discrimination in places of public accommodation. *See* N.Y. Civ. Rights Law §§ 40, 40-c. However, because the lower court noted that Plaintiffs-Appellants agreed that law was co-extensive with the NYSHRL and did not require a separate analysis, *see* JA 1121, this brief limits its discussion to the NYSHRL.

[6] In 1968 the Ives-Quinn Anti-Discrimination Law was renamed the Human Rights Law. 1968 N.Y. Session Law ch. 958 § 2.

RTS. & CIV. LIBERTIES 167, 173 (2011); *see also Margerum v. City of Buffalo*, 24 N.Y.3d 721, 733–34 (2015) (Rivera, J., concurring in part and dissenting in part).

The law's origins trace back to the recommendations of a World War II-era commission studying and attempting to remedy racially discriminatory practices in war industries; after a precursor to the commission attempted to adjudicate wrongs against individuals one by one, the commission recommended a sweeping law to address the problem more globally. Morroe Berger, *New York State Law Against Discrimination Operation and Administration*, 35 CORNELL L. REV. 747, 748 (1950); *see also* Terry Lichtash, *Ives-Quinn Act—The Law Against Discrimination*, 19 ST. JOHN'S L. REV. 170, 170 (1945). The New York State Temporary Commission Against Discrimination ("Commission Against Discrimination"), as it was then known, issued a report finding that "'discriminations . . . are too serious a menace to democracy to be safely neglected,'" and "'prejudice is the fruit of ignorance.'" Berger, *supra*, at 749 (citation omitted).[7]

There was opposition to the law at the time it was passed. But as the then-Chairman of the Commission Against Discrimination wrote:

> Corporations, big and small, had contended that their business would be ruined. Factory officials declared that passage of the measure would force them to move their plants to other states. Some civic leaders said

---

[7] In 1968 the Commission Against Discrimination was renamed the New York State Division of Human Rights, the name it still holds today. 1968 N.Y. Session Law ch. 958 § 4.

the bill would prohibit new enterprise from settling in the state. Businessmen cited it as another curb on their activities, a new case of government meddling, an impossible attempt to settle a purely moral issue by legislative intervention…. [S]o far, none of these predictions have materialized.

Henry C. Turner, *Tolerance on Trial: How New York's Fair-Employment Law Is Working After Eight Months in Operation*, THE AMERICAN MAGAZINE, June 1946, at 14; *see also The New York State Commission Against Discrimination: A New Technique for an Old Problem*, 56 YALE L.J. 837, 845 (1947) (opponents of the bill argued "it would drive business from that state and that it was totalitarian and communist"); Berger, *supra*, at 766 ("The early fears of opponents of the law have not been realized: industries have not been driven from the state by the law . . . .").

Though the initial iteration of the NYSHRL was limited in its protections and focused on the employment context, it was clear that this was a first step of many towards expanding protections. Lichtash, *supra*, at 172–75 ("[T]he door is left open to further legislation, in the light of experience and future developments . . . . [T]he problem is not merely that of labor, capital, or of any specific minority. It is uniquely common to all who envisage a workable democracy. The commission is charged with the duty of acting in furtherance of the general welfare.").

From the beginning, the protections offered by the NYSHRL were broadly defined. While it was initially limited largely to employment protections, over the years courts have repeatedly rejected attempts to construe it narrowly or to carve out

exceptions. *See New York Inst. of Tech. v. State Div. of Hum. Rts.*, 40 N.Y.2d 316, 324 (1976) ("the Human Rights Law should be liberally construed in order to accomplish its purposes"); *City of Schenectady v. State Div. of Hum. Rts.*, 37 N.Y.2d 421, 428 (1975) ("it is the duty of courts to make sure that the Human Rights Law works and that the intent of the Legislature is not thwarted by a combination of strict construction of the statute and a battle with semantics"); *Holland v. Edwards*, 307 N.Y. 38, 43–46 (1954) ("[T]he legislature created the Commission Against Discrimination to effectuate its declared policy of combating the practice of discrimination on the basis of race, creed, color or national origin, as a threat to our democratic institutions . . . . The commission . . . 'has wide discretion in its choice of a remedy . . . .'" (citation omitted)).

