# No. 22-75

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

EMILEE CARPENTER, LLC d/b/a Emilee Carpenter Photography and EMILEE
CARPENTER,

*Plaintiffs-Appellants,*

v.

LETITIA JAMES, in her official capacity as Attorney General of New York;
MARIA L. IMPERIAL, in her official capacity as Acting Director of the New York
State Division of Human Rights; and WEEDON WETMORE, in his official
capacity as District Attorney of Chemung County,

*Defendants-Appellees.*

On Appeal from the United States District Court for the Western District of New
York, Case No. 6:21-cv-06303

**BRIEF OF AMICI CURIAE MASSACHUSETTS, CALIFORNIA,
CONNECTICUT, DELAWARE, THE DISTRICT OF COLUMBIA,
HAWAIʻI, ILLINOIS, MAINE, MARYLAND, MICHIGAN, MINNESOTA,
NEVADA, NEW JERSEY, NEW MEXICO, NORTH CAROLINA, OREGON,
PENNSYLVANIA, RHODE ISLAND, VERMONT, AND WASHINGTON IN
SUPPORT OF DEFENDANTS-APPELLEES**

MAURA HEALEY
  *Attorney General*
  *Commonwealth of Massachusetts*
Elizabeth N. Dewar
  *State Solicitor*
Adam M. Cambier*
  *Assistant Attorney General*
One Ashburton Place
Boston, MA 02108
adam.cambier@mass.gov
(617) 963-2278
  *Counsel of Record*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

INTERESTS OF AMICI............................................................................................1

ARGUMENT ............................................................................................................2

I.  State laws that require public accommodations to serve all comers aim to combat the history of discrimination against LGBTQ Americans in public life.  ................................................................................................................2

    A.  LGBTQ Americans are a historically disadvantaged group. ................3

    B.  States prohibit discrimination against LGBTQ people in public accommodations to prevent severe economic, personal, and social harms. ...........................................................................................5

II.  The First Amendment does not exempt businesses open to the public from state anti-discrimination laws. .......................................................................10

    A.  State public accommodations laws do not violate the Free Speech Clause when applied to businesses that object to serving LGBTQ customers. ........................................................12

    B.  State public accommodations laws do not violate the Free Exercise Clause. ........................................................................24

III.  A First Amendment exemption to public accommodations laws of the kind sought by Appellants would dramatically undermine anti-discrimination laws.  ..........................................................................................................27

CONCLUSION .......................................................................................................29

CERTIFICATE OF SERVICE ...............................................................................32

CERTIFICATE OF COMPLIANCE ......................................................................32

ADDENDUM .........................................................................................................33

Table A: State Laws ...............................................................................................33

Table B: Local Laws ..............................................................................................35

Table C: Discriminatory Advertising Laws.............................................................42

# TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis*,
    6 F.4th 1160 (10th Cir. 2021) ................................................................20, 22

*Anderson v. Treadwell*,
    294 F.3d 453 (2d Cir. 2002) ..........................................................................18

*Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*,
    481 U.S. 537 (1987) ................................................................................. 19-22

*Bostock v. Clayton County, Georgia*,
    140 S. Ct. 1731 (2020) ...............................................................................8, 11

*Burt v. Gates*,
    502 F.3d 183 (2d Cir. 2007) ..........................................................................13

*Burwell v. Hobby Lobby Stores, Inc.*,
    573 U.S. 682 (2014) ......................................................................................21

*Cervelli v. Aloha Bed & Breakfast*,
    415 P.3d 919 (Haw. Ct. App. 2018) ..............................................................20

*Christian Legal Soc. v. U.C. Hastings*,
    561 U.S. 661 (2010) ................................................................................11, 19

*City Council of Los Angeles v. Taxpayers for Vincent*,
    466 U.S. 789 (1984) ........................................................................................9

*Daniel v. Paul*,
    395 U.S. 298 (1969) ........................................................................................6

*Elane Photography, LLC v. Willock*,
    309 P.3d 53 (N.M. 2013) ...............................................................................17

*Employment Div. v. Smith*,
    494 U.S. 872 (1990) ......................................................................................25

*Fulton v. City of Philadelphia,*
    141 S. Ct. 1868 (2021) ..............................................................3, 26

*Gay Rights Coal. of Georgetown Univ. Law Ctr. v. Georgetown
    Univ.,*
    536 A.2d 1 (D.C. 1987) .................................................................20

*Giboney v. Empire Storage & Ice Co.,*
    336 U.S. 490 (1949).....................................................................15

*Gifford v. McCarthy,*
    137 A.D.3d 30 (N.Y. App. Div. 2016) ..........................................20

*Goodpaster v. City of Indianapolis,*
    736 F.3d 1060 (7th Cir. 2013) ......................................................16

*Goodridge v. Dep't of Pub. Health,*
    798 N.E.2d 941 (Mass. 2003).........................................................3

*Heart of Atlanta Motel, Inc. v. United States,*
    379 U.S. 241 (1964).............................................. 3, 5-7, 22, 24

*Holcomb v. Iona Coll.,*
    521 F.3d 130 (2d Cir. 2008) .........................................................11

*Hurley v. Irish American Gay, Lesbian & Bisexual Group of
    Boston,*
    515 U.S. 557 (1995)........................................................15, 16, 27

*Int'l Bhd. of Teamsters v. United States,*
    431 U.S. 324 (1977).....................................................................18

*Katzenbach v. McClung,*
    379 U.S. 294 (1964).................................................................12, 24

*Lawrence v. Texas,*
    539 U.S. 558 (2003) .....................................................................11

iv

*Lombard v. Louisiana*,
   373 U.S. 267 (1963)...................................................................................7

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*,
   138 S. Ct. 1719 (2018).................................... 3, 6, 7, 20-22, 25, 29

*N. Coast Women's Care Med. Grp., Inc. v. San Diego Cty. Super.
   Ct.*,
   189 P.3d 959 (Cal. 2008) .............................................................20

*Obergefell v. Hodges*,
   576 U.S. 644 (2015).................................................................3, 22

*Pittsburgh Press Co. v. Human Relations Comm'n*,
   413 U.S. 376 (1973).......................................................................17

*Pruneyard Shopping Ctr. v. Robins*,
   447 U.S. 74 (1980)........................................................................15

*Ragin v. New York Times Co.*,
   923 F.2d 995 (2d Cir. 1991) ...................................................10, 19

*Roberts v. United States Jaycees*,
   468 U.S. 609 (1984)........................................2, 5, 6, 9, 16, 19-22, 24

*Romer v. Evans*,
   517 U.S. 620 (1996).....................................................................2, 22

*Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*,
   547 U.S. 47 (2006)..................................................... 13-16, 18, 19

*Snyder v. Phelps*,
   562 U.S. 443 (2011)........................................................................28

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011).......................................................................18

*Soules v. Dep't of Hous. & Urb. Dev.*,
   967 F.2d 817 (2d Cir. 1992) .......................................................19

*State v. Arlene's Flowers, Inc.*,
   441 P.3d 1203 (Wash. 2019) ..........................................................................24

*Telescope Media Grp. v. Lucero*,
   936 F.3d 740 (8th Cir. 2019) ................................................................. 18-19

*Wooley v. Maynard*,
   430 U.S. 705 (1977)......................................................................................15

*Zarda v. Altitude Express, Inc.*,
   883 F.3d 100 (2d Cir. 2018) ........................................................................11

**Constitutional Provisions, Statutes, and Rules**

U.S. Const. amend. 1 ..........................................................................*passim*

42 U.S.C. § 3604 ..........................................................................................10

42 U.S.C. § 2000e-3 ......................................................................................10

Act Forbidding Unjust Discrimination on Account of Color or
   Race,
   1865 Mass. Acts, ch. 277 (May 16, 1865).....................................................7

Mass. Gen. Laws ch. 272, § 92A ...............................................................10

Mont. Code Ann. § 49-2-304(1)(b)..............................................................10

N.Y. Exec. Law § 296.2(a) ...................................................................10, 26

N.Y. Sexual Orientation Non-Discrimination Act of 2002, ch.
   2, § 1 .............................................................................................................8

Or. Rev. Stat. § 659A.409..........................................................................10

Va. Code § 2.2-3904 ...................................................................................10

Florida Commission on Human Relations, *Notice: Sexual Discrimination* (2021) ......................................................................8

**Miscellaneous**

Center for the Study of Inequality, Cornell University, What Does the Scholarly Research Say About the Effects of Discrimination on the Health of LGBT People?, What We Know Project (2019) ..................................................................4

*The Economist/YouGov Poll* (Mar. 10-13, 2018) ..................................28

Tim Fitzsimons, *Nearly 1 in 5 Hate Crimes Motivated by Anti-LGBTQ Bias, FBI Finds*, NBC News (Nov. 12, 2019) ..................................4

Mark L. Hatzenbuehler, *Structural Stigma: Research Evidence and Implications for Psychological Science*, 71 Am. Psychologist 742 (2016) ..................................................................5

Mark L. Hatzenbuehler, *The Social Environment and Suicide Attempts in Lesbian, Gay, and Bisexual Youth*, 127 Pediatrics 896 (2011) ..................................................................5

