# 22-75

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

EMILEE CARPENTER, LLC, d/b/a Emilee Carpenter Photography, and
EMILEE CARPENTER,

*Plaintiffs-Appellants,*

v.

LETITIA JAMES, in her official capacity as Attorney General of New York;
MARIA L. IMPERIAL, in her official capacity as the Acting Commissioner of
the New York State Division of Human Rights; and WEEDEN WETMORE,
in his official capacity as District Attorney of Chemung County,

*Defendants-Appellees.*

On Appeal from the United States District Court for the Western District
of New York, Case No. 6:21-cv-6303, Hon. Frank P. Geraci, Jr.

**Brief in Support of Appellees and Affirmance of *Amici Curiae*
Americans United for Separation of Church and State; ADL (Anti-
Defamation League); Bend the Arc: A Jewish Partnership for
Justice; Central Conference of American Rabbis; Covenant
Network of Presbyterians; Global Justice Institute, Metropolitan
Community Churches; Hindu American Foundation; Interfaith
Alliance Foundation; Men of Reform Judaism; Muslim Advocates;
Muslims for Progressive Values; The Sikh Coalition; Union for
Reform Judaism; and Women of Reform Judaism**

RICHARD B. KATSKEE
ALEX J. LUCHENITSER (*Counsel of Record*)
ADRIANNE M. SPOTO
KENNETH D. UPTON, JR.
Americans United for Separation of Church and State
1310 L Street NW, Suite 200
Washington, DC 20005
(202) 466-7306
*luchenitser@au.org*

## RULE 26.1 DISCLOSURE STATEMENT

The *amici* are all nonprofit organizations that have no parent corporations and are not owned in whole or in part by any publicly held corporation.

## TABLE OF CONTENTS

Interests of the *Amici Curiae* ................................................................ 1

Introduction and Summary of Argument ................................................ 3

Argument ................................................................................................ 4

I.  The Free Exercise Clause does not require the exemption that
    Carpenter seeks ................................................................................ 4

    A.  The public-accommodations law does not trigger strict
        scrutiny ...................................................................................... 4

    B.  The public-accommodations law would satisfy even strict
        scrutiny ...................................................................................... 18

II. New York's public-accommodations law does not coerce
    Carpenter to participate in religious activity ................................... 24

III. Antidiscrimination laws protect religious freedom ......................... 27

Conclusion ............................................................................................. 32

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. ACLU,*
    542 U.S. 656 (2004) ............................................................... 21

*Battaglia v. Buffalo Niagara Introductions, Inc.,*
    No. 10138581 (N.Y. Div. Hum. Rts. Jan. 28, 2012),
    https://on.ny.gov/39bB3im.......................................................... 9

*Braunfeld v. Brown,*
    366 U.S. 599 (1961) ............................................................... 19

*Bray v. Alexandria Women's Health Clinic,*
    506 U.S. 263 (1993) ............................................................... 22

*Catholic Charities of Diocese of Albany v. Serio,*
    859 N.E.2d 459 (N.Y. 2006).......................................................... 12

*Catholic Charities of Sacramento v. Superior Court,*
    85 P.3d 67 (Cal. 2004) ............................................................ 12

*Central Rabbinical Congress of U.S. & Canada v. New York*
    *City Department of Health & Mental Hygiene,*
    763 F.3d 183 (2d Cir. 2014)......................................... 5, 6, 7, 18

*Christian Legal Society v. Martinez,*
    561 U.S. 661 (2010) ............................................................... 22

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993) ..................................................... 4, 5, 6, 7

*County of Allegheny v. ACLU Greater Pittsburgh Chapter,*
    492 U.S. 573 (1989) ............................................................... 24

*Employment Division v. Smith,*
    494 U.S. 872 (1990) .................................................... 4, 5, 14, 18

*Fields v. City of Tulsa,*
    753 F.3d 1000 (10th Cir. 2014) .................................................... 25

*Fulton v. City of Philadelphia,*
    141 S. Ct. 1868 (2021) ............................................... 6, 16, 17, 20

## TABLE OF AUTHORITIES—continued

*Heart of Atlanta Motel, Inc. v. United States*,
379 U.S. 241 (1964) .......................................................................... 22, 23

*Henderson v. Kennedy*,
253 F.3d 12 (D.C. Cir. 2001) ........................................................... 27, 28

*Hernandez v. Commissioner*,
490 U.S. 680 (1989) .......................................................................... 13, 14

*Huri v. Office of the Chief Judge*,
804 F.3d 826 (7th Cir. 2015) ................................................................. 30

*Janny v. Gamez*,
8 F.4th 883 (10th Cir. 2021), *petition for cert. dismissed*,
142 S. Ct. 878 (2022) .............................................................................. 26

*Kane v. De Blasio*,
19 F.4th 152 (2d Cir. 2021) ....................................................... 14, 15, 16

*Khedr v. IHOP Restaurants, LLC*,
197 F. Supp. 3d 384 (D. Conn. 2016) .................................................... 29

*Lawrence v. Texas*,
539 U.S. 558 (2003) ................................................................................ 22

*Lee v. Weisman*,
505 U.S. 577 (1992) .......................................................................... 25, 26

*Lyng v. Northwest Indian Cemetery Protective Ass'n*,
485 U.S. 439 (1988) .................................................................................. 7

*Martineau v. Ghezzi*,
389 F. Supp. 187 (N.D.N.Y. 1974).......................................................... 15

*Masterpiece Cakeshop, Ltd. v. Colorado
Civil Rights Commission*,
138 S. Ct. 1719 (2018) ..................................................9, 11, 12, 20, 21, 23

*Minnesota ex rel. McClure v. Sports & Health Club, Inc.*,
370 N.W.2d 844 (Minn. 1985) (en banc) ............................................... 30

*Morgan v. Zaharo Cab Corp.*,
No. 10117888 (N.Y. Div. Hum. Rts. Nov. 14, 2008),
https://on.ny.gov/38mgBLI ..................................................................... 10

