# 22-75

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

**EMILEE CARPENTER LLC, d/b/a Emilee Carpenter Photography and
EMILEE CARPENTER**
*Plaintiffs-Appellants*

**v.**

**LETITIA JAMES, in her official capacity as Attorney General of New York;
MARIA L. IMPERIAL, in her official capacity as Acting Commissioner of the
New York State Division of Human Rights; and WEEDEN WETMORE, in
his official capacity as District Attorney of Chemung County**
*Defendants-Appellees.*

On Appeal from the United States District Court for the
Western District of New York, Case No. 6:21-cv-06303

**BRIEF OF *AMICI CURIAE* AMALGAMATED BANK, CSAA INSURANCE
GROUP, FASTLY, INC., KIND LLC, LEVI STRAUSS & CO., PAYPAL
HOLDINGS, INC., ROYAL BANK OF CANADA, S&P GLOBAL, SUN
LIFE U.S., SUBMITTED IN SUPPORT OF DEFENDANTS-APPELLEES
AND IN FAVOR OF AFFIRMANCE**

*Counsel Information Located on Back Cover*

**STEPTOE & JOHNSON LLP**
Patricia B. Palacios
Mark F. Murphy
Daniele Arad-Neeman
1330 Connecticut Avenue NW
Washington, D.C. 20036
Tel: (202) 429-3000
*ppalacios@steptoe.com*
*mmurphy@steptoe.com*
*daradneeman@steptoe.com*

Azar Alexander
227 W. Monroe St.
Suite 4700
Chicago, IL 60606
Tel: (312) 577-1236
*aalexander@steptoe.com*

**HUMAN RIGHTS CAMPAIGN FOUNDATION**
Cynthia Cheng-Wun Weaver
JP Schnapper-Casteras
1640 Rhode Island Ave. NW
Washington, DC 20036
Tel: (202)-527-3669
*Cynthia.Weaver@hrc.org*

**TAYLOR & COHEN LLP**
Robert Cohen
305 Broadway, 7th Floor
New York, NY 10007
Tel: (212) 267-1901
*rcohen@taylorcohenllp.com*

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *amici curiae* certify the following information:

Amalgamated Bank is 100% owned by Amalgamated Financial Corp. No publicly held corporation owns more than 10% of Amalgamated Financial Corp.'s stock.

CSAA Insurance Group has no parent corporation, and no publicly held corporation owns more than 10% of its stock.

Fastly, Inc. has no parent corporation, and no publicly held corporation owns more than 10% of its stock.

KIND LLC is a subsidiary of KIND Inc., which is a subsidiary of Mars Wrigley Confectionary, US, LLC, which is a subsidiary of Mars Inc.

Levi Strauss & Co. has no parent corporation, and no publicly held corporation owns more than 10% of its stock.

PayPal Holdings, Inc. has no parent corporation, and no publicly held corporation owns more than 10% of its stock.

Royal Bank of Canada has no parent corporation, and pursuant to the *Bank Act* (Canada), no entity may own more than 10% of its shares without approval of the Minister of Finance (Canada). To the best of Royal Bank of Canada's knowledge, no entity has been granted such approval.

i

S&P Global has no parent corporation, and no publicly held corporation owns more than 10% of its stock.

Sun Life U.S.'s parent corporation is Sun Life of Canada (U.S.) Holdings, Inc.  Sun Life U.S. and Sun Life of Canada (U.S.) Holdings, Inc. are both 100% owned by Sun Life Financial Inc.

## **TABLE OF CONTENTS**

**I.  INTEREST OF THE *AMICI CURIAE*** ................................................................ 1

**II.  SUMMARY OF THE ARGUMENT** ................................................................ 2

**III. ARGUMENT** .................................................................................................... 4

    A.  Appellants' Proposed Speech-Based Exemptions to Non-Discrimination Laws are Overly Broad and Difficult to Predict ............................................... 5

    B.  Appellants' Proposed Exemptions Would Create Confusion in the Marketplace. ........................................................................................... 8

    C.  Appellants' Proposed Exemptions for Expressive Goods or Services Would Disrupt *Amici*'s Operations. ....................................................................... 10

