# 22-75

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

EMILEE CARPENTER, LLC d/b/a Emily Carpenter Photography, and
EMILEE CARPENTER,

*Plaintiffs-Appellants*,

v.

LETITIA JAMES, in her official capacity as Attorney General of New York; MARIA L. IMPERIAL, in her official capacity as Acting Commissioner of the New York State Division of Human Rights; and WEEDEN WETMORE, in his official capacity as District Attorney of Chemung County,

*Defendants-Appellees*.

On Appeal from the United States District Court for the
Western District of New York, Case No. 6:21-cv-06303

## BRIEF OF *AMICUS CURIAE* LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC., IN SUPPORT OF DEFENDANTS-APPELLEES

JENNIFER C. PIZER
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
4221 Wilshire Blvd., Ste. 280
Los Angeles, CA 90010-3512
jpizer@lambdalegal.org
(213) 590-5903

KAREN L. LOEWY
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
1776 K Street N.W., 8th Floor
Washington, DC 20006-2304
kloewy@lambdalegal.org
(202) 804-6245

OMAR GONZALEZ-PAGAN
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
ogonzalezpagan@lambdalegal.org
(212) 809-8585

Counsel for Amicus Curiae

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and 29(a)(4)(A), *amicus curiae* Lambda
Legal Defense and Education Fund, Inc. ("Lambda Legal") certifies that it is a
non-profit corporation.  It has no parent corporation, no publicly held corporation
has an ownership interest in it, and it does not issue any stock.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................... iii

TABLE OF CONTENTS ......................................................................................... iv

TABLE OF AUTHORITIES ..................................................................................... v

STATEMENT OF INTEREST .................................................................................. 1

SUMMARY OF THE ARGUMENT ........................................................................ 2

ARGUMENT ............................................................................................................ 6

I.      ACROSS GENERATIONS OF EQUALITY STRUGGLES,
        COURTS REPEATEDLY HAVE CONFIRMED THAT
        RELIGIOUS OBJECTIONS DO NOT THWART SOCIETY'S
        COMPELLING INTEREST IN A NON-DISCRIMINATORY
        MARKETPLACE. ........................................................................................... 6

II.     THE STATE'S INTEREST IN ENDING DISCRIMINATION
        AGAINST LGBT PEOPLE, REGARDLESS OF THE
        MOTIVATIONS FOR THAT DISCRIMINATION, IS
        COMPELLING ............................................................................................. 13

III.    THIS COURT SHOULD NOT RECOGNIZE ANY
        RELIGIOUS EXEMPTION FROM THE STATE'S
        ESSENTIAL NONDISCRIMINATION LAW ............................................. 26

CONCLUSION ....................................................................................................... 30

CERTIFICATE OF COMPLIANCE ...................................................................... 31

CERTIFICATE OF SERVICE ............................................................................... 32

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*303 Creative LLC v. Elenis*,
  6 F.4th 1160 (10th Cir. 2021) ................................................................. 2, 11, 28

*Arlene's Flowers, Inc. v. State of Washington*,
  141 S.Ct. 2884 (2021) .............................................................................2, 5

*Batavia Lodge No. 196, Loyal Order of Moose v. N.Y. State Div. of Hum. Rts.*,
  316 N.E.2d 318 (1974)..............................................................................13

*Bob Jones Univ. v. United States*,
  461 U.S. 574 (1983) ...................................................................................7

*Bodett v. CoxCom, Inc.*,
  366 F.3d 736 (9th Cir. 2004) ......................................................... 10, 11

*Bollenbach v. Bd. of Educ. of Monroe-Woodbury Cent. Sch. Dist.*,
  659 F. Supp. 1450 (S.D.N.Y. 1987) ........................................................8

*Bowers v. Hardwick*,
  478 U.S. 186, 106 S.Ct. 2841 ................................................................15

*Cervelli v. Aloha Bed & Breakfast*,
  142 Hawai`i 177 (Haw. Intermed. Ct. App. 2018) .................................. 2, 11, 22

*Christiansen v. Omnicom Grp., Inc.*,
  852 F.3d 195 (2d Cir. 2017)....................................................................18

*Dawson v. Bumble & Bumble*,
  398 F.3d 211 (2d Cir. 2005).....................................................................18

*Dole v. Shenandoah Baptist Church*,
  899 F.2d 1389 (4th Cir. 1990) .................................................................8

*E.E.O.C. v. Fremont Christian Sch.*,
   781 F.2d 1362 (9th Cir. 1986) .................................................................8

*Elane Photography, LLC v. Willock*,
   309 P.3d 53 (N.M. 2013) ......................................................................11

*Emilee Carpenter, LLC v. James*,
   No. 21-CV-6303-FPG, 2021 WL 5879090 (W.D.N.Y. Dec. 13, 2021)....... 13, 28

*Employment Div., Dep't of Hum. Res. of Or. v. Smith*,
   494 U.S. 872 (1990)..............................................................................29

*Gifford v. McCarthy*,
   23 N.Y.S.3d 422 (N.Y. App. Div. 2016) .......................................... 2, 11, 13, 22

*Heart of Atlanta Motel v. United States*,
   379 U.S. 241 (1964)..............................................................................26

*Klein v. Oregon Bureau of Labor & Indus.*,
   410 P.3d 1051 (Or. Ct. App. 2017).................................................. 2, 10

*Klein v. Oregon Bureau of Labor & Indus.*,
   506 P.3d 1108 (Or. Ct. App. 2022).................................................. 2, 11

*Knight v. Conn. Dep't of Pub. Health*,
   275 F.3d 156 (2d Cir. 2001)........................................................... 10, 11

*Lawrence v. Texas*,
   539 U.S. 558 (2003)........................................................................ 1, 12, 15

*Loving v. Virginia*,
   388 U.S. 1 (1967)....................................................................................7

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*,
   138 S. Ct. 1719 (2018) ................................................................. *passim*

*Matter of New York City Tr. Auth. v. State Div. of Human Rights*,
   577 N.E.2d 40 (1991)............................................................................13

*McGrath v. Toys "R" Us, Inc.*,
　409 F.3d 513 (2d Cir. 2005) .................................................................18

*Mill River Club, Inc. v. N.Y. State Div. of Hum. Rts.*,
　873 N.Y.S.2d 167 (2009) ....................................................................14

*Miller v. City of New York*,
　177 F. App'x 195 (2d Cir. 2006) .........................................................18

*Newman v. Piggie Park Enterprises, Inc.*,
　256 F. Supp. 941 (D.S.C. 1966) ............................................................7

*Newman v. Piggie Park Enters., Inc.*,
　390 U.S. 400 (1968) .................................................................... 5, 6, 7

*North Coast Women's Care Medical Group, Inc. v. Superior Court (Benitez)*,
　189 P.3d 959 (Cal. 2008) ................................................. 1, 10, 11, 23

*Obergefell v. Hodges*,
　576 U.S. 644 (2015) ...................................................................... 1, 9, 16

*People v. Onofre*,
　415 N.E.2d 936 (1980) ........................................................................16

*Peterson v. Hewlett-Packard Co.*,
　358 F.3d 599 (9th Cir. 2004) ......................................................... 10, 11

*Roberts v. U.S. Jaycees*,
　468 U.S. 609 (1984) .......................................................................... 13, 26

*Romer v. Evans*,
　517 U.S. 620 (1996) ..............................................................................1

