22-75
*Carpenter v. James*

# United States Court of Appeals
# For the Second Circuit

August Term 2022

Argued: September 28, 2022
Decided: July 12, 2024

No. 22-75

EMILEE CARPENTER, LLC, DBA EMILEE CARPENTER PHOTOGRAPHY, EMILEE
CARPENTER,

*Plaintiffs-Appellants,*

*v.*

LETITIA JAMES, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF NEW YORK,
MARIA L. IMPERIAL, IN HER OFFICIAL CAPACITY AS THE ACTING COMMISSIONER OF
THE NEW YORK STATE DIVISION OF HUMAN RIGHTS, WEEDON WETMORE, IN HIS
OFFICIAL CAPACITY AS DISTRICT ATTORNEY OF CHEMUNG COUNTY,

*Defendants-Appellees.*[*]

Appeal from the United States District Court
for the Western District of New York
No. 21-cv-6303, Frank P. Geraci, *Judge.*

---

[*] The Clerk of Court is respectfully directed to amend the captions accordingly.

Before:    CARNEY, BIANCO, and NATHAN, *Circuit Judge*s.

Plaintiff Emilee Carpenter is a wedding photographer who offers her services to the general public.  Her complaint alleges that she wishes to create photography that reflects her religious and personal beliefs about marriage, including by declining to offer her services for same-sex weddings.  She brought this preenforcement action alleging that New York's public accommodations laws prohibiting discrimination on the basis of sexual orientation violate the First and Fourteenth Amendments.  Carpenter sought declaratory and injunctive relief, and requested a preliminary injunction against enforcement of the laws.  The United States District Court for the Western District of New York (Geraci, J.) dismissed all of her claims.

Following the Supreme Court's decision in *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023), State and County Defendants concede and we agree that Carpenter has met her burden at the pleading stage to state a plausible free speech claim. However, we reject Carpenter's request to enter a preliminary injunction at this stage.  We also affirm the district court's dismissal of Carpenter's other claims. Carpenter has failed to sufficiently plead that the public accommodations laws violate her right to free association, her right to free exercise of religion, or the Establishment Clause.  She has also failed to state a plausible claim that the laws are unconstitutionally overbroad or vague.  Accordingly, we **AFFIRM** in part, **REVERSE** in part, **VACATE** in part, and **REMAND** for further proceedings.

————

BRYAN D. NEIHART (John J. Bursch, Jonathan A. Scruggs, Jacob P. Warner, *on the brief*), Alliance Defending Freedom, Washington, DC, *for Plaintiffs-Appellants*.

Raymond J. Dague, Dague & Martin, P.C., Syracuse, NY, *for Plaintiffs-Appellants*.

JEFFREY W. LANG (Barbara D. Underwood, Alexandria Twinem, *on the brief*) for Letitia James, Attorney General, State of New York,

Albany, NY, *for Defendants-Appellees Letitia James and Maria L. Imperial.*

M. HYDER HUSSAIN, County of Chemung Department of Law, Elmira, NY, *for Defendant-Appellee Weeden Wetmore.*

———————

NATHAN, *Circuit Judge*:

Like many states, New York has long had public accommodations laws to guarantee equal access to goods and services for members of protected classes. These laws are codified in New York's Human Rights Law and Civil Rights Law, which, among other things, make it an unlawful discriminatory practice for public establishments to refuse service to individuals because of protected characteristics including race, religion, sex, and sexual orientation. *See* N.Y. Exec. Law § 296(2)(a); N.Y. Civ. Rts. Law § 40-c(2). With the protection of these laws, a same-sex couple can live and travel throughout New York State knowing that they will not be denied service at a restaurant, a room at an inn, or myriad other goods and services because of who they are.

This case arose when Plaintiff Emilee Carpenter brought a preenforcement challenge against New York's public accommodations laws on grounds that they

are unconstitutional under the First and Fourteenth Amendments as applied to her business. Specifically, the complaint alleges that New York's laws violate Carpenter's constitutional rights to free speech, free association, and free exercise of religion, violate the Establishment Clause, and are unconstitutionally overbroad or vague. Carpenter's complaint alleges that she is a wedding photographer who wishes to provide her services consistent with her beliefs about marriage. Because one of those beliefs is that marriage should be only between a man and a woman, she intends to refuse her photography services to same-sex couples. Concerned that this course of conduct would violate New York's public accommodations laws prohibiting discrimination on the basis of sexual orientation, she brought this preenforcement suit. The district court dismissed all of Carpenter's claims.

On appeal, Carpenter challenges each dismissal and seeks an order directing the district court to enter a preliminary injunction. We affirm the district court's dismissal of Carpenter's claims that New York's public accommodations laws (1) violate her First Amendment right to free association, (2) violate her First

Amendment right to free exercise of religion, (3) violate the Establishment Clause, (4) are unconstitutionally vague, or (5) are overbroad.

As to the free speech claim, State and County Defendants concede that the case must be remanded in light of the Supreme Court's recent decision in *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023). We agree. However, in light of the Supreme Court's analysis in *303 Creative* and relevant First Amendment law, we deny Carpenter's request to enter a preliminary injunction at this stage. Instead, we remand to allow the district court to consider the preliminary injunction request in the first instance. In assessing that request, the district court must evaluate a developed factual record—rather than merely the complaint's allegations—to determine whether the application of the law at issue actually compels Carpenter's expressive conduct, rather than nonexpressive conduct that imposes an incidental burden on speech. And the district court should assess whether Carpenter's blogging is a good or service regulated by New York's public accommodations laws.

Accordingly, we **REVERSE** in part, **VACATE** in part, and **AFFIRM** in part the judgment of the district court, and **REMAND** for further proceedings.

## BACKGROUND

### I.    Factual Allegations

The current posture of the case is review of the grant of a motion to dismiss, so the factual allegations are taken from Plaintiff's complaint and any incorporated documents, and they are assumed to be true at this stage.  *See Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 65 (2d Cir. 2012).  Plaintiff Emilee Carpenter is a photographer from Chemung County, New York, who provides engagement and wedding photography services to the general public through her limited liability company Emilee Carpenter, LLC.  As explained in more detail below, Carpenter alleges that the wedding photographs she creates for her customers are customized expressions of her own artistic vision.  Carpenter runs a website as part of her business, on which she advertises her services and displays her work.  She also publishes a blog on her website, which includes posts about the engagements and weddings she photographs.  As the district court noted, it is

unclear whether these blog posts are part of the photography service that Carpenter offers to the general public. *See Emilee Carpenter, LLC v. James*, 575 F. Supp. 3d 353, 372 n.10 (W.D.N.Y. 2021) (observing that Carpenter's complaint at times describes the blog as a form of her own marketing for her business). As we explain below, the precise nature and the status of Carpenter's blogging remain factual questions for the district court to evaluate in the first instance based on a more developed record. Carpenter's allegations regarding the blog do not alter our resolution of the appeal at this stage and so we need not examine them further here.