Over time, the legislature has expanded the NYSHRL's coverage to protect New Yorkers from discrimination in various contexts on the basis of, *inter alia*, age (1958 N.Y. Sess. Law ch. 738 § 1), sex (1965 N.Y. Sess. Law ch. 516 § 1), disability (1974 N.Y. Sess. Law ch. 988 § 2), marital status (1975 N.Y. Sess. Law ch. 803 § 291), predisposing genetic characteristics (1996 N.Y. Sess. Law ch. 204 § 4; 2005 N.Y. Sess. Law ch. 75 § 2), military status (2003 N.Y. Sess. Law ch. 106 §§ 13–19), and domestic violence victim status (2009 N.Y. Sess. Law ch. 80 § 1). *See also Margerum*, 24 N.Y.3d at 734 (Rivera, J., concurring in part and dissenting in part)

("Over time the legislature expanded the law's coverage to provide maximum protection to New Yorkers . . . .").

## C. The Legislature Has Made It Clear that LGBTQ New Yorkers Deserve Protection Under the NYSHRL

In 2002, more than 50 years after the enactment of what is now the NYSHRL, the legislature extended its protections (and those of other laws) to LGB[8] New Yorkers in the Sexual Orientation Non-Discrimination Act ("SONDA"). The legislative findings in support of that bill are notable and expansive, recognizing the underlying societal need to protect all against discrimination:

> The legislature reaffirms that the state has the responsibility to act to assure that every individual within this state is afforded an equal opportunity to enjoy a full and productive life, and that the failure to provide such equal opportunity, whether because of discrimination, prejudice, intolerance or inadequate education, training, housing or health care not only threatens the rights and proper privileges of its inhabitants, but menaces the institutions and foundation of a free democratic state and threatens the peace, order, health, safety and general welfare of the state and its inhabitants.

> The legislature further finds that many residents of this state have encountered prejudice on account of their sexual orientation, and that this prejudice has severely limited or actually prevented access to employment, housing and other basic necessities of life, leading to deprivation and suffering. The legislature further recognizes that this prejudice has fostered a general climate of hostility and distrust, leading in some instances to physical violence against those perceived to be homosexual or bisexual.

---

[8] The law did not explicitly add protections for people who are transgender—the "T" in LGBT—or gender-nonconforming people. As discussed below, protections for those groups were explicitly added in a separate law several years later.

2002 N.Y. Sess. Law ch. 2 § 1.

The justification posed by that bill's drafters in their sponsor's memorandum states, in relevant part:

> Discrimination based on sexual orientation is widespread and commonplace throughout the State of New York despite our best efforts to eliminate it. These efforts are hampered substantially because the State's laws do not prohibit discrimination based on sexual orientation. It exists -- both directly and indirectly -- in employment, in housing, in public accommodations and services . . . . This bill now continues our vigorous pursuit for equal treatment of all New Yorkers. The most distinctive aspect of discrimination based on sexual orientation is a resulting all-pervasive climate of fear within which gay and lesbian New Yorkers are forced to lead their lives. The State has a moral obligation to do all it can to help dispel this climate. A marked improvement in this climate would not only benefit the lives of lesbian and gay New Yorkers; it would also improve the quality of life for all citizens of the State.

N.Y. State Assemb., Memorandum In Support of A.B. 1971, 225th Leg. (2002).[9]

SONDA added "sexual orientation"—defined as "heterosexuality, homosexuality, bisexuality or asexuality, whether actual or perceived"—to the NYSHRL's list of protected classes against which discrimination was forbidden in public accommodations and other settings.[10] 2002 N.Y. Sess. Law ch. 2 § 1.

---

[9] *Available at* https://nyassembly.gov/leg/?default_fld=&leg_video=&bn=A01971&term=2001&Summary=Y&Actions=Y&Floor%26nbspVotes=Y&Memo=Y&Text=Y.