Mark L. Hatzenbuehler et al., *State-Level Policies and Psychiatric Morbidity in Lesbian, Gay, and Bisexual Populations*, 99 Am. J. Pub. Health 2275 (2009) ..................................................................5

Christy Mallory & Brad Sears, *Refusing to Serve LGBT People: An Empirical Assessment of Complaints Filed under State Public Accommodations Non-Discrimination Laws*, 8 J. Res. Gender Stud. 106 (2018) ..................................................................4

Christy Mallory & Brad Sears, *LGBT Discrimination, Subnational Public Policy, and Law in the United States*, in Oxford Research Encyclopedia of Politics 1 (2020) ..................................................................4

Tasseli McKay et al., *Understanding (and Acting On) 20 Years of Research on Violence and LGBTQ + Communities*, 20 Trauma, Violence, & Abuse 665 (2019) ..................................................................4

Julia Raifman et al., *Association of State Laws Permitting Denial of Services to Same-Sex Couples with Mental Distress in Sexual Minority Adults: A Difference-in-Difference-in-Differences Analysis*, 75 JAMA Psychiatry 671 (2018) ......................................................5

Julia Raifman et al., *Difference-in-Differences Analysis of the Association Between State Same-Sex Marriage Policies and Adolescent Suicide Attempts*, 171 JAMA Pediatrics 350 (2017)....................................................................................................5

Brief for Appellees, *Katzenbach v. McClung*, No. 543, 1964 WL 81100 (U.S. Oct. 2, 1964)................................................................24

*Reuters/Ipsos/UVA Center for Politics Race Poll* (Sept. 11, 2017) ......................28

## INTERESTS OF AMICI

The *Amici* States—Massachusetts, California, Connecticut, Delaware, the District of Columbia, Hawaiʻi, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont and Washington—file this brief pursuant to Fed. R. App. P. 29(a)(2) because we share sovereign and compelling interests in protecting our residents and visitors from discrimination. Like New York, we support civil rights protections for LGBTQ people, including prohibitions on discrimination in places of public accommodation: the diners, stores, and other businesses that are part of daily life in a free society. Such public accommodations laws respond to the pervasive discrimination LGBTQ people have long suffered and continue to suffer today, ensuring equal enjoyment of goods and services and combatting the severe personal, economic, and social harms caused by discrimination.

The *Amici* States also share interests in upholding the rights protected by the First Amendment. We respect and do not seek to abridge the right to hold and express views regarding the nature of marriage, including views founded in religious faith. But neither the Free Speech Clause nor the Free Exercise Clause shields businesses from content-neutral, generally applicable civil rights laws like the one Emilee Carpenter, LLC (together with its proprietor, Ms. Emilee Carpenter, "Emilee Carpenter Photography") proposes to violate.

1

Exempting businesses from public accommodations laws on the basis of the First Amendment would undermine the vital benefits these laws provide to residents and visitors. Many Americans would face exclusion from a host of everyday businesses or, at the very least, face the ever-present threat that any business owner could refuse to serve them when they walk in the door—simply because of their sexual orientation, or their race, religion, or sex.

The *Amici* States therefore join New York in supporting affirmance of the decision below dismissing Emilee Carpenter Photography's complaint and declining to enter a preliminary injunction.

## ARGUMENT

**I. State laws that require public accommodations to serve all comers aim to combat the history of discrimination against LGBTQ Americans in public life.**

The States have sovereign and compelling interests in protecting their residents, and particularly members of historically disadvantaged groups, from the economic, personal, and social harms caused by invidious discrimination. *See Roberts v. United States Jaycees*, 468 U.S. 609, 624 (1984). Since the mid-nineteenth century, statutes focused on places of public accommodation have been a centerpiece of state efforts to combat discrimination. *See Romer v. Evans*, 517 U.S. 620, 627-28 (1996). These statutes have long been held constitutional as

applied to a range of public accommodations, including commercial businesses. *See, e.g.*, *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 260 (1964).

Because "'[o]ur society has come to the recognition that gay persons and gay couples cannot be treated as social outcasts or as inferior in dignity and worth'" and because this "interest is a weighty one," many States and other jurisdictions throughout the country expressly protect LGBTQ people from discrimination in places of public accommodation. *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1882 (2021) (quoting *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1727 (2018)); *see* Addendum Tables A and B, *infra* (collecting laws). These statutes recognize and work to redress the discrimination that LGBTQ Americans continue to face.

## A. LGBTQ Americans are a historically disadvantaged group.

LGBTQ Americans have faced a long history of invidious discrimination—including legally sanctioned discrimination. *See Obergefell v. Hodges*, 576 U.S. 644, 660-61, 673-74, 677-78 (2015); *Goodridge v. Dep't of Pub. Health*, 798 N.E.2d 941, 967-68 (Mass. 2003). For much of this country's history, LGBTQ people were fired from their jobs, evicted from their homes, targeted by police, and denied service by businesses simply because of their "distinct identity." *Obergefell*, 576 U.S. at 660.

Discrimination against LGBTQ people is a severe and continuing problem. LGBTQ Americans are still much more likely to be bullied, harassed, and attacked in hate crimes than their non-LGBTQ peers.[1] LGBTQ people also report overt discrimination, particularly in the form of denial of service by businesses, at rates comparable to, or greater than, those for other historically disadvantaged groups.[2]

This continuing discrimination harms the health and well-being of LGBTQ people, their families, and their communities. A large and growing body of evidence shows that discriminatory social conditions have severe negative health impacts on LGBTQ people, including increased rates of mental health disorders and suicide attempts, especially for LGBTQ youth.[3] Notably, these outcomes are

---

[1]    *See* Tasseli McKay et al., *Understanding (and Acting On) 20 Years of Research on Violence and LGBTQ + Communities*, 20 Trauma, Violence, & Abuse 665, 669-70 (2019); Tim Fitzsimons, *Nearly 1 in 5 Hate Crimes Motivated by Anti-LGBTQ Bias, FBI Finds*, NBC News (Nov. 12, 2019), https://www.nbcnews.com/feature/nbc-out/nearly-1-5-hate-crimes-motivated-anti-lgbtq-bias-fbi-n1080891.

[2]    *See* Christy Mallory & Brad Sears, *Refusing to Serve LGBT People: An Empirical Assessment of Complaints Filed under State Public Accommodations Non-Discrimination Laws*, 8 J. Res. Gender Stud. 106, 113-16 (2018); Christy Mallory & Brad Sears, *LGBT Discrimination, Subnational Public Policy, and Law in the United States*, *in* Oxford Research Encyclopedia of Politics 1, 2-8 (2020), https://oxfordre.com/politics/view/10.1093/acrefore/9780190228637.001.0001/acrefore-9780190228637-e-1200?rskey=tI5wxr&result=7.

[3]    Ctr. for the Study of Inequality, Cornell University, *What Does the Scholarly Research Say About the Effects of Discrimination on the Health of LGBT People?*, What We Know Project (2019), https://whatweknow.inequality.cornell.edu/topics/lgbt-equality/what-does-scholarly-research-say-about-the-effects-of-

(footnote continued)

4

less severe and not as pervasive in communities that provide LGBTQ people with legal protection against discrimination, including in public accommodations.[4]

## B. States prohibit discrimination against LGBTQ people in public accommodations to prevent severe economic, personal, and social harms.

Discrimination by places of public accommodation causes unique and severe economic, personal, and social harms. It denies equal access to important goods and services and, by segregating the market, has a well-established "substantial and harmful effect" on the economy. *Heart of Atlanta*, 379 U.S. at 258 (acknowledging broad impacts of seemingly local discrimination); *see also Roberts*, 468 U.S. at 625-26. Such discrimination also stigmatizes its victims, causing them intense dignitary injuries, and encourages social fragmentation and

---

discrimination-on-the-health-of-lgbt-people/ (detailing findings from 300 peer-reviewed studies); *see also, e.g.*, Julia Raifman et al., *Association of State Laws Permitting Denial of Services to Same-Sex Couples with Mental Distress in Sexual Minority Adults: A Difference-in-Difference-in-Differences Analysis*, 75 JAMA Psychiatry 671, 673-75 (2018); Julia Raifman et al., *Difference-in-Differences Analysis of the Association Between State Same-Sex Marriage Policies and Adolescent Suicide Attempts*, 171 JAMA Pediatrics 350, 353-55 (2017); Mark L. Hatzenbuehler, *Structural Stigma: Research Evidence and Implications for Psychological Science*, 71 Am. Psychologist 742, 745-46 (2016); Mark L. Hatzenbuehler, *The Social Environment and Suicide Attempts in Lesbian, Gay, and Bisexual Youth*, 127 Pediatrics 896, 899-901 (2011); Mark L. Hatzenbuehler et al., *State-Level Policies and Psychiatric Morbidity in Lesbian, Gay, and Bisexual Populations*, 99 Am. J. Pub. Health 2275, 2277-78 (2009).