# TABLE OF AUTHORITIES—continued

*Nappi v. Holland Christian Home Ass'n*,
  No. 2:11-cv-2832, 2015 WL 5023007 (D.N.J. Aug. 21, 2015) ................ 30

*New Hope Family Services, Inc. v. Poole*,
  966 F.3d 145 (2d Cir. 2020) ..................................................... 6

*Newman v. Piggie Park Enterprises, Inc.*,
  390 U.S. 400 (1968) (per curiam) ........................................... 28

*Our Lady of Guadalupe School v. Morrissey-Berru*,
  140 S. Ct. 2049 (2020) .......................................................... 4

*Paletz v. Adaya*,
  No. B247184, 2014 WL 7402324
  (Cal. Ct. App. Dec. 29, 2014) ................................................. 29

*Prince v. Massachusetts*,
  321 U.S. 158 (1944) .............................................................. 19

*Reynolds v. United States*,
  98 U.S. 145 (1878) ............................................................ 4, 5

*Roberts v. U.S. Jaycees*,
  468 U.S. 609 (1984) .................................................. 20, 21, 24

*Romer v. Evans*,
  517 U.S. 620 (1996) .............................................................. 28

*Santa Fe Independent School District v. Doe*,
  530 U.S. 290 (2000) .............................................................. 26

*Sherbert v. Verner*,
  374 U.S. 398 (1963) ........................................................ 18, 19

*Stormans, Inc. v. Selecky*,
  586 F.3d 1109 (9th Cir. 2009) ................................................. 7

*Tandon v. Newsom*,
  141 S. Ct. 1294 (2021) (per curiam) ...................................... 6, 8

*Town of Greece v. Galloway*,
  572 U.S. 565 (2014) .............................................................. 24

v

## TABLE OF AUTHORITIES—continued

*United States v. Lee*,
455 U.S. 252 (1982) .......................................................... 18, 19

*U.S. Power Squadrons v. State Human Rights Appeal Board*,
452 N.E.2d 1199 (N.Y. 1983).................................................. 10

*Warner v. Orange County Department of Probation*,
115 F.3d 1068 (2d Cir. 1996), *reinstated after vacatur and
remand*, 173 F.3d 120 (2d Cir. 1999) ...................................... 26

*We the Patriots USA, Inc. v. Hochul*,
17 F.4th 266 (2d Cir. 2021), *petition for cert. docketed*
(U.S. Feb. 14, 2022) (No. 21-1143) ............................. 14, 16, 17

*Wisconsin v. Yoder*,
406 U.S. 205 (1972) .......................................................... 18, 19

*Yellowbear v. Lampert*,
741 F.3d 48 (10th Cir. 2014) ................................................. 12

**Constitutions, Statutes, and Rules**

2002 N.Y. Sess. Laws A.1971, https://bit.ly/3MdwuTp.............................. 15

N.Y. Ben. Ord. Law § 2 ............................................................ 11

N.Y. Dom. Rel. Law § 10-b........................................................ 11

N.Y. Exec. Law § 292 .......................................................... 10, 11

N.Y. Exec. Law § 296 ......................................3, 8, 12, 13, 15, 17, 18, 19, 21

**Other Authorities**

Complaint, *Fatihah v. Neal*, No. 6:16-cv-00058, ECF No. 3
(E.D. Okla. Feb. 17, 2016) ............................................... 29, 30

Christy Mallory et al., Williams Institute, *The Impact of
Stigma and Discrimination Against LGBT People in Texas*
(2017), https://bit.ly/3LQWkfE............................................... 23

S. Rep. No. 88-872 (1964)......................................................... 23

## TABLE OF AUTHORITIES—continued

Brent Staples, *Traveling While Black:*
   *The Green Book's Black History*, N.Y. Times (Jan. 25, 2019),
   https://nyti.ms/3aaPiAB ........................................................................ 23

## INTERESTS OF THE *AMICI CURIAE*[1]

*Amici* are religious and civil-rights organizations that are united in respecting the important but distinct roles of religion and government in our nation. *Amici* represent diverse faiths and beliefs while sharing a commitment to ensuring that LGBTQ people remain free from officially sanctioned discrimination. They believe that the right to exercise religion freely is precious and should never be misused to undermine that principle or otherwise cause harm. *Amici* also recognize and oppose the threat to religious freedom that would result if the Constitution were understood to require religious exemptions from antidiscrimination laws.

The *amici* are:

- Americans United for Separation of Church and State.

- ADL (Anti-Defamation League).

- Bend the Arc: A Jewish Partnership for Justice.

- Central Conference of American Rabbis.

- Covenant Network of Presbyterians.

- Global Justice Institute, Metropolitan Community Churches.

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amici*, their members, or their counsel made a monetary contribution intended to fund the brief's preparation or submission. All parties have consented to the filing of this brief.

- Hindu American Foundation.

- Interfaith Alliance Foundation.

- Men of Reform Judaism.

- Muslim Advocates.

- Muslims for Progressive Values.

- The Sikh Coalition.

- Union for Reform Judaism.

- Women of Reform Judaism.

## INTRODUCTION AND SUMMARY OF ARGUMENT

New York law requires that public accommodations serve all people regardless of their sexual orientation. *See* N.Y. Exec. Law § 296(2)(a). The law thus ensures that when LGBTQ people seek to buy goods and services on the same terms as everyone else, they do not suffer the stigma and degradation associated with discrimination.

In a nation defined by its religious pluralism, the many and varied beliefs among our people make it inevitable that secular laws—including New York's public-accommodations law—will at times offend some people's religious sensibilities. But while religion and religious practices may not be specially disfavored, there is no Free Exercise Clause violation when a law that regulates conduct for valid secular purposes and in a nondiscriminatory manner incidentally burdens some religious exercise. That is exactly the kind of law Section 296(2) is.