    D.  Speech and Religious-Based Exemptions Would Create Holes in Non-Discrimination Laws That May Subject *Amici*'s Employees to Discrimination Inside and Outside of the Workplace. .................................. 12

**IV. CONCLUSION** ........................................................................................... 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*United States v. Munoz-Flores*,
  495 U.S. 385 (1990)...........................................................................7

*Vieth v. Jubelirer*,
  541 U.S. 267 (2004)...........................................................................7

**Rules**

Fed. R. App. P. 29(a)(4)(E)...............................................................1

2d Cir. R. 29.1....................................................................................1

**Other Authorities**

AM. PSYCHOL. ASSN., STRESS IN AMERICA: THE IMPACT OF
  DISCRIMINATION (Mar. 2016) ..........................................................15

András Tilcsik, *Pride and Prejudice: Employment Discrimination
  Against Openly Gay Men in the United States*, 117 AM. J.
  SOCIOLOGY. 586 (2011) ....................................................................14

CREDIT SUISSE, CREDIT SUISSE ESG RESEARCH, LGBT: THE VALUE OF
  DIVERSITY (Apr. 2016) ......................................................................13

CROSBY BURNS, THE COSTLY BUSINESS OF DISCRIMINATION: THE
  ECONOMIC COST OF DISCRIMINATION AND THE FINANCIAL BENEFITS
  OF GAY AND TRANSGENDER EQUALITY IN THE WORKPLACE (Ctr. for
  Am. Progress 2012) ...........................................................................14

Feng Li & Venky Nagar, *Diversity and Performance*, 59 MGMT. SCI.
  529 (2013)..........................................................................................13

FORBES INSIGHTS, GLOBAL DIVERSITY AND INCLUSION: FOSTERING
  INNOVATION THROUGH A DIVERSE WORKFORCE (2011)......................13

HUMAN RIGHTS CAMPAIGN FOUNDATION, CORPORATE EQUALITY
  INDEX 2022 - RATING WORKPLACES ON LESBIAN, GAY, BISEXUAL,
  TRANSGENDER AND QUEER EQUALITY .................................................12

iv

Iain MacNeil, *Uncertainty in Commercial Law*, 13 EDINBURGH L. REV. 68 (2009) ...................................................................................8

Jennifer C. Pizer, et al., *Evidence of Persistent and Pervasive Workplace Discrimination Against LGBT People: The Need for Federal Legislation Prohibiting Discrimination and Providing for Equal Employment Benefits*, 45 LOY. L.A. L. REV. 715 (2012) .......................15

KENJI YOSHINO & CHRISTIE SMITH, UNCOVERING TALENT: A NEW MODEL OF INCLUSION (Deloitte Univ. Dec. 2013) ...............................................13

LEVEL PLAYING FIELD INST., THE COST OF EMPLOYEE TURNOVER DUE SOLELY TO UNFAIRNESS IN THE WORKPLACE (2007) .........................................13

M. V. LEE BADGETT ET AL., THE BUSINESS IMPACT OF LGBT- SUPPORTIVE WORKPLACE POLICIES (Williams Institute May 2013).............13, 14

Richard H. Fallon, Jr., *Judicially Manageable Standards and Constitutional Meaning*, 119 HARV. L. REV. 1275 (2006) ...................................7

Roger Hallowell, *The Relationships of Customer Satisfaction, Customer Loyalty, and Profitability: An Empirical Study*, 7 INT'L J. SERV. INDUS. MGMT. 27 (Feb. 1996) .....................................................................12

SHAUN PICHLER, ET AL., DO LGBT-SUPPORTIVE CORPORATE POLICIES ENHANCE FIRM PERFORMANCE? (2017) ................................................................13

Sylvia Ann Hewlett, et al., *How Diversity Can Drive Innovation,* HARV. BUS. REV. (Dec. 2013).....................................................................13

SYLVIA ANN HEWLETT, ET AL., INNOVATION, DIVERSITY AND MARKET GROWTH (Ctr. for Talent Innovation 2013)......................................................13

William D. Hawkland, *The Uniform Commercial Code and the Civil Codes*, 56 LA. L. REV. 231 (1995) .........................................................................8