*Smith v. Fair Employment & Hous. Comm'n*,
　913 P.2d 909 (Cal. 1996) ......................................................................8

*State v. Arlene's Flowers, Inc.*,
　441 P.3d 1203 (Wash. 2019) .......................................................... 2, 5, 11

*Swanner v. Anchorage Equal Rights Comm'n*,
874 P.2d 274 (Alaska 1994).................................................................9

*Telescope Media Grp. v. Lindsey*,
271 F. Supp. 3d 1090 (D. Minn. 2017)..............................................11

*United States v. Windsor*,
570 U.S. 744 (2013).............................................................. 9, 15, 17

*Whitney v. Greater N.Y. Corp. of Seventh-Day Adventists*,
401 F. Supp. 1363 (S.D.N.Y. 1975) ...................................................7

*Windsor v. United States*,
699 F.3d 169 (2d Cir. 2012)...............................................................15

*Zarda v. Altitude Express, Inc.*,
883 F.3d 100 (2d Cir. 2018)...............................................................18

## Constitutional Provisions, Laws, and Statutes

2002 Sess. Law News of N.Y. Ch. 2, § 1 (A. 1971)......................... 16-17

2011 Sess. Law News of N.Y. Ch. 95, § 2 (A. 8354)..............................*17*

N.Y. Civ. Rights Law § 40 ............................................................. *passim*

N.Y. Exec. Law § 290................................................................... *passim*

## Other Litigation Materials

*Cervelli v. Aloha Bed & Breakfast*, Answering Brief of Plaintiffs-Appellees,
No. CAAP-13-0000806, Haw. Intermed. Ct. of App.,
2013 WL 11238552 (Nov. 27, 2013)..................................................10

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, Brief *Amici Curiae*
of Lambda Legal, et al., Supreme Ct. Case No. 16-111,
2017 WL 5127317 (filed Oct. 30, 2017) .................................... 20, 25

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n,* Brief of *Amici Curiae* Ilan H. Meyer, Ph.D, et al., Supreme Ct. Case No. 16-111, 2017 WL 5036301 (filed Oct. 30, 2017) ........................................................ 9, 20

Complaint, *Oliver v. The Barbershop,* No. CIVDS1608233 San Bernardino Cnty. Super. Ct., Cal. (filed May 25, 2016) https://tinyurl.com/y8ggm2gd........................................................................ 10, 23

## Other Authorities

ACLU-Illinois, *Mattoon Couple Challenge Denial of Services at Two Illinois Bed and Breakfast Facilities*, (Nov. 2, 2011), https://tinyurl.com/y9muwyn8. .........23

Alessi, Edward J., *et al.*, *Prejudice Events and Traumatic Stress Among Heterosexuals and Lesbians, Gay Men, and Bisexuals*, 22 J. of Aggression, Maltreatment & Trauma 510, 510-26 (2013), https://tinyurl.com/9j2ec4w8......25

Carter, David, *Stonewall: The Riots That Sparked The Gay Revolution* (2004).....14

Chauncy, George, *Gay New York: Gender, Urban Culture, and the Making of the Gay Male World, 1890-1940*, at 154 (1994)........................................................14

Crandall, Christian, *et al.*, *Social norms and the expression and suppression of prejudice: The struggle for internalization*, 82 J. Personality & Soc. Psych. 359, 359–78 (2002), https://tinyurl.com/3ve2ecee.....................................................24

Cruz, David B., *Piety and Prejudice: Free Exercise Exemption from Laws Prohibiting Sexual Orientation Discrimination*, 69 N.Y.U. L. Rev. 1176 (1994) ...........................................................................26

Gates, Gary J., *Same-sex couples in Census 2010: Race and Ethnicity*, 3 (Williams Institute, 2012), https://tinyurl.com/5bdnr9bd.....................................................21

Hatzenbuehler, Mark, *et al.*, *Stigma As a Fundamental Cause of Population Health Inequalities*, 103 Am. J. Pub. Health 813, 813 (2013), https://tinyurl.com/3butkwjh......................................................................... 14, 26

Institute of Medicine, *The Health of Lesbian, Gay, Bisexual, and Transgender People: Building a Foundation for Better Understanding* (Nat'l Acads. Press 2011), https://tinyurl.com/ug72d7j ....................................................................24

Kates, Jennifer, *et al.*, *Health and Access to Care and Coverage for Lesbian, Gay, Bisexual, and Transgender (LGBT) Individuals in the U.S.* **(**Kaiser Family Foundation, May 3, 2018), https://tinyurl.com/y3ll6f6t .......................................23

Kuhn, Betsy *Gay Power!: The Stonewall Riots and the Gay Rights Movement, 1969* (2011) ...........................................................................................................15

Leslie, Christopher R., *Creating Criminals: The Injuries Inflicted by 'Unenforced' Sodomy Laws*,
35 Harv. C.R.-C.L. L. Rev. 103 (2000) ..............................................................25

LGBT Demographic Data Interactive (Williams Institute, UCLA School of Law, January 2019), https://tinyurl.com/48ntfm3c. ....................................................14

Mallory, Christy & Sears, Brad, *Evidence of Discrimination in Public Accommodations Based on Sexual Orientation and Gender Identity: An Analysis of Complaints Filed with State Enforcement Agencies, 2008-2014*, 7 (Williams Institute, UCLA School of Law, 2016),
https://tinyurl.com/y8hc62c4 ..............................................................................20

Meyer, Ilan & Frost, David, *Minority Stress and the Health of Sexual Minorities*, Handbook of Psychology and Sexual Orientation, 252-66 (Patterson & D'Augelli, eds., 2013), https://tinyurl.com/ydht87or .........................................23

Meyer, Ilan, *et al.*, *The Role of Help-Seeking in Preventing Suicide Attempts among Lesbians, Gay Men, and Bisexuals*, 45 J. Suicide & Life-Threatening Behavior 1 (2014) (research shows anti-gay messages from religious leaders increase severe mental health reactions), https://tinyurl.com/2zzrs898 .............25

Nejaime, Douglas, *Marriage Inequality: Same-Sex Relationships, Religious Exemptions, and the Production of Sexual Orientation Discrimination*, 100 Cal. L. Rev. 1169 (2012) ................................................................................... 11, 23

Nejaime, Douglas & Siegel, Reva B., *Conscience Wars: Complicity-Based Conscience Claims in Religion and Politics*, 124 Yale L.J. 2516 (2015),
https://tinyurl.com/tkyjjhl ..................................................................................27

NeJaime, Douglas & Siegel, Reva, *Religious Exemptions and Antidiscrimination Law in Masterpiece Cakeshop*,
128 Yale Law Journal Forum 201 (2018)............................................................11

N.Y. Attorney General, *The Sexual Orientation Non-Discrimination Act*, https://tinyurl.com/twdwp6vz. ...............................................................16

Purnick, Joyce, *Homosexual Rights Bill is Passed by City Council in 21-to-14 Vote*, N.Y. Times, A-1 (Mar. 21, 1986). ...............................................16

Sears, Brad, et al*, New York – Sexual Orientation and Gender Identity Law and Documentation of Discrimination in State Appendices to Documenting Discrimination in State Employment*, 555-91 (Williams Institute, UCLA School of Law, Sept. 2009), https://tinyurl.com/y6wjsoyf............................................24