Carpenter's complaint alleges that she seeks to conduct her photography business consistent with her religious faith and her own beliefs about marriage. To that end, she requires all engagement and wedding clients to sign a service agreement giving her full artistic license and editorial discretion over their photographs. One of Carpenter's beliefs is that marriage should be only between a man and a woman. She alleges that she therefore will not provide her photography services for same-sex weddings or engagements, as she thinks doing

so would express acceptance and celebration of same-sex marriage contrary to her beliefs. Carpenter claims she will provide other photography services to the individuals whose weddings she will not photograph—such as "branding photographs for a business owned and operated by LGBT individuals"—but she will not provide her wedding-photography service to same-sex couples. App'x at 37.

According to the complaint, Carpenter currently silently screens prospective clients for same-sex couples, ignoring requests for engagement and wedding photography from couples who appear to be the same sex. Carpenter intends to continue refusing to photograph same-sex couples' engagements and weddings. Further, she wishes to amend her company's operating agreement to include a "Beliefs and Practices" statement explaining this practice, to advertise on her website that she will not provide engagement or wedding photography to same-sex couples because of her religious and personal beliefs, and to ask prospective clients directly whether they are a same-sex couple so that she can decline their request if they are. *See* App'x at 51.

8

Carpenter understands that running her business in this way would be contrary to state law. Like many states, New York has long had public accommodations laws guaranteeing equal access to goods and services on the basis of certain protected grounds. Drawing on the common-law tradition that those who offer their services to the general public must serve all comers, states and localities began passing these laws after the Civil War out of a concern that discrimination in public accommodations would "perpetuate a caste system in the United States." *Bell v. Maryland*, 378 U.S. 226, 288 (1964) (Goldberg, J., concurring); *see Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 571 (1995) (noting the "venerable" common-law history of public accommodations laws).

Today, New York's public accommodations laws are codified in the state's Human Rights Law and Civil Rights Law. Three provisions of the Human Rights Law are at issue in this case. First, the Accommodations Clause makes it an "unlawful discriminatory practice" for the provider of a "place of public accommodation, resort or amusement . . . to refuse, withhold from or deny to" an

9

individual "any of the accommodations, advantages, facilities or privileges thereof" on the basis of a number of protected characteristics including race, religion, sex, and sexual orientation. N.Y. Exec. Law § 296(2)(a). Second, the Denial Clause makes it similarly unlawful for providers of public accommodations "to publish, circulate, issue, display, post or mail any written or printed communication, notice or advertisement" to the effect that the public accommodation will be refused to an individual on those same grounds. *Id.* Third, the Unwelcome Clause prohibits communications, notices, or advertisements to the effect that an individual's "patronage or custom" at a place of public accommodation is "unwelcome, objectionable or not acceptable, desired or solicited" on the same protected grounds. *Id.*

Separately, the Civil Rights Law provides that "[n]o person shall . . . be subjected to any discrimination in his or her civil rights, or to any harassment . . . in the exercise thereof, by any other person or by any firm, corporation or institution, or by the state or any agency or subdivision of the state" on the basis of protected grounds including (again) sexual orientation. N.Y. Civ. Rts. Law § 40-

10

c(2). The parties agree that the Civil Rights Law's protections against discrimination by public accommodations are coextensive with those of the Human Rights Law. The parties also agree that Carpenter's photography business is a public accommodation under New York law. Indeed, while excluding any institution that is "in its nature distinctly private," New York law defines "place of accommodation, resort or amusement" broadly to include "establishments dealing with goods or services of any kind." N.Y. Exec. Law § 292(9).

These laws can be enforced in a number of ways. Any person aggrieved by discrimination may file a complaint with New York's Division of Human Rights, as may certain state officials including the Attorney General. N.Y. Exec. Law § 297(1). The Division may also initiate a complaint itself. *Id.* The Division investigates complaints and has the authority to order various remedies such as cease-and-desist orders, compensatory damages, and fines when it finds, after a hearing, that discrimination has occurred. *Id.* § 297(4)(c). Willful violation of an order from the Division of Human Rights is a misdemeanor, which can result in criminal prosecution. *Id.* §§ 63(10), 299. So too is a violation of the Civil Rights

11

Law.  *Id.* § 63(10); N.Y. Civ. Rts. Law § 40-d.  Finally, someone who has experienced discrimination has a cause of action to sue the provider of the public accommodation directly for violations of the Human Rights Law or the Civil Rights Law.  N.Y. Exec. Law § 297(9); N.Y. Civ. Rts. Law § 40-d.

## II.  Procedural History

Carpenter sued state and county officials in the Western District of New York in April 2021, alleging that New York's public accommodations laws violate her First Amendment rights to free speech, free association, and free exercise of religion; violate the Establishment Clause; and are unconstitutionally vague and overbroad.  Carpenter sought injunctive and declaratory relief, and also moved for a preliminary injunction.

The County Defendant moved to dismiss Carpenter's complaint for lack of standing, while the State Defendants moved to dismiss for lack of standing and failure to state a claim.  The district court denied the motions to dismiss for lack of standing, concluding that Carpenter faced a credible threat of having New York's laws enforced against her.  *See Carpenter*, 575 F. Supp. 3d at 365-70.  Defendants do

12

not contest this holding on appeal.  However, the court dismissed Carpenter's

complaint for failure to state a claim and denied her request for a preliminary

injunction as moot.  *See id.* at 370-86.  Carpenter timely filed the present appeal.

After oral argument, we held consideration of this case in abeyance pending the

Supreme Court's issuance of its decision in *303 Creative LLC v. Elenis*, 600 U.S. 570

(2023).  With that decision issued, we now resolve this appeal.

## DISCUSSION

We review *de novo* a district court's dismissal for failure to state a claim,

accepting as true all factual allegations in the complaint and drawing all

reasonable inferences in the plaintiff's favor.  *See Tongue v. Sanofi*, 816 F.3d 199, 209

(2d Cir. 2016).  In order to survive a motion to dismiss, a plaintiff must plead

"enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp.*

*v. Twombly*, 550 U.S. 544, 570 (2007).  That requires "factual content that allows the

court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

13

As an initial matter, before reaching the merits of Carpenter's claims, we agree with the district court—and Defendants, on appeal—that Carpenter has plausibly alleged an injury in fact for the purpose of standing. We note, however, that it will be her obligation to continue to demonstrate standing "with the manner and degree of evidence required at the successive stages of the litigation." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)); *see also Gill v. Whitford*, 585 U.S. 48, 69 (2018) ("The facts necessary to establish standing, however, must not only be alleged at the pleading stage, but also proved at trial."). Our conclusion here is premised on assuming the truth of Carpenter's factual allegations as pled in her complaint. But this conclusion would have little bearing on the question of standing if a more developed factual record should cast doubt on whether Carpenter faces a credible threat of enforcement of New York's laws.