[10] Arguably the existing prohibition on sex-based discrimination also covered discrimination based on sexual orientation or gender identity: "[I]t is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1741 (2020). But SONDA and subsequent laws, as discussed below,

The passage of SONDA was the culmination of a multi-decade journey during which many local jurisdictions within New York had passed bans on discrimination based on sexual orientation given the lack of statewide (or federal) protections. *See* N.Y. State Bar Ass'n Committee on LGBT People and the Law, *Report of the Special Committee to Study Issues Affecting Same-Sex Couples – 2004*, 243–44 (2004), https://nysba.org/app/uploads/2020/01/Same-SexIssuesReport2004.pdf.

Since SONDA's passage the legislature has continued to expand the rights granted to LGBTQ New Yorkers. For example, in 2011, it passed the landmark Marriage Equality Act, which expanded the right to marry to same-sex couples in New York. The Marriage Equality Act came four years before the Supreme Court's decision in *Obergefell* expanded that right nationwide. 2011 N.Y. Sess. Law ch. 95; *Obergefell v. Hodges*, 576 U.S. 644 (2015).[11] As the sponsor's statement in support of the bill noted, "For more than two centuries, New York has stood at the forefront in advancing equal rights for all - from hosting the women's rights convention at Seneca Falls, to breaking baseball's color barrier, to starting the modern 'gay rights

---

removed any doubt about the intention of the New York legislature well before *Bostock*.

[11] In that decision the Supreme Court noted the harm in excluding same-sex couples from an institution such as marriage: "exclusion from that status has the effect of teaching that gays and lesbians are unequal in important respects. It demeans gays and lesbians for the State to lock them out of a central institution of the Nation's society." *Obergefell*, 576 U.S. at 670.

movement' in New York City four decades ago." N.Y. State Assemb., Memorandum In Support of A.B. 8354, 234th Leg. (2011).[12] *See also* Stephen J. Clark *et. al.*, *An Oral History of the Marriage Equality Act in New York*, 5 ALB. GOV'T L. REV. 651, 659 (2012) ("The right to be treated equally in all respects under the law is a principle embodied through all parts of the bill and explicitly recognized in the findings.").

In 2019, the legislature passed the Gender Expression Non-Discrimination Act ("GENDA"), which added explicit protections for transgender and gender-non-conforming New Yorkers (to the extent they were not already protected by prohibitions on sex-based discrimination), including by explicitly adding gender identity and expression to the list of categories protected by the NYSHRL. 2019 N.Y. Sess. Law ch. 8 §§ 5–13. In passing GENDA, the legislature again:

> [R]eaffirm[ed] that the state has the responsibility to act to assure that every individual within this state is afforded an equal opportunity to enjoy a full and productive life, and that the failure to provide such equal opportunity . . . menaces the institutions and foundation of a free democratic state and threatens the peace, order, health, safety and general welfare of the state and its inhabitants.

*Id.* § 1. In the legislative discussion prior to passing the bill, multiple sponsors noted the importance of the dignity that bills like GENDA and the NYSHRL's protections

---

[12] *Available at* https://nyassembly.gov/leg/?default_fld=&leg_video=&bn=A08354&term=2011&Summary=Y&Memo=Y.

confer. *See* Transcript of January 15, 2019 Session, N.Y. State Assembly 45 (2019)[13] ("Because every human being has dignity. Every human being with that dignity deserves full equality, justice and an opportunity to succeed."); *id.* at 47; *id.* at 49–50 ("[F]or folks who think that there's something wrong with allowing people to have that dignity, I'm going to pray. Because I think that everybody deserves dignity.").

There can be no question that the legislature has repeatedly shown that it is in this state's interest to protect LGBTQ New Yorkers and prohibit discrimination against them. New York has been on the forefront of protecting LGBTQ New Yorkers and other vulnerable groups, and this Court should not second-guess the legislature and set back that effort.