[4]      *See* Raifman et al. (2018), *supra* n.3; Raifman et al. (2017), *supra* n.3; Hatzenbuehler et al., *supra* n.3.

conflict. *See Roberts*, 468 U.S. at 625-26; *Daniel v. Paul*, 395 U.S. 298, 306 (1969); *Heart of Atlanta*, 379 U.S. at 250; *see also Masterpiece*, 138 S. Ct. at 1727 (allowing wedding service providers to refuse to provide goods and services to same-sex couples would create "a community-wide stigma inconsistent with the history and dynamics of civil rights laws").

As the Supreme Court has long recognized, "no action is more contrary to the spirit of our democracy and Constitution—or more rightfully resented by a . . . citizen who seeks only equal treatment"—than a denial of equal service by a business "ostensibly open to the general public." *Daniel*, 395 U.S. at 306-08 (quotations omitted); *see also Heart of Atlanta*, 379 U.S. at 292 (Goldberg, J., concurring) ("Discrimination is not simply dollars and cents, hamburgers and movies; it is the humiliation, frustration, and embarrassment that a person must surely feel when he is told that he is unacceptable as a member of the public because of his race or color." (quoting S. Rep. No. 88-872, at 16 (1964)). Accordingly, the Supreme Court has instructed the lower courts to resolve public accommodations cases "without subjecting gay persons to indignities when they seek goods and services in an open market." *Masterpiece*, 138 S. Ct. at 1732.

The American legal and political system has long recognized the importance of public accommodations being open to all. Modern statutes codify and expand upon a common law doctrine, dating back at least to the sixteenth century, that

6

generally required public accommodations to serve all customers. *See Heart of Atlanta*, 379 U.S. at 261 (recognizing that such statutes "codify the common-law innkeeper rule"); *see also, e.g.*, *Lombard v. Louisiana*, 373 U.S. 267, 275-77 & n.6 (1963) (Douglas, J., concurring) (collecting references dating back to 1558). States began enacting public accommodations statutes in 1865 to prohibit discrimination against African Americans. *See* Act Forbidding Unjust Discrimination on Account of Color or Race, 1865 Mass. Acts, ch. 277 (May 16, 1865). Although there is some variation across the States, "public accommodations" laws generally guarantee that when customers enter a business that has opened its doors to the public, they will not be denied service simply because of the color of their skin, their sex, their disability, or—under many state and local laws—their sexual orientation.

A majority of Americans now live in communities that "carr[y] forward [this] tradition," *Masterpiece*, 138 S. Ct. at 1725, by prohibiting places of public accommodation from discriminating on the basis of sexual orientation. Twenty-two States and the District of Columbia have laws expressly protecting their residents against discrimination in public accommodations on the basis of sexual orientation. *See* Addendum Table A, *infra*.[5] These state-level protections are

---

[5] In addition to these twenty-three jurisdictions, in Florida, the State's Commission on Human Relations announced last year that, based on the Supreme

(footnote continued)

supplemented by local laws and ordinances enacted by hundreds of cities, towns, and counties across the country. *See* Addendum Table B, *infra* (collecting citations to roughly 100 local laws and ordinances in the States that do not have statewide laws protecting against discrimination in public accommodations based on sexual orientation). All told, according to U.S. Census Bureau data, the number of Americans living in jurisdictions that have such statewide or local protections is over 189 million (or 57.6% of the national population). *See* Addendum Tables A & B, *infra*.

These laws—including the New York statute at issue before this Court— recognize the strong evidence of discrimination against LGBTQ people. As New York's Legislature found in extending the State's antidiscrimination protections, prejudice on account of sexual orientation "has severely limited or actually prevented access to employment, housing and other basic necessities of life, leading to deprivation and suffering," and has "fostered a general climate of hostility and distrust, leading in some instances to physical violence." N.Y. Sexual Orientation Non-Discrimination Act of 2002, ch. 2, § 1. And such public accommodations laws ban the very "acts of . . . discrimination" that "cause [the]

---

Court's decision in *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731 (2020), the Commission will interpret the prohibition of discrimination on the basis of sex in Florida's public accommodations law to prohibit discrimination on the basis of sexual orientation. *See* Florida Commission on Human Relations, *Notice: Sexual Discrimination* (2021), https://fchr.myflorida.com/sexual-discrimination.

unique evils that government has a compelling interest to prevent," thereby

"'respond[ing] precisely to the substantive problem which legitimately concerns'

the State[.]" *Roberts*, 468 U.S. at 628-29 (quoting *City Council of Los Angeles v.*

*Taxpayers for Vincent*, 466 U.S. 789, 810 (1984)) (describing gender

discrimination).

In conjunction with bans on acts of discrimination, state public

accommodations laws commonly also prohibit posting notices and advertisements

that indicate that services will be denied on the basis of a protected characteristic.

At least twenty-three States and the District of Columbia expressly prohibit such

discriminatory advertising by public accommodations. *See* Addendum Table C,

*infra*. Twenty of those laws include terms similar to New York's provision

making it unlawful for public accommodations "to publish, circulate, issue,

display, post or mail any written or printed communication, notice or

advertisement, to the effect that any of the accommodations, advantages, facilities

and privileges of such place shall be refused, withheld from or denied to any

person on account of . . . sexual orientation" or "that the patronage or custom

threat of any person of or purporting to be of any particular . . . sexual

orientation . . . is unwelcome, objectionable or not acceptable, desired or solicited."

N.Y. Exec. Law § 296.2(a).[6]  Prohibitions against discriminatory advertising are

also commonly included in anti-discrimination measures directed at housing and

employment.  *See, e.g.*, 42 U.S.C. § 3604 (barring housing advertising that

"indicates any preference, limitation, or discrimination based on" a protected

characteristic); 42 U.S.C. § 2000e-3(b) (similar prohibition for employment

advertisements).  The States and federal government, recognizing that

advertisements themselves may serve as the means by which businesses turn away

customers, have thus prohibited such advertisements in order to prevent the

resulting harms from discrimination.

## II.    The First Amendment does not exempt businesses open to the public from state anti-discrimination laws.

There is no real dispute that Emilee Carpenter Photography's stated intent to

refuse services to LGBTQ customers would violate New York's anti-

discrimination law:  The company "offers, solicits, and receives inquiries for

engagement and wedding-photography services from the general public and

---

[6]    Of the list of twenty-four laws included in Table C, *infra*, only four States' public accommodations laws do not use similar "unwelcome" terms.  *See* Mass. Gen. Laws ch. 272, § 92A; Mont. Code Ann. § 49-2-304(1)(b); Or. Rev. Stat. § 659A.409; Va. Code § 2.2-3904.  As recognized by the district court, JA1158, Emilee Carpenter Photography's vagueness challenge to this prohibition fails for the simple reason that its proposed conduct plainly violates the law's terms—which in any case are of a kind long recognized as readily understandable by ordinary people.  *See, e.g.*, *Ragin v. New York Times Co.*, 923 F.2d 995, 1002 (2d Cir. 1991) (rejecting vagueness challenge to similar Fair Housing Act provision).

provides these services to the general public," JA0026 (¶ 32), while categorically refusing to "provide wedding photography which . . . promotes or celebrates any engagements, weddings, or marriages not between one man and one woman, such as same-sex . . . engagements or marriages," JA0035 (¶ 117). An objection to two people of the same sex marrying cannot reasonably be divorced from the status of being LGBTQ. *See Bostock v. Clayton County*, 140 S. Ct. 1731, 1741-42 (2020); *Christian Legal Soc. v. U.C. Hastings*, 561 U.S. 661, 689 (2010); *Lawrence v. Texas*, 539 U.S. 558, 583 (2003); *Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 125-27 (2d Cir. 2018); *cf. Holcomb v. Iona Coll.*, 521 F.3d 130, 138-39 (2d Cir. 2008) (recognizing that "where an employee is subjected to adverse action because an employer disapproves of interracial [marriage], the employee suffers discrimination because of the employee's own race"). Nor is it a defense to provide photography services to LGBTQ parents or planners associated with opposite-sex weddings, to LGBTQ models staging an opposite-sex wedding for a photoshoot, or to LGBTQ clients of Emilee Carpenter Photography's branding photography business, when the business will not provide service to same-sex weddings. *Cf.* Appellants' Br. 19; *Mem. Law Supp. Pls.' Prelim. Inj. Mot.*, No. 21-cv-6303, Dkt. 3-1 at 13-14 (W.D.N.Y. Apr. 6, 2021) (hereinafter "Pls.' PI Mem."). Public accommodations laws exist to prevent not only outright exclusion, but also separate and unequal treatment. Otherwise, our country would be blighted by

11

segregated businesses that serve in perniciously unequal ways, reserving some services only for customers who are members of preferred groups. *See Katzenbach v. McClung*, 379 U.S. 294, 296-97 (1964) (discussing restaurant that served African American customers through a take-out window but refused to serve them in the dining area).

The First Amendment does not require permitting such unequal treatment by businesses that offer their services to the public. No matter the sincerity of a business owner's religious beliefs or other deeply held views, the Free Speech Clause does not allow a business to pick and choose its customers in violation of laws that prohibit discriminatory conduct. Nor does the Free Exercise Clause excuse a business from complying with neutral and generally applicable civil rights laws based on its owner's religious beliefs.

### A. State public accommodations laws do not violate the Free Speech Clause when applied to businesses that object to serving LGBTQ customers.