Exempting businesses from the law so that they may refuse service to gay and lesbian people based on the businesses' religious views would undermine, not advance, religious freedom. The arguments that plaintiff-appellant Emilee Carpenter, LLC makes for such an exemption would also, if accepted, permit businesses to rely on their religious beliefs to deny service to people of the "wrong" religion—or race, or sex, or any other protected characteristic, for that matter. Far from promoting religious

3

freedom, a ruling in Carpenter's favor would thus hamstring New York's ability to ensure that its residents can live as equal members of the community regardless of faith or belief.

## ARGUMENT

## I. The Free Exercise Clause does not require the exemption that Carpenter seeks.

Religious freedom is a value of the highest order. But the constitutional guarantee of religious freedom is not an entitlement to "general immunity from secular laws." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020). The Free Exercise Clause is not, and never has been, a free pass to violate the law. And it in no way compels New York to exempt Carpenter from the State's prohibition against sexual-orientation discrimination in public accommodations.

### A. The public-accommodations law does not trigger strict scrutiny.

Though government cannot regulate a religious practice *because* it is religious (*see, e.g.*, *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531–33 (1993)), religion-based disagreement with the law does not excuse noncompliance. "To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself." *Emp. Div. v. Smith*, 494 U.S. 872, 879 (1990) (quoting *Reynolds v. United States*,

98 U.S. 145, 166–67 (1878)). And that would "open the prospect of constitutionally required religious exemptions from civic obligations of almost every conceivable kind," from drug laws to traffic laws. *Id.* at 888–89.

The Supreme Court has therefore held that laws that apply generally and are neutral with respect to religion do not trigger heightened scrutiny, even if they "ha[ve] the incidental effect of burdening a particular religious practice." *Lukumi*, 508 U.S. at 531; *accord Smith*, 494 U.S. at 879. Hence, "a state can determine that a certain harm should be prohibited generally, and a citizen is not, under the auspices of her religion, constitutionally entitled to an exemption." *Cent. Rabbinical Cong. of U.S. & Can. v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 196 (2d Cir. 2014). Accordingly, Carpenter's religious motivations cannot excuse noncompliance with the public-accommodations law's prohibition on sexual-orientation discrimination, and Carpenter's free-exercise claim was properly dismissed.

**1.** The neutrality requirement means that a law must not "restrict practices because of their religious motivation." *Lukumi*, 508 U.S. at 533. Discriminatory intent may be apparent on the face of a law, or it may be revealed through the law's practical effects, as when legal requirements have been "gerrymandered with care to proscribe" religious conduct *qua*

5

religious conduct. *See id.* at 533–34, 542. But neutrality is not undermined just because a law *affects* a claimant's religious exercise. Rather, to trigger strict scrutiny the claimant must show that the state has targeted specific religious conduct or beliefs for maltreatment. *See id.*; *New Hope Family Servs., Inc. v. Poole*, 966 F.3d 145, 162–63 (2d Cir. 2020).

General applicability is the closely related requirement that the state, "in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief." *Lukumi*, 508 U.S. at 543. Government thus may not burden religious conduct while affording more favorable treatment to nonreligious conduct that is as detrimental to the underlying state interests. *See Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam). Nor may the state utilize "a mechanism for individualized exemptions" to favor requests for secular exceptions over religious ones. *See Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021) (quoting *Smith*, 494 U.S. at 884).

New York's public-accommodations law is neutral and generally applicable. Far from "*purposefully* singl[ing] out religious conduct" for discriminatory treatment (*see Cent. Rabbinical Cong.*, 763 F.3d at 194), it bars sexual-orientation discrimination in all places of public accommodation. A business's motivations for denying service, religious or otherwise, are immaterial. And Carpenter offers no evidence that the law

6

was "specifically directed at . . . religious practice" (*id.* at 193 (quoting *Smith*, 494 U.S. at 878)).

The fact that a law may affect some religiously motivated conduct is an unavoidable result of how law operates in a religiously diverse society. *See Smith*, 494 U.S. at 878–80, 888–90; *see also Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 452 (1988) ("[G]overnment simply could not operate if it were required to satisfy every citizen's religious needs and desires."). Such incidental effects do not amount to religious targeting or render a law non-neutral. *See Lukumi*, 508 U.S. at 535.

Accordingly, New York may enact and enforce laws when, as here, it acts on "a legitimate concern of government for reasons quite apart from [religious] discrimination." *Id.* That is true even if the law disproportionately affects some religious exercise. *See, e.g.*, *id.* at 531. And "[t]he Free Exercise Clause is not violated even though a group motivated by religious reasons may be more likely to engage in the proscribed conduct." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1131 (9th Cir. 2009).

**2.** Nor are the neutrality and general applicability of New York's prohibition on sexual-orientation discrimination in public accommodations undermined by any asserted exemptions for secular activities. As the Supreme Court recently clarified, a law may fail the requirements of neutrality and general applicability if it treats religious activity more

7

harshly than comparable secular activities—that is, secular activities that equally conflict with the underlying state interests. *See Tandon*, 141 S. Ct. at 1296. The Covid-related public-health law at issue in *Tandon*, for example, was not neutral and generally applicable because it severely restricted in-home religious gatherings while exempting nonreligious gatherings that posed greater or equal risks of transmission of Covid. *See id.* at 1296–97. So if Section 296(2) prohibited religiously motivated denials of service but permitted nonreligious denials that equally interfered with the law's purpose of eradicating discrimination in public accommodations against gay and lesbian people, heightened scrutiny would apply.

But the statute does no such thing. Indeed, Carpenter fails to identify *any* secular exemptions from New York's prohibition against sexual-orientation discrimination in public accommodations.

First, Carpenter points to scenarios that do not represent exemptions at all but instead are examples of conduct that is not discriminatory. Carpenter asserts that Section 296(2) exempts bakers who do not want to create cakes with anti-LGBTQ or racist messages. *See* Appellants' Br. 38. But neither opposition to LGBTQ rights nor racism makes one a member of a protected class, so declining to make a cake with those messages would not constitute discrimination under New York's law.