## I.  INTEREST OF THE *AMICI CURIAE*

This brief is submitted with the consent of all parties.[1]  *Amici* include companies from a wide variety of industries, including information technology, financial services, food and beverage, insurance, consumer products, fashion, and retail.  *Amici* share a belief that non-discrimination laws ensure all people— including customers and employees—are treated with dignity and respect.  Non-discrimination laws also improve profitability, productivity, and creativity in the workplace.  The broad and ill-defined exemptions from non-discrimination laws proposed by Appellants would burden *amici* and their employees.  Appellants' proposed exemptions would create uncertainty and impose unnecessary costs and administrative complexities on employers.  Commerce would also be disrupted if businesses were required to interrogate their customers when providing goods or services to ensure businesses are not adopting or endorsing a message with which they disagree.  Moreover, *amici* would be unable to rely on state non-discrimination laws to ensure their employees are treated fairly as they consume goods and services either as members of the community or as employees.  Smooth,

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E) and Local Rule 29.1, counsel for *amici* affirm that this brief was not authored by any party's counsel in whole or in part, and that no party or other person, other than the *amici curiae*, their members, or their counsel contributed money intended to fund the preparation or submission of this brief.

1

predictable, and efficient business transactions may be disrupted if businesses decline to work with *amici*'s employees on either speech or religious grounds.

*Amici* want to serve customers of all identities, beliefs, and backgrounds. The only prerequisite to conducting business is, and should continue to be, whether the customer can meet the business's requirements for purchase: whether the customer has the financial capacity to purchase the good or service and whether the customer can abide by any necessary contractual obligations. Customers' personal beliefs are and should remain largely irrelevant to whether they can transact with a business.

*Amici* submit this brief to advise the Court of the adverse impacts the Appellants' proposed exemptions are likely to cause for *amici*, other employers, and their employees.

The businesses joining this brief, also listed in the attached Appendix, are: Amalgamated Bank, CSAA Insurance Group, Fastly, Inc., KIND LLC, Levi Strauss & Co., PayPal Holdings, Inc., Royal Bank of Canada, S&P Global, and Sun Life U.S.

## II.    SUMMARY OF THE ARGUMENT

A ruling for Appellants would disrupt the flow of *amici*'s business and stymie *amici*'s efforts to safeguard their employees from discrimination. First, Appellants' proposed exemption from non-discrimination laws based on a

2

business's provision of ostensibly expressive goods and services is as impossible for businesses to administer as it is for the courts. To determine whether *amici*'s business partners can opt out of non-discrimination laws on First Amendment grounds, *amici* would be forced to guess at whether certain goods and services are as expressive as taking photographs. Additionally, the adoption of Appellants' proposed exemptions, which assume that the expressive message of a good or service belongs to the business, would require *amici* to interrogate or investigate their customers to ensure *amici* are not accidentally endorsing a message or event with which they do not agree. Making such determinations is both difficult and resource-consuming for *amici*, as well as an unnecessary distraction from core economic demands.

Moreover, permitting speech- or religious-based exemptions to non-discrimination laws would substantially weaken these laws and make amici's employees more vulnerable to discrimination. They would be subject to increased discrimination as customers in their own communities and while performing their jobs. Discrimination negatively affects employees' morale and the ability of amici to operate their businesses as efficiently as possible. Indeed, if amici's employees can be denied goods and services from other businesses simply because of their identities, amici will be unable to conduct business smoothly and predictably. Non-discrimination laws benefit amici's businesses and reflect the policies and

values amici have worked hard to instill in their own corporate cultures.  A ruling for the Appellants would negatively affect both.

## III.  ARGUMENT

*Amici* value non-discrimination laws, which ensure all people—whether employees or customers of *amici* or otherwise—are treated with respect and dignity.  *Amici* have an interest in America's courts continuing to uphold the ability of state governments to enforce non-discrimination laws.  They also have an interest in this Court rejecting sweeping arguments that the First Amendment exempts some businesses from complying with those laws.  Indeed, *amici* have adopted their own non-discrimination policies, not solely to preserve the dignity of their customers and employees, but also because these policies are beneficial to profitability, productivity, and creativity.  *See infra* Section D.