Siegel, Reva B., *From Colorblindness to Antibalkanization: An Emerging Ground of Decision in Race Equality Cases*, 120 Yale L.J. 1278 (2011).......................24

Singh, Sejal & Durso. Laura E., *Widespread Discrimination Continues to Shape LGBT People's Lives in Both Subtle and Significant Ways*, Center for American Progress (May 2, 2017), https://tinyurl.com/y7t6mad6.....................................21

U.S. Office of Disease Prevention & Health Promotion, *Lesbian, Gay, Bisexual, and Transgender Health*, https://tinyurl.com/z4q9mzs ......................................14

Waters, Emily, *Lesbian, Gay, Bisexual, Transgender, Queer, and HIV-Affected Hate Violence in* 2016 (National Coalition of Anti-Violence Programs, Jun. 2017), https://tinyurl.com/yb6fc7f2 ...................................................................18

Zauzmer, Julie, *Barber refuses to cut transgender Army veteran's hair, citing religious views*, Wash. Post (March 15, 2016), https://tinyurl.com/ycue5n36 ...........................................................................22

# STATEMENT OF INTEREST[1]

*Amicus Curiae* Lambda Legal Defense and Education Fund, Inc. ("*Amicus*" or "Lambda Legal") is the nation's oldest and largest legal organization working for full recognition of the civil rights of lesbian, gay, bisexual, and transgender ("LGBT") people through impact litigation, education, and public policy work. *See, e.g.*, *Obergefell v. Hodges*, 576 U.S. 644 (2015) (representing plaintiff couples in cases recognizing same-sex couples' freedom to marry); *Lawrence v. Texas*, 539 U.S. 558 (2003) (representing plaintiffs in case invalidating state laws banning same-sex intimacy); *Romer v. Evans*, 517 U.S. 620 (1996) (representing plaintiffs in case challenging state constitutional amendment limiting antidiscrimination protections based on sexual orientation). Lambda Legal has represented individuals and same-sex couples in many cases involving assertions that neutral statutes, rules, or policies regulating businesses, professional services, and other public accommodations by prohibiting sexual orientation discrimination infringe upon a business's religious freedom. *E.g.*, *North Coast Women's Care Medical Group, Inc. v. Superior Court (Benitez)*, 189 P.3d 959 (Cal. 2008) (denial of medical care);

---

[1] *Amicus* affirms that no counsel for a party authored this brief in whole or in part and that no person other than *Amicus*, its members, or its counsel made a monetary contribution intended to fund the brief's preparation or submission. The parties have consented to the filing of this brief.

*Cervelli v. Aloha Bed & Breakfast*, 142 Hawai`i 177 (Haw. Intermed. Ct. App. 2018), *cert. denied*, 139 S. Ct. 1319, 203 L. Ed. 2d 600 (2019) (denial of lodging).

Similarly, Lambda Legal has appeared as *amicus curiae* in many cases in which religious beliefs were asserted to justify discrimination against same-sex couples by businesses offering wedding-related goods or services. *E.g.*, *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719 (2018); *303 Creative LLC v. Elenis*, 6 F.4th 1160 (10th Cir. 2021), *cert. granted in part*, 142 S. Ct. 1106 (2022); *State v. Arlene's Flowers, Inc.*, 441 P.3d 1203 (Wash. 2019), *cert. denied*, 141 S.Ct. 2884 (2021); *Klein v. Oregon Bureau of Labor & Indus.*, 410 P.3d 1051 (Or. Ct. App. 2017), *review den.,* 434 P.3d 25 (Or. 2018), *cert. granted, jmt. vacated, remanded,* 139 S. Ct. 2713 (2019), *on remand*, 506 P.3d 1108 (Or. Ct. App. 2022); *Gifford v. McCarthy*, 23 N.Y.S.3d 422 (N.Y. App. Div. 2016).

Because this appeal addresses similar issues and is likely to affect hundreds of thousands of LGBT people in New York, *Amicus* has a particular interest in assisting the Court.

## SUMMARY OF THE ARGUMENT

This case concerns a claim of a right to engage in sexual orientation discrimination asserted by a for-profit photography business and its owner who intend to make money taking engagement and wedding photos for the general public. Appellants Emilee Carpenter, LLC and its owner, Emilee Carpenter ("Appellants"),

have effectively declined at least seven requests from same-sex couples to photograph their weddings by simply not responding to those couples. They would like to refuse service to same-sex couples in the future more overtly, including by amending the LLC's operating agreement to prohibit the provision of wedding-related photography to such couples, expressly screening potential wedding clients to ensure they do not work with same-sex couples, and posting notices on the business's website and social media declaring their intention to turn such couples away, all in violation of the New York Human Rights Law, N.Y. Exec. Law § 290 et seq., and the New York Civil Rights Law, N.Y. Civ. Rights Law § 40 et seq. (together, "the public accommodations laws"). *Amicus Curiae* Lambda Legal submits this brief in support of Appellees Attorney General Letitia James, Acting Commissioner of the N.Y. State Division of Human Rights Maria L. Imperial, and Chemung County District Attorney Weeden Wetmore (together, "the State") and agrees with the key points of the State's Brief. In particular, *Amicus* agrees that Appellants have failed to show that being required to comply with the public accommodations laws unconstitutionally abridges Carpenter's free speech and association rights or her free exercise rights, that these laws violate the Establishment Clause of the First Amendment, or that they are unlawfully vague in violation of her due process rights.

*Amicus* writes separately to provide more information about why, under any level of scrutiny, the State of New York's interest in protecting LGBT people from discrimination is compelling. This brief describes the recurrent resistance to civil rights by some who have invoked religious freedom to justify discrimination, and the consistent, appropriate conclusion by courts across many decades that such arguments must fail. With information specific to New York, together with other evidence of discrimination nationwide, *Amicus* also shows why effective nondiscrimination rules are necessary now to protect LGBT people from being turned away by public accommodations. In challenges to laws such as the public accommodations laws, there should be no doubt that the government's interest in enforcement is compelling, and that there is no narrower way of stopping discrimination than by banning discrimination.

Accordingly, *Amicus* urges the Court to rule consistently with the many other courts that have addressed this issue and firmly have rejected business owners' arguments for refusing wedding-related services to same-sex couples, while providing those services to different-sex couples. For this Court to disagree and allow religion-based, discriminatory exemptions from New York's law would ignore the settled wisdom not only of these cases but of the Supreme Court's analysis in *Masterpiece Cakeshop*. As *Masterpiece* observes:

> It is unexceptional that Colorado law can protect gay persons, just as it can protect other classes of individuals, in acquiring whatever products

and services they choose on the same terms and conditions as are offered to other members of the public. . . . [W]hile … religious and philosophical objections [to particular customers] are protected, it is a general rule that such objections do not allow business owners and other actors in the economy and in society to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations law.

138 S. Ct. at 1727-28. For this proposition, the Court cited its own *Newman v. Piggie Park Enterprises* decision of half a century ago, which not only rejected religion as a defense for unlawful race discrimination in public accommodations but deemed that defense "patently frivolous." *Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 402 n.5 (1968). *Accord Arlene's Flowers*, 441 P.3d at 1235 (rejecting religious freedom defense and recognizing, "[t]his case is no more about access to flowers than civil rights cases in the 1960s were about access to sandwiches."), *cert. denied*, 141 S.Ct. 2884 (2021).