I.     **Free Speech Claim**

Carpenter principally argues that New York's public accommodations laws violate her First Amendment right of free speech on the theory that the laws

14

compel speech. The district court rejected Carpenter's free speech claims, finding that even assuming strict scrutiny applies, the Accommodations Clause is narrowly tailored to advance the state's compelling interest in eliminating discrimination based on sexual orientation in the provision of public accommodations. *See Carpenter*, 575 F. Supp. 3d at 370-80. The district court further upheld the Denial and Unwelcome Clauses, reasoning that a state may prohibit speech that promotes unlawful activity, including discrimination. *See id.* at 380. Because the court dismissed Carpenter's complaint for failure to state a claim, it also denied her request for a preliminary injunction as moot. *See id.* at 365.

Since the district court's ruling, the Supreme Court issued its decision in *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023). Carpenter argues now, and State and County Defendants concede, that this claim must be remanded to the district court in light of the Supreme Court's decision. Carpenter further argues that *303 Creative* warrants vacating the district court's denial of a preliminary injunction and directing entry of an injunction on remand. For the reasons that follow, we agree

15

that Carpenter's free speech claim must be remanded to the district court, but we decline Carpenter's invitation to direct entry of a preliminary injunction. Instead, on remand, the district court should consider the application for preliminary injunctive relief on a developed factual record.

### A. Dismissal for Failure to State a Claim

Following *303 Creative*, we conclude (as the Defendants also concede) that Carpenter has pled sufficient facts to plausibly allege a free speech claim. *303 Creative* concerned a graphic designer, Lorie Smith, who offered website design services through her business, 303 Creative LLC. Smith planned to create wedding websites but asserted faith- and free-speech-based objections to creating wedding websites for same-sex couples. Smith stated a fear that her refusal to offer her services for same-sex weddings would violate Colorado's Anti-Discrimination Act (CADA) which, much like New York's laws here, prohibits a public accommodation from denying "the full and equal enjoyment" of its goods and services to any customer based on a number of protected categories including sexual orientation. *303 Creative*, 600 U.S. at 580-81. Smith brought a

16

preenforcement First Amendment challenge alleging that she faced a credible threat that Colorado would enforce CADA to compel her to create websites celebrating marriages she does not endorse—namely, same-sex weddings. *See id.* at 580.

The Supreme Court held that, as applied to Smith's website design business, Colorado's public accommodations law violated the First Amendment because it impermissibly compelled speech. *Id.* at 588. The Court took three steps to reach that conclusion: First, the Court acknowledged the credible threat that Colorado would invoke CADA to compel Smith to create wedding websites that she did not wish to create. *Id.* at 583. Second, it determined that "the wedding websites Ms. Smith seeks to create qualify as 'pure speech'" under the First Amendment. *Id.* at 587. And third, the Court concluded that "the wedding websites Ms. Smith seeks to create involve *her* speech." *Id.* at 588. Having drawn these three conclusions, the Court reasoned that CADA could not constitutionally be applied to Smith's wedding website business, because the First Amendment prohibits Colorado from compelling persons like Smith to engage in pure speech. *See id.* at 592 (stating that

17

public accommodations laws cannot be "applied to expressive activity to compel speech" (internal quotation marks omitted)).

Relevant here, the Supreme Court declared that the parties did not contest the first premise in its chain of logic (the threat of compulsion). It then ruled that the other two premises—that the websites Smith would be compelled to create (1) qualify as "pure speech" that (2) involve *her* speech—followed directly from the parties' factual stipulations. First, the Court said its conclusion as to "pure speech" followed from the following stipulations: "that Ms. Smith's websites promise to contain images, words, symbols, and other modes of expression," "that every website will be her original, customized creation," and "that Ms. Smith will create these websites to communicate ideas—namely, to celebrate and promote the couple's wedding and unique love story and to celebrate and promote what Ms. Smith understands to be a true marriage." *Id*. at 587 (cleaned up).

The Court next accepted the premise that the wedding websites at issue involved *Smith's* speech. "Again," the Court said, "the parties' stipulations lead the way to that conclusion." *Id*. at 588. This time, the Court referred to the parties'

18

stipulations that "Ms. Smith intends to vet each prospective project to determine whether it is one she is willing to endorse," "consult with clients to discuss their unique stories as source material," and in the end "produce a final story for each couple using her own words and her own original artwork," which will be presented together with the name of her solely owned company. *Id.* (cleaned up); *id.* at 579.

As Carpenter and State and County Defendants agree, the Supreme Court's reliance on these factual stipulations is dispositive here. That is because the specific facts alleged in Carpenter's complaint are substantially similar to the relevant facts stipulated to by the parties in *303 Creative*. Specifically, Carpenter has alleged that she exercises artistic license to create customized and original images that express her religious views about marriage. Carpenter has thus alleged substantially similar facts to suggest that her photography services plausibly qualify as expressive activity under the Court's holding, *see* App'x at 26-32. In light of these factual allegations, Carpenter has plausibly stated a compelled

19

speech claim because the Accommodations Clause of New York's Human Rights Law requires her to extend her photography services to same-sex weddings.[1]

We accordingly reverse the district court's grant of the motion to dismiss that claim.

### B.  Preliminary Injunction Request

Although we agree that Carpenter has plausibly stated a valid free speech claim, we reject Carpenter's argument that *303 Creative* "*proves* that Emilee deserves injunctive relief for her free-speech claim now."  Appellant's Letter Br. at 1 (emphasis added).  Instead, we remand to the district court to consider the application for preliminary injunctive relief on a developed factual record.

"We review the denial of a motion for a preliminary injunction for abuse of discretion, which we will identify only if the decision rests on an error of law or a

---

[1] It follows directly from Carpenter's plausible claim regarding the Accommodations Clause that she has also stated a plausible free speech claim against the Denial and Unwelcome Clauses.  As in *303 Creative*, where the Court acknowledged that Smith's "Communication Clause challenge hinges on her Accommodation Clause challenge," 600 U.S. at 598, here Carpenter's challenge to the Denial and Unwelcome Clauses rises and falls with her challenge to the Accommodation Clause.  If Carpenter's refusal to serve same-sex weddings is protected expressive activity, then the Denial and Unwelcome Clauses—which prevent Carpenter from advertising that position to the public—regulate protected speech.

clearly erroneous finding of fact, or cannot be located within the range of permissible decisions." *New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 180 (2d Cir. 2020). "The district court's denial of [Carpenter's] preliminary injunction motion as moot rests on an error of law, specifically, the court's dismissal of all [Carpenter's] claims." *Id.* For the reasons stated in the preceding discussion, Carpenter's free speech claim should not have been dismissed and, thus, the preliminary injunction motion is not moot.

Carpenter urges this Court not only to vacate the denial of its preliminary injunction motion, but also to direct entry of the requested injunction on remand. We recognize our authority to do so, *see id.*, but decline in the instant case because Carpenter's request for a preliminary injunction at this stage rests on a misreading of *303 Creative* and further development of the factual record on remand is warranted before entry of a preliminary injunction.