## II. The NYSHRL Is Vital to Protecting LGBTQ New Yorkers from Ongoing Discrimination.

New York is home to the largest concentration of LGBT people in the country, with over 700,000 living in the New York City area alone, and more than 100,000 living elsewhere in the state.[14] Though LGBTQ rights have advanced significantly in recent decades, the LGBTQ population remains vulnerable and subject to

---

[13] *Available at* https://www2.assembly.state.ny.us/write/upload/transcripts/2019/1-15-19.pdf.

[14] *See* Kerith J. Conron et al., *LGBT Adults in Large US Metropolitan Areas*, UCLA SCHOOL OF LAW WILLIAMS INSTITUTE (Mar. 2021), https://williamsinstitute.law.ucla.edu/wp-content/uploads/MSA-LGBT-Ranking-Mar-2021.pdf. The survey did not measure queer respondents, so the broader LGBT*Q* population may be even higher. *Id.* at 7.

significant discrimination, even in states like New York which have relatively strong safeguards and which explicitly provide protections against discrimination based on sexual orientation and gender identity.[15]

A 2017 survey of LGBTQ New York City residents found that almost 50% reported being denied equal treatment or services or having been harassed in public spaces based on their LGBTQ status, including in retail stores, restaurants, and healthcare settings.[16] That figure was significantly higher, at 70%, for transgender or gender-nonconforming New York City residents. More broadly, LGBTQ individuals still disproportionately report discrimination in employment,[17] healthcare,[18] and

---

[15] Many states do not have such protections. Of an estimated 13 million LGBT people aged 13 and over living in the United States, approximately 6.9 million live in states without explicit statutory protections in areas of public accommodation. Kerith J. Conron & Shoshana K. Goldberg, *LGBT Protections From Discrimination: Employment and Public Accommodations*, UCLA SCHOOL OF LAW WILLIAMS INSTITUTE (June 2019), https://williamsinstitute.law.ucla.edu/wp-content/uploads/LGBT-ND-Statutes-Empl-PA-Jun-2019.pdf.

[16] Office of the New York City Comptroller Scott M. Stringer, Bureau of Policy and Research, *Results of a Survey of LGBTQ New Yorkers* (2017), https://comptroller.nyc.gov/wp-content/uploads/documents/Results_of_a_Survey_of_LGBTQ.pdf.

[17] Brad Sears et al., *LGBT People's Experiences of Workplace Discrimination and Harassment*, UCLA SCHOOL OF LAW WILLIAMS INSTITUTE 1 (Sept. 2021), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Workplace-Discrimination-Sep-2021.pdf ("Over 40% of LGBT workers (45.5%) reported experiencing unfair treatment at work . . . because of their sexual orientation or gender identity at some point in their lives . . . . [N]early one-third (31.1%) of LGBT respondents reported that they experienced discrimination or harassment within the past five years.").

[18] Logan S. Casey et al., *Discrimination in the United States: Experiences of lesbian, gay, bisexual, transgender, and queer Americans*, 54 HEALTH SERV. RES. 1454

housing,[19] among other areas. The rates of discrimination are typically even higher for transgender people and Black LGBTQ individuals.[20]

In addition to the invidious, direct impact of discrimination itself, the threat of such discrimination has a chilling effect that causes LGBTQ people to forego essential services based on the mere risk of mistreatment based on their sexuality or gender identity. For example, a 2020 survey found that one-fifth of LGBTQ people have avoided traveling, doctors' offices, and other activities or services in order to avoid facing discrimination. *See* Sharita Gruberg et al., *The State of the LGBTQ Community in 2020*, CENTER FOR AMERICAN PROGRESS (Oct. 6, 2020),

---

(2019), https://onlinelibrary.wiley.com/doi/10.1111/1475-6773.13229 ("16 percent of LGBTQ adults reported discrimination in health care encounters").