The application of New York's content- and viewpoint-neutral public accommodations law to prevent a commercial business from denying the full and equal enjoyment of its services to LGBTQ customers does not violate the Free Speech Clause of the First Amendment.

### 1. Prohibiting businesses from discriminating against customers does not compel speech.

Although the First Amendment prohibits States from "telling people what they must say" or requiring them to "speak the government's message," *Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47, 61, 63 (2006) ("*FAIR*"), public accommodations statutes like New York's do neither.

Indeed, New York's public accommodations law does not regulate speech at all. In *FAIR*, the Supreme Court held that a prohibition on law schools discriminating against military recruiters when providing campus access to outside employers regulated "conduct, not speech": "It affects what law schools must *do*—afford equal access to military recruiters—not what they may or may not *say*." *Id*. at 60; *see also, e.g.*, *Burt v. Gates*, 502 F.3d 183, 191-92 (2d Cir. 2007) (because Solomon Amendment regulates conduct, it does not interfere with First Amendment right to academic freedom). That reasoning applies equally to this case. State anti-discrimination laws like New York's affect what public accommodations "must *do*"—provide equal access to LGBTQ people—"not what they may or may not *say*." *FAIR*, 547 U.S. at 60. In other words, New York's law does not require speaking or endorsing a government motto, pledge, or message. *See id.* at 62. Rather, the law simply requires businesses to "afford equal access" to the full range of their services to LGBTQ couples. *Id.* at 60.

13

Moreover, even assuming that wedding photography is a form of speech, New York law does not "compel" wedding photography or blog posts, nor does it regulate the process of wedding photography in any particular way. Emilee Carpenter Photography is under no legal obligation to offer wedding photography or blog posts as a service of its broader photography business, *see* JA0026 (¶¶ 36-39) (noting that Emilee Carpenter Photography also offers branding photography services), nor to take photographs or post those photographs on the business's website in any specific manner. And nothing in New York law comes close to compelling Ms. Carpenter—or the caterer, or the florist, or the musical accompanist—to join with invited guests of a wedding to "follow[] the officiant's instructions" or "'act as a witness' of the union 'before God,'" Appellants' Br. 42, nor to "sing[] and engage[] with . . . prayers" or otherwise practice religion, when attending the weddings she photographs in her professional capacity as part of her business. Pls.' PI Mem. 20 (claiming, in connection with Free Exercise and Establishment Clause arguments, that Plaintiffs "must also participate in same-sex weddings in the same ways she does for opposite sex weddings"); JA0030 (¶ 71). New York law simply requires that businesses offering their services to the public make wedding photography available for LGBTQ customers if, and to the extent that, they provide wedding photography for other customers. *See FAIR*, 547 U.S. at 61-62 (law requiring schools to post written notice of military recruiter visits

was "only 'compelled' if, and to the extent, the school" chose to assist "other recruiters" and was, in any event, "incidental to the [law's] regulation of conduct"). This type of non-discrimination requirement is a "far cry" from laws "dictat[ing] the content of . . . speech." *Id.* (distinguishing cases like *Wooley v. Maynard*, 430 U.S. 705 (1977)). As the *FAIR* Court noted with an example also apposite here, "prohibit[ing] employers from discriminating in hiring on the basis of race" does not compel speech, and "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Id.* (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)).

What is more, public accommodations laws also leave businesses like Emilee Carpenter Photography free to disclaim any message they worry may be communicated by providing non-discriminatory service. So long as businesses treat all customers equally, they may, for example, create and disseminate a disclaimer stating that the provision of a service does not constitute an endorsement or approval of any customer or conduct. *See FAIR*, 547 U.S. at 64-65; *Pruneyard Shopping Ctr. v. Robins*, 447 U.S. 74, 86-88 (1980).

This doctrine also lays bare why Emilee Carpenter Photography is wrong to rely on *Hurley v. Irish American Gay, Lesbian & Bisexual Group of Boston*, 515

U.S. 557 (1995), in arguing that New York's public accommodations law unlawfully compels its speech. *See, e.g.*, Appellants' Br. 25, 45-46. Its argument relies on the premise that a commercial business's refusal to serve customers from a historically disadvantaged group should receive the same First Amendment protection afforded to private, non-commercial organizations engaged in expressive associational activities at the core of the First Amendment's protections. But, as the district court rightly recognized, JA1142-1146, this premise elides the fundamental distinction between a private speaker sharing its *own* message and a public accommodation that offers services to the general public. While *Hurley* noted that "business corporations generally" enjoy a speaker's "autonomy to choose the content of his *own* message," and that a private parade organizer may "customar[ily] determin[e]" which expressive units it wishes to present, 515 U.S. at 573-75 (emphasis added), *Hurley* nowhere suggested that a business that offers as a service to the general public the creation of a product could refuse to provide the service to customers on the basis of their sexual orientation, nor that laws requiring such service compel any form of speech. *See FAIR*, 547 U.S. at 63 ("The expressive nature of a parade was central to our holding in *Hurley*."). Rather, just as a commercial business has no protected expressive interest in its relationship with its customers, *see Roberts*, 468 U.S. at 638 (O'Connor, J., concurring); *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1073 (7th Cir. 2013), a

16

business offering services to the general public does not have the right to express a message by offering only a subset of its services to clients of particular sexual orientations, *see Elane Photography, LLC v. Willock*, 309 P.3d 53, 68 (N.M. 2013) ("While photography may be expressive, the operation of a photography business is not."). Similarly, such a business is not unlawfully compelled to speak when it is required to offer those clients all of its services on equal footing. *See id.*

### 2. The First Amendment does not protect advertisements giving notice that public accommodations will refuse service on the basis of a protected characteristic.

Public accommodations laws' restrictions on discriminatory advertising do not violate the free speech rights of business owners who wish to post notices of their intent to deny services on the basis of a protected characteristic. *See* JA0051 (¶¶ 229-232) (describing intent to add policy statement to operating agreement "bind[ing] Emilee Carpenter Photography to not photograph same-sex weddings"); JA0053-54 (¶¶ 246-252) (describing intent to post statement to website "explaining her religious reasons for why she only promotes marriages between one man and one woman"). Such advertisements may be prohibited for at least two reasons.

First, to the extent the notices constitute commercial speech, they can be banned outright simply because they advertise unlawful, discriminatory activities. *See Pittsburgh Press Co. v. Hum. Rels. Comm'n*, 413 U.S. 376, 388-89 (1973) (employment discrimination ordinance validly prohibited newspaper from

publishing sex-segregated employment advertisements); *see also Anderson v. Treadwell*, 294 F.3d 453, 460 (2d Cir. 2002) ("Even a communication combining commercial and noncommercial elements, if it is an advertisement . . . is properly characterized as commercial speech.").

Second, commercial speech doctrine aside, a State may prohibit such signs as part and parcel of, and incidental to, the public accommodations law's restriction on discriminatory conduct. Such laws in essence prohibit discriminatory refusals of service that are communicated preemptively in a notice, rather than only after service is requested by the customer. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) ("That is why a ban on race-based hiring may require employers to remove 'White Applicants Only' signs." (quoting *FAIR*, 547 U.S. at 62) (internal quotation marks omitted)); *cf. Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365 (1977) ("If an employer should announce his policy of discrimination by a sign reading 'Whites Only' on the hiring-office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs."). Indeed, even some of the case law Emilee Carpenter Photography itself cites on this very point, *see* Appellants' Br. 36, recognizes that, insofar as a State can constitutionally prohibit a discriminatory refusal to provide services, the State can also "forbid the [business owners] from advertising their intent to engage in discriminatory conduct." *Telescope Media*

18

*Grp. v. Lucero*, 936 F.3d 740, 757 n.5 (8th Cir. 2019) (citing *FAIR*, 547 U.S. at

62). Accordingly, courts have repeatedly held that, even in contexts like

newspapers that are widely understood to be protected, discriminatory advertising

is not entitled to First Amendment protection. *See, e.g.*, *Soules v. Dep't of Hous. &*

*Urb. Dev.*, 967 F.2d 817, 824 (2d Cir. 1992); *Ragin v. New York Times Co.*, 923

F.2d 995, 1003 (2d Cir. 1991).

### 3. Public accommodations laws like New York's satisfy any level of constitutional scrutiny.

For all the reasons above, New York's neutral and generally applicable

statute regulates conduct and commercial speech, and therefore is not subject to

strict scrutiny.[7] The law would, however, survive even strict scrutiny. As the

Supreme Court has found time and again, "public accommodations laws 'plainly

serv[e] compelling state interests of the highest order.'" *Bd. of Dirs. of Rotary Int'l*

*v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987) (quoting *Roberts*, 468 U.S. at

624).

---

[7]     Emilee Carpenter Photography's contention that New York's statute is somehow *not* viewpoint-neutral, *see* Appellants' Br. 31-36, defies both common sense and decades of precedent. *See, e.g.*, *Christian Legal Soc.*, 561 U.S. at 695 ("all-comers requirement" is "textbook viewpoint neutral"); *see also* Part II.B, *infra*, at 24-27 (explaining why New York's law is neutral for free exercise purposes).