8

Contrary to what Carpenter suggests (Appellants' Br. 39), the Supreme Court did not hold in *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, 138 S. Ct. 1719 (2018), that a public-accommodations law is not neutral toward religion if it prohibits refusal to bake a cake for the wedding of a same-sex couple but allows refusal to bake an anti-LGBTQ cake. The Court instead treated as evidence of an antireligious value judgement a state civil-rights commission's reasoning that anti-LGBTQ cakes communicated an offensive message while cakes celebrating same-sex weddings did not. *See id.* at 1730–31. Justice Kagan explained in a concurring opinion that if the civil-rights commission had simply reasoned that being opposed to marriage equality for LGBTQ people does not make one a member of a protected class under the applicable public-accommodations law, there would not have been a free-exercise concern. *See id.* at 1732–34 (Kagan, J., concurring).

Likewise, New York's public-accommodations law is not violated when a business acts for "legitimate and nondiscriminatory reason[s]" (Appellants' Br. 38). For example, Carpenter's complaint cites cases (J.A. 60 ¶ 291) in which a matchmaker refused service based on a prospective client's refusal to share personal information rather than based on his disability (*Battaglia v. Buffalo Niagara Introductions, Inc.*, No. 10138581, at 4–6 (N.Y. Div. Hum. Rts. Jan. 28, 2012), https://on.ny.gov/39bB3im) and

9

a taxi driver accelerated when a passenger attempted to enter his taxi
because he did not see the passenger rather than because of the
passenger's race or religion (*Morgan v. Zaharo Cab Corp.*, No. 10117888,
at 2, 4–5 (N.Y. Div. Hum. Rts. Nov. 14, 2008), https://on.ny.gov/38mgBLI).
Once again, these are not exemptions from New York's antidiscrimination
law because no discrimination based on membership in a protected class
took place. The same reasoning applies when healthcare providers refer
patients to a different office "based on sound medical judgment"
(Appellants' Br. 38): the patient is not being denied service based on
membership in a protected group.

Carpenter also points (*id.* at 48) to the public-accommodations law's
nonapplication to entities that are "in [their] nature distinctly private"
(N.Y. Exec. Law § 292(9)), such as private clubs with selective membership
policies (*see U.S. Power Squadrons v. State Hum. Rts. Appeal Bd.*, 452
N.E.2d 1199, 1204 (N.Y. 1983)). But these "distinctly private" entities are
by definition not open to the public at large, so allowing them to control
their membership does not risk subjecting the citizens of New York to the
stigma and degradation of being denied equal access to goods and services
in the public marketplace. That "distinctly private" entities are not
covered by New York's public-accommodations law therefore does not
undermine the interests supporting the law. Moreover, because "religious

10

corporation[s]" and "benevolent orders" (many of which are also religious, *see* N.Y. Ben. Ord. Law § 2) are included among "distinctly private" entities under the statute (*see* N.Y. Exec. Law § 292(9)), the public-accommodations law's treatment of "distinctly private" entities accommodates religion instead of disfavoring it.

In fact, New York accommodates religion even more broadly through another statute, N.Y. Dom. Rel. Law § 10-b, which grants an exemption from all New York antidiscrimination laws, with respect to provision of wedding services or facilities, not only to religious corporations and benevolent orders but also to "a not-for-profit corporation operated, supervised, or controlled by a religious corporation, or any employee thereof being managed, directed, or supervised by or in conjunction with a religious corporation, benevolent order, or a not-for-profit corporation." That New York has not expanded this exemption to religious objectors who operate for-profit businesses such as Carpenter does not trigger strict scrutiny, for the exemption favors religion instead of discriminating against it. Indeed, in *Masterpiece Cakeshop*, the U.S. Supreme Court emphasized that although

> it can be assumed that a member of the clergy who objects to gay marriage on moral and religious grounds could not be compelled to perform the ceremony without denial of his or her right to the free exercise of religion . . . if that exception were not confined, then a long list of persons who provide goods and

11

services for marriages and weddings might refuse to do so for
gay persons, thus resulting in a community-wide stigma
inconsistent with the history and dynamics of civil rights laws
that ensure equal access to goods, services, and public
accommodations.

138 S. Ct. at 1727. State high courts have likewise rejected the proposition

that if government grants an exemption to certain kinds of religious

institutions it must then extend the exemption to all religious entities and

objectors, explaining that the law is full of exemptions that are restricted

to certain kinds of religious entities, and that prohibiting legislatures from

reasonably limiting the scope of religious exemptions would harm religious

freedom by discouraging legislators from enacting the exemptions at all.

*See Cath. Charities of Diocese of Albany v. Serio*, 859 N.E.2d 459, 464

(N.Y. 2006); *Cath. Charities of Sacramento v. Superior Court*, 85 P.3d 67,

84–86 (Cal. 2004); *see also Yellowbear v. Lampert*, 741 F.3d 48, 58 (10th

Cir. 2014) (Gorsuch, J.) ("Surely the granting of a religious accommodation

to some in the past doesn't bind the government to provide that

accommodation to all in the future. . . .").

 Carpenter goes further astray in relying on exemptions from

prohibitions on discrimination that is not in public accommodations or is

not based on sexual orientation. For example, Carpenter cites (Appellants'

Br. 47) provisions limiting the reach of New York's restrictions on

discrimination in employment (*e.g.*, N.Y. Exec. Law § 296(1)) and housing

12

(N.Y. Exec. Law § 296(5)). Carpenter also references (Appellants' Br. 40, 48) an exemption from New York's disability-accommodation requirements for situations where the accommodation "would fundamentally alter the nature of the facility, privilege, [or] advantage" (N.Y. Exec. Law § 296(2)(c)(ii)), as well as a provision that allows the State to "grant[ ] an exemption based on bona fide considerations of public policy" from its statutory prohibition against sex discrimination (N.Y. Exec. Law § 296(2)(b)).

But none of these provisions are exemptions from the prohibition that Carpenter actually challenges—New York's bar against sexual-orientation discrimination in public accommodations. These provisions therefore do not and cannot undermine New York's interest in preventing that type of discrimination. The pertinent legal question is whether the *challenged* prohibition is neutral and generally applicable, not whether some *other* prohibition falls short.