*Amici* are concerned about the potential effects on their businesses if this Court adopts the Appellants' constitutional interpretation.  The Appellants' expansive position on expression and expressive conduct would create unpredictable exemptions to non-discrimination laws and laws of general applicability.  Importantly, Appellants do not even attempt to offer a rule or framework for implementing exemptions, insisting broadly that New York "could extend" exemptions to businesses like theirs.  *See* App. Br. at 48.  Such uncertainty regarding these exemptions is problematic for *amici* because *amici* would have

difficulty predicting whether businesses with which they wish to partner create expressive goods or provide expressive services that would entitle them to an exemption from otherwise generally applicable laws. Moreover, a ruling that makes the customer's expressive message synonymous with the business's overall message would require *amici* to engage in intrusive and awkward interactions with their customers to ensure that *amici* are not implicitly endorsing messages that contradict their values.

In addition to being nearly impossible for businesses to administer, the vast number of potential exemptions to non-discrimination laws that would exist under Appellants' framework is concerning. The weakening of non-discrimination laws via speech- and religious-based exemptions would harm *amici* and their employees by potentially subjecting employees to increased discrimination (1) as they purchase goods and services in their own communities, which undercuts *amici*'s own non-discrimination polices and negatively impacts employee morale and productivity; and (2) when conducting business as a part of their job, which would disrupt the smooth and efficient flow of *amici*'s operations.

### A. Appellants' Proposed Speech-Based Exemptions to Non-Discrimination Laws are Overly Broad and Difficult to Predict.

*Amici* are concerned that adoption of the Appellants' argument regarding expression and expressive conduct could result in numerous and difficult-to-predict

5

exemptions to non-discrimination laws and other laws of general applicability.[2] These unpredictable exemptions would have negative effects on *amici*'s business operations and profits. A lack of clarity in the application of the law imposes significant costs on businesses.

Adopting Appellants' arguments would create unpredictable exemptions to laws of general applicability because what may qualify as expression or expressive conduct is broad and ambiguous. Appellants admit that they will refuse projects that "promote[] or celebrate" same-sex marriage, whether photographing a same-sex wedding or a "staged wedding shoot" for an advertisement depicting a same-sex wedding. JA0035 ⁋ 117; JA0038 ⁋ 138. They contend that accepting such assignments would in effect "promote activities contrary to [their] beliefs [and] express messages contradicting [their] beliefs." *Id.* at JA0035 ¶ 118. Thus, Appellants advocate for an exemption based solely on the subjective, personal views of a company as to whether certain products or services "promote" or "celebrate" a message that is objectionable to them.

Administering such an unwieldy position on speech-based exemptions to generally applicable laws would be challenging for lower courts and the business

---

[2] Appellants' proposed rule is not limited to non-discrimination laws. Rather, it could permit First Amendment exemptions to *any* neutral law of general applicability. Under Appellants' proposed rule, for example, businesses could exempt themselves from health and safety regulations on speech or religious grounds.

community alike.[3] To apply Appellants' position, one would need to determine whether certain conduct is as expressive as taking on photography-based projects that *promote or celebrate* same-sex marriage. Appellants use the example of a same-sex wedding, but photography that *promotes* same-sex marriage could be as simple as a photo of two same-sex individuals in any context (work, personal, or otherwise). Or a project that does not depict the LGBTQ+ community but is *funded* by a married same-sex couple could be interpreted as a promotion of the ideals of same-sex marriage. Adopting such a broad definition of expression or expressive conduct could result in a multitude of business activities potentially being expressive. For example, designing a website, editing photos, interior decorating, landscaping, hair styling, practicing medicine, or authoring an appellate brief all could theoretically qualify as expressive. Or not. The boundaries of expression or expressive conduct are simply too amorphous under Appellants' position.

*Amici* believe that the opportunity for such frequent and unpredictable exemptions from non-discrimination laws and other laws of general applicability

---

[3] Courts often consider the administrability of holdings when deciding constitutional questions, and this Court should in this case as well. *See Vieth v. Jubelirer*, 541 U.S. 267 (2004) (finding an Equal Protection claim regarding gerrymandering nonjusticiable because the Court could not find a judicially manageable standard); *United States v. Munoz-Flores*, 495 U.S. 385, 395-96 (1990) (recognizing the need for courts to develop judicially manageable standards); *see generally* Richard H. Fallon, Jr., *Judicially Manageable Standards and Constitutional Meaning*, 119 HARV. L. REV. 1275 (2006).