*Amicus* urges the Court also to be guided by the Supreme Court's observation that creating new, antigay exceptions to civil rights laws for wedding-celebration contexts risks many businesses that sell related goods and services refusing them "for gay persons, thus resulting in a community-wide stigma inconsistent with the history and dynamics of civil rights laws that ensure equal access to goods, services, and public accommodations." *Masterpiece*, 138 S. Ct. at 1727. The consequences would be terrible not just for this minority population but for everyone who may

5

need the protection of similar laws in the future. *Amicus* urges the Court to affirm the District Court's decision.

## ARGUMENT

### I. Across Generations of Equality Struggles, Courts Repeatedly Have Confirmed That Religious Objections Do Not Thwart Society's Compelling Interest in a Non-Discriminatory Marketplace.

In the United States, differing religious beliefs about family life and gender roles often have generated disputes in the context of public accommodations, as well as in education, employment, medical services, and other settings. Although some forms of religiously motivated discrimination have receded, history finds successive generations asking anew whether protections for religious liberty provide exemptions from laws protecting others' liberty and right to participate equally in civic life. Courts have provided a consistent, necessary answer to that question: Religious beliefs do not entitle any of us to exemptions from generally applicable civil rights laws protecting all of us from harm. Indeed, the United States Supreme Court has described free exercise defenses to antidiscrimination laws as "so patently frivolous that a denial of counsel fees to the [plaintiffs] would be manifestly inequitable." *Newman*, 390 U.S. at 403 n.5. In citing *Piggie Park* in *Masterpiece Cakeshop*, 138 S. Ct. at 1727, the Court reaffirmed that there is to be consistent application of the principle that religious beliefs do not excuse unlawful

discrimination by public accommodations, regardless of whether the discrimination is based on race or sexual orientation.

*Piggie Park*'s clarity and forcefulness on this point might be expected today, given the legal and social consensus against race discrimination that has evolved since then. But the federal law at issue in that case was still new in 1968. And en route to the current national consensus that our civil rights laws serve essential public interests, such laws repeatedly faced religion-based objections. Some Christian schools excluded students who supported interracial dating, based on the view that "mixing of the races is . . . a violation of God's command." *See Bob Jones Univ. v. United States*, 461 U.S. 574, 580, 583 n.6 (1983). Some employers objected on religious grounds to their employees' interracial friendships. *See, e.g., Whitney v. Greater N.Y. Corp. of Seventh-Day Adventists*, 401 F. Supp. 1363 (S.D.N.Y. 1975) (holding that religious freedom did not excuse employer's violation of Civil Rights Act by firing white clerk due to her friendship with a black man). Some white restaurant owners refused to serve black customers, citing religious objections to "integration of the races." *See, e.g.*, *Newman v. Piggie Park Enterprises, Inc.*, 256 F. Supp. 941, 944–45 (D.S.C. 1966) (rejecting barbeque restaurant owner's religious defense of race discrimination), *rev'd in part on other grounds*, 377 F.2d 433 (4th Cir. 1967), *aff'd*, 390 U.S. 400 (1968). And, famously, religion was invoked to justify laws against interracial marriage. *See Loving v. Virginia*, 388 U.S. 1, 3 (1967)

(invalidating state interracial marriage ban where trial judge had opined that "Almighty God created the races white, black, yellow, malay and red, and he placed them on separate continents" and therefore "did not intend for the races to mix").

Likewise, as women entered the workplace, some who objected on religious grounds sought exemptions from nondiscrimination laws. Despite the longstanding traditions on which such claims often were premised, courts recognized that accommodating such objections would vitiate the anti-discrimination protections on which workers are entitled to depend. *See, e.g.*, *Dole v. Shenandoah Baptist Church*, 899 F.2d 1389, 1397–99 (4th Cir. 1990) (holding employer's free exercise rights did not justify violation of Fair Labor Standards Act's equal pay requirement); *E.E.O.C. v. Fremont Christian Sch.*, 781 F.2d 1362, 1367–69 (9th Cir. 1986) (rejecting religious school's argument that its free exercise rights excused unequal benefits for female employees); *Bollenbach v. Bd. of Educ. of Monroe-Woodbury Cent. Sch. Dist.*, 659 F. Supp. 1450, 1473 (S.D.N.Y. 1987) (holding employer's refusal to hire women bus drivers due to religious objection of Hasidic male bus riders was improper). Similarly, after some governments enacted fair housing laws that protected unmarried couples, landlords unsuccessfully sought exemptions on the belief that they themselves would be complicit in their tenants' sin if they were to provide a residence in which tenants might commit fornication. *See, e.g.*, *Smith v. Fair Employment & Hous. Comm'n*, 913 P.2d 909, 928–29 (Cal. 1996) (rejecting

religion-based defense because anti-discrimination requirements did not impose substantial burden, as landlord's religion did not require investing in rental apartments); *Swanner v. Anchorage Equal Rights Comm'n*, 874 P.2d 274, 279–80 (Alaska 1994) (same). Thus, across generations, the question already has been asked and answered with reassuring regularity.

Courts consistently have recognized the public's need for peaceful co-existence in the marketplace, which requires ensuring that all members of society can receive equal treatment, regardless of discriminatory beliefs any given business owner may have about particular groups of people. Today, these principles are tested once again, as LGBT people seek full participation in American life. There is growing understanding that sexual orientation is a personal characteristic bearing no relevance to one's ability to contribute to society, including one's ability to form a loving relationship and build a family. *Obergefell*, 576 U.S. at 647-48; *United States v. Windsor*, 570 U.S. 744 (2013). And yet, many people's pervasive and fervent religious objections to treating LGBT people as equals or interacting with LGBT people in commercial contexts still prompt widespread harassment and discrimination. *See, e.g.*, Brief *Amici Curiae* of Lambda Legal, *et al.*, in *Masterpiece Cakeshop*, Supreme Ct. Case No. 16-111, 2017 WL 5127317 (filed Oct. 30, 2017) (presenting dozens of examples of anti-LGBT discrimination by public accommodations, many with explicit religious motives); Complaint, *Oliver v. The*

9

*Barbershop,* No. CIVDS1608233, San Bernardino Cnty. Super. Ct., Cal. (filed May 25, 2016) (for religious reasons, barber refused to cut hair of plaintiff, whom he wrongly considered female, seeing hair as women's "glory"), https://tinyurl.com/y8ggm2gd; Answering Brief of Plaintiffs-Appellees, *Cervelli v. Aloha Bed & Breakfast*, No. CAAP-13-0000806, Haw. Intermed. Ct. of App., 2013 WL 11238552 (Nov. 27, 2013) (explaining refusal to provide lodging to lesbian couple, proprietor said same-sex relationships are "detestable" and "defile our land"); *Klein*, 410 P.3d at 1058 (explaining business's refusal to sell cake to lesbian couple for their wedding, owner cited Biblical condemnation of same-sex relationships as "an abomination"); *Bodett v. CoxCom, Inc.*, 366 F.3d 736 (9th Cir. 2004) (supervisor religiously harassed lesbian subordinate); *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599 (9th Cir. 2004) (anti-gay proselytizing was intended to upset coworkers); *Knight v. Conn. Dep't of Pub. Health*, 275 F.3d 156 (2d Cir. 2001) (anti-gay proselytizing by visiting nurse to home-bound AIDS patient and his same-sex partner); *North Coast Women's Care Medical Group, Inc.*, 189 P.3d at 967 (physicians' religion-based refusal of treatment to lesbian patient).