The Supreme Court's decision in *303 Creative* justifies remand for resolution of the preliminary injunction for two reasons. First, the Court in *303 Creative* was clear that its holding was tied to the factual stipulations reached in that case. And

21

for good reason.  In cases like these, "details might make a difference." *Masterpiece*

*Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 584 U.S. 617, 624 (2018).  To make the

limited reach of its holding clear, the *303 Creative* Court acknowledged that

"[d]oubtless, determining what qualifies as expressive activity protected by the

First Amendment can sometimes raise difficult questions." *303 Creative*, 600 U.S.

at 599.  "But this case presents no complication of that kind," the Court stressed,

because "[t]he parties have *stipulated* that Ms. Smith seeks to engage in expressive

activity." *Id*. (emphasis in original).

Directly relevant to the facts of this case, the majority in *303 Creative* rebuffed

the dissent's suggestion that the Court's holding would allow a professional

photographer who takes photos of newlyweds to "refuse to sell that service to a

newlywed gay or lesbian couple, even if she believes the couple is not, in fact, just

married because in her view their marriage is false."  *Id*. at 630 (Sotomayor, J.,

dissenting) (internal quotation marks omitted).  The majority clarified: "Instead of

addressing the parties' stipulations about the case actually before us, the dissent

spends much of its time adrift on a sea of hypotheticals about *photographers*,

22

stationers, and others, asking if they too provide expressive services covered by the First Amendment." *Id*. at 599 (emphasis added). "But those cases are not *this* case." *Id*. The Court could not have been clearer that the facts matter.

For that reason, the district court must be given the opportunity to consider a developed and specific factual record regarding Carpenter's business and determine whether, if applied here, New York's public accommodations laws will compel Carpenter's expressive activity as contemplated by *303 Creative*.

Second, and relatedly, *303 Creative* must be read in light of familiar First Amendment principles that confirm the fact-intensive nature of the inquiry at hand. These principles, as well, compel us to reject Carpenter's request that we direct entry of the preliminary injunction at this stage in the litigation.

*303 Creative* reminds us first that the First Amendment extends its protection to certain forms of expression even when the speaker is engaged in commerce. *See id*. at 594. This breaks no new ground. Indeed, long before *303 Creative*, "[i]t [was] well settled that a speaker's rights are not lost merely because compensation is

received; a speaker is no less a speaker because he or she is paid to speak." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 801 (1988).

Instead, the preliminary question in a case asserting unlawfully compelled speech is whether the law at issue regulates "nonexpressive conduct" of a commercial nature—perhaps with an "incidental burden[] on speech," *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011)—or whether the law as applied compels what the Court in *303 Creative* called "pure speech" or "expressive activity," *303 Creative*, 600 U.S. at 599; *see also Masterpiece Cakeshop*, 584 U.S. at 631 ("[I]t is a general rule that such objections [to same-sex marriage] do not allow business owners and other actors in the economy and in society to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations law.").

In *303 Creative*, the Court rejected Colorado's argument that the "case involves only the sale of an ordinary commercial product and any burden on Ms. Smith's speech is purely incidental." *303 Creative*, 600 U.S. at 593 (internal quotation marks omitted). Instead, as the majority explained, "the State has

24

stipulated that Ms. Smith does *not* seek to sell an ordinary commercial good but intends to create customized and tailored speech for each couple." *Id.* (internal quotation marks omitted). Here too, before entering or denying a preliminary injunction, the district court on remand should consider whether the factual record ultimately establishes, contrary to Carpenter's allegations, that her photography services involve only the sale of ordinary commercial services, i.e., nonexpressive conduct—or if it indeed supports her claim that the services constitute expressive conduct.

Along these lines, *303 Creative* also reiterates the familiar First Amendment principle that conduct cannot be labeled expressive activity simply "whenever the person engaging in the conduct intends thereby to express an idea." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 65-66 (2006) ("*FAIR*") (internal quotation marks omitted); *see also Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984) (holding that the right of expression does not permit selecting law firm partners in violation of Title VII). Instead, courts must consider whether the good or service at issue amounts to a "medium for the communication of ideas." *Joseph Burstyn,*

25

*Inc. v. Wilson*, 343 U.S. 495, 501 (1952) (extending First Amendment protection to films because they are a "significant medium for the communication of ideas"); *see also Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 790 (2011) (same with respect to video games). Thus, in *Hurley*, the Court concluded that First Amendment protection extends to parades because parades are "mediums of expression," and not simply "group[s] of people . . . march[ing] from here to there." 515 U.S. at 568-69. Importantly, the Court noted that "we use the word 'parade' to indicate marchers who are making some sort of collective point, not just to each other but to bystanders along the way," and indeed parades "depend[] on watchers." *Id*. at 568; *compare with FAIR*, 547 U.S. at 64 ("Unlike a parade organizer's choice of parade contingents, a law school's decision to allow recruiters on campus is not inherently expressive.").

The question posed here, then, is whether Carpenter's photography services are expressive conduct, because, for example, her photographs provide conduits of public discourse or "communicate ideas." *Brown*, 564 U.S. at 790; *see also Wilson*, 343 U.S. at 501 (describing protected mediums of expression as "organ[s] of public

opinion" that "may affect public attitudes and behavior in a variety of ways, ranging from direct espousal of a political or social doctrine to the subtle shaping of thought which characterizes all artistic expression"). Even if photography is "presumptively expressive," *Mastrovincenzo v. City of New York*, 435 F.3d 78, 93 (2d Cir. 2006), some photography services may be so devoid of expressive content as to fall outside the category of expressive conduct, *cf. Telescope Media Grp. v. Lucero*, 936 F.3d 740, 751 (8th Cir. 2019) (concluding that certain videos were protected speech where complaint alleged that videos were "not just . . . simply recordings, the product of planting a video camera at the end of the aisle and pressing record"). In the absence of such a stipulation, the district court must decide on remand which category Carpenter's photography falls into: expressive or not.

That is essentially the question the Supreme Court answered in *303 Creative* when it determined that Smith's wedding websites were expressive or "pure speech." The factual stipulations confirmed that Smith was not merely selling off-the-shelf commercial products. Instead, she was creating original, tailored, and expressive works that all parties agreed communicated Smith's particular

personal views.  As the Court put it, Smith's websites constituted "modes of expression" and were designed to communicate Smith's ideas about what constitutes a "true marriage."  *303 Creative*, 600 U.S. at 587.  Put otherwise, the parties had all but agreed that Smith was an artist and that her websites were her artistic mediums of expression.  But here, whether Carpenter's actual wedding photography services constitute expressive conduct is an open threshold question for the district court to consider on remand in light of a developed evidentiary record.