[19] Diane K. Levy et al., *A Paired-Testing Pilot Study of Housing Discrimination against Same-Sex Couples and Transgender Individuals*, URBAN INSTITUTE (June 2017), https://www.urban.org/sites/default/files/publication/91486/2017.06.27_hds_lgt_final_report_report_finalized_0.pdf (gay men and transgender people are less likely to be shown rental units by landlords, and gay men are charged higher average costs); M.H. Morton et al., *Missed Opportunities: Youth Homelessness in America*, CHAPIN HALL AT THE UNIVERSITY OF CHICAGO 13 (2017), https://voicesofyouthcount.org/wp-content/uploads/2017/11/VoYC-National-Estimates-Brief-Chapin-Hall-2017.pdf ("Lesbian, gay, bisexual, and transgender (LGBT) youth had a 120% increased risk of experiencing homelessness compared to youth who identified as heterosexual and cisgender.").

[20] *See Black LGBTQ People and Compounding Discrimination*, HUMAN RIGHTS CAMPAIGN FOUNDATION (2021), https://hrc-prod-requests.s3-us-west-2.amazonaws.com/Black-LGBTQ-Survey.pdf; Jaime M. Grant et al., *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey*, NATIONAL CENTER FOR TRANSGENDER EQUALITY & NATIONAL GAY AND LESBIAN TASK FORCE (2011), https://transequality.org/sites/default/files/docs/resources/NTDS_Report.pdf.

https://www.americanprogress.org/article/state-lgbtq-community-2020. *See also* Casey et al., *supra* ("More than one in six LGBTQ adults also reported avoiding health care due to anticipated discrimination (18 percent), including 22 percent of transgender adults . . . .").

## III. Introducing an Exception to the NYSHRL Would Expose All New Yorkers to Discrimination.

### A. Any Carveout to the NYSHRL Threatens All Protected Persons.

LGBTQ New Yorkers are not the only ones threatened by a carveout to the NYSHRL. Nothing in Plaintiffs-Appellants' argument is specific to the LGBTQ population or the wedding vendor or photography businesses—any carveout would apply to *any* protected persons and to *any* place of public accommodation and would decimate the law's protections for *everyone*. Just as with the LGBTQ population, other protected persons—whether based on sex, religion, or race—could face re-newed discrimination without recourse, and a limitation on their ability to access goods or services in places of public accommodation.

In the spirit of the NYSHRL's purpose of "protection of the public welfare, health and peace of the people of this state," N.Y. Exec. Law § 290(2), a multitude of vulnerable people have sought the protection of the law. People with disabilities have used the NYSHRL to seek reasonable accommodations in employment and housing. *See, e.g.*, *JPK Imports/Oneonta, Inc. v. New York State Div. of Hum. Rts.*, 193 A.D.3d 1230 (3d Dep't 2021) (employee fired the day he informed employer he

may need surgery); *1 Toms Point Lane Corp. v. New York State Div. of Hum. Rts.*, 176 A.D.3d 930 (2d Dep't 2019) (landlord denied permission for tenant with disability to keep an emotional support animal). The NYSHRL has been used to protect against discrimination based on familial status for individuals with children. *Li v. New York State Div. of Hum. Rts.*, 147 A.D.3d 1321 (4th Dep't 2017). It has protected employees from discrimination based on age. Recommended Findings of Fact, Opinion and Decision, and Order, *State Div. of Human Rights v. City of Niagara Falls*, No. 10166975 (N.Y. Div. Hum. Rts. 2015).[21] And employees have used the NYSHRL to address race-based discrimination. Notice and Final Order, *State Div. of Human Rights v. Refrigerated Transportation Solutions, LLC*, No. 10152706 (N.Y. Div. Hum. Rts. 2013).[22] All of these protections and more are in danger if courts, including this Court, allow providers of public accommodations to evade the safeguards conferred by the legislature.

The NYSHRL is an essential tool to protect equal access to a vast array of public accommodations for numerous minority individuals. Any special exemption or carveout will undermine the careful balance struck by the legislature and runs the

---

[21] *Available at* https://dhr.ny.gov/sites/default/files/pdf/Commissioners-Orders/ ormsby_v_niagara_falls.pdf.