        **a.**      **States have a compelling interest in eliminating sexual orientation discrimination in public accommodations.**

States have a "compelling interest of the highest order" in eradicating invidious discrimination against historically marginalized groups, *Duarte*, 481 U.S. at 549 (quoting *Roberts*, 468 U.S. at 624)—including LGBTQ persons. *See Masterpiece*, 138 S. Ct. at 1727 ("The exercise of their freedom on terms equal to others must be given great weight and respect by the courts."). Courts across the country, including in New York, have recognized as much. *See, e.g.*, *303 Creative LLC v. Elenis*, 6 F.4th 1160, 1178 (10th Cir. 2021), *cert. granted in part*, 142 S. Ct. 1106 (Feb. 22, 2022); *Cervelli v. Aloha Bed & Breakfast*, 415 P.3d 919, 931, 935 (Haw. Ct. App. 2018); *Gifford v. McCarthy*, 137 A.D.3d 30, 40 (N.Y. App. Div. 2016); *N. Coast Women's Care Med. Grp., Inc. v. San Diego Cnty. Super. Ct.*, 189 P.3d 959, 968 (Cal. 2008); *Gay Rights Coal. of Georgetown Univ. Law Ctr. v. Georgetown Univ.*, 536 A.2d 1, 31-37 (D.C. 1987).

As discussed above, LGBTQ Americans continue to suffer severe and pervasive discrimination in employment, housing, and places of public accommodation, among other facets of their everyday lives. *See* Part I, *supra*, at 2-5 & nn.1-4. And research bears out the terrible injuries this discrimination inflicts on LGBTQ people, their families, and their communities—not only lost employment or housing, but also severe harms to their health and wellbeing. *See* Part I, *supra*, at 2-5 & nn.1-4. Emilee Carpenter Photography asserts here that

20

refusals of service on the basis of sexual orientation are not an "actual problem" in light of the existence of other photographers who will provide services for same-sex weddings. Appellants' Br. 51-52. But in many less populated regions of this country, including large swaths of the Amici States, an LGBTQ couple that wishes to wed will not have a wide array of choices when selecting photographers, caterers, florists, and other professionals who service weddings. And the Supreme Court has long recognized the significant harm caused by such discrimination on its own, as well as the States' concomitant compelling interests in preventing these harms. *See, e.g.*, *Masterpiece*, 138 S. Ct. at 1728-29; *Duarte*, 481 U.S. at 549.

> **b.** **Public accommodations laws are narrowly tailored to serve the States' compelling interest in combatting discrimination.**

Just as employment discrimination laws are "precisely tailored" to advance a state interest in providing "equal opportunity to participate in the workforce," *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 733 (2014), public accommodations laws like New York's are precisely tailored to advance a state interest in ensuring equal access to the businesses that sustain our everyday life. *See Roberts*, 468 U.S. at 628. New York's law is therefore constitutional.

Public accommodations laws directly combat the economic, personal, and social harms caused by discrimination. By guaranteeing full and equal access to the commercial marketplace, these laws ensure that LGBTQ residents are not

denied—or forced to overcome artificial barriers to acquire—"tangible goods and services." *Id.* at 625-26; *see also Romer*, 517 U.S. at 631 ("[T]hese are protections against exclusion from an almost limitless number of transactions and endeavors that constitute ordinary civic life."); *303 Creative LLC*, 6 F.4th at 1179-80. Public accommodations laws also provide protection from the "stigmatizing injury" and "deprivation of personal dignity" that necessarily "accompanies denials of equal access to public establishments." *Roberts*, 468 U.S. at 625 (quoting *Heart of Atlanta*, 379 U.S. at 250); *see Masterpiece*, 138 S. Ct. at 1727, 1729, 1732. By ensuring that such public establishments are indeed open to the entire public, these laws foster not only the economic, but also the social and political integration of residents. *Roberts*, 468 U.S. at 625-26. In so doing, these laws deliver many benefits, including counteracting the negative health effects caused by stigmatization and social exclusion, *see supra* nn.3-4. In short, New York's law and its analogues across the country serve to vindicate the "equal dignity" of LGBTQ people. *Obergefell*, 576 U.S. at 681.

Given these "compelling state interests of the highest order" directly served by public accommodations laws, they are constitutional, including when applied to business owners who would discriminate based on their personal views or religious beliefs. *Duarte*, 481 U.S. at 549 (quoting *Roberts*, 468 U.S. at 624). Emilee Carpenter Photography's suggestion that the potential LGBTQ customers it wishes

22

to turn away can simply hire other wedding photographers, *see* Appellants' Br. 52, ignores this central animating purpose of anti-discrimination laws: to ensure that people will *not* be turned away from a business on account of their race, sex, religion, or sexual orientation. And its "just go elsewhere" argument would hearken back to the days when Black travelers relied on the "Negro Motorist Green Book" to find accommodations that would serve them while on the road, thus reinforcing the kind of social disintegration and economic balkanization that public accommodations laws like New York's are intended to combat.

For the same reason, the examples of further tailoring that Emilee Carpenter Photography proposes, Appellants' Br. 48-49, would not achieve New York's goal of ensuring access to public accommodations free from discrimination. Exceptions for businesses like those at issue here would not constitute better tailoring; rather, they would frustrate the law's very purpose. To take one example, Emilee Carpenter Photography proposes that New York limit its public accommodations law to "exclude expressive businesses." *Id.* But this ill-defined restriction removes from the scope of the law's protections countless businesses that could conceivably be deemed "expressive"—including architects, sign makers, hairdressers, make-up artists, chefs, and more. Exempting businesses like these from public accommodations laws leaves LGBTQ people (and Black people, and Jews, and women, and myriad other protected groups) vulnerable to discrimination

23

across the marketplace.  Laws like New York's effectively ensure equal access and combat discrimination's harms only when they comprehensively cover places open to the public; States cannot both combat discrimination and, at the same time, license businesses to discriminate.  *See State v. Arlene's Flowers, Inc.*, 441 P.3d 1203, 1235 (Wash. 2019) ("carv[ing] out a patchwork of exceptions for ostensibly justified discrimination" would "fatally undermine[]" this interest).

Accordingly, for well over a century, courts have upheld the constitutionality of public accommodations laws against challenges by businesses seeking to discriminate based on personal convictions.  *See, e.g.*, *McClung*, 379 U.S. at 298 n.1 (rejecting argument that restaurant could discriminate against African Americans based on "personal convictions and . . . choice of associates," as argued in the Brief for Appellees, No. 543, 1964 WL 81100, at *32-33 (U.S. Oct. 2, 1964)).  The Supreme Court has long decried discrimination in public establishments as a "unique evil" entitled to "no constitutional protection," *Roberts*, 468 U.S. at 628-29, and has described state laws prohibiting such discrimination as "unquestionab[ly]" constitutional, *Heart of Atlanta*, 379 U.S. at 260-61.  So too here.

### B.  State public accommodations laws do not violate the Free Exercise Clause.

Prohibiting a business from refusing to provide wedding photography services to LGBTQ customers also does not violate the Free Exercise Clause.

24

The Free Exercise Clause does not excuse businesses from complying with neutral laws of general applicability, including public accommodations laws like New York's. *Employment Div. v. Smith*, 494 U.S. 872, 879 (1990); *Masterpiece*, 138 S. Ct. at 1727 (While a person's "religious and philosophical objections are protected, it is a general rule that such objections do not allow business owners and other actors in the economy and in society to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations law."). For free exercise purposes, a law is neutral and generally applicable if it does not target religion and "prohibit[s] conduct the State is free to regulate." *Smith*, 494 U.S. at 878-79.

There is no merit to Emilee Carpenter Photography's contention that New York's public accommodations law, as a whole, is not generally applicable because of the existence of individualized exemptions. Appellants' Br. 38. The business fails to identify any such exemption from the law forbidding discrimination on the basis of sexual orientation and instead points only to limited, specifically defined exemptions from the protections New York's public accommodations law extends to *other* protected classes. *See id.* at 38, 40 (discussing exemptions concerning sex and disability protections).[8] But the existence of carefully calibrated exemptions to

---

[8] Emilee Carpenter Photography also points to exemptions it says allow "non-religious legitimate and nondiscriminatory reason[s] for declining a request."

(footnote continued)

other legal protections does not change the fact that no such exemption exists for the particular antidiscrimination provision Emilee Carpenter Photography seeks to violate—fatally undermining its contention that the specific provision it challenges before this Court is not generally applicable. *Cf. Fulton*, 141 S. Ct. at 1878 (noting that the inclusion of individualized exemptions in the particular regulatory section at issue rendered it not generally applicable). The law forbids *all* public accommodations in New York from discriminating on the basis of sexual orientation.

Ultimately, nothing in New York's public accommodations law targets religious belief; the law instead prohibits businesses from refusing to serve potential customers, or denying any person the full and equal enjoyment of their services, "because of" certain characteristics, like their race, sex, or sexual orientation. N.Y. Exec. Law § 296.2(a) (emphasis added). Whether a person's desire to discriminate on the basis of sexual orientation is grounded in religious or secular reasons, the law treats it the same: A business that refuses to provide a service for same-sex couples that it would provide to other customers violates the

---

Appellants' Br. 38 (citing JA0060 (¶ 291)). But as New York pointed out below, this mischaracterizes the record: The cases Emilee Carpenter Photography cites as reflecting an "exemption" in fact found that no discrimination had taken place at all, such that the public accommodations law was simply not implicated. Dkt. 26 at 23.

law. Because New York's law is neutral and generally applicable, Emilee

Carpenter Photography's Free Exercise claim should be rejected.