Thus, for example, the Supreme Court held in *Hernandez v. Commissioner*, 490 U.S. 680, 700 (1989), that the Free Exercise Clause did not entitle a religious group's members to an exemption from taxation of income paid for spiritual-training sessions. The Court explained that the tax code contains a general prohibition against deducting from income money paid to nonprofits—secular or religious—in exchange for services.

13

*See id.* at 689–90, 699–700. It made no difference to the Court that *other* provisions of the tax code allow taxpayers to deduct charitable contributions to nonprofits when the taxpayer receives nothing in return. *See id.* at 683–84, 689–90, 699–700.

Likewise, in *Smith*, 494 U.S. at 874, 890, the Supreme Court held that Oregon's general criminal prohibition against use of the mind-altering drug peyote could be constitutionally applied to people who use peyote as a religious sacrament. The Court concluded that the Oregon law was neutral and generally applicable, as it prohibited both religious and nonreligious uses of peyote. *See id.* at 874, 879–80. It did not matter to the Court that Oregon state law as a whole did not prohibit the use of another mind-altering substance—alcohol.

And recently, this Court ruled that several Covid-vaccination mandates were generally applicable even though they covered only certain classes of workers as opposed to all workers or all New Yorkers. *See Kane v. De Blasio*, 19 F.4th 152, 166 (2d Cir. 2021) (certain New York City Department of Education employees and contractors); *We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 274, 290 (2d Cir. 2021) (certain healthcare workers), *petition for cert. docketed* (U.S. Feb. 14, 2022) (No. 21-1143). This Court explained, "neither the Supreme Court, our court, nor any other court of which we are aware has ever hinted that a law must

14

apply to all people, everywhere, at all times, to be 'generally applicable.'" *Kane*, 19 F.4th at 166.

Further, it would be particularly inappropriate for the Court to consider exemptions to prohibitions other than the one on sexual-orientation discrimination in public accommodations because of the different considerations and interests that different antidiscrimination provisions address and balance. *See, e.g.*, State Appellees' Br. 59–60. For example, the only instance we have identified of application of the "public policy" exemption to the prohibition against sex discrimination in public accommodations (N.Y. Exec. Law § 296(2)(b)) was a situation where hair salons were allowed to serve only one gender because separate licenses were required to cut men's hair and to cut women's hair. *See Martineau v. Ghezzi*, 389 F. Supp. 187, 192 (N.D.N.Y. 1974). This type of situation does not arise in the context of sexual-orientation discrimination. Accordingly, the New York legislature did not extend to the sexual-orientation context exemptions that had applied in other contexts when it enacted—in a separate act, passed at a different time from those that codified the State's bans on other types of discrimination—the State's prohibitions against sexual-orientation discrimination. *See* 2002 N.Y. Sess. Laws A.1971, https://bit.ly/3MdwuTp.

**3.** Carpenter characterizes the examples it presents as a "formal mechanism" of "individualized exemptions" and appears to argue that strict scrutiny should apply for that reason, relying on *Fulton*. *See* Appellants' Br. 38–39 (quoting *Fulton*, 141 S. Ct. at 1877, 1879). But an "exemption is not individualized simply because it contains express exceptions for objectively defined categories of persons." *Kane*, 19 F.4th at 165 (quoting *We the Patriots*, 17 F.4th at 288). "[A] mechanism for individualized exemptions" may raise special free-exercise concerns "because it creates the risk that administrators will use their discretion to exempt individuals from complying with the law for secular reasons, but not religious reasons." *See We the Patriots*, 17 F.4th at 288. Categorical exemptions, on the other hand, do not create that risk because they "do not 'invite[ ]' the government to decide which reasons for not complying with the policy are worthy of solicitude." *See Kane*, 19 F.4th at 166 (quoting *Fulton*, 141 S. Ct. at 1879 (alteration in original)).

All but one of the examples to which Carpenter points (to the extent they represent exemptions at all, as opposed to conduct that simply does not amount to discrimination against a protected class) are objective, categorical exemptions—not discretionary, individualized ones. *See supra* pp. 10–13 and statutes cited therein. The only one that might be viewed as individualized is the provision that allows the State to "grant[ ] an

16

exemption based on bona fide considerations of public policy" from the statutory prohibition on sex discrimination. *See* N.Y. Exec. Law § 296(2)(b). But as Carpenter concedes (*see* Appellants' Br. 40), this provision does not extend to *sexual-orientation* discrimination. The provision therefore cannot "create[ ] the risk that administrators will use their discretion to exempt individuals from complying" with the relevant law—here the prohibition against sexual-orientation discrimination in public accommodations—"for secular reasons, but not religious reasons" (*We the Patriots*, 17 F.4th at 288). Thus *Fulton* is inapplicable, as there the Court held that a city's prohibition on sexual-orientation discrimination by foster-care agencies was subject to strict scrutiny because the city's contracts with the agencies allowed it to exempt them, on a discretionary basis, from *that same* prohibition. *See* 141 S. Ct. at 1878–79.

* * * * *

New York seeks to eradicate sexual-orientation discrimination in the marketplace by equally and absolutely prohibiting all public accommodations from engaging in it. Carpenter does not plausibly allege that the State has singled out for unfavorable treatment those that refuse to serve gay and lesbian people for religious reasons while allowing others to refuse to serve them for nonreligious reasons. Neither does Carpenter plausibly allege that the State has in any other respect treated it worse

17

than similarly situated covered entities. Nor does Carpenter identify any secular exemptions from the public-accommodations law's bar against sexual-orientation discrimination. And there is no whiff of religious animus, either on the law's face or in its application. Neither *Tandon*, nor *Fulton*, nor any other authority supports application of heightened scrutiny under these circumstances.

Because Section 296(2) is neutral and generally applicable and evinces no disfavor or animus toward any religion, it is subject to rational-basis review only. *See Cent. Rabbinical Cong.*, 763 F.3d at 193. And the statute more than satisfies this test—for, as we next explain, it would satisfy even strict scrutiny if that were the applicable test.