7

would affect *amici*'s daily operations, profitability, employee relations, and customer service.

## B. Appellants' Proposed Exemptions Would Create Confusion in the Marketplace.

Allowing broad, unclear exemptions to non-discrimination laws based on expression or expressive services would make it difficult for businesses to predict when and how to account for discrimination in their transactions.[4]  In other words, the ill-defined parameters of Appellants' view of expression and expressive services means *amici* and other businesses will face difficulties in determining whether they or certain vendors provide expressive goods or services and how that would impact business dealings.  This ensuing confusion about which companies can opt out of generally applicable laws, and for which reasons, would disrupt business by creating unpredictability in the marketplace.  The impact of having to vet vendors could vary widely among companies.

Consider the following example:  A small company is planning its holiday party and is seeking DJs to provide entertainment.  The company knows that many

---

[4] *Amici*, and the business community in general, value certainty and predictability when conducting commercial transactions, which are shaped through and facilitated by legal rules.  *See* Iain MacNeil, *Uncertainty in Commercial Law*, 13 EDINBURGH L. REV. 68, 69 (2009) ("It is often said that business activity is facilitated by legal certainty."); *see also* William D. Hawkland, *The Uniform Commercial Code and the Civil Codes*, 56 LA. L. REV. 231, 231 (1995) (discussing how the Uniform Commercial Code was intended to create uniformity and certainty).

8

of its employees are in same-sex relationships and may dance with their partners

during the DJ's set.  The company does not want to contract with a DJ who may

suddenly refuse to perform while the same-sex couples dance or try to terminate

the contract.  Under Appellants' proposed system of unpredictable exemptions,

company leaders would need to engage in a cumbersome vetting process.  First, the

company would need to determine if the DJ's appearance would be considered

expressive, and, if so, if the appearance might "promote" or "celebrate" the same-

sex couples' relationships.  This would be a subjective and confusing

determination that would depend on whether the specific DJs under consideration

would themselves view their appearance as promoting or celebrating the identities

or characteristics of members of the audience.  Then, the company would need to

ascertain which specific audience characteristics are objectionable to the DJs and

might cause them to refuse to appear.   In addition to being awkward for the

employees tasked with making these determinations, the process might not even

catch all of a particular DJ's claimed grounds for refusal to appear, leading to

inevitable contract disputes if a DJ refuses to perform at the last minute.

Such a process would be both time-consuming and inefficient.  Moreover,

the extra steps needed to navigate these exemptions and permissible discrimination

would not result in any net positive for the company, the marketplace for DJs, or

society at large.  There is no shortage of potential examples like this, and many

9

companies could not operate effectively under such a system. *Amici* have built successful businesses and are proud of the contributions those businesses make to the economy and society. But not all companies are equipped to engage in the resource-straining process of determining which services may be considered expressive and how inconsistent non-discrimination laws could apply to those services—nor should any company have to.

Appellants would require companies to either run the risk of being denied goods or services (and the opportunity to market their goods and services), or create and operate a complex system to somehow assess whether each and every vendor with which they wish to conduct business: (1) engages in expressive conduct, or (2) might decline to provide their expressive goods or services to *amici*. The number of companies with which many companies transact business means that such assessments would increase costs, create administrative and legal burdens, and divert resources from core business operations.

## C. Appellants' Proposed Exemptions for Expressive Goods or Services Would Disrupt *Amici*'s Operations.

Appellants refuse to photograph same-sex weddings because they claim that the mere act of photographing them constitutes an endorsement of the marriage of a same-sex couple. Under Appellants' theory of the case, they would be endorsing same-sex marriage even if their subjects were actors and not an actual same-sex couple. The import of Appellants' position—that a business's sale of goods or

10

services to a customer is an endorsement of that customer's beliefs or their use of the products—would fundamentally change the way businesses operate.

As it stands now, consumers and the general public do not assume that businesses open to the public have adopted or endorsed the views or beliefs of their customers or the end use of the goods and services they provide to them. *Amici* do not want this to change. Adopting the view that a business endorses the views of all its customers, their events, or their messages would create significant problems for the operation of business. For example, it would be unduly cumbersome for a tailor to interrogate each customer who orders a custom suit or garment about the event to which plan to wear it. But, under Appellants' position, a tailor would have to do just that to avoid endorsing the views of their customers that contradict their core values. Businesses would certainly suffer internal and external disruptions if forced to take on the laborious—if possible at all—task of deciphering and applying Appellant's proposed exemption to real-world situations.