As laws and company policies have begun to offer protections against this discrimination, some who object now are asking courts to allow the religious exemptions that have been denied in the past. For the most part, this past principle has held true and the equality needs of third parties have remained a constraint on

religion-based conduct in commercial contexts. *See, e.g.*, *Cervelli,* 142 Hawai'i at 177 (rejecting religious defense); *North Coast Women's Care Medical Group*, 189 P.3d at 970 (same); *Bodett*, 366 F.3d at 736 (rejecting religious accommodation claim); *Peterson*, 358 F.3d at 599 (same); *Knight*, 275 F.3d at 156 (same). But religious objections to equal treatment of LGBT people by those engaged in commerce remains a problem, and refusals of wedding-related services have become a vehicle of choice for those who seek a different rule of law. *See, e.g.*, *Masterpiece Cakeshop, Ltd.*, 138 S. Ct. 1719 (cake); *303 Creative*, 6 F.4th 1160 (wedding website); *Klein*, 506 P.3d at 1114 (cake); *Arlene's Flowers*, 441 P.3d at 1235 (flowers); *Telescope Media Grp. v. Lindsey*, 271 F. Supp. 3d 1090 (D. Minn. 2017), *aff'd in part, rev'd in part and remanded sub nom. Telescope Media Grp. v. Lucero*, 936 F.3d 740 (8th Cir. 2019) (videography); *Gifford*, 23 N.Y.S.3d at 422 (facility rental); *Elane Photography, LLC v. Willock*, 309 P.3d 53 (N.M. 2013), *cert. denied* 134 S. Ct. 1787 (2014) (photography); *see also* generally Douglas NeJaime & Reva Siegel, *Religious Exemptions and Antidiscrimination Law in Masterpiece Cakeshop*, 128 Yale Law Journal Forum 201 (2018); Douglas NeJaime, *Marriage Inequality: Same-Sex Relationships, Religious Exemptions, and the Production of Sexual Orientation Discrimination*, 100 Cal. L. Rev. 1169, 1189-92 (2012).

Appellants' request for permission to deny services to same-sex couples is simply the latest example of a demand to change decades-old precedents. And the

answer must remain the same. As in the wedding-vendor cases decided by many other courts, the exemption Appellants seek would mark a sea change—opening the door to denials of goods and services, housing, employment, and other unequal treatment for LGBT people, persons living with HIV, and anyone else whose family life or minority status is disfavored by a business owner's religious convictions. As the United States Supreme Court has recognized, our laws and traditions have "afford[ed] constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education." *Lawrence*, 539 U.S. at 574 (citation omitted). The Court's explanation of the "respect the Constitution demands for the autonomy of the person in making these choices," *id.*, makes clear that the "person" whose autonomy is protected is the individual himself or herself—not those offering goods or services in the marketplace. This must remain the rule. Religion must not be made into a sword for invidious deprivations of basic human rights.

Given our nation's history, many Americans now do recognize that being told "we don't serve your kind here" is discrimination that not only inflicts immediate dignitary harm on those rejected, but also stigmatizes the entire disparaged group and corrodes our civil society. This is as true for LGBT people today as it always has been for those targeted and denied equal treatment in public life based on others' religious or personal judgments. Public accommodations nondiscrimination laws

exist to eliminate this harmful conduct. Without enforcement of such laws, as *Masterpiece* instructs, religion-based service refusals will lead to "community-wide stigma inconsistent with the history and dynamics of civil rights laws." 138 S. Ct. at 1727.

## II. The State's Interest in Ending Discrimination Against LGBT People, Regardless of the Motivations for That Discrimination, Is Compelling.

As the district court properly held, "New York has a compelling interest in ensuring that individuals, without regard to sexual orientation, have 'equal access to publicly available goods and services.'" *Emilee Carpenter, LLC v. James*, No. 21-CV-6303-FPG, 2021 WL 5879090, at *12 (W.D.N.Y. Dec. 13, 2021) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 624 (1984)). New York courts have acknowledged the "long-recognized, substantial interest in eradicating discrimination" embodied in the Human Rights Law because

> [d]iscriminatory denial of equal access to goods, services and other advantages made available to the public not only "deprives persons of their individual dignity," but also "denies society the benefits of wide participation in political, economic, and cultural life." … Assuring the citizens of New York "equal access to publicly available goods and services [thus] plainly serves compelling state interests of the highest order."

*Gifford*, 23 N.Y.S.3d at 431 (quoting *Roberts,* 468 U.S. at 624-25; citing *Matter of New York City Tr. Auth. v. State Div. of Human Rights,* 577 N.E.2d 40 (1991); *Batavia Lodge No. 196, Loyal Order of Moose v. N.Y. State Div. of Hum. Rts.,* 316

13

N.E.2d 318 (1974); *Matter of Mill Riv. Club, Inc. v. N.Y. State Div. of Hum. Rts.,* 873 N.Y.S.2d 167 (2009)). This interest is particularly compelling considering both the history and continued prevalence of discrimination against LGBT people across the State.

New York has a substantial LGBT population. According to analysis of Gallup data, 5.1% of New York's population identifies as LGBT, about 22% of whom are adults over age 25 raising children. *LGBT Demographic Data Interactive* (Williams Institute, UCLA School of Law, January 2019), https://tinyurl.com/48ntfm3c.

Treatment of same-sex couples, and of LGBT people generally, in New York has not always been kind, however. Although Greenwich Village provided a gathering place for LGBT people seeking refuge, freedom, and community, vigilante attacks and police raids occurred regularly throughout the 20th Century. *See*, *e.g.*, George Chauncy, *Gay New York: Gender, Urban Culture, and the Making of the Gay Male World, 1890-1940*, at 154 (1994) (describing challenges of gay life in New York, including pervasive harassment and abuse). The Stonewall riots in New York City, often considered the beginning of the organized LGBT rights movement in the United States, were in fact a spontaneous community uprising against decades of government oppression. *See*, *e.g.*, David Carter, *Stonewall: The Riots That*

*Sparked The Gay Revolution* (2004); Betsy Kuhn, *Gay Power!: The Stonewall Riots and the Gay Rights Movement, 1969* (2011).

This Court recognized the lengthy, ignoble history of anti-LGBT discrimination in concluding that the federal government's discrimination against married same-sex couples was subject to heightened scrutiny:

> It is easy to conclude that homosexuals have suffered a history of discrimination. … [W]e think it is not much in debate. Perhaps the most telling proof of animus and discrimination against homosexuals in this country is that, for many years and in many states, homosexual conduct was criminal. These laws had the imprimatur of the Supreme Court. *See Bowers[ v. Hardwick]*, 478 U.S. [186,] 196, 106 S.Ct. 2841 [(1986)]; see also *Lawrence*, 539 U.S. at 578, 123 S.Ct. 2472 (noting that such laws "demean[ed homosexuals'] existence [and] control[led] their destiny").