Finally, the Court's requirement in *303 Creative* that the websites involve *Smith's* speech also returns us to familiar First Amendment principles.  *See id*. at 588 (concluding that "the wedding websites Ms. Smith seeks to create involve *her* speech").  To state a compelled speech claim, it is not enough for a plaintiff to show that the service at issue involves a medium of expression.  The plaintiff must also demonstrate that the expressive activity is her own – that is, she created the expressive content herself or, by compiling or curating third-party content in some forum, she is also engaged in her own expressive activity.  *See Moody v. NetChoice,*

28

*LLC*, -- S. Ct. --, 2024 WL 3237685, at *10 (2024) (explaining that, in determining whether "ordering a party to provide a forum for someone else's views implicates the First Amendment," the Court has "repeatedly held that it does so if, though only if, the regulated party is engaged in its own expressive activity, which the mandated access would alter or disrupt," and that expressive activity may include "presenting a curated compilation of speech originally created by others"). In the absence of such a showing, the plaintiff's autonomy is not implicated and does not trigger First Amendment protection.

The Supreme Court spelled out this principle in *Hurley*. There, the Court considered whether an entity who is organizing or compiling expressive content created by one or more third parties is engaged in its own expressive activity that is also protected by the First Amendment. In particular, after concluding that parades are mediums of expression, the Court turned next to the question of *whose* expression was involved. It elaborated that "in the context of an expressive parade, as with a protest march, the parade's overall message is distilled from the individual presentations along the way, and each unit's expression is perceived by

spectators as part of the whole." 515 U.S. at 577. As a result, the Court rejected the argument that compelled admission of certain participants in "the parade would not threaten the core principle of speaker's autonomy" because, it explained, public spectators were "likely [to] perceive[]" the inclusion of a unit "as having resulted from" the organizer's belief that the unit's message was "worthy of presentation and . . . support." *Id.* at 575. In other words, the Court concluded that it was indeed the *organizer's* speech that would be compelled. The Supreme Court in *Hurley* thus held that "the speaker's right to autonomy over the message is compromised" when "dissemination of a view contrary to one's own is forced upon a speaker *intimately connected* with the communication advanced[.]" *Id.* at 576 (emphasis added).[2]

Here, to the extent Carpenter is using her photographs or website to host the expressive content of third parties (such as the wedding couple who hired her), rather than her own, the district court must determine, as articulated in *Hurley* and

---

[2] *Cf. Wooley v. Maynard*, 430 U.S. 705, 717 n.15, 715 (1977) (holding unconstitutional a law requiring motorists to display the state motto on license plates given that a vehicle "is readily *associated* with its operator" and thus the law requires drivers to "use their private property as a 'mobile billboard' for the State's ideological message" (emphasis added)).

*303 Creative*, whether the law compels Carpenter's own speech.  In making this determination, a court might consider whether the public accommodations law compels Carpenter to "'alter the expressive content'" of her photographs, *id.* at 585 (quoting *Hurley*, 515 U.S. at 572–73), or "affect their message," *id.* at 589 (quoting *Hurley*, 515 U.S. at 572) (alterations adopted), whether it "'interfere[s] with [her] choice not *to propound a point of view* contrary to [her] beliefs,'" *id.* at 586 (emphasis added) (quoting *Boy Scouts of America v. Dale*, 530 U.S. 640, 654 (2000)), and whether it "forc[es] . . . [her] to include other ideas within [her] own speech that [she] would prefer not to include," *id.*

Carpenter insists that "*303 Creative* also shows that Emilee deserves injunctive relief . . . because the parties had their chance to develop the record below, no one disputes a relevant fact, . . . and *303 Creative* shows that compelling speech is per se invalid."  Appellant's Letter Br. at 14.  To the contrary, *303 Creative* makes clear that the district court must be given the opportunity to consider a more fully developed factual record.  This is especially so because Carpenter's statement that "no one disputes a relevant fact" is incorrect.  Here, unlike in *303*

31

*Creative*, the State did not agree to factual stipulations in the district court demonstrating that all of the content at issue on Carpenter's website is her own expressive activity.[3]   In light of the Supreme Court's decision in *303 Creative* and relevant First Amendment precedent, the State should have an opportunity to present evidence with respect to any factual disputes that will be material to that analysis.

Beyond any factual disputes raised with respect to Carpenter's alleged expressive activities in her photography and photography-related services, the district court should also consider the nature of the speech on Carpenter's company blog in light of a more developed record.  Specifically, the court should assess whether Carpenter's blogging is more akin to, for instance, advertisement than to a service Carpenter offers to the general public, which her customers

---

[3] As previously discussed, the Supreme Court in *303 Creative* cited several factual stipulations that, put together, satisfied this requirement.  These included that fact that "Ms. Smith intends to vet each prospective project to determine whether it is one she is willing to endorse," "consult with clients to discuss their unique stories as source material," and in the end "produce a final story for each couple using her own words and her own original artwork," which will be presented together with the name of her solely owned company.  *303 Creative*, 600 U.S. at 588 (cleaned up); *id.* at 579.

purchase from her—in other words, whether Carpenter's blogging is a good or service regulated by New York's public accommodations laws.

Accordingly, we reject Carpenter's request that we direct entry of the preliminary injunction at this stage of the litigation.[4]

All in all, we have no doubt that "determining what qualifies as expressive activity protected by the First Amendment can sometimes raise difficult questions." *303 Creative*, 600 U.S. at 599. The inquiry is made all the more difficult by the fact that all of life's activities are, in some fashion, expressive. Weddings— including same-sex weddings—involve many goods and services that vendors could attempt to declare expressive: catering, flower arrangements, invitations, live music, table settings, lighting, tailoring, and so on. But the fact that some good or service can implicate expression is a different matter entirely from whether it

---

[4] We additionally note that, should the district court determine that any injunctive relief in this case is appropriate (whether preliminary or otherwise), relief would properly be limited to prohibiting the enforcement of New York's laws to compel Carpenter to provide wedding-related photography services for the weddings of same-sex couples. Carpenter would still be subject to the laws' more general prohibition on refusing service based on a customer's sexual orientation. As noted above, Carpenter disclaims any intention to refuse to provide other photography services to members of the LGBT community.

implicates the First Amendment in the way identified by the Supreme Court in *303 Creative*. *That* task—separating the wheat from the chaff—is ultimately the challenge that the district court must undertake on remand based on a developed record and fact finding.

In sum, following *303 Creative*, courts must consider whether (1) the law at issue will compel a business owner to engage in activity she would not otherwise engage in, and (2) that activity constitutes the owner's expressive activity. To determine whether services constitute expressive activity, courts must analyze whether the vendor creates a medium of expression or communicates an idea through their services or whether she simply engages in predominantly nonexpressive activity of a commercial nature. This is a nuanced, indeed sometimes "difficult," inquiry whose application to public accommodations laws is fact-intensive and varies depending on the context and nature of the goods and services at issue.