[22] *Available at* https://dhr.ny.gov/sites/default/files/pdf/Commissioners-Orders/ jones_v_refrigerated_transportation_solutions_et.pdf.

risk of harming all vulnerable people, including but not limited to those of various religious faiths.

**B.** **The Vulnerable People Protected by the NYSHRL Would Lose Protections in Public Accommodation if Appellants' Argument Succeeds.**

Carving out exceptions to the NYSHRL would endanger New Yorkers' ability to access places of public accommodations—including virtually every restaurant, store, medical facility, entertainment venue, and more—which are open to the general public. *See generally* N.Y. Exec. Law § 292(9). In addition to the concrete, physical harms this would cause, as the New York Court of Appeals noted, to exclude people from places of public accommodation based on their protected characteristics "is to fix upon them a brand of inferiority." *King,* 110 N.Y. at 426.

For example, a survey of LGBTQ people found that approximately one-third stated that it would be very difficult or impossible to find alternative housing or daycare, and approximately one-fifth said it would be very difficult or impossible to find alternative hospitals, therapists, or—notably—wedding vendors if they were denied service.[23]

As one professor of psychology reported to Human Rights Watch: "'And therapists, counselors, and psychotherapists, it's not like every town has one, like a fire station. People might be 40 miles, 50 miles, from the nearest therapist who takes

---

[23] *See* Gruberg et al., *supra.*

their health insurance . . . .'"[24] People in rural areas, particularly in upstate New York, can face greater challenges in accessing resources like health care and even grocery stores.[25] Even in more urban areas, residents may not have multiple options for services; a 2009 estimate placed 750,000 New York City residents in "food deserts," where full-service grocery stores are out of reach.[26] The additional hurdle of having to find a someone willing to serve any given minority group would only exacerbate the scarcity of such resources, and could effectively place them out of the reach of vulnerable New Yorkers.

It is not a stretch to imagine that if an exception is made to the laws and policies protecting LGBTQ people in this case, any business owner who wishes to exclude any group of people could find a sincerely held belief to justify excluding customers from a grocery store or doctor's office. A wedding photography business should be held to the same standard—a refusal of services imposes both dignitary and more concrete harm—but regardless this Court should not allow the nature of

---

[24] Ryan Thoreson, *"You Don't Want Second Best" Anti-LGBT Discrimination in US Health Care*, HUMAN RIGHTS WATCH (2018), https://www.hrw.org/report/2018/07/23/you-dont-want-second-best/anti-lgbt-discrimination-us-health-care.

[25] Nick Reisman, *How rural New Yorkers face health care challenges*, SPECTRUM NEWS 1 (Feb. 22, 2022), https://spectrumlocalnews.com/nys/central-ny/ny-state-of-politics/2022/02/22/how-rural-new-yorkers-face-health-care-challenges.

[26] Editorial, *Fresh Food for Urban Deserts*, N.Y. TIMES (March 20, 2009), https://www.nytimes.com/2009/03/21/opinion/21sat4.html.

the business to open the door for a new permitted avenue of discrimination for **all** commercial businesses.

## **CONCLUSION**

For the foregoing reasons, this Court should affirm the District Court's order and rule in favor of Defendants-Appellees.

Respectfully submitted,

Dated:  May 16, 2022          AKERMAN LLP
              New York, New York

By: */s/ Donald N. David*
Donald N. David
Alexander D. Newman
1251 Avenue of the Americas
37th Floor
New York, New York 10020
(212) 880-3800

*Attorneys for Amici Curiae*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Second Circuit Local Rules 29.1(c) and 32.1(a)(4) because this brief contains 5,923 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font.

Dated: May 16, 2022
      New York, New York        */s/ Donald N. David*
                                       Donald N. David

                                       *Attorneys for Amici Curiae*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused the foregoing document to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the Court's CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished through the CM/ECF system.

Dated: May 16, 2022
       New York, New York       */s/ Donald N. David*
                               Donald N. David

                               *Attorneys for Amici Curiae*