## III. A First Amendment exemption to public accommodations laws of the kind sought by Appellants would dramatically undermine anti-discrimination laws.

Although the claim here on its face relates to just one photography business,

the consequences of ruling in its favor would have far broader consequences for

our States' public accommodations laws, our residents, and our society.

As discussed above, *supra* at 23-24, Emilee Carpenter Photography offers

no principled basis for distinguishing a photography business from myriad other

businesses that may seek to claim an exemption from public accommodations

laws. An architect, sign-maker, hairdresser, make-up artist, chef: Each is engaged

in a business that its operator may view as involving "expressive" activity. Indeed,

there is no reason that Emilee Carpenter Photography's sweeping view of *Hurley*,

*see* Appellants' Br. 25, 45-46, would be limited to its category of "expressive"

businesses, as opposed to other businesses that offer services with potentially

expressive aspects—like a hotel ballroom that posts custom signs to announce its

events. Under Emilee Carpenter Photography's view of *Hurley*'s reach, LGBTQ

people could be exposed to discrimination in a broad swath of the commercial

marketplace, particularly when attempting to exercise their fundamental right to

marry or to celebrate other important life events.

27

Moreover, the free-speech exemption sought here would not be limited to opposition to marriage between same-sex couples. Under this theory, for example, a baker opposed to mixed-race relationships could refuse to bake wedding cakes for interracial couples, or a real estate agent opposed to racial integration could refuse to represent non-white couples in real estate negotiations. It remains a sad fact of American society that such views remain disturbingly prevalent.[9] And the discrimination that would be permitted by this exemption sweeps even broader still: A photographer who believes women should not work outside the house could refuse to provide his services at a party celebrating a woman's graduation from law school, or an atheist funeral director could refuse to host funerals that included overtly religious speeches. Although the First Amendment tolerates all manner of odious speech in the public square, *see, e.g.*, *Snyder v. Phelps*, 562 U.S. 443 (2011), it does not require insulating from liability businesses that violate

---

[9]     *See, e.g.*, *Reuters/Ipsos/UVA Center for Politics Race Poll* (Sept. 11, 2017), http://www.centerforpolitics.org/crystalball/wp-content/uploads/2017/09/2017-Reuters-UVA-Ipsos-Race-Poll-9-11-2017.pdf (showing 16% of U.S. adults—*i.e.*, approximately 35 million people—agree that "[m]arriage should only be allowed between people of the same race," and 5% of adults—*i.e.*, approximately 12 million people—disagree that "[p]eople of different races should be free to live wherever they choose"); *The Economist/YouGov Poll* (Mar. 10-13, 2018), https://d25d2506sfb94s.cloudfront.net/cumulus_uploads/document/y3tke5cxwy/econTabReport.pdf (stating that 17% of U.S. adults believe that interracial marriage is "morally wrong").

content-neutral laws by turning away customers because of their race, religion, sex, or sexual orientation.

This Court should heed the Supreme Court's instruction to ensure that LGBTQ persons are not subjected "to indignities when they seek goods and services in an open market." *Masterpiece*, 138 S. Ct. at 1732. The States must be permitted to preserve their residents' social and economic well-being and protect all within their borders from the manifest harms of discrimination.

## CONCLUSION

For the foregoing reasons, this Court should affirm the judgment below.

Respectfully submitted,

MAURA HEALEY
  *Attorney General*
  *Commonwealth of Massachusetts*
Elizabeth N. Dewar
  *State Solicitor*
Adam M. Cambier*
  *Assistant Attorney General*
One Ashburton Place
Boston, MA 02108
adam.cambier@mass.gov
(617) 963-2278
      *\*Counsel of Record*

ROBERT BONTA
*Attorney General of California*
1300 I Street
Sacramento, CA 95814

WILLIAM TONG
*Attorney General of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
*Attorney General of Delaware*
820 North French Street
Wilmington, DE 19801

KARL A. RACINE
*Attorney General for the District of Columbia*
400 6th Street NW, Suite 8100
Washington, D.C. 20001

HOLLY T. SHIKADA
*Attorney General of Hawaiʻi*
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
*Attorney General of Illinois*
100 West Randolph Street, 12th Floor
Chicago, IL 60601

AARON M. FREY
*Attorney General of Maine*
6 State House Station
Augusta, ME 04333

BRIAN E. FROSH
*Attorney General of Maryland*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202

DANA NESSEL
*Attorney General of Michigan*
P.O. Box 30212
Lansing, MI 48909

KEITH ELLISON
*Attorney General of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Boulevard
St. Paul, MN 55155

AARON D. FORD
*Attorney General of Nevada*
100 North Carson Street
Carson City, NV 89701

MATTHEW J. PLATKIN
*Attorney General of New Jersey*
25 Market Street
Trenton, NJ 08625

HECTOR BALDERAS
*Attorney General of New Mexico*
P.O. Drawer 1508
Santa Fe, NM 87504

JOSHUA H. STEIN
*Attorney General of North Carolina*
114 W. Edenton Street
Raleigh, NC 27603

ELLEN F. ROSENBLUM
*Attorney General of Oregon*
1162 Court Street N.E.
Salem, OR 97301

JOSH SHAPIRO
*Attorney General of Pennsylvania*
16th Floor, Strawberry Square
Harrisburg, PA 17120

PETER F. NERONHA
*Attorney General of Rhode Island*
150 South Main Street
Providence, RI 02903

THOMAS J. DONOVAN, JR.
*Attorney General of Vermont*
109 State Street
Montpelier, VT 05609

ROBERT W. FERGUSON
*Attorney General of Washington*
P.O. Box 40100
Olympia, WA 98504

## CERTIFICATE OF SERVICE

I hereby certify that on May 16, 2022, this brief was filed electronically with the Clerk of the Court for the United States Court of Appeals for the Second Circuit through the Court's CM/ECF system. I certify that all participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

*/s/ Adam M. Cambier*
Adam M. Cambier


## CERTIFICATE OF COMPLIANCE

1.      This Brief complies with the type-volume limitation of Local Rule 29.1(c) and Local Rule 32.1(a)(4)(A) because it contains 6,582 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman style, 14-point font.

*/s/ Adam M. Cambier*
Adam M. Cambier

**ADDENDUM**

**Table A: State Laws**

The following States have laws expressly prohibiting discrimination on the basis of sexual orientation in places of public accommodation. The population data is taken from the United States Census Bureau's estimate of State populations as of July 1, 2020.[10]

| State | Population | State Law |
|---|---|---|
| California | 39,368,078 | Cal. Civ. Code § 51 (2018). |
| Colorado | 5,807,719 | Colo. Rev. Stat. § 24-34-601 (2014). |
| Connecticut | 3,557,006 | Conn. Gen. Stat. § 46a-64 (2019). |
| Delaware | 986,809 | Del. Code Ann. tit. 6, § 4504 (2013). |
| District of Columbia | 712,816 | D.C. Code § 2-1402.31 (2001). |
| Hawaii | 1,407,006 | Haw. Rev. Stat. § 489-3 (2006). |
| Illinois | 12,587,530 | 775 Ill. Comp. Stat. 5/1-102, 5/5-102 (2015). |
| Iowa | 3,163,561 | Iowa Code § 216.7 (2007). |
| Maine | 1,350,141 | Me. Rev. Stat. tit. 5, § 4592 (2019). |
| Maryland | 6,055,802 | Md. Code Ann., State Gov't § 20-304 (West 2018). |
| Massachusetts | 6,893,574 | Mass. Gen. Laws. ch. 272, § 98 (2018). |
| Minnesota | 5,657,342 | Minn. Stat. § 363A.11 (2019). |
| Nevada | 3,138,259 | Nev. Rev. Stat. § 651.070 (2011). |
| New Hampshire | 1,366,275 | N.H. Rev. Stat. § 354-A:17 (2009). |
| New Jersey | 8,882,371 | N.J. Stat. § 10:5-12(f) (West 2013). |
| New Mexico | 2,106,319 | N.M. Stat. § 28-1-7 (2008). |

---

[10] *See* U.S. Census Bureau, *Annual Estimates of Resident Population for the United States, Regions, States, and Puerto Rico: April 1, 2010 to July 1, 2020* (Dec. 2020), https://www.census.gov/programs-surveys/popest/technical-documentation/research/evaluation-estimates/2020-evaluation-estimates/2010s-state-total.html

| New York | 19,336,776 | N.Y. Exec. Law § 291 (McKinney 2010). |
|---|---|---|
| Oregon | 4,241,507 | Or. Rev. Stat. § 659A.403 (2019). |
| Rhode Island | 1,057,125 | R.I. Gen. Laws § 11-24-2 (2019). |
| Vermont | 623,347 | Vt. Stat. tit. 9, § 4502 (2019). |
| Virginia | 8,590,563 | Va. Code Ann. § 2.2-3904 (2020). |
| Washington | 7,693,612 | Wash. Rev. Code § 49.60.030 (2019). |
| Wisconsin | 5,832,655 | Wis. Stat. § 106.52 (2018). |