## B. The public-accommodations law would satisfy even strict scrutiny.

**1.** Free-exercise jurisprudence makes clear that while the rights to believe (or not) and to practice one's faith (or not) are sacrosanct, they do not entail a right to impose one's own beliefs on others.

Even before *Smith*, when strict scrutiny was the default test for free-exercise claims (*see Sherbert v. Verner*, 374 U.S. 398, 403–09 (1963); *Wisconsin v. Yoder*, 406 U.S. 205, 215–19 (1972)), the Supreme Court repeatedly rejected claims for religious exemptions that would have imposed harms or burdens on others. In *United States v. Lee*, for example,

18

the Court rejected an Amish employer's request for an exemption from paying social-security taxes partly because the exemption would have "operate[d] to impose the employer's religious faith on the employees." 455 U.S. 252, 261 (1982). In *Braunfeld v. Brown*, the Court declined to grant an exemption from Sunday-closing laws partly because it would have provided Jewish businesses with "an economic advantage over their competitors who must remain closed on that day." 366 U.S. 599, 608–09 (1961) (plurality opinion). And in *Prince v. Massachusetts*, the Court denied an exemption from child-labor laws that would have allowed minors to distribute religious literature because parents are not free "to make martyrs of their children." 321 U.S. 158, 170 (1944).

In contrast, the Court recognized a Seventh-Day Adventist's right to an exemption from a restriction on unemployment benefits in *Sherbert* because the exemption would not have "serve[d] to abridge any other person's religious liberties." 374 U.S. at 409. And the Court partially exempted Amish parents from state compulsory-education laws in *Yoder* only after the parents demonstrated the "adequacy of their alternative mode of continuing informal vocational education" to meet their children's educational needs. 406 U.S. at 235–36.

**2.** Turning to the first component of strict scrutiny, Section 296(2)'s prohibition against sexual-orientation discrimination by public

19

accommodations serves not just a legitimate state interest but a compelling one, preventing the harms that would result from depriving gay and lesbian New Yorkers of fair and free access to goods and services in the marketplace. The Supreme Court explained in *Roberts v. U.S. Jaycees*, 468 U.S. 609, 624 (1984), that "eliminating discrimination and assuring . . . citizens equal access to publicly available goods and services . . . plainly serves compelling state interests of the highest order." Similarly, in *Fulton*, the Court recognized that the government's interest in preventing sexual-orientation discrimination "is a weighty one, for '[o]ur society has come to the recognition that gay persons and gay couples cannot be treated as social outcasts or as inferior in dignity and worth.'" 141 S. Ct. at 1882 (quoting *Masterpiece Cakeshop*, 138 S. Ct. at 1727)). To be sure, in *Fulton*, the Court ultimately concluded that a city did not have a compelling interest in denying a foster-care agency a religious exemption from an antidiscrimination rule in a city contract because the contract permitted secular exemptions from the same rule on a discretionary basis, and also that the city's separate public-accommodations ordinance was inapplicable to foster-care agencies. *See id.* at 1880–82. But the law at issue here is a public-accommodations statute that does not allow any secular exemptions from its ban against sexual-orientation discrimination.

20

Instead, New York's public-accommodations statute uniformly ensures that sexual orientation is not a barrier to "acquiring whatever products and services [one] choose[s] on the same terms and conditions as are offered to" everyone else. *See Masterpiece Cakeshop*, 138 S. Ct. at 1728. And it protects LGBTQ people "from a number of serious social and personal harms," including deprivation "of their individual dignity." *See Roberts*, 468 U.S. at 625. Granting a religious exemption would license Carpenter, and by extension all other public accommodations, to discriminate against customers because of their sexual orientation as long as the business asserted a religious reason for doing so. LGBTQ people would then suffer the social, psychological, and economic harms that the law was designed to prevent.

**3.** Section 296(2) is narrowly tailored to achieving that end, because prohibiting the discrimination sought to be eradicated "abridges no more [activity] than is necessary to accomplish that purpose." *See id.* at 628–29. New York need not substitute Carpenter's proposed alternatives (*see* Appellants' Br. 47–49), for they would "not be as effective" in achieving the State's objective to eradicate sexual-orientation discrimination. *See Ashcroft v. ACLU*, 542 U.S. 656, 665 (2004).

Carpenter insists that it refuses service based not on sexual orientation but on the same-sex character of marriages, and argues that

21

New York could achieve its goals less restrictively by "apply[ing] its law to stop status discrimination, not message-based objections." *See* Appellants' Br. 9, 48. But the Supreme Court has "declined to distinguish between status and conduct in this context," because the two are so closely linked. *See Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 689 (2010); *accord Lawrence v. Texas*, 539 U.S. 558, 583 (2003) (O'Connor, J., concurring in the judgment); *see also Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993) ("A tax on wearing yarmulkes is a tax on Jews.").

And to suggest that exempting Carpenter would pose no "actual problem" because other photographers in New York provide services to same-sex couples (Appellants' Br. 51–52) misses the point. Even assuming that there are comparable wedding vendors throughout the state, telling a couple suffering the pain and humiliation of discrimination to "just go someplace else" is no remedy for the grave stigmatic harms that discrimination inflicts. "Discrimination is not simply dollars and cents, hamburgers and movies; it is the humiliation, frustration, and embarrassment that a person must surely feel when he is told that he is unacceptable as a member of the public." *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 292 (1964) (Goldberg, J., concurring). Antidiscrimination laws "vindicate 'the deprivation of personal dignity that surely accompanies denials of equal access to public establishments.'"

22

*See id.* at 250 (majority opinion) (quoting S. Rep. No. 88-872, at 16–17 (1964)).

That some (or even most) wedding vendors in New York might serve same-sex couples would do nothing to alleviate the "serious stigma" (*Masterpiece Cakeshop*, 138 S. Ct. at 1729) of living in a community in which businesses can publicly bar their doors to LGBTQ people. Were the requested exemption granted, same-sex couples would awaken each day knowing that, wherever they go, they might be turned away from public accommodations that deem them unfit and unworthy to be served, and that they would have no legal recourse as long as the denials were explained in religious terms.