To avoid being associated with individuals, groups, events, or messages with which they prefer not to be associated, businesses would expend resources to scrutinize and interrogate their customers about their lives and the planned use of the goods or services being sold. In addition to the expense associated with such a process, questioning customers in this way would require businesses to pry into the

private lives of their customers, result in inefficient customer service,[5] and may even trigger discrimination claims.

This problem extends to *amici*'s employees as well. If a business's product counts as expression, the employee creating the product may likewise be perceived as adopting the business's message. This will prove problematic for businesses because employees potentially could refuse to do certain jobs simply because they do not want to be associated with the message. Goods created for customers or services performed for customers are and should remain the expression of the customer, not the business.

### D. Speech and Religious-Based Exemptions Would Create Holes in Non-Discrimination Laws That May Subject *Amici*'s Employees to Discrimination Inside and Outside of the Workplace.

Safeguarding the dignified and respectful treatment of their employees is of utmost importance to *amici*. Indeed, this is why they adopt robust non-discrimination policies and diversity and inclusion policies of their own.[6] *Amici*

---

[5] *Amici* value providing top quality customer service, which affects profits. *See generally* Roger Hallowell, *The Relationships of Customer Satisfaction, Customer Loyalty, and Profitability: An Empirical Study*, 7 INT'L J. SERV. INDUS. MGMT. 27 (Feb. 1996) (finding a correlation between customer satisfaction and profitability).
[6] For example, 93% of Fortune 500 companies surveyed by the Human Rights Campaign in 2022 provide explicit sexual orientation non-discrimination protections. *See* HUMAN RIGHTS CAMPAIGN FOUNDATION, CORPORATE EQUALITY INDEX 2022 - RATING WORKPLACES ON LESBIAN, GAY, BISEXUAL, TRANSGENDER AND QUEER EQUALITY 15. Additionally, 91% of Fortune 500 companies and 97% of all U.S. companies surveyed by the Human Rights Campaign in 2022 provide explicit gender identity non-discrimination protections. *See id* at 14.

adopt these policies not only for moral and legal reasons, but because they are

good for business.  Such policies are tied to increases in profitability;[7] they

promote diverse and inclusive workplaces, which are more receptive to new ideas

and opportunities;[8] and they allow *all* employees to be their full and true selves in

the workplace, which in turn, increases their on-the-job morale.[9]  In contrast,

---

[7] *See* CREDIT SUISSE, CREDIT SUISSE ESG RESEARCH, LGBT: THE VALUE OF DIVERSITY 1 (Apr. 2016) (finding that 270 companies that openly support and embrace LGBTQ+ employees outperformed and had returns on equity and cash flow that were 10% to 21% higher);  M. V. LEE BADGETT ET AL., THE BUSINESS IMPACT OF LGBT-SUPPORTIVE WORKPLACE POLICIES 23 (Williams Institute May 2013) (finding that the "more robust a company's LGBTQ+-friendly policies, the better its stock performed over the course of four years (2002-2006), compared to other companies in the same industry over the same period of time"); SHAUN PICHLER, ET AL., DO LGBT-SUPPORTIVE CORPORATE POLICIES ENHANCE FIRM PERFORMANCE? 29 (2017) ("[F]irms with LGBT-supportive policies benefit on key factors of financial performance, which, in turn, increase the investor perception of the firm."); SYLVIA ANN HEWLETT, ET AL., INNOVATION, DIVERSITY AND MARKET GROWTH 6 (Ctr. for Talent Innovation 2013) (finding "a robust correlation between highly innovative, diverse companies and market growth"); LEVEL PLAYING FIELD INST., THE COST OF EMPLOYEE TURNOVER DUE SOLELY TO UNFAIRNESS IN THE WORKPLACE 4 (2007) (estimating American businesses lose upwards of $64 billion annually losing and replacing workers who leave due to discrimination).
[8] *See* Feng Li & Venky Nagar, *Diversity and Performance*, 59 MGMT. SCI. 529, 531 (2013); *see also* Sylvia Ann Hewlett, et al., *How Diversity Can Drive Innovation,* HARV. BUS. REV. (Dec. 2013) (finding that diversity "unlocks innovation by creating an environment where 'outside the box' ideas are heard"); Hewlett, et al., *supra*, n.7 at 4 ("[A]n inherently diverse workforce can be a potent source of innovation, as diverse individuals are better attuned to the unmet needs of consumers or clients like themselves."); FORBES INSIGHTS, GLOBAL DIVERSITY AND INCLUSION: FOSTERING INNOVATION THROUGH A DIVERSE WORKFORCE 19 (2011) ("And the best way to ensure the development of new ideas is through a diverse and inclusive workforce.").
[9] *See* KENJI YOSHINO & CHRISTIE SMITH, UNCOVERING TALENT: A NEW MODEL OF INCLUSION 9 (Deloitte Univ. Dec. 2013) (reporting on the "negative impacts" felt