*Windsor v. United States*, 699 F.3d 169, 182 (2d Cir. 2012), *aff'd*, 570 U.S. 744 (2013). The Supreme Court did the same, noting the longstanding, harsh discrimination LGBT people have faced, in holding unconstitutional state laws excluding same-sex couples from marriage:

> Until the mid–20th century, same-sex intimacy long had been condemned as immoral by the state itself in most Western nations, a belief often embodied in the criminal law. For this reason, among others, many persons did not deem homosexuals to have dignity in their own distinct identity. A truthful declaration by same-sex couples of what was in their hearts had to remain unspoken. Even when a greater awareness of the humanity and integrity of homosexual persons came in the period after World War II, the argument that gays and lesbians had a just claim to dignity was in conflict with both law and widespread social conventions. Same-sex intimacy remained a crime in many States. Gays and lesbians were prohibited from most government

15

employment, barred from military service, excluded under immigration laws, targeted by police, and burdened in their rights to associate.

*Obergefell*, 576 U.S. at 660–61.

It is true that, after the Stonewall riots, New York began to make changes that somewhat ameliorated the situation. In 1980, New York courts ruled that criminalizing same-sex intimacy was unconstitutional. *See People v. Onofre*, 415 N.E.2d 936, 937 (1980). Six years later, New York City banned discrimination based on sexual orientation. *See* Joyce Purnick, *Homosexual Rights Bill is Passed by City Council in 21-to-14 Vote*, N.Y. Times, A-1 (Mar. 21, 1986).[2] At the state level, it would be another sixteen years before the General Assembly would add sexual orientation protections to the Human Rights Law. *See* N.Y. Attorney General, *The Sexual Orientation Non-Discrimination Act ("SONDA")*, https://tinyurl.com/twdwp6vz. In adding these protections, the legislature recognized

> that many residents of this state have encountered prejudice on account of their sexual orientation, and that this prejudice has severely limited or actually prevented access to employment, housing and other basic necessities of life, leading to deprivation and suffering. The legislature further recognizes that this prejudice has fostered a general climate of hostility and distrust, leading in some instances to physical violence against those perceived to be homosexual or bisexual.

---

[2] Efforts to pass these protections had begun in 1971, only to be rebuffed over the course of the next fifteen years before finally becoming law. *Id.*

2002 Sess. Law News of N.Y. Ch. 2, § 1 (A. 1971). In addressing this history, the legislature plainly set forth the compelling interest underlying the public accommodations laws, recognizing that failing to ensure "equal opportunity to enjoy a full and productive life" to every individual in New York "not only threatens the rights and proper privileges of its inhabitants, but menaces the institutions and foundation of a free democratic state and threatens the peace, order, health, safety and general welfare of the state and its inhabitants." *Id*. New York reiterated its interest in ensuring equality for same-sex couples in enacting the Marriage Equality Act, stating its intent "that the marriages of same-sex and different-sex couples be treated equally in all respects under the law." 2011 Sess. Law News of N.Y. Ch. 95, § 2 (A. 8354). In so doing, New York sought "to correct what its citizens and elected representatives perceived to be an injustice that they had not earlier known or understood." *Windsor*, 570 U.S. at 764.

These state interests remain urgent because, despite enactment of explicit public policies against anti-LGBT discrimination, the climate has been slow to change statewide. Researchers at the Williams Institute have documented persistent discrimination against LGBT New Yorkers, reporting substantial abuse by both government actors and the general public. Brad Sears, *et al*., *New York – Sexual Orientation and Gender Identity Law and Documentation of Discrimination* in *State Appendices* to *Documenting Discrimination in State Employment*, 555-91 (Williams

Institute, UCLA School of Law, Sept. 2009), https://tinyurl.com/y6wjsoyf. This Court's own jurisprudence reflects the persistence of discrimination against LGBT people in New York despite these state and municipal protections. *See, e.g.*, *Zarda v. Altitude Express, Inc.*, 883 F.3d 100 (2d Cir. 2018), *aff'd sub nom. Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731 (2020); *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 198 (2d Cir. 2017); *Miller v. City of New York*, 177 F. App'x 195 (2d Cir. 2006); *McGrath v. Toys "R" Us, Inc.*, 409 F.3d 513 (2d Cir. 2005); *Dawson v. Bumble & Bumble*, 398 F.3d 211 (2d Cir. 2005).

Moreover, bias-motivated hostility toward LGBT people remains broadly prevalent as well. According to its most recent report, the New York City Anti-Violence Project answered over 3,350 hotline calls in 2016 from LGBTQ and HIV-affected people who reported having experienced violence. Emily Waters, *Lesbian, Gay, Bisexual, Transgender, Queer, and HIV-Affected Hate Violence in* 2016 (National Coalition of Anti-Violence Programs, Jun. 2017), at 66. https://tinyurl.com/yb6fc7f2.

The requests Lambda Legal has received from people across New York for assistance with diverse discrimination problems provide further evidence of a troublingly relentless hostile climate. Lambda Legal's Help Desk maintains an electronic database in which these requests are recorded. A search of the database finds that the Help Desk received over 2,000 such calls between January 1, 2016 and

December 31, 2021, with the requests coming from all parts of the state—from Buffalo, Niagara Falls, Rochester, and Syracuse, to Potsdam, Saranac Lake, Schenectady, and Albany, to the Finger Lakes, Elmira, and Binghamton, to the Catskills, Newburgh, and Rockland County, across Long Island and all five boroughs of New York City. The requests concerned problems ranging from being kicked out of homeless shelters and drug recovery programs for being LGBT to being beaten and threatened by police for wearing pride paraphernalia to diverse other forms of harassment and violence. Many concerned discrimination by public accommodations, such as a funeral home excluding a same-sex spouse from her beloved's wake, a store's auto department refusing to fix the car of a married lesbian couple, an airline employee refusing to recognize a same-sex couple and their children as a family needing to travel together, and countless examples of LGBT people, couples, and families facing discrimination, harassment, and exclusion from stores, restaurants, bars, trains, gyms, nursing homes, and health care settings. Lambda Legal protects the confidentiality of those who request legal assistance, but *Amicus* can provide some additional details if it would assist the Court.

In *Masterpiece Cakeshop*, Lambda Legal performed a similar review of its Help Desk database nationally and presented a representative sampling of the public accommodations discrimination problems about which LGBT people had requested assistance, as well as the practical and emotional impacts of that treatment. *Lambda*

*Legal Masterpiece Cakeshop Amici Brief*, *supra*, 2017 WL 5127317. To compile this sampling, Lambda Legal reviewed more than a thousand reports from across the country received during the prior five-year period. The results confirm and detail the pervasive, harmful discrimination against LGBT people in the United States in public accommodations alone, reaching from cradle (infertility care, midwifery services, and childbirth classes) to grave (funeral services), and nearly everything in between. The sampling makes vivid that discrimination against LGBT people occurs throughout public life, often without warning and in places where most people would not expect to be denied service or treated as a second-class citizen. *See also* Brief of *Amici Curiae* Ilan H. Meyer, Ph.D, et al., , *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n,* Supreme Ct. No. 16-111, 2017 WL 5036301 (filed Oct. 30, 2017).

Researchers at UCLA report similar findings after studying complaints filed in state agencies in the District of Columbia and the twenty-one states, including New York, that expressly prohibit sexual orientation and/or gender identity discrimination in public accommodations. Christy Mallory & Brad Sears, *Evidence of Discrimination in Public Accommodations Based on Sexual Orientation and Gender Identity: An Analysis of Complaints Filed with State Enforcement Agencies, 2008-2014*, 7 (Williams Institute, UCLA School of Law, 2016), https://tinyurl.com/y8hc62c4. They found that, as of 2016, the rate of anti-LGBT

discrimination complaints was similar to but exceeded the rates of race discrimination[3] and other forms of sex-based discrimination in public accommodations. LGBT people of color and those with disabilities suffer even higher rates of discrimination than others within the LGBT community. Sejal Singh & Laura E. Durso, *Widespread Discrimination Continues to Shape LGBT People's Lives in Both Subtle and Significant Ways*, Center for American Progress (May 2, 2017), https://tinyurl.com/y7t6mad6.