What is clear, however, is that *303 Creative* is *far* from an invitation for public accommodations to discriminate against same-sex couples, or inter-faith couples,

34

or bi-racial couples, or any members of protected groups for that matter. To the contrary—the Supreme Court affirmed that it "do[es] not question the vital role public accommodations laws play in realizing the civil rights of all Americans" and "recognized that governments in this country have a '*compelling interest*' in eliminating discrimination in places of public accommodation." *Id*. at 590 (citation omitted) (emphasis added). It called laws like Colorado's or New York's that "expressly prohibit discrimination on the basis of sexual orientation" "entirely unexceptional." *Id*. at 591 (internal quotation marks omitted). And it insisted that "Colorado and other States are generally free to apply their public accommodations laws, including their provisions protecting gay persons, to a vast array of businesses" given that "there are no doubt *innumerable* goods and services that no one could argue implicate the First Amendment." *Id*. at 591-92 (citation omitted) (emphasis added); *see also Hurley*, 515 U.S. at 572 (noting that public accommodations laws "do not, as a general matter, violate the First or Fourteenth Amendments"). What *303 Creative* did is clarify and reaffirm that in highly specific factual circumstances, a public accommodations law can be "applied peculiarly to

compel expressive activity," thereby violating the First Amendment. *303 Creative*, 600 U.S. at 600 n.6 (cleaned up).

*    *    *

There is little daylight between the facts alleged by Carpenter and the facts stipulated in *303 Creative*. As a result, the parties now agree that Carpenter has sufficiently alleged a free speech claim to survive a motion to dismiss. We adopt that position and remand the claim to the district court. However, we decline Carpenter's invitation to direct entry of a preliminary injunction. On remand, the district court must undertake that First Amendment analysis in the first instance with the benefit of a fully developed factual record.

## II.  Free Association Claim

Carpenter also appeals the district court's dismissal of her claim that New York's public accommodations laws violate her First Amendment right to expressive association. Specifically, Carpenter argues that the laws violate her associational rights because they impede her ability to publicly advocate her

support for opposite-sex marriage. We reject that argument and affirm the dismissal of this claim.

Implicit in the First Amendment is the "right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984). But to determine "whether a group is protected by the First Amendment's expressive associational right," courts "must determine whether the group engages in 'expressive association.'" *Boy Scouts of America v. Dale*, 530 U.S. 640, 648 (2000). If so, courts must then determine whether the law at issue would "significantly burden" the association's expression. *Id*. at 653.

We need not reach the latter step of the inquiry because no "expressive association" exists here. Here, Carpenter fails to allege that her business—a single-member LLC that sells photography services to the public—is an association of any kind, let alone an expressive association. And even if it were, requiring Carpenter to photograph same-sex weddings would not compel her to accept same-sex couples as members of her business. Rather, Carpenter would only

"'associate' with [same-sex couples] in the sense that [she] interact[s] with them"
as clients. *FAIR*, 547 U.S. at 69.

To the extent that Carpenter's claim is instead that requiring her to transact
with same-sex couples violates her First Amendment rights of association, that
argument fails both factually and legally. To start, Carpenter's factual allegations
preclude any such claim surviving a motion to dismiss. A key component of
Carpenter's argument is the assertion that she does not discriminate on the basis
of a customer's identity. The first paragraph of her complaint states that "Emilee
decides whether to create based on *what* her artwork conveys, not *who* asks for it."
App'x at 21; *see also id*. ("Emilee is already willing to work with clients no matter
who they are, including those in the LGBT community."). As one of our sister
circuits has concluded in evaluating a similar claim, it is "clear, then, that serving,
speaking to, and otherwise associating with gay and lesbian customers is not the
harm [Carpenter] seek[s] to remedy. [Her] real objection is to the message of the
[photographs] themselves, which is just another way of saying that the [New York

law] violates [her] free-speech rights." *Telescope Media Grp.*, 936 F.3d at 760. We agree with this analysis, and it applies here.

Moreover, the logic of a generalized expressive association objection to transacting with persons that vendors would like to avoid applies to *all* public accommodation laws. Opponents of the Civil Rights Act of 1964 asserted this exact objection, arguing that the Act would deny them "any freedom to speak or to act on the basis of . . . their deep-rooted preferences for associating or not associating with certain classifications of people." 110 Cong. Rec. 7778 (1964) (remarks of Sen. John Tower). But it has long since been settled that "[t]he Constitution does not guarantee a right to choose employees, customers, suppliers, or those with whom one engages in simple commercial transactions, without restraint from the State." *Roberts*, 468 U.S. at 634 (O'Connor, J., concurring). Any such contention therefore fails as a matter of law.

Carpenter nevertheless argues that *303 Creative* dictates reversal on the freedom of expressive association claim in addition to her free speech claim. It does not. As a preliminary matter, in granting certiorari, the Supreme Court

limited the question presented to "[w]hether applying a public-accommodation law to compel an artist to speak or stay silent violates the *Free Speech Clause* of the First Amendment." *303 Creative LLC v. Elenis*, 142 S. Ct. 1106 (2022) (emphasis added). And indeed, its holding was limited to a finding that CADA would compel speech in violation of the Free Speech Clause. Moreover, in reaching that holding the Court made clear that "the parties' stipulations le[d] the way to th[e] conclusion" that Colorado's anti-discrimination law would compel Lorie Smith to speak, which violated the Free Speech Clause. *303 Creative*, 600 U.S. at 588. None of those stipulations pertained to an associational-freedom claim. Therefore, nothing in the holding of *303 Creative* necessitates reversal of the district court's dismissal.

Carpenter attempts to draw support for a contrary conclusion from *303 Creative*'s reference to *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000), a freedom of association case. But that attempt falls short. In *Dale*, the Court held that a public accommodations law implicated the Boy Scouts' right to expressive association because it required the organization to retain a gay rights activist as an

assistant scoutmaster.  *Id*. at 653.  Such a requirement, the Court concluded, "would significantly burden the organization's right to oppose or disfavor homosexual conduct."  *Id*. at 659.  But the Supreme Court has since clarified that *Dale*'s holding is inapplicable if a public accommodations law "does not force [an organization] to accept members it does not desire."  *FAIR*, 547 U.S. at 69 (internal quotation marks omitted).  A "speaker cannot erect a shield against laws requiring access simply by asserting that mere association would impair its message."  *Id*. (internal quotation marks omitted).  That is exactly what Carpenter's associational rights claim attempts to accomplish here.  We thus affirm the district court's dismissal of Carpenter's expressive association claim.

## III. Free Exercise Claim

We also affirm the district court's dismissal of Carpenter's free exercise claim.

The Free Exercise Clause protects "the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through 'the performance of (or abstention from) physical acts.'"  *Kennedy v. Bremerton Sch. Dist*., 597 U.S. 507,

41

524 (2022) (quoting *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 877

(1990)). However, it "does not relieve an individual of the obligation to comply

with a valid and neutral law of general applicability." *Kane v. De Blasio*, 19 F.4th

152, 164 (2d Cir. 2021) (quoting *Smith*, 494 U.S. at 879). A law that is both neutral

and generally applicable is subject to rational basis review. *Id.* By contrast, if a

law is "not neutral or not generally applicable, it is subject to strict scrutiny, and

the burden shifts to the government to establish that the law is narrowly tailored

to advance a compelling government interest." *We The Patriots USA, Inc. v. Conn.*

*Off. of Early Childhood Dev.*, 76 F.4th 130, 144 (2d Cir. 2023).