**Table B: Local Laws**

The following local jurisdictions have laws or ordinances prohibiting discrimination on the basis of sexual orientation in places of public accommodation and are jurisdictions *not* covered by the State-level public accommodations laws listed in Table A. The list is not exhaustive but includes the laws and ordinances that could be readily identified and reviewed through publicly available sources. The population data is taken from the U.S. Census Bureau's estimates of local populations as of July 1, 2018.[11] (This table omits the numerous local non-discrimination ordinances in the States listed in Table A.)

| *Population* | *Ordinance* |
|---|---|
| **Alabama** | |
| 209,403 | Birmingham, Ala., Ordinance No. 17-121 (2017). |
| **Alaska** | |
| 288,000 | Anchorage, Alaska, Anchorage Municipal Code tit. 5, ch. 5.20, § 5.20.050 (2015). |
| 31,974 | Juneau, Alaska, Compiled Laws of the City and Borough of Juneau, Alaska tit. 41, ch. 41.05, § 41.05.020 (2019). |
| **Arizona** | |
| 1,680,992 | Phoenix, Ariz., Phx. City Code art 1, ch. 18, §18-4 (2013). |
| 548,073 | Tucson, Ariz., Tucson City Code ch. 17, art. 3, § 17-12 (1999). |
| 195,805 | Tempe, Ariz., Tempe City Code ch. 2, § 2-603(1) (2019). |
| 75,038 | Flagstaff, Ariz., Flagstaff City Code ch. 14-02-001-0003(A) (2013). |
| **Florida** | |
| 2,716,940 | Miami-Dade County, Fla., The Code of Miami-Dade County ch. 11A, art. 3, § 11A-19 (2014). |

---

[11] U.S. Census Bureau, *Annual Estimates of the Resident Population for Incorporated Places of 50,000 or More, Ranked by July 1, 2019 Population: April 1, 2010 to July 1, 2019* (April 2021) (data accessible at https://www.census.gov/data/tables/time-series/demo/popest/2010s-total-cities-and-towns.html); U.S. Census Bureau, *Annual Estimates of the Resident Population for Minor Civil Divisions: April 1, 2010 to July 1, 2019* (April 2021) (accessible at same link); U.S. Census Bureau QuickFacts: United States (Dec. 2019) (https://www.census.gov/quickfacts/).

| | |
|---|---|
| 1,952,778 | Broward County, Fla., Broward County, Fla., Code of Ordinances ch. 16½, §§ 16½-3(p), 16½-34 (2011). |
| 1,471,968 | Hillsborough County, Fla., Hillsborough County Code of Ordinances and Laws ch. 30, § 30-23 (2014). |
| 1,393,452 | Orange County, Fla., Orange County Code of Ordinances ch. 22, art. 3, § 22-42 (2013). |
| 974,996 | Pinellas County, Fla., Pinellas County Code of Ordinances ch. 70, art. 2, § 70-214 (2014). |
| 553,284 | Volusia County, Fla., Municipal Code of Ordinances ch. 36, art. 3, § 36-41 (2019). |
| 293,582 | Leon County, Fla., Leon County Code of Ordinances ch. 9, art. 3, § 9-42 (2019). |
| 269,043 | Alachua County, Fla., Alachua County Code of Ordinances ch. 111, art. 1, § 111.06 (2013). |
| **Georgia** | |
| 506,811 | Atlanta, Ga., Atlanta Code of Ordinances ch. 94, art. 3, § 94-68 (2000). |
| **Idaho** | |
| 228,959 | Boise, Idaho, Boise City Code ch. 6, § 6-02-03(B) (2012). |
| 56,637 | Pocatello, Idaho, City Code tit. 9, ch. 9.36, § 9.36.030(B) (2013). |
| 52,414 | Coeur D'Alene, Idaho, Coeur d'Alene, Idaho City Code tit. 9, ch. 9.56, § 9.56.030(B) (2019). |
| 25,702 | Moscow, Idaho, Moscow City Code tit. 10, ch. 19, § 19-23(B) (2013). |
| **Indiana** | |
| 964,582 | Indianapolis-Marion County, Ind., Rev. Code of the Consolidated City and County ch. 581, art. 1, § 581-101 (2008). |
| 270,402 | Fort Wayne, Ind., Fort Wayne City Code tit. 9, ch. 93, § 93.018 (2003). |
| 195,732 | Tippecanoe County, Code of Tippecanoe County tit. 3, ch. 31, §§ 31.75, 31.76 (2001). |
| 181,451 | Vanderburgh County, Ind., Vanderburgh County Code tit. 2, ch. 2.56, § 2.56.020 (2020). |
| 148,431 | Monroe County, Ind., Monroe County Code ch. 520-2 (2020). |

| | |
|---|---|
| 102,026 | South Bend, Ind., Municipal Code of South Bend, Ind. ch. 2, art. 9, § 2-127.1 (2012). |
| 75,522 | Hammond, Ind., City of Hammond, Ind. Code of Ordinances tit. 3, ch. 37, § 37.057 (2019). |
| 67,999 | Muncie, Ind., Code of Ordinances tit. 3, ch. 34, div. 5, § 34.87(F) (2015). |
| 33,897 | Valparaiso, Ind. Ordinance No. 16-09 (2017). |
| 31,015 | Michigan City, Ind., Michigan City Code ch. 66, div. 3, § 66-114 (2019). |
| 28,357 | Zionsville, Ind., Zionsville Town Code tit. 9, ch. 103, § 103.07 (2019). |
| **Kansas** | |
| 98,193 | Lawrence, Kan., City Code of Lawrence ch. 10, art. 1, § 10-110 (2019). |
| 54,604 | Manhattan, Kan., Code of Ordinances City of Manhattan, Kan. ch. 10, art. 3, § 10-17 (2019). |
| **Kentucky** | |
| 617,638 | Louisville-Jefferson County, Ky., Metro Code tit. 9, ch. 92, § 92.05 (2004). |
| 323,152 | Lexington-Fayette County, Ky., Charter and Code of Ordinances Lexington-Fayette Urban County Gov't ch. 2, art. 2, § 2-33 (1999). |
| 40,341 | Covington, Ky., Covington, Ky. Code of Ordinances tit. 3, ch. 37, § 37.07 (2003). |
| 27,755 | Frankfort, Ky., City of Frankfort, Ky. Code of Ordinances tit. 9, ch. 96, § 96.08 (2013). |
| 7,562 | Morehead, Ky., City of Morehead, Ky. Code of Ordinances tit. 9, ch. 96, § 96.07 (2013). |
| **Louisiana** | |
| 390,144 | New Orleans, La., Code of the City of New Orleans, Louisiana ch. 86, art. 6, § 86-33 (1999). |
| 187,112 | Shreveport, La., City Code of Ordinances City of Shreveport ch. 39, art. 1, § 39-2 (2013). |
| **Michigan** | |
| 670,031 | Detroit, Mich., Detroit City Code ch. 27, art. 6, § 27-6-1 (2008). |

| | |
|---|---|
| 119,980 | Ann Arbor, Mich., Code City of Ann Arbor tit. 9, ch. 112, §§ 9:150, 9:153 (2020). |
| 118,210 | Lansing, Mich., Codified Ordinances of Lansing, Mich. tit. 12, ch. 297.04 (2019). |
| 76,200 | Kalamazoo, Mich., Kalamazoo City Code ch. 18, art. 2, § 18-20 (2009). |
| 48,145 | East Lansing, Mich., Code of Ordinances City of East Lansing, Mich. ch. 22, art. 2, § 22-35 (2012). |
| 20,033 | Ferndale, Mich., Code of Ordinances City of Ferndale, Mich. ch. 28, §28-4 (2006). |
| 15,738 | Traverse City, Mich., Codified Ordinances of Traverse City, Mich. Pt. 6, ch. 605, § 605.04 (2010). |
| 2,425 | Pleasant Ridge, Mich., Code of Ordinances City of Pleasant Ridge, Mich. ch. 40, § 40-4 (2013). |
| **Mississippi** | |
| 160,628 | Jackson, Miss., Code of Ordinances City of Jackson, Miss. ch. 86, art. 10, § 86-302 (2019). |
| **Missouri** | |
| 994,205 | St. Louis County, Mo., Code of Ordinances, tit. 7, ch. 718, § 718.020 (2012). |
| 495,327 | Kansas City, Mo., Code of Ordinances of Kansas City, Mo. vol. 1, ch. 38, art. 3, § 38-113 (2013). |
| 300,576 | St. Louis, Mo., The Charter, the Scheme, and the General Ordinances of the City of St. Louis, Mo. tit. 3, ch. 3.44, § 3.44.080(E) (2003). |
| 123,195 | Columbia, Mo., Code of Ordinances ch. 12, art. 3, div. 1, §12-35 (2012). |
| 71,028 | St. Charles, Mo., Code of Ordinances of the City of St. Charles ch. 240, art. 3, § 240.090 (2019). |
| **Montana** | |
| 75,516 | Missoula, Mont., Missoula Municipal Code tit. 9, ch. 64, §9.64.040 (2010). |
| 49,831 | Bozeman, Mont., Municipal Code of the City of Bozeman, Mont. Ch. 24, art. 10, § 24.10.050 (2014). |
| 34,207 | Butte-Silver Bow, Mont., Butte-Silver Bow Municipal Code tit. 5, ch. 5.68, §5.68.040 (2014). |