Allowing discrimination by public accommodations also inflicts economic harms well beyond the standalone discriminatory event. *See* Christy Mallory et al., Williams Inst., *The Impact of Stigma and Discrimination Against LGBT People in Texas* 54–64 (2017), https://bit.ly/3LQWkfE (explaining that "state economies benefit from more inclusive legal and social environments"); *see also Heart of Atlanta*, 379 U.S. at 252–53, 257–58. Must LGBTQ people carry around a Green Book to find establishments that will serve them? *Cf.* Brent Staples, *Traveling While Black: The Green Book's Black History*, N.Y. Times (Jan. 25, 2019), https://nyti.ms/3aaPiAB. And must New York allow businesses

to force them to do so, at so great a cost to the State, its economy, and the dignity and well-being of its citizens?

Put simply, "acts of invidious discrimination in the distribution of publicly available goods [and] services . . . cause unique evils" (*Roberts*, 468 U.S. at 628), which New York has chosen to exorcise. To accept Carpenter's arguments would instead give official imprimatur to those acts. It would deny LGBTQ people the fundamental American promise of equality for all and diminish their standing in society. The Constitution does not require government to impose such grave harms in the name of religious accommodation.

## II. New York's public-accommodations law does not coerce Carpenter to participate in religious activity.

Carpenter's contention that the public-accommodations law is unconstitutionally coercive in violation of the Free Exercise and Establishment Clauses (*see* Appellants' Br. 41–44) likewise fails.

"It is an elemental First Amendment principle that government may not coerce its citizens 'to support or participate in any religion or its exercise.'" *Town of Greece v. Galloway*, 572 U.S. 565, 586 (2014) (plurality opinion) (quoting *County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 659 (1989) (Kennedy, J., concurring)). Whether a law coerces religious exercise is an objective question for the courts. *See id.*

24

at 588–89 (plurality opinion) (rejecting plaintiffs' argument that official prayers were coercive, based on Court's interpretation of factual record); *see also Lee v. Weisman*, 505 U.S. 577, 592–94 (1992) (making fact-specific determination that prayer at public-school event was coercive).

Emilee Carpenter says that she views weddings as "inherently religious . . . events" and that, when she photographs a wedding, she always "follows the officiant's instructions[ ] and 'acts as a witness' of the union 'before God.'" Appellants' Br. 42 (quoting J.A. 29–30, 35). But New York's public-accommodations law does not require her to officiate a wedding ceremony, swear to the validity of a marriage, or celebrate it. Rather, the law requires only that a business that chooses to offer a service to the public—here, wedding photography—must provide that service regardless of the sexual orientation of the marrying couple. The couple is paying the photographer to memorialize their wedding, not to participate in it. Merely being present to do a job while invited guests celebrate a significant religious activity in their lives does not constitute legal coercion to join the religious practice. *See Fields v. City of Tulsa*, 753 F.3d 1000, 1010–12 (10th Cir. 2014) (no coercion where police officer was ordered to attend community-outreach event at Islamic community center, when attending similar events hosted by secular and religious organizations was regular aspect of his duties).

By contrast, in cases where courts concluded that governmental practices were unconstitutionally coercive, the government's conduct directly placed coercive pressure on the plaintiffs to take part in religious activity. For example, in cases involving school prayer, public-school officials "creat[ed] a state-sponsored and state-directed religious exercise" at public-school events, and the prayers "bore the imprint of the state." *See Lee*, 505 U.S. at 587, 590; *see also Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 305–08 (2000). Likewise, in cases where people on probation or parole were placed in religious programs or facilities, the *government* required them to attend those facilities and participate in the religious activities, on penalty of imprisonment. *See Janny v. Gamez*, 8 F.4th 883, 908–09 (10th Cir. 2021), *petition for cert. dismissed*, 142 S. Ct. 878 (2022); *Warner v. Orange Cnty. Dep't of Prob.*, 115 F.3d 1068, 1075 (2d Cir. 1996), *reinstated after vacatur and remand*, 173 F.3d 120 (2d Cir. 1999).

Unlike public-school students, probationers, or parolees, wedding photographers voluntarily select an occupation that necessarily results in exposure to ceremonies and religious activity that might not align with the photographers' own religious beliefs. Emilee Carpenter is no more forced to participate in religious activity with which she disagrees when she is hired for a wedding of a same-sex couple than she is when she is hired for a wedding of a Jewish, Hindu, or interfaith couple. Accepting Carpenter's

26

coercion argument would permit Carpenter and every other wedding-service provider to discriminate against couples with any different religious beliefs or practices from the provider's own. As we discuss more in the next section, that result would be devastating for religious freedom.

## III. Antidiscrimination laws protect religious freedom.

This case entails more than the weighing of religious objections against secular rights and interests. For public-accommodations laws like New York's also protect religion and its exercise. Public-accommodations laws advance strong state interests in preventing discrimination of all kinds, including *religious* discrimination, in the provision of goods and services, thereby ensuring that all people may believe and worship according to their conscience, without fear that they will be denied equal treatment in the public marketplace. The religious freedom of all is therefore threatened, not served, by efforts to misuse the First Amendment to license discrimination.

Though Carpenter may assert an objection solely to weddings of same-sex couples, the drastic revision of free-exercise law that it seeks could not be so cabined. For in our pluralistic society, there is an almost limitless variety of religious motivations, interests, and potential objections. What is more, many religious adherents view themselves as guided by religion in everything they do. *See, e.g.*, *Henderson v. Kennedy*,

27

253 F.3d 12, 17 (D.C. Cir. 2001). Emilee Carpenter is a case in point: she asserts that her religious beliefs "shape every aspect of her life, including her identity, her relationship with others, . . . her understanding of creation, truth, morality, purity, beauty, and excellence," and "how she treats others." J.A. 25, 27. Meanwhile, antidiscrimination laws "protect[ ] against exclusion from an almost limitless number of transactions and endeavors that constitute ordinary civic life in a free society." *Romer v. Evans*, 517 U.S. 620, 631 (1996). If this Court were to interpret the First Amendment to license violations of these laws whenever one has a religion-based desire not to obey, all manner of discrimination would become permissible: Anyone could be denied service in a restaurant, hotel, shop, or other public establishment, for no reason other than that they are gay, Black, Jewish, or disabled, and the proprietor states a religious reason for barring the doors to them. *Cf., e.g.*, *Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 402 n.5 (1968) (per curiam) (restaurant owner's refusal to serve Black patrons was based on belief that federal public-accommodations law "contravenes the will of God").