employees at companies that do not encourage diversity and inclusiveness often "do not feel valued or fear discrimination in the workplace."[10]  Moreover, diverse workforces help "capture new clients."[11]

But *amici*'s non-discrimination policies can only go so far.  Employer non-discrimination policies cannot protect employees from discrimination outside of the workplace—*amici* must rely on state and federal law to do that.  If state non-discrimination laws like New York's are effectively weakened by religious- and speech-based exemptions, *amici*'s employees are more likely to encounter discrimination when purchasing goods and services in their communities.  Indeed, empirical evidence shows that LGBTQ+ discrimination tends to be higher in jurisdictions without non-discrimination laws.[12]

---

by all employees when they feel uncomfortable expressing all parts of their identity at work). The positive effects of non-discrimination policies improve the performance of non-LGBTQ+ employees as well. *See* CROSBY BURNS, THE COSTLY BUSINESS OF DISCRIMINATION: THE ECONOMIC COST OF DISCRIMINATION AND THE FINANCIAL BENEFITS OF GAY AND TRANSGENDER EQUALITY IN THE WORKPLACE 34 (Ctr. for Am. Progress 2012) ("When gay and transgender employees work in environments where they do not have to hide their sexual orientation and gender identity from their coworkers, everybody's productivity is enhanced, including straight and nontransgender colleagues.").
[10] BURNS, *supra*, at 12.
[11] *See* FORBES INSIGHTS, *supra*, at 11; *see also* BADGETT, *supra*, n.7 at 21 (explaining that many local governments *require* that their contractors have LGBTQ+ supportive hiring practices).
[12] András Tilcsik, *Pride and Prejudice: Employment Discrimination Against Openly Gay Men in the United States*, 117 AM. J. SOCIOLOGY. 586, 614-15 (2011).

*Amici*'s diverse employees may be unable to engage in ordinary, everyday commercial transactions because of their identity if Appellants' exemptions are adopted. *Amici* object to such treatment of their employees—or any individual for that matter—on principle, and also for practical reasons. Employees who are subjected to such discrimination will suffer emotional and psychological harm,[13] which is likely to negatively affect their job performance and productivity. *Amici*'s efforts to create inclusive work environments for all of their employees would be undercut if their employees were being discriminated against in their own communities. Thus, a ruling for Appellants would mean that employees may choose to work for a company because of its non-discrimination policies, but then must live in an environment where, as a customer, discrimination is permissible.

Hollowing out state non-discrimination laws would also hurt *amici*'s employees as they interact with other businesses as a part of their job. It is a fact of the modern marketplace that businesses do not function in silos. Purchasing goods and conducting transactions are essential aspects of operating a business and require companies and their employees to interact with each other. Appellants'

---

[13] *See* AM. PSYCHOL. ASSN., STRESS IN AMERICA: THE IMPACT OF DISCRIMINATION 8 (Mar. 2016) (discussing how discrimination is associated with higher stress levels and certain health disparities); Jennifer C. Pizer, et al., *Evidence of Persistent and Pervasive Workplace Discrimination Against LGBT People: The Need for Federal Legislation Prohibiting Discrimination and Providing for Equal Employment Benefits*, 45 LOY. L.A. L. REV. 715, 738 (2012) ("Research shows that experiencing discrimination can affect an individual's mental and physical health.").

desired ruling could result in *amici*'s employees being turned away from businesses because those businesses assert a speech or religious objection to serving the employee.