The New York General Assembly's addition of sexual orientation and gender identity and expression protections to the Human Rights Law in 2002 and 2019 were a significant improvement for LGBT New Yorkers. But the events at issue in this case are part of a larger, persistent pattern of business proprietors in New York and many other states claiming religious rights to defy nondiscrimination laws, with refusal of wedding-related goods and services inflicting particular humiliation and reinforcing stigma for same-sex couples. Appellants are not the first New York business that sought to turn away same-sex couples seeking services related to their weddings. As the Appellate Division held in *Gifford*, however, New York's

---

[3] Of course, many LGBT people are people of color. A UCLA Williams Institute analysis of Census data quantifies this obvious fact, finding for example that among same-sex couples raising children, 28% are non-white. Gary J. Gates, *Same-sex couples in Census 2010: Race and Ethnicity*, 3 (Williams Institute, UCLA School of Law, 2012), https://tinyurl.com/5bdnr9bd.

commitment to ensuring equal opportunity means that a business owner who provides those services to different-sex couples must also do so for same-sex couples, regardless of the owner's personal religious beliefs. 23 N.Y.S.3d at 431.

This discrimination did not begin when same-sex couples were no longer excluded from marriage, however. Rather, LGBT people have been encountering refusals of services based on proprietors' religious objections for years and in diverse settings unrelated to marriage. For example, a same-sex couple was refused vacation lodging at the Aloha Bed & Breakfast, despite Hawaii's nondiscrimination law, due to the owner's religious objection to hosting lesbians. *Cervelli*, 142 Hawai`i at 177. In California, a barbershop refused a haircut based on the barber's perception and religiously based condemnation of the would-be customer's gender expression. *Oliver v. The Barbershop,* No. CIVDS1608233 (San Bernardino Cnty. Super. Ct., Cal. May 25, 2016); Julie Zauzmer, *Barber refuses to cut transgender Army veteran's hair, citing religious views*, Wash. Post (March 15, 2016), https://tinyurl.com/ycue5n36. In Illinois, a gay couple planning their civil union (not marriage) reception was turned down by two establishments that routinely host all manner of events. One not only refused the couple but berated them with religiously condemning emails. ACLU-Illinois, *Mattoon Couple Challenge Denial of Services at Two Illinois Bed and Breakfast Facilities*, (Nov. 2, 2011), https://tinyurl.com/y9muwyn8. And in California, a woman was refused standard

22

infertility treatment because her physicians objected on religious grounds to treating her the same as other patients because she was in a relationship with another woman. *North Coast Women's Care*, 189 P.3d at 959. *See generally* NeJaime, *Marriage Inequality*, *supra*, 100 Cal. L. Rev. at 1189-92.

*Amicus* sounds alarm bells here not just because everyone should have equal access to the full range of goods, services, housing, jobs, and other opportunities offered generally to the public, but because discriminatory refusals of generally available opportunities exacerbate the stress from social exclusion and stigma that can lead to serious health problems, including depression, anxiety, substance use disorders, and suicide attempts. *See*, *e.g.*, Jennifer Kates, *et al.*, *Health and Access to Care and Coverage for Lesbian, Gay, Bisexual, and Transgender (LGBT) Individuals in the U.S.* **(**Kaiser Family Foundation, May 3, 2018), https://tinyurl.com/y3ll6f6t; U.S. Office of Disease Prevention & Health Promotion, *Lesbian, Gay, Bisexual, and Transgender Health*, https://tinyurl.com/z4q9mzs. *See generally* Ilan Meyer & David Frost, *Minority Stress and the Health of Sexual Minorities*, Handbook of Psychology and Sexual Orientation, 252-66 (Patterson & D'Augelli, eds., 2013), https://tinyurl.com/ydht87or; Institute of Medicine, *The Health of Lesbian, Gay, Bisexual, and Transgender People: Building a Foundation for Better Understanding* (Nat'l Acads. Press 2011), https://tinyurl.com/ug72d7j;

Mark Hatzenbuehler, *et al.*, *Stigma As a Fundamental Cause of Population Health Inequalities*, 103 Am. J. Pub. Health 813, 813 (2013), https://tinyurl.com/3butkwjh.

Similarly, discrimination can breed more dangerous discrimination if deemed socially acceptable. *See* Christian Crandall, *et al.*, *Social norms and the expression and suppression of prejudice: The struggle for internalization*, 82 J. Personality & Soc. Psych. 359, 359–78 (2002), https://tinyurl.com/3ve2ecee (examining effect of group norms on individual opinions). This is because "[s]tate-sanctioned condemnation of a group of citizens . . . sends the clear message that this group is not entitled to the freedom from physical violence provided other citizens." Christopher R. Leslie, *Creating Criminals: The Injuries Inflicted by 'Unenforced' Sodomy Laws*, 35 Harv. C.R.-C.L. L. Rev. 103, 126 (2000). When unchecked, those biases and segregationist tendencies harm society as a whole, as well the targeted groups. *See* Reva B. Siegel, *From Colorblindness to Antibalkanization: An Emerging Ground of Decision in Race Equality Cases*, 120 Yale L.J. 1278, 1300–02 (2011) (emphasizing Court's role in warding off divisive threats to a cohesive society).

Moreover, religious reinforcement of anti-LGBT bias often increases the negative effects on mental health. *See* Ilan Meyer, *et al.*, *The Role of Help-Seeking in Preventing Suicide Attempts among Lesbians, Gay Men, and Bisexuals*, 45 J. Suicide & Life-Threatening Behavior 1 (2014) (research shows anti-gay messages

from religious leaders increase severe mental health reactions), https://tinyurl.com/2zzrs898; Edward J. Alessi, *et al.*, *Prejudice Events and Traumatic Stress Among Heterosexuals and Lesbians, Gay Men, and Bisexuals*, 22 J. of Aggression, Maltreatment & Trauma 510, 510-26 (2013), https://tinyurl.com/9j2ec4w8.

Conversely, sexual orientation nondiscrimination laws help reduce stresses resulting from anti-LGB stigma and discrimination and, thus, positively address existing health disparities. *Ilan H. Meyer et al. Masterpiece Cakeshop Amici Brief*, *supra,* 2017 WL 5036301 (citing Mark Hatzenbuehler, *et al.*, *State Level Policies and Psychiatric Morbidity in Lesbian, Gay, and Bisexual Populations*, 99 Am. J. Pub. Health 2275 (2009)).

If New York's laws can be made hollow by religious carve-outs, many of the approximately 1,030,000 LGBT people living in New York will be much more vulnerable to discrimination.[4] Appellants' quest for a religious exemption for commercial activity poses a potentially devastating threat with distressing historical echoes. *See generally* David Cruz, *Piety and Prejudice: Free Exercise Exemption from Laws Prohibiting Sexual Orientation Discrimination*, 69 N.Y.U. L. Rev. 1176,

---

[4] According to the U.S. Census, New York's population in 2020 was 20,201,249. https://tinyurl.com/yrbkw7n3. According to the Williams Institute's analysis of Gallup's national survey data, 5.1% of people in New York self-identify as LGBT. LGBT Demographic Data Interactive (Jan. 2019), https://tinyurl.com/48ntfm3c.