The district court held that the challenged laws were neutral and generally

applicable and therefore subject to rational basis review. *See Carpenter*, 575 F.

Supp. 3d at 381-84. We agree. On appeal, Carpenter does not challenge the district

court's neutrality holding. And for good reason. The challenged laws are neutral

both facially and as applied because they are not "specifically directed at a

religious practice." *Slattery v. Hochul*, 61 F.4th 278, 292 (2d Cir. 2023) (internal

quotation marks omitted). Carpenter focuses instead on general applicability. In

42

particular, she claims that New York's laws are not generally applicable because they allow for individualized exemptions and treat comparable secular activity more favorably than her religious exercise.

A law is not generally applicable if it selectively imposes burdens on religious conduct. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 543 (1993). "The Supreme Court has explained that a law is *not* generally applicable in at least two circumstances: first, where it 'invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions,' and second, where it 'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way.'" *We The Patriots USA*, 76 F.4th at 145 (quoting *Fulton v. City of Philadelphia*, 593 U.S. 522, 534 (2021)).

The challenged laws do not provide "a mechanism for individualized exemptions," meaning they do not invite government officials to consider whether an individual's reasons for requesting an exemption are meritorious. *See id.* at 150 (quoting *Fulton*, 593 U.S. at 533). Carpenter alleges that New York's public

43

accommodations laws contain individualized exemptions because they permit artists to refuse to create cakes with anti-LGBTQ or racist messages. But those refusals are not exemptions for otherwise prohibited conduct. Rather, these refusals are permitted because they are not based on a protected ground such as race or sexual orientation. Accordingly, such conduct is simply not regulated by New York's antidiscrimination laws. *See* N.Y. Exec. Law § 296(2)(a).

Carpenter points to other examples that purportedly support her argument that New York's laws allow for individualized exemptions. For instance, Carpenter cites to administrative decisions issued by the New York Human Rights Division. But in each decision, the administrative law judge (ALJ) found that the complainant failed to show discrimination based on any protected ground. In *Battaglia v. Buffalo Niagara Introductions, Inc.*, the ALJ found that the complainant was denied service for failing to provide sufficient information in his application, not because of his disability status. No. 10138581, 2012 WL 13207309 (N.Y. Div. Hum. Rts. Jan. 28, 2012). In *Morgan v. Zaharo Cab Corp.*, the ALJ found that the complainant was denied transportation because the taxi driver needed to continue

driving passengers already in his car, not because of her race or faith. No. 10117888, 2009 WL 10738994 (N.Y. Div. Hum. Rts. Nov. 14, 2008). Carpenter's reliance on *New York Roadrunners Club v. State Division of Human Rights* fares no better. 432 N.E.2d 780 (N.Y. 1982) (per curiam). There, the New York Court of Appeals concluded that the New York City Marathon's requirement that participants use their feet did not discriminate based on disability status, because the requirement served legitimate purposes such as promoting fair competition. *Id.* at 781. Contrary to Carpenter's contentions, these decisions do not show that the challenged laws create "individualized exemptions" to discriminate based on sexual orientation or any other protected ground. The cited examples have no bearing on the present question of whether the challenged laws create a system of "individualized exemptions" that would render the laws not generally applicable.

Nor has Carpenter plausibly alleged that the challenged laws treat "comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam). Indeed, she has failed to identify even a single scenario where a public accommodation vendor may lawfully refuse

45

service based on a customer's sexual orientation for secular reasons but not for religious reasons. Instead, Carpenter alleges that New York's public accommodations laws permit sex discrimination "based on bona fide considerations of public policy." N.Y. Exec. Law § 296(2)(b). And she argues from this that New York treats similar secular activity more favorably than her religious exercise, because sex and gender-identity discrimination may be permitted for secular reasons while her religiously motivated conduct is prohibited.

But the religious conduct that Carpenter seeks to engage in is not "comparable" to any sex-based discrimination justified by bona fide public policy reasons. Comparability is measured "against the asserted government interest that justifies the regulation at issue." *Tandon*, 593 U.S. at 62. Carpenter argues that New York's interest in eradicating discrimination applies "uniformly" to sexual orientation and sex. Appellant's Br. at 40. But New York's interests in prohibiting discrimination on different protected grounds are not identical, as unique policy and legal considerations underlie how the public accommodations laws deal with discrimination against members of different protected groups. It is well-

established that bona fide public policy reasons may justify differential treatment by the government on the basis of sex. *See, e.g.*, *United States v. Virginia*, 518 U.S. 515, 533 (1996); *Buzzetti v. City of New York*, 140 F.3d 134, 141 (2d Cir. 1998) ("[T]his Court has consistently upheld statutes where the gender classification is not invidious, but rather realistically reflects the fact that the sexes are not similarly situated in certain circumstances." (quoting *Michael M. v. Superior Court of Sonoma Cnty.*, 450 U.S. 464, 469 (1981) (plurality opinion)). Moreover, New York's asserted interest in including sexual orientation as a protected ground in its public accommodations laws is "[t]o prohibit discrimination based on sexual orientation." N.Y. Assembly Mem. in Support, *in* Bill Jacket for 2002 A.B. 1971, Ch. 2, at 4 (2002). The conduct that Carpenter seeks to engage in would undermine this asserted interest. In contrast, the limited public policy exemption for sex discrimination does not "undermine[] the government's asserted interest[]" in prohibiting sexual orientation discrimination "in a similar way." *See Fulton*, 593 U.S. at 534.

47

New York's public accommodations laws are therefore generally applicable and subject to rational basis review. They easily satisfy rational basis review, as the Supreme Court has long "recognized that governments in this country have a 'compelling interest' in eliminating discrimination in places of public accommodation." *303 Creative*, 600 U.S. at 590 (quoting *Roberts*, 468 U.S. at 628); *see also Masterpiece Cakeshop*, 584 U.S. at 631 ("[R]eligious and philosophical objections . . . do not allow business owners and other actors in the economy and in society to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations law."). We therefore affirm the district court's dismissal of the free exercise claim.

## IV. Establishment Clause Claim

Carpenter also alleges that the challenged laws violate the Establishment Clause by forcing her to attend and participate in religious ceremonies to which she objects. We agree with the district court that Carpenter has failed to state a claim for violation of the Establishment Clause.

Under the Establishment Clause, the government may not "make a religious observance compulsory," "coerce anyone to attend church," or "force citizens to engage in a formal religious exercise." *Kennedy*, 597 U.S. at 537 (cleaned up). Carpenter alleges that New York's public accommodations laws would force her to attend and participate in same-sex weddings, which she believes are "inherently religious" events. Appellant's Br. at 42.