| | |
|---|---|
| 33,124 | Helena, Mont., Municipal Code of the City of Helena, Mont. tit. 1, ch. 8, § 1-8-4 (2019). |
| 8,295 | Whitefish, Mont., The City Code of the City of Whitefish, Mont. tit. 1, ch. 10, § 1-10-4 (2019). |
| **Nebraska** | |
| 478,192 | Omaha, Neb., Omaha Municipal Code, Charter, and General Ordinances of the City vol. I, ch. 13, art. 3, div. 1, § 13-84 (2012). |
| **Ohio** | |
| 898,553 | Columbus, Ohio, Columbus – City Code of Ordinances tit. 23, ch. 2331, § 2331.04 (2008). |
| 381,009 | Cleveland, Ohio, Code of Ordinances § 667.01 (2019). |
| 303,940 | Cincinnati, Ohio, Municipal Code of Cincinnati, Ohio § 914-7 (2006). |
| 272,779 | Toledo, Ohio, Toledo Municipal Code § 554.05 (2019). |
| 197,597 | Akron, Ohio, Code of Ordinances tit. 3, ch. 38, § 38.04 (2019). |
| 140,407 | Dayton, Ohio, Code of Ordinances City of Dayton, Ohio tit. III, div. I, § 32.04 (2007). |
| 65,469 | Youngstown, Ohio, Codified Ordinances of the City of Youngstown, Ohio pt. 5, ch. 147, § 547.04 (2019). |
| 49,678 | Lakewood, Ohio, Codified Ordinances of Lakewood, Ohio pt. 5, § 516.04 (2019). |
| 50,315 | Newark, Ohio, City of Newark Code of Ordinances pt. 6, ch. 632, §632.03(c) (2007). |
| 43,992 | Cleveland Heights, Ohio, Codified Ordinances of the City of Cleveland Heights, Ohio pt. 7, ch. 749, § 749.15 (2019). |
| 31,504 | Bowling Green, Ohio, City of Bowling Green Code of Ordinances tit. 3, ch. 39, §§ 39.01, 39.03 (2018). |
| 24,536 | Athens, Ohio, Code of Ordinances tit. 3, ch. 3.07, §3.07.62 (2019). |
| 23,110 | Oxford, Ohio, Codified Ordinances of the City of Oxford, Ohio pt. 1, ch. 143, § 143.04 (2019). |
| 13,770 | Bexley, Ohio, Bexley City Codes ch. 637, § 637.04 (2018). |
| 11,051 | Coshocton, Ohio, Codified Ordinances of the City of Coshocton, Ohio pt. 1, tit. 5, ch. 159, § 159.03(c) (2014). |

| Oklahoma | |
|---|---|
| 124,880 | Norman, Okla., Norman, Oklahoma - Code of Ordinances, ch. 7, § 7-104 (2020). |
| **Pennsylvania** | |
| 1,584,064 | Phila., Pa., The Philadelphia Code tit. 9, § 9-1106 (2016). |
| 1,216,045 | Allegheny County, Pa., Administrative Code div. 2, ch. 215, art. 5, § 215-35 (2009). |
| 269,728 | Erie County, Pa., Erie County Code, ord. 59, art. 11 (2004). |
| 121,442 | Allentown, Pa., The Ordinances of the City of Allentown, Pa. tit. 11, art. 181, § 181.06 (2019). |
| 88,375 | Reading, Pa., Reading, Pa. Code of Ordinances pt. 5, ch. 23, § 23-509 (2019). |
| 49,271 | Harrisburg, Pa., The Harrisburg Municipal Code tit. 4, pt. 1, ch. 4- 101, § 4-105.3 (2018). |
| 42,160 | State College, Pa., Borough Codification of Ordinances ch. 5, pt. E, § 505 (2018). |
| 40,766 | Wilkes-Barre, Pa., Code of Ordinances City of Wilkes-Barre, Pa. ch. 14, §§ 14-1, 14-3 (2018). |
| 2,530 | New Hope, Pa., Code of the Borough of New Hope ch. 129, art. 1, § 129-4 (2007). |
| **South Carolina** | |
| 415,759 | Richland County, S.C., Code of Ordinances of Richland County, S.C. ch. 16, art. 6, §16-68 (2017). |
| 137,566 | Charleston, S.C., Code of the City of Charleston, S.C. ch. 16, art. IV, § 16-29 (2019). |
| **South Dakota** | |
| 24,415 | Brookings, South Dakota, Brookings, South Dakota - Code of Ordinances, ch. 2, art. V, div. 2, § 2-143(5) (2019). |
| **Texas** | |
| 1,547,253 | San Antonio, Tex., Code City of San Antonio Tex. ch. 2, art. 10, div. 5, § 2-592 (2018). |
| 1,343,573 | Dallas, Tex., The Dallas City Code vol. II, ch. 46, art. II, § 46-6.1 (2019). |
| 978,908 | Austin, Tex., The Code of the City of Austin, Tex. Tit. 5, ch. 5-2, § 5-2- 4 (1992). |
| 909,585 | Fort Worth, Tex., City of Fort Worth Code of Ordinances pt. 2, ch. 17, art. 2, § 17-48 (2019). |

| | |
|---|---|
| 681,728 | El Paso, Tex., A Codification of the General Ordinances of El Paso, Tex. Tit. 10, ch. 10.16, § 10.16.010 (2003). |
| 287,677 | Plano, Tex., Code of Ordinances City of Plano, Tex. ch. 2, art. I, § 2- 11(d) (2019). |
| **West Virginia** | |
| 46,536 | Charleston, W. Va., Code of the City of Charleston, W. Va. Ch. 62, art. 3, § 62-81(6) (2007). |
| 45,110 | Huntington, W. Va., Codified Ordinances of Huntington, W. Va. pt. 1, ch. 5, art. 147, § 147.08(f) (2018). |
| 6,029 | Charles Town, W. Va., Codified Ordinances of Charles Town pt. 1, ch. 5, art. 154, § 154.03(6) (2018). |
| 3,807 | Lewisburg, W. Va., Codified Ordinances of Lewisburg, W. Va. Pt. 1, ch. 5, art. 137, § 137.08(f) (2019). |
| **Wyoming** | |
| 32,711 | Laramie, Wyo., Laramie, Wyo. Municipal Code tit. 9, ch. 9.32, § 9.32.040 (2015). |

**Table C: Discriminatory Advertising Laws**

The following States prohibit discriminatory advertising or notices as part of their public accommodations laws.

| State | State Law |
|---|---|
| **Alaska** | Alaska Stat. § 18.80.230 (2000). |
| **Colorado** | Colo. Rev. Stat. §§ 24-34-601(2)(a), 701 (2021). |
| **Delaware** | Del. Code Ann. tit. 6, § 4504(b) (West 2019). |
| **District of Columbia** | D.C. Code § 2-1402.31(a)(2) (2006). |
| **Idaho** | Idaho Code Ann. § 67-5909(5)(b) (2005). |
| **Illinois** | 775 Ill. Comp. Stat. § 5/5-102(B) (2007). |
| **Iowa** | Iowa Code § 216.7(1)(b) (2019). |
| **Kentucky** | KY. Rev. Stat. Ann. § 344.140 (West 1992). |
| **Maine** | Me. Rev. Stat. tit. 5, § 4592(2) (2019). |
| **Massachusetts** | Mass. Gen. Laws ch. 272, § 92A (2016). |
| **Michigan** | Mich. Comp. Laws § 37.2302(b) (1977). |
| **Montana** | Mont. Code Ann. § 49-2-304(1)(b) (1993). |
| **New Hampshire** | N.H. Rev. Stat. Ann. § 354-A:17 (2019). |
| **New Jersey** | N.J. Stat. Ann. § 10:5-12(f)(1) (West 2020). |
| **New York** | N.Y. Civ. Rights Law § 40 (McKinney 1945). |
| **North Dakota** | N.D. Cent. Code § 14-02.4-16 (1995). |
| **Oregon** | Or. Rev. Stat. § 659A.409 (2007). |
| **Pennsylvania** | 43 Pa. Cons. Stat. § 955(i)(2) (2009). |

| | |
|---|---|
| **Rhode Island** | R.I. Gen. Laws § 11-24-2 (2001). |
| **South Dakota** | S.D. Codified Laws § 20-13-25 (1986). |
| **Tennessee** | Tenn. Code Ann. § 4-21-502 (West 1978). |
| **Virginia** | Va. Code Ann. § 2.2-3904 (2020). |
| **West Virginia** | W. Va. Code § 5-11-9(6)(B) (2016). |
| **Wisconsin** | Wis. Stat. § 106.52(3)(3)-(3m) (2016). |