That these harms could extend to religious minorities is not merely theoretical. The case law shows—and the experiences of *amici* and our members confirm—that disfavor toward, unequal treatment of, and denials of service to members of minority faiths and nonbelievers are all

28

too common. Moreover, religious minorities are also often members of other disfavored groups, such as the LGBTQ community. And religious discrimination, like other forms of discrimination, is often premised on the discriminator's religious views.

In *Paletz v. Adaya*, No. B247184, 2014 WL 7402324 (Cal. Ct. App. Dec. 29, 2014), for example, a hotel owner closed a poolside event after learning that it was hosted by a Jewish group. The hotelier told an employee, "I don't want any [f—ing] Jews in the pool" (*id.* at *2 (alteration in original)); said that her family would cut off funding to the hotel if they learned of the gathering (*id.* at *4); and directed hotel staff to remove the Jewish guests from the property (*id.* at *2). In *Khedr v. IHOP Restaurants, LLC*, 197 F. Supp. 3d 384 (D. Conn. 2016), a restaurant refused service to a Muslim family because of their faith. The father recounted: "The restaurant manager started to look at us up and down with anger, hate, and dirty looks because my wife was wearing a veil, as per our religion of Islam." *Id.* at 385. In front of the family's twelve-year-old child, the manager told his staff "not to serve 'these people' any food." *Id.* And in *Fatihah v. Neal*, the owners of a gun range posted a sign declaring the facility a "<u>MUSLIM FREE ESTABLISHMENT</u>," armed themselves with handguns when a Muslim man wanted to use the range, and accused him of wanting to murder them because "'[his] Sharia law' required" it. *See*

Compl. ¶¶ 24, 32, 34, No. 6:16-cv-00058, ECF No. 3 (E.D. Okla. Feb. 17, 2016).

The context of employment discrimination further illuminates the danger. *See, e.g.*, *Huri v. Off. of the Chief Judge*, 804 F.3d 826, 830, 834 (7th Cir. 2015) (supervisors called Muslim employee who wore hijab "evil," denied her time off for Islamic religious holidays, and engaged in "social shunning, implicit criticism of non-Christians, and uniquely bad treatment of [the employee] and her daughter"); *Nappi v. Holland Christian Home Ass'n*, No. 2:11-cv-2832, 2015 WL 5023007, at *1–3 (D.N.J. Aug. 21, 2015) (Catholic maintenance worker subjected to harassment by colleagues—who encouraged him to leave his church, put religious literature in his locker, "wanted to shoot [him]," and ultimately fired him "because, as a Roman Catholic, he was an 'outsider' who did not 'fit in.'"); *Minnesota ex rel. McClure v. Sports & Health Club, Inc.*, 370 N.W.2d 844, 846–47 (Minn. 1985) (en banc) (gym excluded job applicants and employees not living according to owners' faith, based on owners' "religious belief that they are forbidden by God, as set forth in the Bible, to work with 'unbelievers'").

It follows that if the First Amendment were construed to grant businesses a license to violate antidiscrimination laws whenever they profess a religious motivation, religious discrimination would receive governmental sanction and could become commonplace across New York.

30

Suppose that an interfaith couple wished to marry, and in keeping with the religion of one partner, the couple planned to serve kosher or halal food. But the only kosher or halal caterer in town refused to prepare food for the wedding, based on its religious belief that interfaith marriages are sinful. Should the caterer have the right, in the face of public-accommodations protections against religious discrimination, to force the couple to choose between forgoing a catered reception, on the one hand, and violating one spouse's sincere religious beliefs, on the other?

What of children who are part of a family that, in the opinion of a businessowner, should not exist because the parents are of different faiths or were married within a faith that the merchant's religion rejects? Might the children be denied a birthday cake or a party celebrating a bar or bat mitzvah or a first communion?

And more broadly, may a restaurant turn away a Muslim woman who wears a hijab, because the owner's religion forbids associating with members of other faiths? May a grocer refuse to sell food to an unmarried pregnant woman because his religion tells him that he would be facilitating someone else's living in sin? And what about the recently widowed Catholic whose Protestant spouse wanted a Protestant funeral? May a Protestant funeral director bar the widow from the memorial,

31

leaving her unable to say goodbye in a way that respects her beloved's faith?

If the First Amendment licenses religion-motivated denials of service to same-sex couples, as Carpenter contends, then it also sanctions all other religion-motivated denials, including exclusions based on a customer's faith. One could be refused employment, thrown out of a hotel, or barred from purchasing a hamburger just for being of the "wrong" religion. And no state or local authority or law could do anything to remedy the situation. Such a system would devastate religious freedom, not protect it.

## CONCLUSION

For the foregoing reasons, the district court's decision should be affirmed.

Respectfully submitted,

s/ *Alex J. Luchenitser*
  RICHARD B. KATSKEE
  ALEX J. LUCHENITSER*
    *Counsel of Record*
  KENNETH D. UPTON, JR.
  ADRIANNE M. SPOTO
  Americans United for Separation of
    Church and State
  1310 L Street NW, Suite 200
  Washington, DC 20005
  (202) 466-7306
  *katskee@au.org*
  *luchenitser@au.org*
  *upton@au.org*
  *spoto@au.org*

*Counsel for* Amici Curiae

Date: May 16, 2022

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Local Rules 29.1(c) and 32.1(a)(4)(A) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), it contains 6,763 words.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5), and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared using Microsoft Word in Century Schoolbook font measuring no less than 14 points.

s/ *Alex J. Luchenitser*

34