*Amici*'s businesses would suffer greatly under such conditions. For example, imagine a gay employee organized a work lunch with clients to seal an important deal, but when the group shows up to the restaurant, the restaurant's chef refuses to "craft" his specialty dishes because the host is gay. That would not only embarrass and demean the gay employee, it might also spoil the deal and disrupt business affairs. Or, if a Muslim employee hired a contractor to design and build a new office space and the contractor stopped halfway through upon discovering the employee's religion, both the employer and the employee would be injured— including due to wasted resources and time. Again, such a wasteful process would not tangibly benefit any of the parties involved.

*Amici*'s success as companies depends upon the fair treatment of their employees, which permits smooth, consistent, and predictable business transactions. If permissible discrimination prevents *amici*'s employees from conducting business with other companies, *amici* cannot conduct their businesses efficiently or effectively.

16

## IV.   CONCLUSION

Non-discrimination laws ensure that customers are able to purchase goods and services regardless of their identity.  Adopting Appellants' broad and difficult-to-administer exemptions, permitting businesses to opt out of non-discrimination laws and other laws of general applicability, would negatively affect *amici*'s ability to operate efficiently, keep administrative costs low, promote profitability, maintain their diverse and inclusive environment, and ensure the dignified treatment of their employees.  *Amici* respectfully urge that the judgment of the District Court be affirmed.

May 16, 2022                                    Respectfully submitted,


                                         */s/ Patricia B. Palacios*
                                         Patricia B. Palacios
                                         Mark F. Murphy
                                         Daniele Arad-Neeman
                                         1330 Connecticut Avenue NW
                                         Washington, D.C. 20036
                                         Tel: (202) 429-3000
                                         *ppalacios@steptoe.com*
                                         *mmurphy@steptoe.com*
                                         *daradneeman@steptoe.com*

                                         Azar Alexander
                                         227 W. Monroe St.
                                         Suite 4700
                                         Chicago, IL 60606
                                         Tel: (312) 577-1236
                                         *aalexander@steptoe.com*

                                         **STEPTOE & JOHNSON LLP**

17

Cynthia Cheng-Wun Weaver
JP Schnapper-Casteras
1640 Rhode Island Ave. NW
Washington, DC 20036
Tel: (202)-527-3669
*Cynthia.Weaver@hrc.org*

**HUMAN RIGHTS
CAMPAIGN FOUNDATION**

Robert Cohen
305 Broadway, 7th Floor
New York, NY 10007
Tel: (212) 267-1901
*rcohen@taylorcohenllp.com*

**TAYLOR & COHEN LLP**

*Counsel for Amici Curiae*

## <u>APPENDIX</u>

## LIST OF *AMICI CURIAE*

Amalgamated Bank

CSAA Insurance Group

Fastly, Inc.

KIND LLC

Levi Strauss & Co.

PayPal Holdings, Inc.[*]

Royal Bank of Canada

S&P Global*

Sun Life U.S.

---

[*] Denotes *amici* represented solely by Taylor & Cohen LLP.  All other *amici* are represented solely by Steptoe & Johnson LLP

1

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Local Rule 29.1(c) because, excluding the portions exempted by Federal Rule of Appellate Procedure 32(f), it contains 3939 words.  The brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: May 16, 2022

_/s/ Patricia B. Palacios_
Patricia B. Palacios
1330 Connecticut Avenue NW
Washington, D.C. 20036
Tel: (202) 429-3000
ppalacios@steptoe.com

_Counsel for Amici Curiae_

## CERTIFICATE OF SERVICE

I hereby certify that on May 16, 2022, this brief was filed electronically with the Clerk of the Court for the U.S. Court of Appeals for the Second Circuit through the Court's CM/ECF system. I certify that all participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: May 16, 2022

/s/ Patricia B. Palacios
Patricia B. Palacios
1330 Connecticut Avenue NW
Washington, D.C. 20036
Tel: (202) 429-3000
ppalacios@steptoe.com

*Counsel for Amici Curiae*