1221 (1994) (desired exemptions "would undermine the egalitarian public order that such laws seek to establish, creating precisely the access and dignitary harms that the Supreme Court held to be the legitimate concern of antidiscrimination laws."). Given the history and continuing reality of anti-LGBT bias in New York and nationwide, it should be beyond question that the public accommodations laws serve compelling public interests and must remain effectively enforceable.

## III. This Court Should Not Recognize Any Religious Exemption From The State's Essential Nondiscrimination Law.

The Supreme Court unequivocally has held that non-discrimination laws "serve[] compelling state interests of the highest order." *Roberts*, 468 U.S. at 624 (enforcing Minnesota public accommodations law). In the context of public accommodations, specifically, the United States Supreme Court also has acknowledged the "moral and social wrong" of discrimination. *Heart of Atlanta Motel v. United States*, 379 U.S. 241, 257 (1964). Public accommodations non-discrimination laws "eliminate [the] evil" of businesses serving only those "as they see fit," which demeans both the individual and society writ large. *Id.* at 259. As is true for other socially vulnerable minorities, perpetuating discrimination against LGBT people through the denial of public accommodations humiliates and reinforces stigma. If Appellants were allowed to refuse services to same-sex couples, despite providing those same services to different-sex couples, it would result in precisely the sort of "exclusion that . . . demeans [and] stigmatizes." *Obergefell* at

26

2602; *see also* Douglas NeJaime & Reva B. Siegel, *Conscience Wars: Complicity-Based Conscience Claims in Religion and Politics*, 124 Yale L.J. 2516, 2574–78 (2015), https://tinyurl.com/tkyjjhl (discussing how complicity-based conscience claims harm the parties targeted and excluded by those claims).

Despite our history, the social science findings, and many forceful court decisions, some people with passionate convictions—including anti-LGBT advocates in particular—continue to assert religious beliefs in cases such as this one to excuse invidious discrimination. Given the immense demographic diversity and religious pluralism of our nation, the law must remain crystal clear: each person's religious liberty ends where legally prohibited harm to another begins. That well-settled principle of American law must apply equally to all invocations of religious belief, whether urged to justify racial, gender, marital status, or religious discrimination, or discrimination based on sexual orientation.

Thus, courts repeatedly have held that religious liberty cannot shield invidious deprivations of another's basic rights. Our shared pledge calling for "liberty and justice for all" demands it. Many business owners hold religious and other beliefs that guide their lives. Permitting those engaged in commerce to invoke religion to excuse service refusals contrary to public accommodation laws would embolden other businesses to do the same and, as the district court correctly noted, would result in "'a disfavored group [being] relegated to a narrower selection of generic

27

services,'" thus subverting the compelling state interests served by the public accommodations laws. 2021 WL 5879090, at \*16 (quoting *303 Creative*, 6 F.4th at 1181).

Appellants offer no limiting principle and, indeed, there is none. Religious critiques of marriage for same-sex couples can be leveled just as easily at the marriages of interracial and interfaith couples, at heterosexual cohabitation, at divorce, at contraception, sterilization, and infertility care, at unwed motherhood, and at innumerable other personal decisions about family life. Moreover, the "go elsewhere" approach that Appellants defend will not and has not stayed confined to discrimination based on family relationships or decisions. The notion that business owners sin, are forced to celebrate "sinful" behavior, or are prevented from promoting their faith when they simply engage in a commercial transaction with a "sinful" customer, could apply just as well to transactions about any goods or services, housing, or employment.

In sum, granting Appellants' demand for an exemption from the public accommodations laws would eviscerate bedrock doctrine that has been reaffirmed consistently over time. The settled approach permits and encourages a flourishing coexistence of the diverse religious, secular, and other belief systems that animate our nation while ensuring equal opportunity for everyone in the public marketplace. The proposed alternative would transform that marketplace into segregated

dominions within which each business owner with religious convictions "become[s] a law unto himself," *Employment Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 879 (1990) (internal citation omitted), and would force members of minority groups to suffer the harms and indignities of being required to go from shop to shop searching for places where they will not be treated as pariahs. Enforcing the neutral, generally applicable public accommodations laws notwithstanding the religious objections of a business owner neither evinces impermissible hostility toward religion nor privileges secular considerations. There is simply no narrower way of fulfilling the state's interest in ensuring the equal opportunity of LGBT New Yorkers than by banning discrimination without exception.

New York's public accommodations laws provide critically needed protections against ostracism and other discriminatory treatment in public life. New York enacted and has updated these statutes to protect vulnerable members of our diverse society from discrimination regardless of others' religious reasons for wanting to refuse them things of value offered to everyone else. Despite this country's long history recognizing that religious exemptions to civil rights laws will largely nullify such laws, Appellants nonetheless asks this Court for permission to single out LGBT people and same-sex couples for rejection, humiliation, and stigma while operating the business. As the District Court properly recognized, the answer must be "no."

29

## CONCLUSION

For the foregoing reasons, *Amicus Curiae* Lambda Legal Defense and Education Fund, Inc. respectfully asks the Court to affirm the December 13, 2021 decision of the District Court.

Respectfully submitted this 16th day of May, 2022.

Jennifer C. Pizer
Karen L. Loewy
Omar Gonzalez-Pagan
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.

By:  /s *Karen L. Loewy*_____
        Karen L. Loewy

Counsel for *Amicus Curiae*
Lambda Legal Defense and Education Fund, Inc.

## CERTIFICATE OF COMPLIANCE WITH RULE 32(g)(1)

1.    This brief complies with the type-volume limit of Local Rule 29.1(c) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), according to the word count feature of the word-processing system used to prepare this brief, this document contains 6,739 words.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated:  May 16, 2022                 Respectfully submitted,


By:  /s/ *Karen L. Loewy*
     Karen L. Loewy

## CERTIFICATE OF SERVICE

I hereby certify that on May 16, 2022, a true and accurate copy of this brief was electronically filed with the Court using the CM/ECF system, which will send notification of such filing to the following:

Letitia James,
*Attorney General*
Barbara Underwood,
*Solicitor General*
Jeffrey W. Lang,
*Deputy Solicitor General*
Alexandria Twinem,
*Assistant Solicitor General*
State of New York
The Capitol
Albany, NY 12224
Telephone: (518) 776-2015
Alexandria.Twinem@ag.ny.gov

Hyder Hussain
County Attorney, County of Chemung
167 Lake St.
Elmira, NY 14902
Telephone: (607) 737-2982
hhussain@chemungcountyny.gov

*Attorneys for Government Defendants-Appellees*

Jonathan A. Scruggs
Bryan D. Neihart
Jacob P. Warner
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@ADFlegal.org
bneihart@ADFlegal.org
jwarner@ADFlegal.org

John J. Bursch
Alliance Defending Freedom
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

Raymond J. Dague
Dague & Martin, P.C.
4874 Onondaga Road
Syracuse, NY 13215
(315) 422-2052
rjdague@daguelaw.com

*Attorneys for Plaintiffs-Appellants*

Dated:  May 16, 2022                    Respectfully submitted,


                                        By:  /s/ *Karen L. Loewy*
                                              Karen L. Loewy