But the challenged laws would only require Carpenter to provide her wedding photography services. Nowhere in her complaint does Carpenter allege that she offers as a service to the public her active religious participation in the weddings that she photographs. New York's laws therefore do not require Carpenter to sing, pray, follow an officiant's instructions, act as a "witness" of the union "before God," or otherwise participate in any same-sex wedding. *Id.* While Carpenter is free to choose to sing, pray, and express approval during the opposite-sex weddings that she photographs, New York's laws cannot plausibly be construed to compel her to do the same at same-sex weddings. Carpenter has made the decision to offer her services, some of which she personally views as

inherently religious, to the public.  While a clergyperson who objects to gay marriage cannot be compelled to perform a wedding ceremony for a same-sex couple, that narrow exception cannot be broadened to the "long list of persons who provide goods and services for marriages and weddings."  *See Masterpiece Cakeshop*, 584 U.S. at 632.

Nor does Carpenter's allegation that her mere presence at a same-sex wedding violates her religious beliefs state a claim under the Establishment Clause, because mere presence does not equate to coerced participation in any religious activity.  The activities that take place during a wedding are not directed at the commercial photographer or any other wedding vendor—they are directed at the marrying couple and the couple's invited family and friends.  *Cf. Town of Greece, N.Y. v. Galloway*, 572 U.S. 565, 587-89 (2014) (concluding that mere presence at a public prayer was not coercive because the public is not "directed" to participate in prayer).  As the Supreme Court has explained, "offense does not equate to coercion."  *Id.* at 567.  The Establishment Clause does not include a "modified heckler's veto, in which . . . religious activity can be proscribed based

50

on perceptions or discomfort." *Kennedy*, 597 U.S. at 534 (cleaned up). This is so even accepting as true Carpenter's allegations that she will feel "immense social pressure" to attend and participate in the same-sex wedding. Appellant's Br. at 42. Social pressure is not state coercion because "mature adults . . . presumably are not readily susceptible to religious indoctrination or peer pressure." *Galloway*, 572 U.S. at 590 (internal quotation marks omitted). As the Supreme Court has emphasized, "learning how to tolerate diverse expressive activities has always been 'part of learning how to live in a pluralistic society.'" *Kennedy*, 597 U.S. at 541 (quoting *Lee v. Weisman*, 505 U.S. 577, 590 (1992)).

For the foregoing reasons, we affirm the district court's dismissal of the Establishment Clause claim.

## V. Vagueness Claim

Carpenter's final two claims focus on the Unwelcome Clause of New York's Human Rights Law, which prohibits communications conveying that the patronage of persons with certain protected characteristics is "unwelcome, objectionable or not acceptable, desired or solicited." N.Y. Exec. Law § 296(2)(a).

51

Carpenter argues that this statutory language is unconstitutionally vague, in violation of due process. Like the district court, we conclude that Carpenter has failed to state a valid vagueness claim.

A statute is unconstitutionally vague if it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," or if it "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). Here, though, Carpenter's vagueness claim cannot get off the ground, because her own desired speech is clearly covered by the statute. "[A] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 20 (2010) (internal quotation marks omitted). And "[t]hat rule makes no exception for conduct in the form of speech." *Id.*; *accord Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 48 (2017).

Carpenter argues that this rule does not apply to vagueness claims based on unbridled enforcement discretion, relying on a D.C. Circuit case. *See Act Now to*

*Stop War & End Racism Coal. & Muslim Am. Soc'y Freedom Found. v. District of Columbia*, 846 F.3d 391, 409-10 (D.C. Cir. 2017). We have not decided that question. Nor do we have to decide it here, because even if that is true, Carpenter has not pled a plausible unbridled discretion claim.

Carpenter's complaint cannot plausibly allege that the Unwelcome Clause gives New York authorities unbridled discretion when she "fail[s] to cite even a single example of discrimination in enforcement . . . much less show . . . a pattern of discriminatory enforcement." *Telescope Media Grp.*, 936 F.3d at 762 (rejecting a vagueness challenge to a Minnesota public accommodations law); *see also Smith v. Goguen*, 415 U.S. 566, 582 n.31 (1974) (noting that "the validity of statutes . . . insofar as the vagueness doctrine is concerned, will depend as much on their judicial construction *and enforcement history* as their literal terms" (emphasis added)). Without a plausible unbridled discretion argument, Carpenter's vagueness claim is clearly foreclosed by Supreme Court precedent, and we affirm its dismissal.

## VI. Overbreadth Claim

Finally, like the district court, we conclude that Carpenter has waived any claim that the Unwelcome Clause is facially overbroad.  The "strong medicine" of the overbreadth doctrine is to be used "sparingly and only as a last resort." *Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 997 (2d Cir. 1997) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)).  We will not consider using it here where Carpenter's complaint raises no distinct overbreadth claim and makes only passing reference to overbreadth on two occasions within 350 paragraphs, buried in lists of First Amendment doctrines without supporting factual allegations.  The claim was further waived in Carpenter's briefing, which is comparably sparse and fails to provide any basis for the assertion that the law "bans too much."  Appellant's Br. at 60.  Through inadequate pleading and briefing, Carpenter has failed to adequately present this claim to the Court, and we therefore affirm the district court's dismissal on this ground.

54

CONCLUSION

The issues in this case require courts to accommodate competing commitments to equality and to the expressive freedoms guaranteed by the First Amendment. On the one hand, it is clear that the First Amendment protects the "freedom to think as you will and to speak as you think." *303 Creative*, 600 U.S. at 584 (quoting *Dale*, 530 U.S. at 660-61). Laws that are applied to public discourse to coercively alter the messages of private individuals abridge that freedom. *Id.* at 586-87.

On the other hand, it is equally clear that "gay persons and gay couples cannot be treated as social outcasts or as inferior in dignity and worth," and that "the laws and the Constitution can, and in some instances must, protect them in the exercise of their civil rights." *Masterpiece Cakeshop*, 584 U.S. at 631. One important way of guaranteeing this protection is through the longstanding tradition of public accommodations laws, which states have "broad authority" to enact in order to remove "the barriers to economic advancement and political and social integration that have historically plagued certain disadvantaged groups."

*Roberts*, 468 U.S. at 625-26; *see also 303 Creative*, 600 U.S. at 590.  In light of these compelling interests, public accommodations laws generally do not violate the First or Fourteenth Amendments, unless they are applied in a "peculiar way" so as to compel speech.  *Hurley*, 515 U.S. at 572; *see also 303 Creative*, 600 U.S. at 600 n.6.

Following the Supreme Court's decision in *303 Creative*, we agree with Defendants' concession that Carpenter's complaint states a claim that New York's public accommodations laws compel her to speak in violation of the First Amendment.  However, in light of *303 Creative*'s fact-intensive First Amendment analysis, we deny Carpenter's request for entry of a preliminary injunction and instead remand to the district court for determination on a factual record.  As to all of her other claims, we hold that dismissal was proper.  Accordingly, the judgment of the United States District Court for the Western District of New York is **AFFIRMED** in part, **REVERSED** in part, and **VACATED** in part.  We **REMAND** for further proceedings consistent with this Opinion.